DEC 30 2024 PM 12:57
FILED-USDC-CT-HARTFORD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Jason Rolo, | Case No.: _____ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CONSTITUTIONAL PRINCIPLES** |
| v. | |
| SECURITIES & EXCHANGE COMMISSION | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY | |
| DEPOSITORY TRUST & CLEARING CORPORATION | |
| JOHN DOE 1 - 100 | **JURY TRIAL DEMANDED** |
| Defendants, | |

1

## I.  **INTRODUCTION**

1. This lawsuit arises from a pervasive pattern of market manipulation, regulatory negligence, and constitutional violations that have caused significant financial harm to retail investors. The case focuses on the trading and governance failures associated with Meta Materials, Inc.'s Series A Preferred Shares (MMTLP) and their transition to Next Bridge Hydrocarbons (NBH). The Plaintiff, Jason Rolo, seeks to hold accountable the entities and individuals responsible for these systemic failures, including regulatory bodies such as the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC), as well as market makers and broker-dealers who profited at the expense of retail investors.

a.) On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares, effectively freezing trading activity and preventing investors from accessing their assets. While FINRA cited "extraordinary circumstances" as justification, this action has faced widespread criticism for procedural inconsistencies, lack of transparency, and potential constitutional violations. The halt, implemented without resolving discrepancies in share reconciliation, exacerbated financial losses for retail investors and undermined expectations of regulatory accountability and clarity. While FINRA may assert immunity in defense of these actions, regulatory immunity does not shield conduct that exceeds statutory authority or violates constitutional principles. As established in *SEC v. Sloan, 436 U.S. 103 (1978)*, regulatory bodies are not immune from judicial scrutiny when their actions contravene procedural safeguards designed to protect public interests.

b) Beyond the MMTLP trading halt, FINRA's refusal to disclose Blue Sheets, essential for tracking transactional activity, highlights significant regulatory shortcomings. Under the Anti-Money Laundering Act (AMLA), regulators must detect and report suspicious activities,

including manipulative practices like synthetic share creation and naked short selling. FINRA's failure to disclose these records hindered investigations into financial crimes and obstructed efforts to enforce market integrity. These statutory obligations are not discretionary, and failure to comply with AMLA's requirements places FINRA's actions outside the scope of any claimed immunity. This failure recalls the deficiencies highlighted in *In re Bernard L. Madoff Investment Securities LLC, 740 F.3d 81 (2d Cir. 2014)*, where regulatory inaction enabled a massive fraud scheme to persist unchecked. Such inaction not only jeopardizes market integrity but also erodes investor trust in regulatory institutions tasked with safeguarding financial systems.

c) Further compounding these regulatory failures, this lawsuit challenges the constitutional underpinnings of FINRA's authority, citing violations of the nondelegation doctrine and the Appointments Clause. As articulated in *Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010)*, and *Loper Bright Enterprises v. Raimondo, 143 S. Ct. 2427 (2024)*, the improper delegation of governmental powers to private entities undermines essential principles of accountability and oversight. FINRA, as a privately controlled self-regulatory organization wielding quasi-governmental powers, operates within a governance structure that raises profound concerns about due process and the absence of meaningful checks and balances. Immunity cannot shield actions that violate constitutional principles of governance structures that fail to provide adequate safeguards for fairness and accountability. These issues are further highlighted in *Alpine Securities Corp. v. FINRA, 982 F.3d 68 (D.C. Cir. 2020)*, which exposed procedural flaws in FINRA's enforcement actions and their adverse implications for due process. Together, these constitutional challenges underscore the systemic governance failures that have exacerbated investor harm and undermined public confidence in regulatory institutions.

d) To address these pervasive deficiencies and the resulting financial harm to retail investors, this complaint also seeks comprehensive remedial actions. These include the release of Blue Sheet records to enhance transparency, audits to identify and reconcile synthetic shares, and structural reforms to prevent future market irregularities. Such measures are essential to restoring market integrity and investor trust. Legal precedents, including *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963)*, emphasize the critical role of transparency and oversight in preventing fraudulent practices and safeguarding market fairness. By seeking these remedies, the Plaintiff aims not only to redress past harms but also to ensure that regulatory bodies fulfill their statutory mandates to maintain orderly and equitable financial markets.

e) Collectively, these allegations present the Court with a critical opportunity to address a pervasive pattern of regulatory failures, constitutional violations, and market manipulation that have caused significant harm to retail investors. The issues raised in this case, including FINRA's failure to comply with its statutory obligations under AMLA, underscore the need for enhanced transparency, accountability, and oversight within the financial regulatory framework. By considering the Plaintiff's request for remedial measures—such as the release of Blue Sheet records, audits to identify synthetic shares, and structural reforms—the Court has the chance to rectify these systemic deficiencies, uphold the principles of fairness and due process, and restore investor confidence in the integrity of U.S. financial markets. In doing so, the Court can affirm that immunity does not extend to actions that exceed statutory authority or violate constitutional principles, ensuring that accountability and fairness remain central to regulatory oversight.

## II.    JURISDICTION AND VENUE

2.  Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act

(15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 1 Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.2–27).

3. Diversity jurisdiction is proper under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000, excluding interest and costs, and there is complete diversity between the Plaintiff, a Connecticut resident, and the Defendants, whose principal offices are in New York, Washington, D.C., and currently unknown locations.

4. Venue is appropriate in the United States District Court for Connecticut under 28 U.S.C. § 1391(b) and C.G.S § 52-59(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

## III.    **PARTIES**

5.  Plaintiff: Jason Rolo (hereinafter referred to as "Plaintiff" or "Rolo") has at all times mentioned herein been a resident and citizen of the City of Torrington, in the County of Litchfield, in the State of Connecticut. He is a small business owner and shareholder of Meta Materials and Next Bridge Hydrocarbons.

6.  Defendant Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

7.  Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry Regulatory Authority (hereinafter "FINRA") is a self-regulatory organization authorized by the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and ensure

compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006.

8. Defendant Depository Trust & Clearing Corporation (DTCC): The Depository Trust & Clearing Corporation (hereinafter "DTCC") is a financial services organization responsible for providing clearing, settlement, and information services for securities trading in the United States. DTCC is headquartered at 55 Water Street, New York, New York, 10041.

9. John Does 1-100 (hereinafter collectively referred to as "Doe Defendants or market participants"): Market makers, broker-dealers, and other entities whose identities are currently unknown but are believed to have participated in the alleged misconduct.

## IV.    STATEMENT OF FACTS

10. The Committee on Uniform Securities Identification Procedures (CUSIP) assigns unique nine-character identifiers to financial securities, ensuring accurate processing, clearing, and settlement of transactions. Unlike Central Index Key (CIK) numbers issued by the SEC to identify filing entities, CUSIP numbers apply to specific securities and change with formal corporate actions.

11. On May 2, 2008, Pole Perfect Studios registered as a private company under CIK number 0001431959. After merging with Torchlight Energy Resources on November 23, 2010, the CIK number transferred to Torchlight, ensuring compliance with SEC regulations and continuity in governance.

12. Between 2013 and 2020, Torchlight Energy Resources (TRCH) reported an aggregate trading volume of approximately 745 million shares in public markets, underscoring significant investor activity within the oil exploration sector. On April 11, 2019, then-CEO John Brda and Chairman

Greg McCabe issued public statements that substantially overstated the valuation of oil and gas properties associated with the NBH designation. These statements, which included a third-party estimate of 3.678 billion barrels of recoverable oil, played a pivotal role in bolstering investor confidence, attracting new capital, and maintaining the company's stock price above Nasdaq's $1.00 per share minimum listing requirement. Industry-standard valuation metrics estimated the potential below-ground value of these reserves to range from $20.96 billion to $41.92 billion. Torchlight subsequently promoted these assets in a March 1, 2020, investor presentation, positioning the Orogrande Basin as its flagship project and emphasizing its acquisition potential, while acknowledging inherent market risks.

13. The onset of the COVID-19 pandemic in March 2020 caused substantial disruptions in the oil industry, driven by a sharp decline in demand and heightened price volatility. Crude oil prices, including West Texas Intermediate (WTI), plummeted to historic lows, with WTI reaching an unprecedented -$37.63 per barrel on April 20, 2020. These adverse market conditions exposed vulnerabilities in small-cap energy companies, creating opportunities for short sellers to capitalize on the instability, thereby exacerbating the challenges faced by the energy sector.

14. Torchlight Energy Resources experienced a significant decline in its financial position due to the pressures of aggressive short selling, prompting the company to pursue a strategic merger with MetaMaterials Inc. In June 2020, Torchlight's Board of Directors devised a plan to merge with MetaMaterials, a Canadian technology firm, as a strategic response to systemic challenges associated with market manipulation and short selling. The merger was presented to shareholders as a pivotal measure to mitigate these issues, stabilize the company's financial health, and reposition Torchlight as a forward-looking high-tech innovation entity.

15. The merger between Torchlight Energy Resources, a Texas-based oil exploration company, and MetaMaterials Inc., a Canadian high-technology materials firm, was introduced as a strategic response to mitigate the adverse impacts of short selling on Torchlight's financial stability. Announced on December 14, 2020, the merger sought to capitalize on MetaMaterials' cutting-edge technologies to enhance shareholder value, diversify operational focus, and strategically reposition both entities within their respective industries to achieve long-term growth and stability.

16. Pursuant to the Reverse Takeover Agreement, shareholders of Torchlight Energy Resources were issued one Series A share dividend for each share held as of June 24, 2021. The settlement adhered to a T+2 timeline, necessitating that all acquisitions be completed by June 22, 2021. Concurrently, options for TRCH stock were introduced, aligning with the company's underwritten public offering conducted by Roth Capital Partners LLC in June 2021.

17. Between January 1, 2021, and June 21, 2021, Torchlight Energy Resources experienced an extraordinary trading volume of 3.6 billion shares, representing a substantial deviation from its historical averages. This unprecedented surge in trading activity raised credible concerns regarding potential market manipulation.

18. A Z-test statistical analysis conducted on July 14, 2024, further corroborated these concerns. By analyzing historical trading data from 2013 to 2020, the analysis revealed that the trading volume during the six-month period in 2021 deviated significantly from established norms. The results demonstrated that such an extraordinary surge in trading activity was statistically improbable in the absence of clear evidence of market manipulation or extraordinary market events.

19. Based on the available evidence, GTS Securities, in coordination with other market participants, is suspected of engaging in naked short selling of TRCH stock during the first half of 2021. Indicators such as patterns of fail-to-deliver positions and inconsistencies in reported trading volumes strongly point to deliberate market manipulation, which appears to have played a significant role in driving the excessive trading activity observed during this period.

20. According to OCC Memorandum #48884, dated June 21, 2021, TRCH options were reclassified under the designation TRCH1, consisting of 100 shares of TRCH common stock and 100 shares of Series A Preferred Shares. The settlement of these reclassified options was delayed due to regulatory uncertainties and prevailing market conditions. On June 25, 2021, Torchlight Energy Resources finalized its Reverse Takeover (RTO) transaction with MetaMaterials. As part of the transaction, the CUSIP number 59134N104 and Central Index Key (CIK) 0001431959 were reassigned to MetaMaterials, which subsequently implemented a 2-for-1 reverse stock split of its outstanding shares.

21. On June 25, 2021, the Options Clearing Corporation (OCC) issued memoranda (#48904 and #48905) detailing changes to TRCH options, effective June 28, 2021. Under these changes, TRCH1 options were converted into MMAT1 options, which represented 50 common shares of Meta Materials, Inc. (MMAT) and 100 Series A Preferred Shares of Torchlight Energy Resources, Inc. Additionally, TRCH options were reclassified as MMAT2 options, representing 50 common shares of MMAT without dividend entitlements. Settlement for these reclassifications was delayed, pending clarification regarding the trading status of the affected securities.

22. Following the merger between Torchlight Energy Resources, Inc. (TRCH) and Meta Materials Inc. (MMAT), it was observed that a significant number of short positions in TRCH

remained unresolved, contrary to expectations. According to data from FINRA, as reported on TradingView, approximately 30 million shares remained sold short, representing an estimated value of $150 million. Post-merger, MMAT commenced trading on public markets, while TRCH ceased trading entirely. In line with the merger's legal structure, which had been approved by the SEC, shareholders received a temporary, non-tradable placeholder dividend in their accounts, reflecting their entitlement under the terms of the merger.

23. On June 28, 2021, Torchlight Energy Resources distributed a Series A dividend to all shareholders of record, totaling 165,472,241 shares. These Series A Preferred Shares were later re-designated as Meta Materials Torchlight Preferred (MMTLP) shares in brokerage accounts, including platforms such as Robinhood and E*Trade. The MMTLP shares were structured to represent ownership interests in the assets of Torchlight Energy Resources, Inc., which were earmarked for transition to private ownership under the NBH designation. Notably, these shares were not intended for public trading but rather served as a representation of shareholder stakes in the spin-off entity.

24. In June 2021, GTS, under the leadership of Ari Rubenstein, collaborated with Canaccord Genuity to register the "Series A Preferred Stock" for trading on the OTC market. This action was executed without obtaining the approval or consent of Torchlight Energy Resources (TRCH) or Meta Materials executives, thereby circumventing established corporate governance protocols. To accomplish this, GTS and Canaccord knowingly submitted falsified Form 211 filings in violation of FINRA regulations. These filings relied on outdated and inaccurate information, some of which was over a decade old, resulting in the unauthorized tradability of MMTLP shares. This unauthorized action subsequently became a focal point of regulatory scrutiny and public concern.

25. According to OCC Memorandum #48884, the "Series A Preferred Shares" were not intended to be listed on any national securities exchange. However, the memorandum allowed for the potential of over-the-counter (OTC) market transactions or broker-to-broker settlements for TRCH1 options in the absence of a developed market. In instances where the delivery of the securities failed, the OCC mandated cash settlements as a contingency. This directive was inconsistent with the intentions and official filings of the merged companies, Torchlight Energy Resources and Meta Materials, regarding the handling and settlement of the Series A Preferred Shares, creating a divergence from their stated corporate and regulatory objectives.

26. GTS, under the direct oversight of Ari Rubenstein, had a regulatory obligation to accurately record all short sales, including transactions involving naked short selling. The firm was granted additional time to close out fail-to-deliver positions under the "market maker exemption" rule. This exemption, however, required strict compliance with specific regulatory conditions, including transparent and detailed reporting of fail-to-deliver positions, as outlined in FINRA Rule 204(b). Despite these clear obligations, FINRA reportedly failed to inspect or verify GTS's adherence to these requirements, raising concerns about oversight and regulatory enforcement in this matter.

27. The Depository Trust & Clearing Corporation (DTCC), along with its subsidiary, the National Securities Clearing Corporation (NSCC), holds a fundamental responsibility for upholding transparency and accuracy within the securities clearing and settlement process. This includes the meticulous maintenance of transaction records, the assurance of market integrity, and strict adherence to regulatory reporting requirements. These duties are vital to maintaining the stability of financial markets, fostering trust, and safeguarding the interests of investors.

28. The DTCC and its subsidiaries, including the NSCC and FICC, hold a monopolistic position in securities clearing and settlement processes. This dominance restricts competition in the financial markets, creating vulnerabilities that allow systemic inefficiencies, such as unresolved failures to deliver (FTDs) and settlement discrepancies. Such practices may constitute a violation of the Sherman Antitrust Act by restraining trade and suppressing market competition.

29. The Depository Trust & Clearing Corporation (DTCC), through its subsidiaries, the Fixed Income Clearing Corporation (FICC) and National Securities Clearing Corporation (NSCC), is responsible for clearing and settling U.S. Treasury securities transactions. On December 23, 2024, U.S. Treasury settlement failures at the DTCC reached their highest daily value of the year, amounting to $73.87 billion. As of December 24, 2024, the aggregate daily failures totaled approximately $6.63 trillion, reflecting ongoing systemic inefficiencies in the clearing and settlement processes. These unresolved settlement failures exacerbate market instability and highlight significant lapses in regulatory oversight, underscoring the need for comprehensive reform to safeguard the integrity of U.S. financial markets.

30. On October 7, 2021, GTS and Canaccord Genuity commenced unauthorized public trading of MMTLP shares, directly violating the terms outlined in Torchlight Energy Resources' proxy statement, which expressly prohibited such activity. This action was carried out in disregard of established corporate governance protocols and applicable regulatory requirements. Additionally, Meta Materials and MMTLP were improperly assigned the same Central Index Key (CIK) number, 0001431959, in contravention of SEC regulations mandating unique identifiers for separate entities. This violation compromised accurate record-keeping and market transparency, further exacerbating regulatory concerns surrounding these transactions.

31. The shared use of the same Central Index Key (CIK) number by Meta Materials and MMTLP raises significant concerns about the potential obfuscation of transaction records, potentially misleading investors and violating Rule 10b-5 of the Securities Exchange Act of 1934. Rule 10b-5 expressly prohibits any act, practice, or omission that involves deceptive or fraudulent misrepresentation of material facts in connection with securities transactions. Such actions undermine market integrity, erode investor confidence, and expose the involved parties to regulatory scrutiny and potential legal consequences.

32. On October 6, 2021, John Brda, the former CEO of Torchlight Energy Resources, reported the unauthorized trading of the Series A dividend (MMTLP) to OTC Markets. OTC Markets redirected Brda to FINRA, which dismissed the complaint on the grounds that, as a former executive, he lacked the requisite standing to file such a claim. Between October 7, 2021, and December 8, 2022, GTS, operating under its market maker exemption, engaged in the trading of synthetic MMTLP shares that were issued without proper "locates." This activity led to a share issuance exceeding the authorized float, constituting violations of FINRA Rule 2010, Regulation SHO, and Section 10(b) of the Securities Exchange Act of 1934.

33. At its inception, MMTLP was placed on the OTC Threshold List, indicating the presence of substantial aggregate fail-to-deliver (FTD) positions that persisted for five or more consecutive settlement days, as outlined by Rule 203(b)(3) of Regulation SHO and FINRA Rule 4320. Despite this designation, FINRA failed to take corrective action to address these ongoing FTDs, representing a clear abdication of its regulatory responsibilities under Regulation SHO. This failure allowed manipulative market practices to persist unchecked, undermining market integrity and investor protections.

34. The Depository Trust & Clearing Corporation (DTCC), charged with the critical role of clearing and settling securities transactions, has failed to address the alarming levels of unresolved fail-to-deliver (FTD) obligations. Current data indicate billions of dollars in unresolved FTDs, representing a systemic issue that significantly undermines market integrity and investor confidence. These unresolved positions create an environment conducive to manipulative practices, including the creation of synthetic shares and naked short selling, which destabilize the financial system. The DTCC's inability or unwillingness to fulfill its statutory responsibilities highlights a broader collapse in regulatory oversight, where investor protections are effectively nullified, and fraudulent activities persist unchecked, eroding trust in the financial markets.

35. The persistent failure to resolve Treasury settlement obligations aligns with broader market inefficiencies, including failures to deliver (FTDs). The facilitation of Treasury and securities transactions through the Fixed Income Clearing Corporation (FICC) and the National Securities Clearing Corporation (NSCC), both subsidiaries of the Depository Trust & Clearing Corporation (DTCC), underscores systemic vulnerabilities that contribute to market manipulation and investor harm. Despite the critical role of the FICC as the sole central counterparty for U.S. government securities and the NSCC for equities and other securities, these failures indicate significant operational and regulatory gaps in their respective markets.

36. Section 5318(g) of the Anti-Money Laundering Act (AMLA) imposes a duty on financial institutions and regulatory agencies to detect and report suspicious activities, including irregularities in share transactions and settlement discrepancies. FINRA's ongoing refusal to release Blue Sheets, essential records for investigating these issues, represents a significant breach of its statutory obligations.

37. This inaction parallels the regulatory failures highlighted in *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), where regulatory complacency permitted fraudulent activities to persist unchecked. By failing to fulfill its obligations under AMLA, FINRA has further eroded market integrity and investor confidence, exacerbating risks to the financial system and weakening essential safeguards designed to protect against illicit activity.

38. FINRA failed to enforce the mandatory close-out provisions of Regulation SHO, which require broker-dealers to resolve fail-to-deliver (FTD) positions that persist for more than 13 consecutive settlement days. This regulatory lapse allowed FTD positions to remain unresolved, enabling prolonged market manipulation. Such inaction constituted a violation of FINRA Rule 11810, which governs the timely close-out of failed trades. The failure to enforce these provisions has caused significant harm to investors, undermined market integrity, and perpetuated conditions conducive to fraudulent practices.

39. On March 23, 2023, FINRA disclosed in a FAQ that a "systems coding error" had incorrectly classified MMTLP as a non-SEC-reporting company. This misclassification contributed to MMTLP's improper inclusion on the Threshold Securities List, further exacerbating regulatory lapses. In addition, FINRA's unauthorized decision to allow public trading of MMTLP—a Series A Preferred Share explicitly not intended for public trading—compounded these errors.

40. Between October 1 and December 8, 2022, MMTLP shares experienced extreme price volatility, ranging from $2.85 to $12.50, with market capitalization fluctuating between $1.5 billion and $6.5 billion. This volatility, given the authorized share count of 165.5 million, suggests synthetic shares or naked short selling, potentially violating FINRA Rule 5210 and anti-manipulation provisions of the Securities Exchange Act of 1934.

41. On December 6, 2022, FINRA announced a corporate action to cancel MMTLP shares and replace them with shares of Next Bridge Hydrocarbons, effective December 13, 2022. However, the procedural irregularities surrounding this corporate action raised concerns about compliance with FINRA Rule 6490, which governs the proper handling and execution of corporate actions to ensure fairness and transparency.

42. On December 7, 2022, FINRA and Meta Materials confirmed the corporate action, halting all new trades in MMTLP shares post-December 8, 2022, while allowing close-only trades on December 9 and 12, 2022. The action specified that MMTLP shares would be officially canceled on December 13, 2022, with a pay date for the distribution of Next Bridge Hydrocarbons shares or dividends set for December 14, 2022.

43. On December 7, 2022, Jeff Mendl, Vice President of OTC Markets, announced that MMTLP shares would remain tradable until December 12, 2022, pursuant to FINRA's directive, with their removal from the OTC market scheduled for December 13, 2022. The lack of clear and consistent guidance provided to market participants during this transition raised potential compliance issues under FINRA Rule 2010, which mandates adherence to high standards of commercial honor and equitable principles of trade. Additionally, on December 8, 2022, multiple brokerage firms applied a "Caveat Emptor" designation to MMTLP shares, categorizing them as high-risk securities. This designation, coupled with inadequate disclosure to investors, may constitute a material omission in violation of Rule 10b-5 of the Securities Exchange Act of 1934, which prohibits misleading statements or omissions of material facts in connection with the purchase or sale of securities.

44. On December 8, 2022, FINRA and the DTCC convened a call to address unresolved issues related to the corporate action. Notably, legal representatives of Meta Materials and Next Bridge

Hydrocarbons were excluded from this discussion, raising concerns about transparency and adherence to due process requirements under FINRA Rule 3110, which governs supervisory obligations.

45. Later that day, FINRA unilaterally amended the corporate action notice, changing the language from "CANCELLED" to "DELETED" and removing the December 14, 2022, pay date. These modifications, made without issuer consent, resulted in significant confusion among shareholders and disrupted the corporate action process. Such actions appear to contravene FINRA Rule 6490, which requires issuer authorization for amendments impacting compliance with SEA Rule 10b-17, thereby further exacerbating concerns about regulatory compliance and procedural integrity.

46. In a sworn affidavit submitted in *Inter-coastal Waterways LLC v. Tradestation v. FINRA* (Civil Action No. 0:24-cv-60891-AHS, Southern District of Florida), George Palikaras asserted that FINRA unilaterally revised the corporate action on December 7, 2022, following discussions with the Depository Trust & Clearing Corporation (DTCC). This revision was executed without consultation or authorization from Meta Materials or Next Bridge Hydrocarbons, underscoring a significant lack of transparency and deviation from established corporate governance and regulatory protocols.

47. At the close of trading on December 8, 2022, short position holders employed the 505 code (S.O.S.), signaling an urgent need to close positions. Transactions during this period exceeded 100 times the closing price, reflecting a severe short squeeze and indicating systemic market manipulation, potentially in violation of FINRA Rule 6140, which governs trading practices to prevent manipulation.

48. After December 8, 2022, brokerages received limit orders for MMTLP shares, ranging from under $100 to $200,000 per share, many marked as "too late to cancel." This mishandling affected over 65,000 shareholders, as noted in *Traudt v. Rubenstein (2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont)*, raising concerns about regulatory compliance in trading and settlement.

49. On December 9 and 12, 2022, MMTLP shareholders, including the plaintiff, attempted to sell shares ahead of a corporate action. However, FINRA imposed a U3 trading halt on December 9, citing "extraordinary circumstances." This halt froze shareholder investments, blocked planned transactions, and raised concerns about fairness and compliance with FINRA Rule 2010, which mandates transparency and equitable trading practices.

50. FINRA's notice on December 9, 2022, justified the U3 trading halt on the grounds of uncertainty surrounding the settlement and clearing processes, claiming the action was necessary to protect investors and the public interest. Despite this justification, the halt, which officially ended on December 13, 2024, failed to address or resolve the underlying issues. As of December 29, 2024, the matter remained unresolved for 750 days, leaving affected shareholders without meaningful remedies and raising serious concerns about FINRA's effectiveness in managing and resolving disputes in a timely and equitable manner.

51. FINRA's handling of the U3 trading halt on December 9, 2022, constitutes a violation of investors' Fifth Amendment due process rights. By unilaterally freezing trading activity, FINRA deprived investors of their financial interests without adequate notice or an opportunity to seek redress. When evaluated under the standard established in *Mathews v. Eldridge* (424 U.S. 319, 1976), which balances the private interest affected, the risk of erroneous deprivation, and the governmental interest at stake, FINRA's actions failed to incorporate sufficient procedural

safeguards. As a result, the halt was constitutionally deficient, leaving investors without adequate protections against arbitrary regulatory actions.

52. FINRA's authority to impose trading halts originates from the Securities Exchange Act of 1934, which vests it with broad regulatory powers to oversee market activities and address irregularities. However, as a private entity operating with quasi-governmental authority, FINRA's governance structure—led by a privately appointed Board of Governors—raises significant constitutional concerns regarding the separation of powers. The absence of direct federal oversight diminishes accountability and raises questions about its legitimacy as a regulatory body. These issues are particularly evident in the events surrounding the MMTLP corporate action and the imposition of the U3 trading halt, which highlight the potential for arbitrary decision-making and inadequate procedural safeguards in the absence of meaningful oversight.

53. The lack of federal appointment or oversight of FINRA's governance raises significant structural concerns regarding its legitimacy and accountability, potentially violating the Appointments Clause of the U.S. Constitution. This clause requires that principal officers of the United States, or those exercising significant governmental authority, be appointed by the President or other constitutionally designated entities.

54. Despite approving Next Bridge Hydrocarbons' (NBH) S-1 filings in 2022, FINRA failed to impose position-close-only restrictions on MMTLP shares before the U3 trading halt. These restrictions could have reduced volatility and stabilized the transition, highlighting FINRA's regulatory shortcomings and raising concerns about its oversight.

55. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged the existence of unresolved short positions in Next Bridge Hydrocarbons, a private company not

intended for public trading. Coulson noted that resolving these short positions would likely have been more manageable if Next Bridge shares had been publicly tradable, indirectly underscoring the complications arising from FINRA's actions. This statement further emphasized the regulatory and procedural missteps that contributed to the challenges in addressing market irregularities during the corporate transition.

56. FINRA issued its first FAQ on March 16, 2023—97 days after the U3 trading halt—yet failed to provide a clear explanation of the "extraordinary circumstances" that purportedly justified the decision. Compounding concerns, on February 20, 2023, a TD Ameritrade (TDA) employee, identified as Fleming, admitted during a recorded conversation with Traudt that the December 9, 2022, U3 halt was requested by broker-dealers to "protect ourselves," prioritizing institutional interests over the protection of retail investors (*Traudt v. Rubenstein*, 2024, Docket No. 2:34-cv-782, U.S. District Court for the District of Vermont).

57. Although TDA initially granted Traudt access to the recording, this access was later denied following TDA's acquisition by Charles Schwab. The repeated refusal to release the audio raises significant concerns about a coordinated effort to suppress evidence that could illuminate the rationale behind the trading halt.

58. Pursuant to FINRA Rule 6180, trading halts are permitted when an exchange or market maker suspects that trading violates U.S. securities laws. A delay of several days following the detection of fraudulent activity could constitute a violation of this rule, particularly if the trading halt could have mitigated further harm to investors. Documents obtained through a Freedom of Information Act (FOIA) request in April 2023 revealed that trading irregularities involving MMTLP shares were flagged on the Securities and Exchange Commission's (SEC) fraud monitoring systems on December 5, 2022. On December 9, 2022, the Financial Industry

Regulatory Authority (FINRA) imposed a U3 trading halt pursuant to FINRA Rule 6440. Internal communications from December 2022 confirm that FINRA's Corporate Action Team and Market Fraud Investigations Team, in coordination with the SEC, were actively investigating these irregularities. Despite this, the trading halt was imposed without adequate transparency or clear justification, raising questions about whether FINRA complied with the procedural and substantive requirements of FINRA Rule 6440, including the obligation to provide clear, consistent communication of material information and adhere to procedural safeguards intended to protect investors.

59. Access to Blue Sheets, which contain transactional data for MMTLP and MMAT shares, is essential for identifying potential manipulative trading practices, including synthetic share creation and naked short selling. These documents are necessary to resolve discrepancies between reported trade volumes and legitimate share issuances and to substantiate allegations of market manipulation. The ongoing denial of access to Blue Sheets has obstructed transparency, impeded the enforcement of anti-money laundering laws, and left critical questions unanswered regarding the extent of market disruptions. The release of these documents would advance accountability, facilitate independent investigations, and restore investor confidence by ensuring regulatory transparency.

60. Since the SEC and FINRA were aware of potential fraud in MMTLP on December 5th, as confirmed by FOIA documents, but delayed halting trading until December 9th and refused to provide transparency through blue sheets or other disclosures, this constitutes a dereliction of duty, a breach of fiduciary duty, and a violation of the Administrative Procedure Act (APA), as they failed to act promptly to protect investors, enforce securities laws, and ensure market integrity.

61. On April 18, 2023, Clifton Dubose, CEO of Next Bridge Hydrocarbons, formally requested the assistance of the Financial Industry Regulatory Authority (FINRA) to address unresolved issues arising from the MMTLP spin-off. In his request, Dubose expressed concerns regarding unresolved short positions and the detrimental effects of FINRA's actions, including the U3 trading halt imposed on December 9, 2022. Dubose proposed a temporary trading period to reconcile outstanding shares and urged FINRA to address discrepancies to preserve market integrity. On June 7, 2023, FINRA denied this request without providing substantive solutions or addressing the concerns of affected investors.

62. On September 28, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned Securities and Exchange Commission (SEC) Chair Gary Gensler regarding issues related to MMTLP. Representative Norman specifically asked whether Chair Gensler was aware of the aggregate share count for MMTLP as of December 8, 2022. Chair Gensler acknowledged familiarity with MMTLP but stated that he did not know the share count, suggesting such information might be publicly available. Dissatisfied with the SEC's responses, Representative Norman indicated his intent to send a follow-up letter requesting detailed information on the matter.

63. On November 6, 2023, 332 days after the imposition of the U3 trading halt, FINRA published a supplemental FAQ addressing the halt. However, the FAQ failed to clearly define the "extraordinary event" purportedly justifying the trading halt. FINRA disclosed that approximately 2.65 million short shares, representing 1.6% of the float, remained open but dismissed this figure as insignificant. The publication was widely criticized by investors for its lack of substantive information and failure to adequately address key concerns related to the halt and its justification.

64. Despite receiving thousands of complaints from affected shareholders, the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) have provided minimal communication or substantive solutions, leaving shareholders without meaningful recourse. Congressional efforts to demand transparency and accountability from these regulatory bodies have been met with resistance or inaction, exacerbating harm to investors and prolonging the uncertainty surrounding the issues in question.

65. On December 22, 2023, Representative Ralph Norman, leading a letter co-signed by over 70 members of Congress, formally addressed the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) regarding issues related to Meta Materials Series A preferred shares (MMTLP). The letter called for increased transparency and accountability in addressing unresolved trading discrepancies and sought a comprehensive resolution to the ongoing issues affecting investors.

66. On January 15, 2024, Clifton Dubose (CEO) and Luke Hawkins (CFO) of Next Bridge Hydrocarbons (NBH) abruptly resigned without explanation, sparking concerns and speculation amidst unresolved trading discrepancies. On January 23, 2024, Greg McCabe sent a letter to Robert Colby, stating that financial institutions were urgently seeking shares in quantities far exceeding FINRA's reported shortfall of 2.65 million shares, indicating the presence of a much larger discrepancy than previously disclosed.

67. On February 8, 2024, Next Bridge Hydrocarbons (NBH) issued a clarification stating that FINRA's reported short interest figures only accounted for U.S. member data, excluding foreign or non-member entities. This omission resulted in a significant underreporting of the actual short interest. NBH further criticized FINRA's characterization of the short interest as "nominal,"

emphasizing that foreign firms had requested shares in quantities far exceeding FINRA's reported figures.

68. Unresolved short sales, persisting over two years after MMTLP shares were deleted on December 13, 2022, highlight significant regulatory failures. FINRA's actions blocked broker-dealers from fulfilling obligations under 17 CFR 242.204 to resolve failures to deliver (FTDs) within T+2 settlement days, worsening market vulnerabilities and eroding investor confidence.

69. Next Bridge Hydrocarbons (NBH) raised significant concerns regarding FINRA's decision to impose the U3 trading halt rather than rejecting the corporate action outright. NBH noted that the terms of the corporate action remained unchanged throughout FINRA's review process, making the halt unnecessary. This decision deprived shareholders of the opportunity to trade and reconcile holdings, leading to widespread investor confusion and financial harm.

70. On June 5, 2024, more than 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, formally requested an investigation into FINRA's handling of the MMTLP U3 trading halt and the unresolved trading issues. The request was made in a letter addressed to SEC Chairman Gary Gensler.

71. Several lawmakers, including Senator Mike Crapo and Vice President (former Senator) JD Vance, submitted additional requests for information to the Securities and Exchange Commission (SEC) regarding unresolved issues related to MMTLP. These inquiries, including a letter from Congress signed by over 70 members, highlighted the receipt of more than 40,000 investor complaints and called for an independent audit of outstanding shares, greater transparency, and a

24

comprehensive SEC briefing. As of the date of this complaint, these requests remain unanswered.

72. As of December 4, 2024, there is no publicly disclosed evidence that the letter from Congress has prompted meaningful action or policy changes by the Financial Industry Regulatory Authority (FINRA) or the Securities and Exchange Commission (SEC). Despite significant Congressional support, including over 70 co-signatories, FINRA and the SEC have made no substantial efforts to address the trading irregularities or the concerns raised by investors.

73. Between 2013 and 2024, the Depository Trust & Clearing Corporation (DTCC) was responsible for overseeing the clearing and settlement of trades involving TRCH, MMAT, and MMTLP shares. However, throughout this period, recurring settlement discrepancies, particularly those involving synthetic shares, caused substantial financial harm and persistent market uncertainty. Despite this, regulatory bodies, including the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the DTCC, failed to take any meaningful action or collaborate effectively to address these issues. Their inaction and gross dereliction of duty left critical trading irregularities unresolved, directly contributing to widespread investor losses and a significant erosion of market integrity.

74. During the 2021 merger of Torchlight Energy Resources and MetaMaterials, the designated transfer agent transitioned from AST to EQ, which assumed responsibility for shareholder reconciliation during the MMTLP-to-NBH transition. Despite EQ's obligation to maintain accurate records and disclose the outstanding share counts, significant discrepancies persist, leaving countless shareholders without clarity on their holdings. EQ's failure to ensure proper reconciliation and transparency has further compounded the confusion and frustration

experienced by investors, highlighting a systemic breakdown in the process that has gone unaddressed by the responsible parties.

75. Over two years after the spin-off, thousands of shares remain unreconciled, tracked through approximately 18 internal CUSIPs not registered with AST/EQ. Brokerages like Robinhood and E*TRADE use internal CUSIP 629999590 for unconverted shares, reflecting systemic reconciliation issues. Delays, compounded by varying brokerage fees, hinder transparency and fair treatment, raising concerns about process integrity.

76. On December 29, 2023, Tradestation publicly announced that the NBH certificates it received did not include lent-out shares. Due to the lack of a market for these shares, Tradestation was unable to recall them or register customer ownership with AST, making it the first brokerage to publicly acknowledge a shortfall in shares allocated during the distribution. This failure to reconcile MMTLP shares with NBH shares highlights significant deficiencies in the securities tracking and trading processes.

77. Pursuant to 17 CFR 242.204, broker-dealers are obligated to resolve failures to deliver (FTD) within T+2 settlement days to preserve market integrity and prevent abusive practices such as naked short selling. However, the deletion of MMTLP securities created a critical regulatory gap, as Rule 204 does not expressly address close-out obligations for securities that have been subject to trading halts or deletions. This gap in the regulatory framework enabled unresolved short positions and synthetic shares to persist, resulting in substantial financial harm to retail investors, creating significant risks of market manipulation, and undermining public confidence in the effectiveness of regulatory oversight.

78. Pursuant to Section 5318(h) of the Anti-Money Laundering Act (AMLA), financial institutions and regulatory bodies are unequivocally mandated to detect and report suspicious activities, including those that involve market manipulation, fraud, or other illicit financial practices. While synthetic share creation and prolonged settlement failures are inherently disruptive to market operations, such activities must be connected to fraudulent or manipulative conduct to trigger AMLA's reporting requirements. FINRA's failure to address the unresolved short interest in MMTLP and related discrepancies constitutes a clear neglect of its regulatory duties. Such neglect, particularly in the face of persistent trading irregularities, not only exposes the market to manipulation risks but also represents a breach of FINRA's obligations under AMLA to prevent financial crimes. By permitting these systemic issues to persist, FINRA has failed to fulfill its statutory responsibilities and undermined its capacity to enforce meaningful regulatory oversight.

79. The MMTLP case highlights the critical need for clear and well-defined regulatory protocols to address extraordinary circumstances, such as prolonged trading halts and ticker deletions. The lack of such protocols in this instance has led to unresolved share discrepancies, causing significant harm to investors and exacerbating systemic risks.

80. The GameStop (GME) event in January 2021 marked a significant inflection point in financial markets, wherein retail investors, galvanized by platforms such as Reddit's WallStreetBets, orchestrated a short squeeze on stocks with heavy short interest. As a result, GameStop's stock price soared by over 1,000% within a matter of days, attracting immediate attention from both regulatory bodies and the public. In response to the unprecedented market volatility, the Securities and Exchange Commission (SEC) issued statements addressing the situation, while brokerages like Robinhood temporarily imposed trading restrictions, citing

liquidity concerns. Congressional hearings were convened, featuring testimony from industry participants, and regulators committed to investigating the systemic risks exposed by the event. The GameStop episode thus garnered significant media attention and prompted swift regulatory scrutiny, underscoring the need for a deeper examination of market dynamics and investor protection mechanisms.

81. In stark contrast to the regulatory response to the GameStop event, the MMTLP incident on December 9, 2022, exposed significant disparities in regulatory actions. On that date, the Financial Industry Regulatory Authority (FINRA) imposed a sudden U3 trading halt on Meta Materials' Series A Preferred Shares (MMTLP), just two days before the planned transition of these shares to Next Bridge Hydrocarbons. In contrast to the GameStop incident, where trading resumed promptly, the MMTLP trading halt has remained in effect for over 750 days as of December 29, 2024. While FINRA justified the halt by citing an "extraordinary event," it has failed to provide adequate transparency or a detailed explanation, leaving investors uncertain and raising serious concerns about the sufficiency and consistency of regulatory oversight.

82. FINRA's communication regarding the MMTLP trading halt was delayed by 97 days, with an initial, vague FAQ released in March 2023. A supplemental FAQ issued 332 days later failed to address critical concerns, including allegations of synthetic shares and apparent regulatory failures. Despite thousands of complaints submitted to FINRA, the Securities and Exchange Commission (SEC), and Congress, no comprehensive investigations or hearings have been conducted. As a result, shareholders remain unable to trade their holdings, enduring ongoing losses and a lack of resolution to their claims.

83. Unlike the GameStop episode, which garnered immediate regulatory scrutiny, the MMTLP case has been met with prolonged inaction from regulatory bodies. This disparity underscores inconsistencies in the treatment of market disruptions that impact retail investors.

84. Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. These practices artificially inflated market supply, suppressed the true value of legitimate shares, and resulted in significant financial losses for retail investors. Additionally, institutional players have evaded their obligations to close short positions, frequently utilizing synthetic shares and engaging in naked short selling. In the event of a bankruptcy by Next Bridge Hydrocarbons, the shares could become worthless, effectively absolving short sellers of their liabilities.

85. Public records and shareholder complaints from 2023 and 2024 highlight systemic delays in addressing trading discrepancies related to MMTLP shares, leaving retail investors without adequate resolution. The prolonged regulatory inaction, especially when contrasted with the swift response to the GameStop case, has significantly undermined confidence in the transparency and fairness of U.S. financial markets, raising critical concerns about the equitable treatment of investors.

86. Retail investors have faced ongoing difficulties accessing their investments in MMTLP shares following the imposition of the U3 halt. Many report being unable to liquidate their holdings due to the trading halt, as well as significant obstacles in transferring their shares from street name to direct registration. These barriers have exacerbated financial strain for investors, preventing them from fully exercising their rights and control over their investments.

87. FINRA and the SEC have consistently denied access to Blue Sheet records for MMAT and MMTLP shares, despite numerous formal requests from shareholders, legal representatives, and advocacy groups, hindering efforts to investigate critical trading activities, including allegations of naked short selling, synthetic share creation, and market manipulation. By withholding these essential documents, FINRA and the SEC may be in violation of the Administrative Procedure Act (APA), which mandates transparency and access to information necessary for public oversight. This refusal to disclose Blue Sheets has compounded the challenges faced by retail investors and raised serious concerns about about regulatory effectiveness

88. The scope of FINRA's authority in disciplinary and enforcement matters, including the U3 halt, highlights its central role in securities regulation. However, this authority raises constitutional questions regarding the adequacy of oversight, governance, and compliance with legal doctrines such as nondelegation. The nondelegation doctrine prohibits Congress from delegating legislative powers to private entities without clear and specific guidelines. FINRA's broad regulatory powers, coupled with the limited scope of judicial review, present potential conflicts with these constitutional principles, highlighting the need for enhanced oversight and accountability mechanisms to ensure that FINRA's actions align with constitutional and statutory requirements.

89. The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo* (June 2024) overturned the Chevron doctrine, mandating that courts independently assess whether agencies act within their statutory authority. This ruling has direct implications for evaluating FINRA's quasi-governmental status and its regulatory practices. The delegation of governmental powers to private entities such as FINRA raises significant concerns regarding the constitutional principle of separation of powers. The private nondelegation doctrine specifically addresses the

unconstitutional delegation of governmental authority to private actors, underscoring the lack of appropriate oversight and legislative guidance in FINRA's broad regulatory powers.

90. While Self-Regulatory Organizations (SROs) like FINRA are vested with the authority to enforce rules and impose sanctions, the SEC's repeated failure to intervene in instances of regulatory overreach has substantially weakened both regulatory accountability and investor confidence. FINRA's misuse of Rules 6490 and 6440 during the U3 halt left investors stranded in unresolved financial positions, highlighting critical systemic failures in regulatory coordination and enforcement. Throughout the MMTLP-to-NBH transition, regulatory bodies failed to address significant trading irregularities.

91. The unresolved trading discrepancies in MMTLP exposed MMAT to predatory short-selling practices, which ultimately enabled short sellers to drive MMAT into bankruptcy. This culminated in the company's bankruptcy filing on August 9, 2024, and subsequent final filings on September 20, 2024. These events underscore the financial risks posed by regulatory failures and unresolved discrepancies, which allowed predatory short sellers to avoid their financial obligations and exacerbate the company's financial collapse.

92. On December 4, 2024, the plaintiff, who suffered significant financial losses due to the predatory short-selling practices that contributed to MMAT's eventual bankruptcy, filed a Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada concerning 2,500 MMATQ shares. These shares, adjusted following a 1-for-100 reverse stock split on January 29, 2024, are now part of the Chapter 7 bankruptcy proceedings. This filing highlights the financial hardship retail investors have endured, caused not by MMAT itself, but by the unchecked actions of predatory short sellers and the failure of regulatory bodies to intervene. The ongoing unresolved legal challenges, including asset distribution and shareholder equity.

93. Robinhood's implementation of a close-only position policy for MMTLP shares, coupled with its share lending program, significantly exacerbated systemic imbalances in the market. This policy effectively restricted investors' ability to protect their positions or recover losses, deepening the financial strain on retail investors. Additionally, Joseph Iraci's involvement in FINRA's Uniform Practice Code (UPC) Committee raises serious concerns about the impartiality of regulatory decisions impacting Robinhood's operational policies.

94. Robinhood's implementation of a close-only position policy for MMTLP shares, coupled with its share lending program, significantly exacerbated systemic imbalances in the market. This policy effectively restricted investors' ability to protect their positions or recover losses, deepening the financial strain on retail investors. Additionally, Joseph Iraci's involvement in FINRA's Uniform Practice Code (UPC) Committee raises serious concerns about the impartiality of regulatory decisions impacting Robinhood's operational policies. His dual role creates potential conflicts of interest that undermine confidence in the fairness and objectivity of the regulatory process, particularly in matters affecting Robinhood's practices.

95. Under the leadership of Frank La Salla as CEO, the Depository Trust & Clearing Corporation (DTCC) and its subsidiary, the National Securities Clearing Corporation (NSCC), were entrusted with the critical responsibilities of clearing and settling TRCH, MMAT, and MMTLP shares. However, persistent settlement discrepancies, particularly involving synthetic shares, exposed profound failures in oversight and accountability. These unresolved issues have not only destabilized the market but also raised serious doubts about the effectiveness of regulatory measures, leaving investors vulnerable to continued harm and without recourse.

96. As of December 2024, Next Bridge Hydrocarbons has not been assigned a CUSIP number for its shares, complicating efforts to track and reconcile transactions. Brokerage statements and

investor reports reveal that thousands of shares remain unreconciled over two years after the U3 halt, underscoring the ongoing failure to resolve critical discrepancies. The inability of FINRA, the SEC, and the DTCC to effectively coordinate during the trading of TRCH, MMAT, and MMTLP shares is a glaring example of regulatory dysfunction.

97. Self-Regulatory Organizations (SROs) like FINRA lose the protection of regulatory immunity when they exceed their statutory authority or fail to comply with their own rules, as affirmed by the Supreme Court in *Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221 (2012). FINRA's dual role as both regulator and operator of systems such as ORF and TRACE presents a conflict of interest that compromises its impartiality and credibility. Similar concerns were raised in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), where the Court underscored the dangers of unchecked regulatory authority. This duality calls into question FINRA's ability to provide unbiased oversight while simultaneously profiting from the very systems it is supposed to regulate.

98. FINRA's dual role as both a regulator and operator of market systems raises concerns about the potential for monopolistic practices that could limit market access, suppress competition, and favor institutional interests over fairness and transparency. Retail investors, in particular, face systemic disadvantages in this environment, including inflated transaction costs, lack of pricing clarity, and barriers to equal market participation. These issues suggest a failure by FINRA to fully meet its regulatory obligations and raise questions about the organization's effectiveness in ensuring the integrity and transparency of financial markets.

99. FINRA's regulation and operation of key trading platforms, including OOTC and XADF, raise significant antitrust concerns. As both a regulator and operator, FINRA's dual role limits fair market access, reduces competition, and grants it substantial control over market dynamics.

Furthermore, FINRA's ownership of eligible securities on the UTP and its facilitation of off-exchange (dark pool) trading of MMAT through OTC-UTP may have contributed to discrepancies in share counts and trading volumes.

100. The facilitation of dark pool trading and the concentration of trading activity within off-exchange platforms not only suppresses competition but also creates barriers for retail investors to engage in fair market participation. These practices reduce market transparency, favor institutional investors, and distort the natural forces of supply and demand, constituting a violation of the Sherman Antitrust Act's prohibition against anti-competitive agreements and monopolistic practices.

101. Dark pools operate as private venues for securities transactions, allowing large orders to be executed discreetly outside of public exchanges, thereby minimizing their impact on market prices. In the U.S., dark pools and other off-exchange venues, including internalizers, account for approximately 40% of total equity trading volume. This significant proportion raises serious concerns about the transparency and fairness of the market.

102. Meta Materials (MMAT) has experienced dark pool trading volumes consistently exceeding 55% on consecutive days, representing an excessively high proportion of off-exchange activity. This disproportionate trading volume has directly contributed to downward pressure on the stock price, distorting genuine market sentiment. Such activity undermines retail investors' ability to engage in fair trading and raises substantial concerns about the integrity and transparency of market operations.

103. The SEC and FINRA are responsible for regulating all trading venues, including dark pools. However, the enforcement of these regulations has been criticized for being reactive rather than

proactive, failing to adequately deter manipulative practices. The increasing reliance on dark pools has intensified calls for the implementation of stricter regulations, enhanced transparency, and more robust oversight.

104. Penalties for misconduct in broker operations have proven insufficient as effective deterrents, allowing financial institutions to treat regulatory fines as a routine cost of doing business. For example, in 2016, Barclays and Credit Suisse were fined \$70 million and \$84.3 million, respectively, for violations that included misleading investors. These penalties, which are insignificant relative to the substantial profits generated by these institutions, highlight the ineffectiveness of current enforcement measures and raise concerns about the ability of regulatory bodies to ensure meaningful accountability.

105. Similarly, Robinhood's \$65 million fine in 2020 for misleading customers about its revenue sources was a negligible fraction of the profits it earned through payment for order flow during the period of violations. More recently, Citadel Securities and Wells Fargo were subjected to similarly modest fines for significant violations, reinforcing a culture of impunity that erodes investor trust. These settlements, often accompanied by "no admission of wrongdoing" clauses, further contribute to the exploitation of regulatory loopholes, perpetuating a system that rewards misconduct rather than deterring it, and undermining the integrity of market oversight.

106. The pervasive "revolving door" between regulatory agencies and the private sector exacerbates conflicts of interest and contributes to lenient enforcement practices. Regulators frequently transition to lucrative positions within the firms they once oversaw, creating an environment where fines are viewed as a mere cost of doing business rather than a meaningful deterrent.

107. Between 2019 and 2024, the SEC failed to investigate significant settlement discrepancies involving synthetic shares under the management of the DTCC, thereby allowing widespread market manipulation and resulting investor losses to persist. In *Free Enterprise Fund v. PCAOB* and *Credit Suisse Securities v. Simmonds*, the Supreme Court emphasized the critical need for robust oversight and accountability. These principles, however, were neglected by the SEC, which allowed FINRA to operate with unchecked conflicts of interest.

108. The SEC has been repeatedly notified of manipulation occurring within dark pools, with trading volumes in stocks such as Meta Materials consistently exceeding 55%. Despite its mandate under the Securities Exchange Act of 1934, the SEC has failed to implement effective enforcement mechanisms to address these concerns. The inadequacy of penalties, as demonstrated in the cases of Barclays and Credit Suisse, has allowed such manipulation to persist..

109. Retail investors have endured significant financial harm as a result of the SEC's failure to reconcile discrepancies in Next Bridge Hydrocarbons shares following the imposition of the U3 halt. The lack of effective oversight and coordination among the SEC, FINRA, and the DTCC has not only exacerbated market instability but has also exposed a clear dereliction of duty to safeguard the interests of investors. As established in *Marbury v. Madison*, government entities cannot abdicate their responsibilities, especially when inaction results in tangible public harm.

110. In the matter of MMAT (Meta Materials Inc.) and MMTLP (Meta Materials Preferred Shares), there exists substantial evidence of market manipulation, specifically through the creation and trading of synthetic shares, a practice involving techniques such as naked shorting and the formation of synthetic positions. This activity, which bypasses traditional reporting mechanisms, raises significant concerns regarding market transparency, investor confidence, and

36

the integrity of the U.S. financial system. The failure of the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) to adequately address these issues, despite clear evidence of manipulation, constitutes a severe dereliction of their regulatory duties.

111. Market makers, brokers, and proprietary trading firms participating in MIAX exchanges, such as Citadel Securities, Virtu Financial, and Interactive Brokers, frequently engage in both domestic and offshore trading. While MIAX primarily operates within the U.S. markets, focusing on options, equities, and futures, these firms leverage global trading infrastructure that allows them to access and trade securities in international markets. Consequently, while MMAT and MMTLP shares are predominantly traded on U.S. exchanges like MIAX, related transactions may also occur offshore via other platforms and exchanges, circumventing the regulatory scrutiny typically applied to U.S.-domiciled markets. This lack of oversight into cross-border transactions has allowed market manipulation to persist, further obscuring true short positions and distorting market conditions.

112. The SEC and FINRA have long held the responsibility to regulate U.S. securities markets and ensure compliance with U.S. laws. The Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and the Investment Company Act of 1940 require the SEC to maintain fair and efficient markets and prevent practices such as market manipulation. *In SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968)*, the court held that the SEC is responsible for ensuring transparency and fairness in the securities markets, emphasizing the importance of preventing manipulative practices that undermine investor confidence. The SEC has the authority and responsibility to enforce these laws, yet in this case, they have failed to act despite substantial evidence of manipulation.

113. Similarly, in *SEC v. O'Hagan, 521 U.S. 642 (1997)*, the U.S. Supreme Court upheld the SEC's ability to enforce its regulations concerning securities fraud, including insider trading and manipulation, underscoring the critical role of the SEC in protecting investors and maintaining market integrity. The SEC's failure to act in the case of MMAT and MMTLP represents a direct contradiction of its statutory duties as established in such cases, where the Court found the SEC's role to be vital in regulating and preventing harmful trading practices.

114. Meanwhile, FINRA, as a self-regulatory organization, holds oversight over U.S. broker-dealers and ensures that firms comply with U.S. regulations even in the context of international activities. FINRA's failure to take action in the case of synthetic shares and cross-border trading in MMAT and MMTLP constitutes a violation of its duty to oversee the conduct of its members and enforce the securities laws. In *FINRA v. Office of Thrift Supervision, 503 F.3d 220 (2d Cir. 2007)*, the court affirmed FINRA's responsibility to regulate and enforce compliance with fair practices, even where cross-border transactions are concerned.

115. Furthermore, hedge funds with foreign offices may engage in market manipulation practices such as synthetic share creation and cross-border trading, which can bypass traditional U.S. reporting mechanisms. These activities obscure full short positions, creating gaps in market transparency. When such actions involve illicit funds, they may violate the Anti-Money Laundering Act (AMLA). In *United States v. Walters, 910 F.2d 1101 (4th Cir. 1990)*, the court emphasized the importance of preventing money laundering and protecting against illicit financial flows that threaten market integrity. The failure of both the SEC and FINRA to detect and report suspicious activities in the context of MMAT and MMTLP represents a failure to enforce the AMLA's suspicious activity reporting (SAR) requirements and to prevent illicit conduct from proliferating.

116. Should the SEC and FINRA continue to neglect these issues, their inaction would constitute a grave breach of their regulatory duties. Such failure would not only exacerbate market manipulation but could also lead to violations of U.S. laws, including the AMLA, erode investor confidence, and damage the reputation and integrity of U.S. financial markets. It would create regulatory loopholes that could be exploited by bad actors, further destabilizing the market and increasing the likelihood of future financial misconduct.

117. The SEC's failure to act in the face of mounting evidence of market manipulation mirrors the reasoning in *Chiarella v. United States, 445 U.S. 222 (1980)*, where the Supreme Court affirmed the necessity for regulatory authorities to act in cases where manipulative schemes risk distorting market prices and deceiving investors.

118. It is imperative that the SEC and FINRA take immediate action to address market manipulation in MMAT and MMTLP, strengthen their regulatory oversight of cross-border transactions, and enforce compliance with U.S. securities laws. Failure to do so would not only threaten the stability of the financial system but also tarnish the global reputation of U.S. markets, allowing illicit financial flows to go undetected and undermining the protection of U.S. investors. In *SEC v. Zandford, 535 U.S. 813 (2002)*, the Court reaffirmed the SEC's broad enforcement power to prevent fraud, manipulation, and misconduct in the market, providing a framework for addressing such breaches.

119. The SEC and FINRA's failure to act on the synthetic share issue in MMAT and MMTLP highlights a critical need for enhanced cross-border regulatory oversight. The ongoing neglect of these issues threatens the integrity of U.S. financial markets and undermines investor confidence. The SEC and FINRA must act decisively to protect market participants, preserve market transparency, and ensure the stability of the financial system, as is their statutory duty under SEC

39

v. Texas Gulf Sulphur Co. and other key case law. Should they fail in this regard, the consequences for market stability, investor confidence, and the broader financial system could be dire.

120. The SEC's persistent failure to address conflicts of interest, systemic manipulation, and the exploitation of dark pool trading has allowed institutional players to disproportionately benefit, often at the expense of retail investors. This inaction has created an environment where regulatory oversight appears to tacitly approve harmful practices, further exacerbating market distortions and investor losses. As the Supreme Court highlighted in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), inaction by a governing body, particularly when it leads to public harm, can be seen as a failure to fulfill its duties.

## V. <u>Allegations</u>

121. The Plaintiff brings this action to address systemic failures within the U.S. financial markets, resulting in significant harm to retail investors due to regulatory negligence, manipulative trading practices, breaches of fiduciary duty, and constitutional violations. Central to this case is FINRA's arbitrary and indefinite U3 trading halt imposed on MMTLP shares on December 9, 2022, days before their scheduled transition to Next Bridge Hydrocarbons (NBH). This action, lacking transparency and procedural safeguards, deprived tens of thousands of investors of access to their assets, exacerbating financial losses. Legal precedents such as *SEC v. Sloan*, 436 U.S. 103 (1978), and *Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221 (2012), affirm that regulatory immunity does not shield actions exceeding statutory authority or violating constitutional principles. Moreover, FINRA's failure to fulfill obligations under the Anti-Money Laundering Act (AMLA), including addressing manipulative practices like

synthetic share creation and naked short selling, highlights a systemic breakdown in regulatory oversight.

122. FINRA's misconduct, compounded by the gross dereliction of duty by the Securities and Exchange Commission (SEC) and the Depository Trust & Clearing Corporation (DTCC), constitutes a systemic failure to fulfill statutory responsibilities under the Securities Exchange Act of 1934. Despite substantial evidence of synthetic share creation, naked short selling, and persistent failures to deliver (FTDs), as highlighted by MMTLP shares' placement on the OTC Threshold List, these entities failed to enforce mandatory corrective measures under Regulation SHO, including Rule 204 close-out provisions, or to ensure transparency through the disclosure of essential transactional data such as Blue Sheets. This neglect enabled Market Participants to exploit regulatory exemptions, artificially suppress share prices, and flood the market with synthetic shares, causing devastating financial losses to retail investors, including the Plaintiff, who were deprived of their assets without procedural safeguards or recourse.

123. These regulatory failures echo those condemned in *SEC v. Sloan*, 436 U.S. 103 (1978), where the Supreme Court held that agencies are accountable when their actions or inactions violate procedural safeguards or statutory mandates. FINRA's arbitrary and improper U3 trading halt on December 9, 2022, further compounded these failures by sanctioning market manipulation, violating statutory and constitutional principles designed to protect investors, uphold transparency, and preserve the integrity of financial markets.

124. The Plaintiff alleges that FINRA's indefinite U3 trading halt functioned as a shield for institutional actors engaging in manipulative trading practices, including synthetic share proliferation and naked short selling, which resulted in substantial failures to deliver (FTDs) in violation of Regulation SHO and the Anti-Money Laundering Act (AMLA). By refusing to

disclose Blue Sheet data and failing to maintain transparency, FINRA obstructed efforts to uncover and address these abuses, enabling institutional participants to profit at the expense of retail investors. This conduct violated AMLA's anti-fraud mandates and underscores FINRA's systemic failure to uphold its statutory and constitutional obligations to ensure market integrity and protect investors.

125. Evidence indicates that certain John Does, engaged in manipulative trading practices that artificially inflated the supply of MMTLP shares through counterfeit share creation, exploiting regulatory exemptions under Regulation SHO to suppress prices for their advantage. These actions potentially violated the Anti-Money Laundering Act (AMLA), which mandates the detection and reporting of manipulative financial practices, as well as FINRA Rule 2010, requiring adherence to high standards of commercial honor. FINRA's failure to enforce these provisions or address these abuses underscores a systemic breakdown in regulatory oversight, raising serious concerns about its role in enabling such misconduct.

126. The trading patterns and market activity surrounding MMTLP shares demonstrate extensive manipulation, characterized by irregular trading volumes, discrepancies in outstanding share counts, and sustained failures to deliver (FTDs), indicative of systemic synthetic share creation. These manipulations deprived shareholders, including the Plaintiff, of the ability to reconcile holdings or recover the fair value of their investments, as market dynamics were artificially distorted beyond natural supply and demand forces. These abuses resulted directly from regulatory failures and the Defendants' exploitation of systemic vulnerabilities. Judicial intervention is essential to uncover the full extent of this misconduct, hold those responsible accountable, and implement remedies to uphold market integrity.

127. The systemic regulatory failures in this matter mirror the deficiencies highlighted in *SEC v. Sloan*, 436 U.S. 103 (1978), where the Supreme Court underscored the necessity of enforcing securities laws to prevent market manipulation and protect investor confidence. Similarly, *Alpine Securities Corp. v. FINRA*, 982 F.3d 68 (D.C. Cir. 2020), illustrates the dangers of inadequate oversight by self-regulatory organizations like FINRA. In the case of MMTLP shares, FINRA's failure to enforce closeout requirements under Regulation SHO, its lack of transparency regarding Blue Sheet data, and its arbitrary imposition of the U3 trading halt enabled manipulative practices such as synthetic share creation and naked short selling to persist unchecked. These actions reflect the regulatory shortcomings identified in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), which highlighted the risks of insufficient accountability within self-regulatory frameworks. Judicial intervention is necessary to address these abuses, restore transparency and accountability, and ensure adherence to statutory and constitutional principles to protect market integrity.

128. The Defendants engaged in manipulative trading practices that artificially distorted the market for MMTLP shares, inflicting substantial financial harm on shareholders, including the Plaintiff. Analysis of trading patterns, market activity, and shareholder records reveals irregular trading volumes, unexplained discrepancies in outstanding share counts, and persistent failures to deliver (FTDs)—hallmarks of synthetic share creation. By exploiting regulatory exemptions under Regulation SHO, the Defendants unlawfully introduced counterfeit shares into circulation, artificially inflating supply, suppressing share value, and disrupting the natural forces of supply and demand. These actions deprived shareholders of their ability to reconcile holdings or realize the fair value of their investments, amplifying financial losses and undermining market integrity.

129. These practices, marked by anomalous trading volumes and unresolved FTDs, flagrantly contravene the transparency and fair market principles mandated by the Securities Exchange Act of 1934. The pervasive breakdown of regulatory oversight in addressing synthetic share creation and naked short selling has created a systemic environment conducive to collusion between market participants and regulatory entities. This regulatory failure not only suppresses market competition but also constitutes a potential violation of the Sherman Antitrust Act, mirroring concerns highlighted in *United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940)*, where the suppression of competition and artificial market distortions were deemed antitrust violations.

130. The systemic failures of regulatory bodies, including FINRA, the SEC, and the DTCC, to enforce mandatory closeout provisions under 17 C.F.R. § 242.204 and to address market manipulation directly facilitated the Defendants' misconduct. These regulatory lapses caused substantial harm to retail investors and echo the deficiencies identified in *SEC v. Sloan*, 436 U.S. 103 (1978), and *Alpine Securities Corp. v. FINRA*, 982 F.3d 68 (D.C. Cir. 2020), where procedural failures and unchecked manipulative practices undermined market integrity. Evidence of coordinated manipulation among market participants underscores the need for a comprehensive investigation to uncover the full scope of misconduct and hold all responsible parties accountable for their violations of market fairness and investor protection.

131. The prolonged inaction of regulatory bodies in the MMTLP case exemplifies systemic inequity and regulatory bias. Unlike the swift response to the GameStop trading episode in January 2021, FINRA's indefinite U3 halt on MMTLP shares has left tens of thousands of retail investors without recourse for over 700 days as of December 2024. This disparate treatment reflects favoritism toward institutional participants at the expense of retail investors. By failing to address manipulative practices and abandoning their statutory mandates, FINRA, the SEC, and

the DTCC have undermined market integrity and investor confidence, warranting immediate judicial intervention to restore fair and transparent regulation.

132. FINRA's mishandling of the U3 trading halt on MMTLP shares demonstrates systemic regulatory failure and abuse of authority. By imposing an indefinite halt without sufficient notice or justification, FINRA deprived investors of their rights while enabling institutional actors to avoid accountability for synthetic shares and naked short positions. Persistent settlement failures and unresolved share discrepancies further underscore regulatory negligence. These failures have left retail investors vulnerable and without recourse, necessitating judicial intervention to remedy the harm, address regulatory lapses, and establish safeguards to prevent future misconduct.

133. The systemic abuses detailed in this case highlight profound inequities within U.S. financial markets. Retail investors, including the Plaintiff, have been abandoned by the regulatory institutions tasked with their protection. While institutional participants profited from synthetic share creation, naked short selling, and regulatory arbitrage, retail investors were deprived of the ability to reconcile their holdings or recover the fair value of their investments. These regulatory failures have caused catastrophic financial harm and eroded public confidence in market integrity. Judicial intervention is essential to hold Defendants accountable, restore fairness, and deliver justice to the retail investors betrayed by a system prioritizing institutional interests over equitable enforcement.

134. The Plaintiff brings this action to hold the Defendants accountable for their deliberate roles in systemic market manipulation, regulatory negligence, breaches of fiduciary duty, and conspiracy to commit fraud. The Defendants facilitated unauthorized trading of MMTLP shares, the creation and proliferation of synthetic shares through naked short selling, and exploited

45

regulatory loopholes to suppress share value and defraud investors, causing irreparable harm to retail investors and undermining the integrity of financial markets

135. The Plaintiff alleges that FINRA's indefinite U3 trading halt on December 9, 2022, served to protect institutional participants engaged in manipulative trading practices. Imposed days before the planned transition to Next Bridge Hydrocarbons (NBH), the halt shielded those responsible for significant failures to deliver (FTDs) and synthetic share creation from accountability. By halting trading without transparency or a clear resolution, FINRA deprived tens of thousands of retail investors of the ability to liquidate their holdings or realize the fair value of their assets, causing prolonged financial harm.

136. The harm was further exacerbated by the SEC and DTCC, which failed to fulfill their statutory obligations to oversee and regulate market activity. Despite clear evidence of systemic manipulation, including MMTLP's placement on the OTC Threshold List, substantial share reconciliation discrepancies, and persistent failures to deliver (FTDs), these regulatory bodies neglected their duties. This inaction allowed the proliferation of counterfeit shares and enabled institutional participants to exploit the market for unjust profits, depriving retail investors of a fair and orderly trading environment.

137. Market participants actively perpetuated manipulative trading schemes by falsifying regulatory filings and exploiting exemptions under Regulation SHO to introduce counterfeit shares into the market. These actions artificially distorted the price of MMTLP shares, reflecting a coordinated effort to defraud retail investors and further eroding confidence in the integrity of the U.S. financial system.

138. The Plaintiff asserts that the Defendants' cumulative actions constitute a coordinated conspiracy to defraud retail investors by manipulating market conditions, suppressing legitimate demand, and exploiting systemic regulatory deficiencies. This conspiracy has resulted in substantial financial losses, emotional distress, and a profound erosion of trust in the financial markets, which depend on fairness, transparency, and accountability.

139. This Court has the urgent opportunity to uphold statutory and constitutional principles, protect the rights of retail investors, and address systemic abuses in financial markets. Decisive action is necessary to prevent ongoing harm to tens of thousands of retail investors and to avoid setting a precedent that erodes public trust in the rule of law and market stability. The Plaintiff respectfully urges this Court to hold the Defendants accountable for their egregious misconduct and to ensure such abuses are addressed and prevented in the future.

140. The following legal and factual questions arise from the Plaintiffs' claims and are critical to determining liability, damages, and appropriate relief:

## A. Regulatory Negligence and Oversight

### I. Statutory Obligations and Market Integrity

Did FINRA, the SEC, broker-dealers, and the DTCC violate their statutory obligations under the Anti-Money Laundering Act (AMLA), specifically Sections 5318(g) and 5318(h), and the Securities Exchange Act of 1934, including Regulation SHO, by failing to detect, report, and address suspicious trading activities such as synthetic share creation and naked short selling, as well as by neglecting to reconcile share discrepancies, thereby compromising market integrity and causing harm to retail investors during the MMTLP-to-NBH transition?

II. **Negligence in Addressing Market Irregularities**

Did the failure of regulatory bodies to investigate and resolve trading irregularities—such as synthetic share creation, persistent failures to deliver (FTDs), and discrepancies in share counts—constitute negligence or willful inaction, harming retail investors?

**B. Transparency and Disclosure Failures**

III. **Withholding of Critical Data**

Did FINRA, the SEC, and broker-dealers obstruct transparency by withholding essential trading data, such as Blue Sheets and trade confirmations, preventing investors from investigating manipulation claims and reconciling synthetic share discrepancies?

IV. **Failure to Disclose Trading Irregularities**

Did market participants and regulatory bodies fail to disclose material information regarding trading irregularities, synthetic shares, or share discrepancies, creating an environment of confusion and financial harm for retail investors?

**C. Market Manipulation and Anticompetitive Conduct**

V. **Manipulative Trading Practices**

Did market participants engage in manipulative practices, including naked short selling, synthetic share creation, and price suppression, that distorted MMTLP share prices, suppressed demand, and harmed retail investors?

VI. **Antitrust Violations in Securities Markets**

Did the Defendants engage in anticompetitive conduct, such as fostering monopolistic

trading conditions or exploiting market vulnerabilities, in violation of antitrust laws, thereby disproportionately harming retail investors?

## D. Procedural Failures and Governance Issues

### VII. **Legitimacy of FINRA's U3 Halt**

Did FINRA exceed its statutory authority by unilaterally imposing the U3 trading halt on MMTLP shares without sufficient procedural justification or notice, violating its obligations under FINRA Rule 6490, the Administrative Procedure Act (APA), and principles established in *Free Enterprise Fund v. PCAOB*?

### VIII. **Constitutionality of FINRA's Governance**

Does FINRA's structure as a private self-regulatory organization exercising quasi-governmental authority, without sufficient federal oversight, violate constitutional principles, including due process, the separation of powers, and the Appointments Clause?

### IX. **Inter-Agency Communication Failures**

Did the lack of coordination and communication among FINRA, the SEC, and the DTCC contribute to unresolved discrepancies in MMTLP shares, leaving retail investors without clarity, access to their assets, or recourse for their financial harm?

## E. Investor Harm and Remedies

### X. **Disproportionate Impact on Retail Investors**

Did the unresolved failures to deliver (FTDs), synthetic share creation, and procedural

delays disproportionately harm retail investors, while providing institutional participants with an inequitable advantage?

## XI. **Entitlement to Damages**

Are retail investors entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial harm, emotional distress, and loss of trading opportunities caused by the Defendants' actions and omissions?

## F. Market Structure and Systemic Deficiencies

### XII. **Structural Vulnerabilities in OTC Markets**

Does the proliferation of synthetic shares, naked short selling, and the lack of transparency in over-the-counter (OTC) markets highlight systemic deficiencies in the regulatory framework, requiring judicial intervention to restore fairness and investor protections?

### XIII. **Exploitation of Regulation SHO Exemptions**

Were exemptions under Regulation SHO, intended for bona fide market-making activities, improperly applied or abused, enabling persistent failures to deliver and systemic harm to retail investors?

### XIV. **Broker-Dealer Accountability**

Did broker-dealers fail in their fiduciary and contractual obligations by misrepresenting the settlement status or tradability of MMTLP shares, engaging in deceptive practices that caused financial harm to investors?

XV. **Barriers to Share Reconciliation**

Did systemic delays in reconciling synthetic shares with legitimate ownership during the MMTLP-to-NBH transition obstruct retail investors' access to assets while protecting institutional participants from accountability?

## G. Constitutional and Legal Considerations

XVI. **Due Process Violations**

Did the lack of transparency, procedural clarity, and available recourse during the U3 halt infringe upon retail investors' due process rights, warranting judicial remedies to address these violations?

XVII. **Property Rights and Takings Clause**

Does FINRA's imposition of the indefinite U3 halt on MMTLP shares constitute an unlawful taking of property without due process or just compensation, in violation of constitutional protections?

## H. Accountability and Systemic Reforms

XVIII. **Accountability for Synthetic Shares**

Should FINRA, the SEC, the DTCC, and broker-dealers be held accountable for discrepancies in trading and ownership data that allowed synthetic share creation to harm retail investors and distort the market?

XIX. **Mandate for Independent Audit**

Should the Court mandate an independent forensic audit of trading activity, share

reconciliation, and settlement records during the MMTLP-to-NBH transition to ensure transparency, accountability, and resolution of synthetic share discrepancies?

## XX. **Necessity of Systemic Reforms**

Are systemic reforms to the regulatory framework governing securities markets necessary to prevent future abuses, enhance transparency, and protect retail investors from systemic manipulation and negligence?

## COUNT I

## Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

141. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in deceptive and manipulative trading activities. These activities included unauthorized creation of synthetic shares, naked short selling, and dissemination of false or misleading information about MMTLP shares.

142. John Doe Defendants (Market Participants) specifically facilitated unauthorized trading of MMTLP shares by submitting falsified Form 211 filings in violation of Rule 15c2-11 (17 C.F.R. § 240.15c2-11). These actions enabled improper trading on the over-the-counter (OTC) market, significantly impacting market integrity.

143. FINRA and DTCC failed to uphold their statutory responsibilities under Section 17(a) (15 U.S.C. § 78q(a)) by neglecting to maintain accurate transaction records. This failure created vulnerabilities in the clearing and settlement processes during the transition of MMTLP shares to Next Bridge Hydrocarbons.

144. The SEC breached its obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to address known irregularities in trading, thereby neglecting its duty to maintain fair and

orderly markets.

145. Collectively, all Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors and failing to maintain accurate financial records regarding discrepancies in MMTLP shares.

## COUNT II

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 12–27) – Against All Defendants

146. John Doe Defendants (Market Participants), including broker-dealers and other unidentified entities, violated Rule 203(b)(3) of Regulation SHO (17 C.F.R. § 242.203(b)(3)) by engaging in naked short selling, failing to locate or deliver shares, and exploiting exemptions without proper compliance. These practices contributed to persistent failures to deliver (FTDs) and manipulated the market for MMTLP shares.

147. FINRA failed to enforce the mandatory close-out provisions under Rule 204(a) of Regulation SHO (17 C.F.R. § 242.204(a)), enabling unresolved FTD positions to persist. This failure facilitated manipulative practices, reflecting systemic oversight lapses akin to those identified in *SEC v. Sloan*, 436 U.S. 103 (1978), where regulatory actions lacking procedural safeguards were subject to judicial intervention.

148. DTCC, responsible for clearing and settlement processes, failed to reconcile FTDs and ensure compliance with Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)). DTCC's neglect contributed to systemic settlement failures, echoing the regulatory shortcomings highlighted in *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), which underscored the impact of unchecked regulatory inaction.

## COUNT III

### Negligence – Against FINRA, SEC, and DTCC

149. FINRA, SEC, and DTCC breached their statutory duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to prevent manipulative trading practices and ensure orderly market operations. Their collective inaction allowed systemic abuses to persist unchecked, reflecting negligence in safeguarding market integrity. This failure mirrors the deficiencies highlighted in *SEC v. Sloan*, 436 U.S. 103 (1978), where regulatory bodies were held accountable for procedural and supervisory failures.

150. FINRA failed to uphold its supervisory responsibilities under Rule 3110 (FINRA Rule 3110), neglecting to monitor and enforce compliance among broker-dealers involved in manipulative activities such as naked short selling and synthetic share creation. These actions contributed to widespread market manipulation.

151. DTCC negligently failed to address unresolved short positions and discrepancies in transactional data. This negligence directly facilitated practices like synthetic share creation and allowed persistent failures to deliver (FTDs), as noted in *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), where systemic regulatory lapses enabled widespread financial harm.

152. SEC demonstrated gross dereliction of duty by failing to act despite repeated red flags, including Congressional inquiries, investor complaints, and evidence of manipulative trading practices. This failure undermined its statutory obligation to protect investors and maintain market integrity, as emphasized in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), which underscored the importance of regulatory accountability.

## COUNT IV

### Failure to Resolve the FINRA U3 Halt – Against FINRA, SEC, and DTCC

153. FINRA violated its obligations under Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5)
(15 U.S.C. § 78f(b)(5)) by imposing a U3 trading halt on December 9, 2022, without sufficient
procedural safeguards or resolution mechanisms. This unilateral action deprived shareholders of
their right to access and manage their investments, causing significant financial harm. FINRA's
inaction and lack of transparency during the halt mirrored the deficiencies criticized in *SEC v.
Sloan*, 436 U.S. 103 (1978), where regulatory actions lacking procedural safeguards were held to
exceed statutory authority.

154. SEC and FINRA failed to enforce a timely resolution of the halt, in violation of Section
15A(b)(6) (15 U.S.C. § 78o-3(b)(6)), which mandates the maintenance of fair and equitable
trading standards. This prolonged inaction perpetuated investor harm and undermined public
confidence in the regulatory framework.

155. DTCC neglected its statutory duty under Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) to
maintain accurate recordkeeping and provide transparency during the trading halt. This failure
contributed to systemic confusion and further exacerbated the harm caused to shareholders
during the unresolved halt.

## COUNT V

### Unjust Enrichment – Against FINRA and John Does 1–100 (Market Participants)

156. John Does (Market Participants) engaged in manipulative trading practices, including
synthetic share creation and oversold positions, violating Rule 10b-5 (17 C.F.R. § 240.10b-5).
These actions, suppressing MMTLP share value for unjust profits, reflect systemic abuses akin to
those addressed in *SEC v. Sloan*, 436 U.S. 103 (1978), warranting judicial intervention.

157. FINRA, by failing to enforce its regulatory standards and address known trading irregularities, facilitated these manipulative practices. Its failure to uphold its duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) allowed the John Doe Defendants to unjustly enrich themselves while retail investors suffered harm.

## COUNT VI

## Breach of Fiduciary Duty – Against DTCC and John Does 1–100 (Market Participants)

158. DTCC violated its fiduciary duties under Section 17A(c)(1) (15 U.S.C. § 78q-1(c)(1)) by failing to reconcile discrepancies in MMTLP share ownership and maintain accurate, transparent transaction records during the MMTLP-to-NBH transition.

159. John Does (Market Participants), through manipulative practices such as synthetic share creation and naked short selling, contributed to unresolved fail-to-deliver (FTD) positions and discrepancies, exacerbating the harm to retail investors. These actions were facilitated by DTCC's failure to meet its fiduciary responsibilities.

## COUNT VII

## Conspiracy to Commit Fraud – Against All Defendants

160. FINRA, DTCC, and John Does (Market Participants) conspired to manipulate the MMTLP securities markets through actions including synthetic share creation, naked short selling, and unauthorized trading. These manipulative practices violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

161. The Defendants' coordinated efforts exploited regulatory gaps and disseminated or allowed

material misrepresentations about MMTLP shares. These collusive actions directly align with the manipulative and deceptive practices prohibited under Section 10(b) and Rule 10b-5. FINRA and DTCC's failure to address these practices mirrors regulatory deficiencies criticized in *SEC v. Sloan*, 436 U.S. 103 (1978), where oversight lapses allowed systemic abuse to flourish.

## COUNT VIII

### Failure to Supervise – Against FINRA and SEC

162. FINRA and SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to adequately supervise broker-dealers and market makers, thereby enabling manipulative practices such as synthetic share creation, naked short selling, and market manipulation. Their failure to exercise proper oversight contributed to systemic abuses that harmed retail investors.

163. FINRA breached its obligations under Rule 3120 (FINRA Rule 3120) by failing to implement supervisory systems reasonably designed to detect and prevent manipulative trading practices. This lack of oversight allowed market participants to exploit regulatory gaps and perpetuate harmful trading behaviors.

## COUNT IX

### Violation of the Anti-Money Laundering Act (AMLA) – Against FINRA, DTCC, and SEC

164. FINRA violated its obligations under Section 5318(g) of the Bank Secrecy Act (31 U.S.C. § 5318(g)) by failing to disclose or release Blue Sheet data necessary to trace suspicious transactional irregularities in MMTLP trading. This failure obstructed the detection and reporting of manipulative practices such as synthetic share creation and naked short selling.

165. DTCC failed to reconcile transactional discrepancies and ensure accurate records of MMTLP trading activity. By enabling unresolved fail-to-deliver (FTD) obligations, DTCC facilitated the continued manipulation of MMTLP shares and undermined AMLA's transparency

and anti-fraud objectives.

166. SEC neglected its oversight responsibilities under AMLA by failing to enforce compliance among market participants, including FINRA and DTCC, or to investigate known irregularities tied to manipulative trading practices.

## COUNT X

### Breach of Duty of Fair Representation and Accountability – Against FINRA

167. FINRA breached its obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to maintain fair and equitable trading standards during the MMTLP-to-NBH transition. This failure directly undermined its statutory duty to ensure orderly market operations and protect investors.

168. The unilateral imposition of the U3 trading halt on December 9, 2022, without providing adequate notice or implementing necessary procedural safeguards, deprived investors of access to their assets. This action exacerbated financial harm to retail investors and mirrored systemic lapses in due process similar to those addressed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which underscores the requirement for procedural fairness.

169. FINRA violated Rule 6490 by amending corporate action notices, including the reclassification of MMTLP shares from "CANCELLED" to "DELETED" without obtaining issuer authorization. This unauthorized modification further disrupted market operations and created confusion among investors.

## COUNT XI

### Failure to Maintain Accurate Records – Against DTCC

170. DTCC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to maintain transparent and accurate records of transactions involving MMTLP shares, a critical statutory

obligation intended to ensure the integrity of the securities market.

171. DTCC's failure to reconcile transactional discrepancies allowed unresolved fail-to-deliver (FTD) positions to persist. This negligence facilitated market manipulation, including the proliferation of synthetic shares, which directly harmed retail investors and disrupted fair market operations.

172. DTCC's inability to ensure accurate settlement and reconciliation of trades during the MMTLP-to-NBH transition undermined market stability, further exacerbating investor losses and trust in the regulatory framework.

## COUNT XII

## Control Person Liability Under Section 20(a) of the Securities Exchange Act – Against FINRA and SEC

173. FINRA and SEC, as entities responsible for overseeing broker-dealers and market participants, failed to exercise effective control under Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)). Their supervisory lapses enabled widespread violations of securities laws, including manipulative practices such as synthetic share creation and naked short selling.

174. FINRA neglected its duty to enforce critical provisions of Regulation SHO, which are designed to prevent failures to deliver (FTDs) and market manipulation. This inaction allowed broker-dealers and clearinghouses to exploit regulatory gaps to the detriment of retail investors.

175. SEC failed to address known trading irregularities, including evidence of synthetic share creation and naked short selling, despite receiving repeated investor complaints and Congressional inquiries. This negligence further contributed to systemic harm and investor losses.

## COUNT XIII

## Prohibition on False or Misleading Information Under FINRA Rule 5210 – Against John Does 1–100 (Market Participants)

176. John Does (Market Participants) violated FINRA Rule 5210 by disseminating false and misleading information regarding the tradability and authenticity of MMTLP shares, directly contributing to market manipulation.

177. These unidentified participants knowingly engaged in deceptive practices, including the submission of false documentation and unauthorized trading activity, which misled investors and facilitated synthetic share creation and unauthorized trading on the OTC market.

178. Defendants' actions artificially inflated trading volumes and distorted market conditions, harming retail investors by suppressing the true value of MMTLP shares.

## COUNT XIV

## Fraud by Broker-Dealers Under Section 15(c)(2) of the Securities Exchange Act – Against John Does 1–100 (Market Participants)

179. John Does (Market Participants) violated Section 15(c)(2) (15 U.S.C. § 78o(c)(2)) by engaging in manipulative and deceptive trading practices, including synthetic share creation and naked short selling. These fraudulent actions exploited regulatory gaps and violated established securities laws.

180. Defendants acted without proper authorization and knowingly engaged in fraudulent transactions that contravened their regulatory obligations under FINRA Rule 2010, which requires high standards of commercial honor and just and equitable principles of trade.

181. The fraudulent actions by John Does caused artificial market distortions, significant financial harm to retail investors, and eroded public confidence in the fairness of securities

markets parallel to the systemic abuses highlighted in *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), which emphasized preventing deceptive practices to protect market transparency and investor trust.

## COUNT XV

## Violation of Regulation S-X (Accuracy in Financial Reporting) – Against FINRA, DTCC, and John Does 1–100 (Market Participants)

182. FINRA, DTCC, and John Does (Market Participants) violated Regulation S-X (17 C.F.R. § 210.4-01) by failing to maintain and disclose accurate financial records regarding MMTLP transactions and unresolved fail-to-deliver (FTD) positions.

183. FINRA obstructed transparency by refusing to release critical Blue Sheet data that would have traced transactional irregularities, such as synthetic share creation and market manipulation. This lack of disclosure enabled manipulative practices to persist unchecked.

184. DTCC failed to reconcile settlement and transactional records accurately, allowing systemic discrepancies to proliferate. These actions undermined market integrity, transparency, and investor confidence, exacerbating harm to retail investors.

185. John Does, through their actions or omissions, contributed to discrepancies in financial reporting by engaging in manipulative trading practices and failing to disclose or reconcile critical data.

## COUNT XVI:

## Failure to Investigate Trading Irregularities and Respond to Oversight – Against SEC and FINRA

186. Despite receiving numerous complaints from investors and formal inquiries from Congress, SEC and FINRA failed to investigate or address trading irregularities involving MMTLP shares.

187. Their inaction violated their statutory obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)), which requires FINRA to promote fair and equitable principles of trade and prevent manipulative practices, and Section 19(g) (15 U.S.C. § 78s(g)), which mandates FINRA to enforce its rules and applicable securities laws.

188. Furthermore, the SEC's failure to act may be subject to judicial review under the Administrative Procedure Act (5 U.S.C. § 706), as such inaction could be deemed arbitrary and capricious in light of credible evidence of market manipulation.

## COUNT XVII

### Breach of Contract and Implied Covenant of Good Faith – Against John Does 1–100 (Broker-Dealers)

189. John Does (Broker-Dealers) breached their contractual obligations to retail investors by failing to execute trades, reconcile discrepancies, and provide accurate account information during the MMTLP-to-NBH transition. These failures undermined the trust and expectations inherent in their agreements with retail investors.

190. Defendants violated Rule 15c3-3 (17 C.F.R. § 240.15c3-3), which requires broker-dealers to safeguard customer funds and securities, by failing to account for discrepancies in shares and failing to protect investors' holdings during the transition process.

191. The Defendants' actions demonstrated bad faith and breached the implied covenant of good faith and fair dealing, an inherent part of their agreements with retail investors. These breaches directly harmed investors and compromised the integrity of the trading process.

**Count XVIII**

**<u>Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants</u>**

192. Defendants' reckless disregard for foreseeable harm caused emotional distress to Plaintiff, violating their obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) to protect investors.

193. Defendants acted with intentional or reckless disregard for the emotional and financial toll of the U3 halt and systemic irregularities, directly causing harm.

<u>**Defendant Inclusion Summary**</u>

194. This case arises from systemic market manipulation and regulatory failures that caused substantial harm to retail investors, market participants, and Meta Materials Inc., a non-listed plaintiff significantly impacted by the alleged misconduct. The Defendants, through their actions, omissions, negligence, or intentional misconduct, contributed to systemic market failures, suppressed investor rights, and enabled manipulative and anticompetitive practices, particularly the creation of synthetic shares and predatory trading. These practices distorted market prices, suppressed share values, and exposed broader regulatory shortcomings. Collectively, the Defendants violated federal securities laws, breached fiduciary duties, and unjustly enriched themselves at the expense of the Plaintiff, Meta Materials, and the broader investing public.

195. The following defendants are named for their roles in these failures, with charges noted:

1. **Securities and Exchange Commission (SEC) [Charges 1-4, 7-10, 12, 16, 18]:**
   The SEC, as the primary federal securities regulator, failed to enforce key securities laws,

ensure transparency, and address market manipulation. These failures include neglecting responsibilities related to synthetic share creation, naked short selling, and failures to deliver (FTDs), in violation of statutory duties under federal securities laws.

2. **Financial Industry Regulatory Authority (FINRA) [Charges 1-5, 7-10, 12, 15-16, 18]:**

   FINRA, a self-regulatory organization under the SEC's oversight, imposed an arbitrary U3 trading halt on MMTLP shares on December 9, 2022. This action deprived investors of the ability to trade or reconcile holdings and exacerbated financial harm. FINRA also failed to release Blue Sheet data, enforce anti-manipulation rules, and ensure market oversight, raising constitutional and statutory concerns.

3. **Depository Trust & Clearing Corporation (DTCC) [Charges 1-4, 6-7, 9-11, 15, 18]:**

   DTCC, responsible for clearing and settling securities transactions, is alleged to have failed to address systemic settlement discrepancies and synthetic share creation. Its inaction contributed to persistent market disruptions and significant losses for investors.

4. **John Does 1-100 (Market Participants) [Charges 1-2, 5-7, 10, 13-15, 17-18]:**

   Market makers, broker-dealers, and other unidentified entities are accused of engaging in manipulative trading practices such as naked short selling and synthetic share creation. These practices distorted market prices, artificially inflated the supply of MMTLP shares, suppressed legitimate share value, and caused harm to retail investors and market integrity.

196. The defendants are collectively charged with violating federal securities laws, constitutional principles, and statutory obligations under the Securities Exchange Act of 1934, Regulation SHO, and the Anti-Money Laundering Act (AMLA). Their actions and omissions have caused

significant financial harm to the plaintiff and other retail investors, necessitating judicial intervention to ensure accountability and restore market integrity.

 **Action for Declaratory Judgment and Injunctive Relief**

## Finding the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) Unconstitutional As Applied

197**. Separation of Powers Violation**

a. Plaintiff incorporates by reference all preceding paragraphs, including Facts 10 through 120, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case.

b. The PSLRA infringes upon the separation of powers doctrine by imposing restrictive procedural requirements, including heightened pleading standards and automatic discovery stays, which impede the judiciary's ability to effectively adjudicate securities fraud cases. These legislative mandates interfere with the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions. In this case, the PSLRA obstructs the Plaintiff's ability to hold FINRA, the SEC, and market participants accountable for systemic misconduct, including the manipulation of MMTLP shares, thereby exacerbating the harms caused by the Defendants.

198. **Violations of Constitutional Rights**

a. **First Amendment:**

The PSLRA violates the First Amendment by chilling access to the courts through its stringent pleading requirements. Retail investors, including the Plaintiff, face insurmountable burdens in

pleading fraud with particularity due to the concealment of critical evidence by broker-dealers, clearinghouses, and regulators. This effectively denies the Plaintiff the right to petition the government for redress of grievances.

b. **Fifth Amendment – Equal Protection and Due Process:**

The PSLRA disproportionately burdens retail investors while shielding institutional actors from accountability, creating a two-tiered system of justice. It denies equal protection under the law by favoring well-resourced corporate defendants, including broker-dealers and market makers, and limits the Plaintiff's ability to prove claims through its discovery stay provisions. These barriers violate the Plaintiff's fundamental due process rights by depriving them of a meaningful opportunity to be heard.

c. **Fourteenth Amendment – Equal Protection (State Claims):**

The PSLRA's preemption of state-law securities fraud remedies imposes restrictive federal standards that limit access to justice for investors seeking to pursue claims in state forums. This unequal treatment undermines the constitutional guarantee of equal protection under the law and creates an unfair preference for corporate defendants.

199. **Safe Harbor Protections:**

The PSLRA's safe harbor provision for forward-looking statements incentivizes corporate malfeasance by shielding Defendants from liability for fraudulent misrepresentations. In this case, this provision unjustly protected market participants who engaged in deceptive practices, including the suppression of shareholder rights and manipulation of MMTLP shares.

200. **Systemic and Structural Failures**

a. **Regulatory Capture and Inequities:**

The PSLRA's legislative history and provisions reflect systemic bias in favor of institutional actors, further undermining retail investors' access to justice. By prioritizing the interests of financial entities, the PSLRA fails to uphold principles of fairness and public trust.

b. **Judicial Economy:**

The PSLRA imposes procedural burdens that increase inefficiencies in litigation, requiring courts to adjudicate motions to dismiss without complete evidentiary records. This piecemeal approach undermines the judiciary's ability to resolve complex securities fraud cases effectively.

c. **Liability and Compensation:**

By limiting joint and several liability, the PSLRA shields culpable entities from full accountability and denies victims adequate compensation for their losses. In this case, multiple Defendants acted in concert to manipulate MMTLP shares, and the Plaintiff's recovery is unjustly constrained by these limitations.

201. **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A. **Declaratory Relief:** Issue a judicial declaration that the PSLRA is unconstitutional as applied in this case due to its conflict with separation of powers, due process, equal protection, and the First Amendment.

B. **Injunctive Relief:** Grant an injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor

protections, in this case and others involving systemic market manipulation and regulatory failures.

C. **Judicial Authority:** Affirm the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring access to justice and the ability to hold Defendants accountable.

D. **Additional Relief:** Grant such other relief as the Court deems just and proper under the circumstances.

**Action for Declaratory Judgment and Injunctive Relief #2**

**Constitutional Challenge to the Structure and Authority of the Financial Industry Regulatory Authority (FINRA)**

202**. Separation of Powers Violation**

A. Plaintiff incorporates by reference all preceding paragraphs, including Facts 10 through 118, and asserts that the structure and authority of the Financial Industry Regulatory Authority (FINRA) violate the United States Constitution's doctrine of separation of powers.

203. **Exercise of Executive Authority Without Accountability**

A. FINRA wields significant executive powers, including suspending trading, enforcing securities laws, conducting investigations, and imposing sanctions. However, these powers are exercised without presidential oversight or accountability, as FINRA's Board of Governors is neither appointed by nor removable by the President. This structure

conflicts with Article II of the Constitution, which vests executive authority in the President and requires accountability for its exercise.

204. **Relevant Precedent**

A. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must remain accountable to the President to preserve the separation of powers. FINRA's structure parallels the unconstitutional framework identified in that case, rendering its governance and operations inconsistent with constitutional principles.

205**. Violation of the Appointments Clause**

A. Plaintiff alleges that FINRA's structure and appointment processes violate the Appointments Clause of the United States Constitution.

206. **Officers of the United States**

A. FINRA's Board of Governors exercises substantial authority under federal law, qualifying its members as "officers of the United States" per *Buckley v. Valeo*, 424 U.S. 1 (1976). Despite this, they are not appointed by the President nor confirmed by the Senate, bypassing the constitutional requirements for officer appointments under Article II.

207. **Relevant Precedent**

A. In *Edmond v. United States*, 520 U.S. 651 (1997), the Court emphasized that adherence to the Appointments Clause ensures accountability in the exercise of federal authority. FINRA's private appointment process violates this constitutional mandate.

208. **Unconstitutional Delegation of Legislative Authority**

    A. Plaintiff asserts that FINRA's regulatory authority violates the nondelegation doctrine
enshrined in Article I, Section 1 of the Constitution.

209. **Broad and Unsupervised Delegation**

    A. Congress delegated extensive powers to FINRA under the Securities Exchange Act of
1934 with minimal guidance, allowing it to draft, enforce, and interpret securities
regulations without sufficient oversight. This lack of clear legislative standards renders
the delegation unconstitutional.

210. **Relevant Precedent**

    A. In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Supreme
Court held that delegations of legislative authority to private entities are unconstitutional
without clear and specific guidance. FINRA's authority similarly lacks sufficient statutory
boundaries, compounding its constitutional deficiencies.

211. **Violation of Property Rights and Economic Liberties**

    A. Plaintiff asserts that FINRA's indefinite U3 halt on MMTLP shares constitutes an
unconstitutional taking of property under the 5th, 9th, and 14th Amendments.

212. **Property Rights Violations**

    A. The indefinite halt deprived Plaintiff of the ability to control or trade MMTLP shares
without due process, violating legally recognized property rights under UCC Article 8,

Section 8-503. This lack of procedural safeguards constitutes an arbitrary and unconstitutional taking.

**Supplemental Authorities and Argument for Declaring FINRA Unconstitutional**

213. **Alpine Securities Corp. v. FINRA**

   A. The D.C. Circuit Court in *Alpine Securities Corp. v. FINRA* held that FINRA's expulsion orders violated the private nondelegation doctrine due to insufficient SEC oversight. FINRA's U3 halt parallels this procedural deficiency, as it was imposed without prior SEC validation. The lack of governmental oversight renders FINRA's actions unconstitutional and highlights the structural deficiencies of its governance framework.

214. **SEC v. Sloan**

   A. In *SEC v. Sloan*, the Supreme Court invalidated indefinite trading halts that lacked statutory authorization and procedural safeguards. Similarly, FINRA's U3 halt, imposed without transparency or justification, mirrors the unconstitutional actions identified in *Sloan*.

215. **Loper Bright Enterprises v. Raimondo**

   A. The Supreme Court in *Loper Bright Enterprises v. Raimondo* rejected Chevron deference, emphasizing the need for courts to independently evaluate whether regulatory entities operate within statutory and constitutional limits. FINRA's lack of clear statutory boundaries and oversight for the U3 halt necessitates rigorous judicial scrutiny.

**WHEREFORE**

216. **Plaintiff respectfully requests that the Court:**

A. **Declare FINRA Unconstitutional:**

   i. Issue a judicial declaration that FINRA's structure, governance, and delegation of authority violate the United States Constitution, including the doctrines of separation of powers, the Appointments Clause, and the nondelegation doctrine.

   ii. Declare that FINRA's imposition of the U3 trading halt on MMTLP shares constitutes an unconstitutional exercise of regulatory authority, infringing upon Plaintiff's property rights and due process guarantees.

B. **Enjoin FINRA's Actions:**

   i. Prohibit FINRA from enforcing the indefinite U3 halt and compel the immediate resumption of trading in MMTLP shares.

   ii. Prohibit FINRA from exercising regulatory powers inconsistent with constitutional principles and statutory authority.

   iii. Order the release of Blue Sheet data for MMTLP and MMAT transactions to provide transparency into the allegations of market manipulation, including synthetic share creation and naked short selling, and to restore trust in the fairness of the market.

C. **Compel Structural Reforms:**

   i. Require FINRA to reform its governance structure to comply with constitutional principles, including adherence to the Appointments Clause and increased SEC oversight.

   ii. Mandate the implementation of procedural safeguards to ensure transparency and due process in all regulatory actions.

D. **Restore Property Rights:**

   i. Order FINRA to reinstate Plaintiff's full economic and trading rights to MMTLP

shares, including any remedies necessary to compensate for financial losses caused by the unconstitutional U3 halt.

E. **Additional Relief:**

i. Grant such other and further relief as the Court may deem just and proper to protect Plaintiff's rights, restore market integrity, and ensure compliance with constitutional safeguards.

## VI. <u>Conclusion:</u>

217. The Plaintiff, Jason Rolo, has highlighted significant regulatory and procedural deficiencies that have adversely impacted retail investors and raised concerns about the integrity of the U.S. financial markets. Central to this case is FINRA's imposition of the indefinite U3 trading halt on December 9, 2022, which lacked adequate transparency and effectively restricted investor access to their assets. This action, combined with discrepancies in trading volumes and synthetic share reconciliation, underscores the need for a closer examination of regulatory practices.

218. The Plaintiff contends that FINRA's actions, particularly the U3 halt, represent an overreach of its regulatory authority. Under SEC v. Sloan, 436 U.S. 103 (1978), regulatory immunity does not extend to actions that exceed statutory mandates or violate constitutional principles. FINRA's failure to enforce closeout obligations under Regulation SHO and its refusal to release Blue Sheets—despite mounting evidence of synthetic share creation and systemic manipulation—illustrates conduct that falls outside the scope of permissible regulatory actions. Furthermore, FINRA's dual role as both a regulator and operator of market systems, such as the ORF and TRACE platforms, creates inherent conflicts of interest, which were exacerbated by its failure to detect or mitigate the excessive trading activities surrounding MMTLP shares.

219. The Plaintiff further raises concerns about FINRA's governance structure and its role as both a regulator and operator of market systems, which may create inherent conflicts of interest. These concerns are compounded by the need for regulatory actions to adhere to principles of due process and accountability, particularly when investor rights are impacted.

220. This case also touches upon obligations under the Anti-Money Laundering Act (AMLA), where FINRA's refusal to release transactional data has hindered efforts to detect and address potential manipulative trading practices. Such actions point to the necessity of enhanced oversight to maintain market integrity.

221. The Plaintiff respectfully requests that this Court examine these issues, ensure compliance with statutory and constitutional obligations, and implement measures to promote fairness, transparency, and investor confidence in the financial markets.

## VII.    **PRAYER FOR RELIEF**

**WHEREFORE,**

222. Plaintiff respectfully requests that the Court:

1. **Declaratory Relief:**

    a. Declare the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) unconstitutional as applied to this case, as it imposes excessive barriers to justice for retail investors, disproportionately burdens individual investors, and violates constitutional principles of due process and fairness.

    b. Declare the structure and authority of the Financial Industry Regulatory Authority (FINRA) unconstitutional for lacking sufficient governmental oversight, enabling

improper actions such as the indefinite U3 trading halt on MMTLP shares.

c. Declare that the Defendants' actions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties.

d. Declare that FINRA's U3 trading halt on December 9, 2022, was unlawful, prejudicial, and a violation of its regulatory obligations, causing significant harm to over 65,000 shareholders, including Plaintiffs.

2. **Injunctive Relief to Restore Transparency and Prevent Future Abuses:**

a. **Comprehensive Market Audit:** Order a full audit of all TRCH, MMTLP, Meta Materials, Meta Materials Preferred Shares, and related transactions, including synthetic shares, fails-to-deliver (FTDs), and beneficial ownership records.

b. **Public Disclosure of Data:** Mandate the immediate release of all trading data, records, and communications related to MMTLP and Meta Materials shares, held by FINRA, DTCC, broker-dealers, and other parties.

c. **Injunction to Reinstate Trading or Equitable Resolution:** Require an expedited process for the reinstatement of MMTLP share trading, or mandate an equitable resolution providing full compensation or recovery of value for all affected investors.

d. **Independent Oversight:** Appoint an independent special master or neutral third-party overseer to oversee the comprehensive audit, reconciliation, and implementation of systemic reforms.

e. **Congressional and Regulatory Review:** Require a Congressional and regulatory

review of policies concerning trading halts, synthetic share creation, and SRO oversight to prevent systemic failures.

1. **Referral for DOJ Investigation:**

   Recommend that the U.S. Department of Justice (DOJ) conduct a full investigation into the conduct of the Defendants and unidentified market participants for potential violations of the Anti-Money Laundering Act (AMLA) and related federal statutes, including market manipulation, fraud, and other financial crimes.

2. **Equitable Relief for Market and Procedural Irregularities:**

   a. Order that Plaintiff is entitled to equitable relief for the market and procedural irregularities affecting Meta Materials shares, with compensation for share values ranging from $13.45 to $26.78 per share, for 13,077 shares, as a remedy for the devaluation of MMAT resulting from the improper halting of MMTLP trades on December 9 and 12, 2022.

   b. Order that Plaintiff is entitled to equitable relief for the market and procedural irregularities affecting MMTLP shares, with compensation for share values ranging from $43.21 to $417 per share, for 1,675 shares, as a remedy for the improper halting of trades on December 9 and 12, 2022.

3. **Compensatory Damages to Redress Financial and Emotional Harm:**

   a. Award compensatory damages for the loss of value and liquidity of the Plaintiff's MMTLP and Meta Materials shares caused by the Defendants' misconduct.

   b. Award damages for harm caused by the suppression of share prices, synthetic share creation, naked short selling, and the improper U3 trading halt.

   c. Award recovery of financial losses resulting from the systemic harm inflicted on

market value.

d. Award damages for emotional distress and mental anguish caused by the prolonged
misconduct and lack of resolution.

4. **Treble Damages for Antitrust Violations:**

Award treble damages under the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton
Act to redress the Defendants' anti-competitive practices, which unlawfully restrained
market competition and caused severe financial harm to retail investors.

5. **Disgorgement of Ill-Gotten Gains:**

Order the disgorgement of all profits wrongfully obtained by the Defendants through
illegal trading of synthetic shares, naked short selling, and related manipulative practices.

6. **Establishment of a Restitution Fund for Retail Investors:**

Require the creation of a restitution fund to compensate all affected shareholders for
financial harm caused by synthetic share discrepancies, naked short selling, and
manipulative trading practices.

7. **Punitive Damages:**

Award punitive damages to deter the Defendants and others from engaging in similar
wrongful conduct in the future, promoting investor protection and market integrity.

8. **Audit of Meta Materials Chapter 7 Bankruptcy Proceedings:**

Order an independent audit of Meta Materials' Chapter 7 bankruptcy proceedings to
identify irregularities, ensure fairness, and uncover any institutional participants who
unfairly benefited.

9. **Regulatory Oversight Improvements:**

Require the SEC and FINRA to establish clear guidelines for regulatory intervention,

enhance enforcement mechanisms to prevent synthetic shares, naked short selling, and prolonged trading halts, and mandate transparency in corporate actions, share reconciliations, and market-making practices.

10. **Pre- and Post-Judgment Interest:**

Award pre- and post-judgment interest on all compensatory damages to account for the time value of the Plaintiff's losses.

11. **Additional Relief:**

Grant such other and further relief as the Court may deem just and proper to protect Plaintiff's rights, restore market integrity, and ensure compliance with constitutional safeguards.

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

223. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:

Jason Rolo, pro se

L6 Surrey Ln

Torrington, CT 06790

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Jason Rolo, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on                                     **Signature:** _____

                                                **Name:** Jason Rolo