IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

Jason Rolo,

                              Plaintiff,

        v.

SECURITIES & EXCHANGE COMMISSION

FINANCIAL INDUSTRY REGULATORY AUTHORITY

DEPOSITORY TRUST & CLEARING CORPORATION

JOHN DOE 1 - 100

                              Defendants,

Case No.:  3:24-cv-02053

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CONSTITUTIONAL PRINCIPLES**

JAN 14 2025 PM 12:27
FILED-USDC-CT-HARTFORD

**JURY TRIAL DEMANDED**

# First Amended Complaint

# I. INTRODUCTION

1. This action arises from a systemic and deliberate pattern of market manipulation, regulatory negligence, and constitutional violations, resulting in significant and irreparable financial harm to retail investors. The claims in this case center on the trading irregularities, governance failures, and statutory breaches associated with Meta Materials, Inc.'s Series A Preferred Shares (MMTLP) and their transition to Next Bridge Hydrocarbons (NBH). Plaintiff Jason Rolo seeks to hold accountable all culpable parties, including but not limited to regulatory entities such as the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), and the Depository Trust & Clearing Corporation (DTCC). The complaint further implicates market makers, broker-dealers, and other financial entities who engaged in exploitative practices, unjustly enriching themselves at the expense of retail investors, in violation of federal securities laws and constitutional protections.

2. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares, effectively freezing all trading activity and denying investors access to their assets. While FINRA cited "extraordinary circumstances" as justification, the halt has been widely criticized for procedural irregularities, lack of transparency, and constitutional violations. This action, taken without resolving material discrepancies in share reconciliation, exacerbated the financial losses of retail investors, undermined public trust in regulatory accountability, and left investors in an inequitable position. While FINRA may seek to assert regulatory immunity, such immunity does not protect actions that exceed statutory authority, violate constitutional principles, or are undertaken in a private entity capacity. In *SEC v. Sloan*, 436 U.S. 103 (1978), the Supreme Court

held that regulatory bodies lack authority to exceed their statutory limits, stating that "the Commission does not have the authority under § 12(k)... to issue a series of summary orders that would suspend trading in a stock beyond the initial 10-day period." Similarly, in *Alpine Securities Corporation v. FINRA*, the D.C. Circuit emphasized the limitations of FINRA's authority, noting that "there is a serious argument that FINRA hearing officers exercise significant executive power with insufficient oversight." Plaintiff asserts that FINRA's conduct in imposing and maintaining the U3 halt constitutes an abuse of discretion, a violation of statutory and constitutional protections, and demands judicial intervention to remedy the significant harm inflicted upon retail investors.

3. Beyond the MMTLP trading halt, FINRA's refusal to disclose Blue Sheets—critical records for tracking transactional activity—exposes significant regulatory failures. Under the Anti-Money Laundering Act (AMLA), regulators are mandated to detect and report suspicious activities, including manipulative practices such as synthetic share creation and naked short selling. By withholding these essential records, FINRA has hindered investigations into financial crimes and obstructed efforts to uphold market integrity. These statutory obligations under the AMLA are non-discretionary, and FINRA's failure to comply with these requirements places its actions outside the scope of any claimed regulatory immunity. This regulatory inaction recalls the deficiencies identified in *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), where lapses in oversight enabled a massive fraud scheme to go undetected for years. Such failures not only jeopardize market integrity but also erode public trust in regulatory bodies tasked with safeguarding the financial system. Plaintiff asserts that FINRA's refusal to disclose Blue Sheets and its failure to meet its statutory obligations under the AMLA constitute actionable

misconduct requiring judicial intervention to restore transparency, accountability, and investor confidence.

4. Further compounding these regulatory failures, this lawsuit challenges the constitutional validity of FINRA's authority, citing violations of the nondelegation doctrine and the Appointments Clause. As emphasized in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), "the accumulation of these structural protections does not transform an agency into a freestanding government entity." Similarly, in *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2427 (2024), the Court reiterated that improper delegation of governmental powers to private entities undermines essential principles of accountability and oversight. FINRA, as a privately controlled self-regulatory organization wielding significant governmental authority, operates within a governance structure that raises profound concerns regarding due process, the absence of meaningful checks and balances, and the lack of constitutional safeguards. Immunity cannot shield conduct that violates constitutional principles or governance structures that fail to ensure fairness and accountability. These issues are further illustrated in *Alpine Securities Corp. v. FINRA*, 982 F.3d 68 (D.C. Cir. 2020), where the court highlighted procedural deficiencies in FINRA's enforcement actions and their adverse implications for due process. Collectively, these constitutional challenges expose systemic governance failures that have exacerbated investor harm, eroded due process protections, and undermined public confidence in regulatory institutions. FINRA's governance structure and enforcement practices require judicial scrutiny to rectify these constitutional deficiencies and restore accountability in financial regulation.

5. The SEC has similarly exhibited significant regulatory deficiencies, as evidenced by its failure to collect nearly $10 billion in fines over the past decade. This inability to enforce its penalties

undermines investor protections, emboldens misconduct, and allows systemic abuse to persist unchecked. Specific cases of enforcement failures, particularly in areas involving insider trading and financial fraud, underscore the need for substantial reform in the SEC's operational framework. These shortcomings are exemplified in the agency's handling of the MMTLP-to-Next Bridge Hydrocarbons transition and unresolved discrepancies in share reconciliation during the TRCH-to-MMAT merger. During the earlier merger, approximately 30 million shares were shorted and remained unresolved post-merger, causing significant market instability and further undermining investor trust. Additionally, MMAT itself continued to experience extensive short positions, exacerbating financial harm to retail investors. These patterns of inaction erode public confidence in regulatory oversight and raise substantial concerns regarding potential violations of due process protections under the Administrative Procedure Act (APA). As articulated in *Jarkesy v. SEC*, 34 F.4th 446 (2022), "due process requires regulatory agencies to adhere to statutory mandates and provide fair procedures to those affected by their actions." These enforcement failures, coupled with the agency's inaction in addressing critical market abuses, constitute systemic violations of statutory and constitutional obligations, necessitating judicial intervention to ensure accountability.

6. To address these pervasive deficiencies and the resulting financial harm to retail investors, this complaint seeks comprehensive remedial actions. These include the release of Blue Sheet records to enhance transparency, audits to identify and reconcile synthetic shares, and structural reforms to prevent future market irregularities. Such measures are essential to restoring market integrity and investor trust. Legal precedents, including SEC v. Capital Gains Research Bureau, Inc. (375 U.S. 180, 1963), emphasize the critical role of transparency and oversight in preventing fraudulent practices and safeguarding market fairness. The Court in Capital Gains Research

underscored that "regulators must prioritize disclosure and fairness to safeguard market integrity."

7. Collectively, these allegations present the Court with a critical opportunity to address a pervasive pattern of regulatory failures, constitutional violations, and market manipulation that have caused significant harm to retail investors. The issues raised in this case, including FINRA's failure to comply with its statutory obligations under AMLA, underscore the need for enhanced transparency, accountability, and oversight within the financial regulatory framework. By considering the Plaintiff's request for remedial measures—such as the release of Blue Sheet records, audits to identify synthetic shares, and structural reforms—the Court has the chance to rectify these systemic deficiencies, uphold the principles of fairness and due process, and restore investor confidence in the integrity of U.S. financial markets. In doing so, the Court can affirm that regulatory bodies must operate "within the bounds of their statutory authority, emphasizing that regulatory actions must maintain transparency and adhere to legal frameworks, as illustrated in Free Enterprise Fund v. PCAOB (561 U.S. 477, 2010) and SEC v. Sloan (436 U.S. 103, 1978) ensuring that accountability and fairness remain central to regulatory oversight.

## II.    JURISDICTION AND VENUE

8. Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 1 Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. § 1367.2–27).

9. Diversity jurisdiction is proper under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000, excluding interest and costs, and there is complete diversity between the

Plaintiff, a Connecticut resident, and the Defendants, whose principal offices are in New York, Washington, D.C., and currently unknown locations.

10. Venue is appropriate in the United States District Court for Connecticut under 28 U.S.C. § 1391(b) and C.G.S § 52-59(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

## III.   **PARTIES**

11.  Plaintiff: Jason Rolo (hereinafter referred to as "Plaintiff" or "Rolo") has at all times mentioned herein been a resident and citizen of the City of Torrington, in the County of Litchfield, in the State of Connecticut. He is a small business owner and shareholder of Meta Materials and Next Bridge Hydrocarbons.

12.  Defendant Securities and Exchange Commission (SEC): The Securities and Exchange Commission (hereinafter "SEC") is the federal agency responsible for enforcing securities laws, regulating the securities industry, and ensuring market integrity. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

13.  Defendant Financial Industry Regulatory Authority (FINRA): The Financial Industry Regulatory Authority (hereinafter "FINRA") is a self-regulatory organization authorized by the Securities and Exchange Commission (SEC) to oversee and regulate broker-dealers and ensure compliance with federal securities laws. FINRA is headquartered at 1735 K Street NW, Washington, D.C., 20006.

14. Defendant Depository Trust & Clearing Corporation (DTCC): The Depository Trust & Clearing Corporation (hereinafter "DTCC") is a financial services organization responsible for

providing clearing, settlement, and information services for securities trading in the United States. DTCC is headquartered at 55 Water Street, New York, New York, 10041.

15. John Does 1-100 (hereinafter collectively referred to as "Doe Defendants or market participants"): Market makers, broker-dealers, and other entities whose identities are currently unknown but are believed to have participated in the alleged misconduct.

## IV.    STATEMENT OF FACTS

16. The Committee on Uniform Securities Identification Procedures (CUSIP) assigns unique nine-character identifiers to financial securities, ensuring accurate processing, clearing, and settlement of transactions. Unlike Central Index Key (CIK) numbers issued by the SEC to identify filing entities, CUSIP numbers apply to specific securities and change with formal corporate actions.

17. On May 2, 2008, Pole Perfect Studios registered as a private company under CIK number 0001431959. Following its merger with Torchlight Energy Resources on November 23, 2010, this CIK number transferred to Torchlight, ensuring compliance with SEC regulations and maintaining continuity in governance.

18. Torchlight Energy Resources, Inc., faced with evolving market conditions and significant shifts within the energy sector, sought strategic opportunities to secure its long-term viability. In September 2020, its Board of Directors approved a merger with MetaMaterials Inc., a Canadian company specializing in advanced materials and nanotechnology. The proposed merger aimed to transition Torchlight from its traditional oil and gas exploration business to the high-growth advanced materials industry. The merger was framed as a strategic initiative to integrate

MetaMaterials' technologies, align with sustainability goals, and offer Torchlight shareholders access to emerging markets with significant growth potential.

19. The merger, formally announced on December 14, 2020, was structured under a definitive agreement as a statutory plan of arrangement. Under the terms, MetaMaterials shareholders received approximately 75% equity in the combined entity, while Torchlight shareholders retained 25% ownership along with rights to a preferred stock dividend tied to proceeds from the divestiture of Torchlight's oil and gas assets. This transaction also facilitated a strategic realignment of operations, enabling the combined entity to focus on advanced materials technologies and leveraging MetaMaterials' intellectual property to enhance financial stability and market positioning.

20. As part of the Reverse Takeover Agreement, Torchlight Energy Resources issued one Series A preferred share dividend for each share held as of June 24, 2021. The settlement adhered to a T+2 timeline, requiring all acquisitions to be completed by June 22, 2021. Concurrently, options for TRCH stock were introduced, aligning with the company's underwritten public offering conducted by Roth Capital Partners LLC in June 2021.

21. A Z-test statistical analysis conducted on July 14, 2024, revealed significant deviations in Torchlight Energy Resources' trading volume during the six-month period from January to June 2021 compared to historical averages. Trading volumes during this time-frame were statistically improbable under ordinary market conditions, strongly indicating extraordinary market events or factors influencing trading activity.

22. Evidence suggests that GTS Securities, in coordination with other market participants, engaged in naked short selling of TRCH stock during the first half of 2021. Indicators, such as

patterns of fail-to-deliver positions and inconsistencies in reported trading volumes, point to deliberate market manipulation, contributing to excessive trading activity observed during this period.

23. Fails-to-deliver (FTDs) disproportionately harm small investors by distorting market prices, suppressing transparency, and amplifying volatility. These settlement failures often result from manipulative practices, such as naked short selling, which contravene the principles of market integrity outlined in SEC Regulation SHO. FTD's restrict small investors' ability to buy or sell securities, delay transaction settlements, and lead to financial losses due to artificially inflated or deflated prices. Moreover, small investors face limited recourse, as regulatory actions against violators typically fail to provide direct restitution. While measures like Regulation SHO mandate pre-borrow requirements and enforce close-out rules, the systemic effects of persistent FTDs continue to disadvantage retail investors and undermine confidence in fair market operations.

24. Academic research, including the study titled "ETF Short Interest and Failures-to-Deliver: Naked Short-Selling or Operational Shorting?" (Wharton School, 2017), provides empirical evidence that ETFs are frequently associated with high levels of FTDs. This study demonstrates that operational shorting, facilitated through the ETF creation and redemption process, can result in temporary failures-to-deliver, which closely mimic the effects of naked short selling. These findings highlight systemic vulnerabilities in ETF trading practices that are exploitable by market participants seeking to manipulate securities prices. The Plaintiff alleges that such vulnerabilities were exploited during the trading of MMTLP shares, where the misuse of ETFs and similar mechanisms facilitated the flooding of the market with synthetic shares, causing significant harm to retail investors.

25. Statistical evidence, including persistently high failures-to-deliver (FTDs), anomalous trading volumes, and discrepancies in share reconciliation for MMTLP shares, strongly indicates that certain market participants engaged in manipulative practices. These practices included reset transactions, involving sham or prearranged trades designed to temporarily reset the FTD clock without resolving the underlying delivery failures. Such conduct perpetuated naked short positions, artificially inflated the supply of MMTLP shares, and suppressed their value, all in violation of Regulation SHO's Rule 204, which mandates prompt resolution of FTD positions.

26. According to OCC Memorandum #48884, dated June 21, 2021, TRCH options were reclassified under the designation TRCH1, consisting of 100 shares of TRCH common stock and 100 shares of Series A Preferred Shares. The settlement of these reclassified options was delayed due to regulatory uncertainties and prevailing market conditions.

27. On June 25, 2021, Torchlight Energy Resources finalized its Reverse Takeover (RTO) transaction with MetaMaterials. As part of this transaction, a new CUSIP number (59134N104) was assigned to MetaMaterials, while the Central Index Key (CIK) number 0001431959 was reassigned from Torchlight Energy Resources to MetaMaterials. Following the RTO, MetaMaterials implemented a 2-for-1 reverse stock split of its outstanding shares.

28. On the same date, the Options Clearing Corporation (OCC) issued memoranda (#48904 and #48905), which outlined modifications to TRCH options, effective June 28, 2021. Pursuant to these memoranda, TRCH1 options were converted into MMAT1 options, representing 50 common shares of Meta Materials, Inc. (MMAT) and 100 Series A Preferred Shares of Torchlight Energy Resources, Inc. Additionally, TRCH options were reclassified as MMAT2 options, representing 50 common shares of MMAT without dividend entitlements. Settlement of these

reclassifications was delayed due to regulatory uncertainties and ambiguities surrounding the trading status of the affected securities.

29. Following the merger between Torchlight Energy Resources, Inc. (TRCH) and Meta Materials Inc. (MMAT), it was observed that a significant number of short positions in TRCH remained unresolved, contrary to expectations. According to data from FINRA, as reported on TradingView, approximately 30 million shares remained sold short, representing an estimated value of $150 million. Post-merger, MMAT commenced trading on public markets, while TRCH ceased trading entirely. In line with the merger's legal structure, which had been approved by the SEC, shareholders received a temporary, non-tradable placeholder dividend in their accounts, reflecting their entitlement under the terms of the merger.

30. On June 28, 2021, Torchlight Energy Resources distributed a Series A dividend to all shareholders of record, totaling 165,472,241 shares. These Series A Preferred Shares were later re-designated as Meta Materials Torchlight Preferred (MMTLP) shares in brokerage accounts, including platforms such as Robinhood and E*Trade. The MMTLP shares were structured to represent ownership interests in the assets of Torchlight Energy Resources, Inc., which were earmarked for transition to private ownership under the NBH designation. Notably, these shares were not intended for public trading but rather served as a representation of shareholder stakes in the spin-off entity.

31. According to Options Clearing Corporation (OCC) Memorandum #48884 on June 21, 2022, the "Series A Preferred Shares" were not intended to be listed on any national securities exchange. The memorandum allowed for over-the-counter bulletin board (OTCBB) transactions or broker-to-broker settlements for TRCH1 options and mandated cash settlements in cases of

failed delivery. These directives conflicted with the publicly stated intentions and official filings of Torchlight Energy Resources and Meta Materials regarding the settlement and handling of the Series A Preferred Shares.

32. GTS was required to record all short sales accurately, including naked short sales, and comply with SEC Rule 204(a) under the "market maker exemption." This exemption required compliance with FINRA Rule 204(b), mandating detailed reporting of fail-to-deliver positions. Upon information and belief, FINRA failed to inspect or verify GTS's compliance, raising questions about regulatory enforcement and oversight.

33. On April 26, 2017, the SEC issued a no-action letter to Latour Trading LLC, a broker-dealer and market maker, permitting the use of ETF share creation to close out failures-to-deliver (FTDs) under Rule 204 of Regulation SHO. This process allowed Latour to meet FTD obligations by submitting irrevocable creation orders through authorized participants (APs) without purchasing the underlying securities in the secondary market. While intended to facilitate market liquidity, this mechanism raised concerns about potential misuse to conceal persistent FTDs or enable naked short selling. The creation and redemption of ETF shares in "creation unit" aggregations, as outlined in SEC releases (Securities Act Release Nos. 8901 and 9922), were designed to enhance liquidity and price stability. However, the flexibility granted to APs and broker-dealers, including the substitution of cash for underlying securities, has been exploited to create synthetic shares, perpetuate FTDs, and suppress prices of underlying securities.

34. FINRA's enforcement actions against Scout Trading and Wedbush Securities in April 2015 highlighted vulnerabilities in the ETF creation and redemption process, which facilitated manipulative practices like prolonged short-selling and persistent failures-to-deliver (FTDs).

These practices harm market integrity, suppress prices, and disproportionately affect retail investors. Despite these precedents, FINRA failed to prevent similar abuses in the trading of MMAT and MMTLP shares. This failure allowed institutional participants to artificially inflate share supply, suppress prices, and perpetuate synthetic share creation, exposing systemic regulatory shortcomings.

35. The Depository Trust & Clearing Corporation (DTCC), through its subsidiaries, including the National Securities Clearing Corporation (NSCC) and Fixed Income Clearing Corporation (FICC), is tasked with ensuring transparency, accuracy, and stability in securities clearing and settlement processes. These responsibilities are critical to maintaining market trust and protecting investors. However, systemic lapses in oversight and enforcement have allowed unresolved FTDs and settlement discrepancies to persist, undermining market stability and exposing inefficiencies within the clearing process.

36. The DTCC, NSCC, and FICC hold a monopolistic position in the securities clearing and settlement industry, effectively controlling the market and limiting competition. This dominance has created systemic inefficiencies, including persistent FTDs and settlement failures, which suppress competition and distort market dynamics. Such practices may constitute violations of the Sherman Antitrust Act by restraining trade and suppressing competition. See *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) holding that monopoly power coupled with exclusionary conduct can violate antitrust laws.

37. On December 23, 2024, U.S. Treasury settlement failures processed by the DTCC reached their highest daily value of the year, totaling $73.87 billion. By December 24, 2024, the aggregate settlement failures amounted to approximately $6.63 trillion. These figures underscore

ongoing inefficiencies within the clearing and settlement system. Such unresolved failures exacerbate market instability and highlight the urgent need for regulatory reforms to safeguard the integrity of U.S. financial markets.

38. On or around October 7, 2021, GTS, under the leadership of Ari Rubenstein, and Canaccord Genuity facilitated the unauthorized public trading of MMTLP shares on the OTC market. This trading violated the terms outlined in Torchlight Energy Resources' proxy statement, which explicitly prohibited such activity, and was conducted without the approval or consent of Torchlight Energy Resources or Meta Materials executives. These unauthorized actions disregarded established corporate governance protocols and regulatory requirements.

39. Broker-dealers involved in the trading of MMTLP shares relied on an exemption under SEC Rule 15c2-11, which permits quotations in response to unsolicited customer orders without the comprehensive issuer information review required under Form 211. This reliance, combined with the use of outdated and incomplete issuer information, enabled the trading of MMTLP shares without proper regulatory oversight.

40. Meta Materials Inc. ("MMAT") and its Series A Preferred Shares ("MMTLP") share the same Central Index Key (CIK) number as issued by the Securities and Exchange Commission (SEC). This shared identifier, intended to track entities rather than securities, has contributed to significant discrepancies in transaction reporting and reconciliation. By aggregating data for both securities under a single CIK, brokers and market participants obscured distinctions between MMAT and MMTLP shares, resulting in inflated float figures, misreported outstanding shares, and an inability to ensure accurate share tracking. This conflation directly undermined market transparency, exacerbated settlement failures, and impeded shareholder reconciliation efforts. The

failure of regulatory oversight to address the implications of a shared CIK highlights systemic vulnerabilities that facilitated market manipulation and synthetic share creation, contrary to Rule 10b-5 of the Securities Exchange Act of 1934.

41. On or about October 7, 2021, John Brda, the former CEO of Torchlight Energy Resources, reported the unauthorized trading of the Series A dividend (MMTLP) to OTC Markets. OTC Markets redirected Brda to FINRA, which dismissed the complaint, citing his lack of standing as a former executive. Brda also brought this matter to the attention of George Palikaras, the CEO of Meta Materials, who informed Patti Casimates at FINRA. Despite the trading of the dividend occurring against the company's will, Casimates dismissed the concerns, offering no assistance and refusing to disclose who authorized the trading or why it was permitted to commence. The unauthorized trading of MMTLP shares, despite explicit corporate statements that these shares were not intended for public trading, constitutes fraudulent conduct under Section 17(a) of the Securities Act of 1933. This trading activity misrepresented the securities' nature and eligibility, misleading retail investors into believing the shares were tradable. Such deceitful practices were further exacerbated by FINRA's failure to intervene or investigate, which allowed for the manipulation of MMTLP shares.

42. At its inception, MMTLP was placed on the OTC Threshold List, reflecting substantial aggregate fail-to-deliver (FTD) positions persisting for five or more consecutive settlement days, as defined by Rule 203(b)(3) of Regulation SHO and FINRA Rule 4320. Despite this designation, FINRA failed to take corrective action to address the ongoing FTDs. This regulatory inaction constituted a clear abdication of FINRA's responsibilities under Regulation SHO and allowed manipulative market practices to persist unchecked.

43. Between October 7, 2021, and December 8, 2022, GTS, leveraging its market maker exemption, traded synthetic MMTLP shares without proper "locates," causing unauthorized share issuance that exceeded the authorized float and violated FINRA Rule 2010, Regulation SHO, and Section 10(b) of the Securities Exchange Act of 1934. Simultaneously, the Depository Trust & Clearing Corporation (DTCC) failed to address billions of dollars in unresolved failures-to-deliver (FTDs), enabling manipulative practices such as naked short selling and synthetic share creation, undermining market integrity, destabilizing the financial system, and reflecting a systemic regulatory breakdown.

44. The vulnerabilities inherent in over-the-counter (OTC) markets have been widely recognized, as established in *Burke v. China Aviation Oil (Singapore) Corp., Ltd.*, 421 F. Supp. 2d 649 (S.D.N.Y. 2005). The court observed that OTC markets, such as the OTC Bulletin Board and Pink Sheets, lack the efficiency, transparency, and regulatory oversight of major exchanges like NASDAQ. This lack of oversight fosters conditions for manipulative practices, as evidenced by the trading of MMTLP shares. The placement of MMTLP on the OTC Threshold List, alongside persistent failures-to-deliver (FTDs), exemplifies the structural inefficiencies highlighted in *Burke*, which exacerbate investor harm and undermine market integrity.

45. The unresolved failures in Treasury settlement obligations align with broader market inefficiencies, including persistent FTDs. The Fixed Income Clearing Corporation (FICC) and the National Securities Clearing Corporation (NSCC), both subsidiaries of the DTCC, play critical roles in facilitating Treasury and securities transactions. The FICC serves as the sole central counterparty for U.S. government securities, while the NSCC handles equities and other securities. Despite their pivotal responsibilities, these entities have demonstrated significant

operational and regulatory shortcomings. These systemic vulnerabilities have contributed to market manipulation, investor harm, and broader financial instability.

46. FINRA, as a self-regulatory organization, failed to meet its statutory obligations under Section 15A(b)(6) of the Securities Exchange Act (15 U.S.C. § 78o-3(b)(6)) to prevent manipulative trading practices and ensure orderly markets. Furthermore, FINRA neglected its responsibilities under the Anti-Money Laundering Act (AMLA), enacted as part of the Bank Secrecy Act (31 U.S.C. § 5318(g)), to monitor, detect, and report suspicious activities. For example, OTC Link LLC, a subsidiary of OTC Markets Group Inc., recently settled with the SEC for $1.19 million over AMLA violations, including the failure to file Suspicious Activity Reports (SARs) related to potentially manipulative trading activity. This settlement underscores systemic deficiencies in AMLA compliance among FINRA-regulated entities and highlights FINRA's failure to enforce AMLA standards effectively.

47. This regulatory failure mirrors the systemic lapses highlighted in *In re Bernard L. Madoff Investment Securities LLC*, 740 F.3d 81 (2d Cir. 2014), where unchecked inaction by regulators enabled widespread financial harm. Similarly, in October 2022, FINRA fined UBS Securities LLC $2.5 million for violations of Regulation SHO, including failing to close out over 5,300 failure-to-deliver (FTD) positions and executing more than 73,000 short sales in securities with unsatisfied close-out requirements. These enforcement actions underscore FINRA's broader supervisory deficiencies, particularly in addressing persistent FTDs and manipulative trading practices.

48. FINRA failed to enforce the mandatory close-out provisions of Regulation SHO, which require broker-dealers to resolve fail-to-deliver (FTD) positions that persist for more than 13

consecutive settlement days. This regulatory lapse enabled FTD positions to remain unresolved, facilitating prolonged market manipulation. Such inaction also violated FINRA Rule 11810, which governs the timely close-out of failed trades. FINRA's failure to enforce these provisions has caused significant harm to investors, undermined market integrity, and perpetuated conditions conducive to fraudulent practices.

49. On March 23, 2023, FINRA disclosed in a FAQ that a "systems coding error" had incorrectly classified MMTLP as a non-SEC-reporting company. This misclassification contributed to MMTLP's improper inclusion on the Threshold Securities List, compounding regulatory lapses. Moreover, FINRA's unauthorized decision to allow public trading of MMTLP—a Series A Preferred Share explicitly not intended for public trading—further exacerbated these errors.

50. Between October 1 and December 8, 2022, MMTLP shares experienced extreme price volatility, with prices ranging from $2.85 to $12.50 and market capitalization fluctuating between $1.5 billion and $6.5 billion. Given the authorized share count of 165.5 million, this volatility suggests the presence of synthetic shares or naked short selling. Such activity potentially violated FINRA Rule 5210 and anti-manipulation provisions of the Securities Exchange Act of 1934.

51. On December 6, 2022, FINRA announced a corporate action to cancel MMTLP shares and replace them with shares of Next Bridge Hydrocarbons, effective December 13, 2022. However, the procedural irregularities surrounding this corporate action raised concerns about compliance with FINRA Rule 6490, which governs the proper handling and execution of corporate actions to ensure fairness and transparency. These irregularities undermined investor confidence and cast doubt on the integrity of the process.

52. On December 7, 2022, FINRA and Meta Materials confirmed the corporate action, halting all new trades in MMTLP shares effective after December 8, 2022. Close-only trades were permitted on December 9 and 12, 2022. FINRA specified that MMTLP shares would be officially canceled on December 13, 2022, with a pay date for the distribution of Next Bridge Hydrocarbons shares or dividends set for December 14, 2022. Despite these announcements by FINRA, Meta Materials, and brokerages via email communications, inconsistencies in communication and implementation raised concerns about regulatory compliance and investor protections.

53. Also on December 7, 2022, Jeff Mendl, Vice President of OTC Markets, announced that MMTLP shares would remain tradable until December 12, 2022, pursuant to FINRA's directive, with their removal from the OTC market scheduled for December 13, 2022. However, the lack of clear and consistent guidance provided to market participants during this transition raised potential compliance issues under FINRA Rule 2010, which mandates adherence to high standards of commercial honor and equitable principles of trade. On December 8, 2022, multiple brokerage firms applied a "Caveat Emptor" designation to MMTLP shares, categorizing them as high-risk securities. This designation, coupled with inadequate disclosure to investors, constitute a material omission in violation of Rule 10b-5 of the Securities Exchange Act of 1934, which prohibits misleading statements or omissions of material facts in connection with the purchase or sale of securities.

54. On December 8, 2022, FINRA and the Depository Trust & Clearing Corporation (DTCC) convened a call to address unresolved issues related to the corporate action involving MMTLP shares. Legal representatives of Meta Materials and Next Bridge Hydrocarbons were excluded from this discussion, raising concerns about transparency and adherence to due process requirements under FINRA Rule 3110, which governs supervisory obligations. This exclusion

undermined the integrity of the corporate action process and deprived issuers of an opportunity to participate in critical discussions affecting shareholder interests.

55. Later that same day, FINRA unilaterally amended the corporate action notice, changing the language from "CANCELLED" to "DELETED" and removing the December 14, 2022, pay date. These modifications were made without issuer consent, resulting in significant confusion among shareholders and disrupting the corporate action process. Such unilateral changes appear to contravene FINRA Rule 6490, which requires issuer authorization for amendments that impact compliance with SEA Rule 10b-17. This lack of adherence to regulatory protocols further exacerbated concerns about FINRA's procedural integrity and its commitment to fair market practices.

56. In a sworn affidavit submitted in *Inter-coastal Waterways LLC v. Tradestation v. FINRA*, Civil Action No. 0:24-cv-60891-AHS (S.D. Fla.), George Palikaras asserted that FINRA unilaterally revised the corporate action on December 8, 2022, following discussions with the DTCC. This revision was executed without consultation or authorization from Meta Materials or Next Bridge Hydrocarbons. These actions underscore a significant lack of transparency and deviation from established corporate governance and regulatory protocols, further undermining shareholder trust and market confidence.

57. At the close of trading on December 8, 2022, short position holders employed the 505 code (S.O.S.), signaling an urgent need to close positions. Transactions during this period exceeded 100 times the closing price, reflecting a severe short squeeze and indicating systemic market manipulation. Such activity potentially violated FINRA Rule 6140, which governs trading

practices designed to prevent market manipulation, further demonstrating systemic vulnerabilities and lapses in regulatory oversight.

58. Before and after December 8, 2022, brokerages received limit orders for MMTLP shares at prices ranging from under $100 to $1,500 per share, many of which were marked as "too late to cancel." On December 9, 2022, FINRA imposed a permanent U3 trading halt on MMTLP shares, citing "extraordinary circumstances." This halt effectively froze shareholder investments and blocked planned transactions, including those by the plaintiff. By failing to address unresolved short positions before imposing the halt, FINRA acted in violation of its obligations under Section 6(b)(5) of the Securities Exchange Act, which requires self-regulatory organizations to design and enforce rules that promote fairness and prevent manipulation. Furthermore, FINRA's actions violated FINRA Rule 2010, as the trading halt lacked transparency, failed to equitably account for unresolved investor positions, and resulted in disproportionate harm to retail investors. These failures demonstrate a disregard for the high standards of commercial honor and equitable principles required of FINRA in its regulatory capacity.

59. In its December 9, 2022, notice, FINRA justified the U3 permanent trading halt on the grounds of uncertainty surrounding the settlement and clearing processes, claiming the action was necessary to protect investors and the public interest. However, the halt, which officially ended on December 13, 2024, failed to resolve the underlying issues. As of December 29, 2024, the matter remained unresolved for 750 days, leaving affected shareholders without meaningful remedies. This prolonged inaction raises serious concerns about FINRA's effectiveness in managing and resolving disputes in a timely manner.

60. FINRA's handling of the U3 permanent trading halt on December 9, 2022, constitutes a violation of investors' Fifth Amendment due process rights. By unilaterally freezing trading activity, FINRA deprived investors of their financial interests without adequate notice or an opportunity to seek redress. This failure echoes the concerns raised in *Jarkesy v. SEC*, where the Supreme Court emphasized the necessity of procedural safeguards in agency actions imposing penalties or restrictions. Similarly, *Lucia v. SEC* highlights the constitutional limits on agency powers, underscoring the need for FINRA's governance structure and decision-making processes to comply with due process requirements. FINRA's actions in this matter lacked transparency, judicial oversight, and constitutionally mandated protections.

61. FINRA derives its authority to impose trading halts from the Securities Exchange Act of 1934, which grants it broad regulatory powers to oversee market activities and address irregularities. However, as a private entity operating with significant governmental authority, FINRA's governance structure—led by a privately appointed Board of Governors—raises significant constitutional concerns regarding the separation of powers. The absence of direct federal oversight diminishes accountability and raises questions about its legitimacy as a regulatory body. These concerns are particularly evident in the events surrounding the MMTLP corporate action and the imposition of the U3 trading halt, which highlight the potential for arbitrary decision-making and inadequate procedural safeguards in the absence of meaningful oversight.

62. The lack of federal appointment or oversight of FINRA's governance raises significant structural concerns regarding its legitimacy and accountability, potentially violating the Appointments Clause of the U.S. Constitution. The Appointments Clause mandates that principal officers of the United States, or those exercising significant governmental authority, must be

appointed by the President or other constitutionally designated entities. FINRA's governance structure, led by a privately appointed Board of Governors, calls into question its constitutional authority to exercise quasi-governmental regulatory powers.

63. Despite approving Next Bridge Hydrocarbons' (NBH) S-1 filings in 2022, FINRA failed to impose position-close-only restrictions on MMTLP shares before the December 9, 2022, U3 trading halt. These restrictions could have mitigated volatility and facilitated a smoother transition. FINRA's omissions highlight procedural and substantive deficiencies akin to those addressed in *Jarkesy v. SEC*, where the discretionary powers of regulatory bodies were deemed excessive and unconstitutional in the absence of clear legislative guidelines. The lack of intelligible principles guiding FINRA's enforcement decisions exacerbated harm to retail investors and underscored the structural and procedural flaws within its regulatory framework.

64. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged the existence of unresolved short positions in Next Bridge Hydrocarbons, a private company not intended for public trading. Coulson noted that resolving these short positions would have been more manageable if Next Bridge shares had remained publicly tradable. This acknowledgment indirectly highlighted the complications arising from FINRA's actions and emphasized the regulatory missteps that contributed to market irregularities during the corporate transition.

65. On March 16, 2023, 97 days after the U3 trading halt, FINRA issued its first FAQ regarding the halt but failed to provide a clear explanation of the "extraordinary circumstances" that purportedly justified the action. Additionally, on February 20, 2023, a TD Ameritrade (TDA) employee, identified as Fleming, stated in a recorded conversation with Traudt that the December 9, 2022, U3 halt was requested by broker-dealers to "protect ourselves." This statement,

documented in *Traudt v. Rubenstein*, Docket No. 2:34-cv-782 (D. Vt. 2024), underscores that the halt prioritized institutional interests over the protection of retail investors, raising serious questions about FINRA's impartiality and commitment to its regulatory mission.

66. Although TD Ameritrade initially granted Traudt access to the recording of the conversation with Fleming, this access was later revoked following TDA's acquisition by Charles Schwab. The repeated refusal to release the audio raises significant concerns about a coordinated effort to suppress evidence that could illuminate the rationale behind the trading halt. This lack of transparency undermines confidence in FINRA's regulatory decisions and further suggests potential collusion between broker-dealers and FINRA to conceal material facts.

67. Pursuant to FINRA Rule 6440, temporary trading halts are permitted when extraordinary events occur, material information about a security is unavailable, or there is evidence of trading activity that may violate U.S. securities laws. A delay of several days following the detection of fraudulent activity may constitute a violation of this rule, particularly if an earlier trading halt could have mitigated harm to investors. Documents obtained through a Freedom of Information Act (FOIA) request in April 2023 revealed that trading irregularities involving MMTLP shares were flagged on the Securities and Exchange Commission's (SEC) fraud monitoring systems as early as December 5, 2022. On December 9, 2022, FINRA imposed a U3 trading halt pursuant to FINRA Rule 6440, citing "extraordinary circumstances."

68. However, this use of Rule 6440 was unnecessarily extreme, as FINRA had the option to invoke Rule 6490 to delay or deny processing the corporate action instead of halting trading entirely. By choosing the more drastic measure, FINRA effectively froze shareholder investments and disrupted planned transactions, causing significant harm to investors. This decision raised

serious concerns about procedural fairness and adherence to FINRA's regulatory obligations, particularly the obligation to use measures proportionate to the circumstances. Furthermore, the lack of transparency surrounding this decision amplified confusion and mistrust among investors.

69. Access to Blue Sheets, which contain transactional data for MMTLP and MMAT shares, is critical for identifying potential manipulative trading practices, such as synthetic share creation and naked short selling. These documents are essential for reconciling discrepancies between reported trade volumes and legitimate share issuances and for substantiating allegations of market manipulation. The ongoing denial of access to Blue Sheets has obstructed transparency, hindered the enforcement of anti-money laundering laws, and left critical questions about market disruptions unanswered. Releasing these documents would advance accountability, facilitate independent investigations, and restore investor confidence by ensuring regulatory transparency.

70. The SEC and FINRA were aware of potential fraudulent activity involving MMTLP shares as early as December 5, 2022, as confirmed by FOIA documents. However, the delayed imposition of the U3 trading halt on December 9, 2022, coupled with the refusal to provide access to Blue Sheets or other relevant disclosures, constitutes a dereliction of duty and a breach of fiduciary obligations. This failure to act promptly and transparently to protect investors, enforce securities laws, and ensure market integrity also violates the Administrative Procedure Act (APA).

71. On April 18, 2023, Clifton Dubose, CEO of Next Bridge Hydrocarbons, formally requested FINRA's assistance in addressing unresolved issues arising from the MMTLP spin-off. Dubose expressed concerns about unresolved short positions and the detrimental effects of FINRA's actions, including the U3 trading halt imposed on December 9, 2022. He proposed a temporary trading period to reconcile outstanding shares and urged FINRA to address discrepancies to

preserve market integrity. On June 7, 2023, FINRA denied this request without providing

substantive solutions or addressing the concerns of affected investors.

72. During a United States Senate Committee on Banking, Housing, and Urban Affairs full

committee meeting on September 12, 2023, Senator Mike Crapo questioned SEC Chair Gary

Gensler regarding the SEC's oversight responsibilities. Chair Gensler, who has referred to

himself as the "cop on the beat" for investors, acknowledged that FINRA had not requested the

SEC to investigate, seek advice, or provide guidance concerning the alleged MMTLP fraud or the

imposition of the U3 permanent trading halt. Chair Gensler further clarified that FINRA operates

as an independent self-regulatory organization, establishing and enforcing its own rules, while

the SEC conducts only an annual examination of FINRA's operations. This testimony highlights

the lack of coordination and communication between FINRA and the SEC in addressing

significant market irregularities and investor concerns.

73. On September 28, 2023, during a House Financial Services Committee hearing,

Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP-related issues.

Representative Norman specifically inquired whether Chair Gensler knew the aggregate share

count for MMTLP as of December 8, 2022. Chair Gensler acknowledged familiarity with

MMTLP but admitted he did not know the share count, suggesting the information might be

publicly available. Dissatisfied with the SEC's responses, Representative Norman announced his

intention to follow up with a formal letter requesting detailed information on the matter.

74. On November 6, 2023—332 days after the imposition of the U3 trading halt—FINRA

published a supplemental FAQ addressing the halt. However, the FAQ failed to define the

"extraordinary event" purportedly justifying the trading halt and offered limited substantive

information. FINRA disclosed that approximately 2.65 million short shares, representing 1.6% of the float, remained open but dismissed this figure as insignificant. Investors widely criticized the publication for its lack of transparency and failure to address key concerns, including how FINRA's actions allowed more shares to exist in a private company than were authorized. These omissions further suggest FINRA acted arbitrarily and capriciously in handling the corporate transition and trading halt.

75. Despite receiving thousands of complaints from affected shareholders, FINRA and the SEC have provided minimal communication or substantive solutions, leaving shareholders without meaningful recourse. FINRA has the legal authority to audit its members but has failed to do so. Public statements by FINRA representatives have even suggested that the organization lacks the means to audit its members effectively. Congressional efforts to demand transparency and accountability from these regulatory bodies have been met with resistance or inaction, exacerbating harm to investors and prolonging the uncertainty surrounding these issues.

76. On December 22, 2023, Representative Ralph Norman, along with over 70 members of Congress, sent a formal letter to FINRA and the SEC addressing issues related to Meta Materials Series A Preferred Shares (MMTLP). The letter called for increased transparency and accountability in resolving unresolved trading discrepancies and sought a comprehensive resolution to the ongoing issues impacting investors.

77. On November 21, 2023, Greg McCabe formally addressed these concerns in correspondence to Robert Colby, Executive Vice President and Chief Legal Officer at Finra, emphasizing that financial institutions were urgently seeking shares in volumes far exceeding FINRA's reported shortfall of 2.65 million shares. This discrepancy indicates significant systemic irregularities.

FINRA's failure to act has obstructed a thorough and necessary inquiry into these trading irregularities.

78. FINRA's disclosure of 2.65 million shares of MMTLP identified as short within its member firms, as referenced in its January 31, 2024, response to Congressman Ralph Norman, constitutes an incomplete representation of the total short interest. The reported figures fail to account for short positions held by non-member firms and foreign entities, which likely represent a significantly larger volume of short selling activity. FINRA allowed more shares to exist than what was authorized by the company and reported to the SEC by the company.

79. On February 8, 2024, Next Bridge Hydrocarbons (NBH) issued a formal clarification asserting that FINRA's data excluded foreign and non-member firms entirely, and further criticized FINRA's characterization of the short interest as "nominal." This omission underscores FINRA's reliance on inadequate regulatory tools, including the Consolidated Audit Trail and trade reporting facilities, which lack the capacity to conduct a comprehensive share count or fully ascertain the scope of short selling activity, particularly among non-member firms and foreign custodians. These deficiencies highlight FINRA's failure to adequately investigate or address the full extent of trading irregularities related to MMTLP.

80. Despite significant indicators of potential market manipulation or securities fraud, FINRA has failed to file a Suspicious Activity Report (SAR) with the Securities and Exchange Commission (SEC) or escalate these matters for further investigation. Pursuant to the Anti-Money Laundering Act (AMLA), the SEC possesses the authority to investigate non-member firms and foreign entities engaging in such activities. However, FINRA's inaction has effectively impeded the SEC's ability to exercise its oversight authority.

81. FINRA's decision to impose a U3 trading halt on MMTLP shares, rather than outright rejecting the corporate action, deprived shareholders of the opportunity to trade or reconcile their holdings. Next Bridge Hydrocarbons (NBH) has asserted that the terms of the corporate action remained unchanged throughout FINRA's review process, rendering the halt unnecessary and exacerbating investor confusion and financial harm. This decision exemplifies FINRA's broader failure to execute its responsibilities in a timely, transparent, and effective manner, particularly in addressing unresolved short positions. Such regulatory inaction undermines FINRA's obligations as a self-regulatory organization to uphold market integrity and protect investor interests.

82. On June 5, 2024, more than 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, formally requested an investigation into FINRA's handling of the MMTLP U3 trading halt and unresolved trading issues. This request was made in a letter addressed to SEC Chairman Gary Gensler, emphasizing the need for transparency and accountability in addressing investor concerns and market irregularities.

83. Several lawmakers, including Senator Mike Crapo and Vice President (former Senator) JD Vance, submitted additional requests for information to the Securities and Exchange Commission (SEC) regarding unresolved issues related to MMTLP. A separate letter signed by over 70 members of Congress highlighted the receipt of more than 40,000 investor complaints and called for an independent audit of outstanding shares, greater transparency, and a comprehensive SEC briefing. As of the date of this complaint, these requests remain unanswered.

84. As of December 4, 2024, there is no publicly disclosed evidence that Congressional requests have prompted meaningful action or policy changes by the Financial Industry Regulatory Authority (FINRA) or the SEC. Despite significant bipartisan Congressional support, including

over 70 co-signatories, FINRA and the SEC have made no substantial efforts to address trading irregularities or the concerns raised by investors.

85. Between 2013 and 2024, the Depository Trust & Clearing Corporation (DTCC) oversaw the clearing and settlement of trades involving TRCH, MMAT, and MMTLP shares. However, throughout this period, recurring settlement discrepancies, including those involving synthetic shares, caused substantial financial harm and persistent market uncertainty. Despite these issues, regulatory bodies such as FINRA, the SEC, and the DTCC failed to take meaningful action or collaborate effectively to resolve these irregularities. This gross dereliction of duty left critical trading discrepancies unresolved, directly contributing to widespread investor losses and a significant erosion of market integrity.

86. During the 2021 merger of Torchlight Energy Resources and Meta Materials, the designated transfer agent transitioned from AST to EQ, which assumed responsibility for shareholder reconciliation during the MMTLP-to-NBH transition. Despite EQ's obligation to maintain accurate records and disclose the outstanding share counts, significant discrepancies persist, leaving countless shareholders without clarity regarding their holdings. EQ's failure to ensure proper reconciliation and transparency has further compounded investor confusion and frustration, highlighting a systemic breakdown in the reconciliation process that remains unaddressed by the responsible parties.

87. More than two years after the MMTLP spin-off, thousands of shares remain unreconciled, tracked through approximately 18 internal CUSIPs not registered with AST or EQ. For example, brokerages such as Robinhood and E*TRADE use internal CUSIP 629999590 to track unconverted shares, reflecting systemic reconciliation failures. These delays, compounded by

varying brokerage fees, continue to hinder transparency and fair treatment for shareholders, raising serious concerns about the integrity of the reconciliation process.

88. On December 29, 2023, Tradestation publicly announced that the Next Bridge Hydrocarbons (NBH) certificates it received did not include lent-out shares. Due to the lack of a market for these shares, Tradestation was unable to recall them or register customer ownership with AST, making it the first brokerage to publicly acknowledge a shortfall in shares allocated during the distribution. This failure to reconcile MMTLP shares with NBH shares highlights significant deficiencies in securities tracking and trading processes, further exacerbating investor harm and undermining confidence in market integrity.

89. Pursuant to 17 CFR 242.204, broker-dealers are obligated to resolve failures to deliver (FTD) within T+2 settlement days to preserve market integrity and prevent abusive practices such as naked short selling. However, the deletion of MMTLP securities created a critical regulatory gap, as Rule 204 does not expressly address close-out obligations for securities subject to trading halts or deletions. This regulatory gap enabled unresolved short positions and synthetic shares to persist, resulting in substantial financial harm to retail investors, increasing the risk of market manipulation, and eroding public confidence in regulatory oversight.

90. Under Section 5318(h) of the Anti-Money Laundering Act (AMLA), financial institutions and regulatory bodies are mandated to detect and report suspicious activities, including market manipulation, fraud, or other illicit financial practices. While synthetic share creation and prolonged settlement failures disrupt market operations, such activities must be connected to fraudulent or manipulative conduct to trigger AMLA's reporting requirements. FINRA's failure to address unresolved short interest in MMTLP and related discrepancies constitutes a clear neglect

of its regulatory duties. This neglect, particularly in the face of persistent trading irregularities, exposes the market to manipulation risks and breaches FINRA's obligations under AMLA to prevent financial crimes. By permitting these systemic issues to persist, FINRA has failed to fulfill its statutory responsibilities, undermining its capacity to enforce meaningful regulatory oversight.

91. On December 9, 2022, the Financial Industry Regulatory Authority (FINRA) imposed a sudden U3 permanent trading halt on Meta Materials Series A Preferred Shares (MMTLP), just two days before the planned transition of these shares to Next Bridge Hydrocarbons. As of December 29, 2024, the halt has remained in effect for over 750 days, clearly establishing its permanency. While FINRA justified the halt by citing an "extraordinary event," it has failed to provide adequate transparency or a detailed explanation, leaving investors uncertain and raising serious concerns about the sufficiency and consistency of regulatory oversight. This prolonged inaction reflects systemic deficiencies in FINRA's regulatory processes and its failure to uphold its obligations to protect investors.

92. FINRA's communication regarding the MMTLP trading halt was delayed by 97 days, with an initial, vague FAQ released in March 2023. A supplemental FAQ issued 332 days later failed to address critical concerns, including allegations of synthetic shares and apparent regulatory failures. Despite thousands of complaints submitted to FINRA, the Securities and Exchange Commission (SEC), and Congress, no comprehensive investigations or hearings have been conducted. As a result, shareholders remain unable to trade their holdings, enduring ongoing financial losses and a lack of resolution to their claims.

93. Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. These practices artificially inflated market supply, suppressed the true value of legitimate shares, and caused significant financial losses for retail investors. Additionally, institutional actors have evaded their obligations to close short positions, frequently utilizing synthetic shares and engaging in naked short selling. If Next Bridge Hydrocarbons were to declare bankruptcy, the shares could become worthless, effectively absolving short sellers of their liabilities and further compounding retail investor harm.

94. Public records and shareholder complaints from 2023 and 2024 highlight systemic delays in addressing trading discrepancies related to MMTLP shares. Retail investors have been left without adequate resolution, raising concerns about equitable treatment. The prolonged regulatory inaction, especially when contrasted with the swift response to cases like GameStop, has significantly undermined public confidence in the transparency and fairness of U.S. financial markets.

95. Retail investors continue to face significant obstacles in accessing their investments in MMTLP shares following the U3 trading halt. Many report being unable to liquidate their holdings due to the halt, as well as encountering difficulties in transferring their shares from street name to direct registration. These barriers have exacerbated financial strain on investors, preventing them from fully exercising their rights and control over their investments and further highlighting the lack of effective regulatory oversight.

96. FINRA and the SEC have consistently denied access to Blue Sheet records for MMAT and MMTLP shares, despite numerous formal requests from shareholders, legal representatives, and

advocacy groups. This lack of transparency has hindered efforts to investigate allegations of naked short selling, synthetic share creation, and market manipulation. By withholding these critical records, FINRA and the SEC may be in violation of the Administrative Procedure Act (APA), which mandates transparency and access to information necessary for public oversight. This refusal to disclose Blue Sheets has compounded the challenges faced by retail investors and raised serious concerns about the effectiveness of regulatory enforcement.

97. The Financial Industry Regulatory Authority (FINRA) operates with significant constitutional deficiencies under the Appointments Clause and the Nondelegation Doctrine. As a self-regulatory organization vested with substantial governmental powers, FINRA functions without adhering to the constitutional requirement that principal officers be appointed by the President and confirmed by the Senate, as mandated by the Appointments Clause of the United States Constitution. Furthermore, Congress's delegation of regulatory authority to FINRA, a private entity, violates the Nondelegation Doctrine, which prohibits Congress from delegating its legislative powers to private entities without providing clear statutory parameters or accountability mechanisms.

98. These structural deficiencies are inconsistent with established constitutional principles articulated in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), where the Supreme Court emphasized the necessity of oversight and accountability to prevent unbridled regulatory power. FINRA's application of Rule 6440 to impose a U3 trading halt on MMTLP shares demonstrates its exercise of significant governmental authority in the absence of meaningful oversight or accountability mechanisms. This raises serious questions regarding the legitimacy of FINRA's actions, their consistency with constitutional mandates, and

the resulting adverse effects on retail investors who were deprived of procedural safeguards and transparency.

99. FINRA has further exacerbated these deficiencies by failing to maintain transparency in its enforcement practices. Specifically, FINRA's refusal to disclose Blue Sheets—essential transactional data necessary to investigate potential manipulative trading practices—has hindered efforts to address systemic market manipulation, including the proliferation of synthetic shares. This lack of transparency violates its obligations under the Anti-Money Laundering Act (AMLA) and erodes public trust in regulatory enforcement, leaving critical trading irregularities unresolved.

100. FINRA's misapplication of Rule 6440 during the MMTLP-to-NBH transition underscores a broader failure to integrate procedural safeguards critical to regulatory enforcement. By imposing a U3 trading halt without addressing unresolved short positions or enforcing reconciliation requirements under Regulation SHO and related FINRA rules, such as Rules 4320 and 11810, FINRA disrupted market operations and disproportionately harmed retail investors. This case exemplifies the systemic challenges posed by inconsistent enforcement and raises significant questions about the adequacy of FINRA's governance structure to ensure accountability.

101. The unresolved trading discrepancies in MMTLP exposed Meta Materials (MMAT) to predatory short-selling practices, enabling short sellers to devalue the company and drive it into financial ruin. This culminated in MMAT's bankruptcy filing on August 9, 2024, with final filings submitted on September 20, 2024. These events underscore the severe financial risks posed by regulatory failures and FINRA's overreach during the MMTLP-to-NBH transition. The regulatory deficiencies violated constitutional and statutory requirements, including the

Appointments Clause and the Nondelegation Doctrine, and allowed predatory short sellers to evade their financial obligations, compounding the harm to retail investors.

102. On December 4, 2024, the plaintiff, who suffered significant financial losses due to predatory short-selling practices, filed a Statement of Interest with the U.S. Bankruptcy Court for the District of Nevada concerning 2,500 MMATQ shares. These shares, adjusted following a 1-for-100 reverse stock split on January 29, 2024, are now part of the Chapter 7 bankruptcy proceedings. This filing highlights the financial hardship endured by retail investors, caused not by MMAT's business operations but by unchecked predatory short selling and the failure of regulatory bodies to intervene effectively.

103. Brokers routinely lend shares held in client margin accounts without notifying clients of the specific shares or quantities lent, as authorized by standard margin agreements. These agreements, which clients must sign to open a margin account, grant brokers the right to lend securities for collateral or short selling transactions. While Regulation SHO mandates close-out procedures for short sales, the lack of transparency regarding which shares are lent creates systemic vulnerabilities. Specifically, brokers' lending practices can facilitate naked short selling by enabling the proliferation of synthetic shares, as borrowers may fail to locate or deliver the underlying securities. This lack of transparency disproportionately impacts retail investors, who are often unaware that their shares are being lent or that these practices can artificially inflate share supply, suppress market prices, and destabilize market integrity.

104. Robinhood's implementation of a close-only position policy for MMTLP shares, coupled with its share lending program, exacerbated systemic imbalances in the market. This policy restricted investors' ability to protect their positions or recover losses, intensifying the financial

strain on retail investors. Furthermore, Joseph Iraci's involvement in FINRA's Uniform Practice Code (UPC) Committee raises serious concerns about the impartiality of regulatory decisions affecting Robinhood's operational policies. His dual role creates potential conflicts of interest that undermine confidence in the fairness and objectivity of the regulatory process, particularly in matters directly impacting Robinhood's practices.

105. Under the leadership of Frank La Salla as CEO, the Depository Trust & Clearing Corporation (DTCC) and its subsidiary, the National Securities Clearing Corporation (NSCC), were entrusted with the critical responsibilities of clearing and settling trades involving TRCH, MMAT, and MMTLP shares. Despite these responsibilities, persistent settlement discrepancies, particularly involving synthetic shares, revealed profound failures in oversight and accountability. These unresolved issues have destabilized the market, left investors vulnerable to ongoing harm, and raised serious doubts about the effectiveness of regulatory measures.

106. As of December 2024, Next Bridge Hydrocarbons has not been assigned a CUSIP number for its shares, complicating efforts to track and reconcile transactions. Brokerage statements and investor reports indicate that thousands of shares remain unreconciled more than two years after the U3 trading halt. This failure to resolve critical discrepancies underscores the inability of FINRA, the SEC, and the DTCC to coordinate effectively during the trading of TRCH, MMAT, and MMTLP shares, exemplifying systemic regulatory dysfunction and leaving investors without adequate recourse.

107. Self-Regulatory Organizations (SROs), such as FINRA, lose the protection of regulatory immunity when they exceed their statutory authority or fail to comply with their own rules, as affirmed by the Supreme Court in *Credit Suisse Securities (USA) LLC v. Simmonds*, 566 U.S. 221

(2012). FINRA's dual role as both regulator and operator of systems such as the OTC Reporting Facility (ORF) and Trade Reporting and Compliance Engine (TRACE) creates inherent conflicts of interest that compromise its impartiality and credibility. Similar concerns were raised in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), where the Court emphasized the dangers of unchecked regulatory authority. FINRA's duality raises serious questions about its ability to provide unbiased oversight while profiting from the very systems it regulates, undermining investor confidence in its governance.

108. FINRA's dual role as both a regulator and operator of market systems raises concerns about potential monopolistic practices that limit market access, suppress competition, and favor institutional interests over fairness and transparency. Retail investors, in particular, face systemic disadvantages in this environment, including inflated transaction costs, lack of pricing clarity, and barriers to equal market participation. These systemic issues indicate FINRA's failure to fully meet its regulatory obligations and raise questions about its effectiveness in ensuring the integrity and transparency of financial markets.

109. FINRA's regulation and operation of key trading platforms, including the Over-the-Counter Options (OOTC) and Alternative Display Facility (XADF), raise significant antitrust concerns. As both a regulator and operator, FINRA's dual role restricts fair market access, reduces competition, and grants it substantial control over market dynamics. The platforms operated under distinct Market Identifier Codes (MICs), such as OOTC, XADF, OTCQB, and OTC-UTP, further illustrate FINRA's monopolistic control over trading venues. Additionally, FINRA's ownership of eligible securities on the Unlisted Trading Privileges (UTP) platform and its facilitation of off-exchange (dark pool) trading of MMAT shares through OTC-UTP may have

contributed to discrepancies in share counts and trading volumes, exacerbating market imbalances.

110. Fractional share trading, supported by FINRA through the UTP Data Services and enhancements to the Securities Information Processor (SIP) system, can contribute to synthetic share creation by obscuring the actual share count. As fractional trades are bundled and reported under the UTP Quotation and Trade Data system, inaccuracies or aggregation errors in trade reporting can inflate the National Best Bid and Offer (NBBO) and the reported float. FINRA's role as both the UTP Plan administrator and the operator of the OTC Reporting Facility (ORF) and TRACE systems raises concerns about transparency, particularly in FINRA OTC-eligible securities where fractional shares could amplify discrepancies in share tracking and create opportunities for manipulative practices. This potential for synthetic share creation and market manipulation is exacerbated in dark pools, where fractional trades are often executed and aggregated without the same level of scrutiny as public exchanges.

111. The concentration of trading activity within dark pools and other off-exchange platforms not only suppresses competition but also creates significant barriers for retail investors to engage in fair market participation. These practices reduce market transparency, favor institutional investors, and distort the natural forces of supply and demand. Such conduct constitutes a potential violation of the Sherman Antitrust Act, which prohibits anti-competitive agreements and monopolistic practices.

112. Dark pools operate as private venues for securities transactions, allowing large orders to be executed discreetly outside of public exchanges to minimize their impact on market prices. In the United States, dark pools and other off-exchange venues, including internalizers, account for

approximately 40% of total equity trading volume. This significant proportion of trading activity raises serious concerns about the transparency and fairness of the market, disproportionately disadvantaging retail investors and undermining confidence in the integrity of public markets.

113. Meta Materials (MMAT) has consistently experienced dark pool trading volumes exceeding 55% on consecutive days, representing an excessively high proportion of off-exchange activity. This disproportionate trading volume has directly contributed to downward pressure on the stock price, distorting genuine market sentiment. Such activity undermines retail investors' ability to engage in fair trading and raises substantial concerns about the integrity and transparency of market operations.

114. The SEC and FINRA are responsible for regulating all trading venues, including dark pools. However, their enforcement of these regulations has been criticized as reactive rather than proactive, failing to deter manipulative practices effectively. The increasing reliance on dark pools has intensified calls for stricter regulations, enhanced transparency, and more robust oversight to protect market integrity and prevent exploitation.

115. Penalties imposed on financial institutions for misconduct in broker operations have proven insufficient as effective deterrents. Financial institutions often treat regulatory fines as a routine cost of doing business. For example, in 2016, Barclays and Credit Suisse were fined $70 million and $84.3 million, respectively, for violations that included misleading investors. These penalties, insignificant relative to the substantial profits generated by these institutions, underscore the ineffectiveness of current enforcement measures and raise concerns about the ability of regulatory bodies to ensure meaningful accountability.

116. Similarly, Robinhood's $65 million fine in 2020 for misleading customers about its revenue sources represented a negligible fraction of the profits it earned through payment for order flow during the period of violations. More recently, Citadel Securities and Wells Fargo faced similarly modest fines for significant regulatory violations. These settlements, often accompanied by "no admission of wrongdoing" clauses, contribute to the exploitation of regulatory loopholes. Such practices perpetuate a system that rewards misconduct rather than deterring it and undermine the integrity of market oversight, further eroding investor trust.

117. The pervasive "revolving door" between regulatory agencies and the private sector exacerbates conflicts of interest and contributes to lenient enforcement practices. Regulators frequently transition to lucrative positions within the firms they once oversaw, fostering an environment where financial penalties are viewed as a manageable cost of doing business rather than a meaningful deterrent. This revolving door dynamic undermines public confidence in the impartiality and effectiveness of regulatory bodies, perpetuating a culture of impunity among financial institutions.

118. Between 2019 and 2024, the Securities and Exchange Commission (SEC) failed to investigate significant settlement discrepancies involving synthetic shares under the management of the Depository Trust & Clearing Corporation (DTCC). This inaction allowed widespread market manipulation and resulting investor losses to persist. In *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the Supreme Court emphasized that oversight mechanisms must ensure accountability for entities vested with governmental authority, noting, "Without accountability, a regulatory body can stray beyond its statutory authority without consequence." Similarly, in *Credit Suisse Securities v. Simmonds*, 566 U.S. 221 (2012), the Court reinforced the necessity of effective oversight to prevent abuses within regulated systems. These principles were neglected

by the SEC, which permitted FINRA to operate with unchecked conflicts of interest, compounding systemic harm to investors.

119. The SEC has been repeatedly notified of manipulation occurring within dark pools, where trading volumes for stocks such as Meta Materials (MMAT) consistently exceeded 40% of total activity. Despite its mandate under the Securities Exchange Act of 1934 to prevent manipulative practices, the SEC has failed to implement effective enforcement mechanisms. The inadequacy of penalties, as demonstrated in cases such as Barclays and Credit Suisse, has perpetuated a regulatory environment in which manipulation is treated as a routine cost of doing business rather than a punishable violation.

120. Retail investors have suffered significant financial harm due to the SEC's failure to reconcile discrepancies in Next Bridge Hydrocarbons (NBH) shares following the imposition of the U3 trading halt. The lack of effective oversight and coordination among the SEC, FINRA, and the DTCC has destabilized markets and exposed a clear dereliction of duty to safeguard investors. As established in *Marbury v. Madison*, 5 U.S. 137 (1803), "It is emphatically the province and duty of the judicial department to say what the law is." Government entities, including regulatory agencies, cannot abdicate their responsibilities when inaction results in tangible public harm.

121. Substantial evidence exists of market manipulation involving Meta Materials Inc. (MMAT) and Meta Materials Preferred Shares (MMTLP), particularly through the creation and trading of synthetic shares. This practice, enabled by techniques such as naked shorting and the formation of synthetic positions, bypasses traditional reporting mechanisms and raises significant concerns about market transparency and investor confidence. Despite these clear indicators, the SEC and

FINRA have failed to act decisively, constituting a severe dereliction of their regulatory duties. As emphasized in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), "The fundamental purpose of the [Securities Exchange] Act was to achieve a high standard of business ethics in the securities industry."

122. Market makers, brokers, and proprietary trading firms operating on MIAX exchanges, including Citadel Securities, Virtu Financial, and Interactive Brokers, frequently engage in both domestic and offshore trading. While MIAX primarily operates within U.S. markets, these firms leverage global trading infrastructure to access and trade securities in international markets. Consequently, transactions involving MMAT and MMTLP shares may occur offshore, circumventing the regulatory scrutiny typically applied to U.S.-domiciled markets. This lack of oversight into cross-border transactions has facilitated market manipulation, obscured true short positions, and distorted market conditions, contrary to the SEC's mandate to maintain fair and transparent markets.

123. The SEC is statutorily obligated under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) to maintain fair and efficient markets and prevent manipulative practices. In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), the court stated, "The investing public must be assured that all participants in the marketplace play by the same rules." The SEC's failure to act in the MMAT and MMTLP cases undermines this assurance, eroding investor confidence and market integrity.

124. In *SEC v. O'Hagan*, 521 U.S. 642 (1997), the Supreme Court upheld the SEC's authority to enforce securities fraud regulations, including insider trading and manipulation, to protect investors and maintain market integrity. The Court emphasized that "the maintenance of public

confidence in the securities markets is essential to the economic health of the nation." The SEC's failure to address market manipulation in the MMAT and MMTLP cases represents a direct contradiction of its statutory duties, exposing retail investors to systemic harm.

125. FINRA, as a self-regulatory organization, holds oversight authority over U.S. broker-dealers and is responsible for ensuring compliance with federal securities laws, including in cross-border activities. In *FINRA v. Office of Thrift Supervision*, 503 F.3d 220 (2d Cir. 2007), the court affirmed FINRA's duty to regulate and enforce compliance with securities laws, stating, "Regulators must ensure that entities subject to their authority adhere to fair and transparent practices." FINRA's failure to act against synthetic share creation and cross-border trading involving MMAT and MMTLP underscores systemic regulatory deficiencies and necessitates judicial intervention.

126. Hedge funds with foreign offices frequently engage in market manipulation practices, including synthetic share creation and cross-border trading, that bypass traditional U.S. reporting mechanisms and obscure full short positions. These activities exploit gaps in market transparency, creating opportunities for money laundering and other illicit financial practices. In *United States v. Walters, 910 F.2d 1101 (4th Cir. 1990)*, the court emphasized the necessity of reporting suspicious transactions to prevent illicit financial flows that threaten market integrity. By failing to detect and report suspicious activities associated with MMAT and MMTLP trading, the SEC and FINRA violated their obligations under the Anti-Money Laundering Act (AMLA). This regulatory inaction enables manipulative and illicit conduct to proliferate unchecked, undermining investor confidence and destabilizing U.S. financial markets.

127. Should the SEC and FINRA continue to neglect these issues, their inaction would constitute a grave breach of their regulatory duties. Such failures enable market manipulation, violate U.S. laws, including the Anti-Money Laundering Act (AMLA), erode investor confidence, and damage the reputation and integrity of U.S. financial markets. For example, in a case highlighting systemic lapses, Morgan Stanley agreed to pay a $15 million fine to settle SEC allegations that the firm failed to detect and prevent hundreds of unauthorized transactions by its advisors, leading to millions in client losses. Similarly, the SEC fined 26 Wall Street firms a total of $390 million for unauthorized communications using text messages and WhatsApp, which impeded regulatory oversight and allowed potential misconduct to go unmonitored.

128. These examples underscore the critical need for vigilant enforcement to prevent exploitation of regulatory loopholes. Neglecting these responsibilities not only destabilizes markets but also increases the likelihood of financial misconduct, creating opportunities for bad actors to exploit systemic vulnerabilities. Robust regulatory intervention is essential to uphold transparency, protect investors, and maintain the integrity of U.S. financial markets.

129. The SEC's failure to act in the face of mounting evidence of market manipulation parallels the reasoning in *Chiarella v. United States*, 445 U.S. 222 (1980), where the Supreme Court affirmed the necessity for regulatory authorities to intervene in cases where manipulative schemes distort market prices and deceive investors. The Court stated that protecting market participants from fraud and manipulation is integral to maintaining the integrity of the securities market.

130. Immediate action by the SEC and FINRA is imperative to address market manipulation in MMAT and MMTLP, enhance regulatory oversight of cross-border transactions, and enforce

compliance with U.S. securities laws. Failure to act threatens the stability of the financial system, tarnishes the global reputation of U.S. markets, and allows illicit financial flows to go undetected. In *SEC v. Zandford*, 535 U.S. 813 (2002), the Court reaffirmed the SEC's broad enforcement powers to prevent fraud and manipulation, underscoring the need for decisive regulatory intervention to protect market participants.

131. The SEC and FINRA's failure to act on synthetic share issues in MMAT and MMTLP highlights the urgent need for enhanced cross-border regulatory oversight. This persistent neglect undermines investor confidence and jeopardizes the integrity of U.S. financial markets. As established in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), regulatory bodies must act to ensure transparency and fairness. Continued inaction in this case threatens the broader financial system, with dire consequences for market stability and investor trust.

132. The SEC's persistent failure to address conflicts of interest, systemic manipulation, and the exploitation of dark pool trading has disproportionately benefited institutional players, often at the expense of retail investors. This inaction creates an environment where harmful practices are tacitly approved, exacerbating market distortions and investor losses. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Court noted that inaction by a governing body, particularly when it results in public harm, constitutes a failure to fulfill its duties. Such failures undermine the SEC's mandate to protect investors and ensure fair markets.

133. South Korea provides a compelling example of effective regulatory enforcement against market manipulation, particularly naked short selling. The Financial Supervisory Service (FSS) has implemented stringent legal frameworks and demonstrated a commitment to market integrity through decisive action against violators. For example, in December 2024, the FSS fined

Citigroup and Barclays for prohibited naked short selling of Korean stocks, issuing criminal warnings for repeat offenses. Similarly, in July 2024, Credit Suisse faced significant sanctions for systemic breaches of South Korea's securities regulations.

134. These actions highlight South Korea's proactive approach to safeguarding market transparency, in stark contrast to the regulatory deficiencies in the United States. Persistent issues such as unresolved fail-to-deliver positions and synthetic share creation remain inadequately addressed by U.S. regulators. Unlike South Korea's stringent accountability measures, the U.S. framework has failed to deter manipulative practices effectively, leaving retail investors vulnerable and financial markets exposed.

135. This comparison underscores the urgent need for comprehensive reforms in U.S. securities regulation. Stricter enforcement measures and enhanced transparency, as demonstrated by South Korea, are essential to address systemic vulnerabilities and restore market integrity. Adopting global best practices is critical to building a fair and equitable financial system that prioritizes investor protection and strengthens the credibility of U.S. markets.

## V.    **Allegations**

136. The Plaintiff brings this action to address systemic failures within the U.S. financial markets that have caused significant harm to retail investors. These failures, rooted in regulatory negligence, manipulative trading practices, breaches of fiduciary duty, and constitutional violations, represent a shocking disregard for the trust that ordinary investors placed in the fairness and integrity of the financial system. At the center of this case is FINRA's arbitrary and indefinite U3 trading halt on MMTLP shares, imposed on December 9, 2022, just days before their scheduled transition to Next Bridge Hydrocarbons (NBH). This halt, executed without

transparency or procedural safeguards, deprived tens of thousands of investors of access to their rightful assets, compounded their financial losses, and exposed a troubling lack of accountability within the regulatory framework.

137. A significant factor enabling these failures is the SEC's issuance of the 2017 no-action letter to Latour Trading LLC. This letter permitted broker-dealers to use ETF share creation to satisfy FTD obligations without purchasing the underlying securities, ostensibly to enhance market liquidity. However, instead of supporting the market, this mechanism was abused to obscure persistent FTDs, facilitate naked short selling, and flood the market with synthetic shares. The exploitation of this loophole suppressed legitimate share prices, distorted market conditions, and deprived retail investors of fair market value. As the Second Circuit stated in *In re Bernard L. Madoff Investment Securities LLC*, "regulatory inaction, when systemic, creates a fertile environment for financial abuses that devastate investor confidence and market integrity." This regulatory failure reflects an alarming gap in oversight that allowed bad actors to operate without meaningful consequences, leaving investors to suffer the fallout.

138. FINRA compounded these failures through its refusal to enforce mandatory provisions under Regulation SHO, specifically Rule 204, which requires participants to close out FTD positions by purchasing or borrowing securities within four settlement days (T+4). Despite MMTLP's repeated placement on the OTC Threshold List—an unmistakable indicator of persistent FTDs—FINRA failed to act. This inaction allowed institutional participants to manipulate the market by creating synthetic shares and artificially suppressing prices, directly harming retail investors. Such negligence violated FINRA Rule 2010, which requires adherence to high standards of commercial honor and just principles of trade. By failing to enforce these

critical protections, FINRA facilitated an environment where manipulation became not only possible but pervasive, eroding the fundamental trust investors place in the regulatory system.

139. The imposition of FINRA's indefinite U3 trading halt, coupled with its failure to enforce key regulatory provisions, demonstrates the very type of unchecked self-regulatory abuse described in *Alpine Securities Corp. v. FINRA*. The D.C. Circuit in *Alpine* stressed that self-regulatory organizations "must exercise their powers within the boundaries set forth by Congress" and that exceeding these limits "undermines the principles of fairness and accountability inherent in the regulatory framework." FINRA's overreach in halting trading without statutory authority or due process protections, combined with its neglect of enforcement responsibilities, underscores a concerning lack of accountability that left retail investors defenseless against these systemic abuses.

140. The Securities and Exchange Commission (SEC) and the Depository Trust & Clearing Corporation (DTCC) share significant responsibility for this failure. Despite their statutory obligations under the Securities Exchange Act of 1934 and the Anti-Money Laundering Act (AMLA), they neglected to address the manipulation tied to MMTLP shares. These entities allowed institutional participants to distort supply and demand by introducing synthetic shares into circulation. Such actions mirror the manipulative practices condemned by the Supreme Court in *United States v. Socony-Vacuum Oil Co.*, where the Court recognized that "any combination which tampers with the natural forces of supply and demand operates as a restraint of trade." By turning a blind eye to these abuses, the SEC and DTCC failed in their duties, allowing manipulation to flourish at the expense of investor confidence and market stability.

141. For retail investors, this case is about more than just financial losses—it is about a profound betrayal of trust. These individuals, many of whom invested their life savings, relied on a system that promised fairness, transparency, and accountability. Instead, they were left abandoned by the very institutions tasked with safeguarding their interests. The Supreme Court in *Free Enterprise Fund v. PCAOB* emphasized that "regulation must not only exist but must function in a manner that ensures accountability, fairness, and the prevention of abuse." FINRA, the SEC, and the DTCC failed to meet these basic standards, leaving retail investors to bear the devastating consequences of systemic negligence and oversight failures.

142. Judicial intervention is essential to address these failures and restore faith in the U.S. financial markets. The Plaintiff, on behalf of all affected investors, respectfully asks this Court to act decisively to ensure accountability, restore market integrity, and provide justice for the tens of thousands of retail investors whose trust and financial security have been so severely undermined.

143 Moreover, judicial intervention is imperative to address these systemic failures and restore integrity to U.S. financial markets. The Plaintiff seeks the immediate release of Blue Sheet data to uncover manipulative practices, enforcement of Regulation SHO to resolve synthetic share discrepancies, and comprehensive audits of unresolved positions. Structural reforms are necessary to eliminate conflicts of interest arising from FINRA's dual roles as a regulator and market operator and to close regulatory loopholes like those created by the Latour no-action letter. As the Supreme Court emphasized in *Marbury v. Madison*, "it is emphatically the province and duty of the judicial department to say what the law is." Judicial oversight is essential to ensure that the principles of fairness, accountability, and transparency are upheld, and that retail investors are no longer left to suffer the consequences of systemic regulatory failures.

144. The following legal and factual questions arise from the Plaintiffs' claims and are critical to determining liability, damages, and appropriate relief:

### A. Regulatory Negligence and Oversight

#### I. Statutory Violations

Did FINRA, the SEC, broker-dealers, and the DTCC fail to fulfill their statutory obligations under the Anti-Money Laundering Act (AMLA) (Sections 5318(g) and 5318(h)), the Securities Exchange Act of 1934, and Regulation SHO by neglecting to detect, report, and address suspicious trading activities—such as synthetic share creation, naked short selling, and share discrepancies—thereby compromising market integrity and causing financial harm to retail investors during the MMTLP-to-NBH transition?

#### II. Negligence in Addressing Irregularities

Did the failure of regulatory bodies to investigate and resolve trading irregularities—such as synthetic share creation, persistent failures to deliver (FTDs), and discrepancies in share counts—constitute negligence or willful inaction, directly harming retail investors and violating their fiduciary responsibilities?

### B. Transparency and Disclosure Failures

#### III. Withholding of Critical Data

Did FINRA, the SEC, and broker-dealers obstruct transparency by withholding essential trading data, such as Blue Sheets and trade confirmations, hindering investors' ability to investigate manipulation claims, reconcile synthetic share discrepancies, and protect their investments?

### IV. **Failure to Disclose Trading Irregularities**

Did market participants and regulatory bodies fail to disclose material information regarding trading irregularities, synthetic shares, or discrepancies in ownership records, creating confusion and exacerbating financial harm for retail investors?

## C. Market Manipulation and Anticompetitive Conduct

### V. **Manipulative Trading Practices**

Did market participants engage in manipulative practices—such as naked short selling, synthetic share creation, and price suppression—that distorted MMTLP share prices, suppressed demand, and caused substantial harm to retail investors?

### VI. **Antitrust Violations in Securities Markets**

Did the Defendants engage in anticompetitive conduct by fostering monopolistic trading conditions, exploiting market vulnerabilities, or restricting fair competition, thereby violating antitrust laws and disproportionately harming retail investors?

## D. Procedural Failures and Governance Issues

### VII. **Legitimacy of FINRA's U3 Halt**

Did FINRA exceed its statutory authority by imposing the U3 trading halt on MMTLP shares without sufficient procedural justification or proper notice, violating its obligations under FINRA Rule 6490, the Administrative Procedure Act (APA), and principles established in *Free Enterprise Fund v. PCAOB*?

### VIII. **Constitutionality of FINRA's Governance**

Does FINRA's structure as a private self-regulatory organization, exercising

quasi-governmental authority without sufficient federal oversight, violate constitutional
principles, including due process, the separation of powers, and the Appointments
Clause?

IX. **Inter-Agency Communication Failures**

Did the lack of coordination and communication among FINRA, the SEC, and the DTCC
exacerbate discrepancies in MMTLP shares, leaving retail investors without clarity,
access to their assets, or meaningful recourse for their financial harm?

**E. Investor Harm and Remedies**

X. **Disproportionate Impact on Retail Investors**

Did unresolved failures to deliver (FTDs), synthetic share creation, and procedural delays
disproportionately harm retail investors while benefiting institutional participants,
creating an inequitable trading environment?

XI. **Entitlement to Damages**

Are retail investors entitled to compensatory and punitive damages, injunctive relief, and
systemic reforms to redress the financial harm, emotional distress, and lost trading
opportunities caused by the Defendants' actions and omissions?

**F. Market Structure and Systemic Deficiencies**

XII. **Structural Vulnerabilities in OTC Markets**

Does the prevalence of synthetic shares, naked short selling, and inadequate transparency
in over-the-counter (OTC) markets expose systemic deficiencies in the regulatory
framework, necessitating judicial intervention to restore fairness and investor protections?

### XIII. **Exploitation of Regulation SHO Exemptions**

Were exemptions under Regulation SHO, designed for bona fide market-making activities, improperly applied or abused, enabling persistent failures to deliver (FTDs) and causing systemic harm to retail investors?

### XIV. **Broker-Dealer Accountability**

Did broker-dealers breach their fiduciary and contractual obligations by misrepresenting the settlement status or tradability of MMTLP shares and engaging in deceptive practices that caused financial harm to investors?

### XV. **Barriers to Share Reconciliation**

Did systemic delays in reconciling synthetic shares with legitimate ownership during the MMTLP-to-NBH transition obstruct retail investors' access to their assets while insulating institutional participants from accountability?

## G. Constitutional and Legal Considerations

### XVI. **Due Process Violations**

Did the lack of transparency, procedural clarity, and accessible recourse during the U3 halt violate retail investors' due process rights, warranting judicial remedies to address these constitutional breaches?

### XVII. **Property Rights and Takings Clause**

Does FINRA's imposition of the indefinite U3 halt on MMTLP shares constitute an unlawful taking of property without due process or just compensation, in violation of constitutional protections?

**H. Accountability and Systemic Reforms**

XVIII. **Accountability for Synthetic Shares**

Should FINRA, the SEC, the DTCC, and broker-dealers be held accountable for discrepancies in trading and ownership data that facilitated synthetic share creation, harming retail investors and distorting market integrity?

XIX. **Mandate for Independent Audit**

Should the Court mandate an independent forensic audit of trading activity, share reconciliation, and settlement records related to the MMTLP-to-NBH transition to ensure transparency, accountability, and resolution of synthetic share discrepancies?

XX. **Necessity of Systemic Reforms**

Are systemic reforms to the regulatory framework governing securities markets necessary to prevent future abuses, enhance transparency, and safeguard retail investors from systemic manipulation and regulatory negligence?

**COUNT I**

**Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) – Against All Defendants**

145.  Defendants, including the SEC, FINRA, DTCC, and John Doe Market Participants, violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by engaging in manipulative and deceptive practices, including synthetic share creation, naked short selling, and dissemination of misleading information.

146. Defendants' actions materially distorted the market for MMTLP shares, suppressed their true value, and caused significant financial harm to retail investors, in violation of their obligations under federal securities laws.

## COUNT II

### Breach of Anti-Money Laundering Obligations Under the Bank Secrecy Act (31 U.S.C. § 5318) – Against FINRA, SEC, and DTCC

147. Defendants failed to detect, investigate, and report suspicious trading activities, including synthetic share creation and persistent failures-to-deliver (FTDs), in violation of anti-money laundering obligations.

148. This failure allowed systemic financial crime and market manipulation to persist, eroding investor trust and causing significant financial losses.

## COUNT III

### Violation of the Administrative Procedure Act (5 U.S.C. § 706) – Against SEC and FINRA

150. The SEC and FINRA violated the APA by engaging in arbitrary and capricious actions, including imposing the U3 halt on MMTLP shares without adequate explanation, failing to act on clear evidence of manipulation, and neglecting their statutory duties to ensure fair and orderly markets.

## COUNT IV

**Violation of Constitutional Principles (Appointments Clause and Nondelegation Doctrine) –**
**Against FINRA**

151. FINRA exercised significant governmental authority without proper constitutional
oversight, violating the Appointments Clause of the U.S. Constitution and the Nondelegation
Doctrine.

152. This structure enabled FINRA to take arbitrary actions, such as the U3 trading halt, that
deprived investors of their property interests without due process.

## COUNT V

**Antitrust Violations Under the Sherman and Clayton Acts (15 U.S.C. §§ 1–2) – Against**
**DTCC and FINRA**

153. DTCC's monopolistic control over clearing and settlement processes, combined with
FINRA's dual role as regulator and operator of trading platforms, suppressed competition and
distorted market dynamics.

154. These practices disproportionately harmed retail investors by inflating transaction costs,
facilitating market manipulation, and creating systemic inefficiencies.

## COUNT VI

**Negligence in Regulatory Oversight Under the Securities Exchange Act of 1934 (15 U.S.C.**
**§§ 78o and 78q) – Against SEC and FINRA**

155. The SEC and FINRA failed to address clear evidence of manipulation, including excessive FTDs, synthetic shares, and unresolved short positions, despite their statutory obligations to protect investors and ensure market integrity.

156. This negligence enabled manipulative practices to persist, causing widespread financial harm to retail investors.

## COUNT VII

### Breach of Duty of Fair Representation and Accountability – Against FINRA

157. FINRA breached its obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to maintain fair and equitable trading standards during the MMTLP-to-NBH transition.

158. The unilateral imposition of the U3 trading halt on December 9, 2022, without providing adequate notice or implementing necessary procedural safeguards, deprived investors of access to their assets.

159. FINRA violated Rule 6490 by amending corporate action notices, including the reclassification of MMTLP shares from "CANCELLED" to "DELETED," without obtaining issuer authorization.

## COUNT VIII

### Control Person Liability Under Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)) – Against FINRA and SEC

160. FINRA and SEC, as entities responsible for overseeing broker-dealers and market participants, failed to exercise effective control under Section 20(a) of the Securities Exchange Act.

161. Their supervisory lapses enabled widespread violations of securities laws, including manipulative practices such as synthetic share creation and naked short selling, which caused systemic harm to retail investors.

## COUNT IX

**Fraud by Broker-Dealers Under Section 15(c)(2) of the Securities Exchange Act (15 U.S.C. § 78o(c)(2)) – Against John Does 1–100**

162. John Doe Market Participants violated Section 15(c)(2) by engaging in fraudulent trading practices, including synthetic share creation and naked short selling.

163. These deceptive practices exploited regulatory gaps, suppressed market transparency, and directly harmed retail investors by distorting the market for MMTLP shares.

## COUNT X

**Failure to Maintain Accurate Records Under Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) – Against DTCC**

164. DTCC violated its statutory obligation to maintain accurate and transparent records of transactions involving MMTLP shares.

165. DTCC's failure to reconcile transactional discrepancies allowed unresolved FTD positions to persist and facilitated synthetic share creation, causing significant harm to retail investors.

## COUNT XI

**Violation of the Connecticut Unfair Trade Practices Act (C.G.S. § 42-110a et seq.) – Against All Defendants**

166. Defendants engaged in unfair and deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA).

167. Defendants' conduct included:

a. Misrepresenting or failing to disclose critical information about the tradability of MMTLP shares, including synthetic share creation and unresolved FTDs.

b. Engaging in manipulative practices such as price suppression, sham trades, and unauthorized trading of non-tradable securities.

c. Failing to provide transparency regarding the U3 trading halt, unresolved short positions, and procedural irregularities.

168. These actions caused quantifiable financial harm to Connecticut-based retail investors and violated public policy. Plaintiffs are entitled to compensatory damages, punitive damages, attorney's fees, and injunctive relief.

**Defendant Inclusion Summary**

169. This action arises from systemic market manipulation and regulatory failures that have caused substantial harm to retail investors, market participants, and Meta Materials Inc., a

non-listed plaintiff significantly impacted by the alleged misconduct. The Defendants, through their actions, omissions, negligence, or intentional misconduct, contributed to systemic market failures, suppressed investor rights, and enabled manipulative and anticompetitive practices. Specifically, the creation of synthetic shares and predatory trading activities distorted market prices, suppressed share values, and revealed broader regulatory shortcomings.

170. The Defendants' conduct collectively constitutes violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment. These unlawful actions were carried out at the expense of the Plaintiff, Meta Materials Inc., and the broader investing public, undermining market integrity and eroding investor confidence in the regulatory framework.

**The following defendants are named for their roles in these failures, with charges noted:**

**Securities and Exchange Commission (SEC)   [Charges: I, II, III, IV, VI, VIII, IX, XI]**

171. The SEC, as the primary federal securities regulator, failed to enforce key securities laws, ensure transparency, and address market manipulation. These failures include neglecting responsibilities related to synthetic share creation, naked short selling, and failures-to-deliver (FTDs), in violation of statutory duties under federal securities laws.

**Financial Industry Regulatory Authority (FINRA)  [Charges: I, II, III, IV, V, VI, VII, VIII, IX, XI]**

172. FINRA, a self-regulatory organization under the SEC's oversight, imposed an arbitrary U3 trading halt on MMTLP shares on December 9, 2022. This action deprived investors of the ability to trade or reconcile holdings and exacerbated financial harm. FINRA also failed to release Blue Sheet data, enforce anti-manipulation rules, and ensure market oversight, raising constitutional and statutory concerns.

**Depository Trust & Clearing Corporation (DTCC)   [Charges: I, II, V, VI, VII, IX, X, XI]**

173. DTCC, responsible for clearing and settling securities transactions, is alleged to have failed to address systemic settlement discrepancies and synthetic share creation. Its inaction contributed to persistent market disruptions and significant losses for investors.

**John Does 1-100 (Market Participants)   [Charges: I, II, V, VI, IX, X, XI]**

174. Market makers, broker-dealers, and other unidentified entities are accused of engaging in manipulative trading practices such as naked short selling and synthetic share creation. These practices distorted market prices, artificially inflated the supply of MMTLP shares, suppressed legitimate share value, and caused harm to retail investors and market integrity.

**Action for Declaratory Judgment and Injunctive Relief**

**Finding the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) Unconstitutional As Applied**

**Separation of Powers Violation**

175. Plaintiff incorporates by reference all preceding paragraphs, including Facts 16 through 135, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case.

176. The PSLRA infringes upon the separation of powers doctrine by imposing restrictive procedural requirements, including heightened pleading standards and automatic discovery stays, which impede the judiciary's ability to effectively adjudicate securities fraud cases. These

legislative mandates interfere with the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions. In this case, the PSLRA obstructs the Plaintiff's ability to hold FINRA, the SEC, and market participants accountable for systemic misconduct, including the manipulation of MMTLP shares, thereby exacerbating the harms caused by the Defendants.

**Violations of Constitutional Rights**

I. **First Amendment:**

177. The PSLRA violates the First Amendment by chilling access to the courts through its stringent pleading requirements. Retail investors, including the Plaintiff, face insurmountable burdens in pleading fraud with particularity due to the concealment of critical evidence by broker-dealers, clearinghouses, and regulators. This effectively denies the Plaintiff the right to petition the government for redress of grievances.

II. **Fifth Amendment – Equal Protection and Due Process:**

178. The PSLRA disproportionately burdens retail investors while shielding institutional actors from accountability, creating a two-tiered system of justice. It denies equal protection under the law by favoring well-resourced corporate defendants, including broker-dealers and market makers, and limits the Plaintiff's ability to prove claims through its discovery stay provisions. These barriers violate the Plaintiff's fundamental due process rights by depriving them of a meaningful opportunity to be heard.

III. **Fourteenth Amendment – Equal Protection (State Claims):**

179. The PSLRA's preemption of state-law securities fraud remedies imposes restrictive federal standards that limit access to justice for investors seeking to pursue claims in state forums. This

unequal treatment undermines the constitutional guarantee of equal protection under the law and creates an unfair preference for corporate defendants.

**Safe Harbor Protections:**

180. The PSLRA's safe harbor provision for forward-looking statements incentivizes corporate malfeasance by shielding Defendants from liability for fraudulent misrepresentations. In this case, this provision unjustly protected market participants who engaged in deceptive practices, including the suppression of shareholder rights and manipulation of MMTLP shares.

**Systemic and Structural Failures**

### I. Regulatory Capture and Inequities:

181. The PSLRA's legislative history and provisions reflect systemic bias in favor of institutional actors, further undermining retail investors' access to justice. By prioritizing the interests of financial entities, the PSLRA fails to uphold principles of fairness and public trust.

### II. Judicial Economy:

182. The PSLRA imposes procedural burdens that increase inefficiencies in litigation, requiring courts to adjudicate motions to dismiss without complete evidentiary records. This piecemeal approach undermines the judiciary's ability to resolve complex securities fraud cases effectively.

### III. Liability and Compensation:

183. By limiting joint and several liability, the PSLRA shields culpable entities from full accountability and denies victims adequate compensation for their losses. In this case, multiple Defendants acted in concert to manipulate MMTLP shares, and the Plaintiff's recovery is unjustly constrained by these limitations.

**PRAYERS FOR RELIEF**

184. WHEREFORE, Plaintiff respectfully requests that the Court:

I.   **Declaratory Relief:** Issue a judicial declaration that the PSLRA is unconstitutional as applied in this case due to its conflict with separation of powers, due process, equal protection, and the First Amendment.

II.  **Injunctive Relief:** Grant an injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic market manipulation and regulatory failures.

III. **Judicial Authority:** Affirm the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring access to justice and the ability to hold Defendants accountable.

IV.  **Additional Relief:** Grant such other relief as the Court deems just and proper under the circumstances.

**Action for Declaratory Judgment and Injunctive Relief #2: Constitutional Challenge to the Structure and Authority of the Financial Industry Regulatory Authority (FINRA)**

I.   **Separation of Powers Violation**

**A. Incorporation by Reference**

185. Plaintiff incorporates by reference all preceding paragraphs, including Facts 10 through 118, and asserts that the structure and authority of the Financial Industry Regulatory Authority (FINRA) violate the United States Constitution's doctrine of separation of powers.

**B. Exercise of Executive Authority Without Accountability**

186. FINRA wields significant executive powers, including suspending trading, enforcing securities laws, conducting investigations, and imposing sanctions. However, these powers are exercised without presidential oversight or accountability, as FINRA's Board of Governors is neither appointed by nor removable by the President. This structure conflicts with Article II of the Constitution, which vests executive authority in the President and requires accountability for its exercise.

**C. Relevant Precedent**

187. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must remain accountable to the President to preserve the separation of powers. FINRA's structure parallels the unconstitutional framework identified in that case, rendering its governance and operations inconsistent with constitutional principles.

## II.    Violation of the Appointments Clause

**A. Structural Violations**

188. Plaintiff alleges that FINRA's structure and appointment processes violate the Appointments Clause of the United States Constitution.

**B. Officers of the United States**

189. FINRA's Board of Governors exercises substantial authority under federal law, qualifying its members as "officers of the United States" as defined in *Buckley v. Valeo*, 424 U.S. 1 (1976). Despite this, these individuals are neither appointed by the President nor confirmed by the Senate, bypassing the constitutional requirements for officer appointments under Article II.

**C. Relevant Precedent**

190. In *Edmond v. United States*, 520 U.S. 651 (1997), the Court emphasized that adherence to the Appointments Clause ensures accountability in the exercise of federal authority. FINRA's private appointment process violates this constitutional mandate, further undermining the accountability required of federal officers.

## III.    Unconstitutional Delegation of Legislative Authority

**A. Nondelegation Doctrine Violations**

191. Plaintiff asserts that FINRA's regulatory authority violates the nondelegation doctrine enshrined in Article I, Section 1 of the Constitution.

**B. Broad and Unsupervised Delegation**

192. Congress delegated extensive powers to FINRA under the Securities Exchange Act of 1934 with minimal guidance, granting FINRA the ability to draft, enforce, and interpret securities regulations without sufficient legislative oversight. This lack of clear standards renders the delegation unconstitutional.

**C. Relevant Precedent**

193. In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Supreme Court held that delegations of legislative authority to private entities are unconstitutional without clear and specific guidance. Similarly, FINRA's broad and unsupervised powers lack sufficient statutory boundaries, exacerbating its constitutional deficiencies.

## IV.    Violation of Property Rights and Economic Liberties

**A. Unconstitutional Takings**

194. Plaintiff asserts that FINRA's indefinite U3 halt on MMTLP shares constitutes an unconstitutional taking of property under the 5th, 9th, and 14th Amendments.

**B. Property Rights Violations**

195. The indefinite halt deprived Plaintiff of the ability to control or trade MMTLP shares without due process, violating legally recognized property rights under UCC Article 8, Section 8-503. This lack of procedural safeguards constitutes an arbitrary and unconstitutional taking.

## V.    Supplemental Authorities and Arguments Supporting the Declaration of FINRA's Unconstitutionality

**A. Alpine Securities Corp. v. FINRA**

196. In *Alpine Securities Corp. v. FINRA, Appeal from the United States District Court for the District of Columbia (No. 1:23-cv-01506)* underscored the constitutional concerns surrounding self-regulatory organizations (SROs) operating without sufficient governmental oversight. The court emphasized, "The result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law." The court further stated that the lack of SEC pre-enforcement review for expedited expulsions likely "runs afoul of the private nondelegation doctrine," which demands that a private actor delegated regulatory authority be subject to supervision by an accountable government entity. This failure of oversight is directly analogous to the procedural deficiencies surrounding FINRA's U3 halt, demonstrating the same structural flaws identified in Alpine.

**B. SEC v. Sloan**

197. In *SEC v. Sloan*, 436 U.S. 103 (1978), the Supreme Court invalidated indefinite trading halts

that lacked statutory authorization and procedural safeguards. FINRA's U3 halt, imposed without

transparency or justification, mirrors the unconstitutional actions identified in *Sloan*.

## C. Loper Bright Enterprises v. Raimondo

198. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court rejected Chevron deference,

emphasizing the judiciary's duty to independently evaluate whether regulatory entities operate

within statutory and constitutional limits. FINRA's lack of clear statutory boundaries and

oversight for the U3 halt necessitates rigorous judicial scrutiny.

## D. Combined Precedent Supporting Relief

199. The principles established in *Alpine Securities Corp. v. FINRA*, *SEC v. Sloan*, and *Loper*

*Bright Enterprises v. Raimondo* collectively compel this Court to intervene in FINRA's

overreach. The Alpine decision highlighted that "FINRA's ability to unilaterally expel members

without SEC pre-enforcement review violates the constitutional requirement that private entities

delegated governmental authority must be subject to meaningful oversight." Similarly, *Sloan*

invalidated indefinite regulatory actions lacking statutory authority, and *Loper Bright* emphasized

that the judiciary must actively scrutinize regulatory overreach to prevent violations of statutory

and constitutional principles. Together, these cases affirm that FINRA's indefinite U3 trading

halt, imposed without accountability or transparency, epitomizes the structural and procedural

deficiencies condemned by these precedents.

## PRAYERS FOR RELIEF

200. WHEREFORE, Plaintiff respectfully requests that the Court:

**I. Declare FINRA Unconstitutional:**

A. Issue a judicial declaration that FINRA's structure, governance, and delegation of authority violate the United States Constitution, including the doctrines of separation of powers, the Appointments Clause, and the nondelegation doctrine.

B. Declare that FINRA's imposition of the U3 trading halt on MMTLP shares constitutes an unconstitutional exercise of regulatory authority, infringing upon Plaintiff's property rights and due process guarantees.

**II. Enjoin FINRA's Actions:**

A. Prohibit FINRA from enforcing the indefinite U3 halt and compel the immediate resumption of trading in MMTLP shares.

B. Prohibit FINRA from exercising regulatory powers inconsistent with constitutional principles and statutory authority.

C. Order the release of Blue Sheet data for MMTLP and MMAT transactions to uncover manipulative practices, including synthetic share creation and naked short selling, and to restore trust in the fairness of the market.

**III. Compel Structural Reforms:**

A. Require the SEC to reform its Self Regulatory Organization's structure to comply with constitutional principles, including adherence to the Appointments Clause and increased SEC oversight.

B. Mandate the implementation of procedural safeguards to ensure transparency and due process in all regulatory actions.

**IV. Restore Property Rights:**

A. Order FINRA to reinstate Plaintiff's full economic and trading rights to MMTLP shares, including any remedies necessary to compensate for financial losses caused by the unconstitutional U3 halt.

## V. Additional Relief:

A. Grant such other and further relief as the Court may deem just and proper to protect Plaintiff's rights, restore market integrity, and ensure compliance with constitutional safeguards.

## Action for Declaratory Judgment and Injunctive Relief Requesting # 3 Full-Scale Department of Justice Investigation into Defendants' Criminal Activities and Violations

## I. Systemic and Criminal Violations

201. Plaintiff incorporates by reference all preceding paragraphs, including Facts 16 through 135, and asserts that the actions of the Defendants, including but not limited to the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC), the Depository Trust & Clearing Corporation (DTCC), and related entities, constitute a pervasive pattern of criminal misconduct, regulatory failures, and statutory violations requiring immediate intervention by the Department of Justice (DOJ).

202. Defendants engaged in manipulative, fraudulent, and illegal activities, including the creation and concealment of synthetic shares, naked short selling, and obstruction of regulatory processes. These actions violated the Securities Exchange Act of 1934, Anti-Money Laundering Act

(AMLA), and various other federal statutes, directly harming retail investors and undermining public confidence in U.S. financial markets.

## II. Systemic Regulatory Failures

### A. Market Manipulation

203. Defendants systematically manipulated securities, including MMTLP shares, by engaging in practices such as synthetic share creation and naked short selling. These actions suppressed share prices, diluted legitimate investor holdings, and destabilized market integrity, constituting willful violations of securities laws, including SEC Regulation SHO and FINRA Rule 2010.

### B. Concealment of Evidence

204. Defendants obstructed transparency and accountability by withholding critical data, such as Blue Sheets and transactional records, essential for identifying manipulative trading practices. This concealment violated statutory obligations under the Securities Exchange Act, AMLA, and principles of market fairness, necessitating criminal investigation and prosecution.

### C. Violations of Due Process and Equal Protection

205. Defendants' practices disproportionately harmed retail investors, denying them meaningful access to justice and creating an inequitable system that shields institutional actors from accountability. This systemic bias violates constitutional guarantees under the Fifth and Fourteenth Amendments, as well as statutory protections for investors.

## III. Criminal and Statutory Misconduct

### A. Anti-Money Laundering Act (AMLA) Violations

206. Defendants failed to detect, report, and address suspicious trading activities, including

manipulative practices and systemic settlement failures. These lapses constitute violations of AMLA's mandates, including 31 U.S.C. § 5318(g), and demonstrate systemic negligence in preventing financial crimes.

**B. Securities Fraud and Breach of Fiduciary Duty**

207. By engaging in market manipulation, concealing evidence, and obstructing regulatory processes, Defendants committed securities fraud and breached their fiduciary duties to uphold transparency, fairness, and investor protections.

**C. Obstruction of Justice**

208. Defendants' refusal to release critical trading data and other records essential to uncovering systemic misconduct constitutes obstruction of justice, necessitating DOJ intervention to ensure accountability and enforcement of federal laws.

**IV. Urgent Need for Investigation**

209. The severity and scope of the Defendants' actions necessitate a full-scale DOJ investigation to uncover the extent of criminal activities, hold all culpable parties accountable, and restore investor confidence in the U.S. financial system. The systemic failures outlined herein represent a direct threat to market integrity and public trust, warranting federal intervention.

**PRAYERS FOR RELIEF**

210. WHEREFORE, Plaintiff respectfully requests that the Court:

A. DOJ Investigation: Order the Department of Justice to conduct a full-scale investigation into all Defendants for violations of federal securities laws, AMLA, and other statutory and regulatory obligations.

B. Declaratory Relief: Issue a judicial declaration that the Defendants' actions, including market manipulation, withholding of critical evidence, and regulatory obstruction, constitute criminal misconduct requiring federal enforcement.

C. Injunctive Relief: Grant an injunction compelling Defendants to release all records necessary for the DOJ's investigation, including Blue Sheets, transactional data, and any evidence of trading irregularities.

D. Accountability Measures: Mandate structural reforms to address systemic failures, ensuring regulatory accountability and protecting retail investors from future harm.

E. Additional Relief: Grant such other relief as the Court deems just and proper under the circumstances.

## VI. Harms: Impact to Plaintiff

211. As a direct result of the Defendants' systemic misconduct, including market manipulation, regulatory failures, and deliberate obstruction of transparency, Plaintiff has suffered significant financial harm and irreparable damage to his rights as a retail investor. Defendants' actions have deprived Plaintiff of fair access to the market, denied the ability to seek meaningful redress, and caused substantial economic losses.

212. Beyond financial harm, the Plaintiff has endured significant emotional distress, including stress and anxiety, caused by the Defendants' actions. The improper freezing of Plaintiff's assets,

without recourse or resolution, has created ongoing uncertainty and financial strain, further compounding the mental and emotional burden on the Plaintiff.

213. Defendants' misconduct has also deprived Plaintiff of opportunities to reinvest frozen assets or pursue alternative investments. By obstructing access to these funds, Defendants have caused missed opportunities to recover financial losses or generate returns, deepening the harm inflicted upon the Plaintiff.

214. These harms—financial, emotional, and consequential—are directly attributable to the Defendants' unlawful actions and inactions. Without a comprehensive investigation and judicial relief, Plaintiff and similarly situated investors face continued financial uncertainty, emotional distress, and systemic inequity.

215. Therefore, Plaintiff respectfully requests that this Court provide the following relief to address the violations and restore accountability in this matter:

## VII. PRAYER FOR RELIEF

216. WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

**I. Declaratory Relief:**

    A.  Declare the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) unconstitutional as applied to this case, as it imposes excessive barriers to justice for retail investors, disproportionately burdens individual investors, and violates constitutional principles of due process and fairness.

B. Declare the structure and authority of the Financial Industry Regulatory Authority (FINRA) unconstitutional for lacking sufficient governmental oversight, enabling improper actions such as the indefinite U3 trading halt on MMTLP shares.

C. Declare that the Defendants' actions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties.

D. Declare that FINRA's U3 trading halt on December 9, 2022, was unconstitutional, and exceeded FINRA's statutory and constitutional authority, was prejudicial and a violation of its regulatory obligations, causing significant harm to over 65,000 shareholders, including Plaintiff.

**II. Injunctive Relief to Restore Transparency and Prevent Future Abuses:**

E. **Comprehensive Market Audit:** Order a full audit of all TRCH, MMTLP, Meta Materials, Meta Materials Preferred Shares, and related transactions, including synthetic shares, failures-to-deliver (FTDs), and beneficial ownership records.

F. **Public Disclosure of Data:** Mandate the immediate release of all trading data, records, and communications related to MMTLP and Meta Materials shares, held by FINRA, DTCC, broker-dealers, and other parties.

G. **Injunction to Reinstate Trading or Equitable Resolution:** Require an expedited process for the reinstatement of MMTLP share trading or mandate an equitable resolution providing full compensation or recovery of value for all affected investors.

H. **Independent Oversight:** Appoint an independent special master or neutral third-party overseer to supervise the comprehensive audit, reconciliation, and implementation of systemic reforms.

I. **Congressional and Regulatory Review:** Require a Congressional and regulatory review of policies concerning trading halts, synthetic share creation, and SRO oversight to prevent systemic failures.

**III. Referral for DOJ Investigation:**

J. Recommend that the U.S. Department of Justice (DOJ) conduct a full investigation into the conduct of the Defendants and unidentified market participants for potential violations of the Anti-Money Laundering Act (AMLA) and related federal statutes, including market manipulation, fraud, and other financial crimes.

**IV. Equitable Relief for Market and Procedural Irregularities:**

K. Order that Plaintiff is entitled to equitable relief for the market and procedural irregularities affecting Meta Materials shares, with compensation for share values ranging from $8.50 to $20.00 per share, for 13,077 shares, as a remedy for the devaluation of MMAT resulting from the improper halting of MMTLP trades on December 9 and 12, 2022..

L. Order that Plaintiff is entitled to equitable relief for the market and procedural irregularities affecting MMTLP shares, with compensation for share values ranging from $43.21 to $417 per share, for 1,675 shares, as a remedy for the improper halting of trades on December 9 and 12, 2022.

**V. Compensatory Damages to Redress Financial and Emotional Harm:**

M. Award compensatory damages for the loss of value and liquidity of the Plaintiff's MMTLP and Meta Materials shares caused by the Defendants' misconduct.

N. Award damages for harm caused by the suppression of share prices, synthetic share creation, naked short selling, and the improper U3 trading halt.

O. Award recovery of financial losses resulting from the systemic harm inflicted on market value.

P. Award damages for emotional distress and mental anguish caused by the prolonged misconduct and lack of resolution.

**VI. Treble Damages for Antitrust Violations:**

Q. Award treble damages under the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act to redress the Defendants' anti-competitive practices, which unlawfully restrained market competition and caused severe financial harm to retail investors.

**VII. Disgorgement of Ill-Gotten Gains:**

R. Order the disgorgement of all profits wrongfully obtained by the Defendants through illegal trading of synthetic shares, naked short selling, and related manipulative practices.

**VII. Establishment of a Restitution Fund for Retail Investors:**

S. Require the creation of a restitution fund to compensate all affected shareholders for financial harm caused by synthetic share discrepancies, naked short selling, and manipulative trading practices.

**VIII. Punitive Damages:**

T.  Award punitive damages under the Connecticut Unfair Trade Practices Act (CUTPA) to deter the Defendants and others from engaging in similar wrongful conduct in the future, thereby promoting investor protection and market integrity.

**IX. Audit of Meta Materials Chapter 7 Bankruptcy Proceedings:**

U.  Order an independent audit of Meta Materials' Chapter 7 bankruptcy proceedings to identify irregularities, ensure fairness, and uncover any institutional participants who unfairly benefited.

**X. Regulatory Oversight Improvements:**

V.  Require the SEC and FINRA to establish clear guidelines for regulatory intervention, enhance enforcement mechanisms to prevent synthetic shares, naked short selling, and prolonged trading halts, and mandate transparency in corporate actions, share reconciliations, and market-making practices.

**XI. Pre- and Post-Judgment Interest:**

W.  Award pre- and post-judgment interest on all compensatory damages to account for the time value of the Plaintiff's losses.

**XII. Additional Relief:**

X.  Grant such other and further relief as the Court may deem just and proper to protect Plaintiff's rights, restore market integrity, and ensure compliance with constitutional safeguards.

**VIII.  <u>DEMAND FOR JURY TRIAL</u>**

217. The Plaintiff hereby demands a trial by jury for all claims and issues triable as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated:

Jason Rolo, pro se

L6 Surrey Ln

Torrington, CT 06790


**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Jason Rolo, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on                                       **Signature:**

                                                 **Name:** Jason Rolo