**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

JAN 14 2025 PM12:43
FILED-USDC-CT-HARTFORD

Jason Rolo,

Case No.:   3:24-cv-02053

Plaintiff,

v.

SECURITIES & EXCHANGE COMMISSION

FINANCIAL INDUSTRY REGULATORY AUTHORITY

DEPOSITORY TRUST & CLEARING CORPORATION

JOHN DOE 1 - 100

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS AND CONSTITUTIONAL
PRINCIPLES**

**JURY TRIAL DEMANDED**

Defendants,

# **Exhibits**

Exhibit 1: Z test of TRCH as referenced in paragraph 21

Exhibit 2: OCC Memo 48884 as referenced in paragraph 26

Exhibit 3: OCC Memo 48904 as referenced in paragraph 28

Exhibit 4: OCC Memo 48905 as referenced in paragraph 28

Exhibit 5: Screenshot showing TRCH volume as referenced in 29

Exhibit 6: Screenshot of search showing CIK for MMTLP in paragraph 40

Exhibit 7: Screenshot showing CIK for MMAT in paragraph 40

Exhibit 8: FAQ from FINRA mentioned in paragraph 49

Exhibit 9: Trading chart for MMTLP mentioned in paragraph 50

Exhibit 10: Finra daily list for DEC 6 mentioned in paragraph 51

Exhibit 11: letters from brokers acknowledging pco trade for the 9th and 12th. p. 52

Exhibit 12: Finra CA for DEC 8th with revision to delete mentioned in p 55

Exhibit 13: George Palikaras affidavit 56

Exhibit 14: Finra Hault notice mentioned in paragraph 58

Exhibit 15: orders from accounts in etrade

Exhibit 16: FOIA from DEC 2 2022 and Dec 5 2022 about mmtlp in paragraph 67 and 70

Exhibit 17: FINRA supp faq 2 mentioned in paragraph 74 and 92

Exhibit 18: Letter from Congress 12/22/23 bi partisan mentioned in paragraph 76

Exhibit 19: Letter from Greg McCabe to Robert Colby mentioned in paragraph 77

Exhibit 20: PR mentioned in paragraph 80

Exhibit 21: Finra response to Ralph Norman Letter 1/31/24 mentioned in paragraph  78

Exhibit 22: Letter from Crapo / Vance mentioned in paragraph 83

Exhibit 23: Tradestation admitting over certificate mentioned in paragraph 88

 Exhibit 24: Finra admission of owning OTC securities and operating systems in paragraph 110

Exhibit 25: screenshot showing outstanding shares of mmtlp above amount distributed and closer to the MMAT float from a bad CIK information explained in paragraph 40

Exhibit 26: 10-Q from 5-9-2022 showing approximately the same shares outstanding number as MMTLP from 11/28/22 seen in exhibit 25 and mentioned in paragraph 40

Exhibit 27: Threshold lists for MMTLP as mentioned in paragraph 42

Exhibit 28: Extra broker notices to clients about trading on the 9th and 12th of December 22 exhibit 11 back up

Exhibit 29: Next Bridge Hydrocarbons S-1 filed July 15, 2022 showing the Outstanding shares of the company is 165.5 million shares which were held by the company and 100% accounted for. Not the 296.6 million shares as seen in exhibit 25 from brokers as that was confused with MMAT shown in exhibit 26 because of the CIK supporting paragraph 40.

Exhibit 30: FINRA admission of fractional trading, owner of OTC securities, and being administrator and operator of ADF systems. Shows FINRA conflict of interest as regulator and administrator. Supports paragraph 110


* SAME AS 24 JUST BigGer

Exhibit 1





**THE FOUNDATION FOR SECURE MARKETS**

#48884

Date:                June 21, 2021

Subject:             Torchlight Energy Resources, Inc. – Distribution
                     Option Symbol: TRCH
                     New Symbol: TRCH1
                     Date: 06/23/21

## Background

Torchlight Energy Resources, Inc. (TRCH) has announced a distribution of (New) Torchlight Energy Resources, Inc. Series A Preferred Shares ("Series A Preferred Shares"). The distribution ratio is 1 Series A Preferred Share for each TRCH share held. The record date is June 24, 2021; the payable date is June 25, 2021. The NASDAQ has set June 23, 2021 as the ex-distribution date for this distribution.

The trading status for Series A Preferred Shares is not yet known. Per the TRCH Proxy Statement dated May 5, 2021 and filed May 7, 2021, it is not expected that the Series A Preferred Shares will be listed on a national securities exchange.

## Possible Settlement Procedures

OCC anticipates that if an OTC or OTCBB (Bulletin Board) market develops, NSCC will accept transactions in the Series A Preferred Shares which arise as a result of option exercise and assignment activity. In that event, TRCH1 option exercise and assignment activity will settle in the normal fashion through NSCC. However, if a market does not develop or NSCC does not accept transactions in the Series A Preferred Shares, OCC anticipates requiring broker to broker settlement for TRCH1 options. Pursuant to customary OCC broker to broker settlement procedures, inability to effect delivery may subsequently occasion cash settlement as determined by OCC.

## Contract Adjustment

Effective Date:          June 23, 2021

Option Symbol:           TRCH changes to TRCH1

Strike Prices:           No Change

Number of
Contracts:               No Change

Multiplier:              100 (e.g., a premium of 1.50 yields $150; a strike of 7.50 yields $750.00)
New Deliverable
Per Contract:            1) 100 Torchlight Energy Resources, Inc. (TRCH) Common Shares
                         2) 100 (New) Torchlight Energy Resources, Inc. Series A Preferred Shares
                         (subject to delayed settlement until the trading status can be determined)

| Settlement Allocation: | TRCH: 95% |
| | Series A Preferred Shares: 5% |

| CUSIPs: | TRCH: 89102U103 |
| | Series A Preferred Shares: TBD |

THE SETTLEMENT ALLOCATION OF THE TOTAL STRIKE PRICE AMOUNT IS BEING PROVIDED SOLELY FOR THE PURPOSE OF THE INTERFACE BETWEEN OCC AND THE NATIONAL SECURITY CLEARING CORPORATION (NSCC), AND IS NOT INTENDED TO BE USED FOR ANY OTHER PURPOSE, TRANSACTION OR CUSTOMER ACCOUNT STATEMENTS.

## Delayed Settlement

The TRCH component of the TRCH1 deliverable will settle through National Securities Clearing Corporation (NSCC). OCC will delay settlement of the Series A Preferred Share component of the TRCH1 deliverable until the trading status of Series A Preferred Shares is determined. Upon determination of the trading status of Series A Preferred Shares, OCC will require Put exercisers and Call assignees to deliver the appropriate number of shares.

## Disclaimer

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed options or futures prepared for the convenience of market participants. OCC accepts no responsibility for the accuracy or completeness of the summary, particularly for information which may be relevant to investment decisions. Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A. The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable. For both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

For questions regarding this memo, call Investor Services at 1-888-678-4667 or email investorservices@theocc.com.  Clearing Members may contact Member Services at 1-800-544-6091 or, within Canada, at 1-800-424-7320, or email memberservices@theocc.com.

*Exhibit 5*



#48904

| | |
|---|---|
| **Date:** | **June 25, 2021** |
| **Subject:** | **Adjusted Torchlight Energy Resources, Inc. – Further Adjustment**<br>**Adjusted Option Symbol: TRCH1**<br>**New Adjusted Option Symbol: MMAT1**<br>**Date: 6/28/21** |

Adjusted Torchlight Energy Resources, Inc. (TRCH) options were adjusted on June 23, 2021 (See OCC Information Memo #48884). The new deliverable became 1) 100 Torchlight Energy Resources, Inc. (TRCH) Common Shares and 2) 100 Torchlight Energy Resources, Inc. Series A Preferred Shares (subject to delayed settlement until the trading status can be determined).

Torchlight Energy Resources, Inc. (TRCH) has announced a 1-for-2 reverse stock split and a name, symbol, CUSIP change. As a result of the reverse stock split and underlying changes, each TRCH Common Share will be converted into the right to receive 0.5 (New) Meta Materials Inc. (MMAT) Common Shares. The reverse stock split and underlying changes will become effective before the market open on June 28, 2021.

<u>Contract Adjustment</u>

| | |
|---|---|
| **Effective Date:** | June 28, 2021 |
| **Option Symbol:** | TRCH1 changes to MMAT1 |
| **Contract Multiplier:** | 1 |
| **Strike Divisor:** | 1 |
| **New Multiplier:** | 100 (e.g., for premium or strike dollar extensions 1.00 will equal $100) |
| **New Deliverable Per Contract:** | 1) 50 Meta Materials Inc. (MMAT) Common Shares<br>2) 100 Torchlight Energy Resources, Inc. Series A Preferred Shares<br> (subject to delayed settlement until the trading status can be determined) |
| **Settlement Allocation:** | MMAT: 95%<br>Series A Preferred Shares: 5% |
| **CUSIPs:** | MMAT (New): 59134N104<br>Series A Preferred Shares: TBD |

<u>Delayed Settlement</u>

The MMAT component of the MMAT1 deliverable will settle through National Securities Clearing Corporation (NSCC). OCC will delay settlement of the Series A Preferred Share component of the MMAT1 deliverable until the trading status of Series A Preferred Shares is determined. Upon determination of the trading status of Series A Preferred Shares, OCC will require Put exercisers and Call assignees to deliver the appropriate number of shares.

## Disclaimer

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed options or futures prepared for the convenience of market participants. OCC accepts no responsibility for the accuracy or completeness of the summary, particularly for information which may be relevant to investment decisions. Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A. The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable. For both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

For questions regarding this memo, call Investor Services at 1-888-678-4667 or email investorservices@theocc.com. Clearing Members may contact Member Services at 1-800-544-6091 or, within Canada, at 1-800-424-7320, or email memberservices@theocc.com.

Exhibit 4



**THE FOUNDATION
FOR SECURE
MARKETS**

#48905

Date:                     June 25, 2021

Subject:                 **Torchlight Energy Resources, Inc. - Reverse
                         Split/Name/Symbol/CUSIP Change
                         Option Symbol: TRCH
                         New Symbol: MMAT2
                         Date: 6/28/21**

Torchlight Energy Resources, Inc. (TRCH) has announced a 1-for-2 reverse stock split and a name,
symbol, CUSIP change. As a result of the reverse stock split and underlying changes, each TRCH
Common Share will be converted into the right to receive 0.5 (New) Meta Materials Inc. (MMAT) Common
Shares. The reverse stock split and underlying changes will become effective before the market open on
June 28, 2021.

## Contract Adjustment

| | |
|---|---|
| **Effective Date:** | June 28, 2021 |
| **Option Symbol:** | TRCH changes to MMAT2 |
| **Contract Multiplier:** | 1 |
| **Strike Divisor:** | 1 |
| **New Multiplier:** | 100 (e.g., for premium or strike dollar extensions 1.00 will equal $100) |
| **New Deliverable Per Contract:** | 50 (New) Meta Materials Inc. (MMAT) Common Shares |
| **CUSIP:** | MMAT (New): 59134N104 |

## Pricing

The underlying price for MMAT2 will be determined as follows:

   MMAT2 = 0.50 (MMAT)

## Disclaimer

This Information Memo provides an unofficial summary of the terms of corporate events affecting listed
options or futures prepared for the convenience of market participants. OCC accepts no responsibility for
the accuracy or completeness of the summary, particularly for information which may be relevant to

investment decisions. Option or futures investors should independently ascertain and evaluate all information concerning this corporate event(s).

The determination to adjust options and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article VI, Sections 11 and 11A. The determination to adjust futures and the nature of any adjustment is made by OCC pursuant to OCC By-Laws, Article XII, Sections 3, 4, or 4A, as applicable. For both options and futures, each adjustment decision is made on a case by case basis. Adjustment decisions are based on information available at the time and are subject to change as additional information becomes available or if there are material changes to the terms of the corporate event(s) occasioning the adjustment.

ALL CLEARING MEMBERS ARE REQUESTED TO IMMEDIATELY ADVISE ALL BRANCH OFFICES AND CORRESPONDENTS ON THE ABOVE.

For questions regarding this memo, call Investor Services at 1-888-678-4667 or email investorservices@theocc.com. Clearing Members may contact Member Services at 1-800-544-6091 or, within Canada, at 1-800-424-7320, or email memberservices@theocc.com.

4

3:13



Exhibit
5



— Regular Volume    — Short Volume

Highcharts.com

## Historical Short Volume Data for TRCH

| Date | Close | High | Low | Volume | Short Volume | % of Vol Shorted |
|------|-------|------|-----|--------|--------------|------------------|
| Jun 25 | NA | NA | NA | 34,012,888 | 20,775,892 | 61.08 |
| Jun 24 | NA | NA | NA | 43,613,656 | 26,945,148 | 61.78 |
| Jun 23 | NA | NA | NA | 50,195,107 | 26,729,319 | 53.25 |
| Jun 22 | NA | NA | NA | 76,352,054 | 42,249,501 | 55.34 |
| Jun 21 | NA | NA | NA | 150,035,489 | 82,496,774 | 54.98 |
| Jun 18 | NA | NA | NA | 28,608,216 | 13,557,742 | 47.39 |
| Jun 17 | NA | NA | NA | 21,996,332 | 9,066,068 | 41.22 |
| Jun 16 | NA | NA | NA | 74,217,339 | 41,707,265 | 56.20 |
| Jun 15 | NA | NA | NA | 109,951,610 | 54,999,009 | 50.02 |
| Jun 14 | NA | NA | NA | 5,674,578 | 1,912,649 | 33.71 |
| Jun 11 | NA | NA | NA | 3,045,483 | 950,166 | 31.20 |
| Jun 10 | NA | NA | NA | 2,772,326 | 799,228 | 28.83 |
| Jun 09 | NA | NA | NA | 2,648,062 | 979,929 | 37.01 |

EXhibit
6

✕   ⚙    what was the Cl...    ⌁    🔖    ⋮
        search.yahoo.com

🔍    what was the CIK Number for    ✕

https://www.marketbeat.com › stocks › OTCMKTS

## Meta Materials (MMTLP) Stock Price, News & Analysis - MarketBeat

Dec 12, 2022 · Get The Latest MMTLP Stock Analysis, Price Target, and Headlines at MarketBeat. ... CIK 1431959. Web...

Location: 345 N Reid Place, Suite 620, Sioux Falls, 57103, SD

Phone: (902) 482-5729

Email: contact@marketbeat.com

https://finance.yahoo.com › news › meta-materials-announ...

## Meta Materials Announces FINRA Has Revised Corporate Action ...

People also search for    ✕

| what was the cik number for mmtlp 1 | what was the cik number for mmtlp 2 |
| what was the cik number for mmtlp 5 | what was the cik number for mmtlp 3 |

|||    ◯    ‹


Exhibit 7



🔍 what is the cik numbe...  🎤  📷

**What is a broker dealer CIK number?** ⌄

---

**Do private companies have a CIK number?** ⌄

Feedback

---

Ⓕ Fintel
https://fintel.io › mmat                    ⋮

**MMAT SEC Filings - Meta Materials Inc.- Annual Report, Proxy ...**

MMAT SEC Filings - Meta Materials Inc.- Annual Report ... ==CIK, 1431959.== SEC Filings. All companies that sell ... Number: 001-36247 Meta Materials Inc....

---

SEC.gov
https://www.sec.gov › edgar › data    ⋮

**EDGAR Filing Documents for 0000950170-23-009314**

Mar 23, 2023 — Seq, Description, Document, Type, Size. 1, 10-K, mmat-20221231.htm iXBRL, 10-K, 4983792. 2, EX-2.3.0, mmat-ex2_30.htm, EX-2,...

---

✳
Discover

🔍
**Search**

🔖
Saved

|||     ◯     ‹

Case 3:24-cv-02053-JAM     Document 13-1     Filed 01/14/25     Page 14 of 107

*Exhibit 8*

# FAQ: MMTLP Corporate Action and Trading Halt

MARCH 16, 2023

FINRA has received a number of questions relating to a corporate action and trading halt in the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials) that traded under the symbol MMTLP. This *Investor Insights* article provides general information about how corporate actions and trading halts are processed as well as specific information related to MMTLP.

## Corporate Actions—FINRA's Role

A corporate action occurs when a company makes a change that has or could have an impact on its stock and shareholders. Corporate actions include issuing a dividend, engaging in a stock split, or effecting a merger.

When a company decides to engage in a corporate action that affects a security listed on a national securities exchange, the company must provide notice to the listing exchange and comply with all applicable listing standards and rules of the exchange concerning that security. In contrast, when a company decides to engage in a corporate action that affects an unlisted security that trades in the over-the-counter (OTC) market, federal law requires that the company submit notice of the corporate action to FINRA, and FINRA reviews the submission and publishes a notification about the corporate action to the marketplace (unless the submission is deemed deficient by FINRA). This function helps to keep investors and the market informed of corporate actions affecting OTC securities and of relevant dates.

A company can have both listed and unlisted securities, so different rules can apply to the same company depending on which security is the subject of a corporate action. In any event, FINRA does not initiate, approve, or conduct the underlying corporate action that the company is making, and the company itself is responsible for making sure the corporate action complies with all applicable laws and regulations.

FINRA regulates broker-dealers that facilitate investor access to the securities markets, including the OTC market. However, unlike securities exchanges that list securities, FINRA does not establish listing standards or otherwise regulate the companies that issue OTC securities.

## The MMTLP Corporate Action

Meta Materials' Series A Preferred Shares were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted. These unlisted shares later began trading in the OTC market under the symbol MMTLP (further discussion below).

On July 15, 2022, the company filed a Form S-1 registration statement with the Securities and Exchange Commission (SEC) to register the issuance of the common stock of Next Bridge Hydrocarbons, Inc. (Next Bridge), which at that time was a wholly owned subsidiary of Meta Materials. As disclosed in the registration statement, Meta Materials would distribute to MMTLP shareholders one share of Next Bridge common stock per one share of MMTLP held, and would cancel the Series A Preferred Shares trading under the symbol MMTLP. According to the Form S-1 filed, immediately after the corporate action, Next Bridge would be an independent public reporting company. After several amendments, the registration statement for the Next Bridge shares became effective on November 18, 2022.

On November 23, 2022, Meta Materials issued an announcement regarding the Next Bridge / MMTLP corporate action, stating that each holder of its Series A Preferred Shares—MMTLP—as of December 12, 2022, would become entitled to receive one share of the common stock of Next Bridge for every one share of MMTLP held. Meta Materials also stated that the Next Bridge would be distributed to MMTLP shareholders on December 14, 2022, at which time all MMTLP shares would be automatically cancelled and MMTLP holders would cease to have any rights with respect to those shares. In addition, the company stated that the Next Bridge shares received in the distribution would not be eligible for electronic transfer through The Depository Trust Company (DTC) (or through any other established clearing corporation).

As required by federal law, Meta Materials also notified FINRA of the Next Bridge / MMTLP corporate action. Consistent with the information provided by Meta Materials, on December 6 and 8, 2022, FINRA provided public notice of the corporate action on FINRA's website. FINRA's corporate action notice stated that the Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022, and further clarified that any purchasers after December 8, 2022, (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the corporate action distribution. FINRA's corporate action notice also stated that the MMTLP symbol would be deleted effective December 13, 2022 (*i.e.*, when an issuer cancels shares, FINRA will likewise delete the symbol; see the company's announcement stating that the MMTLP shares were to be cancelled as of the December 14, 2022, distribution date of the Next Bridge shares).

On December 9, 2022, FINRA halted trading in MMTLP. One of FINRA's roles in regulating the activities of broker-dealers trading OTC equity securities is exercising the authority to require such firms to halt quoting and trading activities when FINRA determines that doing so is necessary to protect investors and the public interest. Since imposing the halt, FINRA has received questions regarding the MMTLP trading halt and its impact on investors. Below are answers to some questions FINRA has received.

### 1. Why did FINRA halt trading in MMTLP?

FINRA is permitted under its rules to impose a quoting and trading halt in an OTC equity security where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process. FINRA made such a determination for MMTLP and halted trading on December 9.

Among FINRA's concerns were the facts that, after December 12, the MMTLP shares would cease to be DTC-eligible; MMTLP shares would be cancelled at the time of the distribution (*i.e.*, December 14); and Next Bridge common stock was not expected to be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that those shares were about to be cancelled by Meta Materials, that they may not receive MMTLP shares before they were cancelled, and that they would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

### 2. Why did FINRA halt trading on December 9 if shareholders as of December 12 were entitled to receive the Next Bridge distribution?

FINRA halted trading in MMTLP on Friday, December 9, because securities transactions typically must settle within two business days in accordance with SEC rules. This means that trades in MMTLP executed on December 8 typically would settle on December 12, while trades executed on December 9 or December 12 typically would not settle until after December 12. This is important because a seller ceases to be a holder of shares and a purchaser becomes a holder of shares only after a transaction settles. Therefore, for purposes of the Next Bridge / MMTLP corporate action, only those trades in MMTLP that were executed on or before December 8 typically would have settled in time to establish the purchaser as a new holder of the shares as of December 12.

In addition, after December 12, the MMTLP shares would no longer be DTC-eligible (and the Next Bridge shares were not expected to be DTC-eligible). This means that, after December 12, any unsettled trades in MMTLP would have needed to be handled through broker-to-broker processes outside of DTC. Thus, there was uncertainty about whether trades executed *after* December 8 would settle in an orderly manner, including whether they would settle before the MMTLP shares were cancelled on December 14.

In other words, for trades in MMTLP executed after December 8, the seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would not be recorded as eligible to receive Next Bridge shares in the distribution. Moreover, the buyer would have purchased shares that would be cancelled on December 14, and there was uncertainty as to whether these trades would be settled in an orderly manner before the cancellation date. *See also* Question # 7 below.

### 3. Has the MMTLP trading halt ended?

Yes. As stated in the MMTLP trading halt notice published on December 9, the MMTLP halt ended concurrent with FINRA's deletion of the MMTLP symbol, which occurred on December 13, 2022. FINRA's website was

updated on February 16, 2023, to reflect the December 13 end of the trading halt (this update occurred later than normal due to a coding issue introduced in connection with a system migration). The MMTLP shares were cancelled by the issuer on December 14 and therefore it has not been possible to trade them since that time, irrespective of the halt status displayed on FINRA's website.

### 4. How were MMTLP shares publicly quoted and traded in the first place?

The answer to the question of whether a security is tradeable is determined by the application of federal law, including any applicable SEC rules. Where a security is or becomes tradeable, a public market for the security may develop—as it did with MMTLP.

FINRA does not approve a company's issuance of securities or approve or determine when broker-dealers or customers may begin trading those securities. However, once a broker-dealer executes a transaction in an unlisted security, the firm is required by FINRA rules to report the executed transaction to FINRA. And where a symbol does not yet exist for the security, the broker-dealer must request a symbol from FINRA. Because the issuer obtained a CUSIP for the Series A Preferred Shares, FINRA assigned the MMTLP symbol in 2021 upon request by a broker-dealer to facilitate electronic reporting of an executed transaction that occurred in the security.

This trade reporting process is separate from the process by which a broker-dealer begins quoting a security in compliance with SEC Rule 15c2-11. Rule 15c2-11 requires a broker-dealer, prior to quoting a security on its own behalf, to review specified information about the company that issued the security (unless an exception applies). In some cases, a broker-dealer also must file a form with FINRA—a Form 211. In this case, FINRA did not receive a Form 211. Instead, broker-dealers relied on an exception to SEC Rule 15c2-11 that permits broker-dealers to publish a quotation for unsolicited customer orders.

### 5. Did FINRA cancel the MMTLP shares? Did FINRA delete the MMTLP symbol?

FINRA did not cancel the MMTLP shares. The issuer, Meta Materials, cancelled the shares effective December 14. In fact, FINRA does not and cannot cancel any securities that are issued by a company—this was an action of the issuer. However, just as FINRA assigns symbols to unlisted securities, FINRA also can unassign or "delete" a symbol, for example, where it is no longer needed to quote or trade a security. In this case, FINRA deleted the MMTLP symbol on December 13 in light of the imminent cancellation of the shares as announced by the company in connection with the Next Bridge / MMTLP corporate action.

On December 8, FINRA amended its original December 6 corporate action announcement to clarify, among other things, that it would be deleting the MMTLP symbol on December 13 rather than cancelling the shares (because the issuer itself was responsible for cancelling the Series A Preferred Shares). Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.

### 6. What happened to investors who did not sell their MMTLP shares prior to the trading halt?

Investors who had settled positions in MMTLP on December 12 were holders entitled to receive shares of Next Bridge as part the Next Bridge / MMTLP corporate action. Thus, applying the standard settlement cycle of T+2, an investor who did not sell MMTLP by December 8 would receive Next Bridge shares in the distribution—and this would be the case even had FINRA not halted trading on December 9.

As described in the Next Bridge prospectus filed with the SEC, Next Bridge anticipated that the distribution process for the Next Bridge shares would take about two weeks and would be effected by its transfer agent, American Stock Transfer & Trust Company LLC. Transfer agents work for securities issuers to record changes of securities ownership, maintain security holder records, cancel and issue certificates, and distribute dividends. SEC rules and regulations include registration and other requirements for registered transfer agents. FINRA does not regulate transfer agents and does not have a role in distributing securities as part of a corporate action.

*See also* Question #10 regarding what investors should do if they have not received their Next Bridge shares and Question #11 regarding whether the Next Bridge shares are tradeable.

### 7. What would have happened to any trades executed after December 8 had FINRA not halted trading in MMTLP?

As mentioned above, applying the T+2 settlement cycle, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. Any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes

outside of DTC. There also was concern that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 may not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution), and that the MMTLP shares purchased would imminently be cancelled.

## 8. Is there public data concerning short sale activity in MMTLP?

Yes, there are several data sets published by FINRA and the SEC about short sale activity that include data for MMTLP.

*Short Interest Data:* "Short interest" in a security is a snapshot of the total open short positions existing on the books and records of broker-dealers for that security on a given settlement date. FINRA's short interest reports reflect short positions held both in customer and proprietary accounts and are published twice each month. FINRA published short interest reports for MMTLP from October 15, 2021, through November 30, 2022 (the last short interest reporting settlement date available for MMTLP). These reports are available on FINRA's website. Short interest reports for Next Bridge are not available on FINRA's website because firms report short interest by security symbol and Next Bridge does not have a symbol. FINRA is considering how it might enhance the usefulness of the short interest information available to investors, which could include changes to the content and frequency of the short interest reporting.

*Short Sale Volume:* FINRA also publishes daily short sale volume data by security for OTC equity securities. Importantly, while the two data sets are related in that short sale volume activity may ultimately result in a reportable short interest position, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reported in FINRA's short interest report. For example, while the total short sale volume for transactions in MMTLP that settled from November 16, 2022, through November 30, 2022, was 7,413,679 shares, the published short interest for MMTLP on settlement date November 30, 2022, was 4,658,068 shares.

Differences in the two data sets are expected and occur for a variety of reasons; for example, where a short sale has been covered (either on the same day or at another time prior to the short interest reporting settlement date), which means that there is no longer a short position to report as short interest by the reporting settlement date. As another example, the daily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest.

*Fails-to-Deliver:* The SEC publishes data on the total quantity of "fails-to-deliver" per security as of each reporting settlement date. As the SEC has explained, a fail-to-deliver can occur as the result of either a long or a short sale. For example, a fail-to-deliver can result from a "naked" short sale—where the seller does not borrow or arrange to borrow shares in time to make delivery to the buyer within the standard settlement period. A fail-to-deliver also may result from a long sale where there was a delay in the delivery of shares within the standard settlement period.

Among other things, SEC Regulation SHO imposes close-out requirements for fails-to-deliver in equity securities. These requirements include close-outs of fails-to-deliver in threshold securities. A "threshold security" is a security that meets defined criteria designed to address concerns regarding large and persistent failures to deliver and potentially abusive "naked" short selling. Regulation SHO's threshold security criteria include quantitative standards that apply to the securities of issuers that are SEC-reporting companies. FINRA has a separate rule, with a different quantitative threshold, for the securities of issuers that are not SEC-reporting companies.

Due to a systems coding issue, FINRA incorrectly classified MMTLP as the security of a non-SEC-reporting company and, as a result, incorrectly published its "Threshold Securities List" showing that MMTLP met the FINRA threshold standard from October 22, 2021, through January 4, 2022, and from October 17, 2022, through December 13, 2022. While MMTLP did meet the quantitative criteria under FINRA Rule 4320, it was subject to the Regulation SHO standard instead because MMTLP was issued by an SEC-reporting company. Since it began trading in October 2021, MMTLP did not have fails-to-deliver of the size or duration that would have rendered it a threshold security under Regulation SHO, and it was therefore an error to publish it on the

Threshold Securities List. FINRA has now removed MMTLP from the Threshold Securities List.

**9. What happens if short positions in MMTLP were not closed out before FINRA halted trading?**

Broker-dealers have operational conventions in place for adjusting short positions following a corporate action. In this instance, FINRA understands that firms have adjusted short positions in MMTLP to reflect an equal size short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP now reflects a short position of 100 shares of Next Bridge). In other words, the corporate action did not compel short positions to be closed or extinguish any obligations associated with outstanding short positions.

**10. What should investors do if they believe they have not received their Next Bridge shares?**

If you held a settled position in MMTLP on December 12, 2022, your account should reflect your position in Next Bridge. Your broker-dealer is required to maintain possession or control of your shares in compliance with federal law. You also may request a transfer of shares from the broker-dealer's name to your name; however, this transfer may take time to achieve and your broker-dealer or the transfer agent may charge a fee for this service. If you believe that your shares are not properly reflected in your account or your broker-dealer has not been willing to transfer your shares pursuant to your instructions, you should contact your broker-dealer to understand the status of your Next Bridge shares.

Your broker-dealer may reflect your Next Bridge shares in your account using a numeric or alphanumeric identifier. Different firms may use different identifiers because an official CUSIP number, which is an identifier assigned by CUSIP Global Services at the request of the issuer—not FINRA— has not, to date, been assigned to Next Bridge common stock. The absence of an official CUSIP number does not affect the status of the Next Bridge shares reflected in your account. If you believe that your broker-dealer has not provided a satisfactory explanation to your questions, you may submit an investor complaint to FINRA.

**11. Are the Next Bridge shares tradeable?**

As discussed above, Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of 165,523,363 shares of common stock in connection with the Next Bridge / MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are freely tradeable under federal law.

As of the date of this article, the Next Bridge shares neither have a CUSIP number nor a security symbol. If Next Bridge were to obtain a CUSIP number, that would facilitate secondary market trading. Broker-dealers would be able to request that FINRA assign a symbol to the Next Bridge shares in connection with quoting and trading activity (where such request is consistent with FINRA rules and policies and with federal law). However, even without a CUSIP number, any trades in Next Bridge shares executed by a broker-dealer must be reported by the firm to FINRA for regulatory purposes through a file submission process.

As part of its mission, FINRA provides resources on its website to assist retail investors through the investment process. As relevant to the questions around trading in MMTLP, FINRA has published Investor Insight articles addressing short interest and short sale volume data, as well as corporate actions and the mechanics and risks of trading OTC securities. Visit FINRA's For Investors webpage for more information.

*Note: This article was modified on March 27, 2023, to remove references to the registration of the MMTLP shares, which raised questions that are not relevant to the main focus of this article. The registration status of the MMTLP shares is determined under the Securities Act of 1933 and applicable SEC rules and interpretive guidance thereunder, and not FINRA rules.*

© FINRA. All Rights Reserved.



MTM Link | FINRA short inte | FINRA Fines UBS | ChatGPT | hearing | Hearing | your favorite S

https://x.com/mister_meseeks_/status/1876277245016514784/photo/3 50%

Exhibit 9

1 14 24 772

Search

*Exhibit 10*

## Daily List Events

### Summary

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/06/2022 14:53:29 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

### Comments

MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. MMTLP shares will be canceled effective 12/13/22.

### Details

**Current Value**

| | |
|---|---|
| Daily List Date/Time | 12/06/2022 14:53:29 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class | |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| | MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge |



$Exhibit$ $\not{E}$ 11

implications was the basis of the reasoning for the U3 Halt. The "possibility" of problems does not qualify as an Extraordinary Event. Moreover, FINRA misleads investors to believe that their best solution to this "possibility" of an Extraordinary Event was to rob 65,000 shareholders of their right to sell their shares on the 9th and 12th, as clearly stated by the SEC-approved S-1 in addition to correspondence from broker-dealers. FINRA took the position that it was better to trap investors that relied on all of the public statements available prior to initiating the U3 Halt in a private company that is now "agency diluted" because of their actions. The real protection was given to the overleveraged short hedge funds and the broker dealers that oversold MMTLP and diluted Next Bridge Hydrocarbons Inc. Think of it this way: 65,000 people bought tickets to the Super Bowl. Due to the remote possibility that a minimal number of fans could purchase tickets immediately prior to the event and may not make it to their seats in time, the NFL (FINRA) decided to cancel the Super Bowl event entirely (U3 Halted).



*Exhibit 12*

## Daily List Events

### Summary

| Date/Time | Event Type | Eff/Ex Date/Time | Symbol | Issue Name | Market |
|---|---|---|---|---|---|
| 12/08/2022 13:11:45 | Exchanged | 12/13/2022 00:00:00 | MMTLP | META MATLS INC PFD SER A | OTC Equity |

### Comments

See Daily List of 12/6/2022. Announcement Revised: MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22.

### Details

**Current Value**

| | |
|---|---|
| Daily List Date/Time | 12/08/2022 13:11:45 |
| Event Type | Exchanged |
| Effective/Ex Date/Time | 12/13/2022 00:00:00 |
| Symbol | MMTLP |
| Issue Name | META MATLS INC PFD SER A |
| Class | |
| Market Category | OTC Equity |
| Offering Type | No Restrictions |
| | See Daily List of 12/6/2022. Announcement Revised: MMTLP |

*Exhibit 13*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

INTER-COASTAL WATERWAYS LLC,

                        *Plaintiff,*

    v.

TRADESTATION SECURITIES, INC. and
DOE DEFENDANTS 1-10,

                        *Defendants,*

    and

THE FINANCIAL INDUSTRY
REGULATORY AUTHORITY,

                        *Nominal Defendant.*

CIVIL ACTION NO. 0:24-cv-60891-AHS

**DECLARATION OF GEORGIOS PALIKARAS IN SUPPORT OF PLAINTIFF INTER-
COASTAL WATERWAYS LLC'S OPPOSITION TO DEFENDANT TRADESTATION
SECURITIES, INC.'S MOTION TO COMPEL ARBITRATION AND
CROSS-MOTION FOR THE DISQUALIFICATION OF
THE FINANCIAL INDUSTRY REGULATORY AUTHORITY AS MANDATORY
<u>ALTERNATIVE DISPUTE RESOLUTION SERVICE TO THIS ACTION</u>**

I, Georgios Palikaras, being duly sworn, deposes and says under the penalty of perjury,

pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I was the President and Chief Executive Officer of Metamaterial, Inc. ("META I")

until June 28, 2021, and became President and Chief Executive Officer of Meta Materials Inc.

(formerly known as Torchlight Energy Resources, Inc.) on June 28, 2021 after the combination of

the two companies.

    2.    I was the President and Chief Executive Officer of Meta Materials Inc. ("META

II") trading on the Nasdaq under symbol MMAT from June 28, 2021 until October 10, 2023, as

well as a Board Director until December 4, 2023.

1

3.      On December 14, 2020, Torchlight Energy Resources, Inc. ("Torchlight Energy"), an oil and gas exploration company trading on the NASDAQ under the symbol TRCH and META I, a developer of high-performance functional materials and nanocomposite products trading on the CSE in Canada under symbol MMAT.CN, signed a definitive agreement negotiated at arm's length for a business combination of Torchlight and META I by way of a statutory plan of arrangement (the "Merger").[1]

4.      On June 28, 2021, META I combined with Torchlight Energy, and Torchlight Energy was renamed to Meta Materials Inc. ("META II" or the "Company") and started to trade on the Nasdaq under the symbol MMAT.[2]

5.      Prior to the closing of the Merger transaction, on June 14, 2021, Torchlight Energy declared a Special Dividend of Series A Preferred Stock (the "Dividend" or "Series A Shares") to be issued on a one-for-one basis to Common Stockholders of Record as of the close of market trading on June 24, 2021 to Torchlight Energy shareholders that held shares prior to the merger.[3]

6.      On June 25, 2021, Torchlight Energy announced that it distributed the Dividend to its shareholders of record on June 24, 2021.[4]

7.      The Dividend shares were never intended or authorized to be listed or traded on any exchange, and were created merely to be a dividend placeholder representing the assets of Torchlight Energy that the Company would continue to own as a part of the merger.[5]

---

[1] *See* https://metamaterial.com/metamaterial-and-torchlight-sign-definitive-agreement-for-business-combination/ (last accessed August 15, 2024).
[2] *See* https://metamaterial.com/meta-closes-transaction-and-commences-trading-on-nasdaq/ (last accessed August 15, 2024).
[3] *See* SEC filings, i.e. Torchlight Energy Resources, Inc., Series A Preferred Shares Certificate of Designation (Form 8-K    EX-3.2)    (June    14,    2021),    available    at https://www.sec.gov/Archives/edgar/data/1431959/000119985521000381/ex3-2.htm.
[4] *See* https://finance.yahoo.com/news/torchlight-announces-payment-special-series-203500696.html (last accessed August 15, 2024).
[5] *See* SEC Filings, i.e. Torchlight Energy Resources, Inc. (Schedule 14A) (May 10, 2021), at 50, available at https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm.

8.      On September 30, 2021, pursuant to the closing of the merger with Torchlight Energy, the Company reclassified Torchlight Energy's oil and gas assets as "held for sale" and hired a consultant to help determine the best path to maximize value for Dividend shareholders. The Company informed investors about the ongoing drilling obligations in the Orogrande Project in 2021 to hold the lease for sale or spinout.[6]

9.      On December 3, 2021, the Company announced their intent to spinout or dispose of Torchlight Energy's oil and gas assets in early Q1 2022, pending process approvals by all parties involved.[7]

10.     On January 14, 2022, the Company updated shareholders[8] that it was moving forward in the spinout process of Torchlight Energy's oil and gas assets. This work included, but was not limited to, formal transfer of the assets to OilCo Holdings, Inc. ("OilCo"), a newly formed wholly owned subsidiary of META II, as well as making any necessary filings with the U.S. Securities and Exchange Commission and initiating discussions with FINRA.

11.     On August 31, 2021, OilCo Holdings, Inc. was incorporated in Nevada as a wholly owned subsidiary of META II, and changed its name to Next Bridge Hydrocarbons, Inc. ("Next Bridge") pursuant to an Amended and Restated Articles of Incorporation filed on June 30, 2022.

12.     On July 15, 2022, META II announced that its new, wholly owned subsidiary, Next Bridge, filed a Form S-1 registration statement with the U.S. Securities and Exchange Commission relating to the registration of Next Bridge's common stock. The proposed registration of Next

---

[6] *See* https://metamaterial.com/meta-commences-drilling-operations-in-orogrande-project-to-maintain-lease-compliance/ (last accessed August 15, 2024).
[7] *See* https://metamaterial.com/meta-provides-update-on-the-special-series-a-preferred-stock-dividend/ (last accessed August 15, 2024).
[8] *See* https://metamaterial.com/meta-provides-update-on-the-special-series-a-preferred-stock-dividend-2/ (last accessed August 15, 2024).

Bridge's common stock was pursued in connection with a planned share exchange to Dividend shareholders.

13.    On November 18, 2022, Next Bridge's Form S-1 became effective. Pursuant to Next Bridge's Form S-1, holders of the Series A Preferred Dividend Shares would receive a 1-for-1 share exchange at a future date where one Series A Preferred Dividend Share would be exchanged for one share of Next Bridge common stock.[9]

14.    On October 6, 2021, Mr. Greg West, a Senior Corporate Actions Analyst at the Financial Industry Regulatory Authority ("FINRA") sent a basic "for your information" email to META II at investors@metamaterial.com which included a letter attachment from FINRA notifying the Company that they have assigned the ticker symbol MMTLP to the Series A Shares (the "MMTLP Shares") and the MMTLP Shares may be quoted and traded on the Over-The-Counter Market ("OTC Market").

15.    On October 7, 2021, META II's management responded to FINRA's letter via email and strenuously objected to the assignment of this new symbol in light of the false and misleading information regarding it and Meta Materials Inc. that was published on the OTC Market's website. We further requested that FINRA provide the Company with the contact information of the individual(s) or group(s) that requested the assignment of the symbol, and requested that the profile information shown on the OTC Markets site be immediately deleted and corrected to reflect the readily available information for META II which was contained in our Form 10-Q filing for the quarter that has ended June 30, 2021. The Company's financial

---

[9] *See* https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last accessed August 15, 2024). *See also* https://www.sec.gov/Archives/edgar/data/1936756/000119312522238430/d302576dex21.htm (last accessed August 15, 2024).

4

information provided to FINRA by the **unidentified broker(s)** seeking a listing exemption was incorrect and outdated, containing publicly available Company information from 2012.

16.     On October 7, 2021, the MMTLP shares began trading on the OTC Market without the authorization of the Company. FINRA did not send its notice to the Company until less than 24 hours before the MMTLP Shares began trading on the OTC Market.

17.     FINRA did not halt the trading of MMTLP even after META II's management communicated to Mr. West that the listing included false and outdated information. META II management indicated that the Company did not request for FINRA to assign a ticker symbol to the Series A Shares because the Series A Shares were intended by the Company to be a placeholder dividend representing the assets of Torchlight Energy prior to the asset sale or spin-out.

18.     On October 8, 2021, Mr. West responded to META II's management letter stating he would be escalating the matter to his superiors.

19.     Subsequently, on October 14, 2021, in response to META II's complaint, FINRA's Vice President of Market Operations for FINRA's Market Transparency Services, Ms. Patricia Casimates, left a voicemail for Mr. Ken Rice, META II's Chief Financial Officer, and emailed him asking Mr. Rice to call her regarding the Company's MMTLP complaint.

20.     On or about October 14, 2021, Mr. Rice had a phone call with Ms. Casimates regarding META II's MMTLP complaint. During the call, Mr. Rice reported to me that FINRA refused to provide the identity of the broker(s) or individual(s) that applied for the exemption. Mr. Rice reported to me that FINRA or the related broker(s) or individual(s) who applied for the exemption would not edit, delete or modify the false and outdated Company information that was listed on the OTC Market's website.

21.     Despite the Company actively attempting to communicate its concerns to FINRA regarding the improper quoting and trading of the MMTLP Shares, the MMTLP Shares remained actively listed and trading on the OTC Market until December 9, 2022. During shareholder updates, Company management warned shareholders regarding this matter.

22.     On November 18, 2022, Next Bridge filed a prospectus[10] onto the Securities and Exchange Commission's Electronic Data Gathering, Analysis and Retrieval System informing the public of the summary of the Next Bridge asset spin-off and share exchange.

23.     In the prospectus, Next Bridge noted "at the time of the Spin-Off, Meta will distribute 165,472,241 of the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock and contemporaneously cancel any remaining shares of Common Stock it holds." The prospectus further stated "each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of close of business, New York City time, on December 12, 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of [Next Bridge] Common Stock."[11]

24.     In conjunction with the prospectus, on November 23, 2022, META II published a press release indicating that, "on December 14, 2022 after the close of the trading markets, ... all of the shares of Series A Preferred Stock will be automatically canceled."[12]

25.     On November 22, 2022, I received email communication from Mr. Lance Cook, the designated representative for Dividend shareholders. Mr. Cook had been communicating with many of the Series A Preferred shareholders, including the largest Dividend shareholder, Mr. Greg

---

[10] See SEC filings, i.e., Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2), at 1.
[11] See SEC filings, i.e., Meta Materials, Inc., Prospectus (File No. 333-266143) (Nov. 18, 2022) (available at https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm#toc302576_2).
[12] See https://www.accesswire.com/728166/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc (last accessed July 31, 2024).

McCabe. Mr. Cook discussed that despite the SEC's approval of the S-1 registration statement and FINRA's notification with regard to the publication of a notice of corporate action (after FINRA had received all information requested from the Company in due course to enable the delisting of MMTLP and completion of the spin-out), there were concerns that there was no reason as to why FINRA was delaying in the consent or objection of META II's corporate action. Mr. Cook also reported that a major issue with the delay of formalizing this spin-out was the inability of the Next Bridge to be able to raise funds.

26.    Subsequently, on the same day, November 22, 2022, I forwarded Mr. Lance Cook's email to the OTC Markets team, pleading for a timely response and expedited resolution. The notice of corporate action, designated CAS-75631, was being reviewed by Mr. Luis Cantillo in FINRA's corporate action group who was in contact with the Company's counsel. My understanding is that we had provided him with all necessary supplemental information he had requested.

27.    On December 5, 2022, the Company's counsel, together with Next Bridge's counsel drafted and sent a new email requesting escalation of its concerns to FINRA's executive team. This escalation reminded FINRA that through no actions taken by META II, the Company's Series A Preferred Stock began trading in 2021 and was still trading on the OTC Market under the symbol MMTLP. The Company's counsel stated that META II management had notified FINRA of a corporate action (stock dividend) to be taken (FINRA Rule 6490) approximately 3 months prior and, as of that date, we still did not have an answer regarding whether or not FINRA found the request to be deficient. Counsel also noted to FINRA it had become extremely difficult for META II to make plans and, more importantly, could and may be causing confusion in the OTC market of MMTLP to the detriment of META II's investors. Counsel further noted to FINRA that

7

Next Bridge Hydrocarbons and Meta Materials would need to stand on their own and both companies had responsibilities to their respective shareholders. Counsel further noted to FINRA that any further delays would jeopardize the respective companies' abilities to raise capital and to maintain their respective standing in the marketplace which would be a detriment to all shareholders.

28.     Subsequently, on December 5, 2022, in response of the email sent to FINRA's executive team, Ms. Sarah Gill from Office of the Ombudsman responded via email to META II's counsel stating that FINRA's President and Chief Executive Officer, Mr. Robert Cook, had referred the matter to her and a call was scheduled for December 6, 2022 between META II's counsel and Ms. Gill. Following the call, Ms. Gill connected and introduced Ms. Millicent Banks as the contact who leads FINRA's corporate actions team.

29.     From September 2022 to December 6, 2022, the Company had submitted the various required documentation and payment to FINRA for the publication of a notice of corporate action announcing the 1-for-1 Series A Preferred share exchange to FINRA's Daily List.

30.     On December 7, 2022, FINRA published a notice that it has processed META II's corporate action and published it onto its Daily List, which stated that "MMTLP shareholders with settled positions as of 12/12/22 Record Date will receive one (1) share of Next Bridge Hydrocarbons, Inc. for every one (1) share of MMTLP held on Pay Date of 12/14/22. Purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. [NO EX-DIVIDEND DATE] MMTLP shares will be *canceled* effective 12/13/22.[13] This language was provided to META II by FINRA's corporate action team.

---

[13] *See* https://metamaterial.com/meta-materials-announces-finra-has-processed-corporate-action-for-exchange-of-series-a-preferred/ (last accessed August 15, 2024).

31.     Further, on or about December 8, 2022, FINRA notified the Company that it had unilaterally revised the language of the Company's December 6, 2022 corporate action and required the revised notice to be published on the Daily List. This revision was made without the input or authorization of the Company and took place on or about December 7, 2022, *after* FINRA had a call discussion with DTCC. I was informed that META II and Next Bridge's counsel were not invited to participate in the call between FINRA and DTCC.[14]

32.     To facilitate the successful execution of the MMTLP-Next Bridge share exchange, on December 8, 2022, the revised notice of corporate action was published on FINRA's Daily List, changing the language used by META II in the original corporate action to read, "MMTLP will be *deleted* effective 12/13/22."

33.     After the revised notice of corporate action was published to FINRA's Daily List, the Company announced via press release that "FINRA [had] revised [the Company's] corporate action for exchange of Series A Preferred."

34.     On December 9, 2022, FINRA announced it had enacted a U3 halt on the trading of MMTLP Shares, claiming there was "significant uncertainty in the settlement and clearing process" for the security.

35.     Prior to the U3 halt, FINRA never stated in any communications to the Company (or publicly) that they were going to halt the trading as of December 8, 2022. META II's counsel reached out again on the Morning of December 9, 2022 to ask Ms. Gill whether the halt was permanent or temporary. Only *after* the halt, FINRA added a note on their UPC Advisory page.

36.     During my own inquiries for several weeks after the halt, as well as through counsel including multiple calls with the Ms. Gill at the Office of the Ombudsman, we never received any

---

[14] *See* https://metamaterial.com/meta-materials-announces-finra-has-revised-corporate-action-for-exchange-of-series-a-preferred/ (last accessed August 15, 2024).

answers for exactly what the "extraordinary event" or reasons were that FINRA relied on to enact

the halt.[15] If FINRA had planned the halt all along, it is my opinion that they should have put such

information into the announcement in order to fully inform and protect shareholders and avoid

shareholder confusion.

37.    On December 13, 2022, FINRA deleted the MMTLP ticker.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on August 15, 2024

_____
Georgios Palikaras

Georgios
Palikaras

Digitally signed
by Georgios
Palikaras
Date: 2024.08.15
19:56:27 -03'00'

---

[15] *See* ECF 1-6 at 3.

*Exhibit 14*



**Attn: Trading and Market Making/Legal and Compliance/Operations/Systems**
**UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022**

**Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP)**

Effective Friday, December 09, 2022, the Financial Industry Regulatory Authority, Inc. ("FINRA") halted trading and quoting in the Series A preferred shares of Meta Materials Inc. (OTC Symbol: MMTLP). Pursuant to Rule 6440(a)(3), FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearance process for shares in MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest.

The trading and quoting halt will end concurrent with the deletion of the symbol effective Tuesday, December 13, 2022. *See* updated FINRA Daily List announcement of December 8, 2022, regarding MMTLP; available here: https://otce.finra.org/otce/dailyList.

*See also* Form S1 Registration Statement for Next Bridge Hydrocarbons, Inc. stating that **"...immediately after the Spin-Off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled."** Available here: https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm.

Questions regarding this notice can be directed to: FINRA Market Operations at (866) 776-0800, Option 2.

Investor protection. Market integrity.      9509 Key West Avenue    t  240 386 4000
Rockville, MD    www.finra.org
20850-3329



DOW 38,380.12 ▼ -274.3 (-0.71%) NASDAQ 15,597.68 ▼ -31.28 (-0.20%) S&P 500 4,942.81 ▼ -15.8 (-0.32%) US Markets Closed Customer Service Log Off

E*TRADE from Morgan Stanley Accounts Trading Markets & Ideas At Work What We Offer Transfer Search

Complete View Portfolios Watch Lists Orders Balances Transactions Banking Tax Center Documents Dividend Reinvestment Open Account

Refresh February 05, 2024 10:48 PM ET Help

## Orders

Open Executed Cancelled Saved Individual fills Expired Rejected All Bond quotes

Account: Individual Brokerage -5167

From date: 11/01/2022 To date: 12/31/2022 Symbols: mmtlp Order number: Order type: All Order status: Rejected Security type: All Results per page: 20 Apply filters

Brokerage Update Disclosure

| Date | Order | Type | Order type | Quantity | Symbol | Price type | Term | Price | Reasons |
|---|---|---|---|---|---|---|---|---|---|
| 12/11/22 | 28 | Stock/ETF | Sell | 1,000 | MMTLP | Limit | GT 60 | 1,511.00 | Too Late To Cancel |
| 12/09/22 | 27 | Stock/ETF | Sell | 4,500 | MMTLP | Limit | GT 60 | 10,000.00 | Market Reject |
| 12/09/22 | 26 | Stock/ETF | Sell | 5,000 | MMTLP | Limit | GT 60 | 10,000.00 | Too Late To Cancel |
| 12/07/22 | 25 | Stock/ETF | Sell | 4,000 | MMTLP | Limit | GT 60 | 1,211.00 | Too Late To Cancel |
| 12/06/22 | 23 | Stock/ETF | Sell | 3,000 | MMTLP | Limit | GT 60 | 981.00 | Too Late To Cancel |

Exhibit 15

Refresh October 24, 2023 9:40 PM ET

## Orders

Open | Executed | Cancelled | Saved | Individual fills | Expired | Rejected | All | Bond quotes

Account: Individual Brokerage -4179

From date: 10/01/2022 | To date: 12/24/2022 | Symbols | Order number | Order type: All | Order status: Rejected | Security type: All | Results per page: 50 | Apply filters

Brokerage Update Disclosure

| Date | Order | Type | Order type | Quantity | Symbol | Price type | Term | Price | Reasons |
|---|---|---|---|---|---|---|---|---|---|
| 12/12/22 | 102 | Stock/ETF | Sell | 3,570 | MMTLP | Limit | GT 60 | 999.00 | Too Late To Cancel |
| 11/29/22 | 96 | Stock/ETF | Sell | 184 | MMTLP | Limit | GT 60 | 2,400.00 | Too Late To Cancel |
| 11/29/22 | 94 | Stock/ETF | Sell | 700 | MMTLP | Limit | GT 60 | 1,500.00 | Too Late To Cancel |
| 11/29/22 | 91 | Stock/ETF | Sell | 500 | MMTLP | Limit | GT 60 | 500.00 | Too Late To Cancel |
| 11/21/22 | 55 | Stock/ETF | Sell | 100 | MMTLP | Limit | GT 60 | 1,200.00 | Market Reject |
| 11/21/22 | 50 | Stock/ETF | Sell | 300 | MMTLP | Limit | GT 60 | 900.00 | Market Reject |

* Share-weighted

**Help Center**

Glossary | A-Z Index

A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | 1 | 3 | 4 | 5

**Too Late To Cancel**
The request to cancel is received and the order is no longer able to be canceled. The order has already been executed or is in the process of executing.

Copyright ©2009 by InvestorGuide.com
All Rights Reserved

Check the background of E*TRADE Securities LLC and Morgan Stanley Smith Barney LLC on FINRA's BrokerCheck and see E*TRADE Securities LLC and E*TRADE Capital Management, LLC Relationship Summary and Morgan Stanley Smith Barney LLC Relationship Summary.

Investment Products • Not FDIC Insured • No Bank Guarantee • May Lose Value

Banking products and services are provided by Morgan Stanley Private Bank, National Association, Member FDIC.

Exhibit 15

*16*

| | |
|---|---|
| **From:** | Boyle, Richard |
| **To:** | (b)(6); (b)(7)(C) |
| **Cc:** | Gibbon, Jay |
| **Subject:** | Meta Materials Inc. (MMAT and MMTLP) / Next Bridge Hydrocarbons, Inc. |
| **Date:** | Friday, December 2, 2022 10:46:34 AM |
| **Attachments:** | image001.png |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning  I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer and its proposed spin-off transaction. Would one of you have time on Monday or Tuesday to discuss this matter? FINRA's Market Fraud Investigations team recently received several tips that appear to have also been sent to the SEC. Below are some proposed times to discuss but we can work around your schedules if these don't work for you. Thanks.

Monday – between 11:30 ET and 2:30 ET or between 4:30 ET and 5:30 ET
Tuesday – between 4:30 ET and 5:30 ET


**Rich Boyle**
National Cause and Financial Crimes Detection Programs | 15200 Omega Drive, Suite 210 | Rockville, MD  20850
Phone: (240) 386-5008 | richard.boyle@finra.org | www.finra.org

# FINRA.

Confidentiality Notice:: Information contained in or attached to this email may be non-public, privileged, or confidential. Do not use, save, or copy any of that information, and do not share it with anyone else, unless you are the intended recipient. The sender has not authorized you to save, copy, use, or share any information provided to you in error. If the sender sent you this email or any attachment by mistake, please let the sender know by replying to this email and then deleting it.

Non Responsive Record

*14*

**From:** Draddy, Sam <Sam.Draddy@finra.org>
**Sent:** Monday, December 5, 2022 9:07 AM
**To:** (b)(6); (b)(7)(C)                    @SEC.GOV>
**Cc:** (b)(6); (b)(7)(C)                    @SEC.GOV>; (b)(6); (b)(7)(C)                    @SEC.GOV>; Boyle,
Richard <Richard.Boyle@finra.org>; Gibbon, Jay <Jay.Gibbon@finra.org>
**Subject:** RE: Inquiry

**CAUTION:** This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

(b)(6);
(b)(7)(C)          -looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and
seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our
General Counsel's office—but was wondering if it made sense for my Fraud team to have a
conversation directly with you and your folks working on the matter so we are not duplicating
efforts.  We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting
both MMAT and MMTLP as we speak.

If you think a comparison of notes is worth a quick call—let me know a good day/time.  I can set up a
zoom and feel free to let me know if (b)(6); (b)(7)(C) or anyone else should be included.

Thanks (b)(6); (b)(7)(C)

Sam

Non Responsive Record

*Exhibit 17*

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action a 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors ir receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questio circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and sug substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has be when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concer brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been o dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers o according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfe American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge —the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC. below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP c reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of N distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherw

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is no "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determin "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Ne for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a ty has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and regist distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concer safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodia securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count a whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Fur not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or wheth

Case 3:24-cv-02053-JAM

For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a s shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 share not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares follow

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there w sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of a those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? W position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the to existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short inter date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in I broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, w percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approxi declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to a shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particula number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in th data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rath executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediate 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of A this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *posi* customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open mar (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the custor sale is reflected in the short sale *volume* data but do not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided a interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corpo

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "nak in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arra securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17]Whi required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relev Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data— of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net S the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which app social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 becau executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, w

resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open shor

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock bor
to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Ne
discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares ou
12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the
"counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by

**16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their s
seller?**

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares rel
MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareh
nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge ha
number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may
Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUS
caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a
holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have b
for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted ab
there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulte

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares c
only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by l
borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would ha
receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed
because the existence of a loan does not impact the ownership rights of the purchaser).[21]

**17. Why did FINRA halt trading in MMTLP before December 12?**

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other fa
that an extraordinary event has occurred or ongoing that has had a material effect on the market for the security or has
to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA i
for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on D
shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distributior
stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactio
December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the
December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive *Next Bridge sh
corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the
trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outs
likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MM
cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with resp
be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have
would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of
time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased wo
cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December
had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Acc
determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTl
existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and set
prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Ne
there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next l
secondary market trading in its common stock.

**18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoi**

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shar positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational proces short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adju MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMT a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would ha position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not n purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

### 19. How can a holder of Next Bridge common stock liquidate their securities?

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP h cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As r Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLF Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to mak eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility ena and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Gl common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obt Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate stock, shareholders will continue to have difficulty trading their securities.[26]

1 *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insig corporate-action-and-trading-halt.

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta I Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metam company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehic receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were canc

4 "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

5 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%

6 Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maint in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which not FINRA, perform functions that include serving as a central securities depository and operating a centralized system fo transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "C is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain record appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its sha be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

7 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

8 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%

9 For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" beca

which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, regulatory organizations worked together to develop and implement a system with a universal electronic format, common blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Informatic Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/( securities-transaction-information-exchange-members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regula requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and afte cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have n broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to o its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINR this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023 www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the eve in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered are outstanding), hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Str 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are trade (like MMTLP) naturally can have different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate e sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to i differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short posi confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-de problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the bi inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://ww marketreg/mrfaqregsho1204.htm.

16 While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discus

17 *See* SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

18 On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for wh relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short s locates, borrows, or arrangements to borrow have not been performed).

19 *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting engine. NSCC is a subsidiary of DTCC.

20 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%

21 Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made t shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open terminated.

22 *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23 *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

Case 3:24-cv-02053-JAM    Document 13-1    Filed 01/14/25    Page 43 of 107

24 It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public n

25 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119311522281275/d302576ds1a.htm#toc302576_2.

26 *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/defau
letter-5-19-23.pdf.

© FINRA. All Rights Reserved.

84

# Congress of the United States
## Washington, DC 20510

December 22, 2023

The Honorable Gary Gensler
Chair
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Mr. Robert W. Cook
President & Chief Executive Officer
Financial Industry Regulatory Authority
1735 K Street NW
Washington, D.C. 20006

Dear Chairman Gensler and Mr. Cook:

We write to request that the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) review events surrounding Meta Materials Series A preferred shares (MMTLP).

As you know, MMTLP was created during a merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders.[1] MMTLP shares began trading on the OTC market in 2021. In the summer of 2022, the SEC received and subsequently approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons (NBH).[2] On December 9, 2022, FINRA issued a U3 halt on trading in the company's stock, preventing shareholders from making further trades.[3] Since the halt, constituent investors have contacted Members of Congress regarding the spin-off transaction and the subsequent halt on trading. Specifically, we have received more than 40,000 letters from concerned investors.[4]

Many of our constituents have concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP. As you know, the securities industry is regulated by a disclosure-based regime, and transparency is paramount to FINRA's and the SEC's goals of protecting investors and ensuring market integrity. We believe it is appropriate that FINRA and

[1] *Securities and Exchange Commission, EDGAR,* "Torchlight Announces Payment of a Special Series A Preferred Stock Dividend, a 1:2 Reverse Stock Split and Planned Closing of the Arrangement Agreement with Meta Material, Inc." https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm (last visited Dec. 8, 2023).
[2] Press Release, Meta Materials, "Meta Materials Inc. Board of Directors Approves Planned Completion of the Spin-off of Next Bridge Hydrocarbons Inc.," https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last visited Dec. 8, 2023).
[3] Daily Notice, FINRA, "Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022," https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf, (last visited Dec. 8, 2023).
[4] CONGRESSIONAL RESEARCH SERVICE, Meme Stock MMTLP and FINRA Trading Halt, (Aug. 21, 2023) https://www.crs.gov/Reports/IN12228.

the SEC review these market events and determine what, if any, wrongdoing may have occurred in order to dispel misinformation and properly safeguard investors.

Please provide a response to the following questions and requests no later than January 31, 2024:

1. Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2. The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3. Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4. Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5. Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6. Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7. How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8. Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9. Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

---

[5] Brandon Kochkodin, *MMTLP: The Wild Saga of the Meme Stock That's Left Thousands of Shareholders with Noting,* Forbes Middle East, (Apr. 27, 2023) https://www.forbesmiddleeast.com/money/markets/mmtlp-the-wild-saga-of-the-meme-stock-thats-left-thousands-of-shareholders-with-nothing.

U.S. broker dealers, all shares held offshore that were traded and never settled through the appropriate clearing channels, and the ability to provide the location associated with each short position identified above.

10. Have all MMTLP shareholders received their NBH shares?

11. In your view, did MMTLP investors knowingly enter into a risk-taking transaction with full understanding of material information and without misleading guidance from social media or elsewhere? For example, the SEC has charged social media influencers with manipulation schemes in the past.[6]

12. In your view, are there better ways to provide transparency and clarity regarding risk disclosures that could enhance market integrity and reduce market disruptions? For example, retail investors and experts (e.g., OTC Markets Group's vice president) were reportedly confused about MMTLP's final trading date.[7] As such, investors may not have been able to optimize their investment decisions.

13. Do you have evidence to suggest the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares, that could distort the market?

14. Have you seen any indications of insider trading and/or pump and dump related to MMTLP transactions?

15. Are your organizations willing to work with NBH to determine a resolution for existing shareholders? For example, some investors have expressed concern that, even though their brokerage account statements include shares of NBH in their account, these shares may not have actually been delivered to their broker-dealers.

16. Identify any regulatory or legislative gaps that should be addressed to ensure the SEC, FINRA, and other regulated entities may better protect investors and strengthen market integrity.

We look forward to your response. Thank you for your attention to this important matter.

Sincerely,

Ralph Norman
Member of Congress

Pete Sessions
Member of Congress

---

[6] Press Release, Securities and Exchange Commission, "SEC Charges Eight Social Media Influencers in $100 Million Stock Manipulation Scheme Promoted on Discord and Twitter," (last visited December 8, 2023).

[7] *Supra,* note 5.

Bill Posey
Member of Congress

Bryan Steil
Member of Congress

Bryon Donalds
Member of Congress

Barry Loudermilk
Member of Congress

William Timmons
Member of Congress

Michael V. Lawler
Member of Congress

Andy Ogles
Member of Congress

Alex Mooney
Member of Congress

Mike Flood
Member of Congress

Erin Houchin
Member of Congress

Scott Fitzgerald
Member of Congress

Warren Davidson
Member of Congress

John Rose
Member of Congress

Marcy Kaptur
Member of Congress

Jeff Van Drew
Member of Congress

Joe Wilson
Member of Congress

Stephanie Bice
Member of Congress

Ron Estes
Member of Congress

Mike Ezell
Member of Congress

John Rutherford
Member of Congress

Eli Crane
Member of Congress

Raul M. Grijalva
Member of Congress

Delia Ramirez
Member of Congress

Betty McCollum
Member of Congress

Linda T. Sánchez
Member of Congress

Darren Soto
Member of Congress

Bill Johnson
Member of Congress

Daniel Webster
Member of Congress

Troy E. Nehls
Member of Congress

Jeff Duncan
Member of Congress

Russell Fry
Member of Congress

Brian Fitzpatrick
Member of Congress

Lisa McClain
Member of Congress

Andy Harris, M.D.
Member of Congress

Andy Biggs
Member of Congress

Tim Walberg
Member of Congress

Diana Harshbarger
Member of Congress

Virginia Foxx
Member of Congress

Randy Feenstra
Member of Congress

Randy Weber
Member of Congress

Adrian Smith
Member of Congress

Scott Franklin
Member of Congress



Marc Molinaro
Member of Congress

John Moolenar
Member of Congress

Paul A. Gosar, D.D.S.
Member of Congress

Doug Lamborn
Member of Congress

Nancy Mace
Member of Congress

Barry Moore
Member of Congress

Victoria Spartz
Member of Congress

Carlos A. Gimenez
Member of Congress

Beth Van Duyne
Member of Congress

Nick Langworthy
Member of Congress

Earl L. "Buddy" Carter
Member of Congress

Mike Carey
Member of Congress

Nicole Malliotakis
Member of Congress

Lance Gooden
Member of Congress

Gus M. Bilirakis
Member of Congress

John Joyce
Member of Congress

James Comer
Member of Congress

Maria Elvira Salazar
Member of Congress

Cory Mills
Member of Congress

W. Gregory Steube
Member of Congress

Matthew M. Rosendale
Member of Congress

Claudia Tenney
Member of Congress

Matt Gaetz
Member of Congress

Jenniffer Gonzalez-Colon
Member of Congress

August Pfluger
Member of Congress

Nick LaLota
Member of Congress

Rich McCormick, MD, MBA
Member of Congress

Jen Kiggans
Member of Congress

_____
Max Miller
Member of Congress

_____
Lauren Boebert
Member of Congress

Exhibit 19





VIA EMAIL AND FEDERAL EXPRESS

November 21, 2023

Robert Colby
Executive Vice President
and Chief Legal Officer

Mr. Colby:

I write on behalf of Next Bridge Hydrocarbons, Inc. ("Next Bridge" or the "Company"), which as you know, is a privately held company that was a spin-off from Meta Materials, Inc. ("Meta Materials").[1]

Next Bridge appreciates that FINRA has continued to address the issues that followed FINRA's halt of trading in Meta Materials' Preferred Series A shares (OTC: MMTLP) on December 9, 2022.

We have read FINRA's November 6, 2023 Supplemental FAQ: MMTLP Corporate Action Trading Halt,[2] including FINRA's estimate "that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[] of approximately 2.65 million shares out of 165.47 million total shares outstanding…." Next Bridge has received information from financial firms since the spin-off that suggests that the number of short positions may be significantly higher than FINRA's estimated 2.65 million.

Despite FINRA's FAQs, investors continue to express concerns to Next Bridge concerning unresolved issues from the trading halt, including the lack of clarity around potentially unsettled positions. The ongoing uncertainty risks disrupting Next Bridge's corporate governance and creates a continuing burden on the Company's resources.

---

[1] *See* April 18, 2023, May 19, 2013, and June 7, 2023 letters between you and Next Bridge Hydrocarbons, Inc.'s Chief Executive Officer Clifton Dubose, Jr. (https://www.finra.org/media-center/newsreleases/2023/finra-correspondence-next-bridge-hydrocarbons-april-june-2023).

[2] https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt ("November 6 Supplemental FAQ").



Accordingly, Next Bridge respectfully renews its request that FINRA continue to investigate the open short positions in MMTLP. Because we understand from prior correspondence that FINRA lacks the ability to order the close-out of all existing short positions, we respectfully request that FINRA take steps to facilitate those close-outs.

Please let me know if you have any questions or need additional information.

Sincerely,

Greg McCabe
Chairman of the Board
Next Bridge Hydrocarbons

Exhibit ZO

# NEXT BRIDGE HYDROCARBONS, INC. RELEASES STATEMENT

NEWS PROVIDED BY
**Next Bridge Hydrocarbons, Inc.** ➝
Feb 08, 2024, 15:36 ET

MIDLAND, Texas, Feb. 8, 2024 /PRNewswire/ -- **Next Bridge Hydrocarbons, Inc.** ("Next Bridge," "our," "we," or the "company"), an oil and natural gas exploration and production company with interests in Texas and Oklahoma today provided the following statement:

Our company has reviewed recent written responses from FINRA and SEC regarding the U3 halt of the Series A Preferred Shares of Meta Materials, Inc. that traded under the symbol "MMTLP" and potential outstanding short positions in Next Bridge. We have further been made aware of calls by Congressman Ralph Norman for a Congressional hearing regarding MMTLP, which we and our Chairman would gladly participate in to help supplement the factual record on relevant events. Next Bridge management has differing perspectives on certain key points expressed by FINRA in its letter. We will share these perspectives if given the opportunity in a meeting we are actively working to schedule with representatives of FINRA and the SEC's Office of the General Counsel. However, we hope the meeting can largely be devoted to discussing forward-looking and productive options for jointly addressing ongoing investor concerns.

Next Bridge firmly believes that we and our investors have a right to know, and Congress and the SEC have an interest and duty to understand, the total aggregate outstanding uncovered short positions held by foreign and domestic institutions that exceed the issued and outstanding shares of our company. Unfortunately, this important figure remains unknown. We call on FINRA and the SEC to take a more proactive ownership role in completing the necessary accounting for several key reasons:

First, FINRA and the SEC have access to resources, investigatory powers, and foreign information sharing tools, and we rely on them to serve as champions of the full and complete trading facts for the investing public and US companies whose securities are publicly traded under their oversight.

Second, we believe this information is necessary to help clarify potentially misleading information that has been disseminated to investors and the public. FINRA issued an "Investor Insights" FAQ on its website stating that "there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12 of approximately 2.65 million shares out of 165.47 million total shares outstanding." FINRA went on to characterize this volume as "not significant." We infer no intent to mislead by FINRA, but we note that this statement was not qualified to make clear that the scope of the data available to FINRA under the investigatory powers it cited was limited, and thus it implied a categorical summation of the entire uncovered short interest position in Next Bridge. Subsequent to our most recent press release of January 19, 2024 calling for short interest data from all sources, foreign or domestic, whether registered with FINRA or not, we observed that FINRA clarified in its letter to Congressman Norman that the short interest figure it cited was only based on U.S. member data and not that of "domestic or foreign non-member entities that could act as custodians or agents holding securities for others, including foreign-registered broker-dealers." However, it repeated its assertion that the short interest position it saw was "nominal." Unfortunately, we believe this is a consequential blind spot in FINRA's data, because foreign firms have approached Next Bridge about procuring more than 2.65 million shares.

If FINRA is unable to report on the entire universe of the outstanding uncovered short positions in Next Bridge, including short interest positions held via foreign brokers, we request that they maintain full transparency of this fact in communications with interested parties and refrain from descriptions of the short interest as inconsequential until this is borne out via a comprehensive investigation. We also believe further clarification regarding the limits of the data available to FINRA would be helpful for investors.

Our company is also concerned that uncovered short selling activity might have been carried out by entities that are also exempt from SEC registration or via transactions that are otherwise exempt from reporting. We understand that the SEC does not disclose any details regarding its investigatory activities, but our concern is that the SEC's letter refers Congress to FINRA and our company for the share data Congress seeks, which as explained, will likely not result in the full picture. We are happy to provide information that may be beneficial in helping the SEC scope the necessary sources for data collection in any investigation it may elect to undertake in the future, including any that may require the cooperation of foreign counterparts.

Third, we believe there is an onus on FINRA to help resolve ongoing investor concerns due to the role it played in the events that led to the U3 halt, and the subsequent confusion resulting from the halt itself. FINRA stated that it determined the U3 halt was "necessary and appropriate to protect investors and ensure a fair and orderly marketplace."  Unfortunately, many investors continue to communicate great frustration that the halt accomplished quite the opposite and could have been avoided.  We do not intend to litigate FINRA's decision-making in this release, but we also would like to ensure that we clarify certain points on which we have a divergent view from FINRA in regards to the corporate action announcing the NBH spinoff and subsequent U3 halt, since the issues are actively being discussed in public releases to our investors and publicized letters to Congress.  As an initial matter, we take issue with FINRA's repeated assertion that "FINRA's role is limited to reviewing and processing the (corporate action) submission and announcing the corporate action to market participants (unless the corporate action documentation is found to be deficient under Rule 6490, in which case FINRA may determine not to process the corporate action)."  We do not believe this describes the role that FINRA played in the MMTLP corporate action submission process, nor does it offer a complete recitation of FINRA's authority under Rule 6490.  First, FINRA drafted the initial and revised corporate action notices on December 6th and 8th of 2022, with an instruction that the issuer was not to edit or interpret it, and included language that we believe itself became the source of market confusion.  For example, while FINRA describes the notice to Congressman Norman as "consistent with the information provided by Meta Materials," it is notable that the notice actually introduced a new instruction that MMTLP shares would be "deleted" on December 13th – a date never before contemplated or referenced by the issuers, and which many found difficult to reconcile with Meta's announcement that the distribution of Next Bridge shares would take place the next day- on December 14th. Indeed, it was never proposed to FINRA to add a December 13 cancellation date or deletion date, and adding such a date created an unnecessary restriction to the corporate action and shareholders of MMTLP.  In addition, FINRA's Rule 6490 allows it to refrain from processing requested corporate actions altogether if it "determines not processing is necessary to protect investors and the public interest and to maintain fair and orderly markets." In other words, the justification FINRA ultimately used for issuing the U3 halt was available to it at the outset of the process, when any concerns could have been addressed by the issuer.  Instead, they evidently did not discern a compelling reason to reject the processing of the announcement, crafted a different announcement, and allowed trading to continue through December 8th, 2022, then initiated the U3 halt shortly thereafter when the markets were closed and all participants, short and long, were frozen.  Since nothing regarding the corporate action and the issuers' contemplated record or distribution dates changed between when the corporate action was submitted to FINRA for review, and when the U3 halt was issued (aside from the introduction of FINRA's own announcements), we remain confused as to why FINRA did not simply reject the corporate action announcement at the outset rather than issuing a halt for "extraordinary circumstances" to the great

surprise of the issuer and retail investors. The end result was mass confusion that persists to this day amongst our investor base, many of whom feel they were unnecessarily and unfairly denied two days of trading, and which would have also given parties with millions of short positions an opportunity to cover or close.

**About Next Bridge Hydrocarbons, Inc.**

The Company is an independent public reporting energy company engaged in the acquisition, exploration, exploitation and/or development of oil and natural gas properties in the United States. Our primary focus has been the development of interests in an oil and gas project consisting of 134,000 contiguous gross acres we hold in the Orogrande Basin in West Texas in Hudspeth County, Texas. In addition, we have minor interests in the Eastern edge of the Midland Basin in Texas, and two minor well interests in Oklahoma. Please visit **www.nextbridgehydrocarbons.com** for more information.

Next Bridge is a private company insofar as its shares of common stock are not traded on a public stock exchange of any kind. The Company is expected to update its shareholders about certain operational and financial updates related to the Company's business. To receive timely emails with respect to these corporate developments, please visit **https://www.nextbridgehydrocarbons.com/investors** and complete the Email Alert/Investor Form. You may also choose to follow our social media channels at @nbhydrocarbons on Twitter and "Next Bridge Hydrocarbons" on LinkedIn.

This statement may contain "forward-looking statements" as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described herein. Although the Company believes the expectations in such statements to be reasonable, there can be no assurance that such expectations will prove to be correct. Information concerning the assumptions, uncertainties and risks that may affect the actual results can be found in the Company's filings with the Securities and Exchange Commission ("SEC") available on the Company's website or the SEC's website at **www.sec.gov**.

Contact:
Dennard Lascar Investor Relations
**NextBridge@dennardlascar.com**

SOURCE Next Bridge Hydrocarbons, Inc.

WANT YOUR COMPANY'S NEWS

# FEATURED ON PRNEWSWIRE.COM?

# GET STARTED

**440k+**
Newsrooms &
Influencers

**9k+**
Digital Media
Outlets

**270k+**
Journalists
Opted In

*Exhibit 21*



**Robert W. Cook**
President and Chief Executive Officer

January 31, 2024

The Honorable Ralph Norman
U.S. House of Representatives
569 Cannon HOB
Washington, DC 20515

Dear Congressman Norman:

Thank you for the opportunity to respond on behalf of FINRA to your December 22, 2023, letter addressed to me and Gary Gensler, Chair of the Securities and Exchange Commission (SEC), concerning the Meta Materials, Inc. (Meta Materials) corporate action to distribute Next Bridge Hydrocarbons, Inc. (Next Bridge) common stock and market activity in the Series A Preferred Shares of Meta Materials that traded under the symbol "MMTLP."

We appreciated the opportunity for FINRA officials to meet with your staff throughout the preceding months. We have responded to every Congressional outreach to us regarding this matter and we will continue to be available to answer further questions. In response to Congressional and investor inquiries last year,[1] we also published two Frequently Asked Questions (FAQs) to provide investors with accurate information about trading activity in MMTLP (including short sales) and the circumstances surrounding the Next Bridge/MMTLP corporate action and trading halt.[2]

FINRA is a not-for-profit, self-regulatory organization (SRO) responsible for regulating its member broker-dealers and their associated persons pursuant to the Securities Exchange Act of 1934 (Exchange Act). FINRA is dedicated to protecting investors and safeguarding market integrity in a manner that facilitates vibrant capital markets. Operating under the oversight of the SEC, we are charged with adopting rules consistent with the Exchange Act; examining our members for compliance with securities laws and rules applicable to U.S. broker-dealers; and enforcing compliance where necessary. FINRA is regularly examined itself by the SEC and our rules generally must first be filed as proposals with the SEC, published for public comment, and then approved by the SEC before becoming effective.

---

[1]     FINRA, including through FINRA's Office of the Ombuds, has received a substantial number of inquiries from investors concerning many of the issues you raise in your letter.

[2]     *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt; and Supplemental *See* FAQ: MMTLP Corporate Action and Trading Halt (November 6, 2023), available at https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt.

**Investor protection. Market integrity.**     1700 K Street, NW     t 202 728 8000
Washington, DC     www.finra.org
20006

The Honorable Ralph Norman
January 31, 2024
Page 2

FINRA also is subject to oversight by Congress and recently testified before the House Financial Services Committee at a Capital Markets Subcommittee oversight hearing.[3]

Some investors continue to question FINRA's reasons for imposing the halt, and we continue to observe inaccurate information circulating on some social media about trading in MMTLP and the trading halt. While we discuss these questions in greater detail below and in our FAQs, it is helpful to first highlight several key facts about trading in MMTLP and FINRA's role:

- FINRA's decision to halt trading was due to clearance and settlement concerns in light of the structure and timing of the corporate action. As a result, ongoing trades after December 8, 2022 would not be settled by December 12, 2022, or predictably thereafter, risking significant investor confusion and harm. Contrary to some theories circulated on social media, FINRA did not initiate the halt because there were problems with a "share imbalance" and "counterfeit shares," or because of short positions held by hedge funds. FINRA also did not provide advance notice of the trading halt to broker-dealers, hedge funds, or any other market participant.

- Investors have expressed confusion regarding whether Meta Materials needed to approve the commencement of trading in MMTLP. Generally, an issuer's approval is not needed for a security to trade outside of a securities exchange, *i.e.*, "over the counter" (OTC), although an issuer may take steps to limit such trading. The issue of whether a security can be publicly traded is governed by the Securities Act and SEC rules; for purposes of these provisions, it does not appear that Meta Materials took effective steps to restrict public trading in MMTLP.

- Assigning the "MMTLP" symbol upon request of a broker-dealer was standard practice given the circumstances, and appropriate to further market transparency. When a security trades OTC, FINRA broker-dealers are required by FINRA rules to request a stock symbol (if one does not already exist) and report the trade. Then they must electronically report the price and size of the executed transaction, which FINRA disseminates to the public to provide transparency. This is what occurred in the case of MMTLP. Given that a trade had been executed and the company had obtained a unique identifier for the security,[4] FINRA assigned the "MMTLP" symbol in October 2021. The MMTLP symbol was *not* assigned in connection with a Form

---

[3]    "Examining the Agenda of Regulators, SROs, and Standards-Setters for Accounting, Auditing," Tuesday, December 12, 2023, Capital Markets Subcommittee, House Committee on Financial Services. Testimony of Mr. Robert Cook, President and CEO, Financial Industry Regulatory Authority (FINRA), available at https://docs.house.gov/meetings/BA/BA16/20231212/116638/HHRG-118-BA16-Wstate-CookR-20231212.pdf.

[4]    The issuer had obtained a CUSIP number for the Series A Preferred Shares, which is a unique identifier for a security assigned by CUSIP Global Services and used to facilitate trading and settlement.

The Honorable Ralph Norman
January 31, 2024
Page 3

> 211 submission, contrary to some claims made on social media that trading in
> MMTLP began based on a Form 211 submitted using fraudulent information.

- FINRA has reviewed its members' U.S. trading activity in MMTLP, including short
  sale activity, and has found no evidence that there was significant naked short selling
  (which some social media sources refer to as "counterfeit shares") in MMTLP. The
  total number of U.S. short positions identified at FINRA members represent only a
  nominal percentage of the total shares issued and outstanding as of December 12,
  2022. Further, U.S. reported short positions at FINRA members dramatically
  decreased leading up to the last regular day of trading in MMTLP. In sum, FINRA is
  not aware of any data that supports social media claims of significant naked short
  selling or "counterfeit shares."

- FINRA cannot perform a "certified audited and consolidated count of shares."
  FINRA's regulatory authority does not extend to domestic or foreign non-member
  entities that could act as custodians or agents holding securities for others, including
  foreign-registered broker-dealers. Further, the regulatory tools available to FINRA
  do not provide the data that would enable FINRA to perform a share count (*e.g.*, the
  Consolidated Audit Trail, Electronic Blue Sheets, and FINRA's trade reporting
  facilities do not contain information about securities *positions* as described in more
  detail below). The transfer agent[5] retained by Next Bridge would be the best source
  of information regarding recordholders in Next Bridge common stock.

- Next Bridge registered the issuance of its common stock in connection with the Next
  Bridge/MMTLP corporate action with the SEC—making Next Bridge an independent
  public reporting company whose shares are freely tradeable under the federal
  securities laws. However, today it is very difficult for investors to trade these shares
  because Next Bridge has not taken the necessary steps to support the development of
  a secondary market. Unless Next Bridge takes steps that would support trading in its
  common stock, trading will continue to be difficult, including trades to close out short
  positions.

Investors' use of social media to make investment decisions is an area of concern for FINRA
and other regulators—particularly because this information may be incomplete, misleading,
or false. FINRA has observed a significant amount of social media activity regarding
MMTLP. For example, social media mentions of MMTLP rose from approximately 40,000
between January 1, 2022 and October 6, 2022, to approximately 110,000 between October 7,
2022 and December 8, 2022.[6] Before and since the MMTLP halt, FINRA and other

---

[5]     FINRA does not have regulatory authority over issuers like Next Bridge or transfer agents like
        American Stock Transfer & Trust Company (AST). Transfer agents—overseen by the SEC—are
        responsible for maintaining issuer security holder records and have responsibilities concerning the
        reconciliation and safekeeping of securities. *See also* November 6, 2023, MMTLP FAQs, Question
        No. 13.

[6]     MMTLP experienced significant price activity in the last few months of its trading. Between October
        2022 and early December 2022, social media activity in MMTLP indicated that individuals were

The Honorable Ralph Norman
January 31, 2024
Page 4

regulators have published investor education materials to help investors avoid fraud and make informed investment decisions, including warning investors of the risks inherent in using social media as an investment tool.[7]  FINRA will continue its efforts to educate investors about these and other risks.

FINRA's authority does not cover firms that are not its members or individuals who are not associated with such firms.  Federal or state authorities would typically have jurisdiction over situations where other individuals (including management or other insiders of an issuer) spread inaccurate information regarding securities on social media or otherwise, or engage in potentially fraudulent or manipulative schemes with respect to securities.  FINRA refers any such misconduct it observes to federal and state authorities, as appropriate.[8]

As you note in your letter, in 2022, the SEC filed a complaint alleging that eight individuals violated the federal securities laws by engaging in manipulative activity on social media, including activity related to Meta Materials' predecessor, Torchlight Energy Resources.[9]

---

speculating that there could be a potential "short squeeze" in MMTLP shares.  During this period, the closing price of MMTLP ranged from $1.52 to $11.65 on average daily volume of 1,818,455 shares.  On December 8 (the last day of trading prior to the trading halt), trading volume increased in MMTLP as its price fell steeply from the previous day's closing price (from $7.00 to $2.90).

[7]     *See e.g.,* Investor Alert: Social Media "Investment Group" Imposter Scams on the Rise (January 11, 2024), available at https://www.finra.org/investors/insights/investment-group-imposter-scams; Following the Crowd: Investing and Social Media (March 13, 2023), available at https://www.finra.org/investors/insights/following-crowd-investing-and-social-media; and Investor Bulletin: Social Sentiment Investing Tools—Think Twice Before Trading Based on Social Media (April 03, 2019), available at https://www.finra.org/investors/insights/social-sentiment-investing-tools (published jointly by FINRA and the SEC's Office of Investor Education and Advocacy).

In August 2022, the North American Securities Administrators Association issued an advisory recommending that investors use caution when considering advice from social media financial influencers.  *See* Are you an informed investor?  Financial Advice via Social Media – the Rise of the "Finfluencer", available at https://www.nasaa.org/64940/informed-investor-advisory-finfluencers/?qoid=investor-advisories.

[8]     In 2022, FINRA referred 663 fraud and insider trading cases for potential prosecution.  *See* Statistics, available at https://www.finra.org/media-center/statistics.

[9]     The SEC complaint states, among other things, that:

In the course of the scheme, various Defendants often highlighted an anticipated event that would purportedly raise the stock price (a "catalyst") and encouraged buying and holding the stock until the event, falsely claiming that they too were holding the stock waiting for the catalyst.  In the case of TRCH, the catalyst was a purported upcoming merger with another company, Metamaterial Inc.

*See* Complaint, *Securities and Exchange Commission v. Edward Constantin, et al.*, No. 4:22-cv-04306 (S.D. Tex. filed December 13, 2022).

Separately, on January 11, 2024, Meta Materials announced a proposed settlement with the SEC to address an SEC investigation concerning, among other things, the merger involving

The Honorable Ralph Norman
January 31, 2024
Page 5

The U.S. Department of Justice (DOJ) has also charged the same eight individuals with criminal conspiracy to commit securities fraud and securities fraud.[10]  Separately, the SEC has recently brought charges pertaining to other instances of alleged misconduct by individuals that involved online activity.[11]

Below is detailed information regarding FINRA's role in the OTC equity securities market, its actions in connection with the MMTLP trading halt and the Next Bridge/MMTLP corporate action, as well as information regarding trading activity in MMTLP.  FINRA is not able to respond on behalf of other parties who may have relevant information, such as other regulators, transfer agents, issuers and their management, or other private parties.

**Overview of FINRA's Role in Regulating the OTC Market**

FINRA is a statutorily authorized not-for-profit organization that oversees U.S.-registered broker-dealers that are FINRA members.  Under this regulatory framework, put in place by Congress and overseen by the SEC, FINRA's statutory obligation, in support of the SEC, is to examine and enforce compliance with the federal securities laws, the rules thereunder, and FINRA and certain other rules by member broker-dealers and their associated persons.  This mandate includes overseeing member broker-dealers when they facilitate investor access to the OTC securities market.  However, brokerage services provided by firms for customers remain largely governed by contract.

---

Torchlight Energy Resources, Inc. and Metamaterial Inc.  The press release states, in part, that:

> If the Commissioners approve the Proposed SEC Settlement, the Commission will enter a cease-and-desist order (the "Order") in connection with certain antifraud, reporting, books and records, and internal accounting control provisions of the securities laws. Under the terms of the Proposed SEC Settlement, the Company would neither admit nor deny the findings in the Order.  If approved, in connection with the Proposed SEC Settlement, the Company will pay a civil money penalty in an amount of $1 million in four (4) installments over the period of one (1) year pursuant to an agreed upon payment plan.

The full press release is available at https://metamaterial.com/meta-materials-announces-proposed-sec-settlement/.

[10]     The trial in the DOJ's case (*USA v. Contantinescu, et al.*, No. 4:22-cr-00612 (S.D. Tex. Filed December 7, 2022)) is currently scheduled to begin on April 1, 2024.  Thus far, one defendant in the DOJ's case has entered a guilty plea.  *See* https://www.justice.gov/criminal/criminal-vns/case/united-states-v-constantinescu-et-al.  In addition, the SEC's case has been stayed pending resolution of the DOJ's case.

[11]     The SEC charged three individuals in a microcap scheme targeting retail investors that involved, among other things, an online promotional campaign.  *See* Securities and Exchange Commission v. Jonathan Farber, Aarif Jamani, and Brian Keasberry, Civ. Action No.1:24-CV-00273 (S.D.N.Y. filed Jan 12, 2024).  The litigation release is available at https://www.sec.gov/litigation/litreleases/lr-25926.

The Honorable Ralph Norman
January 31, 2024
Page 6

Unlike securities exchanges, which are also SROs, FINRA does not operate a market and does not establish listing standards for issuers. FINRA also does not have authority to regulate or examine the conduct of non-members, including companies that issue equity securities that trade OTC, such as Meta Materials or Next Bridge, or their affiliated persons.

FINRA's role in regulating the OTC market therefore is based on its responsibility for regulating the activities of its member broker-dealers, not issuers, investors, or the wider marketplace. The federal securities laws require that FINRA's rules remove impediments to and perfect the mechanism of a free and open market, among other things. The SEC's oversight of FINRA includes reviewing its rules, which generally must be filed with the SEC, published by the SEC for public comment, and formally approved by the SEC before becoming effective. Through this process, FINRA has adopted numerous rules that relate to the market activity of its members, including rules governing trade reporting, reviewing corporate actions, and halting quoting and trading in the OTC market. These rules include:

- **FINRA Rule 6622.** This rule requires FINRA member broker-dealers to report executed transactions in OTC equity securities to FINRA's trade reporting facility. FINRA disseminates last sale information regarding those transactions on a real-time basis to provide investors and market participants with transparency regarding transactions and share prices for OTC equity securities.

- **FINRA Rule 6440.** This rule requires FINRA member broker-dealers to halt quoting and trading activities when FINRA determines, in accordance with the rule, that doing so is necessary to protect investors and the public interest. These circumstances include where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.

- **FINRA Rule 6490.** SEC Rule 10b-17 generally requires issuers of publicly traded securities to give notice to the securities exchange for corporate actions involving a listed security, and FINRA for corporate actions involving unlisted securities. FINRA Rule 6490 sets forth FINRA's process for reviewing corporate action submissions required under SEC Rule 10b-17. Corporate actions are the responsibility of the issuer; FINRA does not initiate, approve, or conduct the underlying corporate action that the issuer is taking. FINRA's role is limited to reviewing and processing the submission and announcing the corporate action to market participants (unless the corporate action documentation is found to be deficient under Rule 6490, in which case FINRA may determine not to process the corporate action).

- **FINRA Rule 6432.** Like Rule 6490, Rule 6432 addresses FINRA member broker-dealer compliance with an SEC Rule—in this case, SEC Rule 15c2-11. SEC Rule 15c2-11 sets forth requirements for broker-dealers that publish quotations in a "quotation medium" for OTC securities. In some cases, quoting can only be initiated following the filing of a Form 211 with FINRA. However, SEC Rule 15c2-11

The Honorable Ralph Norman
January 31, 2024
Page 7

includes several exceptions, one of which permits a broker-dealer to publish quotations on behalf of a customer that represents the customer's unsolicited interest (other than company insiders or affiliates, unless specified issuer information is current and publicly available). If an exception applies, a broker-dealer is not required to file a Form 211 with FINRA.

**Overview of FINRA's Actions Related to MMTLP**

Initial Trading and Quoting in MMTLP

The answer to the question of whether a security can be publicly traded under the federal securities laws is governed by the Securities Act and SEC rules. When an OTC equity security trades, one of FINRA's roles is to assign a security symbol in connection with trade reporting by FINRA members. Under the current process, FINRA assigns a symbol only if certain minimum requirements concerning the security are met, including, for example, that the issuer has obtained a CUSIP number for the security.

After Meta Materials obtained a CUSIP number for its Series A Preferred Shares and the security became DTC eligible,[12] FINRA assigned the "MMTLP" symbol to the security in 2021 so that a broker-dealer could report an executed transaction in the security.[13] In doing so, FINRA did not approve or determine when broker-dealers or customers may begin trading the security. Once a security trades, FINRA disseminates last sale pricing information reported by its member broker-dealers to facilitate public price transparency. FINRA did not receive a Form 211 in connection with quoting in MMTLP because broker-dealers that were publishing quotations for MMTLP relied on the exception to SEC Rule 15c2-11 that permits the publication of quotations for unsolicited customer orders (with specified conditions).[14]

FINRA understands that, because Torchlight Energy Resources, Inc. publicly stated in its SEC filing that it did not expect a market to develop for the Series A Preferred Shares, confusion exists as to whether the issuer needed to approve the commencement of trading in MMTLP.[15] The answer to the question of whether a security can be publicly traded under the federal securities laws is governed by the Securities Act and SEC rules, not the expectations of the issuer. As noted above, generally, an issuer's approval is not needed for a security to trade OTC, although an issuer may take steps to limit such trading. Under the

---

[12]    The Depository Trust Company (DTC) is a subsidiary of The Depository Trust & Clearing Corporation.

[13]    *See* March 16, 2023, MMTLP FAQs, Question No. 4.

[14]    *Id.*

[15]    *See* Torchlight Energy Resources, Inc., *Schedule 14A* (May 7, 2021) *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm.

The Honorable Ralph Norman
January 31, 2024
Page 8

federal securities laws, Meta Materials does not appear to have taken the steps necessary to restrict trading in MMTLP.[16]

The Next Bridge/MMTLP Corporate Action

As discussed above, when a company decides to engage in a corporate action that affects an unlisted security that trades only in the OTC market, SEC Rule 10b-17 requires that the company submit notice of specified types of corporate actions to FINRA. FINRA reviews the submission pursuant to FINRA Rule 6490 and, unless FINRA determines that a submission is deficient under Rule 6490, FINRA provides public notice of the corporate action on its website via the Daily List.[17] Broker-dealers and professional vendors historically have been the primary audience for the Daily List, which contains technical terminology and information that broker-dealers need to perform tasks concerning their activities in securities, such as adjusting stock quote prices or sizes (*e.g.*, as the result of a distribution or stock split).

As was required under SEC Rule 10b-17 for issuers with a class of publicly traded securities, Meta Materials notified FINRA of its intention to undertake the Next Bridge/MMTLP corporate action. Following FINRA's review under Rule 6490, FINRA published a notice on the Daily List on December 6, 2022 (modified on December 8) announcing that, consistent with the information provided by Meta Materials, Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022. The Daily List announcement further stated that any purchasers after December 8, 2022 (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the distribution, and the MMTLP symbol would be deleted effective December 13, 2022.[18] FINRA deleted the MMTLP symbol because, pursuant to the Next Bridge/MMTLP corporate action, following the distribution to MMTLP shareholders of Next Bridge common stock, Meta Materials was cancelling the preferred shares that traded under the MMTLP symbol. Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.[19]

---

[16]    FINRA does not approve or have any role in a company's issuance of securities. FINRA also lacks authority to regulate the activities of transfer agents. Finally, FINRA has no role in assigning a CUSIP number or determining whether a security is DTC-eligible.

[17]    The Daily List is a standardized communication published in an electronic format that provides information regarding OTC equity securities, including additions, deletions, symbol changes, name changes and updates to security attributes. The Daily List also indicates if previously announced information has been updated or cancelled. Due to the nature of the Daily List, there are character-length limitations, and it commonly includes technical terminology and information. *See* https://otce.finra.org/otce/dailyList.

[18]    This is due to the fact that, under current SEC rules, trades in OTC equity securities settle two business days after the trade date (commonly referred to as "T+2").

[19]    *See* March 16, 2023, MMTLP FAQs, Question No. 5.

The Honorable Ralph Norman
January 31, 2024
Page 9

The MMTLP Trading Halt

Another of FINRA's roles in overseeing the market for OTC equity securities is exercising authority to direct member firms to halt quoting and trading activities in a security when FINRA deems that such action is necessary and appropriate to protect investors and ensure a fair and orderly marketplace. FINRA made such a determination and, on December 9, 2022, halted trading in MMTLP pursuant to FINRA Rule 6440.[20] Consistent with standard practice, FINRA provided notice of the MMTLP trading halt on the morning of December 9 to all market participants simultaneously through the publication channels of communication normally used for such actions. No market participants were provided with advance notice of the trading halt.

Among FINRA's concerns resulting in the trading halt were the fact that trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12 (only record holders on December 12, 2022, would be recorded as eligible to receive the Next Bridge shares in the distribution).[21] In addition, based on a determination made by the issuer, Next Bridge common stock would not be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an efficient and orderly manner. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that:

- The MMTLP shares they purchased were about to be cancelled by Meta Materials,
- Any purchased MMTLP shares might not be received before they were cancelled, and
- They would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

FINRA was concerned that an inequitable and unfair result could occur because investors purchasing MMTLP after December 8 would be purchasing an asset that would soon cease to exist, with no entitlement to the replacement security as part of the Next Bridge/MMTLP corporate action distribution. FINRA issued the trading halt to prevent these harms from occurring—consistent with FINRA's authority under the trading halt rule, which allows FINRA to halt trading when necessary to protect investors and the public interest.[22]

---

[20]    FINRA Uniform Practice Advisory (UPC # 35-22) (December 9, 2022), Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP), available at https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf.

[21]    December 12, 2022, was a Monday; given the standard two-day settlement cycle and the intervening weekend, this date meant that trades needed to be executed by December 8 to settle timely.

[22]    Additional concerns included that any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC and that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with

The Honorable Ralph Norman
January 31, 2024
Page 10


Questions Regarding Naked Short Selling or Counterfeit Shares in MMTLP

A "short sale" is the sale of a security by one party (the seller) that does not own the security at the time of the sale or a sale where the seller delivers a borrowed security to the purchaser. Short selling is not illegal. Indeed, the SEC has determined that short selling can provide the market with the important benefits of market liquidity and pricing efficiency. SEC Regulation SHO is the primary rule that governs broker-dealers who engage in short selling activity for their own account or the account of others.

When reporting trades, Regulation SHO requires broker-dealers to identify short sales.[23] Regulation SHO also generally requires a broker-dealer to perform a "locate" prior to engaging in a short sale—*i.e.*, the broker-dealer must have reasonable grounds to believe that the security can be borrowed so that it can be delivered upon settlement and does not fail (a "failure to deliver" or "FTD"). A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD.[24] Generally, Regulation SHO does not permit "naked" short selling except under limited circumstances.[25] While there is no identifier in trade reporting data to specifically identify "naked" short sales, if there is significant "naked" short selling in a security, FINRA would expect to see indicators of this activity in various data sources. In particular, because naked short selling is marked by the inability of the seller to deliver the securities upon settlement, significant naked short selling is often accompanied by a high number of FTDs.[26]

---

respect to which security should be delivered to the buyer. *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

[23]  *See* November 6, 2023, MMTLP FAQs, Question No. 15.

[24]  *Id.*

[25]  *See generally* Securities and Exchange Commission: Key Points About Regulation SHO (Section IV.1. *Is all "naked" short selling abusive or illegal?"*), available at https://www.sec.gov/investor/pubs/regsho.htm.

[26]  A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as: delays in customers delivering their shares to the broker-dealer; the inability to obtain borrowed shares in time for settlement; issues related to the physical transfer of securities; or the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

The Honorable Ralph Norman
January 31, 2024
Page 11

FINRA has found no evidence that there was significant naked short selling in MMTLP involving FINRA member firms at the end of its trading. Relative to the number of total shares outstanding, there were not a high number of FTDs in MMTLP for the trading days prior to the trading halt. SEC-published FTDs as of December 9 were very low—215,238 shares out of 165,472,241 shares.[27] In addition, while SEC-published FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that aggregate FINRA member FTDs on that date also would have been very low. A very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs due to the fact that FINRA member broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs at member firms together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12, the successful distribution of Next Bridge shares according to public statements by the issuer, and the low amount of short interest positions in MMTLP at FINRA members relative to total shares outstanding as of December 12[28]—do not indicate that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.[29]

---

[27]   The SEC typically publishes data obtained from the National Securities Clearing Corporation's Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date. *See* https://www.sec.gov/data/foiadocsfailsdatahtm. However, the SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS.

[28]   FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at FINRA member broker-dealers as of December 12 of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding. The aggregate short interest position in MMTLP in accounts held at FINRA member broker-dealers had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

Some investors have confused short *interest* data with short sale *volume* information, both of which FINRA publishes on its website. While the two data sets are related in that short sale *volume* activity may ultimately result in a reportable short interest *position*, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reflected in FINRA's short interest report. *See* March 16, 2023, MMTLP FAQs, Question No. 8. *See also* Short Interest – What It Is, What It Is Not (January 25, 2023), available at https://www.finra.org/investors/insights/short-interest.

[29]   As stated above, investors' use of information obtained on social media to make investment decisions is an area of concern for FINRA and other regulators. *See supra* note 7.

The Honorable Ralph Norman
January 31, 2024
Page 12

Requests for an Audited Share Count of Next Bridge/MMTLP Shares

FINRA is unable to conduct the requested "certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions" described in your letter. As we have previously noted, FINRA lacks the authority and data necessary to regulatorily obtain such information.[30] Pursuant to the Exchange Act, FINRA's regulatory authority is limited to overseeing the conduct of FINRA member firms and their associated persons. Transfer agents, which are regulated by the SEC and not FINRA, are responsible for maintaining issuer security holder records and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have regulatory authority over all the entities, domestic or foreign, that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent. FINRA understands, based on public statements issued by Next Bridge, that its transfer agent, AST, has distributed all shares related to the Next Bridge/MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[31]

In addition, FINRA does not currently possess the data that presumably would be required to conduct a "certified audited and consolidated count of shares." Some have assumed that "blue sheet" data could be used to conduct an audit of the Next Bridge/MMTLP share count. FINRA and SEC examination and investigation teams use blue sheet requests to obtain detailed transaction data from clearing broker-dealers for a specific security for specified dates. Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates—it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares, whether a short sale is "naked," whether there was a locate, or if delivery occurred on settlement date.[32] Nor does blue sheet data capture share exchanges or dividends

---

[30]    *See* November 6, 2023, MMTLP FAQs, Question No. 13.

[31]    *See* Next Bridge Hydrocarbons, Inc. Provides Statement Regarding Its Spin-Off (February 16, 2023).

        The transfer agent and registrar for our common stock is American Stock
        Transfer & Trust Company (AST). AST has distributed all shares of our
        common stock related to the Spin-Off – either directly to any stockholders that
        held their shares directly registered with AST or to our shareholders' bank,
        broker or nominee representatives. For questions relating to the mechanics of
        the distribution of shares resulting from the Spin-Off or matters relating to
        subsequent transfer of shares our common stock, you should review the
        Prospectus referenced below or contact AST shareholder relations…

[32]    For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account
        previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would
        show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the

The Honorable Ralph Norman
January 31, 2024
Page 13

by issuers. Because blue sheet data is requested for investigatory purposes, FINRA does not voluntarily disclose this data to third parties except the SEC, other regulators, and law enforcement pursuant to specific, targeted regulatory or law enforcement requests for the data.[33] The other regulatory tools available to FINRA (*e.g.*, Consolidated Audit Trail and FINRA's trade reporting facilities) also do not provide the data that would enable FINRA to perform a "certified audited and consolidated count of shares," as they also do not contain *position* information.

Receipt of Next Bridge Shares in the Next Bridge/MMTLP Corporate Action Distribution

FINRA understands that there continue to be questions regarding whether the right number of Next Bridge shares were distributed to investors. As FINRA has discussed previously,[34] FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not have regulatory authority over issuers or transfer agents. However, based on publicly available information reported by Next Bridge in connection with the Next Bridge/MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[35] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[36] Thus, there does not appear to be a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis.

We understand that some investors are nonetheless concerned that their broker-dealers have not received their Next Bridge shares or that the information provided by their broker regarding the shares reflected in their account is not accurate. We have encouraged investors to reach out to their brokerage firms to understand the status of their shares or to discuss their

---

account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares.

[33]   Blue sheet data contains sensitive trading and customer personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.

[34]   *See* November 6, 2023, MMTLP FAQs, Question No. 12.

[35]   *Id.*

[36]   *Id.*

The Honorable Ralph Norman
January 31, 2024
Page 14

options.[37]  For example, investors may request a transfer of shares at the transfer agent from the broker-dealer's name to their name; this transfer may take time to achieve and may involve fees.  If an investor makes such a request and their broker has not been willing to transfer their shares pursuant to their instructions, the investor should contact the broker to understand the status of their Next Bridge shares and, if the broker does not provide a satisfactory explanation, the investor may submit an investor complaint to FINRA.[38]

We note that some of the discussion on social media has concerned circumstances where an investor was unable to direct register their Next Bridge shares with the transfer agent because the investor's MMTLP shares had been loaned out by the broker (*e.g.*, where the customer participated in a fully paid lending program, earning a fee for lending the securities).  In such cases, the MMTLP shares would likely have been loaned to a short seller and delivered to the buyer in the short sale transaction, who would have been credited with the Next Bridge shares.  In a securities lending transaction, the lender transfers the legal rights to the security to the borrower.  Thus, investors who held settled long positions in MMTLP on December 12, 2022, were holders entitled to receive shares of Next Bridge as part the Next Bridge/MMTLP corporate action—even if they received borrowed shares in settlement of the transaction (the existence of a borrow by the seller does not impact the ownership rights of the purchaser).[39]  Conversely, the lender of those shares would not be entitled to receive the Next Bridge shares directly from the issuer; however, pursuant to the lending agreement, the lender typically has a claim for the Next Bridge shares against the borrower.[40]  Customers whose MMTLP shares had been on loan as of December 12 should contact their brokerage firm to gain an understanding of the agreements that govern the loan and to discuss their options.

---

[37]   *See* March 16, 2023, MMTLP FAQs, Question No. 10.

[38]   Investors may file a complaint with FINRA at https://www.finra.org/investors/need-help/file-a-complaint.

[39]   *See* November 6, 2023, MMTLP FAQs, Question No. 16.  Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares.  The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

[40]   For example, on December 8, Borrower/Short Seller sells short 100 MMTLP shares to Buyer and Lender lends 100 shares of MMTLP to Borrower/Short Seller.  On December 12, upon settlement of the transaction, Buyer is a holder of a settled 100-share long position in MMTLP and therefore is entitled to receive 100 shares of Next Bridge common stock in the distribution from the issuer.  The lending agreement typically would provide that the Borrower/Short Seller must deliver 100 shares of Next Bridge common stock to the Lender upon the termination of the loan.  The Borrower/Short Seller would reflect an obligation for the shares it owes to the Lender until it purchases and delivers the shares owed.  Since there is no secondary trading market for Next Bridge common stock, Borrowers/Short Sellers may be unable to buy shares of Next Bridge common stock to deliver to Lenders.

The Honorable Ralph Norman
January 31, 2024
Page 15

Potential Future Trading in Next Bridge Shares

Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of its common stock in connection with the Next Bridge/MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are publicly tradeable under federal law and are widely held.[41] However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the necessary steps to support the development of a secondary market (steps that its predecessor undertook with respect to the MMTLP shares). When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC-eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC eligibility enables the central clearance and settlement of securities transactions).[42] Unless Next Bridge takes steps that would support trading in its common stock, trading will continue to be difficult, including trades to close out short positions.[43]

Thus, the lack of a public market for Next Bridge's common stock is the result of Next Bridge's decisions and Next Bridge can rectify the challenges investors are facing by taking the appropriate steps to support the development of a secondary market. While FINRA cannot force Next Bridge to take these steps, FINRA has engaged with Next Bridge leadership, including to explain ways in which the company could support investors' ability to trade Next Bridge shares.[44] FINRA stands ready to take steps that are in line with its role in the OTC markets, consistent with its authority and the processes and procedures that apply to all potential quotation and trading activity in OTC equity securities.

Forward-Looking Steps to Improve OTC Trading for Investors

FINRA is committed to continuous improvement in all of its regulatory operations in order to further its mission, including by learning from events such as those that occurred with respect to MMTLP. For example, FINRA is considering the increase in self-directed retail participation in the markets and concerns regarding investors' use of social media sources to

---

[41]     *See also* March 16, 2023, MMTLP FAQs, Question No. 11.

[42]     *See*
         https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

[43]     *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available
         at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

[44]     FINRA Correspondence with Next Bridge Hydrocarbons, available at https://www.finra.org/media-
         center/newsreleases/2023/finra-correspondence-next-bridge-hydrocarbons-april-june-2023. We also
         continue to engage in correspondence with Next Bridge leadership to understand their perspective on
         the nature and extent of short positions in Next Bridge common stock.

The Honorable Ralph Norman
January 31, 2024
Page 16

make investment decisions. In addition, FINRA is considering whether any changes may be appropriate to long-standing communication protocols around corporate action announcements—particularly where the corporate action appears to be the subject of significant retail interest through social media activity.

FINRA also has been asked whether statutory changes may improve investing in OTC equity securities for investors. Specific to this situation, the federal securities laws do not currently require that issuers of a class of equity securities that are publicly offered (or otherwise widely held) take the steps necessary to facilitate the electronic clearance and settlement of transactions through a registered clearing agency, which, in turn, would support investors' ability to trade the securities. As a result, even where an issuer's securities are SEC-registered or the issuer is a public reporting company under SEC rules, as a practical matter, investors may be unable to buy or sell the securities. This outcome can be problematic where the investors initially purchased a security for which there was an active trading market, but due to a corporate action and through no action of their own, such investors subsequently hold a different security for which there is no trading market. A statutory change in this area could remove impediments to investors' ability to transfer their shares and alleviate the concerns that exist today with trading Next Bridge common stock, including closing out short positions.[45]

**Conclusion**

FINRA is committed to fulfilling our statutory mission of protecting investors and promoting market integrity in a manner that facilitates vibrant capital markets. We share your concerns regarding investors who have complained that they cannot trade their Next Bridge common stock in the absence of a trading market.

We are willing to continue to engage with you and other Congressional offices on this matter. If you have any further questions or need any additional information, FINRA officials would be happy to meet with you and your staff again. Please do not hesitate to contact me, or your staff may contact our Senior Vice President of Government Affairs, Greg Dean. Thank you again for your letter, and for the work of your staff on this issue.

Sincerely,

Robert W. Cook
President and Chief Executive Officer

---

[45]    Congress and the SEC might consider whether this type of regulatory change could best be accomplished through a new SEC rule or an amendment to the Exchange Act.

The Honorable Ralph Norman
January 31, 2024
Page 17

Cc:

The Honorable Pete Sessions
The Honorable Bill Posey
The Honorable Alex Mooney
The Honorable Bryan Steil
The Honorable Mike Flood
The Honorable Byron Donalds
The Honorable Erin Houchin
The Honorable Barry Loudermilk
The Honorable Scott Fitzgerald
The Honorable William Timmons
The Honorable Warren Davidson
The Honorable Michael V. Lawler
The Honorable John Rose
The Honorable Andy Ogles
The Honorable Marcy Kaptur
The Honorable Jeff Van Drew
The Honorable Raúl M. Grijalva
The Honorable Joe Wilson
The Honorable Delia Ramirez
The Honorable Stephanie Bice
The Honorable Betty McCollum
The Honorable Ron Estes
The Honorable Linda T. Sánchez
The Honorable Mike Ezell
The Honorable Darren Soto
The Honorable John Rutherford
The Honorable Bill Johnson
The Honorable Eli Crane
The Honorable Daniel Webster
The Honorable Troy E. Nehls
The Honorable Jeff Duncan
The Honorable Russell Fry
The Honorable Brian Fitzpatrick
The Honorable Lisa McClain
The Honorable Andy Harris, M.D.
The Honorable Andy Biggs
The Honorable Tim Walberg
The Honorable Diana Harshbarger
The Honorable Virginia Foxx
The Honorable Randy Feenstra
The Honorable Randy Weber
The Honorable Adrian Smith

The Honorable Ralph Norman
January 31, 2024
Page 18

Cc (cont.):

The Honorable Scott Franklin
The Honorable Marc Molinaro
The Honorable John Moolenaar
The Honorable Paul A. Gosar, D.D.S.
The Honorable Doug Lamborn
The Honorable Nancy Mace
The Honorable Barry Moore
The Honorable Victoria Spartz
The Honorable Carlos A. Gimenez
The Honorable Beth Van Duyne
The Honorable Nick Langworthy
The Honorable Earl L. "Buddy" Carter
The Honorable Mike Carey
The Honorable Nicole Malliotakis
The Honorable Lance Gooden
The Honorable Gus M. Bilirakis
The Honorable John Joyce
The Honorable James Comer
The Honorable María Elvira Salazar
The Honorable Cory Mills
The Honorable W. Greg Steube
The Honorable Matthew M. Rosendale
The Honorable Claudia Tenney
The Honorable Matt Gaetz
The Honorable Jenniffer González-Colón
The Honorable August Pfluger
The Honorable Nick LaLota
The Honorable Rich McCormick, MD, MBA
The Honorable Jen Kiggans
The Honorable Max Miller

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *position*. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data *and* that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17] While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

### 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

## 17. Why did FINRA halt trading in MMTLP before December 12?

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased would imminently be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

## 18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

## 19. How can a holder of Next Bridge common stock liquidate their securities?

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[26]

1 *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

4  "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

5 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Relea

6  Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA, perform functions that include serving as a central securities depository and operating a centralized system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly on the books of the transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

7 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

8 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Relea

9  For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory or law enforcement requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been available because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding], hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations.
See https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares."
See https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16 While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

17 See SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

18 On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19 See https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

20 See https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Releas

21 Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

22 See the March 16, 2023, MMTLP FAQs, Question No. 1.

23 See March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24 It is customary that trading halts for OTC equity securities become effective simultaneously with the issuance of public notice by FINRA.

25
See https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

26 See Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

© FINRA. All Rights Reserved.

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Next Bridge shares are held for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a type of review that FINRA has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents like AST. Transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concerning the reconciliation and safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count audit." Some have asked whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is a regulatory tool that FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker-dealers for a specific security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or whether a short sale is "naked." For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there was a locate, if the short sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of all MMTLP shares or that those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive trading and personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

### 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? Was there a large short position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each month based on that information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the total open short positions existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short interest reporting settlement date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was deleted prior to the next short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was not made publicly available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particularly with respect to the number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have mistakenly assumed represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from the short interest reports. As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in the daily short sale volume data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rather than short sales executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediately sell to the customer 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC in the open market. In this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *position*. Similarly, when a customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open market 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the customer. The 1,000-share short sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume data *and* that resulted in a short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided above for the total short interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

### 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corporate action?

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling and FTDs in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17]While certain trades are required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relevant short sale data.[18] Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—particularly, a high number of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which appears to run counter to the social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 were very low—215,238 shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that a very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Next Bridge shares (as discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares outstanding as of December 12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.

### 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their shares from a short seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares related to the Next Bridge / MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge has not obtained a CUSIP number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may therefore be reflecting the Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUSIP number may have caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a purchaser becomes a holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have been the holder of record for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted above in Question No. 15, there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulted in FTDs.

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares outstanding—it appears that only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by broker-dealers using borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would have still been entitled to receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed shares from a seller because the existence of a loan does not impact the ownership rights of the purchaser).[21]

### 17. Why did FINRA halt trading in MMTLP before December 12?

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other factors, FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA made such a determination for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on December 8), the MMTLP shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution; and Next Bridge common stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactions executed after December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge shares as part of the corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the distribution. Moreover, any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC, which could likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MMTLP shares would be cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with respect to which security should be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have understood that they would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of MMTLP shares during that time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased would imminently be cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December 8 highly problematic and had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Accordingly, FINRA determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTLP on December 9.[24] The existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and settlement process that prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Next Bridge shares because there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next Bridge may take to facilitate secondary market trading in its common stock.

## 18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoid close-out obligations?

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shares to close out their positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational processes in place for adjusting short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adjusted short positions in MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMTLP was adjusted to reflect a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under SEC Regulation SHO. Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would have a corresponding short position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not necessarily be required to purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there currently is no secondary market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

## 19. How can a holder of Next Bridge common stock liquidate their securities?

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP holders and, thereafter, cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As mentioned above in Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP shareholders hold Next Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the steps necessary to facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enables the central clearance and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Global Services for its common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obtain a trading symbol for Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate trading in its common stock, shareholders will continue to have difficulty trading their securities.[26]

1 *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta Materials, Inc. (Meta Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metamaterial Inc. While the company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A Preferred Shares were unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicle for shareholders to receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as of December 12, 2022, received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were cancelled by the company.

4  "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

5 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Relea:

6  Most investors hold their shares in "street name," where their shares are registered on the records of
the issuer (maintained by its transfer agent) in the name of an intermediary, such as The Depository Trust
Company ("DTC"). Clearing agencies (such as DTC), which are regulated by the SEC, not FINRA,
perform functions that include serving as a central securities depository and operating a centralized
system for the clearing of securities transactions. If a security is DTC-eligible, shares held with DTC are
reflected on the transfer agent's books in the name "Cede & Co.," an entity that is affiliated with
DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain
records identifying the appropriate investors as beneficial owner of the shares. Less frequently, an
investor holds shares in its own name directly on the books of the transfer agent (either in certificate form
or through direct registration). *See* SEC Investor Bulletin: Holding Your
Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-
get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC
eligibility for its shares; therefore, shares must be held directly with the transfer agent or through a third-
party whose name is registered with the transfer agent.

7 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

8 *See* https://uploads-
ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Relea:

9  For several decades, the SEC requested this information by mailing questionnaire forms (known as
"blue sheets" because of the color paper on which the forms were printed) to broker-dealers to be
manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory
organizations worked together to develop and implement a system with a universal electronic format,
commonly known as the "electronic blue sheet" (EBS) system, to replace the manual process. *See*
Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and
Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available
at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-
members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant
to specific regulatory or law enforcement requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate
action and after the MMTLP shares were cancelled by the issuer and the symbol was deleted by FINRA.
Short interest reports for Next Bridge were not and have not been available because broker-dealers
report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to
obtain a CUSIP number for its common stock, broker-dealers would then be able to request that FINRA
assign a symbol in connection with quoting or trading activity, consistent with FINRA rules and
procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA,
and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next
Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-
07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of
trading, December 8, due to the T+2 settlement period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp.
("GME") during the events surrounding its trading in early 2021. An SEC staff study of these events found
that short interest in GME from 2019 until early 2021 "hovered around 100% [of total shares outstanding],
hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market
Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities
exchange (like GME) and securities that are traded only over the counter (like MMTLP) naturally can have
different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review information on the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations.
*See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has also published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares."
*See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16 While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed in note 15 above.

17 *See* SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

18 On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which a market maker is relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19 *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting, allotting, and fail-control engine. NSCC is a subsidiary of DTCC.

20 *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Relea

21 Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

22 *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23 *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24 It is customary that trading halts for OTC equity securities become effective simultaneously with the issuance of public notice by FINRA.

25 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

26 *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

© FINRA. All Rights Reserved.

Exhibit ‡

22

**MIKE CRAPO**
U.S. SENATOR
IDAHO

CO-CHAIRMAN, SENATE RENEWABLE ENERGY AND
ENERGY EFFICIENCY CAUCUS

JOINT COMMITTEE ON TAXATION

WORKING FOREST CAUCUS

SENATE WESTERN CAUCUS

## United States Senate

WASHINGTON, DC 20510

COMMITTEES

FINANCE
RANKING MEMBER

BANKING, HOUSING, AND
URBAN AFFAIRS

BUDGET

September 26, 2023

Gary Gensler
Chairman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington DC 20549-1090

Dear Chairman Gensler:

We write today requesting that the U.S. Securities and Exchange Commission (SEC) examine events surrounding the trading halt of Meta Materials Series A preferred shares (MMTLP) and provide appropriate information to Senate offices engaged on this matter.

As noted by our House counterparts in a letter dated July 28, 2023, MMTLP shares began trading on the over-the-counter (OTC) market in 2021. In 2022, the SEC approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons. On December 9, 2022, FINRA issued a trading halt on the company's stock, preventing shareholders from making further trades. In FINRA's FAQ[i] regarding the MMTLP corporate action and trading halt, it is noted that Next Bridge Shares would be distributed to MMTLP shareholders with settled positions as of December 12, 2022, and FINRA halted trading on December 9 because securities transactions typically must settle within two business days in accordance with SEC rules.

Since December's events, investors across the country have struggled to gain clarity regarding both the spin-off transaction and the halt on trading. Therefore, we echo our House counterparts and request that the SEC review these market events and any corporate filings made with the Commission. It is equally important to our constituents that the SEC further scrutinize these matters to determine if any wrongdoing occurred.

We hope for a timely response to this matter, and ask that the SEC provide detailed information and analysis.

Thank you for your attention to this important matter.

Sincerely,

Mike Crapo
United States Senator

JD Vance
U.S. Senator

---

[i] FAQ: MMTLP Corporate Action and Trading Halt | FINRA.org. Www.finra.org.
https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt

Exhibit 23

# Tradestation 12/29/2023

Upon the initial distribution of NBH common stock, broker-dealers, like TradeStation, were granted physical certificates based on their customers' former holdings of Meta Materials ("MMTLP"). The NBH certificate that TradeStation received excluded a large number of NBH shares that had been lent to other broker-dealers as part of TradeStation's Fully Paid Lending program. Despite TradeStation's best efforts, we have been unable to recall a portion of the lent-out shares because there is currently no market for the security. This means that we will not be able to honor some of our customers' requests to register and record their ownership in book entry form with AST because the shares are not backed by a physical certificate. If the Registration Statement is declared effective by the SEC, TradeStation will fulfill its obligation to transfer the current list of clients who own NBH of record to AST. In the meantime, we must decline your request to transfer a physical certificate reflecting your ownership interest to AST.

*Exhibit 24*

UTP
UNLISTED TRADING PRIVILEGES

OVERVIEW | DATA ADMIN | TECHNICAL | ALERTS | METRICS | LATENCY CHARTS | UTP PLAN | GOVERNANCE | PARTICIPANTS | MEETING SUMMARY | SUPPORT | ODD LOTS

## Technical

### UTP Plan Functions of the Processor

The plan selected Securities Information Processor (SIP) shall make available the UTP Data Services:

- UTP Data Services are comprised of the UTP Quotation Data which provides (i) National Best Bid and Offers; (ii) each Member's Best Bid and Offer and their sizes and the Member's identifier; and (iii) in the case of FINRA Alternative Display Facility ("FINRA ADF"), the identifier of the FINRA ADF Participant(s) that constitute(s) FINRA's ADF Best Bid and Offer quotations, in each case for Nasdaq-listed securities.
- Along with the UTP Trade Data which provides Transaction Reports in Nasdaq-listed securities.

### UTP Data Services (Nasdaq-listed securities Tape C)

**Technical Documents**
* indicates the specs that will be changed with the new Fractional Share Trade Release

- UTP Data Feed Services Specification (UTP Quotation / UTP Trade)*
- UTP Snap-Shot Service Specifications
- UTP Participant Input Interface (Inbound)*
- UTP Transmission Schedule
- SIP Emergency Procedures
- UDP/IP Addresses link: UTP Data Feed Services
- SIP Market-Wide Circuit Breaker Overview

**UPDATE: Technical Documents - Fractional Share Trade Release**
As announced in UTP Vendor Alert 2024-17, this Fraction Trade Release initiative will enhance the existing UTP SIP product to support fractional share trade reporting. The following specifications will become effective upon the implementation of the Hot-Cut release, tentatively scheduled for Q3 2025.

- Fractional Share Trade Reporting Enhancement - Outbound Specs
- Fractional Share Trade Reporting Enhancement - Participant Input Interface

### FINRA OTC eligible securities

While the FINRA OTC eligible securities are administered as part of the UTP Plan Administrator role, The Financial Industry Regulatory Authority (FINRA) is the owner of the OTC eligible securities and the FINRA OTC Reporting Facility (ORF) and TRACE systems. **FINRA is responsible for all technical product management related to TDDS 2.0.**

- For all technical questions regarding the FINRA feeds, contact FINRA Product Management at (866) 899-2107.
- For information related to FINRA transparency-services visit FINRA website

Exhibit 25



*Exhibit 26*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

———————

# FORM 10-Q/A
# (Amendment No. 1)

———————

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2022

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to
Commission File Number: 001-36247

———————

# Meta Materials Inc.
### (Exact Name of Registrant as Specified in its Charter)

———————

| | |
|---|---|
| **Nevada** | **74-3237581** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1 Research Drive** | |
| **Dartmouth, Nova Scotia** | **B2Y 4M9** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (902) 482-5729**

———————

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.001 per share** | **MMAT** | **Nasdaq Capital Market** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of May 9, 2022, the registrant had 296,614,994 shares of common stock, $0.001 par value per share, outstanding.

**Explanatory Note**

Meta Materials Inc. (the "Company") is filing this Amendment No. 1 on Form 10-Q/A (this "Amendment") to its Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission (the "SEC") on May 10, 2022 (the "Original Form 10-Q") solely to include Exhibit 10.1, Amended and Restated Stock Option Plan, and Exhibit 10.2, 2021 Equity Incentive Plan, in the exhibit index, and to file Exhibit 10.3, Form of Stock Option Agreement, Exhibit 10.4, Form of RSU Agreement, Exhibit 10.5, Stock Purchase Agreement, dated March 31, 2022, by and between the Company, on the one hand, and Dmitry Yarmolich and Dzianis Yarmolich, on the other hand, and new certifications under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act") in accordance with Rule 13a-14(a) under the Securities Exchange Act of 1934, as amended. Because no financial statements have been included in this Amendment, the certifications under Section 906 of the Act are not being filed with this Amendment. This Amendment does not reflect events occurring after the filing of the Original Form 10-Q on May 10, 2022 and therefore should be read in conjunction with the Original Form 10-Q and other filings with the SEC subsequent to the filing of the Original Form 10-Q.

**Item 6. Exhibits**

| Exhibit Number | Description | Incorporated by Reference | | Filed Herewith |
| --- | --- | --- | --- | --- |
| | | Form | Filing date | |
| 10.1+ | Amended and Restated Stock Option Plan | S-8 | August 26, 2021 | |
| 10.2+ | 2021 Equity Incentive Plan | S-8 | March 22, 2022 | |
| 10.3+ | Form of Stock Option Agreement | | | X |
| 10.4+ | Form of RSU Agreement | | | X |
| 10.5 | Stock Purchase Agreement, dated March 31, 2022, by and between Meta Materials Inc., on the one hand, and Dmitry Yarmolich and Dzianis Yarmolich, on the other hand | | | X |
| 31.3 | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | X |
| 31.4 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | X |
| 101.INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because XBRL tags are embedded within the Inline XBRL document. | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) | | | |

+ Indicates management contract or compensatory plan.

2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Meta Materials Inc.

Dated: June 1, 2022                                        By:  /s/ Kenneth Rice

Kenneth Rice

*Chief Financial Officer and Chief Operating Officer*

*(Principal Financial and Accounting Officer)*

3

Exhibit ~~28~~ 29 Threshold List

12) Now during this initial period of trading miraculously we saw FTDs great enough, over a long enough period that they hit the OTC Markets threshold securities list... WOW! Look at all the listings Right!! But dates are what is important... Image from [OTC Threshold (finra.org)]

OTC Threshold Securities as of Dec 09, 2022

Issue: MMTLP
Trade Date
Start: 10/08/2021
End: 12/10/2022
Refine Your Results
Total Results: 97
Market
OTCBB
OTC Equity/Other OTC
Other
Reg SHO Threshold
Rule 4320

| Trade Date | Symbol | Issue Name | Market | Reg SHO Threshold Flag | Rule 4320 |
|---|---|---|---|---|---|
| 10/21/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/22/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/25/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/26/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/27/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/28/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/29/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/01/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/02/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/03/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/04/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/05/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/08/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/09/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/10/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/11/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/12/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/15/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/16/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/17/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/18/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/19/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/22/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/23/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/24/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/26/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/29/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 11/30/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/01/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/02/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/03/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/06/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/07/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/08/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/09/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/10/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/13/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/14/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/15/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/16/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/17/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/20/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/21/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/22/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/23/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/27/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/28/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/29/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/30/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 12/31/2021 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |

## Equity Short Interest

FINRA Rule 4560 requires FINRA member firms to report their short positions in all over-the-counter / OTC ) equity securities to FINRA. OTC Equity/Other OTC short interest is available for view by issue, or by downloadable pipe-delimited text file containing all OTC Equity/Other OTC securities reported with a short position. Data is available online for one rolling year based on the settlement date provided in the Short Interest Reporting Deadlines and archived data is available via download.

Please refer to the Short Interest Reporting Deadlines for the current reporting schedule. Additional information relating to short interest reporting can be found here .



Browse archived text files
for Equity Short Interest.
More...

Retrieve instructions to
download Equity Short
Interest data via API
More...

### Short Interest Data ℹ

| Issue MMTLP ≡ ∨ | Settlement Date ↓ | Issue Name | Symbol | Market | Current Short | Previous Short | Chg | % Change from Prev | Avg Daily Vol | Days to Cover | Revision Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Settlement Date Start: 08/01/2022 📅 End: 11/15/2022 📅 Total Results: 6 | 10/31/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,356,133 | 6,592,406 | -236,273 | -3.58 | 1,599,794 | 3.97 | |
| | 10/14/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,592,406 | 6,587,182 | 5,224 | 0.08 | 4,793,196 | 1.38 | |
| | 09/30/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,587,182 | 6,618,821 | -31,639 | -0.48 | 382,425 | 17.22 | |
| | 09/15/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,618,821 | 6,489,175 | 129,646 | 2 | 569,164 | 11.63 | |
| | 08/31/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,489,175 | 6,330,444 | 158,731 | 2.51 | 565,977 | 11.47 | |
| | 08/15/2022 | META MATLS INC PFD SER A | MMTLP | OTC | 6,330,444 | 6,536,958 | -206,514 | -3.16 | 565,567 | 11.19 | |

Displaying 1 - 6 of 6 items    |◀ ◀ Enter Page Number: 1    of 1 ▶ ▶|

### OTC Threshold Securities as of Dec 09, 2022 ℹ

| Issue | Settlement Date | Symbol | Issue Name | Market | Reg SHO Threshold Flag | Rule 4320 |
|---|---|---|---|---|---|---|
| MMTLP | 12/09/2022 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| | 12/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 12/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 12/06/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 12/05/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 12/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 12/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/30/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/29/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/23/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/22/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/21/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/18/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/17/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/16/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/15/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/14/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/10/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/09/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/04/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/03/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 11/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/31/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/27/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/26/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| | 10/24/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |

23) This is a piece I am adding in for more context, $MMTLP has been on the Reg Sho threshold list again for about 29 trading days at this point already, and as you will see it continues to remain on it to this day! This will come back up again in a few minutes though. But needs to be seen now as well.

OTC Threshold Securities as of Dec 09, 2022

Issue
MMTLP
Trade Date
Start:
10/03/2021
End:
12/10/2022

Refine Your Results
Total Results: 91
Market
OTCBB
OTC Equity/Other OTC
Other
Reg SHO Threshold
Rule 4320

| Trade Date | Symbol | Issue Name | Market | Reg SHO Threshold Flag | Rule 4320 |
|---|---|---|---|---|---|
| 01/03/2022 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/14/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/17/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/18/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/19/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/20/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/21/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/24/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/26/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/27/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/31/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/03/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/04/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/09/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/10/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/11/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/14/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/15/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/16/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/17/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/18/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/21/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/22/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/23/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/29/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/30/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/05/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/06/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/09/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |

Displaying 51 - 91 of 91 items  Enter Page Number 2 of 2





| Trade Date | Symbol | Issue Name | Market | Reg SHO Threshold Flag | Rule 4320 |
|---|---|---|---|---|---|
| 01/03/2022 | MMTLP | META MATLS INC PFD SER A | Other OTC | N | Y |
| 10/14/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/17/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/18/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/19/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/20/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/21/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/24/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/26/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/27/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 10/31/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/03/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/04/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/09/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/10/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/11/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/14/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/15/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/16/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/17/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/18/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/21/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/22/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/23/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/25/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/28/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/29/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 11/30/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/01/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/02/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/05/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/06/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/07/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/08/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |
| 12/09/2022 | MMTLP | META MATLS INC PFD SER A | OTC Equity | N | Y |

29) Dec. 8th a large number of overseas brokers have already shut down trading and people are just starting to get their messages of corporate action from their brokers. Again this step is now 2 days late giving only 2 days for retail to make a decision on their plan… Image 1, 2, and 3 are various broker letters to the holders.

*Exhibit*

*28*



## Meta Materials (MMTLP) Spin-off of Next Bridge Hydrocarbons

Meta Materials Series A Preferred (MMTLP) has announced the Spin-off of Next Bridge Hydrocarbons. Terms for this event are one share of Next Bridge Hydrocarbons for every share of MMTLP held.

• The record date for this event is **December 12th 2022.**
• Meta Materials intends to cancel shares in MMTLP effective **December 13th 2022.**
• Distribution of the new Next Bridge Hydrocarbons shares is expected on or around **December 14th 2022.**



### ‹ Corporate Actions Reminder

**MMTLP Corporate Action Notice**

Dear Webull Client,

We received the following notice from the DTC:

MMTLP shareholders with settled positions as of 12/12/22 will receive 1 share of Next Bridge Hydrocarbons, Inc. for every 1 share of MMTLP held. MMTLP will be removed effective 12/13/22.

For additional information, please review the prospectus filed with the SEC at https://sec.report/Document /0001193125-22-292114/

If you have any other questions, feel free to reach out via the in-app Help Center. Thanks and have a great day!

---

**Interactive**Brokers

## Meta Materials (MMTLP) Intends to Issue a Spin-off on a 1-for-1 Basis of Next Bridge Hydrocarbons, Inc. Shares

Dear Client,

Interactive Brokers was notified by Meta Materials (MMTLP) that they intend to issue a spin-off on a 1-for-1 basis of Next Bridge Hydrocarbons, Inc. shares

The record date for this dividend is currently listed as **December 12, 2022,** and the shares are set to be distributed on **December 14, 2022.**

**PLEASE NOTE:**

• Meta Materials intends to cancel MMTLP shares immediately after the spin-off, and the Next Bridge Hydrocarbons, Inc. shares will be non-transferrable and non-tradable.
• **Shortholders:** Should account U*** ███ be in a borrow position after the close of business on **December 8, 2022,** you will be short a security for which there is no market to cover. In addition, there is potentially no market to cover moving forward. At this time, the only way to avoid this is to cover your short position. For further information regarding the risks of short selling, please see the following link: http://...ibkr.edu/article/2080
• **Longholders:** Should account U*** ███ be the owner of record past **December 8, 2022,** you will own shares of Next Bridge Hydrocarbons, Inc. shares that are non-transferrable and non-tradable. The only way to avoid this is to sell MMTLP any time prior to market close on **December 8, 2022**
• If shares of Meta Materials are sold after **December 8, 2022** but prior to the cancellation date, sellers will be responsible for coordinating title ownership to new owner(s).



Exhibit
29

**is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION DATED JULY 15, 2022**

Prospectus

# Next Bridge Hydrocarbons, Inc.

## Common Stock
### (par value $0.0001)

———————

This prospectus ("Prospectus") is being furnished to you as a Series A Preferred stockholder of Meta Materials, Inc. ("Meta") in connection with the planned distribution (the "Spin-Off" or the "Distribution") by Meta to its Series A Preferred stockholders of all the shares of common stock, par value $0.0001 per share (the "Common Stock"), of Next  .ny," "Nex    Copy    Share    Select all    ⋮    Ieta imm                                       nediately prior to the time of the Distribution, Meta holds 165,523,363 shares of Common Stock, which is 100% of the outstanding shares of capital stock of the Company.

At the time of the Spin-Off, Meta will distribute all the outstanding shares of Common Stock held by it on a pro rata basis to holders of Meta's Series A Non-Voting Preferred Stock. Each one share of Meta's Series A Non-Voting Preferred Stock outstanding as of            , New York City time, on               , 2022, the record date for the Spin-Off (the "Record Date"), will entitle the holder thereof to receive one share of

G    Meta holds 165,523,363 shares of Co...
     Tap to see search results

EY: 30

## Technical Documents
* indicates the specs that will be changed with the new Fractional Share Trade Release

- UTP Data Feed Services Specification (UTP Quotation / UTP Trade)*
- UTP Snap-Shot Service Specifications
- UTP Participant Input Interface (Inbound)*
- UTP Transmission Schedule
- SIP Emergency Procedures
- UDP/IP Addresses link: UTP Data Feed Services
- SIP Market-Wide Circuit Breaker Overview

**UPDATE: Technical Documents - Fractional Share Trade Release**
As announced in UTP Vendor Alert 2024-17, this Fraction Trade Release initiative will enhance the existing UTP SIP product to support fractional share trade reporting. The following specifications will become effective upon the implementation of the Hot-Cut release, tentatively scheduled for Q3 2025.

- Fractional Share Trade Reporting Enhancement - Outbound Specs
- Fractional Share Trade Reporting Enhancement - Participant Input Interface

## FINRA OTC eligible securities

While the FINRA OTC eligible securities are administered as part of the UTP Plan Administrator role, The Financial Industry Regulatory Authority (FINRA) is the owner of the OTC eligible securities and the FINRA OTC Reporting Facility (ORF) and TRACE systems. **FINRA is responsible for all technical product management related to TDDS 2.0.**