**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Jason Rolo, | Case No.: _3:24-cv-02053_ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CONSTITUTIONAL PRINCIPLES** |
| v. | |
| SECURITIES & EXCHANGE COMMISSION | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY | |
| DEPOSITORY TRUST & CLEARING CORPORATION | |
| JOHN DOE 1 - 100 | **JURY TRIAL DEMANDED** |
| Defendants, | |

# Response In Opposition to DTCC Motion to Dismiss

# Table of Contents

I. INTRODUCTION ......................................................................................................... 1

II. DTCC IS NOT ENTITLED TO IMMUNITY AND IS LIABLE FOR ITS ULTRA VIRES

CONDUCT .......... 2

III. DTCC VIOLATED THE EXCHANGE ACT AND CAUSED FORESEEABLE INVESTOR

HARM ................. 5

IV. DTCC'S CONDUCT VIOLATED THE SHERMAN ACT AND THE CONNECTICUT

UNFAIR TRADE PRACTICES ACT

.................................................................................................................... 9

V. DTCC'S ULTRA VIRES CONDUCT INDEPENDENTLY WARRANTS LIABILITY

.................................. 12

VI. DTCC EXERCISES TOTAL CONTROL OVER NSCC AND IS LIABLE FOR ITS

ACTIONS .................... 15

VII. DTCC'S INFRASTRUCTURE WAS STRUCTURALLY DEFICIENT, RENDERING ITS

JUSTIFICATIONS INVALID

.................................................................................................................... 18

VIII. PLAINTIFF IS ENTITLED TO DISCOVERY, AND DISMISSAL WITH PREJUDICE IS

UNWARRANTED ... 19

IX. CONCLUSION ....................................................................................................... 20

# <u>Table of Authorities</u>

## <u>Cases</u>

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ........................................................................ 19

Bestfoods, 524 U.S. 51 (1998) ................................................................................... 15

Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001) ....... 7

Butz v. Economou, 438 U.S. 478 (1978) ....................................................................... 6

Carter v. Carter Coal Co., 298 U.S. 238 (1936) ......................................................... 14

Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000) ........................................................ 20

Dexter v. DTCC, 406 F. Supp. 2d 260 (S.D.N.Y. 2005) ............................................... 5

Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451 (1992) .................. 11

Hofman v. FINRA, 2023 WL 3872564 (C.D. Cal. May 8, 2023) ................................... 6

In re Series 7 Broker Qualification Exam Scoring Litig., 510 F. Supp. 2d 35 (D.D.C. 2007) .... 18

Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374 (1995) ........................................ 7

McKenna v. Wright, 386 F.3d 432 (2d Cir. 2004) ....................................................... 19

Naples v. Keystone, 295 Conn. 214 (2010) ................................................................ 15

New Hampshire v. Maine, 532 U.S. 742 (2001) ........................................................... 4

NYSE Specialists Sec. Litig., 503 F. Supp. 2d 265 (S.D.N.Y. 2007) ............................ 8

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) ........................................ 10

Silver v. NYSE, 373 U.S. 341 (1963) ...................................................................... 5, 13

Sparta Surgical Corp. v. NASD, 159 F.3d 1209 (9th Cir. 1998) ................................... 5

Standard Inv. Chartered, Inc. v. NASD, 637 F.3d 112 (2d Cir. 2011) ...................... 5, 13

Tomasso v. Armor Constr., 187 Conn. 544 (1982) ...................................................... 15

Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) ...................... 9, 14

United States v. Bestfoods, 524 U.S. 51 (1998) .......................................................... 15

United States v. Terminal Railroad Ass'n, 224 U.S. 383 (1912) ................................. 10

Votto v. American Car Rental, Inc., 871 A.2d 981 (Conn. App. Ct. 2005) .................. 12

Willow Springs Condo Ass'n v. Seventh BRT Dev. Corp., 245 Conn. 1 (1998) ........... 12

## <u>Statutes & Rules</u>

15 U.S.C. § 78q-1 ....................................................................................................... 3

15 U.S.C. § 78s(b)(1) ................................................................................................... 8

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a) ................... 12

Federal Rule of Civil Procedure 15(a)(2) ................................................................... 20

## I. INTRODUCTION

Plaintiff respectfully submits this memorandum in opposition to Defendant The Depository Trust & Clearing Corporation's ("DTCC") Motion to Dismiss. DTCC's assertion that it passively followed a FINRA trading halt is both factually and legally incorrect. FINRA has confirmed its halt applied only to "member firms" and did not instruct DTCC—an entity that is neither a FINRA member nor a Self-Regulatory Organization (SRO)—to take any action. Nonetheless, DTCC, through its clearing agency subsidiaries, imposed an unauthorized freeze on trade settlement for MMTLP securities without legal authority, SEC directive, or regulatory basis.

This case involves ultra vires conduct by a private market utility wielding quasi-regulatory power without oversight or lawful justification. DTCC's invocation of immunity is misplaced, and its own contradictions with FINRA undermine the legitimacy of its defense. The Motion should be denied, and this case should proceed to discovery.

### A. FACTUAL BACKGROUND

Plaintiff Jason Rolo is a Connecticut-based retail investor who held 1,675 shares of MMTLP—a publicly traded Series A Preferred share of Meta Materials, Inc.—prior to the December 9, 2022 trading halt. These shares were scheduled to convert into private equity in Next Bridge Hydrocarbons, Inc. as part of a corporate spinout. Like thousands of others, Plaintiff relied on continued market access and post-trade settlement to evaluate options prior to delisting.

On or about December 7, 2022, DTCC and the Financial Industry Regulatory Authority ("FINRA") held a private coordination call concerning the MMTLP corporate action. Sworn

1

testimony from Meta Materials CEO Dr. Georgios Palikaras confirms that both the issuer and its legal counsel were deliberately excluded from this meeting, despite its direct impact on shareholder rights and market operations.

Following that undisclosed meeting, FINRA issued a U3 halt on December 9, instructing only its member firms to cease trading and quoting MMTLP. FINRA has since confirmed that its directive applied solely to its members and did not instruct DTCC to suspend clearing or settlement activity. Nevertheless, DTCC—through its subsidiary NSCC—independently halted all post-trade settlement of MMTLP shares.

DTCC is not a FINRA member and received no directive from FINRA or the SEC. The freeze was imposed without an SEC order, systemic risk protocol, or public notice. Thousands of trades executed on December 8—the final day of trading—remained unsettled as a result.

DTCC had tools available to manage settlement through its Obligation Warehouse platform but chose not to use them. It also failed to seek SEC approval via a Form 19b-4 filing as required under Section 19 of the Exchange Act. The result was a discretionary, undisclosed settlement freeze that harmed investors, denied market access, and lacked legal or regulatory justification.

## II. DTCC IS NOT ENTITLED TO IMMUNITY AND IS LIABLE FOR ITS ULTRA VIRES CONDUCT

### A. DTCC Is Not an SRO and Cannot Claim Immunity

DTCC is not a Self-Regulatory Organization (SRO) under the Exchange Act. It is a private holding company whose subsidiaries—NSCC and DTC—are registered clearing agencies under

15 U.S.C. § 78q-1. DTCC does not issue rules, enforce member discipline, or act under SEC-delegated authority. It merely owns and operates entities that carry out settlement functions.

Even assuming arguendo that its subsidiaries were SROs, courts have held that SRO immunity does not extend to ultra vires conduct. In *Weissman v. NASD*, 500 F.3d 1293, 1302 (11th Cir. 2007), the court confirmed that "when conducting private business, SROs remain subject to liability," and that immunity is unavailable for actions outside the scope of delegated regulatory authority.

DTCC's own filings highlight its inconsistency. It asserts that it "does not process securities transactions," while simultaneously claiming immunity based on actions performed by NSCC and DTC. These contradictions bar immunity under the doctrine of judicial estoppel. See *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[A] party cannot prevail on one argument and later switch positions for tactical advantage.").

DTCC cannot disclaim operational responsibility to avoid liability while claiming immunity for those same operations.

**B. Even If DTCC Were an SRO, Its Conduct Falls Outside Protected Functions**

Even if DTCC were treated like an SRO, its actions would not qualify for immunity. Courts grant such protection only for core regulatory functions carried out under SEC oversight. In *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998), the court rejected immunity where the SRO acted independently of the SEC. Similarly, in *Silver v. NYSE*, 373 U.S. 341, 357 (1963), the Supreme Court found no immunity where exchange conduct lacked formal review.

FINRA has explicitly stated that its December 9, 2022 halt applied only to "member firms." DTCC was not directed to cease settlement—it did so unilaterally, without a rule, order, or emergency trigger. That discretionary conduct, taken without SEC oversight, falls outside any zone of regulatory immunity.

**C. DTCC's Conduct Was Ultra Vires and Actionable**

The Exchange Act requires that registered clearing agencies act "in the public interest, for the protection of investors," and ensure "prompt and accurate clearance and settlement." 15 U.S.C. § 78q-1(b)(3)(F). DTCC's freeze on MMTLP settlement violated this mandate and was not authorized by statute, rule, or any emergency declaration.

Such discretionary action without authority is ultra vires. In *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011), the court stated clearly: "Immunity does not extend to ultra vires acts." The Ninth Circuit echoed this in *Sparta*, holding that "[t]he absence of SEC oversight is fatal to [an SRO's] claim of absolute immunity."

DTCC's attempt to invoke immunity while disclaiming any regulatory role is legally incoherent. In *Dexter v. DTCC*, 406 F. Supp. 2d 260 (S.D.N.Y. 2005), DTCC avoided liability by claiming it was merely a passive utility. Here, it seeks immunity for proactive conduct. Such opportunistic reversals violate the rule against inconsistent positions. *New Hampshire v. Maine*, 532 U.S. at 749.

Furthermore, as NSCC's sole parent, DTCC exercises legal and operational control. Courts have found parent corporations liable for subsidiary conduct where they authorize or benefit from

wrongful acts. See *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). DTCC cannot extract profits from NSCC while disclaiming responsibility for its unlawful market intervention.

**D. DTCC's Reliance on *Hofman* Is Misplaced**

DTCC cites *Hofman v. FINRA*, 2023 WL 3872564 (C.D. Cal. May 8, 2023), to support its immunity claim, but that case is inapposite. In *Hofman*, the plaintiff offered no detail about DTCC's conduct. Here, Plaintiff identifies specific actions: the discretionary freeze, the failure to file Form 19b-4, and lack of any SEC oversight or justification.

Moreover, as the Supreme Court held in *Butz v. Economou*, 438 U.S. 478, 512 (1978), immunity attaches based on function, not identity: "It is the function being performed, not the identity of the actor, that determines the scope of immunity." DTCC cannot inherit immunity merely by aligning itself with FINRA.

**E. DTCC Acts as a State Actor for Due Process Purposes**

DTCC exercises a monopoly over the U.S. settlement system under SEC supervision and performs quasi-governmental functions essential to market operation. Its actions are therefore subject to constitutional due process requirements.

In *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001), the Court held that state action exists when a private actor's structure is "pervasively entwined" with the state. Similarly, in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995), the Court found that entities performing delegated public functions under federal oversight may be deemed state actors.

DTCC's discretionary decision to deny market access—without rule, process, or notice—violated Plaintiff's constitutional rights and cannot be immunized.

## III. DTCC VIOLATED THE EXCHANGE ACT AND CAUSED FORESEEABLE INVESTOR HARM

### A. DTCC's Statutory Duties Are Binding, Not Discretionary

As a registered clearing agency under Section 17A of the Exchange Act, 15 U.S.C. § 78q-1(b)(3)(A), (F), DTCC—via NSCC—is required to ensure "prompt and accurate clearance and settlement," "safeguard securities and funds," and act "in the public interest, for the protection of investors." These are not advisory goals; they are mandatory obligations enforceable by law.

DTCC may not sidestep these responsibilities through informal SRO communication. Congress mandated that clearing agencies operate within a transparent, rule-based framework subject to SEC oversight—not private agreements or discretionary decisions made without public disclosure.

### B. The MMTLP Settlement Freeze Was Unlawful

DTCC has not cited any rule, emergency protocol, or SEC directive that authorized its freeze of MMTLP settlement. The halt was not triggered by a system failure or risk escalation. It was based solely on an informal FINRA communication, which—as FINRA has acknowledged—applied only to member firms and did not instruct DTCC to suspend clearing.

This conduct violated both the text and purpose of the Exchange Act. In *Silver v. NYSE*, 373 U.S. 341, 358 (1963), the Supreme Court affirmed that private action taken without SEC oversight is not exempt from judicial review. Likewise, the Ninth Circuit held in *Sparta Surgical*, 159 F.3d at 1214, that "[t]he absence of SEC oversight is fatal to [an SRO's] claim of absolute immunity."

Critically, DTCC never filed a Form 19b-4 with the SEC under 15 U.S.C. § 78s(b)(1)—a procedural requirement for any change that materially affects settlement. See *NYSE Specialists Sec. Litig.*, 503 F. Supp. 2d 265, 278 (S.D.N.Y. 2007) ("Failure to comply with Rule 19b-4 filing requirements can render an SRO's conduct unlawful."). DTCC's settlement freeze, which impacted thousands of investors, was never disclosed, filed, or reviewed.

This was not a procedural oversight—it was a deliberate circumvention of federal safeguards, depriving investors of transparency and notice.

**C. DTCC Misused Its Obligation Warehouse System**

DTCC maintained a platform known as the Obligation Warehouse (OW), specifically designed to track and manage unsettled trades without halting broader market activity. Rather than using this infrastructure to address any potential MMTLP fails, DTCC imposed a blanket freeze—blocking investor access to liquidity and disrupting price discovery.

This failure to utilize OW violated DTCC's statutory duty to "facilitate prompt and accurate settlement." Instead of promoting orderly markets, DTCC's discretionary intervention magnified market opacity and investor harm.

**D. The Freeze Was Executed Without Notice, Transparency, or Regulatory Process**

Sworn testimony from Meta Materials CEO Dr. Georgios Palikaras confirms that DTCC and FINRA coordinated the halt during a private call on or about December 7, 2022—without involving the issuer. Immediately following the call, FINRA revised the corporate action language, and DTCC suspended settlement without any public explanation, legal authority, or procedural safeguard.

This clandestine coordination circumvented Exchange Act mandates and denied the investing public a fair opportunity to assess or react to the changes. The absence of notice, rulemaking, or SEC review renders the freeze procedurally defective and unlawful.

**E. DTCC's Conduct Caused Foreseeable Investor Harm**

By halting settlement just before MMTLP's transition into a private equity, DTCC trapped investors in illiquid positions, stripping them of the ability to sell, hedge, or transfer their shares. The injury was not speculative—it was immediate and severe.

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979), the Supreme Court confirmed that investors may bring private actions where they are the intended beneficiaries of statutory protections. DTCC's violation of duties under the Exchange Act directly harmed Plaintiff and similarly situated market participants.

Moreover, the freeze imposed by DTCC disrupted final-stage price discovery in a publicly traded security during a critical corporate transition. Thousands of investors relied on the post-trade settlement system to make informed decisions and protect their financial positions. DTCC's undisclosed and discretionary intervention—executed without rule, notice, or legal authority—undermined investor confidence, denied access to liquidity, and distorted valuation

outcomes. The harm extended beyond individual loss; it struck at the foundation of market transparency and fairness. No regulatory framework authorizes such covert interference with the essential mechanisms that safeguard the integrity of U.S. securities markets.

## IV. DTCC'S CONDUCT VIOLATED THE SHERMAN ACT AND THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

### A. DTCC's Monopoly Control Over Market Infrastructure Triggers Antitrust Liability

DTCC, through NSCC and DTC, exercises monopoly control over clearance and settlement of U.S. equity securities. Its infrastructure functions as an essential facility—all broker-dealers must use it to complete trades. As the Supreme Court held in *United States v. Terminal Railroad Ass'n*, 224 U.S. 383, 397 (1912), denial of access to an essential facility may constitute an unlawful restraint of trade.

DTCC's freeze was not compelled by operational necessity or regulatory order. It was a discretionary refusal to deal that foreclosed investor access to a critical financial market during the final trading window for MMTLP. No rule or emergency justified the action. As in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973), a monopolist's denial of service without valid business justification supports liability under Section 2 of the Sherman Act.

DTCC's control over post-trade infrastructure, combined with its arbitrary denial of access, constitutes unlawful monopolistic conduct that distorted price discovery and investor participation.

### B. DTCC and FINRA Coordinated to Restrict Trade in Violation of Section 1

9

On or about December 7, 2022, DTCC and FINRA held a private call—confirmed by sworn testimony from Meta Materials CEO Dr. Georgios Palikaras—to revise the MMTLP corporate action. The issuer and its counsel were deliberately excluded. Following the call, FINRA issued a halt notice, and DTCC froze settlement. This sequence of back-to-back actions by two dominant market participants—outside any formal rulemaking process—constitutes coordinated conduct.

Such informal coordination between two market monopolies, where one controls trading and the other controls settlement, implicates the kind of concerted market intervention the Sherman Act prohibits. As the Supreme Court stated in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992), "a concerted refusal to deal or group boycott is a per se violation" of Section 1 absent procompetitive justification—which is lacking here.

The coordination was not speculative. FINRA is a preferred shareholder of DTCC and appoints two members to DTCC's Board of Directors, giving it direct influence over DTCC's governance. This corporate overlap undermines the notion of independent action and strengthens the inference of a concerted market freeze.

**C. DTCC's Conduct Violated the Connecticut Unfair Trade Practices Act (CUTPA)**

DTCC's settlement freeze also violates CUTPA, Conn. Gen. Stat. § 42-110b(a), which prohibits unfair or deceptive acts in the conduct of trade or commerce. Courts apply a three-part test: (1) whether the conduct offends public policy; (2) whether it is immoral, oppressive, or unscrupulous; and (3) whether it causes substantial consumer injury.

10

All three elements are met. DTCC's actions deprived investors of market access without notice, legal basis, or regulatory approval. The freeze occurred during a critical window in a public-to-private corporate transition and was implemented without transparency or SEC filing. These actions violate the public policy embedded in the Exchange Act and SEC Rule 19b-4, which require disclosure and oversight before any market-altering decision.

As the Connecticut Supreme Court held in *Willow Springs Condo Ass'n v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 43 (1998), conduct violates CUTPA when it offends public policy grounded in statute or common law. DTCC's decision to impose a settlement freeze—absent notice, justification, or regulatory compliance—qualifies as such.

Moreover, DTCC's failure to disclose its decision constituted a material omission. In *Votto v. American Car Rental, Inc.*, 871 A.2d 981, 985 (Conn. App. Ct. 2005), the court held that nondisclosure of significant information affecting consumer decision-making supports a CUTPA claim. Here, the concealment of a market freeze directly impacted investor decisions and caused substantial harm.

## V. DTCC'S ULTRA VIRES CONDUCT INDEPENDENTLY WARRANTS LIABILITY

### A. DTCC Acted Beyond the Scope of Its Statutory Authority

DTCC, through its subsidiary NSCC, is registered as a clearing agency under Section 17A of the Exchange Act, 15 U.S.C. § 78q-1. That status confers limited authority to "facilitate the prompt and accurate clearance and settlement of securities transactions," "safeguard securities and funds," and act "in the public interest, for the protection of investors." Nothing in the statute or

DTCC's rulebook authorizes it to suspend settlement based on an informal SRO communication—especially absent an SEC directive, system failure, or declared emergency.

The MMTLP freeze was not regulatory enforcement—it was a discretionary market intervention taken without legal trigger, oversight, or procedural foundation. As the Second Circuit stated in *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011), "Immunity does not extend to ultra vires acts—that is, acts which fall outside the scope of the powers delegated by Congress." DTCC's conduct meets that definition.

**B. DTCC Failed to Comply with the Exchange Act's Rule Filing Requirements**

Under 15 U.S.C. § 78s(b)(1) and SEC Rule 19b-4, clearing agencies must file a rule proposal for any change that "materially affects" the clearing or settlement process. DTCC halted clearance of all MMTLP trades—during the final trading day of a public-to-private conversion—without submitting a filing, issuing public notice, or invoking any emergency exception.

This omission was not a procedural oversight; it was a calculated bypass of federal law. In *NYSE Specialists Sec. Litig.*, 503 F. Supp. 2d 265, 278 (S.D.N.Y. 2007), the court held that failure to comply with Rule 19b-4 can render SRO conduct unlawful. DTCC cannot invoke regulatory protections while disregarding the procedures that define regulatory legitimacy. If DTCC claims to have acted in a regulatory capacity, it was required to follow the process. It did not.

The absence of a Form 19b-4 confirms that DTCC's freeze was not an authorized or reviewable regulatory action. It was ultra vires, opaque, and procedurally invalid.

**C. Private Overreach Is Not Protected by Regulatory Immunity**

The Supreme Court has repeatedly held that private entities cannot wield public power without lawful delegation. In *Silver v. NYSE*, 373 U.S. 341, 357 (1963), the Court confirmed that actions outside SEC review are not exempt from judicial scrutiny. The Ninth Circuit reiterated this in *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998): "The absence of SEC oversight is fatal to [an SRO's] claim of absolute immunity."

This principle applies with even greater force to DTCC, which is not an SRO and did not act under SEC supervision. Its unilateral freeze of trade settlement—without rule, order, or oversight—is precisely the type of unauthorized conduct courts have found actionable.

Similarly, in *Weissman v. NASD*, 500 F.3d 1293, 1302 (11th Cir. 2007), the court held that immunity does not attach to actions "not taken in furtherance of regulatory objectives." DTCC's conduct was not tied to any SEC-approved mandate and thus falls outside the scope of any conceivable immunity doctrine.

### D. DTCC's Conduct Violated Constitutional Separation of Powers Principles

The Supreme Court has long rejected attempts by private entities to assume sovereign power without oversight. In *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), the Court declared that "Congress cannot delegate legislative power to private persons." Yet here, DTCC imposed a market-wide freeze with regulatory effect—without delegation, supervision, or procedural accountability.

This was not a ministerial decision. DTCC altered the rights of thousands of investors, froze access to liquidity, and disrupted market functioning—without lawful basis or administrative

13

review. As reaffirmed in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979), investors may bring private claims for harm caused by violations of statutory duties.

DTCC's freeze was not the product of regulatory procedure—it was a private act of market control that contravened the Exchange Act, denied due process, and warrants judicial intervention.

## VI. DTCC EXERCISES TOTAL CONTROL OVER NSCC AND IS LIABLE FOR ITS ACTIONS

DTCC's Motion to Dismiss falsely presumes that NSCC operated independently when halting MMTLP settlement. In reality, DTCC maintains centralized legal, operational, and financial control over NSCC. That control includes profit extraction, consolidated debt instruments, vertical membership rules, and discretionary authority over access to settlement infrastructure. These facts satisfy both federal and Connecticut standards for piercing the corporate veil.

As the Supreme Court held in *United States v. Bestfoods*, 524 U.S. 51, 61 (1998), a parent may be liable where it "authorizes, directs, or participates in the tortious conduct of its subsidiary." Similarly, in *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 556 (3d Cir. 1997), veil piercing is appropriate when a subsidiary becomes a mere instrumentality of its parent. DTCC's relationship with NSCC meets both standards.

### A. DTCC Extracts Profits and Exercises Financial Control Over NSCC

NSCC is not operated independently. In 2023 and 2024, it paid DTCC $350 million in dividends sourced from clearing revenues—$200 million in 2023 and $150 million in 2024 (NSCC 2024

Financials, p. 4). These consistent, high-volume transfers confirm that DTCC uses NSCC as a profit center.

A parent cannot extract hundreds of millions from its subsidiary while disclaiming responsibility for actions taken through that same entity. Financial dominance of this kind goes beyond ordinary corporate oversight and supports veil piercing under both *Bestfoods* and Connecticut law. See *Naples v. Keystone*, 295 Conn. 214, 233 (2010); *Litchfield Asset Mgmt. v. Howell*, 70 Conn. App. 133, 152 (2002).

**B. DTCC and NSCC Share Debt and Capital Structures**

DTCC and NSCC report the same $9.97 billion in commercial paper and $2.15 billion in long-term debt in 2024, with parallel amortization schedules and pooled liabilities. Their Clearing Fund balances declined in tandem—DTCC from $103.5B to $83.2B, and NSCC from $12.3B to $10.2B—further confirming capital interdependence.

This shared financial architecture shows that NSCC is not independently capitalized. Connecticut courts treat such entwinement as strong evidence of domination. See *Litchfield Asset Mgmt.*, 70 Conn. App. at 152.

**C. DTCC Eliminates Intercompany Transactions and Consolidates All Financials**

DTCC's 2024 annual report confirms that it consolidates financials from all subsidiaries—including NSCC, DTC, FICC, and others—and eliminates all intercompany transactions. These entities are treated as "the Company" in unified filings:

15

"The accompanying consolidated financial statements include the accounts of the

Company and its wholly-owned subsidiaries. Intercompany accounts and

transactions have been eliminated in consolidation."

— *DTCC 2024 Financial Report*, Note 2, p. 10

This is not superficial reporting. It reflects total operational and financial integration. A parent

cannot claim unity for accounting while asserting separation to avoid liability. See *Tomasso v.*

*Armor Constr.*, 187 Conn. 544, 553 (1982) (veil piercing applies when respecting corporate form

would defeat justice).

**D. DTCC Retains Discretionary Control Over Access to Clearing Infrastructure**

According to DTCC's own response to the Financial Stability Board (2023), decisions about

whether to "cease to act" for a clearing participant are not automatic. DTCC's executive and

board-level governance retains full discretion:

"The decision of whether or not to 'cease to act' for a Participant... involves an

active determination and appropriate governance."

— *DTCC FSB Questionnaire (2023), p. 6*

This admission shows that NSCC is not operationally autonomous. Settlement halts—such as the

one imposed on MMTLP—require parent-level approval and governance review.

**E. DTCC Enforces Vertical Membership Requirements Across Subsidiaries**

NSCC's 2023 FSB disclosure confirms that membership is contingent on participation in DTC,

another DTCC subsidiary. Participants cannot join NSCC without simultaneously engaging

DTCC's broader infrastructure. This vertical integration demonstrates DTCC's systemic control over post-trade access and operations.

**F. The MMTLP Freeze Was Executed by DTCC Without Legal Authority**

Sworn testimony from Dr. Georgios Palikaras confirms that DTCC and FINRA coordinated the halt in a private call held on or about December 7, 2022, excluding the issuer and its legal counsel. The next day, FINRA issued a revised corporate action, and DTCC halted settlement—without a rule, SEC directive, or emergency trigger.

FINRA later admitted that its halt applied only to member firms—not DTCC. DTCC executed the clearance freeze on its own discretion, without using its Obligation Warehouse system, invoking any systemic risk protocol, or filing a Form 19b-4. These actions confirm that DTCC—not NSCC—was the decision-maker.

**G. DTCC's Use of Structurally Deficient Systems Reinforces Its Liability**

In March 2024, FINRA issued a Trade Reporting Notice confirming that NSCC does not support clearing of fractional share trades—a common component of retail transactions. DTCC's continued reliance on this incomplete infrastructure, while executing a freeze without rule or justification, underscores its direct role in harming investors and distorting settlement data.

**H. Veil Piercing Is Required to Prevent Injustice**

DTCC used NSCC as a controlled instrumentality to impose a market freeze without transparency, legal authority, or procedural safeguards. Connecticut's "instrumentality" and

"identity" rules both support piercing the veil where a parent uses a subsidiary to commit a wrong and shield liability. See *Naples*, *Tomasso*, *Litchfield*, supra.

Courts reject corporate formalism when domination is used to conceal misconduct. See *Bestfoods*, 524 U.S. at 62; *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 185 (2d Cir. 2016). Here, DTCC extracted NSCC's profits, dictated governance, shared liabilities, and executed market interventions—making veil piercing not just permissible, but necessary to prevent injustice.

## VII. DTCC'S INFRASTRUCTURE WAS STRUCTURALLY DEFICIENT, RENDERING ITS JUSTIFICATIONS INVALID

DTCC's claim that the MMTLP freeze was necessary to protect market integrity is undermined by its own infrastructural deficiencies. In March 2024, FINRA issued a Trade Reporting Notice acknowledging that NSCC does not support clearing of fractional share trades. As a result, trades involving fractional quantities—common in retail accounts—were rejected or misreported.

This means the data DTCC and NSCC relied upon to assess settlement exposure, float composition, or systemic risk was materially incomplete. DTCC acted without a reliable basis for evaluating market conditions. Decisions about halting clearance—if based on such flawed data—were not protective; they were arbitrary and misinformed.

Despite knowing that its clearing infrastructure could not process the full scope of MMTLP trades, DTCC imposed a settlement freeze without invoking systemic risk procedures, filing a Form 19b-4, or citing any valid operational trigger. No SEC rule, emergency order, or

documented risk threshold justified the halt. DTCC failed to follow any formal process for market intervention.

Courts have consistently rejected post hoc rationalizations where no contemporaneous documentation or protocol was followed. In *In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 45 (D.D.C. 2007), the court emphasized that systemic risk claims must be supported by records and formal action. DTCC documented nothing and invoked no process.

The MMTLP clearance freeze occurred in a broken system—lacking transparency, functional infrastructure, and regulatory legitimacy. DTCC's attempt to justify its conduct as protective collapses under the weight of its own operational failures. Rather than safeguarding the market, DTCC concealed deficiencies, misrepresented risk, and acted without lawful authority.

## VIII. PLAINTIFF IS ENTITLED TO DISCOVERY, AND DISMISSAL WITH PREJUDICE IS UNWARRANTED

Even if the Court finds ambiguity regarding the sufficiency of Plaintiff's claims, dismissal would be premature. Plaintiff has alleged plausible violations of the Exchange Act, antitrust laws, and CUTPA, supported by detailed facts, public disclosures, sworn testimony, and internal contradictions in Defendants' own filings.

DTCC's assertion that it merely followed FINRA's lead is contradicted by FINRA's explicit admission that its December 9, 2022 halt applied only to "member firms"—a category that does not include DTCC. No regulatory directive instructed DTCC to halt settlement. Nevertheless, DTCC—through NSCC—imposed a discretionary freeze without filing a rule change, invoking

any SEC authority, or providing public justification. Testimony from the issuer's CEO confirms DTCC's participation in a closed-door coordination meeting preceding the freeze.

Whether DTCC acted lawfully, or had any authority to impose a market-wide settlement halt absent rule, order, or emergency, raises factual issues that cannot be resolved on the pleadings. As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a complaint need only state a "plausible claim for relief." Plaintiff's claims meet that standard.

Moreover, as the Second Circuit held in *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004), a court may not dismiss a plausible complaint simply because it "appears unlikely to succeed." Plaintiff has provided a detailed chronology, factual support, and legal basis for each claim.

If the Court identifies any pleading deficiency, dismissal with prejudice is inappropriate. Plaintiff can further identify unsettled trades, expand on DTCC's infrastructure failures, and present additional evidence of DTCC's operational control. As the Second Circuit explained in *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000), "[a] pro se complaint should not be dismissed without granting leave to amend at least once when a liberal reading gives any indication that a valid claim might be stated."

## IX. CONCLUSION

DTCC's Motion to Dismiss should be denied in full. DTCC acted outside the scope of its statutory authority, without SEC oversight, and without filing the required Form 19b-4, as mandated by Section 19 of the Exchange Act. Its conduct was not regulatory enforcement—it was a discretionary and ultra vires market freeze, coordinated privately with FINRA and imposed without notice, legal authority, or emergency trigger.

20

DTCC is not a self-regulatory organization and is not entitled to immunity. Even if it were deemed functionally similar, the actions at issue fall outside any protected regulatory function. Courts have consistently held that ultra vires conduct and acts taken without SEC supervision are not immune. See *Weissman*, *Sparta*.

Plaintiff has plausibly alleged violations of the Exchange Act, due process, antitrust law, and CUTPA. The resulting harm was direct, foreseeable, and fact-intensive, and cannot be resolved on the pleadings.

Accordingly, the Motion should be denied. If any deficiency is found, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2).

 Respectfully submitted,


Dated: April 10, 2025


**/s/ Jason Rolo**
 Jason Rolo
 Plaintiff, *pro se*
 mastcab@yahoo.com
 (413) 657-9082

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2025, a true and correct copy of the foregoing

document was filed with the Clerk of the Court using the CM/ECF system, which

will automatically send notice of such filing to all registered counsel of record.

Dated: April 10, 2025

**/s/ Jason Rolo**
 Jason Rolo
 Plaintiff, *pro se*
 Torrington, Connecticut
 mastcab@yahoo.com
 (413) 657-9082

22