**Exhibit 32**

**DTC Responses to FSB Continuity of Access Questionnaire
– March 2023**





# THE DEPOSITORY TRUST COMPANY: RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

**March 2023**

*Information provided by DTC in the responses to this questionnaire is accurate as of March1, 2023. For further information, please contact* RecoveryandResolutionPlanning@dtcc.com.

ADVANCING FINANCIAL MARKETS. TOGETHER.™

# Table of Contents

PART I: LEGAL ENTITY AND GENERAL CONTRACT/SERVICE INFORMATION .................................... 5

PART II: RULEBOOK / CONTRACTUAL PROVISIONS REGARDING TERMINATION ............................ 9

PART III: PRIOR TO RESOLUTION, DURING SIGNS OF DISTRESS AT THE PARTICIPANT ............. 18

Part IV: DURING AND AFTER RESOLUTION ........................................................................................ 24

Part V: ARRANGEMENTS AND OPERATIONAL PROCESSES TO FACILITATE CONTINUED ACCESS IN RESOLUTION ....................................................................................................................................... 33

**INTRODUCTION AND DISCLAIMER**

The following document contains the responses of The Depository Trust Company ("DTC") to The Financial Stability Board ("FSB") Survey on Continuity of Access to FMI's for Firms in Resolution.[1]

Please note that the information in DTC's responses is for general informational and indicative purposes only. Each situation regarding a distressed firm is unique and the actions that any of the DTCC Clearing Agencies (DTC, National Securities Clearing Corporation ("NSCC"), and Fixed Income Clearing Corporation ("FICC")) may take in an actual financial institution-resolution event will depend on the specific facts and circumstances, and will be governed by the facts, risks, laws, rules and regulations in effect at that time and that apply in the given situation.[2] This document contains statements about future hypothetical resolution scenarios for a DTCC Clearing Agency participant based on DTC's current expectations and assumptions regarding the future. Some, or all of these assumptions may prove to be incorrect in an actual financial institution-resolution situation. Accordingly, the scenarios and assumptions discussed in this document reflect events and circumstances that may not arise, and the impact of these events and the actions taken by a DTCC Clearing Agency may differ depending on the actual circumstances. These statements, like any statements regarding hypothetical future scenarios, are subject to inherent uncertainties and speak only as of the date made, and DTC does not undertake to update them to reflect changes or events that occur after that date. The hypothetical scenarios and assumptions may not reflect events to which a DTCC Clearing Agency participant is or may become subject to. The range of available actions described in this document and the discussion of actions that could be taken in certain future scenarios are hypothetical only and not binding on any parties in any forum, including but not limited to the DTCC Clearing Agencies, a bankruptcy or other court, or any regulatory, resolution, or other governmental authority. Furthermore, the information in this document may not be relied on by any party for any purpose, as the actions taken in an actual financial institution-resolution event could differ materially from expectations.

Please note that there are certain questions as to which a response is not included in this document where additional context is necessary.  Please contact RecoveryandResolutionPlanning@dtcc.com if your firm is interested in scheduling a bilateral discussion with DTC to discuss those questions.

### _Description of DTC_

DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"), which provides central securities depository ("CSD") services with respect to securities transactions in the U.S. in types of eligible securities including, among others, equities, warrants, rights, corporate debt and notes, municipal bonds, government securities, asset-backed securities, depositary receipts and money market instruments. DTC provides depository and book-entry services pursuant to its rules, procedures, service guides and operational arrangements (the "DTC Rules" or "Rules") available at the DTCC website, www.dtcc.com. Capitalized terms used in the responses that are not otherwise defined herein have the meanings specified in the DTC Rules. We have also included references to DTC's Disclosure Framework, (hereinafter, "Covered Clearing Agency Standards" or "CCAS," and when referring to a specific rule, "CCAS 17Ad-

---

[1] Continuity of access to FMIs for firms in resolution: Streamlined information collection to support resolution planning (revised version 2021) - Financial Stability Board (fsb.org)

[2] DTC reserves any and all rights under its rules and procedures. These are publicly available at www.dtcc.com.

22(e))."[3]

Unless the context otherwise requires, references herein to "participants" refer to the members or participants of each of the SIFMUs, and references herein to "Participants" refer to those admitted as Participants of The Depository Trust Company ("DTC") in accordance with the DTC Rules, By-laws and Organization Certificate and Procedures (the "DTC Rules").

---

[3] See Standards for Covered Clearing Agencies, Exchange Act Release No. 78961 (September 28,2016), 81 FR 70786 (October 13, 2016).

## PART I: LEGAL ENTITY AND GENERAL CONTRACT/SERVICE INFORMATION

**0.  Please provide:**

   **a)  the date of the most recent version of the answers to this questionnaire,**

   March 1, 2023

   **b)  an overview of the changes made since the previous version.**

   - Removal of questions that are no longer included in the template version of the FSB questionnaire
   - Technical edits and clarifications

**1. Please provide the following details:**

   **a)  Full Legal Name**

   The Depository Trust Company (DTC)

   **b)  Legal Entity Identification Number (LEI)**

   549300HBJLRO8YFMI370[4]

   **c)  Jurisdiction of incorporation and registered number in the relevant corporate registry**

   State of New York, United States of America

   **d)  Supervisory, resolution or other relevant regulatory authority responsible for overseeing the activities of your organisation in (i) the relevant jurisdiction(s) of incorporation, and (ii) if different from the jurisdiction of incorporation, the relevant jurisdiction(s) of operation. Where an FMI is overseen by more than one regulatory authority, please also indicate which is the principal/home regulator of the FMI and the relevant function(s) regulated by the respective authorities.**

   DTC is a limited purpose trust company, formed under the Banking Law of New York State and supervised by the New York State Department of Financial Services ("NYSDFS"), a State member bank of the Federal Reserve System ("FRS") subject to examination by the Federal Reserve Bank of New York ("FRBNY") under delegated authority from the Board of Governors (the "FRB") of the FRS, and a clearing agency registered with, and under the supervision of, the SEC. In July 2012, DTC was designated as a systemically important financial market utility (a "SIFMU") under Title VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"); and it is a "covered clearing agency" under the SEC's Standards for Covered Clearing Agencies.

   **e)  The ownership arrangement of the legal entity (e.g. is it majority owned by its users?)**

   DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation (DTCC). DTCC's common stock is owned by the financial institutions that are Participants of its registered clearing agency/SIFMU

---

[4] Global Legal Entity Identifier Foundation, LEI Reference Data, LEI Search 2.0 (gleif.org)

subsidiaries.

2. **Please provide the following information:**

**a) Hyperlink to the published FMI disclosure template under the Disclosure Framework for Financial Market Infrastructures.[5]**

https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf

**b) A list or description of services provided, including a summary of the key ongoing access requirements that you require of members for each service (including operational, financial, and capital requirements).**

DTC provides depository and book-entry services pursuant to its rules, procedures, service guides and operational arrangements (the "DTC Rules" or "Rules") available at the DTCC website, www.dtcc.com.

DTC services include custody of securities certificates and other instruments, and settlement and asset services for types of eligible securities including, among others, equities, warrants, rights, corporate debt and notes, municipal bonds, government securities, asset-backed securities, depositary receipts and MMIs. Eligibility of any particular issue of securities will be determined by DTC under its Rules and in accordance with applicable law, including the Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations thereunder. For a more detailed description of the core services and functions performed by DTC, please refer to DTC Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures, Section III B. titled Key Services: System Design and Operation.[6]

DTC has established participation criteria and requirements relating to financial resources, creditworthiness, and operational capability. These objective and risk-based requirements are designed to limit the risks a Participant may present to DTC or to its membership, while facilitating fair and open access by market participants. In general, DTC participation requirements are set forth in DTC Rule 2 (Participants and Pledgees) and Rule 3 (Participants Qualifications). See also, DTC Disclosure Framework CCAS 17Ad-22(e)(18) (Access and participation requirements).

3. **Do your members/clients access your services directly or through an intermediary?**

DTC's Participants can access DTC's services directly and through third party service providers and service bureaus.

4. **Do your members/clients need a specific software or IT programme to receive your services? If the answer is 'yes', is such software/ IT programme your proprietary product or a specific third-party product (please also consider whether specific**

---

[5] See BIS-IOSCO, Principles for financial market infrastructures: Disclosure framework and Assessment methodology, 2012 (December).
[6] https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf

plug-ins that you require clients to run only run in combination with certain software, e.g. Microsoft products)?

> Participants are provided with a choice of networks, protocols, data delivery, and security options as set forth in the DTCC Client Network Connectivity Guide ("Guide") which is available to Participants on the DTCC Learning Center website.[7] The Guide outlines the specific requirements based on the Participant's network and protocol preferences.

5. **If your contracts are all governed by one governing law, please specify which governing law this is. If there are different governing laws, please specify the main governing laws applicable and explain whether this is dependent on the location of the services provided or as negotiated with the members/clients, or any other reason.**

> The DTC Rules are governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed and performed therein (DTC Rule 1 (Definitions; Governing Law)).

6. **Are there any other service providers or FMIs (for example, CSDs, payment systems or other infrastructure) that a member/client would need to have access to in order to receive your services? Please provide the names of those types of service providers and their regulatory status, where applicable.**

> As stated in DTC Disclosure Framework, CCAS 17Ad-22(e)(9) (Money Settlements), each Participant is required to have a commercial bank that acts as its Settling Bank to fund or receive payments on its behalf. A Settling Bank must be a full-service Participant and have an account at a Federal Reserve Bank through which funds settlement may be processed.

7. **Does your operating framework recognise the continued operations of FMI participants once they enter into resolution (e.g. as under the Bank of England's Resolvability Assessment Framework, or the Single Resolution Board's Expectations for Banks)?**

> The DTC Rules specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise, depending upon the facts and situation, the Board of Directors may suspend the participant from any service provided to the participant either with respect to a particular transaction or transactions, or with respect to transactions generally, or they may prohibit or limit the participant's access to services offered by DTC.

> However, the DTC Rules regarding termination of access are not automatic. Rather, the decision of whether or not to "cease to act" for a Participant, either generally, or with respect to one or more services, involves an active determination and appropriate governance. This is true even in cases of insolvency, where the Board may determine not to cease to act for an insolvent Participant (See DTC Rule 12 (Insolvency)). Key among the issues that management and the Board Risk Committee will consider in any such situation, is whether, and how, the participant entity in resolution could continue to timely perform its obligations as a participant in a manner that

---

[7] https://dtcclearning.com/

does not increase risk to DTC and other DTCC Clearing Agencies or their respective memberships and, if applicable, how the participant's clearing agency activities could be wound down in a timely and orderly fashion. In those situations, the Rules provide for DTC to take precautions, as it may deem necessary, or impose reasonable conditions to mitigate risk to the DTCC Clearing Agencies and their respective participants by such continuation of membership or transfer.

## PART II: RULEBOOK / CONTRACTUAL PROVISIONS REGARDING TERMINATION[8]

**8. Discretionary termination rights.**

**a) Rule Book / Participation agreement provisions: which provisions give rise to a right to terminate a service user's access? Are the FMI's termination provisions disclosed publicly? If so, please provide any link(s) to that information.**

The DTC Rules, which are publicly available on DTCC's website, specify what circumstances may lead to restriction on access to services.

See the following Rules using the link below:

- DTC Rule 10 (Discretionary Termination);
- DTC Rule 11 (Mandatory Termination);
- DTC Rule 12 (Insolvency); and
- DTC Rule 32 (Wind-down of a Participant).

*https://www.dtcc.com/legal/rules-and-procedures.aspx*

Further, DTC has a number of disciplinary tools at its disposal under its Rules. These include monetary fines, reporting certain incidents to regulators of affected Participants, the potential to limit access to one or more services, up to and including termination of membership should a Participant fail to meet its obligations to DTC. (See DTC Disclosure Framework CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks).

**b) Are these provisions based solely on objective criteria, or can the FMI exercise judgement when triggering termination?**

The DTC Rules specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise, depending upon the facts and situation, the Board of Directors may suspend the participant from any service provided to the participant either with respect to a particular transaction or transactions, or with respect to transactions generally, or they may prohibit or limit the participant's access to services offered by DTC. However, the DTC Rules regarding termination of access are not automatic. This is true even in cases of insolvency, where the Board may determine not to cease to act for an insolvent Participant (See DTC Rule 12 (Insolvency)). Rather, consistent with the Key Attributes[9], the decision of whether or not to "cease to act" for a Participant, either generally, or with respect to one or more services, involves an active determination and appropriate governance.

There are important considerations around these decisions that are part of DTC's analysis. The following are some examples of information and steps that would be part of the input and active determination around continued access for a distressed Participant. This is not intended to be an exhaustive list, and the facts/circumstances at the time may require different or unique

---

[8] If your FMI also has the option to suspend rather than terminate membership, please specify for each answer whether and how it would differ for suspension. Please also note Question 4, which asks about the details of suspension in your FMI's provisions

[9] Financial Stability Board, Key Attributes of Effective Resolution Regimes for Financial Institutions (Oct. 15, 2014).

considerations: description of events that caused the stress at the Participant and what actions have been taken to remediate the event(s), information such as recovery/wind-down plans, types of supervisory arrangements in place, and applicable resolution regime; and external factors that impact of the financial viability and timing/success of recovery actions. DTC would look beyond the immediate Participant's stress event as part of its determination and assess, by way of example, macroeconomic conditions, potential systemic risks, the competitive landscape, regulatory considerations, and reputational impacts that could evolve during the stress period. Given that this is likely to be an evolving situation, Participants should assume that the determination will be assessed each day throughout the stress period with regular escalations to DTC's regulators and Board Risk Committee ("BRC").

**c) Does the FMI use 'forward looking' indicators that may trigger termination, and if so, which ones?**

DTC monitors and manages credit and market risk utilizing various indicators as more fully described in DTC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk). Under the DTC Rules, which are implemented through policies, procedures and systems, DTC imposes strict membership admission criteria and review. It conducts ongoing monitoring and review of Participants (See DTC Rules 2 and 3), daily recalculation and collection, as needed, of required Participants Fund deposits (See DTC Rule 4), and intraday monitoring of net debits and collateralization of a Participant's obligations. DTC also has tools that help ensure that Participants are capable of meeting their membership obligations (See DTC Rules 9(A), 9(B)). Management's efforts are supported by certain models and other tools, including those that (i) capture and evaluate Participants' financial metrics and other qualitative information (the Credit Risk Rating Matrix)[10], (ii) calculate Participants Fund requirements, (iii) monitor Participant compliance with Participants Fund requirements, (iv) monitor the net debits of each Participant, and (v) track pricing and collateral value of securities.

**d) Do the FMI's provisions envisage that (i) financial stress on the participant's side (as defined in its provisions – please provide the definition of such stress) and/or (ii) a resolution event (recognised in the relevant jurisdiction) qualifies as a material change that may trigger termination?**

Please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures) that discusses, among other things, the fact that a Participant will be in default if it fails to pay any amount due to DTC within specified timeframes, including the failure to fund a settlement obligation, to pay required deposits to the Participants Fund or to pay adequate assurances to DTC within the required timeframes.

Insolvency of a Participant also would constitute a default. A Participant may be determined to be insolvent if, among other circumstances, (i) the Participant has notified DTC that it is unable to perform its contracts or obligation; (ii) the Participant is subject to a SIPA proceeding; (iii) the Participant has filed, or had filed against it, a petition for bankruptcy or other insolvency proceeding; or (iv) the Participant admits in writing its inability to

---

[10] DTC utilizes a credit risk rating matrix, or "CRRM", to evaluate and rate the credit risk of DTC's U.S. bank, U.S. broker/dealer and foreign bank Participants, and rate such Participants based upon qualitative and quantitative information.

pay its debts generally as they become due. Short of insolvency or non-payment, DTC may find that a Participant is in such financial or operating condition that its continuation as a Participant would jeopardize the interests of DTC or other Participants. Additional types of default include a Participant's failure to satisfy the qualifications for being a Participant, conviction of certain crimes, felonies or misdemeanors (involving securities transactions or a breach of fiduciary duty), expulsion or suspension from a national securities association or exchange, and statutory disqualification under the Exchange Act.

See Rules referred to below:

- <u>DTC Rule 10 (Discretionary Termination):</u> Based on its judgement that adequate cause exists to do so, DTC may at any time ((a) cease to act for a Participant with respect to a particular transaction or transactions, a Program or transactions generally or (b) terminate a Participant's right to act as a Settling Bank. Section 1 sets forth circumstances in which adequate cause for ceasing to act for Participant or terminating a Participant's right to act as a Settling Bank shall be deemed to exist.

- <u>DTC Rule 11 (Mandatory Termination):</u> Provides that DTC, upon determining to its reasonable satisfaction that none of the qualifications set forth in DTC Rule 3 apply to a Participant, shall cease to act for such Participant with respect to transactions generally as provided in Rule 10, and in such case the provisions of Rule 10 and the provisions therein as to notice shall govern.

- <u>DTC Rule 12 (Insolvency):</u> A Participant which fails to perform its contracts or obligations or determines that it is unable to do so shall immediately inform DTC orally and in writing of such failure or inability. Section 2 (a)-(c) sets forth in the event of which circumstances a Participant shall be treated by DTC in all respects as insolvent.

- <u>DTC Rule 32 (Wind-down of a Participant):</u> When a Participant notifies DTC that it intends to wind down its activities, DTC may, in its sole discretion, in order to protect itself and its Participants, determine that such Participant is a "Wind-down Participant." In that event and, without limiting any other rights of DTC under the Rules, DTC may impose conditions on, or take actions with respect to, the Wind-down Participant as provided under this Rule.

**e) During stress or resolution of the member, are actions by other FMIs taken into account as possible indicators or triggers for termination?**

The DTC Rules specify what circumstances may lead to restriction on access to services. These circumstances include the Participant's, or its Controlling Management expulsion or suspension from a national securities association or exchange registered under the Exchange Act, a self-regulatory organization as defined in Section 3(a)(26) of the Exchange Act or a corporation which engages in clearance and settlement activities or a securities depository or has been barred or suspended from being associated with any Participant of such an exchange, association or securities depository (See DTC Rule 10 (Discretionary Termination), Section1(ix)).

**f) Are there any other relevant provisions regarding termination? If so, please explain why they are necessary for the FMI to enable rights for termination.**

Please refer to response to 8(d) which outlines the relevant provisions regarding termination.

**9. Suspension or restriction of membership.**

**a) Does your framework allow for suspension or restriction of a participant's membership rather than termination? If yes, what exactly does this imply (for instance, limiting the right to enter new transactions in the system)? Please explain any differences to termination.**

As described in the responses to questions 8(d) and 8(e), the DTC Rules specify what circumstances may lead to restriction on access to services. Under DTC Rule 10 (Discretionary Termination), the Board may suspend a Participant or prohibit or limit a Participant's access to DTC's services in enumerated circumstances. These circumstances include a Participant's expulsion or suspension from a regulatory or self-regulatory organization (See response to 8(e)), a Participant's failure to make any required deposit with DTC, or a Participant's experiencing such financial or operational difficulties that the Board, or DTC if time does not permit action by the Board, determines that its continuation as a Participant or Settling Bank would jeopardize the interests of DTC, other Participants or Pledgees. DTC Rule 12 (Insolvency) enumerates the circumstances under which a Participant will be treated as insolvent.

If any of the enumerated circumstances arise, depending upon the facts and situation, the Board may suspend the Participant from any service provided to the Participant either with respect to a particular transaction or transactions, or with respect to transactions generally. When a DTCC Clearing Agency, such as DTC, restricts a Participant's access to services generally, it is said to have "ceased to act" for the Participant. Please refer to DTC Rule 10, Sections 3 and 4 regarding actions to be taken by DTC if DTC has ceased to act for a Participant generally. Please also refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

**b) Is there a specific timeline for a suspension period before it leads to termination of membership, and are there circumstances where suspension may be lifted without a termination of membership?**

The DTC Rules do not include a specific timeline for suspension before termination. Please refer to responses to questions 8(d) and 9(a) regarding the DTC Rules regarding restrictions on access to services, suspension, and termination.

**10. Critical FMI service rules, contractual arrangements, or procedures should reflect any legal restrictions on termination and suspension of access because of an FMI service user entering into resolution (FSB 2017 Guidance, 1.1).**

**a) In what way do your rules, contractual arrangements and procedures reflect this?**

As described in the responses to questions 8(b) and 8(d), the DTC Rules

specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise, depending upon the facts and situation, the Board of Directors may suspend the participant from any service provided to the participant either with respect to a particular transaction or transactions, or with respect to transactions generally, or they may prohibit or limit the participant's access to services offered by DTC and other DTCC Clearing Agencies. However, the DTC Rules regarding termination of access are not automatic. This is true even in cases of insolvency, where the Board may determine not to cease to act for an insolvent Participant (See DTC Rule 12 (Insolvency)). Rather, consistent with the Key Attributes[11], the decision of whether or not to "cease to act" for a Participant, either generally, or with respect to one or more services, involves an active determination and appropriate governance.

Please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures); and DTC Disclosure Framework, CCAS 17Ad-22(e)(18) (Access and participation requirements), under the heading "Retirement, Suspension and Orderly Exit of Participants."

**b) Do such arrangements include the effect of parent or affiliates entering resolution?**

The resolution of a Participant's parent or affiliates would not require a transfer of membership nor trigger an automatic termination event. However, as described in the response to question 8(a) regarding DTC's rules and governance process, in order to continue to allow the Participant access to DTC's services, management and the Board Risk Committee will need to review the actions taken at the holding company level and elsewhere within the organization and evaluate the impact of such actions on the Participant subsidiary and its ability going forward to meet its obligations to DTC.

**c) Do you have any plans to amend or otherwise change, or have you recently changed your rules, contractual arrangements or procedures to address legal restrictions on termination of access in the event that an FMI service user enters resolution? If so, please provide details of the proposed/applied changes.**

DTC has neither recently changed, nor has any current plans to amend the Rules concerning a Participant entering resolution.

Please note that as a clearing agency registered with the SEC, the Exchange Act provides a framework under which DTC's Rules are adopted and enforced. All DTC Rules are filed with and reviewed by the SEC.[12] As a clearing agency registered under Section 17A of the Exchange Act, a self-regulatory organization subject to Section 19 of the Exchange Act, and a SIFMU under Title VIII of Dodd-Frank, DTC is required to follow (1) a specified process whenever it proposes a new rule or a change or amendment to its Rules[13] (a "Proposed Rule Change," and the process, the "Proposed Rule Change Process"); and (2) a specified process whenever it proposes to make a change to its rules, procedures or operations that could

---

[11] *Supra* note 9.
[12] The DTC Rules, as originally in effect at the time of DTC's registration as a clearing agency, were filed with and reviewed by the SEC as part of the registration process. Subsequent changes in the DTC Rules have been similarly filed with and reviewed by the SEC.
[13] This process is set forth in Section 19(b) of the Exchange Act and Exchange Act Rule 19b-4.

materially affect the nature or level of risks presented by DTC[14] (a "Material Change," and the process, the "Advance Notice Process").

Under the Proposed Rule Change Process, generally, before a Proposed Rule Change may take effect (1) the change and an explanatory statement, completed pursuant to the SEC Form 19b-4, must be filed with the SEC and posted by DTC on the DTCC website; (2) notice of the filing and the substantive terms or description of the change must be published by the SEC in the Federal Register for public review and comment; and (3) the SEC must approve the change (or the change must otherwise be permitted to take effect[15]). The SEC is required to disapprove a Proposed Rule Change if it does not find that the change is consistent with the requirements of the Exchange Act and the rules and regulations thereunder that are applicable to DTC. (Please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(1) (Legal basis).

**11. Triggers, procedure and consequences of termination of FMI participation.**

**a) Triggers: in which situations would termination be considered? Is participation/membership generally terminated in case of financial stress? Are these criteria clearly outlined in the rulebook or other contractual documentation (please include the relevant references)?**

Please see response to question 8 (a)-(f).

**b) Please explain the management and monitoring around the termination process - steps and timelines of the escalation and decision-making, as well as of the implementation of termination. (Please provide concrete examples, if any, of participation/membership terminations and flag, where relevant, any changes made to the termination process since).**

Please see DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures). As described therein, when a Participant default occurs, DTC must determine whether to cease to act for, or, in some cases, limit services to, the defaulting Participant under Rule 10 (Discretionary Termination), Rule 11 (Mandatory Termination) and Rule 12 (Insolvency). These determinations are, under appropriate internal governance, generally delegated by the Board to the Board Risk Committee ("BRC"). In making this determination, the BRC or the Board will consider the particular facts and circumstances involved, and the condition of the defaulting Participant. To ensure that action may be taken timely, the BRC Charter also provides for delegated authority to the Chair of the BRC, if it is impractical to convene the BRC. Action taken would then be ratified by the BRC at a subsequent meeting.[16]

**c) What are the consequences of termination on the participant/member's ability to**

---

[14] This process is set forth in Section 806(e) of Dodd-Frank and Exchange Act Rule 19b-4.
[15] In certain limited circumstances, including fee changes, Proposed Rule Changes may become effective upon filing. Proposed Rule Changes may also become effective summarily if it appears to the SEC that such action is necessary for the protection of investors, the maintenance of fair and orderly markets or the safeguarding of securities or funds. However, any Proposed Rule Change that becomes effective upon filing or summarily is subject to SEC review and the right of the SEC to take action thereafter.
[16] In addition, DTC Rule 28 (Delegation) also permits action to be taken by senior corporate officers, if so designated.

**access the FMI's services? Would the firm be able to complete the processing of any outstanding transactions (e.g. not accepted for clearing or settlement, or in process but not complete) it has in the FMI's systems, or are these cancelled or liquidated?**

Upon its decision to cease to act generally for a Participant, as a general rule, unless waived or varied by the Board, DTC will no longer accept instructions from other Participants to deliver or pledge securities to the insolvent Participant and will not accept instructions from the insolvent Participant to deliver or pledge securities to other Participants or Pledgees. Please see Rule 11 (Mandatory Termination), Rule 12 (Insolvency), DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures), and DTC Disclosure Framework, CCAS 17Ad-22(e)(18) (Access and Participation Requirements), under the header, "Retirement, Suspension and Orderly Exit of Participants".

**d) Would the decision to terminate participation/membership be notified ex ante (i.e. before it takes effect) to the competent authorities of (i) the direct participant and/or of (ii) the FMI? Would this decision be communicated ex ante to the participant itself? On both aspects, how long in advance of actual termination would such notifications occur?**

Depending on the given situation, DTC would expect to be in regular communication with the Participant regarding assessment of a distressed Participant's ability to meet its current and future obligations. When DTC determines to cease to act for, or limit services to, a defaulting Participant, DTC will notify the defaulting Participant promptly after the decision is made. DTC will also promptly notify its own regulators. DTC will issue an Important Notice to all Participants and Pledgees informing them that it has ceased to act for the identified Participant (or affiliated family of Participants) and indicate how pending matters may be resolved. Further, for a defaulting Participant that is also a member of other clearing agencies with which DTC has cross-guarantee or other arrangements, DTC will also notify those clearing agencies, as required by those arrangements. Please see DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

**e) What impact would a participant/member's termination have on their parent/subsidiaries' direct membership in the FMI?**

Membership of a parent or subsidiary of the defaulted Participant may not necessarily be affected and will depend on the facts and circumstances. DTCC management and the Board Risk Committee ("BRC") will need to review the actions taken by the Participant's holding company and elsewhere within the organization and evaluate the impact of such actions on the Participant's parent and subsidiaries and their respective ability going forward to meet obligations to the DTCC Clearing Agencies. The timely provision of the information and materials requested by DTC will be necessary to facilitate management and the BRC's ability to make such determinations.

**f) Does the FMI have cross-default provisions in its rule set? Could it put a member in default because of an affiliate's insolvency or of an indirect participant/client's default or do the rules explicitly prevent or exclude such automatic termination (as long as other obligations are being met)?**

Please refer to response to 11(e). DTC rules do not contain express automatic termination provisions with respect to default, insolvency, or failure of a Participant or its affiliate. Such determinations would be based upon the facts and circumstances.

**g) What assistance would the FMI provide with the porting (within the FMI) of the participant's direct and/or indirect positions/outstanding transactions to a parent/subsidiary membership, third-party successor or bridge entity?**

DTC membership is not assignable; as such, in such event, a bridge bank or other transferee (if not already a Participant) would need to apply for membership with DTC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee, to DTC's satisfaction. The DTCC Client Account Services team maintains standard membership and account transfer documentation. The relevant documentation varies depending on whether the proposed transferee is currently a DTC Participant or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure).

Assuming a bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Participant, DTC may expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed Participant's DTC relationships to an existing Participant acquirer can be accomplished in a commercially reasonable expedited basis. The acquirer would need to provide the standard account transfer documentation for each applicable DTCC Clearing Agency.

**h) Please discuss any other points related to termination.**

Not applicable.

**12. FMIs should retain the ability, as specified in rules or contractual arrangements, to terminate, suspend or restrict participation or continued provision of services where the firm fails to meet obligations or where safe and orderly FMI operations could be compromised (FSB 2017 Guidance, 1.1).**

**a) Under what conditions, if any, could safe and orderly FMI operations be at risk from maintaining participation of a service user in resolution?**

Please refer to response to question 8(d) and DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures), and DTC Rule 10 (Discretionary Termination).

The actions that DTC may take in an actual financial institution-resolution event will depend on the specific facts and circumstances that apply in the given situation. This is particularly important to preserve orderly settlement in the marketplace and to minimize the risk of loss to DTC and its Participants. During periods of crisis, the nature, quality, and extent of interaction between a Participant and DTC with respect to governance and communication, as well as financial and operational considerations, will have an impact on the determination of whether a Participant is able to maintain continuity of access. Transparency and timely sharing of

information will be critical in the process. Further, external factors may impact of the financial viability and timing/success of recovery actions. Therefore, DTC will look beyond the immediate Participant stress event as part of its determination and assess, by way of example, macroeconomic conditions, potential systemic risks, the competitive landscape, regulatory considerations, and reputational impacts that could evolve during the stress period.

**b) Which indicators, if any, can a participant use to anticipate that such a scenario may occur?**

Please refer to response to Question 12(a) above.

**13. Are there any further aspects or issues to mention in relation to the provisions for termination or suspension of membership? If possible, please provide concrete examples of specific factors that were considered in the past when assessing whether to exercise judgement to terminate or suspend a participant's access. Please elaborate.**

No.

## PART III: PRIOR TO RESOLUTION, DURING SIGNS OF DISTRESS AT THE PARTICIPANT

**The questions in this section assume a situation of stress, in which one of the FMI's (direct) participants/members, or an affiliate company, exhibits signs of distress. Please distinguish in case there are differences between situations of idiosyncratic vs. market stress.**

**To avoid duplication, respondents may cross-reference other answers when appropriate.**

**14. What management and monitoring process(es) does the FMI have in place to identify a situation of stress of a (direct) FMI participant or its affiliate?**

> DTC monitors its credit exposures with respect to the risk that a Participant defaults through the ongoing surveillance of its Participants' financial strength and default risk. On an ongoing basis, Participants are required to provide financial and other information to DTC, as outlined in DTC Rule 2 (Participants and Pledgees), to demonstrate that they meet the membership standards on an ongoing basis. In addition, Financial Risk Management reviews publicly available information such as earnings releases, equity prices, market data, and news as part of its Participant surveillance. DTC utilizes a credit risk rating model to evaluate and rate the credit risk of DTC's U.S. bank, foreign bank, and U.S. broker-dealer Participants, and rate Participants based upon their relevant financial information. These ratings are used to set surveillance levels. All Participants are subject to a credit review at least every 12 to 24 months.
>
> For further information, please refer to:
> * DTC Disclosure Framework, CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks);
> * CCAS 17Ad-22(e)(4) (Credit risk);
> * CCAS 17Ad-22(e)(7) (Liquidity risk);
> * DTC Rule 2 (Participants and Pledgees); and
> * DTC Rule 3 (Participants Qualifications).

**15. Which indicators does the FMI consider as part of its management and monitoring in order to determine whether its participants/members face difficulties due to idiosyncratic and/or market stress (outside of entry into resolution)?**

> Please refer to Question 14 above.

**16. What risk mitigation actions could the FMI take under its rules / internal procedures vis-à-vis the participant or member? Which of those potential actions are likely, i.e. to be expected by the firm? How would risk mitigation vary in the event of mild, moderate, and severe stress situations at a participant/member? Could actions be taken even though the participant/member meets its obligations?**

> The Rules enable DTC, in its discretion, to require adequate assurances of an applicant or Participant's financial responsibility or operational capability as and when DTC deems appropriate (See DTC Rule 9A (Transactions in Securities and Money Payments), Sec. 2; and Rule 2 (Participants and Pledgees), Sec. 1 (as to information)). This includes, generally (and without limitation), the right to require a Participant to provide additional information and reporting, the right to require a Participant to provide access to books and records and may include restricting or modifying the Participant's use of certain services or activities. The Rules also allow DTC to require

additional Participants Fund deposits and evidence of financial responsibility or operational capability. Such evidence, for example, may be in the form of an acceptable guarantee or other form of acceptable credit support, or an operational support arrangement. See also, DTC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk), in particular the description of DTC's utilization of a credit risk rating model and the fact that Participants with a weaker credit rating are automatically placed on the Watch List. Participants on the Watch List may be subject to additional surveillance and monitored more closely than Participants with a stronger credit rating.

**17. What self-reporting requirements are placed on the member/participant in a situation of stress (e.g. additional reporting, increased reporting frequency; evidence of operational and financial capacity)? Please provide any templates or overviews of required data points, where available.**

As discussed in response to question 14, Participants are subject to ongoing review and monitoring of their activities and financial condition. To facilitate this review, each Participant must comply with ongoing reporting and information requirements (DTC Rule 2, Participants and Pledgees). This includes the provision of FOCUS reports for broker-dealers, and Call Reports for bank and trust company Participants. Separately, under the DTC insolvency rule (DTC Rule 12, Insolvency), a Participant is required to immediately notify DTC if it fails to perform its contracts or obligations or determines it is unable to do so.

**18. Please explain the methodology used to calibrate additional membership requirements (including operational, financial and capital requirements) for a member/client in financial stress outside of resolution.**

As noted in response to question 14, DTC monitors its credit exposures with respect to the risk that a Participant defaults through the ongoing surveillance of its Participants' financial strength and default risk. On an ongoing basis, Participants are required to provide financial and other information to DTC, as outlined in DTC Rule 2 (Participants and Pledgees), to demonstrate that they meet the membership standards on an ongoing basis. In addition, Financial Risk Management reviews publicly available information such as earnings releases, equity prices, market data, and news as part of its Participant surveillance. DTC utilizes a credit risk rating model to evaluate and rate the credit risk of DTC's U.S. bank, foreign bank, and U.S. broker-dealer Participants, and rate Participants based upon their relevant financial information. These ratings are used to set surveillance levels. All Participants are subject to a credit review at least every 12 to 24 months.

For further information, please refer to:

- DTC Rule 2 (Participants and Pledgees), and DTC Rule 3 (Participants Qualifications);
- DTC Disclosure Framework, CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks);
- DTC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk), in particular, the sections under the headings, "Ongoing monitoring and surveillance" and "Measurement, Monitoring and Management of Credit Risk;
- DTC Disclosure Framework, CCAS 17Ad-22(e)(5) (Collateral), in particular, the section under the heading "Collateral Monitor" and

- DTC Disclosure Framework, CCAS 17Ad-22(e)(7) (Liquidity Risk), in particular, the section under the heading "Measurement and monitoring of liquidity risk and needs".

**19. Please describe for each of the below risk mitigation actions, in as far as they form part of the FMI's set of potential risk mitigation actions: (i) whether these actions are discretionary or pre-determined, e.g., would the FMI follow a required set of actions, which may be described in its rule book; (ii) in which way, if at all, the FMI could deviate from the predetermined procedure so as to either disregard a mandated risk mitigation action or adopt a non-standard action?**
    **i. Increasing membership contributions (e.g. default fund/loss sharing contributions), mandating pre-funding, restricting withdrawal of deposits;**
    **ii. Increasing initial/variation margin/collateral requirements, restricting collateral types, removing cross-margining facilities; increasing liquidity obligations;**
    **iii. Removing credit lines, reliance on parental guarantees or securities borrowing facilities;**
    **iv. Enforcing trading controls including position limits, restricting markets;**
    **v. Termination or suspension of participation/membership.**

The following is DTC's summary response to Question 19 (i)-(v):

DTC has the ability under its Rules to determine which risk mitigation actions to take or not take based upon the facts and circumstances that apply in the given situation. The Rules are designed to provide DTC with sufficient flexibility to appropriately manage the risks presented to the clearing agency and its membership by the distressed Participant. As noted previously in the response to questions 8(b) and 16, the Rules enable DTC, in its discretion, to require adequate assurances of an applicant or Participant's financial responsibility or operational capability as and when DTC deems appropriate (see DTC Rule 9A (Transactions in Securities and Money Payments)), Sec. 2; and Rule 2 (Participants and Pledgees), Sec. 1 (as to information)). This includes, generally (and without limitation), the right to require a Participant to provide additional information and reporting, the right to require a Participant to provide access to books and records and may include restricting or modifying the Participant's use of certain services or activities. The Rules also allow DTC to require additional Participants Fund deposits and evidence of financial responsibility or operational capability.

**20. Please answer question 19 also for other risk mitigation actions, if any, that are not mentioned here and would likely be taken.**

Not applicable.

**21. In a situation of idiosyncratic or market stress, in which one of the FMI's (direct) participants/members, or an affiliate company, exhibits signs of distress, communications and notifications may be necessary. Please distinguish in the below in case there are differences between a situation of idiosyncratic vs. market stress.**
    **a) What notifications or communications would the FMI undertake to the participant/member, their competent and/or resolution authority, the FMI's competent and/or resolution authority, the stressed firm's settlement agent, and other stakeholders, and when? Would any of these be based on an obligation for the FMI to notify?**
    **b) Do you have a specific communication plan for this, or does your approach leverage existing crisis communication mechanisms? In both cases, please describe the main features of the approach.**

**c) Does the FMI need to get consent from the firm or inform the firm prior to a notification or communication?**

**d) Do the communication/notification protocols require specific factors to be considered, for example legal implication, market impact, etc.?**

**e) Are your communication protocols standardised across participants or do they take into account the specificities of firms' participation and roles in respect of the FMI?**

The following is DTC's summary response to Question 21 (a)- (e): There is no difference in the response between a situation of idiosyncratic vs. market stress.

When DTC determines to cease to act for, or limit services to, a defaulting Participant, DTC will notify the defaulting Participant promptly after the decision is made. DTC will also promptly notify its own regulators.

DTC will issue an Important Notice to all Participants and Pledgees informing them that it has ceased to act for a Participant (or affiliated family of Participants) and indicate how pending matters may be resolved. Finally, for a defaulting Participant that is also a member of other clearing agencies with which DTC has cross-guarantee or other arrangements, DTC will also notify those clearing agencies, as required by those arrangements. (See DTC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures)).

DTC Rule 12 (Insolvency), Section 2, enumerates the circumstances under which a Participant will be treated as insolvent. Pursuant to Section 4, from and after the time when DTC determines to its reasonable satisfaction that an event specified in Section 2 of this Rule has occurred with respect to a Participant (the "Time of Insolvency"), DTC shall cease to act for such Participant, except as determined by DTC in any particular case. DTC shall, as soon as possible after the Time of Insolvency, notify the insolvent Participant and other Participants and Pledgees whether it has ceased to act for the insolvent Participant pursuant to the provisions of DTC Rule 12, and such notice shall state, at least in general terms, how pending matters will be affected and what steps are to be taken in connection therewith.

Pursuant to DTC Rule 32 (Wind-down of a Participant), as soon as practicable after DTC determines that a Participant is a Wind-Down Participant, DTC shall notify the Wind-Down Participant, all other Participants and Pledgees and the SEC of such determination. Further, if DTC takes, or mandates, any action pursuant to this Rule, DTC shall, as soon as practicable thereafter, notify the SEC and such other Participants and Pledgees as it deems proper due to the nature of such action.

**22. Alleviating uncertainty for the FMI.**

**a) Which actions could the firm or the relevant authorities take in order to alleviate uncertainty for the FMI, and reduce the risk that the FMI may take risk mitigation actions that may have an adverse financial impact on the firm?**

**b) Which data / quantitative information and what qualitative information might you need to receive from the participant and/or RA in order to allow the participant to maintain access (please consider the three levels of access mentioned in footnote 3)? Please specify by when you would need each piece of information, if appropriate.**

**c) What other actions could be taken ex-ante to avoid a temporary interruption of services or the risk of some transactions remaining unexecuted?**

**d) Please discuss any other considerations.**

The following is DTC's summary response to Question 22 (a)-(d). Please also refer to response to questions 8(b) and 34.

DTC believes that a key factor in alleviating uncertainty and facilitating an FMI's timely evaluation of a resolution situation is information. This encompasses not only an understanding of the broad resolution strategy, but also, for example:

- The factors that precipitated the resolution event and in what entity or entities they occurred;
- How or whether such issues have been mitigated;
- The proposed transactions sought to be processed by the Participant during the stabilization phase and following;
- The arrangements, including liquidity, capital and key personnel plans, for ensuring ongoing performance of both existing and future obligations;
- Relevant information and timing around a potential change of control and changes to staffing;
- Financials/pro forma financials showing the current capital or recapitalized funds of the Participant and how that Participant will meet the requisite capital requirements to maintain their business and membership;
- Information, such as recovery/wind-down plans, types of supervisory arrangements in place, and applicable resolution regime; and
- Further, during periods of crisis, the nature, quality, and extent of interaction between a Participant and DTC with respect to governance and communication, as well as financial and operational considerations, will have an impact on the determination of whether a Participant is able to maintain continuity of access. Transparency and timely sharing of information will be critical in the process.

It is DTC's view that it is the responsibility of the Participant (together with its resolution authority) to determine which FMI services are critical, to the ability of the Participant, to perform its critical functions to its customers, and to so notify the relevant providers of FMI services to level set expectations. To the extent practicable, Participants should provide FMIs with transparency regarding ancillary service providers whose services are critical to the ongoing performance of the Participant's obligations to the FMI, and the relevant contractual arrangements that would apply in a resolution scenario. DTC believes this information is key to evaluating the third-party risks that may arise by virtue of providing continuing access. Firms should provide more information to FMIs about their strategies, assumptions, and contingency arrangements. DTC appreciates the sensitivity of much of this information, but under the Rules, DTC has the right to seek information from Participants necessary to properly evaluate the risks they present.

**23. Considering adverse financial impact of FMI risk mitigation actions on direct/indirect participants.**
**a) Some actions, designed to protect the FMI, may precipitate the failure of the relevant participant/member or worsen its position at the time of resolution. How does the FMI consider this when deciding to protect itself?**
**b) Does the FMI take into account the impact on indirect participants of actions taken in response to a direct participant/member facing financial stress?**

**24. Possible differences in treatment of domestic and foreign FMI service users entering into resolution. a) Do you differentiate in your treatment of domestic and foreign FMI service users, and if so in what way?**

> Prior to accepting a non-U.S. Participant, DTC identifies, analyzes, and mitigates legal risks arising from potential conflicts of laws. DTC obtains a legal opinion from counsel qualified in the applicant's home jurisdiction as to (1) DTC's ability to enforce its Rules (including its netting and default management rules) under the applicable insolvency regime of the jurisdiction and (2) the enforceability of (i) the choice of New York law to govern the Participant's Agreement and Rules, and (ii) the applicant's agreement to irrevocably waive all immunity from DTC's attachment of the applicant's own assets in the United States. These opinions facilitate analysis of any legal risk that may arise as a result of an applicant's participation in DTC. Please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(1) Principle 1 (Legal basis).

**b) Among foreign users, is there a distinction for users from certain jurisdictions? If so, what are those distinctions?**

> Please refer to response to Question 24 (a) above. Further, the DTC Rules include a "Policy Statement on the Admission of Participants and Pledgees ("Policy Statement"). Section 2 of the Policy Statement, "Policy Statement on the Admission of Non-U.S. Entities as Direct Depository Participants," describes, among other things, the criteria for admission and related requirements with respect to non-U.S. entities.

**25. Safeguards in jurisdictional legal frameworks.**

**a) How do you assess whether the resolution framework of the jurisdiction in which a firm resides provides adequate safeguards to the provider of critical FMI services?[17]**

> Please refer to response to questions 24 (a) and (b) above.

**b) From which regulatory regimes (e.g. countries) do you accept service users?**

> Please refer to response to questions 24 (a) and 25 (a) above.

**26. Are there any further aspects or issues to mention in relation to interaction between the FMI and a participant in financial stress? Do you have any examples of past experiences where the FMI has utilised its powers in relation to a member undergoing stress? What actions were undertaken and what were the outcomes? Could this example be indicative of actions that may be taken in a future case?**

> No.

---

[17] See FSB, Principles for Cross-border Effectiveness of Resolution Actions 2015 (November).

## Part IV: DURING AND AFTER RESOLUTION

**To avoid duplication, respondents may cross-reference other answers when appropriate.**

**27. When the FMI becomes aware of a participant entering a resolution process, which actions would the FMI be likely to take vis-à-vis the participant? Could actions be taken even though the participant/member meets its obligations?**

Please refer to the responses to questions 8(a) and 8(b).

Additionally, please note that: DTC Rule 12 (Insolvency) enumerates the circumstances under which a Participant will be treated as insolvent and DTC Rule 10 (Discretionary Termination) specifies what circumstances may lead to restriction on access to services.

In accordance with DTC Rule 32 (Wind-down of a Participant), when a Participant notifies DTC that it intends to wind-down its activities, the Corporation may, in its sole discretion, in order to protect itself and its Participants, determine that such Participant is a "Wind-down Participant." In that event and without limiting any other rights of DTC under the Rules, DTC may impose conditions on, or take actions with respect to, the Wind-Down Participant including but not limited to, the following:

- Permitting the Wind-Down Participant to submit to DTC only transactions that serve to support the wind-down;
- Permitting the Wind-Down Participant to continue use of one or more of DTC's services, notwithstanding that it may not meet some or all of the financial or operational requirements for continuance as a Participant;
- Restricting or modifying the Wind-Down Participant's use of any or all of DTC's services (whether generally, or with respect to certain transactions);
- Requiring the Wind-Down Participant to utilize the Honest Broker System where applicable;
- Requiring additional assurances of the financial responsibility or operational capability of the Wind-Down Participant through, for example, submission of a guaranty of the Wind-Down Participant's obligations to DTC by an entity acceptable to DTC and/or additional reporting by the Wind-Down Participant;or
- Requiring the Wind-Down Participant to post increased Participant Fund deposits in accordance with Section 1 of DTC Rule 4.

**28. Please explain the methodology used to calibrate additional membership requirements (including operational, financial and capital requirements) for a member/client in resolution. To what extent does the FMI take into account the resolution strategy and tools applied to a member to determine their financial and operational requirements? Does the FMI consider anything specific in its methodology in relation to ring-fenced or specifically safeguarded entities?**

Please refer to the responses to questions 16 and 18.

In addition to the "adequate assurances" described in response to question 16, DTC Rule 32 (Wind-down of a Participant) addresses the situation where a Participant intends to wind-down its activities and DTC determines, in its discretion, that DTC must take special action in order to protect itself

and its Participants. If DTC determines that such existing Participant is a "Wind-Down Participant" (as defined under Rule 32)[18], DTC may, as it deems necessary, place certain conditions on, or take actions with respect to, the Participant (see response to question 27).

**29. Please describe for each of the below risk mitigation actions, in as far as they form part of the FMI's set of risk mitigation actions upon a participant entering a resolution process (in addition to actions that would be taken prior to resolution): (i) whether these actions are discretionary or pre-determined, e.g., would the FMI follow a required set of actions, which may be described in its rule book; (ii) in which way, if at all, the FMI could deviate from the predetermined procedure so as to either disregard a mandated risk mitigation action or adopt a non-standard action; (iii) how/when the following risk mitigation actions would be communicated to the participant.**
**i. Temporary suspension of certain activities (and if so, which activities);**
**ii. Potential requirements to contribute additional margin or amounts to default or guarantee funds, secure additional liquidity commitments (including on an intra-day basis), or to pre-fund part or all of payment and settlement obligations;**
**iii. Potential changes to operational or information requirements, including those needed because certain services might not be available;**
**iv. Potential requirements that may apply in relation to a bridge institution or a third-party purchaser to which functions have been transferred.**

The following is DTC's summary response to Question 29 (i) – (iv):

As described more fully in response to questions 8(b),16 and 19, DTC has the ability under its Rules to determine which risk mitigation actions to take or not take based upon the facts and circumstances that apply in the given situation. The Rules are designed to provide DTC with sufficient flexibility to appropriately manage the risks presented to the clearing agency and its membership by the distressed Participant. For example, the Rules enable DTC, in its discretion, to require adequate assurances of an applicant or Participant's financial responsibility or operational capability as and when DTC deems appropriate (see DTC Rule 9A (Transactions in Securities and Money Payments), Sec. 2; and Rule 2 (Participants and Pledgees), Sec. 1 (as to information)). This includes, generally (and without limitation), the right to require a Participant to provide additional information and reporting, the right to require a Participant to provide access to books and records and may include restricting or modifying the Participant's use of certain services or activities. The Rules also allow DTC to require additional Participants Fund deposits and evidence of financial responsibility or operational capability.

As described in response to Question 11(g), DTC membership is not assignable; as such, a bridge bank or other transferee (if not already a Participant) would need to apply for membership with DTC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee, to the DTC's satisfaction. The DTCC Client Account Services team maintains standard membership and account transfer documentation. The relevant documentation varies depending on whether

---

[18] A Wind-Down Participant is not a "new" membership requiring a transfer, as generally the trustee appointed for an insolvent broker by SIPC, or the FDIC as receiver, steps into the shoes of the insolvent participant by operation of law or court order. Rather, when a Participant indicates that it intends to wind-down (whether on a self-directed basis or through its trustee, receiver or other administrator), the DTCC Clearing Agencies can use this designation as a tool to facilitate an orderly liquidation or completion of the participant's activity in the DTCC Clearing Agency.

the proposed transferee is currently a DTC Participant or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure).

Assuming a bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Participant, DTC may expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed Participant's DTC relationships to an existing Participant acquirer can be accomplished in a commercially reasonable expedited basis. The acquirer would need to provide the standard account transfer documentation for each applicable DTCC Clearing Agency.

**30. Please answer question 29 also for other risk mitigation actions, if any, that are not mentioned here and that would likely be taken.**

Not applicable.

**31. In what way should a service user prepare for resolution-related risk mitigation measures by the FMI to maximise the likelihood of maintaining access? Does the FMI provide any documented guidance on this to its participants/members, and/or to their RAs?**

Participants are expected to review and be familiar with DTC's Rules which are publicly available as they form the contractual basis for their membership both in business-as-usual circumstances and during times of stress. Changes to these rules typically involve a public consultation or approval process, with stakeholders having an opportunity to comment and provide feedback. DTC recognizes that working with firms as part of their resolution planning process, whether as part of industry working groups or on a bilateral one-to-one basis, helps to foster an awareness and understanding of rules- based actions that DTC may take in response to a Participant's entering resolution, together with the range of risk management mitigants and how they might be applied to address different scenarios. Over the past several years, DTC and the other DTCC Clearing Agencies have had discussions with their Participants, both bilaterally and as part of industry and working group projects, to foster transparency and understanding on how to facilitate continued access to their services in distress situations.

**32. What impact would a member/participant's resolution have on any parent or subsidiary's direct membership at the FMI?**

As described in response to questions 11(e) and (f), membership of a parent or subsidiary of the defaulted Participant may not necessarily be affected and will depend on the facts and circumstances. DTC management and the Board Risk Committee ("BRC") will need to review the actions taken by the Participant's holding company and elsewhere within the organization and evaluate the impact of such actions on the Participant's parent and subsidiaries and their respective ability going forward to meet obligations to the DTC and the other DTCC Clearing Agencies. The timely provision of the information and materials requested by DTC will be necessary to facilitate management and the BRC's ability to make such determinations.

**33. In a situation of idiosyncratic or market stress in which one of the FMI's (direct) participants/members, or an affiliate company, enters resolution, communications and notifications may be necessary. Please distinguish in the below in case there are differences between a situation of idiosyncratic vs. market stress.**

**a) What notifications or communications would the FMI undertake to the participant/member, their competent and/or resolution authority, the FMI's competent and/or resolution authority, the firm's settlement agent, and other stakeholders, and when? Would any of these be based on an obligation for the FMI to notify?**

**b) Do you have a specific communications plan for this or does your approach leverage existing crisis communication mechanisms?**

**c) Does the FMI need to get consent from the firm or inform the firm prior to a notification or communication?**

**d) Do the communication/notification protocols require specific factors to be considered, for example legal implication, market impact, etc.?**

**e) Are your communication protocols standardised across participants or do they take into account the specificities of firms' participation and roles in respect of the FMI?**

**f) Would your members/clients be able to leverage any preparations your organisation has undertaken to access the necessary communication infrastructure to deliver the increased extent of communications that may be needed to respond to a resolution and any restructuring of a member/client (such as increased call volumes to call centres)?**

**g) What management and monitoring arrangements would apply for these crisis communications and notifications? Would you have a dedicated team or a point of contact for receiving and initiating all communications that relate to a member/client entity in resolution or any related restructuring?**

> The following is DTC's summary response to Question 33, items (a)-(g). Please also refer to response to question 21.
>
> In a situation of idiosyncratic or market stress, DTC would expect frequent, and timely, intra-day communications with the Participant and relevant authorities as events unfold. There is no difference in the response between a situation of idiosyncratic vs. market stress.
>
> As soon as practicable after DTC determines that a Participant is a "Wind-Down Participant", DTC will notify the firm of its determination, and also notify DTC's participants and the Securities and Exchange Commission ("SEC") of that determination (See DTC Rule 32).
>
> When DTC determines to cease to act for, or limit services to, a defaulting Participant, DTC will notify the defaulting Participant promptly after the decision is made. DTC will also promptly notify its own regulators. DTC will issue an Important Notice to all Participants and Pledgees informing them that it has ceased to act for the identified Participant (or affiliated family of Participants) and indicate how pending matters may be resolved. Finally, for a defaulting Participant that is also a member of other clearing agencies with which DTC has cross-guarantee or other arrangements, DTC will also notify those clearing agencies, as required by those arrangements. (See DTC Rule 10 and DTC Disclosure Framework CCAS 17Ad-22(e)(13) (Participant- default rules and procedures).

**34. Alleviating uncertainty for the FMI. (As requested in Part II, if the responses to sub-questions a.-f. below have been documented in rulebook/contractual provisions or other documents, please reference.)**

**a) What actions (such as communication) could the participant or authorities take in order to alleviate uncertainty for the FMI about the participant's situation, and thereby reduce the risk that the FMI may take risk mitigation actions that may have a further adverse financial impact on the participant?**

**b) Assuming that the authorities and the affected member/client may not be able to share relevant information before the commencement of the resolution process, would that represent a material issue that could determine how your organisation responds to the fact that a member/client has been placed in resolution?**

**c) Which data / quantitative information would the FMI need to receive from the participant and/or RA in order to allow the participant to maintain access (please consider the three levels of access mentioned in footnote 3)? Please specify by when you would need each piece of information, if appropriate, including when you would need to be informed prior to resolution measures.**

**d) Which qualitative information would the FMI need to receive from the participant and/or RA in order to allow the participant to maintain access to the FMI? Please specify by when you would need each piece of information, if appropriate, including when you would need to be informed prior to resolution measures.**

**e) What other actions could be taken ex-ante to avoid a temporary interruption of services or the risk of some transactions remaining unexecuted?**

**f) Please discuss any other considerations.**

The following is DTC's summary response to Question 34, items (a)-(f).

Please also refer to response to question 22.

In order to assess a distressed Participant's ability to meet its current and future obligations—in all resolution scenarios—as well as facilitate continuity of access, it will be key for DTC to have timely and detailed information to understand how the Participant plans to move forward in reference to its short-term and long-term goals and objectives and the attendant risks, given either its, or its parent holding company's or affiliate's failure. From the inception and during the pendency of any resolution, regular, substantive interaction between the Participant (and the relevant resolution authority) and DTC will be critical to the Participant's ability to maintain access to the services of any of the DTCC Clearing Agencies.

Specifically, in order to evaluate the impact or potential impact of a resolution event on a DTC Participant—even in cases where there is a recapitalization of the Participant pursuant to a Single Point of Entry ("SPOE") resolution strategy— DTC would expect to be provided, at a minimum, with the following information:

- Information on what events caused the distress at the Participant (and in which Participant entity or entities), and on the actions taken to remediate the situation;
- If there has been (or will be) a change of control (including by virtue of any bail-in and details of key personnel, including given the event, whether the key personnel that DTC would be dealing with are the same change of the Participant's holding company management or board), information on the nature of the ownership change and the identities of the controlling shareholders and management;
- Financials/pro forma financials showing the current capital or recapitalized funds of the DTC entity (or entities) that participate in the DTCC Clearing Agencies;
  - would need to understand, for example in an SPOE scenario, how the bail-in or other actions result in the participant meeting the requisite capital requirements to maintain its business and

membership.

- Risk reports that would show positions, market values, risk metrics, limits, margin requirements, and stress test results across exposure presented to (a) DTC, (b) the firm's top 25 counterparties, and (c) in total. Reports should be aggregated and summarized in a fashion that is consistent with how the entity plans to manage the exposures;
- Information as to the supervisory arrangements in place and the applicable resolution regime;
  - o  or differ, from those dealt with during the "runway" period up to resolution; and
  - o  whether the key operations staff will be maintained. DTC would need evidence of the Participant's ongoing operational capability and communications architecture.
- Projected settlement activity;
- Liquidity plans to meet the settlement and margin requirements of the DTCC Clearing Agencies, as well as other collateral and funding obligations to other third parties; and
- Settling and (as appropriate) clearing bank arrangements, including:
  - o  information as to the settlement arrangements then in place, and whether or not these have changed as a result of the resolution event. DTC will need evidence of how ongoing settlement (and other financial obligations) will be effected.
  - o  Information on other interconnected activities, such as intercompany arrangements, or if the entity or an affiliate acts as a settling bank or clears transactions for other non-affiliated Participants, how those relationships or activities will be affected or handled going forward.

DTCC will seek to understand if the entity (or entities) that is the DTC Participant, plans to continue the same activities, products and related volumes. Additionally, in order to determine that the Participant is financially capable of meeting its current and future Participants Fund and payment/ settlement obligations based on the expected activities, DTCC will need to understand the Participant's financial structure, including a thorough understanding of its funding and capital positions, sources and projected use of funds, access to intraday and end-of-day cash flows, available liquidity resources and intercompany obligations/guarantees or support arrangements.

**35. Considering adverse financial impact of FMI risk mitigation actions on direct/indirect participants.**
　　**a) Some actions, designed to protect the FMI, may worsen the position of the participant at the time of resolution and as a result may also affect other participants. How does the FMI consider this when deciding to protect itself?**
　　**b) Does the FMI take into account the impact on indirect participants of actions taken in response to a direct participant/member entering into resolution?**

**36. FMI rules and contractual arrangements should allow a bridge institution to maintain its predecessor's participation (membership) during a resolution process (FSB 2017 Guidance, 1.1). (As requested in Part II, if the responses to the sub-questions below have been documented in rulebook/contractual provisions or other documents, please reference.)**
　　**a) Please explain how the FMI rules, contractual arrangements and/or procedures reflect this.**
　　**b) What would be the FMI's process to ensure that continuity of access can be maintained for the purchaser of a resolved entity or for a bridge institution?**
　　**c) Please share any timelines and any external dependencies for this process.**

**d) If the purchaser or bridge institution requires a new access, do you have a "fast-track" procedure to allow access for such a purchaser or bridge institution? How long is setting up access expected to take (with or without a "fast-track" procedure)? What would the FMI require in order to continue providing the service pending completion of the onboarding procedure (e.g. connectivity and BIC/SWIFT codes to remain unchanged)?**

**e) What type of information is needed in the context of a change-of-control assessment, i.e. to accept a purchaser or bridge institution as a participant/member? Please specify by when you would need each piece of information, if appropriate. How long would you then need to take an informed decision on access for the purchaser or bridge institution?**

**f) Does the FMI explicitly consider, in its rulebooks or internal procedures, the possibility of a RA requiring access for the purchaser or bridge institution even in case they do not meet the membership or participation criteria (for instance where a credit rating is required)?**

**g) Please discuss any other, e.g. practical, considerations around continuity of FMI access of a bridge institution or of a purchaser.**

The following is DTC's summary response to Question 36, items (a)-(g). Please also refer to response to question 11(g).

DTC membership is not assignable and as such, a bridge bank or other transferee (if not already a Participant) would need to apply for membership with DTC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee (DTC Rule 2, Participants and Pledgees, DTC Rule 3, Participants Qualifications). The DTC Client Account Services team maintains standard membership and account transfer documentation. The relevant membership documentation varies depending on whether the proposed transferee is currently a DTCC Clearing Agency participant or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure). The DTC Rules allow DTC to approve the application of any applicant, either unconditionally or on an appropriate temporary or other conditional basis, if DTC determines that any standard "as applied to such applicant or its Controlling Management, is unduly or disproportionately severe or that the conduct of such applicant or its Controlling Management has been such as not to make it against the interests of DTC, other Participants or Pledgees or the public to approve such application" (DTC Rule 2 (Participants and Pledgees, Sec. 1)). In such a situation, the applicant may be approved unconditionally, or on a temporary or other conditional basis, and DTC may obtain additional assurances of financial responsibility and operational capability as provided in its rules. These provisions enable DTC, to approve a bridge bank or other transitional entity for membership on a conditional or temporary basis.

Assuming a bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Participant, DTC may expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed Participant's DTC relationships to an existing Participant acquirer can be accomplished in a commercially reasonable expedited basis.  The acquirer would need to provide the standard account transfer documentation for DTC and each other applicable DTCC Clearing Agency.

The use of DTC's adequate assurance authority (See response to question 16 and DTC Rules 9A (Transactions in Securities and Money Payments,

Sec. 2)); and Rule 2 (Participants and Pledgees, Sec. 1 (as to information)) enables it to support the continuation of a Participant's membership pending or following its recapitalization and to facilitate a fast-track bridge bank membership or transfer to a third party. In the context of a Participant's wind-down or sale, whether through a trustee, administrator or self-directed by the Participant, the use of the Wind-Down rule (See DTC Rule 32) and the tools afforded thereunder may facilitate an orderly wind-down as long as the Participant, trustee or administrator has the capacity, resources and third-party arrangements necessary to meet the Participant's settlement and other obligations to DTC during the pendency of the wind-down.

**37. FMIs should consider the operational, technological, financial and legal implications arising from the transfer of functions or positions to a successor (either a bridge institution or a thirdparty purchaser). (FSB 2017 Guidance, 1.4)**

**a) What preparations are necessary in your circumstances for such a transfer to be successful? What changes would be necessary for such a transfer to be successful? Please consider any preparations and changes by the FMI as well as by FMI members/service providers/others.**

**38. Portability/Transferability of underlying client positions, for example to facilitate a bridge or partial transfer resolution strategy.**

**a) For CCPs: Which kind of segregated accounts are offered to (underlying) clients to facilitate the portability/transferability of client positions and securities collateral? Do you envisage that there may be material barriers to the effective and timely transfer of client positions following a decision to transfer the activities of the member in resolution to another member? If so, please explain.**

Not applicable

**b) For CSDs: Do you offer segregated accounts to (underlying) clients? Do you envisage that there may be material barriers to the effective and timely transfer of client securities and cash to another custodian following a decision to transfer the activities of the participant in resolution to another participant? If so, please explain.**

As described in DTC Disclosure Framework, CCAS 17Ad-22(e)(11) (Central securities depositories), DTC Rules afford Participants the option of book-entry segregation of securities for any purpose the Participant may require, including to segregate fully paid-for customer securities. Segregated securities at DTC are not subject to any security interest, lien, or other claim of DTC. However, DTC will continue to treat the Participant to whose account the securities are credited as the owner of those securities; it is up to the Participant to maintain appropriate records on its own books to identify customer securities separately.

DTC does not record interests in securities at the ultimate beneficial owner level and does not maintain separate "customer accounts" for its Participants. Participants also have the ability to transfer their customer accounts and holdings to other Participants via NSCC's Automated Customer Account Transfer Service, an NSCC service that results in the transfer of securities (free of payment) on the books of DTC. Please also refer to response to question 41(b).

**39. Are there any further aspects or issues to mention in relation to interaction between the FMI and the participant during or after resolution of the participant?**

In order to assess a distressed Participant's ability to meet its current and future obligations—in all resolution scenarios—as well as facilitate continuity of access, it will be key for DTC to have timely and detailed information to understand how the Participant plans to move forward in reference to its short-term and long-term goals and objectives and the attendant risks, given either its, or its parent holding company's or affiliate's failure. From the inception and during the pendency of *any* resolution, regular, substantive interaction between the Participant (and the resolution authority) and DTC will be critical to the Participant's ability to maintain access to the services of any of the DTCC Clearing Agencies, including DTC.

Further, in any resolution event, it will be crucial for Participants to have a plan for communications with the Financial Market Infrastructures (FMI's) in which they participate. DTC would expect the applicable Participant(s) (and their resolution authorities, as applicable) to make available to DTCC Enterprise Risk Management staff, the general counsel's office and senior management, personnel with the appropriate level of knowledge and seniority to be able to respond to questions and provide prompt and accurate information, and the authority to bind the Participant and execute on agreed action plans. In the case of a bridge bank or an administrative wind-down, this would include the relevant contacts at the FDIC, SIPC or other applicable resolution authority. DTC would expect frequent, and timely, intra-day communications with the relevant authorities as events unfold.

Please also refer to responses to questions 21 and 33.

## Part V: ARRANGEMENTS AND OPERATIONAL PROCESSES TO FACILITATE CONTINUED ACCESS IN RESOLUTION

**40. The FMI should consider establishing management, monitoring and operational rules and procedures that facilitate the ability of FMI management to make prompt decisions in response to a service user's resolution (including a period when the FMI is closed for business). (FSB 2017 Guidance, 1.4)**

**a) What procedures are in place at the FMI to facilitate prompt decision making at any time? What, if any, are the limitations?**

> When a Participant default occurs, DTC must determine whether to cease to act for, or, in some cases, limit services to, the defaulting Participant under Rule 10 (Discretionary Termination), Rule 11 (Mandatory Termination) and Rule 12 (Insolvency). These determinations are, under appropriate internal governance, generally delegated by the Board to the BRC. In making this determination, the BRC or the Board will consider the particular facts and circumstances involved, and the condition of the defaulting Participant. To ensure that action may be taken timely, the BRC Charter also provides for delegated authority to the Chair of the BRC, if it is impractical to convene the BRC. Action taken would then be ratified by the BRC at a subsequent meeting.[19]

> Please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(13) Principle 13 (Participant-default rules and procedures) and responses to questions 11 and 40(a).

**b) What would be the likely range of decisions undertaken after receiving notice of a service user entering into resolution? What market communications or notifications to the regulator would be undertaken?**

> Please refer to responses to questions 21 and 33.

**41. In line with the Key Attributes,[20] 18 FMIs should regularly test the effectiveness of their relevant rules, contractual arrangements and procedures in responding to a resolution scenario of a participant.**

**a) How do you test these contingency arrangements? How do you take participants in resolution into account in those contingency arrangements?**

**b) How do your rules facilitate the transfer of positions of a client of a service user in resolution to another service user of the FMI, as applicable?**

> In response to (a) and (b), please refer to DTC Disclosure Framework, CCAS 17Ad-22(e)(13) Principle 13 (Participant-default rules and procedures, under the heading "Testing and Engagement with Participants and Other Stakeholders".

> Further, in response to (a), pursuant to DTC Rule 2 (Participants and Pledgees), DTC has established standards for designating those Participants who shall be required to participate in annual business

---

[19] In addition, DTC Rule 28 (Delegation) also permits action to be taken by senior corporate officers, if so designated.
[20] See FSB, Key Attributes of Effective Resolution Regimes for Financial Institutions, 2014 (October), Appendix II-Annex I, part II, section 2.2, p. 73.

continuity and disaster recovery testing that DTC reasonably determines are, taken as a whole, the minimum necessary for the maintenance of fair and orderly markets in the event that business continuity and disaster recovery plans are required to be activated. The standards shall take into account factors such as: (1) activity-based thresholds; (2) significant operational issues of the Participant during the twelve months prior to the designation; and (3) past performance of the Participant with respect to operational testing. The specific standards adopted by the Corporation and any updates or modifications thereto shall be published to Participants and applied on a prospective basis. Upon notification that the Participant has been designated to participate in the annual business continuity and disaster recovery testing, as described above, Participants shall be required to fulfill, within the timeframes established by DTC, certain testing requirements (the scope of such testing to be determined by DTC in its sole discretion) and related reporting requirements (such as reporting the test results to DTC in a manner specified by DTC) that may be imposed by DTC.

Further in response to (b), for purposes of facilitating an expedited transfer operationally, it is assumed that a Participant-acquirer would take over the existing account relationships of the failed Participant, effectively operating them for some period of time as "additional accounts" of the acquiring Participant. That would allow the activity to be phased out and transitioned to the acquirer's main account over time in a manner determined by the acquirer as best suited to its business needs and provide less disruption to the membership.

**42. How do you test members' readiness of arrangements for meeting increased information and communication requests (beyond those required in business as usual (BAU)) that will be needed prior to and during resolution? Which disclosures do you require from members in this regard?**

**43. Are there any further aspects or issues to mention in relation to arrangements and operational processes to facilitate continued access in resolution?**

No. There are no further aspects or issues to mention at this time.