**Exhibit 33**

**NSCC Responses to FSB Continuity of Access Questionnaire – March 2023**

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE





# THE NATIONAL SECURITIES CLEARING CORPORATION: RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

**March 2023**

*Information provided by NSCC in the responses to this questionnaire is accurate as of March 1, 2023. For further information, please contact* RecoveryandResolutionPlanning@dtcc.com.

ADVANCING FINANCIAL MARKETS. TOGETHER.™

# Table of Contents

PART I: LEGAL ENTITY AND GENERAL CONTRACT/SERVICE INFORMATION ................................... 5

PART II: RULEBOOK / CONTRACTUAL PROVISIONS REGARDING TERMINATION ............................ 8

PART III: PRIOR TO RESOLUTION, DURING SIGNS OF DISTRESS AT THE PARTICIPANT ............. 18

Part IV: DURING AND AFTER RESOLUTION ........................................................................................ 25

Part V: ARRANGEMENTS AND OPERATIONAL PROCESSES TO FACILITATE CONTINUED ACCESS IN RESOLUTION .................................................................................................................. 34

## INTRODUCTION AND DISCLAIMER

The following document contains the responses of The National Securities Clearing Corporation ("NSCC") to The Financial Stability Board ("FSB") Survey on Continuity of Access to FMI's for Firms in Resolution.[1]

Please note that the information in NSCC's responses is for general informational and indicative purposes only. Each situation regarding a distressed firm is unique and the actions that any of the DTCC Clearing Agencies (NSCC, The Depository Trust Company ("DTC"), and Fixed Income Clearing Corporation ("FICC")) may take in an actual financial institution-resolution event will depend on the specific facts and circumstances, and will be governed by the facts, risks, laws, rules and regulations in effect at that time and that apply in the given situation.[2] This document contains statements about future hypothetical resolution scenarios for a DTCC Clearing Agency participant based on NSCC's current expectations and assumptions regarding the future. Some or all of these assumptions may prove to be incorrect in an actual financial institution-resolution situation. Accordingly, the scenarios and assumptions discussed in this document reflect events and circumstances that may not arise, and the impact of these events and the actions taken by a DTCC Clearing Agency may differ depending on the actual circumstances. These statements, like any statements regarding hypothetical future scenarios, are subject to inherent uncertainties and speak only as of the date made, and NSCC does not undertake to update them to reflect changes or events that occur after that date. Furthermore, the hypothetical scenarios and assumptions may not reflect events to which a DTCC Clearing Agency participant is or may become subject to. The range of available actions described in this document and the discussion of actions that could be taken in certain future scenarios are hypothetical only and not binding on any parties in any forum, including but not limited to the DTCC Clearing Agencies, a bankruptcy or other court, or any regulatory, resolution, or other governmental authority. Furthermore, the information in this document may not be relied on by any party for any purpose, as the actions taken in an actual financial institution-resolution event could differ materially from expectations.

Please note there are certain questions as to which a response is not included in this document where additional context is necessary.  Please contact RecoveryandResolutionPlanning@dtcc.com if your firm is interested in scheduling a bilateral discussion with NSCC to discuss those questions.

### *Description of NSCC*

NSCC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"), which provides central counterparty ("CCP") services to its customers with respect to securities transactions in equities, corporate and municipal debt, exchange-traded funds and unit investment trusts in the United States. NSCC provides clearanceand settlement, trade guaranty and netting arrangements pursuant to the NSCC Rules & Procedures (the "NSCC Rules" or "Rules") available at the DTCC website, www.dtcc.com. Capitalized terms used in the responses that are not otherwise defined herein have the meanings specified in the NSCC Rules. We have also included references to NSCC's Disclosure Framework, (herein after, "Covered Clearing AgencyStandards" or "CCAS," and when referring to a specific rule, "CCAS 17Ad-22(e)")."[3]

Unless the context otherwise requires, references herein to the term "Member" or "participant" denotes a member of NSCC that has access to NSCC's CCP services. As noted above,

---

[1] https://www.fsb.org/2021/08/continuity-of-access-to-fmis-for-firms-in-resolution-streamlined-information-collection-to-support-resolution-planning-revised-version-2021/

[2] NSCC reserves any and all rights under its rules and procedures. These are publicly available at www.dtcc.com.

[3] See Standards for Covered Clearing Agencies, Exchange Act Release No. 78961 (September 28, 2016), 81 FR 70786 (October 13, 2016).

please refer to the meanings of defined terms as specified in the applicable Rules and CCAS Disclosures, including those applicable to NSCC's membership types.

DTCC Public (White)

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

## PART I: LEGAL ENTITY AND GENERAL CONTRACT/SERVICE INFORMATION

**0. Please provide:**

**a) the date of the most recent version of the answers to this questionnaire,**

Responses are as of March 1, 2023.

**b) an overview of the changes made since the previous version.**

- Removal of questions that are no longer included in the template version of the FSB questionnaire
- Technical edits and clarifications
- Updates to include NSCC's Securities Financing Transaction ("SFT") Clearing Service

**1. Please provide the following details:**

**a) Full Legal Name**

National Securities Clearing Corporation (NSCC)

**b) Legal Entity Identification Number (LEI)**

549300RYC9NELN2ICA34[4]

**c) Jurisdiction of incorporation and registered number in the relevant corporate registry**

State of New York, United States of America

**d) Supervisory, resolution or other relevant regulatory authority responsible for overseeing the activities of your organisation in (i) the relevant jurisdiction(s) of incorporation, and (ii) if different from the jurisdiction of incorporation, the relevant jurisdiction(s) of operation. Where an FMI is overseen by more than one regulatory authority, please also indicate which is the principal/home regulator of the FMI and the relevant function(s) regulated by the respective authorities.**

NSCC is a clearing agency registered with, and under the supervision of, the Securities and Exchange Commission ("SEC"). In July 2012, NSCC was designated as a systemically important financial market utility ("SIFMU") under Title VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010("Dodd-Frank"); and it is a "covered clearing agency" under the SEC's Standards for Covered Clearing Agencies.

**e) The ownership arrangement of the legal entity (e.g. is it majority owned by its users?)**

NSCC is a wholly owned subsidiary of DTCC. DTCC's common stock is owned by the financial institutions that are participants of its registered clearing agency/SIFMU subsidiaries.

---

[4] Global Legal Entity Identifier Foundation, LEI Reference Data,
https://www.gleif.org/lei/549300RYC9NELN2ICA34

2. **Please provide the following information:**

   a) **Hyperlink to the published FMI disclosure template under the Disclosure Framework for Financial Market Infrastructures.**[5]

   https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf

   b) **A list or description of services provided, including a summary of the key ongoing access requirements that you require of members for each service (including operational, financial, and capital requirements).**

   NSCC is a clearing agency and a central counterparty, providing clearing and settlement services and a guarantee of completion for securities transactions in equities, corporate and municipal debt, exchange-traded products ("ETPs") and unit investment trusts executed on major exchanges and other trading venues in the U.S. For a more detailed description of the core services and functions performed by NSCC, please refer to NSCC's Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures, Section III B, Key Services: System Design and Operation.[6]

   NSCC has established participation criteria and requirements relating to financial resources, creditworthiness, and operational capability. These requirements are designed to limit the risks a participant may present to NSCC or to its membership, while facilitating fair and open access by market participants; they are objective, risk-based, and are set forth in NSCC Rule 2A (Initial Membership Requirements), Rule 2B (Ongoing Membership Requirements and Monitoring), Rule 2C (Sponsoring Members and Sponsored Members), and Rule 2D (Agent Clearing Members). See also, NSCC Disclosure Framework, CCAS 17Ad-22(e)(18) (Access and participation requirements).

   NSCC has several categories of membership with different access levels to services. Addendum B to NSCC's Rules provides that an applicant for each level of membership must either be a specified type of legal (regulated) entity, or must otherwise demonstrate to the board that its business and capabilities are such that it could reasonably expect material benefit from direct access to NSCC's services. Please see Appendix B to the NSCC Rules for the list of qualifications necessary for each membership category.

3. **Do your members/clients access your services directly or through an intermediary?**

   NSCC's Members can access NSCC's services directly and through third party service providers and service bureaus.

4. **Do your members/clients need a specific software or IT programme to receive your services? If the answer is 'yes', is such software/ IT programme your proprietary product or a specific third-party product (please also consider whether specific**

---

[5] See BIS-IOSCO, Principles for financial market infrastructures: Disclosure framework and Assessment methodology, 2012 (December).

[6] https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/NSCC_Disclosure_Framework.pdf

**plug-ins that you require clients to run only run in combination with certain software, e.g. Microsoft products)?**

> Members are provided with a choice of networks, protocols, data delivery, and security options as set forth in the DTCC Client Network Connectivity Guide ("Guide") which is available to Members on the DTCC Learning Center website.[7] The Guide outlines the specific requirements based onthe Member's network and protocol preferences.

5. **If your contracts are all governed by one governing law, please specify which governing law this is. If there are different governing laws, please specify the main governing laws applicable and explain whether this is dependent on the location of the services provided or as negotiated with the members/clients, or any other reason.**

> The Rules are governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed and performed therein.  (NSCC Rule 38: Governing Law and Captions, Section 1 – Governing Law).

6. **Are there any other service providers or FMIs (for example, CSDs, payment systems or other infrastructure) that a member/client would need to have access to in order to receive your services? Please provide the names of those types of service providers and their regulatory status, where applicable.**

> Among the conditions for membership is the requirement that a Member also be a Participant of DTC, so as to enable transactions cleared through NSCC to be settled by book entry through NSCC's interface with DTC (NSCC Rule 29 Qualified Securities Depositories). Members are obligated to designate a Settling Bank to effect daily money settlement on their behalf. They may designate a Settling Bank of their own choosing, provided the bank meets certain financial criteria, is a Federal Reserve member, and agrees to settle through use of the Federal Reserve System's National Settlement Service ("NSS"). Settling Bank Only Members of NSCC are required to be members of the Federal Reserve System or have direct access to the Federal Reserve System (NSCC Rule 7: Settling Bank Only Members) Please also refer to NSCC Disclosure Framework section III (General Background of NSCC and Key Metrics).

7. **Does your operating framework recognise the continued operations of FMI participants once they enter into resolution (e.g. as under the Bank of England's Resolvability Assessment Framework, or the Single Resolution Board's Expectations for Banks)?**

> The NSCC Rules specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise, depending upon the facts and situation, the Board of Directors may suspend the Member from any service provided to the Member either with respect to a particular transaction or transactions, or with respect to transactions generally, or they may prohibit or limit the Member's access to services offered by NSCC (NSCC Rule 46: Restrictions on Access to Services).

---

[7] https://dtcclearning.com/

However, the NSCC Rules regarding termination of access are not automatic. Rather, the decision of whether or not to "cease to act" for a Member, either generally, or with respect to one or more services, involves an active determination and appropriate governance. This is true even in cases of insolvency, where the Board may determine *not* to cease to act for an insolvent Member (See NSCC Rule 20 (Insolvency)). Key among the issues that management and the Board Risk Committee will consider in any such situation, is whether, and how, the Member entity in resolution could continue to timely perform its obligations as a Member in a manner that does not increase risk to NSCC and other DTCC Clearing Agencies or their respective memberships and, if applicable, how the Member's clearing agency activities could be wound down in a timely and orderly fashion. In those situations, the Rules provide for NSCC to take precautions, as it may deem necessary, or impose reasonable conditions to mitigate risk to the DTCC Clearing Agencies and their respective members by such continuation of membership or transfer.

## PART II: RULEBOOK / CONTRACTUAL PROVISIONS REGARDING TERMINATION[8]

**8. Discretionary termination rights.**
**a) Rule Book / Participation agreement provisions: which provisions give rise to a right to terminate a service user's access? Are the FMI's termination provisions disclosed publicly? If so, please provide any link(s) to that information.**

The NSCC Rules, which are publicly available on DTCC's website, specify what circumstances may lead to restriction on access to services.

See the following Rules using the link below:

- NSCC Rule 2C (Sponsoring Members and Sponsored Members)
- NSCC Rule 2D (Agent Clearing Members)
- NSCC Rule 20 (Insolvency)
- NSCC Rule 40 (Wind-Down of a Member, Fund Member or Insurance Carrier/Retirement Services Member)
- NSCC Rule 46 (Restrictions on Access to Services)

https://www.dtcc.com/~/media/Files/Downloads/legal/rules/nscc_rules.pdf

Further, NSCC has a number of disciplinary tools at its disposal under its Rules. These include monetary fines, reporting certain incidents to regulators of affected Members ,and, the potential to limit access to one or more services or limit activities, up to and including termination of membership should a Member fail to meet its requirements to NSCC. (See NSCC Disclosure Framework, CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks).

**b) Are these provisions based solely on objective criteria, or can the FMI exercise judgement when triggering termination?**

The NSCC Rules specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise,

---

[8] If your FMI also has the option to suspend rather than terminate membership, please specify for each answer whether and how it would differ for suspension. Please also note Question 4, which asks about the details of suspension in your FMI's provisions

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 10 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

depending upon the facts and situation, the Board of Directors may suspend the participant from any service provided to the participant either with respect to a particular transaction or transactions, or with respect to transactions generally, or they may prohibit or limit the participant's access to services offered by NSCC. (NSCC Rule 46: Restrictions on Access to Services). However, the NSCC rules regarding termination of access are not automatic. This is true even in cases of insolvency, where the Board may determine not to cease to act for an insolvent Member (See NSCC Rule 20: Insolvency). Rather, consistent with the Key Attributes,[9] the decision of whether or not to "cease to act" for a Member, either generally, or with respect to one or more services, involves an active determination and appropriate governance.

### c) Does the FMI use 'forward looking' indicators that may trigger termination, and if so, which ones?

NSCC monitors and manages credit and market risk, as more fully described in NSCC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk) and CCAS 17Ad-22(e)(6) (Margin), respectively, through strict membership admission criteria and review (as outlined in NSCC Rules 2 and 2A, 2B, and 2C and Addendum B), ongoing monitoring and review of Members (as outlined in NSCC Rule 2B), daily (and, as needed, intra-day) collection of Clearing Fund (NSCC Rule 4 and Procedure XV), and other tools that help ensure that Members are capable of meeting their membership obligations (NSCC Rule 15). Management's efforts are supported by certain models and other tools, including those that (i) capture and evaluate Member financial metrics and other qualitative information (the Credit Risk Rating Matrix),[10] (ii) calculate Member Clearing Fund requirements, (iii) monitor Members' compliance with Clearing Fund requirements, and (iv) evaluate the potential closeout exposure of a given Member portfolio in the event of a default.

### d) Do the FMI's provisions envisage that (i) financial stress on the participant's side (as defined in its provisions – please provide the definition of such stress) and/or (ii) a resolution event (recognised in the relevant jurisdiction) qualifies as a material change that may trigger termination?

Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures) that discusses, among other things, what constitutes a participant default and the consequences of default. Under Rule 46 (Restrictions on Access to Services), the Board of Directors may suspend a participant or prohibit or limit a participant's access to NSCC's services in enumerated circumstances. These circumstances include a participant's expulsion or suspension from a regulatory or self-regulatory organization, default in delivering funds or securities to NSCC, and a participant experiencing such financial or operational difficulties that NSCC determines, in its discretion, that restriction on access to its services is necessary for its protection and for the protection of its membership.

---

[9] Financial Stability Board, Key Attributes of Effective Resolution Regimes for Financial Institutions (Oct.15, 2014).
[10] NSCC utilizes a credit risk rating model (referred to as the credit risk rating matrix or "CRRM", to evaluate and rate the credit risk of NSCC's U.S. bank, foreign bank, and U.S. broker-dealer participants, and rate such participants based upon qualitative and quantitative information.

For additional information on a Sponsoring Member Default and a Sponsored Member Default, please visit refer to the FAQ document which may be found at https://www.dtcc.com/-/media/Files/Downloads/Clearing-Services/Copy-of-SFT-Clearing-Service-Fact-Sheet.pdf

See Rules referred to below:

- NSCC Rule 2C (Sponsoring Members and Sponsored Members) describes, among other things, what happens when (i) NSCC ceases to act for a Sponsoring Member in its capacity as a Sponsoring Member and (ii) NSCC ceases to act for a Sponsored Member.  See in particular Rule 2C, Section 10 (Restrictions on Access to Services by a Sponsoring Member), Section 11 (Restrictions on Access to Services by a Sponsored Member), Section 12 (Insolvency of a Sponsoring Member), Section 13 (Insolvency of a Sponsoring Member), and Section 14 (Liquidation of Sponsored Member and Related Sponsoring Member Positions).

- NSCC Rule 2D (Agent Clearing Members) describes, among other things, what happens when NSCC ceases to act for an Agent Clearing Member. See in particular Rule 2D, Section 9 (Restrictions on Access to Services by an Agent Clearing Member) and Section 10 (Insolvency of an Agent Clearing Member).

- NSCC Rule 18 (Procedures for When the Corporation Declines or Ceases to Act) describes the procedures, including actions NSCC may take, when it ceases to act for a Member; this includes provisions for the treatment of core services where Members may have transactions pending with a defaulting Member. The Rule identifies which actions are automatic and which are discretionary, and details how the unsettled transactions of the defaulting Member are to be processed.

- NSCC Rule 20 (Insolvency) A Member who fails to perform its contracts or obligations or determines that it is unable to do or is insolvent shall immediately notify NSCC pursuant to Section 4 of Rule 45 (Notices). Section 2 (a)-(c) sets forth in the event of which circumstances a Member shall be treated by NSCC in all respects as insolvent.

- NSCC Rule 40 (Wind-down of a Member, Fund Member, or Insurance Carrier/Retirement Services Member) When a Member notifies NSCC that it intends to wind down its activities, NSCC may, in its sole discretion, in order to protect itself and its Members, determine that such Member is a "wind-down Member." In that event and, without limiting any other rights of NSCC under the Rules, NSCC may impose conditions on, or take actions with respect to, the Wind-down Member as provided under this Rule.

**e) During stress or resolution of the member, are actions by other FMIs taken into account as possible indicators or triggers for termination?**

The NSCC Rules specify what circumstances may lead to the suspension of a Member or prohibition or limitation of such Member's access to services. These circumstances include that the Member has been expelled or suspended from any regulatory or self-regulatory organization, the Member is in default of any delivery of funds or securities to NSCC, or the Member is in such financial or operating difficulty, that NSCC determined, in its discretion, that such action is necessary for protection of NSCC, the

"participants" (as defined under NSCC Rule 46), creditors, or investors. (See NSCC Rule 46: Restrictions on Access to Services).

**f) Are there any other relevant provisions regarding termination? If so, please explain why they are necessary for the FMI to enable rights for termination.**

Please refer to response to 8(d) which outlines the relevant provisions regarding termination.

## 9. Suspension or restriction of membership.

**a) Does your framework allow for suspension or restriction of a participant's membership rather than termination? If yes, what exactly does this imply (for instance, limiting the right to enter new transactions in the system)? Please explain any differences to termination.**

As described in the responses to questions 8(d) and 8(e), the NSCC Rules specify what circumstances may lead to restriction on access to services. For example, under NSCC Rule 46 (Restrictions on Access to Services), the Board of Directors may suspend a Member or prohibit or limit a Member's access to NSCC's services in enumerated circumstances, including a Member's expulsion or suspension from a regulatory or self-regulatory organization, default in delivering funds or securities to NSCC, and a Member's experiencing such financial or operational difficulties that NSCC determines, in its discretion, that restriction on access to its services is necessary for its protection and for the protection of its membership. NSCC Rule 20 (Insolvency) enumerates the circumstances under which a Member will be treated as insolvent. If any of the enumerated circumstances arise, depending upon the facts and situation, NSCC may suspend the Member from any service provided by NSCC either with respect to a particular transaction or transactions, or with respect to transactions generally, or it may prohibit or limit such Member's access to services offered by NSCC. When NSCC, restricts a Member's access to services generally, NSCC is said to have "ceased to act" for the Member. Please refer to NSCC Rule 18, regarding actions to be taken by NSCC if NSCC has ceased to act for a Member generally. Please also refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

**b) Is there a specific timeline for a suspension period before it leads to termination of membership, and are there circumstances where suspension may be lifted without a termination of membership?**

The NSCC Rules do not include a specific timeline for suspension before termination. Please refer to responses to questions 8(d) and 9(a) regarding the NSCC Rules regarding restrictions on access to services, suspension, and termination.

## 10. Critical FMI service rules, contractual arrangements, or procedures should reflect any legal restrictions on termination and suspension of access because of an FMI service user entering into resolution (FSB 2017 Guidance, 1.1).

**a) In what way do your rules, contractual arrangements and procedures reflect this?**

As described in the responses to questions 8(b) and 8(d), the NSCC Rules specify what circumstances may lead to restriction on access to services. If any of the enumerated circumstances arise, depending upon the facts and situation, NSCC may suspend the Member from any service provided by NSCC either with respect to a particular transaction or transactions, or with respect to transactions generally, or it may prohibit or limit the Member's access to services offered by NSCC. However, the NSCC Rules regarding termination of access are not automatic. This is true even in cases of insolvency, where the Board may determine not to cease to act for an insolvent Member (See NSCC Rule 20 (Insolvency). Rather, consistent with the Key Attributes,[11] the decision of whether or not to "cease to act" for a Member, either generally, or with respect to one or more services, involves an active determination and appropriate governance.

Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures); and NSCC Disclosure Framework, CCAS 17Ad-22(e)(18) (Access and participation requirements), under the heading "Retirement, Suspension and Orderly Exit of Members."

**b) Do such arrangements include the effect of parent or affiliates entering resolution?**

The resolution of a Member's parent or affiliates would not require a transfer of membership nor trigger an automatic termination event. However, as described in the response to question 8(a) regarding NSCC's rules and governance process, in order to continue to allow the Member access to NSCC's services, management and the Board Risk Committee will need to review the actions taken at the holding company level and elsewhere within the organization and evaluate the impact of such actions on the Member subsidiary and its ability going forward to meet its obligations to NSCC.

**c) Do you have any plans to amend or otherwise change, or have you recently changed your rules, contractual arrangements or procedures to address legal restrictions on termination of access in the event that an FMI service user enters resolution? If so, please provide details of the proposed/applied changes.**

NSCC has neither recently changed, nor has any current plans to amend the Rules concerning a Member entering resolution.

As a clearing agency registered with the SEC, the Securities Exchange Act of 1934 ("Exchange Act") provides a framework under which NSCC's Rules are adopted and enforced. NSCC's Rules are filed with and reviewed by the SEC.[12] As a clearing agency registered under Section 17A of the Exchange Act, a self-regulatory organization subject to Section 19 of the Exchange Act, and a SIFMU under Title VIII of Dodd-Frank, NSCC is required to follow: (1) a specified process whenever it proposes a new rule or a change or amendment to its Rules[13] ( "Proposed Rule Change," and the process, the "Proposed Rule Change Process"); and (2) a specified process whenever it

---

[11] *Supra* note 9.
[12] NSCC's Rules, as originally in effect at the time of its registration as a clearing agency, were filed with and reviewed by the SEC as part of the registration process. Subsequent changes in NSCC's Rules have been similarly filed with and reviewed by the SEC.
[13] This process is set forth in Section 19(b) of the Exchange Act and Exchange Act Rule 19b-4.

proposes to make a change to its rules, procedures or operations that could materially affect the nature or level of risks presented by NSCC[14] (a "Material Change," and the process, the "Advance Notice Process").

Under the Proposed Rule Change Process, generally, before a Proposed Rule Change may take effect (1) the change and an explanatory statement, completed pursuant to the SEC Form 19b-4, must be filed with the SEC and posted by NSCC on DTCC's website; (2) notice of the filing and the substantive terms or description of the change must be published by the SEC in the *Federal Register* for public review and comment, and (3) the SEC must approve the change (or the change must otherwise be permitted to take effect[15]). The SEC is required to disapprove a Proposed Rule Change if it does not find that the change is consistent with the requirements of the Exchange Act and the rules and regulations thereunder that are applicable to NSCC. (Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(1) (Legal basis).

**11. Triggers, procedure and consequences of termination of FMI participation.**

**a)Triggers: in which situations would termination be considered? Is participation/ membership generally terminated in case of financial stress? Are these criteria clearly outlined in the rulebook or other contractual documentation (please include the relevant references)?**

Please see response to question 8 (a)-(f).

**b) Please explain the management and monitoring around the termination process - steps and timelines of the escalation and decision-making, as well as of the implementation of termination. (Please provide concrete examples, if any, of participation/membership terminations and flag, where relevant, any changes made to the termination process since).**

Please see NSCC Disclosure Framework, CCAS 17Ad- 22(e)(13) (Participant-default rules and procedures). As described therein, when a Member default occurs, NSCC must determine whether to cease to act for, or, in some cases, limit services to, the defaulting Member under Rule 18 (Procedures For When the Corporation Declines Or Ceases To Act To Act), Rule 46 (Restrictions on Access to Services), and Rule 20 (Insolvency). The determination, as to whether or not to cease to act for a participant is not automatic; rather under Rule 46, an affirmative determination to do so must be made.  The Board of Directors has delegated authority to make such determinations to the Board Risk Committee ("BRC").[16] In making this determination, the BRC or the Board will consider the particular facts and circumstances involved, and the condition of the defaulting Member. To ensure that timely action may be taken, the BRC Charter also provides for

---

[14] This process is set forth in Section 806(e) of Dodd-Frank and Exchange Act Rule 19b-4.

[15] In certain limited circumstances, including fee changes, Proposed Rule Changes may become effective upon filing. Proposed Rule Changes may also become effective summarily if it appears to the SEC that such action is necessary for the protection of investors, the maintenance of fair and orderly markets, or the safeguarding of securities or funds. However, any Proposed Rule Change that becomes effective upon filing or summarily is subject to SEC review and the right of the SEC to take action thereafter.

[16] This authority is reflected in the Charter of the BRC, which is available on DTCC's website at: www.dtcc.com/~/media/Files/Downloads/legal/policy-and-compliance/DTCC-BOD-Risk-Committee-Charter.pdf.

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

delegated authority to the Chair of the BRC, if it is impractical to convene the BRC. Action taken would then be ratified by the BRC at a subsequent meeting.[17]

**c) What are the consequences of termination on the participant/member's ability to access the FMI's services? Would the firm be able to complete the processing of any outstanding transactions (e.g. not accepted for clearing or settlement, or in process but not complete) it has in the FMI's systems, or are these cancelled or liquidated?**

Once NSCC has ceased to act for a Member, its Rules provide it with the authority to promptly close out and manage the positions of a defaulter and to apply the defaulter's collateral. Rule 18 (Procedures for When the Corporation Ceases to Act) describes the procedures, including actions NSCC may take, when it ceases to act for a Member this includes provisions for the treatment of core services where Members may have transactions pending with a defaulting Member. The Rule identifies which actions are automatic and which are discretionary, and details how the unsettled transactions of the defaulting Member are to be processed. In this regard, unless the Board Risk Committee has determined otherwise, NSCC will exclude from further processing any CNS trade or Balance Order trade which, at the time NSCC ceased to act for the Member, had not yet reached the stage where the trade guaranty had attached. In addition, Rule 56 (Securities Financing Transaction Clearing Service) provides that NSCC will exclude from further processing any SFT that, at the time NSCC ceased to act for the Member, had not been novated to NSCC. Similarly, pending transactions in non-guaranteed services will also be exited from NSCC's systems.[18] Any transactions so excluded are to be settled between the parties and not through NSCC. Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

As provided under Rule 2C, Section 10(c), when NSCC ceases to act for a Sponsoring Member in its capacity as a Sponsoring Member, NSCC would no longer accept or novate new Sponsored Member Transactions submitted by that Sponsoring Member; however, NSCC would continue to process Sponsored Member Transactions that are submitted by other Sponsoring Members. NSCC would continue to process any Sponsored Member Transactions which were novated prior to NSCC ceasing to act for the Sponsoring Member and would determine whether to close-out the affected Sponsored Member Transactions or permit the Sponsored Members to complete their settlement.

Section 14 of Rule 2C would generally govern the liquidation of a Sponsored Member's SFT positions in the event NSCC ceased to act for the Sponsored Member and the Sponsoring Member has not performed the obligations of

---

[17] In addition, NSCC Rule 23 also permits action to be taken by senior corporate officers, if so designated.

[18] See NSCC Rule 18. This includes transactions settling on a trade-for-trade basis, transactions processed in NSCC's Obligation Warehouse service and uncompleted ACATS transactions. For the treatment of transactions in NSCC's non-guaranteed wealth management and insurance services, those transactions are handled as provided in NSCC's Rules providing for those services, NSCC Addendum D (Statement of Policy: Envelope Settlement Service, Mutual Fund Services, Insurance and Retirement Processing Services and Other Services Offered by the Corporation) and Rule 46, Section 4.

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 16 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

the Sponsored Member in respect of all SFT positions guaranteed by the Sponsoring Member.   Section 14 provides for the Sponsoring Member to liquidate and value all, but not fewer than all, of the Sponsored Member's SFT positions and to calculate any amount owing by or to the Sponsored Member in relation thereto. The Sponsoring Member would be solely responsible for paying or collecting any such amount.   The Rules do not dictate how a Sponsoring Member must calculate the value of a Sponsored Member's SFT positions. Accordingly, the Sponsoring Member and Sponsored Member may agree in their bilateral documentation as to the manner in which the Sponsoring Member will make such calculations. However, NSCC is not responsible for such calculations or for paying any amount owed to the Sponsored Member in the event Section 14 of Rule 2C applies.

For additional information on a Sponsoring Member Default and a Sponsored Member Default, please visit refer to the FAQ document which may be found at https://www.dtcc.com/-/media/Files/Downloads/Clearing-Services/Copy-of-SFT-Clearing-Service-Fact-Sheet.pdf

**d) Would the decision to terminate participation/membership be notified ex ante (i.e. before it takes effect) to the competent authorities of (i) the direct participant and/or of (ii) the FMI? Would this decision be communicated ex ante to the participant itself? On both aspects, how long in advance of actual termination would such notifications occur?**

Depending on the given situation, NSCC would expect to be in regular communication with the Member regarding assessment of a distressed Member's ability to meet its current and future obligations. When NSCC ceases to act for a Member, or suspends or limits its access to services, NSCC notifies the Member and furnishes it with a written statement of the grounds for the decision, and of the Member's right to request a hearing with respect to that determination.[19]  NSCC will issue an Important Notice to all Members informing them of the decision to cease to act.[20] NSCC will also notify NSCC's own supervisors of such decision. Finally, for a defaulting participant that is also a participant of other clearing agencies with which NSCC has cross-guaranty or other arrangements, NSCC will also notify those clearing agencies as required by those arrangements. See NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

**e) What impact would a participant/member's termination have on their parent/subsidiaries' direct membership in the FMI?**

Membership of a parent or subsidiary of the defaulted Member may not necessarily be affected and will depend on the facts and circumstances. DTCC management and the Board Risk Committee ("BRC") will need to review the actions taken by the Member's holding company and elsewhere within the organization and evaluate the impact of such actions on the

---

[19] Notices are provided for in NSCC Rule 45; hearing procedures are provided pursuant to NSCC Rule 37. As provided in Rule 46, in certain cases NSCC may summarily suspend a participant, with the participant having a right to a hearing after the fact; in other cases, the action is subject to the participant's prior right to request a hearing.
[20] NSCC Rule 18, Section 1.

Member's parent and subsidiaries and their respective ability goingforward to meet obligations to the DTCC Clearing Agencies. The timely provision of the information and materials requested by NSCC will be necessary to facilitate management and the BRC's ability to make such determinations.

**f) Does the FMI have cross-default provisions in its rule set? Could it put a member in default because of an affiliate's insolvency or of an indirect participant/client's default or do the rules explicitly prevent or exclude such automatic termination (as long as other obligations are being met)?**

Please refer to response to 11(e). NSCC rules do not contain express automatic termination provisions with respect to default, insolvency, or failure of a Member or its affiliate. Such determinations would be based upon the facts and circumstances.

**g) What assistance would the FMI provide with the porting (within the FMI) of the participant's direct and/or indirect positions/outstanding transactions to a parent/subsidiary membership, third-party successor or bridge entity?**

NSCC membership is not assignable; as such, a bridge bank or other transferee (if not already a Member) would need to apply for membership with NSCC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee, to NSCC's satisfaction. The DTCC Client Account Services maintains standard membership and account transfer documentation. The relevant documentation varies depending on whether the proposed transferee is currently a NSCC Member or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure).

Assuming the bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Member, NSCC could expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed NSCC Member's relationship to an existing Member acquirer can be accomplished in a commercially reasonable expedited basis. The acquirer would need to provide the standard account transfer documentation for each applicable DTCC Clearing Agency.

**h) Please discuss any other points related to termination.**

Not applicable.

**12. FMIs should retain the ability, as specified in rules or contractual arrangements, to terminate, suspend or restrict participation or continued provision of services where the firm fails to meet obligations or where safe and orderly FMI operations could be compromised (FSB 2017 Guidance, 1.1).**

**a) Under what conditions, if any, could safe and orderly FMI operations be at risk from maintaining participation of a service user in resolution?**

Please refer to response to question 8(d) and NSCC DisclosureFramework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures).

The actions that NSCC may take in an actual financial institution-resolution event

will depend on the specific facts and circumstances that apply in the given situation. This is particularly important to preserve orderly clearing and settlement in the marketplace and to minimize the risk of loss to NSCC and its Members. During periods of crisis, the nature, quality, and extent of interaction between a Member and NSCC with respect to governance and communication, as well as financial and operational considerations, will have an impact on the determination of whether a Member is able to maintain continuity of access. Transparency and timely sharing of information will be critical in the process. Further, external factors may impact of the financial viability and timing/success of recovery actions. Therefore, NSCC will look beyond the immediate Member stress event as part of its determination and assess, by way of example, macroeconomic conditions, potential systemic risks, the competitive landscape, regulatory considerations, and reputational impacts that could evolve during the stress period.

**b) Which indicators, if any, can a participant use to anticipate that such a scenario may occur?**

Please refer to response to Question 12(a) above.

**13. Are there any further aspects or issues to mention in relation to the provisions for termination or suspension of membership? If possible, please provide concrete examples of specific factors that were considered in the past when assessing whether to exercise judgement to terminate or suspend a participant's access. Please elaborate.**

No.

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

## PART III: PRIOR TO RESOLUTION, DURING SIGNS OF DISTRESS AT THE PARTICIPANT

The questions in this section assume a situation of stress, in which one of the FMI's (direct) participants/members, or an affiliate company, exhibits signs of distress. Please distinguish in case there are differences between situations of idiosyncratic vs. market stress.

To avoid duplication, respondents may cross-reference other answers when appropriate.

**14. What management and monitoring process(es) does the FMI have in place to identify a situation of stress of a (direct) FMI participant or its affiliate?**

> NSCC monitors its credit exposures with respect to the risk that a Member defaults through the ongoing surveillance of its Members' financial strength and default risk. On an ongoing basis, Members are required to provide financial and other information to NSCC, as outlined in Rule 2B (Ongoing Membership Requirements and Monitoring), to demonstrate that they meet the membership standards on an ongoing basis. In addition, Financial Risk Management reviews publicly available information such as earnings releases, equity prices, and news as part of its Member surveillance. NSCC utilizes a credit risk rating model (referred to as the credit risk rating matrix, or "CRRM," as further described below) to evaluate and rate the credit risk of NSCC's U.S. bank, foreign bank, and U.S. broker-dealer Members, and rate such Members based upon qualitative and quantitative information. These ratings are used to set surveillance levels and inform the calculation of certain Clearing Fund component charges. All Members are subject to a credit review at least every 12 to 24 months.
>
> For further information, please refer to:
> - NSCC Disclosure Framework, CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks)
> - CCAS 17Ad-22(e)(4) (Credit risk)
> - CCAS 17Ad-22(e)(7) (Liquidity risk)
> - NSCC Rule 2B (On-Going Membership Requirements and Monitoring)
> - NSCC Rule 15 (Assurances of Financial Responsibility and Operational Capability)

**15. Which indicators does the FMI consider as part of its management and monitoring in order to determine whether its participants/members face difficulties due to idiosyncratic and/or market stress (outside of entry into resolution)?**

> Please refer to Question 14 above.

**16. What risk mitigation actions could the FMI take under its rules / internal procedures vis-à-vis the participant or member? Which of those potential actions are likely, i.e. to be expected by the firm? How would risk mitigation vary in the event of mild, moderate, and severe stress situations at a participant/member? Could actions be taken even though the participant/member meets its obligations?**

> The Rules enable NSCC, in its discretion, to require adequate assurances of an applicant or Member's financial responsibility or operational capability as and when NSCC deems appropriate (See NSCC Rule 15 (Assurances of Financial Responsibility and Operational Capability).This includes, generally (and without limitation), the right to require a Member to provide additional information and reporting, the right to require a Member to provide access to books and records, and may include restricting or modifying the

Member's use of certain services or activities. The Rules also allow NSCC to require additional Clearing Fund deposits and evidence of financial responsibility or operational capability. Such evidence, for example, may be in the form of an acceptable guarantee or other form of acceptable credit support, or an operational support arrangement. See also, NSCC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk), in particular the description of NSCC's utilization of a credit risk rating model and the fact that Members with a weaker internal credit rating are automatically placed on the Watch List. Members on the Watch List may be subject to additional surveillance than those Members with a stronger credit rating.

**17. What self-reporting requirements are placed on the member/participant in a situation of stress (e.g. additional reporting, increased reporting frequency; evidence of operational and financial capacity)? Please provide any templates or overviews of required data points, where available.**

As discussed in response to question 14, Members are subject to ongoing review and monitoring of their activities and financial condition. To facilitate this review, each Member must comply with ongoing reporting and information requirements (NSCC Rule 2B, (On-Going Membership Requirements and Monitoring) and Rule 15 (Assurances of Financial Responsibility and Operational Capability)). This includes the provision of CALL Reports for settling bank Members. Separately, under the NSCC insolvency rule (NSCC Rule 20, Insolvency), a Member is required to immediately notify NSCC if it fails to perform its contracts or obligations or determines it is unable to do so or is insolvent.

**18. Please explain the methodology used to calibrate additional membership requirements (including operational, financial and capital requirements) for a member/client in financial stress outside of resolution.**

As noted in response to question 14, NSCC monitors its credit exposures with respect to the risk that a Member defaults through the ongoing surveillance of its Members' financial strength and default risk. On an ongoing basis, Members are required to provide financial and other information to NSCC, as outlined in Rule 2B (Ongoing Membership Requirements and Monitoring), to demonstrate that they meet the membership standards on an ongoing basis. In addition, Financial Risk Management reviews publicly available information such as earnings releases, equity prices, and news as part of its Member surveillance. NSCC utilizes a credit risk rating model (referred to as the credit risk rating matrix, or "CRRM," as further described below) to evaluate and rate the credit risk of NSCC's U.S. bank, foreign bank, and U.S. broker-dealer members, and rate such members based upon qualitative and quantitative information. These ratings are used to set surveillance levels and inform the calculation of certain Clearing Fund component charges. All Members are subject to a credit review at least every 12 to 24 months.

For further information, please refer to NSCC Rule 2B (On-Going Membership Requirements and Monitoring) and Rule 15 (Assurances of Financial Responsibility and Operational Capability).

See also:
- NSCC Disclosure Framework, CCAS 17Ad-22(e)(3) (Framework for the comprehensive management of risks).
- NSCC Disclosure Framework, CCAS 17Ad-22(e)(4) (Credit Risk), in

particular, the sections under the headings, "Ongoing monitoring and surveillance" and "Measurement, Monitoring and Management of Credit Risk.

- NSCC Disclosure Framework, CCAS 17Ad-22(e)(5) (Collateral), in particular, the section under the heading "Collateral Management."
- NSCC Disclosure Framework, CCAS 17Ad-22(e)(6) (Margin).
- NSCC Disclosure Framework, CCAS 17Ad-22(e)(7), (Liquidity Risk), in particular, the section under the heading "Measurement and monitoring of liquidity risk and needs."

**19. Please describe for each of the below risk mitigation actions, in as far as they form part of the FMI's set of potential risk mitigation actions: (i) whether these actions are discretionary or pre-determined, e.g., would the FMI follow a required set of actions, which may be described in its rule book; (ii) in which way, if at all, the FMI could deviate from the predetermined procedure so as to either disregard a mandated risk mitigation action or adopt a non-standard action?**

**i. Increasing membership contributions (e.g. default fund/loss sharing contributions), mandating pre-funding, restricting withdrawal of deposits;**
**ii. Increasing initial/variation margin/collateral requirements, restricting collateral types, removing cross-margining facilities; increasing liquidity obligations;**
**iii. Removing credit lines, reliance on parental guarantees or securities borrowing facilities;**
**iv. Enforcing trading controls including position limits, restricting markets;**
**v. Termination or suspension of participation/membership.**

The following is NSCC's summary response to Question 19 and the series of items (i)-(v):

NSCC has the ability under its Rules to determine which risk mitigation actions to take or not take based upon the facts and circumstances that apply in the given situation. The Rules are designed to provide NSCC with sufficient flexibility to appropriately manage the risks presented to the clearing agency and its membership. As noted previously in the response to questions 8(b) and 16, the Rules enable NSCC, in its discretion, to require adequate assurances of an applicant or Member's financial responsibility or operational capability as and when NSCC deems appropriate (See NSCC Rule 15 (Assurances of Financial Responsibility and Operational Capability)). This includes, generally (and without limitation), the right to require a Member to provide additional information and reporting, the right to require a Member to provide access to books and records, and may include restricting or modifying the Member's use of certain services or activities. The Rules also allow NSCC to require additional Clearing Fund deposits and evidence of financial responsibility or operational capability.

**20. Please answer question 19 also for other risk mitigation actions, if any, that are not mentioned here and would likely be taken.**

Not applicable.

**21. In a situation of idiosyncratic or market stress, in which one of the FMI's (direct) participants/members, or an affiliate company, exhibits signs of distress, communications and notifications may be necessary. Please distinguish in the below in case there are differences between a situation of idiosyncratic vs. market stress.**

**a) What notifications or communications would the FMI undertake to the participant/member, their competent and/or resolution authority, the FMI's competent and/or resolution authority, the stressed firm's settlement agent, and other**

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

**stakeholders, and when? Would any of these be based on an obligation for the FMI to notify?**

**b) Do you have a specific communication plan for this, or does your approach leverage existing crisis communication mechanisms? In both cases, please describe the main features of the approach.**

**c) Does the FMI need to get consent from the firm or inform the firm prior to a notification or communication?**

**d) Do the communication/notification protocols require specific factors to be considered, for example legal implication, market impact, etc.?**

**e) Are your communication protocols standardised across participants or do they take into account the specificities of firms' participation and roles in respect of the FMI?**

The following is NSCC's summary response to Question 21 (a)-(e): There is no difference in the response between a situation of idiosyncratic vs. market stress.

When NSCC ceases to act for a participant, or suspends or limits its access to services, NSCC notifies the participant and furnishes it with a written statement of the grounds for the decision, and of the participant's right to request a hearing with respect to that determination.[21]  NSCC will issue an Important Notice to all participants, informing them of the decision to cease to act.[22]. NSCC will also notify NSCC's own supervisors of such decision. Finally, for a defaulting participant that is also a participant of other clearing agencies with which NSCC has cross-guaranty or other arrangements, NSCC will also notify those clearing agencies as required by those arrangements. (See NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules andprocedures)).

NSCC Rule 20 (Insolvency) Section 2, enumerates the circumstances under which a "participant" (as defined under Rule 20) will be treated as insolvent. Pursuant to Section 3, NSCC shall notify participants pursuant to the provisions of Section 4 of Rule 45 (Notices), of actions taken by NSCC pursuant to Rule 46 (Restrictions on Access to Services). For Sponsoring Members and Sponsored Members, please also see Rule 2C, Section 10 (Restrictions on Access to Services by a Sponsoring Member), Section 11 (Restrictions on Access to Services by a Sponsored Member), Section 12 (Insolvency of a Sponsoring Member), Section 13 (Insolvency of a Sponsoring Member), and Section 14 (Liquidation of Sponsored Member and Related Sponsoring Member Positions).  For Agent Clearing Members, please also see Rule 2D, Section 9 (Restrictions on Access to Services by an Agent Clearing Member) and Section 10 (Insolvency of an Agent Clearing Member).

Pursuant to NSCC Rule 40 (Wind-down of a Member, Fund Member or Insurance Carrier/Retirement Services Member), as soon as practicable after NSCC determines that a Member is a Wind-Down Member, NSCC shall notify the Wind-Down Member, all other participants and the SEC of such determination. Further, if NSCC takes, or mandates, any action

---

[21] Notices are provided for in NSCC Rule 45; hearing procedures are provided pursuant to NSCC Rule 37. As provided in Rule 46, in certain cases NSCC may summarily suspend a participant, with the participant having a right to a hearing after the fact; in other cases, the action is subject to the participant's prior right to request a hearing.

[22] NSCC Rule 18, Section 1.

pursuant to this Rule, NSCC shall, as soon as practicable thereafter, notify the SEC and such other participants as it deems proper due to the nature of such action.

**22. Alleviating uncertainty for the FMI.**
**a) Which actions could the firm or the relevant authorities take in order to alleviate uncertainty for the FMI, and reduce the risk that the FMI may take risk mitigation actions that may have an adverse financial impact on the firm?**
**b) Which data / quantitative information and what qualitative information might you need to receive from the participant and/or RA in order to allow the participant to maintain access (please consider the three levels of access mentioned in footnote 3)? Please specify by when you would need each piece of information, if appropriate.**
**c) What other actions could be taken ex-ante to avoid a temporary interruption of services or the risk of some transactions remaining unexecuted?**
**d) Please discuss any other considerations.**

The following is NSCC's summary response to question 22 (a)-(d): Please also refer to response to questions 8(b) and 34.

NSCC believes that a key factor in facilitating an FMI's timely evaluation of a resolution situation is information. This encompasses not only an understanding of the broad resolution strategy, but also, for example:

- The factors that precipitated the resolution event and in what entity or entities they occurred.
- How or whether such issues have been mitigated.
- The proposed transactions sought to be processed by the FMI participant during the stabilization phase and following.
- The arrangements, including liquidity, capital and key personnel plans, for ensuring ongoing performance of both existing and future obligations.
- Relevant information and timing around a potential change of control and changes to staffing.
- Financials/pro forma financials showing the current capital or recapitalized funds of the Member and how that Member will meet the requisite capital requirements to maintain their business and membership.
- Information as recovery/wind-down plans, types of supervisory arrangements in place, and applicable resolution regime.
- Further, during periods of crisis, the nature, quality, and extent of interaction between a Member and NSCC with respect to governance and communication, as well as financial and operational considerations, will have an impact on the determination of whether a Member is able to maintain continuity of access. Transparency and timely sharing of information will be critical in the process.

It is NSCC's view that it is the responsibility of the firm (together with its resolution authority) to determine which FMI services are critical to the ability of the firm to perform its critical functions to its customers, and to so notify the relevant providers of FMI services to level set expectations. To the extent practicable, firms should provide FMI's with transparency regarding ancillary service providers whose services are critical to the ongoing performance of the firm's obligations to the FMI, and the relevant contractual arrangements that would apply in a resolution scenario. NSCC believes this information is key to evaluating the third-party risks that may arise by virtue of providing continuing access. Firms should provide more

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 24 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

information to FMI's about their strategies, assumptions and contingency arrangements. NSCC appreciates the sensitivity of much of this information, but under the Rules, NSCC has the right to seek significant information from Members necessary to properly evaluate the risks they present.

**23. Considering adverse financial impact of FMI risk mitigation actions on direct/indirect participants.**

**a) Some actions, designed to protect the FMI, may precipitate the failure of the relevant participant/member or worsen its position at the time of resolution. How does the FMI consider this when deciding to protect itself?**
**b) Does the FMI take into account the impact on indirect participants of actions taken in response to a direct participant/member facing financial stress?**

**24. Possible differences in treatment of domestic and foreign FMI service users entering into resolution.**

**a) Do you differentiate in your treatment of domestic and foreign FMI service users, and if so in what way?**

If an applicant is organized under the laws of a jurisdiction outside of the United States, NSCC relies on a legal opinion with respect to the laws of the non-U.S. jurisdiction that specifically addresses issues such as NSCC's ability to enforce its Rules (including its netting, guaranty/assumption, novation and assignment, and default management rules) under the applicable insolvency regime of the applicant's home jurisdiction, and the enforceability of the choice of New York law to govern the membership agreement and the Rules. NSCC also obtains legal analyses or advice as it deems appropriate in connection with new services, changes in law, and other matters. Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(1) Principle 1 (Legal basis).

**b) Among foreign users, is there a distinction for users from certain jurisdictions? If so, what are those distinctions?**

Please refer to response to Question 24 (a) above. Further, the NSCC Rules, Addendum O (Admission of Non-US Entities as Direct NSCC Members) describes, among other things, the criteria for admission and related requirements with respect to non-U.S. entities.

**25. Safeguards in jurisdictional legal frameworks.**

**a) How do you assess whether the resolution framework of the jurisdiction in which a firm resides provides adequate safeguards to the provider of critical FMI services?[23]**

Please refer to response to questions 24 (a) and (b) above.

**b) From which regulatory regimes (e.g. countries) do you accept service users?**

Please refer to response to questions 24 (a) and 25 (a) above.

---

[23] See FSB, Principles for Cross-border Effectiveness of Resolution Actions 2015 (November).

**26. Are there any further aspects or issues to mention in relation to interaction between the FMI and a participant in financial stress? Do you have any examples of past experiences where the FMI has utilised its powers in relation to a member undergoing stress? What actions were undertaken and what were the outcomes? Could this example be indicative of actions that may be taken in a future case?**

No.

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

## Part IV: DURING AND AFTER RESOLUTION

**To avoid duplication, respondents may cross-reference other answers when appropriate.**

**27. When the FMI becomes aware of a participant entering a resolution process, which actions would the FMI be likely to take vis-à-vis the participant? Could actions be taken even though the participant/member meets its obligations?**

Please refer to the responses to questions 8(a) and 8(b). Additionally, please note that:

NSCC Rule 20 (Insolvency) enumerates the circumstances under which a Member will be treated as insolvent and NSCC Rule 46 (Restrictions on Accessto Services) specifies what circumstances may lead to restriction on access to services.

In accordance with NSCC Rule 40 (Wind-down of a Member, Fund Member orInsurance Carrier/Retirement Services Member), when a Member notifies NSCC that it intends to wind-down its activities, NSCC may, in its sole discretion, in order to protect itself and its Members, determine that such Member is a "Wind-down Member." In that event and without limiting any other rights of NSCC under the Rules, NSCC may impose conditions on, or take actions with respect to, the Wind-Down Member, including but not limited to, the following:

- Permitting the Wind-Down Member to submit to NSCC only transactions that serve to support the wind-down;
- Permitting the Wind-Down Member to continue use of one or more of NSCC's services, notwithstanding that it may not meet some or all of the financial or operational requirements for continuance as a Member or Limited Member, as applicable;
- Restricting or modifying the Wind-Down Member's use of any or all of NSCC's services (whether generally, or with respect to certain transactions);
- Requiring additional assurances of the financial responsibility or operational capability of the Wind-Down Member through, for example, submission of a guaranty of the Wind-Down Member's obligations to NSCC by an entity acceptable to NSCC and/or additional reporting by the Wind-Down Member;
- Agreeing to complete one or more trades to which the Wind-Down Member is a party prior to the time NSCC's guaranty otherwise would become effective pursuant to the Rules;
- Requiring the Wind-Down Member to post increased Clearing Fund deposits and/or to post its Required Fund Deposit all in cash or in proportions of cash, qualifying bonds and Eligible Letters of Credit different from those permitted under NSCC Rule 4;
- Prohibiting the Wind-Down Member from withdrawing Clearing Fund on deposit in excess of its Required Fund Deposit;
- Calculating the Required Fund Deposit of the Wind-Down Member in a manner different from the applicable formulae provided in the Rules, in order to more appropriately reflect the risk presented by the Wind-Down Member to NSCC, such as for example, not applying certain components of such calculation; or
- Liquidating by buying-in or selling-out, as applicable, any open positions of the Wind-Down Member, for the benefit of such Wind-Down Member

with any profit or loss resulting therefrom being debited or credited, as applicable, to the settlement account of the Wind-Down Member.

**28. Please explain the methodology used to calibrate additional membership requirements (including operational, financial and capital requirements) for a member/client in resolution. To what extent does the FMI take into account the resolution strategy and tools applied to a member to determine their financial and operational requirements? Does the FMI consider anything specific in its methodology in relation to ring-fenced or specifically safeguarded entities?**

Please refer to the responses to questions 16 and 18.

In addition to the "adequate assurances" described in response to question 16, NSCC Rule 40 (Wind-down of a Member, Fund Member or Insurance Carrier/Retirement Services Member) addresses the situation where a Member intends to wind-down its activities and NSCC determines, in its discretion, that NSCC must take special action in order to protect itself and its Members. If NSCC determines that such existing Member is a "Wind-Down Member" (as defined under this Rule)[24], NSCC may, as it deems necessary, place certain conditions on, or take actions with respect to, the Member (see response to question 27.)

**29. Please describe for each of the below risk mitigation actions, in as far as they form part of the FMI's set of risk mitigation actions upon a participant entering a resolution process (in addition to actions that would be taken prior to resolution): (i) whether these actions are discretionary or pre-determined, e.g., would the FMI follow a required set of actions, which may be described in its rule book; (ii) in which way, if at all, the FMI could deviate from the predetermined procedure so as to either disregard a mandated risk mitigation action or adopt a non-standard action; (iii) how/when the following risk mitigation actions would be communicated to the participant.**
**i. Temporary suspension of certain activities (and if so, which activities);**
**ii. Potential requirements to contribute additional margin or amounts to default or guarantee funds, secure additional liquidity commitments (including on an intra-day basis), or to pre-fund part or all of payment and settlement obligations;**
**iii. Potential changes to operational or information requirements, including those needed because certain services might not be available;**
**iv. Potential requirements that may apply in relation to a bridge institution or a thirdparty purchaser to which functions have been transferred.**

The following is NSCC's summary response to Question 29 and the series of items (i)-(iv):

As described more fully in response to questions 8(b),16 and 19, NSCC has the ability under its Rules to determine which risk mitigation actions to take or not take based upon the facts and circumstances that apply in a given situation. The Rules are designed to provide NSCC with sufficient flexibility to appropriately manage the risks presented by the distressed Member. For example, the Rules enable NSCC, in its discretion, to require adequate assurances of an applicant or Member's financial responsibility or

---

[24] A Wind-Down Member is not a "new" membership requiring a transfer, as generally the trustee appointed for an insolvent broker by SIPC, or the FDIC as receiver, steps into the shoes of the insolvent Member by operation of law or court order. Rather, when a Member indicates that it intends to wind-down (whether on a self-directed basis or through its trustee,receiver or other administrator), the DTCC Clearing Agencies can use this designation as a tool to facilitate an orderly liquidation or completion of the participant's activity in the DTCC Clearing Agency.

operational capability as and when NSCC deems appropriate (See NSCC Rule 15 (Assurances of Financial Responsibility and Operational Capability)). This includes, generally (and without limitation), the right to require a Member to provide additional information and reporting, the right to require a Member to provide access to books and records, and may include restricting or modifying the Member's use of certain services or activities. The Rules also allow NSCC to require participants to provide additional Clearing Fund deposits and evidence of financial responsibility or operational capability, as requested.

As described in response to Question 11(g), NSCC membership is not assignable; as such, a bridge bank or other transferee (if not already a Member) would need to apply for membership with NSCC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee, to NSCC's satisfaction. The DTCC Client Account Services maintains standard membership and account transfer documentation. The relevant documentation varies depending on whether the proposed transferee is currently an NSCC Member or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure).

Assuming a bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Member, NSCC may expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed Member's NSCC relationships to an existing Member acquirer can be accomplished in a commercially reasonable expedited basis. The acquirer would need to provide the standard account transfer documentation for each applicable DTCC Clearing Agency.

**30. Please answer question 29 also for other risk mitigation actions, if any, that are not mentioned here and that would likely be taken.**

Not applicable.

**31. In what way should a service user prepare for resolution-related risk mitigation measures by the FMI to maximise the likelihood of maintaining access? Does the FMI provide any documented guidance on this to its participants/members, and/or to their RAs?**

Members are expected to review and be familiar with NSCC's Rules, which are publicly available, as they form the contractual basis for their membership both in business-as-usual circumstances and during times of stress. Changes to these rules typically involve a public consultation or approval process, with stakeholders having an opportunity to comment and provide feedback. NSCC recognizes that working with firms as part of their resolution planning process, whether as part of industry working groups or on a bilateral one-to-one basis, helps to foster an awareness and understanding of rules-based actions that NSCC may take in response to a Member's entering resolution, together with the range of risk management mitigants and how they might be applied to address different scenarios. Over the past several years, NSCC and the other DTCC Clearing Agencies have had discussions with their participants, both bilaterally and as part of industry and working group projects, to foster transparency and understanding on how to facilitate continued access to their services in distress situations.

**32. What impact would a member/participant's resolution have on any parent or subsidiary's direct membership at the FMI?**

> As described in response to questions 11(e) and (f), membership of a parent or subsidiary of the defaulted Member may not necessarily be affected and will depend on the facts and circumstances. NSCC management and the Board Risk Committee ("BRC") will need to review the actions taken by the Member's holding company and elsewhere within the organization and evaluate the impact of such actions on the Member's parent and subsidiaries and their respective ability going forward to meet obligations to NSCC and the other DTCC Clearing Agencies. The timely provision of the information and materials requested by NSCC will be necessary to facilitate management and the BRC's ability to make such determinations.

**33. In a situation of idiosyncratic or market stress in which one of the FMI's (direct) participants/members, or an affiliate company, enters resolution, communications and notifications may be necessary. Please distinguish in the below in case there are differences between a situation of idiosyncratic vs. market stress.**
**a) What notifications or communications would the FMI undertake to the participant/member, their competent and/or resolution authority, the FMI's competent and/or resolution authority, the firm's settlement agent, and other stakeholders, and when? Would any of these be based on an obligation for the FMI to notify?**
**b) Do you have a specific communications plan for this or does your approach leverage existing crisis communication mechanisms?**
**c) Does the FMI need to get consent from the firm or inform the firm prior to a notification or communication?**
**d) Do the communication/notification protocols require specific factors to be considered, for example legal implication, market impact, etc.?**
**e) Are your communication protocols standardised across participants or do they take into account the specificities of firms' participation and roles in respect of the FMI?**
**f) Would your members/clients be able to leverage any preparations your organisation has undertaken to access the necessary communication infrastructure to deliver the increased extent of communications that may be needed to respond to a resolution and any restructuring of a member/client (such as increased call volumes to call centres)?**
**g) What management and monitoring arrangements would apply for these crisis communications and notifications? Would you have a dedicated team or a point of contact for receiving and initiating all communications that relate to a member/client entity in resolution or any related restructuring?**

> The following is NSCC's summary response to Question 33, items (a)-(g). Please also refer to response to question 21.

> In a situation of idiosyncratic or market stress, NSCC would expect frequent, and timely, intra-day communications with the Member and relevant authorities as events unfold. There is no difference in the response between a situation of idiosyncratic vs. market stress.

> As soon as practicable after NSCC determines that a Member is a "Wind-Down Member," NSCC will notify the firm of its determination, and also notify all other NSCC participants and the SEC of that determination (See NSCC Rule 40).

> When NSCC ceases to act for a participant, or suspends or limits its access

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 30 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

to services, NSCC notifies the participant and furnishes it with a written statement of the grounds for the decision, and of the participant's right to request a hearing with respect to that determination.[25] NSCC will issue an Important Notice to all participants informing them of the decision to cease to act.[26] NSCC will also notify NSCC's own supervisors of such decision. Finally, for a defaulting participant that is also a participant of other clearing agencies with which NSCC has cross-guaranty or other arrangements, NSCC will also notify those clearing agencies as required by those arrangements.

NSCC Rule 20 (Insolvency), Section 2, enumerates the circumstances under which a participant" (as defined under Rule 20) will be treated as insolvent. Pursuant to Section 3, NSCC shall notify participants pursuant to the provisions of Section 4 of Rule 45 (Notices), of actions taken by NSCC pursuant to Rule 46 (Restrictions on Access to Services). (See NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures)).

**34. Alleviating uncertainty for the FMI. (As requested in Part II, if the responses to sub-questions a.-f. below have been documented in rulebook/contractual provisions or other documents, please reference.)**

**a) What actions (such as communication) could the participant or authorities take in order to alleviate uncertainty for the FMI about the participant's situation, and thereby reduce the risk that the FMI may take risk mitigation actions that may have a further adverse financial impact on the participant?**
**b) Assuming that the authorities and the affected member/client may not be able to share relevant information before the commencement of the resolution process, would that represent a material issue that could determine how your organisation responds to the fact that a member/client has been placed in resolution?**
**c) Which data / quantitative information would the FMI need to receive from the participant and/or RA in order to allow the participant to maintain access (please consider the three levels of access mentioned in footnote 3)? Please specify by when you would need each piece of information, if appropriate, including when you would need to be informed prior to resolution measures.**
**d) Which qualitative information would the FMI need to receive from the participant and/or RA in order to allow the participant to maintain access to the FMI? Please specify by when you would need each piece of information, if appropriate, including when you would need to be informed prior to resolution measures.**
**e) What other actions could be taken ex-ante to avoid a temporary interruption of services or the risk of some transactions remaining unexecuted?**
**f) Please discuss any other considerations.**

The following is NSCC's summary response to Question 34, items (a)-(f). Please also refer to response to question 22.
In order to assess a distressed Member's ability to meet its current and future obligations in all resolution scenarios, as well as facilitate continuity of access, it will be key for NSCC to have timely and detailed information to understand how the Member plans to move forward in reference to its short-term and long-term goals and objectives and the attendant risks, given

---

[25] Notices are provided for in NSCC Rule 45; hearing procedures are provided pursuant to NSCC Rule 37. As provided in Rule 46, in certain cases NSCC may summarily suspend a participant, with the participant having a right to a hearing after the fact; in other cases, the action is subject to the participant's prior right to request a hearing.
[26] NSCC Rule 18, Section 1.

either its, or its parent holding company's or affiliate's failure. From the inception and during the pendency of any resolution, regular, substantive interaction between the Member (and the relevant resolution authority) and NSCC will be critical to the Member's ability to maintain access to the services of any of the DTCC Clearing Agencies.

Specifically, in order to evaluate the impact or potential impact of a resolution event on an NSCC Member—even in cases where there is a recapitalization of the Member pursuant to a Single Point of Entry ("SPOE") resolution strategy—NSCC would expect to be provided, at a minimum, with the following information:

- Information on what events caused the distress at the Member (and in which participant entity or entities), and on the actions taken to remediate the situation,
- If there has been (or will be) a change of control (including by virtue of any bail-in and change of the Member's holding company management or board), information on the nature of the ownership change and the identities of the controlling shareholders and management,
- Financials/pro forma financials showing the current capital or recapitalized funds of the Member entity (or entities) that participates in the DTCC Clearing Agencies,
- NSCC would need to understand, for example in an SPOE scenario, how the bail-in or other actions result in the Member meeting the requisite capital requirements to maintain its business and membership.
- Risk reports that would show positions, market values, risk metrics, limits, margin requirements, and stress test results across exposures presented to (a) NSCC, (b) the firm's top 25 counterparties, and (c) in total. Reports should be aggregated and summarized in a fashion that is consistent withhow the entity plans to manage the exposures.
- Information as to the supervisory arrangements in place and the applicable resolution regime,
- Details of key personnel, including:
  - given the event, whether the key personnel that NSCC would be dealing with are the same, or differ, from those dealt with during the "runway" period up to resolution; and
  - whether the key operations staff will be maintained. NSCC would need evidence of the Member's ongoing operational capability and communications architecture.
- Projected settlement activity,
- Liquidity plans to meet the settlement and margin requirements of the DTCC Clearing Agencies, as well as other collateral and funding obligations to other third parties,
- Settling and (as appropriate) clearing bank arrangements, including:
  - information as to the settlement arrangements then in place, and whether or not these have changed as a result of the resolution event. NSCC will need evidence of how ongoing settlement (and other financial obligations) will be effected.
  - Information on other interconnected activities, such as intercompany arrangements, or if the entity or an affiliate acts as a settling bank or clears transactions for other non-affiliated Members, how those relationships or activities will be affected or handled going forward.

DTCC will seek to understand if the entity (or entities) that is the NSCC Member, plans to continue the same activities, products and related

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 32 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

volumes. Additionally, in order to determine that the Member is financially capable of meeting its current and future Clearing Fund and payment/ settlement obligations based on the expected activities, DTCC will need to understand the Member's financial structure, including a thorough understanding of its funding and capital positions, sources and projected use of funds, access to intraday and end-of-day cash flows, available liquidity resources and intercompany obligations/guarantees or support arrangements.

**35. Considering adverse financial impact of FMI risk mitigation actions on direct/indirect participants.**

**a) Some actions, designed to protect the FMI, may worsen the position of the participant at the time of resolution and as a result may also affect other participants. How does the FMI consider this when deciding to protect itself?**

**b) Does the FMI take into account the impact on indirect participants of actions taken in response to a direct participant/member entering into resolution?**

**36. FMI rules and contractual arrangements should allow a bridge institution to maintain its predecessor's participation (membership) during a resolution process (FSB 2017 Guidance, 1.1). (As requested in Part II, if the responses to the sub-questions below have been documented in rulebook/contractual provisions or other documents, please reference.)**

**a) Please explain how the FMI rules, contractual arrangements and/or procedures reflect this.**
**b) What would be the FMI's process to ensure that continuity of access can be maintained for the purchaser of a resolved entity or for a bridge institution?**
**c) Please share any timelines and any external dependencies for this process.**
**d) If the purchaser or bridge institution requires a new access, do you have a "fast-track" procedure to allow access for such a purchaser or bridge institution? How long is setting up access expected to take (with or without a "fast-track" procedure)? What would the FMI require in order to continue providing the service pending completion of the onboarding procedure (e.g. connectivity and BIC/SWIFT codes to remain unchanged)?**
**e) What type of information is needed in the context of a change-of-control assessment, i.e. to accept a purchaser or bridge institution as a participant/member? Please specify by when you would need each piece of information, if appropriate. How long would you then need to take an informed decision on access for the purchaser or bridge institution?**
**f) Does the FMI explicitly consider, in its rulebooks or internal procedures, the possibility of a RA requiring access for the purchaser or bridge institution even in case they do not meet the membership or participation criteria (for instance where a credit rating is required)?**
**g) Please discuss any other, e.g. practical, considerations around continuity of FMI access of a bridge institution or of a purchaser.**

The following is NSCC's summary response to Question 36, items (a)-(g). Please also refer to response to question 11(g).

NSCC membership is not assignable and as such, a bridge bank or other transferee (if not already a Member) would need to apply for membership with NSCC and satisfy the membership criteria and approval processes, including approval by the Board Risk Committee (Rule 2, Members and Limited Members, Rule 2A, Initial Membership Requirements). The DTCC

Client Account Services maintains standard membership and account transfer documentation. The relevant membership documentation varies depending on whether the proposed transferee is currently a DTCC Clearing Agency participant or whether it will be applying for membership concurrently with the transfer, and on the specific details of the proposed transaction (including the proposed account structure).The NSCC Rules allow NSCC to approve an applicant for membership even if NSCC determines that the applicant fails to meet any membership standards, if in the opinion of NSCC, "any one or more of such standards as applied to the applicant is unduly or disproportionately severe or the conduct of the applicant has been such as not to make it against the interests of NSCC, its Members, creditors or investors to approve such application"(NSCC Rule 2A, (Initial Membership Requirements), Sec.1.D)). In such a situation, the applicant may be approved unconditionally, or on a temporary or other conditional basis, and NSCC may obtain additional assurances of financial responsibility and operational capability as provided in its rules. These provisions specifically enable NSCC to approve a bridge bank or other transitional entity for membership on a conditional or temporary basis.

Assuming a bridge bank meets the relevant financial and operational requirements and plans to assume all existing account relationships of the failed Member, NSCC may expedite the membership process and extend to the bridge bank a temporary membership. Operationally, transitioning a failed Member's NSCC relationships to an existing Member acquirer can be accomplished in a commercially reasonable expedited basis. The acquirer would need to provide the standard account transfer documentation for NSCC and each other applicable DTCC Clearing Agency.

The use of NSCC's adequate assurance authority (See response to question 16 and NSCC Rule 15 (Assurances of Financial Responsibility and Operational Capability) enables it to support the continuation of a Member's membership pending or following its recapitalization and to facilitate a fast-track bridge bank membership or transfer to a third party. In the context of a Member's wind-down or sale, whether through a trustee, administrator or self-directed by the Member, the use of the Wind-Down rule (See NSCC Rule 40) and the tools afforded thereunder may facilitate an orderly wind-down as long as the Member, trustee or administrator has the capacity, resources and third-party arrangements necessary to meet the Member's settlement and other obligations to NSCC during the pendency of the wind-down.

**37. FMIs should consider the operational, technological, financial and legal implications arising from the transfer of functions or positions to a successor (either a bridge institution or a thirdparty purchaser). (FSB 2017 Guidance, 1.4)**

**a) What preparations are necessary in your circumstances for such a transfer to be successful? What changes would be necessary for such a transfer to be successful? Please consider any preparations and changes by the FMI as well as by FMI members/service providers/others.**

**38. Portability/Transferability of underlying client positions, for example to facilitate a bridge or partial transfer resolution strategy.**

**a) For CCPs: Which kind of segregated accounts are offered to (underlying) clients to facilitate the portability/transferability of client positions and securities collateral? Do you envisage that there may be material barriers to the effective and timely**

Case 3:24-cv-02053-VDO    Document 54-3    Filed 04/13/25    Page 34 of 36

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

**transfer of client positions following a decision to transfer the activities of the member in resolution to another member? If so, please explain.**

As described in NSCC Disclosure Framework, CCAS 17Ad- 22(e)(14) (Segregation and portability), NSCC operates in legal regimes that facilitate segregation and portability in order to achieve protection of customer assets by alternate means that offer the same degree of protection as the approach recommended by Principle 14 in the FMI Principles report.[27] These regimes do not directly apply to NSCC, but to its participants. For example, a number of NSCC's participants are broker-dealers subject to the SEC's customer protection rules, promulgated by the SEC under the Exchange Act in 1972.[28]

**b) For CSDs: Do you offer segregated accounts to (underlying) clients? Do you envisage that there may be material barriers to the effective and timely transfer of client securities and cash to another custodian following a decision to transfer the activities of the participant in resolution to another participant? If so, please explain.**

Not applicable.

**39. Are there any further aspects or issues to mention in relation to interaction between the FMI and the participant during or after resolution of the participant?**

In order to assess a distressed Member's ability to meet its current and future obligations—in all resolution scenarios—as well as facilitate continuity of access, it will be key for NSCC to have timely and detailed information to understand how the Member plans to move forward in reference to its short-term and long-term goals and objectives and the attendant risks, given either its, or its parent holding company's or affiliate's failure. From the inception and during the pendency of *any* resolution, regular, substantive interaction between the Member (and the resolution authority) and NSCC will be critical to the Member's ability to maintain access to the services of any of the DTCC Clearing Agencies, including NSCC.

Further, in any resolution event, it will be crucial for Members to have a plan for communications with the Financial Market Infrastructures (FMI's) in which they participate. NSCC would expect the applicable Member(s)(s) (and their resolution authorities, as applicable) to make available to DTCC Enterprise Risk Management staff, the general counsel's office and senior management, personnel with the appropriate level of knowledge and seniority to be able to respond to questions and provide prompt and accurate information, and the authority to bind the Member and execute on agreed action plans. In the case of a bridge bank or an administrative wind-down, this would include the relevant contacts at the FDIC, SIPC or other applicable resolution authority. NSCC would expect frequent, and timely, intra-day communications with the relevant authorities as events unfold.

Please also refer to responses to questions 21 and 33.

---

[27] FMI Principles report, Principle 14, explanatory notes 3.14.5, 3.14.6 and footnote 122.
[28] Exchange Act Rule 15c3-3.

## Part V: ARRANGEMENTS AND OPERATIONAL PROCESSES TO FACILITATE CONTINUED ACCESS IN RESOLUTION

**40. The FMI should consider establishing management, monitoring and operational rules and procedures that facilitate the ability of FMI management to make prompt decisions in response to a service user's resolution (including a period when the FMI is closed for business). (FSB 2017 Guidance, 1.4)**

**a) What procedures are in place at the FMI to facilitate prompt decision making at any time? What, if any, are the limitations?**

> When a Member default occurs, NSCC must determine whether to cease to act for, or, in some cases, limit services to, the defaulting Member (See Rule 46 (Restrictions on Access to Services) and Rule 20 (Insolvency)). These determinations are, under appropriate internal governance, generally delegated by the Board to the Board Risk Committee ("BRC"). The determination as to whether or not to cease to act for a participant is not automatic; rather under Rule 46, an affirmative determination to do so must be made.  The Board of Directors has delegated authority to make such determinations to the BRC.[29]  To ensure that timely action may be taken, the BRC Charter also provides for delegated authority to the Chair of the BRC, if it is impractical to convene the BRC. Action taken would then be ratified by the BRC at a subsequent meeting.[30]

> Please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures) and responses to questions 11 and 40(a).

**b) What would be the likely range of decisions undertaken after receiving notice of a service user entering into resolution? What market communications or notifications to the regulator would be undertaken?**

> Please refer to responses to questions 21 and 33.

**41. In line with the Key Attributes,[31] 18 FMIs should regularly test the effectiveness of their relevant rules, contractual arrangements and procedures in responding to a resolution scenario of a participant.**

**a) How do you test these contingency arrangements? How do you take participants in resolution into account in those contingency arrangements?**

**b) How do your rules facilitate the transfer of positions of a client of a service user in resolution to another service user of the FMI, as applicable?**

> In response to (a) and (b), please refer to NSCC Disclosure Framework, CCAS 17Ad-22(e)(13) (Participant-default rules and procedures,under the heading "Testing and Engagement with Participants and Other Stakeholders".

---

[29] This authority is reflected in the Charter of the BRC, which is available on DTCC's website.

[30] In addition, NSCC Rule 23 also permits action to be taken by senior corporate officers, if so designated.

[31] See FSB, Key Attributes of Effective Resolution Regimes for Financial Institutions, 2014 (October), Appendix II-Annex I, part II, section 2.2, p. 73.

NATIONAL SECURITIES CLEARING CORPORATION
RESPONSES TO FSB CONTINUITY OF ACCESS TO FMI'S FOR FIRMS IN RESOLUTION QUESTIONNAIRE

Further, in response to (a), pursuant to NSCC Rule 2B (Ongoing Membership Requirements and Monitoring, NSCC has established standards for designating those Members who shall be required to participate in annual business continuity and disaster recovery testing that NSCC reasonably determines are, taken as a whole, the minimum necessary for the maintenance of fair and orderly markets in the event that business continuity and disaster recovery plans are required to be activated. The standards shall take into account factors such as: (1) activity-based thresholds; (2) significant operational issues of the Member during the twelve months prior to the designation; and (3) past performance of the Member with respect to operational testing. The specific standards adopted by the Corporation and any updates or modifications thereto shall be published to Members and applied on a prospective basis. Upon notification that the Member has been designated to participate in the annual business continuity and disaster recovery testing, as described above, Members shall be required to fulfil, within the timeframes established by NSCC, certain testing requirements (the scope of such testing to be determined by NSCC in its sole discretion) and related reporting requirements (such as reporting the test results to NSCC in a manner specified by NSCC) that may be imposed by NSCC.

Further, in response to (b), for purposes of facilitating an expedited transfer operationally, it is assumed that a Member-acquirer would take over the existing account relationships of the failed Member, effectively operating them for some period of time as "additional accounts" of the acquiring Member. That would allow the activity to be phased out and transitioned to the acquirer's main account over time in a manner determined by the acquirer as best suited to its business needs and provide less disruption to the membership.

**42. How do you test members' readiness of arrangements for meeting increased information and communication requests (beyond those required in business as usual (BAU)) that will be needed prior to and during resolution? Which disclosures do you require from members in this regard?**

**43. Are there any further aspects or issues to mention in relation to arrangements and operational processes to facilitate continued access in resolution?**

No. There are no further aspects or issues to mention at this time.