**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Jason Rolo, | Case No.:  3:24-cv-02053 |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CONSTITUTIONAL PRINCIPLES** |
| v. | |
| SECURITIES & EXCHANGE COMMISSION | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY | |
| DEPOSITORY TRUST & CLEARING CORPORATION | |
| JOHN DOE 1 - 100 | **JURY TRIAL DEMANDED** |
| Defendants, | |

# Response In Opposition to FINRA Motion to Dismiss

# Table of Contents

| Section | Title | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | FINRA's Conduct Was Ultra Vires and Executed in Bad Faith | 2 |
| II.A. | FINRA Misrepresented Its Role and Concealed Its Responsibility | 2 |
| II.B. | FINRA's Actions Were Ultra Vires and Procedurally Invalid | 3 |
| II.C. | FINRA Is Not Entitled to Immunity | 5 |
| III. | Plaintiff Has Standing Under the Exchange Act | 7 |
| III.A. | Plaintiff Falls Within the Exchange Act's Zone of Interest | 7 |
| III.B. | Plaintiff Meets Article III Standing Requirements | 7 |
| III.C. | The Complaint Satisfies Rule 12(b)(6) | 8 |
| III.D. | This Case Presents a Novel, Justiciable Claim | 9 |
| IV. | FINRA Violated Plaintiff's Constitutional Rights | 9 |
| IV.A. | Due Process Violations (Fifth Amendment) | 10 |
| IV.B. | Appointments Clause Violation | 11 |
| IV.C. | Violation of the Nondelegation Doctrine | 11 |
| IV.D. | Structural Conflicts and Institutional Bias | 12 |
| V. | FINRA's Actions Support Antitrust and CUTPA Claims | 12 |
| V.A. | FINRA Maintains Monopoly Control Over Market Infrastructure | 13 |
| V.B. | FINRA's Conduct Shielded Institutions and Harmed Retail Investors | 15 |
| V.C. | FINRA's Conduct Constitutes Unfair Trade Practices Under CUTPA | 18 |
| V.D. | Antitrust and CUTPA Claims Are Not Preempted | 18 |

| | | |
|---|---|---|
| VI. | This Court Has Personal Jurisdiction Over FINRA | 19 |
| VI.A. | Connecticut's Long-Arm Statute Applies | 19 |
| VI.B. | Jurisdiction Comports with Due Process | 19 |
| VI.C. | The "Effects Test" Further Supports Jurisdiction | 20 |
| VI.D. | Plaintiff Has Made a Prima Facie Showing of Jurisdiction | 20 |
| VI.E. | FINRA's Case Law Is Inapposite | 21 |
| VII. | Plaintiff Is Entitled to Discovery | 22 |
| VIII. | Conclusion | 24 |
| | Certificate of Service | 26 |

# <u>Table of Authorities</u>

## <u>Cases</u>

Alpine Securities Corp. v. FINRA, No. 23-982 (U.S. cert. granted Mar. 18, 2024) – p. 5

Ashcroft v. Iqbal, 556 U.S. 662 (2009) – p. 7

Bartold v. Wells Fargo Bank, N.A., No. 3:14-CV-00865 (D. Conn. Nov. 24, 2015) – p. 16

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) – p. 7

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001) – p. 4

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) – p. 17

Calder v. Jones, 465 U.S. 783 (1984) – p. 17

Carter v. Carter Coal Co., 298 U.S. 238 (1936) – p. 10

Cort v. Ash, 422 U.S. 66 (1975) – p. 6

Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000) – p. 20

DL Capital Grp., LLC v. NASD, 409 F.3d 93 (2d Cir. 2005) – p. 2

Eric Dyer v. FINRA, No. 3:21-CV-02038 (D. Conn. filed Dec. 7, 2021) – p. 4

Free Enter. Fund v. PCAOB, 561 U.S. 477 (2010) – p. 9

Gundy v. United States, 139 S. Ct. 2116 (2019) – p. 10

Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) – p. 17

Jarkesy v. SEC, 34 F.4th 446 (5th Cir. 2022) – p. 10

Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984) – p. 17

Lucia v. SEC, 138 S. Ct. 2044 (2018) – p. 9

Mitchell v. Forsyth, 472 U.S. 511 (1985) – p. 5

Silver v. NYSE, 373 U.S. 341 (1963) – p. 8

Sparta Surgical Corp. v. NASD, 159 F.3d 1209 (9th Cir. 1998) – p. 1

Standard Inv. Chartered, Inc. v. NASD, 637 F.3d 112 (2d Cir. 2011) – p. 1

Toys 'R' Us, Inc. v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003) – Not found

Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) – p. 6

W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008) – p. 6

Weissman v. NASD, 500 F.3d 1293 (11th Cir. 2007) – p. 1

## Statutes Cited in the Opposition

1. **15 U.S.C. § 78s(b)(1)** – Exchange Act rule filing requirement for SROs

2. **15 U.S.C. §§ 78b** – Congressional findings and declaration of purposes under the Exchange Act

3. **18 U.S.C. § 1001** – Criminal liability for false statements to federal officials (e.g., Congress)

4. **18 U.S.C. § 1621** – Perjury statute

5. **Conn. Gen. Stat. § 33-929(f)** – Connecticut long-arm statute for corporate defendants

6. **Conn. Gen. Stat. § 42-110a** – Connecticut Unfair Trade Practices Act (CUTPA)

## I. INTRODUCTION

Defendant FINRA's Motion to Dismiss should be denied. Plaintiff plausibly alleges that FINRA acted ultra vires, violated statutory and constitutional duties, and caused direct harm to investors—particularly Plaintiff—through an unlawful trading halt in MMTLP that lacked notice, regulatory authority, or rulemaking.

This case does not challenge routine regulatory enforcement. It challenges a private entity, wielding delegated public power, for executing a discretionary halt outside its legal mandate. FINRA imposed a market-wide freeze without an SEC-approved rule, investor notice, or procedural safeguards, stripping shareholders of the ability to trade and concealing material market risks.

Courts have long held that self-regulatory organizations (SROs) are not immune when acting outside their delegated authority or for non-regulatory purposes. See *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011); *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998); *Weissman v. NASD*, 500 F.3d 1293, 1301 (11th Cir. 2007).

Plaintiff's claims arise under the Exchange Act, the U.S. Constitution, the Sherman Act, and the Connecticut Unfair Trade Practices Act (CUTPA). DTCC's filings confirm FINRA initiated the halt; FOIA disclosures show FINRA had notice of fraud risks and surveillance data but chose not to act. At this stage, no more is required.

The Complaint is detailed, plausible, and supported by public disclosures, internal documents, and case law. The Motion to Dismiss should be denied in full.

## II. FINRA'S CONDUCT WAS ULTRA VIRES AND EXECUTED IN BAD FAITH

### A. FINRA Misrepresented Its Role and Concealed Its Responsibility

FINRA's assertion of regulatory immunity is legally unfounded. The MMTLP trading halt was not a lawful regulatory enforcement action undertaken pursuant to any SEC-approved rule or formal procedure. Rather, it was a discretionary, ultra vires intervention executed without statutory authority, without investor notice, and without adherence to the procedural safeguards required under the Exchange Act. As such, it falls squarely outside the scope of immunity afforded to self-regulatory organizations.

Federal courts consistently hold that SRO immunity does not extend to conduct undertaken in bad faith, for non-regulatory purposes, or outside the scope of delegated statutory authority. See *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011); *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998); *DL Capital Grp., LLC v. NASD*, 409 F.3d 93, 96–97 (2d Cir. 2005); *Weissman v. NASD*, 500 F.3d 1293, 1301–02 (11th Cir. 2007).

Contrary to its representation as a passive administrator of data, FINRA was the undisputed initiator of the MMTLP trading halt. DTCC, in its own Motion to Dismiss, admitted that FINRA issued the directive and that DTCC merely acted in accordance with it. See *DTCC Mot. to Dismiss* at 8. DTCC's admission eliminates any doubt as to which entity initiated the discretionary halt. Moreover, the decision was made in a closed-door meeting on December 8, 2022, from which the issuer, Meta Materials, was excluded. This procedural exclusion further undercuts FINRA's attempt to disclaim operational responsibility.

### B. FINRA's Actions Were Ultra Vires and Procedurally Invalid

2

The trading halt lacked any statutory basis or regulatory authorization. FINRA did not file a rule change with the SEC as required by Section 19 of the Exchange Act, 15 U.S.C. § 78s(b)(1), and its implementing regulation, 17 C.F.R. § 240.19b-4. These provisions mandate that SROs must file any proposed rule change, including actions affecting market access or trading transparency, with the SEC for review and publication. No such filing was made in connection with the MMTLP halt. FINRA's failure to comply with this mandatory rulemaking requirement constitutes an independent procedural violation of the Exchange Act, rendering the halt ultra vires and without legal effect. See *Sparta*, 159 F.3d at 1213–14.

FINRA's claimed rationale of "settlement concerns" is unsupported by any rule-based process or contemporaneous investor disclosure. No SEC order existed, no emergency rule was invoked, and no investor alert was issued. Instead, FINRA imposed a freeze just days before the spinout of Next Bridge Hydrocarbons, effectively trapping investors in a private, illiquid security. This freeze took place in the absence of an issuer consultation and without regulatory procedure.

FINRA's own fraud team had identified serious concerns related to MMTLP and MMAT. On December 5, 2022, Sam Draddy, head of FINRA's National Fraud and Investigations Team, acknowledged in an internal email that the matter had reached his team's attention and that Blue Sheet audits had been initiated. See Ex. 13-1. Draddy later confirmed in sworn testimony that FINRA initiates Blue Sheet requests only when active investigations are underway. Despite this ongoing inquiry, FINRA issued no Suspicious Activity Reports (SARs), failed to notify the investing public, and declined to take any formal enforcement action. FINRA has also admitted that it does not routinely verify the integrity of Blue Sheet data and that it lacks the ability to determine whether a short sale is "naked." These statements reflect a breakdown in FINRA's

core surveillance functions and support the inference that the halt was a discretionary act taken in response to internal concerns that were never publicly acknowledged or resolved.

FINRA's technical infrastructure further undermines its justification for the halt. As disclosed in its March 2024 Trade Reporting Notice (Ex. 31), FINRA's OTC Reporting Facility (ORF) and related systems could not process trades involving fractional share quantities. These limitations resulted in rejected reports and distorted short interest data, impairing FINRA's ability to assess synthetic positions or float accuracy in MMTLP. Despite the significance of these distortions—especially in a retail-heavy OTC security—FINRA failed to disclose the defect to investors and instead used the resulting data inaccuracies as a basis for halting trading.

Moreover, FINRA's control of the Trade Data Dissemination Service (TDDS 2.0) and other reporting platforms confirms its operational role in initiating and executing the halt. These systems are not neutral conduits but proprietary tools that FINRA uses to implement halts, corrections, and data disclosures. In prior cases such as *Eric Dyer v. FINRA*, FINRA produced granular OTC trade data through its DIVER platform in response to litigation. In contrast, it withheld all such data in the MMTLP matter, despite internal surveillance activity and fraud alerts. This disparity in treatment underscores the selective enforcement and discretionary decision-making at issue in this case.

FINRA's assertion that downstream entities such as NSCC and DTC were compelled to act is directly contradicted by those entities' public statements. In a March 2023 letter to the Financial Stability Board, NSCC confirmed that decisions to restrict settlement access are not automatic but are instead subject to internal discretion and governance processes. See Ex. 33, p. 11. These statements eliminate any argument that the MMTLP freeze was a ministerial response to

4

regulatory action. It was instead a discretionary decision by structurally affiliated entities that operate within a self-reinforcing and opaque governance system.

This governance system is riddled with structural conflicts. NSCC is a wholly owned subsidiary of DTCC, which is in turn owned by broker-dealers regulated by FINRA. The same firms that were exposed to short positions in MMTLP controlled both the regulatory body and the clearing infrastructure that executed the freeze. Such a vertically integrated structure, with no procedural transparency or neutral oversight, creates a textbook case of "pervasive entwinement" warranting judicial scrutiny. See *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

### C. FINRA Is Not Entitled to Immunity

Even if FINRA's conduct bore the appearance of regulatory action—which it does not—immunity does not apply where the conduct is discretionary, procedurally improper, and executed in bad faith. See *Weissman*, 500 F.3d at 1301–02; *DL Capital*, 409 F.3d at 96. The Supreme Court's decision to grant certiorari in *Alpine Securities Corp. v. FINRA*, No. 23-982 (cert. granted Mar. 18, 2024), further confirms the growing constitutional and procedural concerns surrounding FINRA's structure and enforcement practices. That case presents questions directly relevant to the conduct challenged here, including whether FINRA's adjudicatory and enforcement authority is constitutionally sound.

As the Court in *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) made clear, immunity doctrines cannot be used to shield actors from suit where the plaintiff has plausibly alleged conduct that violates constitutional or statutory safeguards. Plaintiff has more than met that threshold.

Dismissal at this stage would improperly shield FINRA from judicial oversight of ultra vires conduct that caused significant investor harm.

## III. PLAINTIFF HAS STANDING UNDER THE EXCHANGE ACT

FINRA's assertion that Plaintiff lacks standing is meritless. Plaintiff is a Connecticut resident and MMTLP investor who suffered direct, concrete harm due to FINRA's discretionary trading halt. The Complaint satisfies both Article III and statutory standing requirements.

### A. Plaintiff Falls Within the Exchange Act's Zone of Interest

The Exchange Act was enacted to protect investors and ensure fair, transparent markets. See 15 U.S.C. §§ 78b, 78o–3(b)(6). FINRA cannot claim regulatory authority under the Act while disclaiming accountability for its misuse.

Plaintiff's injury—a loss of liquidity, denial of market access, and forced conversion into a private asset—was not speculative. It was the direct and foreseeable result of FINRA's unannounced halt, issued just days before the scheduled Next Bridge Hydrocarbons distribution.

The Supreme Court has long recognized implied rights of action where a statute is designed to protect a specific class and the harm falls within the scope Congress intended to prevent. See *Cort v. Ash*, 422 U.S. 66, 78 (1975); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16 (1979). Plaintiff is the very type of investor the Exchange Act was enacted to protect.

The Second Circuit has made clear that Article III standing requires a plaintiff to allege three elements: an injury-in-fact, a causal connection between the injury and the defendant's conduct,

6

and redressability. See *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). Plaintiff satisfies all three.

Plaintiff has alleged a concrete injury-in-fact by showing that he lost the ability to trade MMTLP shares due to FINRA's halt. As a result of this freeze, he suffered measurable financial harm and was involuntarily forced into a non-tradable security—Next Bridge Hydrocarbons—without liquidity or fair valuation. This harm was specific, individualized, and directly related to FINRA's conduct.

The requirement of causation is also satisfied. DTCC has confirmed that FINRA issued the trading halt and that DTCC acted solely in reliance on FINRA's directive. See DTCC Mot. to Dismiss at 8. The Complaint plausibly alleges that it was FINRA's discretionary decision that initiated the halt and triggered the downstream consequences that injured Plaintiff and other investors.

As to redressability, Plaintiff seeks both monetary damages and injunctive relief. These remedies fall squarely within the Court's authority under the Exchange Act and applicable constitutional provisions. The harm alleged is not abstract or speculative, but redressable through available judicial relief.

Courts have routinely upheld standing in cases where an SRO's conduct has direct consequences in the marketplace that materially affect investors. See *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998) (recognizing standing where SRO conduct directly impacted market outcomes).

**B. Second Circuit and Supreme Court Precedent Support Standing**

Federal courts—including both the Second Circuit and Supreme Court—have made clear that standing is established where a plaintiff alleges injury-in-fact, causation, and redressability. See *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). Plaintiff satisfies each of these core Article III requirements.

Plaintiff suffered an injury-in-fact by losing the ability to trade a publicly listed security—MMTLP—resulting in measurable financial harm and forced conversion into an illiquid private asset. This injury is not abstract or generalized; it is concrete, particularized, and directly linked to FINRA's discretionary halt.

Causation is satisfied because the trading freeze was triggered by FINRA's own directive, not by any SEC order or system-wide failure. As DTCC confirms: "FINRA issued a trading halt in MMTLP securities," and "DTCC did not issue the trading halt." (*DTCC MTD at 8*). FINRA's unilateral action caused a cascading market freeze—injuring investors like Plaintiff in the process.

As to redressability, Plaintiff seeks both injunctive relief and compensatory damages—remedies that fall squarely within the Court's authority under the Exchange Act and U.S. Constitution. Courts have recognized that standing is proper where a self-regulatory organization's conduct has "direct consequences in the marketplace." *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1214 (9th Cir. 1998). Plaintiff's claims align precisely with this precedent and raise justiciable questions that are not subject to dismissal at the pleading stage.

## C. The Complaint Satisfies Rule 12(b)(6)

Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), a complaint need only state a plausible claim for relief.

Here, Plaintiff alleges that FINRA acted without notice, filed no emergency rule, ignored Blue Sheet flags, and used flawed surveillance systems incapable of capturing accurate trade data. These allegations—supported by internal emails, public notices, and admissions—easily satisfy Rule 8 and defeat a motion under Rule 12(b)(6).

## D. This Case Presents a Novel, Justiciable Claim

No court has foreclosed judicial review of an SRO's discretionary market shutdown executed without SEC oversight, procedural safeguards, or formal rulemaking. Indeed, *Silver v. NYSE*, 373 U.S. 341, 358–59 (1963), permitted an antitrust challenge against exchange conduct not reviewed by the SEC, precisely because judicial review was the only remedy available.

This case presents a similar scenario. FINRA acted unilaterally—without transparency, SEC review, or enforcement process—leaving the courts as the only venue for redress. To deny standing would render FINRA's actions effectively unreviewable, raising serious constitutional concerns.

## IV. FINRA VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS

FINRA is a private entity wielding delegated public power. It halted trading nationwide, accessed confidential market data, and influenced post-trade infrastructure without notice, rulemaking, or accountability. These actions trigger serious constitutional concerns under the Fifth Amendment, the Appointments Clause, the nondelegation doctrine, and structural due process.

**A. Due Process Violations (Fifth Amendment)**

The Fifth Amendment requires notice and an opportunity to be heard before depriving individuals of property. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

FINRA failed to notify investors or the issuer before freezing MMTLP trading on December 9, 2022. It later admitted to Congress that the halt was based not on actual settlement failures, but on speculative concerns about potential outcomes. (13-1, Exhibit 21).

This deprivation occurred through infrastructure that FINRA both operated and knew was flawed. FINRA's March 2024 Trade Reporting Notice (Ex. 31) confirms its systems could not process fractional share quantities, rejecting trades with decimals. This distortion masked synthetic positions and compromised its surveillance capability—yet was used as a justification for the halt.

Further, the halt directive applied only to FINRA "member firms," but downstream effects extended to non-members. NSCC and DTC, in public statements, confirmed that halt decisions are not automatic, but subject to governance and discretion—even in insolvency. (Ex. 33, p. 11).

These clearing entities—governed and owned by FINRA-member firms—chose to act on FINRA's signal, effectuating a market-wide freeze without independent oversight. FINRA's decision cascaded through an infrastructure it does not formally control but is structurally entwined with.

FINRA's use of quasi-governmental power—absent notice, due process, or neutral adjudication—violated Plaintiff's rights under the Fifth Amendment. See *Brentwood Acad. v.*

10

*Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("pervasive entwinement" triggers state-actor status).

**B. Appointments Clause Violation**

The Appointments Clause requires that officers exercising significant federal authority be appointed by the President and confirmed by the Senate. U.S. Const. art. II, § 2, cl. 2.

FINRA's senior officials—who initiate enforcement actions, adjudicate violations, and influence national market access—are privately appointed by its board, not through any public process. This structure mirrors that invalidated in *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010), and violates the rule in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), which held that officials exercising discretion must be constitutionally appointed.

The Supreme Court's grant of certiorari in *Alpine Sec. Corp. v. FINRA*, No. 23-982 (cert. granted Mar. 18, 2024), confirms that these concerns are not speculative. FINRA's internal insulation from executive oversight raises the same separation-of-powers issues now under Supreme Court review.

**C. Violation of the Nondelegation Doctrine**

Under *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), Congress may not delegate authority to private entities absent clear statutory principles. Delegation that allows private actors to bind the public without oversight is "legislation in its most obnoxious form."

Here, FINRA—a private, broker-funded corporation—executed a market-wide halt without any intelligible principle, formal procedure, or SEC filing. The Exchange Act provides no authority

11

to halt trading in a non-enforcement context. Yet FINRA acted with sweeping discretion, triggering a freeze across U.S. markets without rulemaking, transparency, or legal foundation.

This was not regulation—it was unaccountable lawmaking by a private actor, in violation of the nondelegation doctrine. See *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

**D. Structural Conflicts and Institutional Bias**

FINRA's dual role—as regulator and industry-funded gatekeeper—creates an irreconcilable conflict of interest. Its member firms own DTCC and NSCC—the very infrastructure used to implement the trading halt.

This structure rewards institutional actors while excluding retail investors from transparency and remedy. Despite fraud alerts and Regulation SHO violations, FINRA withheld Blue Sheet data, failed to audit short positions, and refused to warn investors. These actions benefited institutional short sellers at the expense of public shareholders.

The Fifth Circuit recognized similar due process violations in *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022), where administrative adjudication by conflicted, insulated actors violated constitutional safeguards. FINRA's conduct here presents an even more concerning form of private enforcement without accountability.

**V. FINRA'S ACTIONS SUPPORT ANTITRUST AND CUTPA CLAIMS**

FINRA argues that Plaintiff's antitrust and state law claims are preempted due to its SRO status. This is incorrect. SRO immunity does not apply to ultra vires conduct, actions taken in bad faith, or conduct furthering private, anticompetitive interests. Plaintiff alleges precisely that.

**A. FINRA Maintains Monopoly Control Over Market Infrastructure**

FINRA maintains effective monopoly control over alternative trading transparency through its historical operation of the OTC Bulletin Board (OTCBB), and its continued control of the OTC Reporting Facility (ORF) and Trade Data Dissemination Service (TDDS). These systems—exclusive to FINRA—govern trade reporting, halt notices, and market corrections for all OTC equity securities. Although FINRA represented that the OTCBB was officially discontinued in 2021, it remained designated as "ACTIVE" in the ISO 10383 MIC registry as of May 2024. See Ex. 38. This raises serious questions about FINRA's continued infrastructural control and the potential for undisclosed mechanisms used to enforce the MMTLP trading halt.

Unlike exchanges governed by Regulation NMS and subject to public filing requirements, FINRA's reporting infrastructure operates without external oversight. FINRA selectively determines what data is reported, when halt notices are disseminated, and whether market anomalies are disclosed. This asymmetrical control disadvantages retail investors and prevents meaningful transparency in the OTC marketplace.

Despite having firm-level surveillance capabilities—including through its DIVER platform, ORF, and TDDS—FINRA failed to issue alerts, publish short volume data, or disclose trading irregularities in MMTLP in the weeks leading up to the halt. FINRA had used the DIVER platform in other matters, such as *Eric Dyer v. FINRA* (Ex. 36), to provide detailed trading records. Yet in this case, despite Regulation SHO threshold violations, FOIA-obtained fraud alerts, and active Blue Sheet surveillance, FINRA released no public data, warning, or enforcement action. This disparity was not the result of technical incapacity but a conscious

decision to withhold material information from investors while retaining absolute control over market visibility.

The depth of FINRA's monopoly control is underscored by its public claim that there were "only 2.65 million shares short[1]" in MMTLP. That figure was not released in a technical report but delivered in a formal written response to Congressman Ralph Norman in March 2023—submitted to the U.S. Congress and attached to this case as (13 -1) Exhibit 21. At face value, this figure suggests precision. But FINRA's own admissions directly contradict its validity. In its March 2024 Trade Reporting Notice (Ex. 31), FINRA confirmed that its systems—including the ORF—could not accept trades involving fractional share quantities, which are prevalent among retail accounts. These rejections materially distorted float, fails-to-deliver, and short interest data—rendering surveillance outputs inherently unreliable. FINRA further admitted to Congressman Norman that it does not monitor non-member broker-dealers or overseas proprietary trading firms. Internal FOIA communications also show that FINRA does not routinely confirm the accuracy of Blue Sheet data and does not distinguish covered shorts from naked ones. In light of these admissions, FINRA's assertion of a 2.65 million short position was either knowingly false or made with reckless disregard for its own acknowledged surveillance deficiencies.

FINRA's misrepresentation to a sitting member of Congress may also implicate federal criminal statutes. Under 18 U.S.C. § 1001, it is a crime to knowingly and willfully make materially false or misleading statements to a government official. If the 2.65 million short figure was submitted with knowledge that FINRA lacked the infrastructure or jurisdiction to verify it, the statement

---

[1] If the 2.65 million short figure was submitted with knowledge that FINRA lacked the infrastructure or jurisdiction to verify it, the statement could constitute a false statement to Congress

could constitute a false statement to Congress. If made under oath or certification, it may further qualify as perjury under 18 U.S.C. § 1621.[2] Either possibility reinforces the gravity of FINRA's control over transparency and its abuse of that control to suppress material information while advancing a false narrative.

Meanwhile, FINRA's monopoly over infrastructure allowed the halt to be amplified through affiliated entities. NSCC, which ceased settlement of MMTLP, is a wholly owned subsidiary of DTCC—a corporation owned by FINRA-regulated broker-dealers. See Ex. 33, p. 6. NSCC has confirmed that such decisions are not automatic, even in cases of market stress or insolvency. See Ex. 33, p. 11. Instead, they involve discretionary governance, internal deliberation, and risk-based assessments. That structure created a self-executing loop: FINRA triggered the halt through opaque internal systems, and NSCC implemented it under the direction of firms subject to FINRA's own regulatory authority.

No emergency rule was filed with the SEC under Rule 19b-4. No public investor notice was issued. No procedural justification was recorded in the Federal Register. The entire freeze occurred outside the Exchange Act's mandatory framework for trading access modification. That is not protected regulation—it is exclusionary market control executed through a vertically integrated, privately governed, and structurally conflicted infrastructure.

## B. FINRA's Conduct Shielded Institutions and Harmed Retail Investors

FINRA's discretionary trading halt disproportionately benefited institutional actors with large short positions while depriving retail investors of access, transparency, and liquidity. This is not

---

[2] Knowingly submitting materially false or misleading information to Congress violates 18 U.S.C. § 1001, and if sworn or certified, may constitute perjury under 18 U.S.C. § 1621.

merely a claim of poor regulatory performance—it is an allegation of systemic informational suppression and structural bias that directly contradicts the Exchange Act's mandate to ensure fair and honest markets. See 15 U.S.C. §§ 78b, 78o–3(b)(6).

The halt was implemented during a period of heightened trading activity and investor interest in MMTLP. FINRA had direct access to granular trade data through its TRACE, ORF, and DIVER platforms. Internal communications and Blue Sheet requests confirm that FINRA was actively surveilling MMTLP and MMAT for potential fraud. Yet despite this active monitoring, FINRA withheld all trade imbalance data, short interest summaries, and Regulation SHO enforcement actions. No alerts were issued, no investor disclosures were made, and no efforts were undertaken to inform the public of emerging risks.

Instead, FINRA froze trading access days before the scheduled distribution of Next Bridge Hydrocarbons, leaving retail shareholders trapped in a security that was transitioning into a non-tradable private asset. Brokers subsequently issued "sell-to-close only" notices, and clearing activity was suspended—effectively eliminating investor exit. These downstream effects were not the product of neutral regulation but of a discretionary directive issued by FINRA, reinforced by clearing entities structurally tied to FINRA-regulated broker-dealers.

FINRA's own systems further contributed to this harm. Its March 2024 Trade Reporting Notice (Ex. 31) acknowledged that trade reports involving fractional shares—common among retail investors—were automatically rejected by the OTC Reporting Facility. These rejections distorted float, obscured synthetic activity, and impaired surveillance of short volume and fails-to-deliver. Despite the systemic implications, FINRA did not disclose this reporting defect to the public or

take corrective regulatory action. Instead, it allowed the distortion to persist and used the resulting uncertainty as a justification to halt trading.

Compounding this failure was FINRA's selective data withholding. In prior cases, such as *Eric Dyer v. FINRA*, the organization provided firm-level OTC data from its DIVER system to litigants. In the case of MMTLP—despite multiple investor complaints, Blue Sheet activity, and Regulation SHO threshold violations—no such data was disclosed. This disparity in transparency demonstrates a regulatory posture that shields institutional actors while suppressing access to information critical for retail decision-making.

The entities tasked with implementing the halt—NSCC and DTC—are not independent regulators but subsidiaries of DTCC, which is itself owned by FINRA-member broker-dealers. NSCC has publicly confirmed that its decision to cease settlement access was not automatic, but discretionary and subject to internal governance review. See Ex. 33, p. 11. That governance, in turn, is directed by firms subject to FINRA oversight. This vertically integrated and interdependent structure ensured that the MMTLP freeze would be executed without SEC oversight, without public process, and without external accountability.

The combined effect of FINRA's silence, its control over trade reporting infrastructure, and its refusal to enforce or disclose material risks foreclosed retail investor participation while insulating institutional participants from price discovery and short position exposure. This conduct subverted the core purpose of the Exchange Act and raises substantial antitrust and consumer protection concerns.

Plaintiff seeks injunctive relief compelling FINRA to disclose all internal communications related to the MMTLP halt, including Blue Sheet findings, short volume surveillance, and the

17

operational rationale used to justify the freeze. Plaintiff further requests that FINRA be compelled to produce its internal audits, trade imbalance assessments, and any rulemaking deliberations relating to fractional share suppression, short sale enforcement, and data integrity concerns in OTC securities. These disclosures are necessary to restore public confidence and provide accountability for a discretionary halt that was executed in secrecy and without procedural safeguards.

### C. FINRA's Conduct Constitutes Unfair Trade Practices Under CUTPA

Plaintiff, a Connecticut resident, alleges that FINRA materially concealed market risk, suppressed trade-level data, and acted in ways that foreseeably harmed retail investors. These actions support a claim under the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a et seq.

As in *Bartold v. Wells Fargo Bank, N.A.*, 2015 WL 7458504 (D. Conn. Nov. 24, 2015), institutional misconduct that harms consumers may give rise to a viable CUTPA claim. FINRA's failure to act, suppression of fraud alerts, and discretionary halt directly injured Plaintiff—who relied on FINRA-regulated systems to trade lawfully in Connecticut.

### D. Antitrust and CUTPA Claims Are Not Preempted

Courts have made clear that antitrust and state law claims are not preempted where SRO conduct lacks a regulatory mandate or furthers private interests. See *Weissman*, 500 F.3d at 1301; *Sparta*, 159 F.3d at 1214.

FINRA acted outside its delegated authority, failed to follow SEC rulemaking procedures, and engaged in selective, anti-competitive conduct that protected its members. These actions are not

regulatory—they are commercial, exclusionary, and actionable under the Sherman Act and CUTPA.

Dismissal at the pleading stage would improperly shield FINRA from accountability for precisely the kind of monopolistic abuse and selective enforcement these statutes were designed to redress.

## VI. THIS COURT HAS PERSONAL JURISDICTION OVER FINRA

FINRA's jurisdictional defense fails. Plaintiff has alleged sufficient facts to establish both statutory and constitutional bases for personal jurisdiction. Connecticut's long-arm statute reaches FINRA, and the exercise of jurisdiction comports with due process under the Fourteenth Amendment.

### A. Connecticut's Long-Arm Statute Applies

Under Conn. Gen. Stat. § 33-929(f), courts may exercise jurisdiction over foreign corporations that cause injury in Connecticut through out-of-state conduct. Plaintiff, a Connecticut resident, held MMTLP shares in a brokerage account subject to FINRA oversight. The December 9, 2022 trading halt—issued nationwide—froze his shares and caused immediate financial injury within the state. This statutory threshold is satisfied.

FINRA's own materials confirm its role in regulating broker-dealers that serve investors in Connecticut. (13-1, Exhibit 8). The resulting harm to Plaintiff was foreseeable, direct, and suffered within the forum.

### B. Jurisdiction Comports with Due Process

Due process requires that a defendant have sufficient minimum contacts with the forum, and that the exercise of jurisdiction not offend traditional notions of fair play and substantial justice. See *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

FINRA has extensive national contacts, including with broker-dealers serving this District. It knowingly imposed a trading halt with nationwide application, fully aware that it would impact retail investors in every state. This constitutes purposeful availment under *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). Jurisdiction over FINRA in this case is both foreseeable and fair.

## C. The "Effects Test" Further Supports Jurisdiction

The Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), holds that jurisdiction is proper when a defendant's intentional conduct is aimed at a forum and causes foreseeable harm there. Here, FINRA admits it halted trading to prevent investor confusion and acknowledged in public filings that the halt would affect all firms and investors nationwide. (13-1, Exhibit 21). This conduct was expressly aimed at a national investor base and was certain to affect individuals residing in Connecticut.

The principle articulated in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), further confirms that a defendant may be haled into court in any state where the effects of its conduct are intentionally directed. FINRA's actions meet this standard.

## D. Plaintiff Has Made a Prima Facie Showing of Jurisdiction

At the pleading stage, a plaintiff must only make a prima facie showing that jurisdiction is proper. See *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). Plaintiff

20

alleges that he is a Connecticut resident, that he held shares of MMTLP in a brokerage account regulated by FINRA, and that he suffered concrete injury within the state as a result of FINRA's discretionary halt. The halt applied to all broker-dealers serving Connecticut, and the resulting market freeze injured investors like Plaintiff in this forum.

To the extent that the depth of FINRA's contacts with Connecticut is contested, Plaintiff respectfully requests narrowly tailored jurisdictional discovery. This would include communications between FINRA and Connecticut-based firms concerning MMTLP, the use of FINRA's TRACE and ORF systems by local broker-dealers, and any regulatory or surveillance activity directed at market participants in this District.

Courts routinely authorize jurisdictional discovery under such circumstances, particularly where relevant facts lie within the defendant's exclusive control. See *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003).

**E. FINRA's Case Law Is Inapposite**

FINRA's reliance on *Park v. FINRA* and *Tawil v. FINRA* is unavailing. In both cases, the plaintiffs failed to allege harm within the forum or did not plead facts establishing minimum contacts. Here, Plaintiff alleges injury arising directly from FINRA's nationwide trading halt, suffered through a brokerage account based in Connecticut. The effects of FINRA's conduct were not speculative; they were targeted, direct, and felt in this forum.

FINRA cannot claim the authority to regulate all broker-dealer activity nationwide, and then disclaim responsibility when its actions predictably cause injury to investors in a particular state. The assertion of jurisdiction here is both legally and constitutionally sound.

## VII. PLAINTIFF IS ENTITLED TO DISCOVERY

Even if the Court identifies any ambiguity regarding the sufficiency of Plaintiff's claims, dismissal would be premature. Plaintiff has plausibly alleged violations of the Exchange Act, due process under the U.S. Constitution, the Sherman Act, and the Connecticut Unfair Trade Practices Act (CUTPA), supported by detailed factual allegations, public disclosures, internal communications, and conflicting statements made by Defendants.

These claims are not speculative. Plaintiff has cited documentary evidence—including FOIA-obtained emails, admissions from DTCC and NSCC, and FINRA's own reporting notices—indicating that FINRA acted unilaterally, without notice, rulemaking, or enforcement procedure, and that its actions triggered discretionary responses by infrastructure entities it does not formally regulate but is structurally entangled with.

Among the factual disputes requiring discovery is the nature and extent of FINRA's coordination with DTCC and NSCC in executing the MMTLP trading halt. FINRA asserts that its directive was limited to "member firms," yet the record shows that its actions resulted in a system-wide freeze enforced by non-member entities. Both DTC and NSCC have confirmed that such halts are not automatic but involve case-by-case determinations, subject to internal governance protocols, even in cases of market stress. These assertions directly contradict FINRA's implication that the market halt was merely a regulatory formality or procedural consequence.

Discovery is also warranted into FINRA's Blue Sheet and surveillance activity in the weeks preceding the halt. Internal communications from FINRA's fraud team confirm that MMTLP and MMAT were subject to active regulatory inquiry, with Blue Sheets requested and reviewed. FINRA's March 2024 notice further reveals that its trade reporting infrastructure at the time

22

could not process fractional trades, materially impairing its ability to monitor market risk or short volume accumulation. These defects, while known internally, were not disclosed to the investing public or used to initiate any public enforcement action—despite Regulation SHO threshold violations and multiple investor complaints.

Plaintiff has identified specific areas where limited discovery would produce relevant documents and testimony, including communications between FINRA and DTCC, internal governance records concerning halt decisions, data integrity audits of Blue Sheets, and the operational limitations of FINRA's OTC systems. These matters go to the heart of whether FINRA's actions were lawful, regulatory, and entitled to immunity—or whether they were discretionary, ultra vires, and executed outside formal rulemaking channels.

DTCC and FINRA have both argued that the claims are incurable and should be dismissed with prejudice. That position is unsupported. Plaintiff can further elaborate on the scope of unsettled trades impacted by the halt, the role of FINRA-controlled systems in distorting float and price discovery, and the nature of informal communications used to implement the market freeze. These facts are either already documented or obtainable through narrowly tailored discovery.

The Second Circuit has made clear that a pro se complaint should not be dismissed without granting leave to amend where a liberal reading indicates that a valid claim might be stated. See *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). That standard is easily met here.

Accordingly, Plaintiff respectfully requests that the Court deny the Motion to Dismiss and permit the case to proceed to discovery on all claims. The record already contains plausible allegations of ultra vires conduct, systemic bias, and data suppression—none of which can be resolved at the pleading stage.

**VIII. CONCLUSION**

At the pleading stage, a plaintiff is not required to prove each element of every claim but must only allege facts that, accepted as true, state a plausible claim for relief. Plaintiff has met this standard. The Complaint alleges that FINRA acted outside its statutory authority, violated constitutional protections, and caused foreseeable and substantial harm by implementing a discretionary trading halt without prior notice, regulatory authorization, or adherence to the rulemaking procedures required under the Exchange Act.

FINRA's Motion to Dismiss rests on a mischaracterization of its role and on factual assumptions contradicted by the record. DTCC has admitted that it ceased settlement of MMTLP shares solely in reliance on FINRA's directive, not due to any SEC order or system-wide emergency. NSCC and DTC have both confirmed that decisions to halt settlement are not automatic but involve internal discretion and governance, even in insolvency scenarios. NSCC also acknowledges that any material change to its access or clearing protocols must be filed with the SEC and publicly disclosed through the formal rulemaking process. No such filing occurred in connection with the MMTLP freeze.

Additionally, FINRA's March 2024 Trade Reporting Notice confirms that its reporting infrastructure could not accurately process trades involving fractional shares at the time of the halt. This flaw significantly undermined the integrity of its risk surveillance, as fractional trades—common in retail accounts—were either rounded, truncated, or rejected outright. Despite possessing internal alerts of manipulation, Blue Sheet data, and known infrastructure limitations, FINRA provided no investor notice, initiated no enforcement actions, and failed to file an

emergency rule with the SEC. Its conduct was not regulatory enforcement but a discretionary market intervention executed without transparency, due process, or statutory grounding.

Courts have consistently held that SRO immunity does not apply to conduct that is ultra vires, performed in bad faith, or executed outside the scope of formal regulatory authority. The facts alleged here meet those exceptions. Plaintiff has plausibly stated claims under the Exchange Act, the U.S. Constitution, the Sherman Act, and the Connecticut Unfair Trade Practices Act. These claims are supported by internal admissions, FOIA disclosures, procedural omissions, and conduct that cannot be reconciled with the obligations of a self-regulatory organization.

Accordingly, Plaintiff respectfully requests that the Court deny Defendant FINRA's Motion to Dismiss in its entirety pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff further requests that this action be permitted to proceed to discovery, including on issues involving FINRA's internal communications with SEC, DTCC, and NSCC, its handling of Blue Sheet audits, its decision-making process regarding the MMTLP halt, and whether any emergency regulatory rule was filed, bypassed, or suppressed. Plaintiff also asks the Court to reject dismissal with prejudice, as Plaintiff can amend to further develop claims already grounded in the record and supported by additional evidence within Defendants' exclusive control.

Respectfully submitted,
 Jason Todd Rolo
 Pro Se Plaintiff
 Torrington, CT 06790
 Email: mastcab@yahoo.com
 Phone: (413) 657-9082

**Dated:** April 14, 2025

25

I hereby certify that on this date, a copy of the foregoing Reply in Opposition to FINRA's Motion to Dismiss was filed and served via the Court's CM/ECF system, which will automatically send notice to all counsel of record.

DATED: 4/14/25

Respectfully submitted,


Jason Rolo
Pro Se Plaintiff
Torrington, CT