**Exhibit 21**


**(court document 13-1 Exhibit 20)**


**Finra response to Norman**



**Robert W. Cook**
President and Chief Executive Officer

January 31, 2024

The Honorable Ralph Norman
U.S. House of Representatives
569 Cannon HOB
Washington, DC 20515

Dear Congressman Norman:

Thank you for the opportunity to respond on behalf of FINRA to your December 22, 2023, letter addressed to me and Gary Gensler, Chair of the Securities and Exchange Commission (SEC), concerning the Meta Materials, Inc. (Meta Materials) corporate action to distribute Next Bridge Hydrocarbons, Inc. (Next Bridge) common stock and market activity in the Series A Preferred Shares of Meta Materials that traded under the symbol "MMTLP."

We appreciated the opportunity for FINRA officials to meet with your staff throughout the preceding months. We have responded to every Congressional outreach to us regarding this matter and we will continue to be available to answer further questions. In response to Congressional and investor inquiries last year,[1] we also published two Frequently Asked Questions (FAQs) to provide investors with accurate information about trading activity in MMTLP (including short sales) and the circumstances surrounding the Next Bridge/MMTLP corporate action and trading halt.[2]

FINRA is a not-for-profit, self-regulatory organization (SRO) responsible for regulating its member broker-dealers and their associated persons pursuant to the Securities Exchange Act of 1934 (Exchange Act). FINRA is dedicated to protecting investors and safeguarding market integrity in a manner that facilitates vibrant capital markets. Operating under the oversight of the SEC, we are charged with adopting rules consistent with the Exchange Act; examining our members for compliance with securities laws and rules applicable to U.S. broker-dealers; and enforcing compliance where necessary. FINRA is regularly examined itself by the SEC and our rules generally must first be filed as proposals with the SEC, published for public comment, and then approved by the SEC before becoming effective.

---

[1] FINRA, including through FINRA's Office of the Ombuds, has received a substantial number of inquiries from investors concerning many of the issues you raise in your letter.

[2] *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt; and Supplemental *See* FAQ: MMTLP Corporate Action and Trading Halt (November 6, 2023), available at https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt.

**Investor protection. Market integrity.**                1700 K Street, NW      t  202 728 8000
                                                        Washington, DC        www.finra.org
                                                        20006

The Honorable Ralph Norman
January 31, 2024
Page 2

FINRA also is subject to oversight by Congress and recently testified before the House
Financial Services Committee at a Capital Markets Subcommittee oversight hearing.[3]

Some investors continue to question FINRA's reasons for imposing the halt, and we continue
to observe inaccurate information circulating on some social media about trading in MMTLP
and the trading halt. While we discuss these questions in greater detail below and in our
FAQs, it is helpful to first highlight several key facts about trading in MMTLP and FINRA's
role:

-   FINRA's decision to halt trading was due to clearance and settlement concerns in
    light of the structure and timing of the corporate action. As a result, ongoing trades
    after December 8, 2022 would not be settled by December 12, 2022, or predictably
    thereafter, risking significant investor confusion and harm. Contrary to some theories
    circulated on social media, FINRA did not initiate the halt because there were
    problems with a "share imbalance" and "counterfeit shares," or because of short
    positions held by hedge funds. FINRA also did not provide advance notice of the
    trading halt to broker-dealers, hedge funds, or any other market participant.

-   Investors have expressed confusion regarding whether Meta Materials needed to
    approve the commencement of trading in MMTLP. Generally, an issuer's approval is
    not needed for a security to trade outside of a securities exchange, *i.e.*, "over the
    counter" (OTC), although an issuer may take steps to limit such trading. The issue of
    whether a security can be publicly traded is governed by the Securities Act and SEC
    rules; for purposes of these provisions, it does not appear that Meta Materials took
    effective steps to restrict public trading in MMTLP.

-   Assigning the "MMTLP" symbol upon request of a broker-dealer was standard
    practice given the circumstances, and appropriate to further market transparency.
    When a security trades OTC, FINRA broker-dealers are required by FINRA rules to
    request a stock symbol (if one does not already exist) and report the trade. Then they
    must electronically report the price and size of the executed transaction, which
    FINRA disseminates to the public to provide transparency. This is what occurred in
    the case of MMTLP. Given that a trade had been executed and the company had
    obtained a unique identifier for the security,[4] FINRA assigned the "MMTLP" symbol
    in October 2021. The MMTLP symbol was *not* assigned in connection with a Form

---

[3]     "Examining the Agenda of Regulators, SROs, and Standards-Setters for Accounting, Auditing,"
        Tuesday, December 12, 2023, Capital Markets Subcommittee, House Committee on Financial
        Services. Testimony of Mr. Robert Cook, President and CEO, Financial Industry Regulatory
        Authority (FINRA), available at https://docs.house.gov/meetings/BA/BA16/20231212/116638/HHRG-
        118-BA16-Wstate-CookR-20231212.pdf.

[4]     The issuer had obtained a CUSIP number for the Series A Preferred Shares, which is a unique
        identifier for a security assigned by CUSIP Global Services and used to facilitate trading and
        settlement.

The Honorable Ralph Norman
January 31, 2024
Page 3

> 211 submission, contrary to some claims made on social media that trading in
> MMTLP began based on a Form 211 submitted using fraudulent information.

- FINRA has reviewed its members' U.S. trading activity in MMTLP, including short
  sale activity, and has found no evidence that there was significant naked short selling
  (which some social media sources refer to as "counterfeit shares") in MMTLP. The
  total number of U.S. short positions identified at FINRA members represent only a
  nominal percentage of the total shares issued and outstanding as of December 12,
  2022. Further, U.S. reported short positions at FINRA members dramatically
  decreased leading up to the last regular day of trading in MMTLP. In sum, FINRA is
  not aware of any data that supports social media claims of significant naked short
  selling or "counterfeit shares."

- FINRA cannot perform a "certified audited and consolidated count of shares."
  FINRA's regulatory authority does not extend to domestic or foreign non-member
  entities that could act as custodians or agents holding securities for others, including
  foreign-registered broker-dealers. Further, the regulatory tools available to FINRA
  do not provide the data that would enable FINRA to perform a share count (*e.g.*, the
  Consolidated Audit Trail, Electronic Blue Sheets, and FINRA's trade reporting
  facilities do not contain information about securities *positions* as described in more
  detail below). The transfer agent[5] retained by Next Bridge would be the best source
  of information regarding recordholders in Next Bridge common stock.

- Next Bridge registered the issuance of its common stock in connection with the Next
  Bridge/MMTLP corporate action with the SEC—making Next Bridge an independent
  public reporting company whose shares are freely tradeable under the federal
  securities laws. However, today it is very difficult for investors to trade these shares
  because Next Bridge has not taken the necessary steps to support the development of
  a secondary market. Unless Next Bridge takes steps that would support trading in its
  common stock, trading will continue to be difficult, including trades to close out short
  positions.

Investors' use of social media to make investment decisions is an area of concern for FINRA
and other regulators—particularly because this information may be incomplete, misleading,
or false. FINRA has observed a significant amount of social media activity regarding
MMTLP. For example, social media mentions of MMTLP rose from approximately 40,000
between January 1, 2022 and October 6, 2022, to approximately 110,000 between October 7,
2022 and December 8, 2022.[6] Before and since the MMTLP halt, FINRA and other

---

[5]     FINRA does not have regulatory authority over issuers like Next Bridge or transfer agents like
        American Stock Transfer & Trust Company (AST). Transfer agents—overseen by the SEC—are
        responsible for maintaining issuer security holder records and have responsibilities concerning the
        reconciliation and safekeeping of securities. *See also* November 6, 2023, MMTLP FAQs, Question
        No. 13.

[6]     MMTLP experienced significant price activity in the last few months of its trading. Between October
        2022 and early December 2022, social media activity in MMTLP indicated that individuals were

The Honorable Ralph Norman
January 31, 2024
Page 4

regulators have published investor education materials to help investors avoid fraud and
make informed investment decisions, including warning investors of the risks inherent in
using social media as an investment tool.[7] FINRA will continue its efforts to educate
investors about these and other risks.

FINRA's authority does not cover firms that are not its members or individuals who are not
associated with such firms. Federal or state authorities would typically have jurisdiction over
situations where other individuals (including management or other insiders of an issuer)
spread inaccurate information regarding securities on social media or otherwise, or engage in
potentially fraudulent or manipulative schemes with respect to securities. FINRA refers any
such misconduct it observes to federal and state authorities, as appropriate.[8]

As you note in your letter, in 2022, the SEC filed a complaint alleging that eight individuals
violated the federal securities laws by engaging in manipulative activity on social media,
including activity related to Meta Materials' predecessor, Torchlight Energy Resources.[9]

---

speculating that there could be a potential "short squeeze" in MMTLP shares. During this period, the
closing price of MMTLP ranged from $1.52 to $11.65 on average daily volume of 1,818,455 shares.
On December 8 (the last day of trading prior to the trading halt), trading volume increased in MMTLP
as its price fell steeply from the previous day's closing price (from $7.00 to $2.90).

[7]     *See e.g.,* Investor Alert: Social Media "Investment Group" Imposter Scams on the Rise (January 11,
        2024), available at https://www.finra.org/investors/insights/investment-group-imposter-scams;
        Following the Crowd: Investing and Social Media (March 13, 2023), available at
        https://www.finra.org/investors/insights/following-crowd-investing-and-social-media; and Investor
        Bulletin: Social Sentiment Investing Tools—Think Twice Before Trading Based on Social Media
        (April 03, 2019), available at https://www.finra.org/investors/insights/social-sentiment-investing-tools
        (published jointly by FINRA and the SEC's Office of Investor Education and Advocacy).

        In August 2022, the North American Securities Administrators Association issued an advisory
        recommending that investors use caution when considering advice from social media financial
        influencers. *See* Are you an informed investor? Financial Advice via Social Media – the Rise of the
        "Finfluencer", available at https://www.nasaa.org/64940/informed-investor-advisory-
        finfluencers/?qoid=investor-advisories.

[8]     In 2022, FINRA referred 663 fraud and insider trading cases for potential prosecution. *See* Statistics,
        available at https://www.finra.org/media-center/statistics.

[9]     The SEC complaint states, among other things, that:

        In the course of the scheme, various Defendants often highlighted an anticipated event that would
        purportedly raise the stock price (a "catalyst") and encouraged buying and holding the stock until
        the event, falsely claiming that they too were holding the stock waiting for the catalyst. In the
        case of TRCH, the catalyst was a purported upcoming merger with another company,
        Metamaterial Inc.

        *See* Complaint, *Securities and Exchange Commission v. Edward Constantin, et al.*, No. 4:22-
        cv-04306 (S.D. Tex. filed December 13, 2022).

        Separately, on January 11, 2024, Meta Materials announced a proposed settlement with the
        SEC to address an SEC investigation concerning, among other things, the merger involving

The Honorable Ralph Norman
January 31, 2024
Page 5

The U.S. Department of Justice (DOJ) has also charged the same eight individuals with
criminal conspiracy to commit securities fraud and securities fraud.[10]  Separately, the SEC
has recently brought charges pertaining to other instances of alleged misconduct by
individuals that involved online activity.[11]

Below is detailed information regarding FINRA's role in the OTC equity securities market,
its actions in connection with the MMTLP trading halt and the Next Bridge/MMTLP
corporate action, as well as information regarding trading activity in MMTLP.  FINRA is not
able to respond on behalf of other parties who may have relevant information, such as other
regulators, transfer agents, issuers and their management, or other private parties.

**Overview of FINRA's Role in Regulating the OTC Market**

FINRA is a statutorily authorized not-for-profit organization that oversees U.S.-registered
broker-dealers that are FINRA members.  Under this regulatory framework, put in place by
Congress and overseen by the SEC, FINRA's statutory obligation, in support of the SEC, is
to examine and enforce compliance with the federal securities laws, the rules thereunder, and
FINRA and certain other rules by member broker-dealers and their associated persons.  This
mandate includes overseeing member broker-dealers when they facilitate investor access to
the OTC securities market.  However, brokerage services provided by firms for customers
remain largely governed by contract.

---

Torchlight Energy Resources, Inc. and Metamaterial Inc.  The press release states, in part,
that:

> If the Commissioners approve the Proposed SEC Settlement, the Commission will enter a
> cease-and-desist order (the "Order") in connection with certain antifraud, reporting,
> books and records, and internal accounting control provisions of the securities laws.
> Under the terms of the Proposed SEC Settlement, the Company would neither admit nor
> deny the findings in the Order.  If approved, in connection with the Proposed SEC
> Settlement, the Company will pay a civil money penalty in an amount of $1 million in
> four (4) installments over the period of one (1) year pursuant to an agreed upon payment
> plan.

The full press release is available at https://metamaterial.com/meta-materials-announces-
proposed-sec-settlement/.

[10]    The trial in the DOJ's case (*USA v. Contantinescu, et al.*, No. 4:22-cr-00612 (S.D. Tex. Filed
December 7, 2022)) is currently scheduled to begin on April 1, 2024.  Thus far, one defendant in the
DOJ's case has entered a guilty plea.  *See* https://www.justice.gov/criminal/criminal-vns/case/united-
states-v-constantinescu-et-al.  In addition, the SEC's case has been stayed pending resolution of the
DOJ's case.

[11]    The SEC charged three individuals in a microcap scheme targeting retail investors that involved,
among other things, an online promotional campaign.  *See* Securities and Exchange Commission v.
Jonathan Farber, Aarif Jamani, and Brian Keasberry, Civ. Action No.1:24-CV-00273 (S.D.N.Y. filed
Jan 12, 2024).  The litigation release is available at https://www.sec.gov/litigation/litreleases/lr-25926.

The Honorable Ralph Norman
January 31, 2024
Page 6

Unlike securities exchanges, which are also SROs, FINRA does not operate a market and does not establish listing standards for issuers. FINRA also does not have authority to regulate or examine the conduct of non-members, including companies that issue equity securities that trade OTC, such as Meta Materials or Next Bridge, or their affiliated persons.

FINRA's role in regulating the OTC market therefore is based on its responsibility for regulating the activities of its member broker-dealers, not issuers, investors, or the wider marketplace. The federal securities laws require that FINRA's rules remove impediments to and perfect the mechanism of a free and open market, among other things. The SEC's oversight of FINRA includes reviewing its rules, which generally must be filed with the SEC, published by the SEC for public comment, and formally approved by the SEC before becoming effective. Through this process, FINRA has adopted numerous rules that relate to the market activity of its members, including rules governing trade reporting, reviewing corporate actions, and halting quoting and trading in the OTC market. These rules include:

- **FINRA Rule 6622.** This rule requires FINRA member broker-dealers to report executed transactions in OTC equity securities to FINRA's trade reporting facility. FINRA disseminates last sale information regarding those transactions on a real-time basis to provide investors and market participants with transparency regarding transactions and share prices for OTC equity securities.

- **FINRA Rule 6440.** This rule requires FINRA member broker-dealers to halt quoting and trading activities when FINRA determines, in accordance with the rule, that doing so is necessary to protect investors and the public interest. These circumstances include where FINRA determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.

- **FINRA Rule 6490.** SEC Rule 10b-17 generally requires issuers of publicly traded securities to give notice to the securities exchange for corporate actions involving a listed security, and FINRA for corporate actions involving unlisted securities. FINRA Rule 6490 sets forth FINRA's process for reviewing corporate action submissions required under SEC Rule 10b-17. Corporate actions are the responsibility of the issuer; FINRA does not initiate, approve, or conduct the underlying corporate action that the issuer is taking. FINRA's role is limited to reviewing and processing the submission and announcing the corporate action to market participants (unless the corporate action documentation is found to be deficient under Rule 6490, in which case FINRA may determine not to process the corporate action).

- **FINRA Rule 6432.** Like Rule 6490, Rule 6432 addresses FINRA member broker-dealer compliance with an SEC Rule—in this case, SEC Rule 15c2-11. SEC Rule 15c2-11 sets forth requirements for broker-dealers that publish quotations in a "quotation medium" for OTC securities. In some cases, quoting can only be initiated following the filing of a Form 211 with FINRA. However, SEC Rule 15c2-11

The Honorable Ralph Norman
January 31, 2024
Page 7

includes several exceptions, one of which permits a broker-dealer to publish quotations on behalf of a customer that represents the customer's unsolicited interest (other than company insiders or affiliates, unless specified issuer information is current and publicly available). If an exception applies, a broker-dealer is not required to file a Form 211 with FINRA.

**Overview of FINRA's Actions Related to MMTLP**

Initial Trading and Quoting in MMTLP

The answer to the question of whether a security can be publicly traded under the federal securities laws is governed by the Securities Act and SEC rules. When an OTC equity security trades, one of FINRA's roles is to assign a security symbol in connection with trade reporting by FINRA members. Under the current process, FINRA assigns a symbol only if certain minimum requirements concerning the security are met, including, for example, that the issuer has obtained a CUSIP number for the security.

After Meta Materials obtained a CUSIP number for its Series A Preferred Shares and the security became DTC eligible,[12] FINRA assigned the "MMTLP" symbol to the security in 2021 so that a broker-dealer could report an executed transaction in the security.[13] In doing so, FINRA did not approve or determine when broker-dealers or customers may begin trading the security. Once a security trades, FINRA disseminates last sale pricing information reported by its member broker-dealers to facilitate public price transparency. FINRA did not receive a Form 211 in connection with quoting in MMTLP because broker-dealers that were publishing quotations for MMTLP relied on the exception to SEC Rule 15c2-11 that permits the publication of quotations for unsolicited customer orders (with specified conditions).[14]

FINRA understands that, because Torchlight Energy Resources, Inc. publicly stated in its SEC filing that it did not expect a market to develop for the Series A Preferred Shares, confusion exists as to whether the issuer needed to approve the commencement of trading in MMTLP.[15] The answer to the question of whether a security can be publicly traded under the federal securities laws is governed by the Securities Act and SEC rules, not the expectations of the issuer. As noted above, generally, an issuer's approval is not needed for a security to trade OTC, although an issuer may take steps to limit such trading. Under the

---

[12]  The Depository Trust Company (DTC) is a subsidiary of The Depository Trust & Clearing Corporation.

[13]  *See* March 16, 2023, MMTLP FAQs, Question No. 4.

[14]  *Id.*

[15]  *See* Torchlight Energy Resources, Inc., Schedule 14A (May 7, 2021) available at https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm.

The Honorable Ralph Norman
January 31, 2024
Page 8

federal securities laws, Meta Materials does not appear to have taken the steps necessary to restrict trading in MMTLP.[16]

### The Next Bridge/MMTLP Corporate Action

As discussed above, when a company decides to engage in a corporate action that affects an unlisted security that trades only in the OTC market, SEC Rule 10b-17 requires that the company submit notice of specified types of corporate actions to FINRA. FINRA reviews the submission pursuant to FINRA Rule 6490 and, unless FINRA determines that a submission is deficient under Rule 6490, FINRA provides public notice of the corporate action on its website via the Daily List.[17] Broker-dealers and professional vendors historically have been the primary audience for the Daily List, which contains technical terminology and information that broker-dealers need to perform tasks concerning their activities in securities, such as adjusting stock quote prices or sizes (*e.g.*, as the result of a distribution or stock split).

As was required under SEC Rule 10b-17 for issuers with a class of publicly traded securities, Meta Materials notified FINRA of its intention to undertake the Next Bridge/MMTLP corporate action. Following FINRA's review under Rule 6490, FINRA published a notice on the Daily List on December 6, 2022 (modified on December 8) announcing that, consistent with the information provided by Meta Materials, Next Bridge shares would be distributed to those MMTLP shareholders with settled positions as of December 12, 2022. The Daily List announcement further stated that any purchasers after December 8, 2022 (*i.e.*, those with trades due to settle on or after December 13, 2022) would not be entitled to receive Next Bridge shares in the distribution, and the MMTLP symbol would be deleted effective December 13, 2022.[18] FINRA deleted the MMTLP symbol because, pursuant to the Next Bridge/MMTLP corporate action, following the distribution to MMTLP shareholders of Next Bridge common stock, Meta Materials was cancelling the preferred shares that traded under the MMTLP symbol. Because the MMTLP shares have been cancelled by the issuer, they can no longer be traded, and the symbol can no longer be reinstated.[19]

---

[16]     FINRA does not approve or have any role in a company's issuance of securities. FINRA also lacks authority to regulate the activities of transfer agents. Finally, FINRA has no role in assigning a CUSIP number or determining whether a security is DTC-eligible.

[17]     The Daily List is a standardized communication published in an electronic format that provides information regarding OTC equity securities, including additions, deletions, symbol changes, name changes and updates to security attributes. The Daily List also indicates if previously announced information has been updated or cancelled. Due to the nature of the Daily List, there are character-length limitations, and it commonly includes technical terminology and information. *See* https://otce.finra.org/otce/dailyList.

[18]     This is due to the fact that, under current SEC rules, trades in OTC equity securities settle two business days after the trade date (commonly referred to as "T+2").

[19]     *See* March 16, 2023, MMTLP FAQs, Question No. 5.

The Honorable Ralph Norman
January 31, 2024
Page 9


<u>The MMTLP Trading Halt</u>

Another of FINRA's roles in overseeing the market for OTC equity securities is exercising authority to direct member firms to halt quoting and trading activities in a security when FINRA deems that such action is necessary and appropriate to protect investors and ensure a fair and orderly marketplace. FINRA made such a determination and, on December 9, 2022, halted trading in MMTLP pursuant to FINRA Rule 6440.[20] Consistent with standard practice, FINRA provided notice of the MMTLP trading halt on the morning of December 9 to all market participants simultaneously through the publication channels of communication normally used for such actions. No market participants were provided with advance notice of the trading halt.

Among FINRA's concerns resulting in the trading halt were the fact that trades executed after December 8 would not have settled in time for the purchaser to become a holder of the MMTLP shares by December 12 (only record holders on December 12, 2022, would be recorded as eligible to receive the Next Bridge shares in the distribution).[21] In addition, based on a determination made by the issuer, Next Bridge common stock would not be DTC-eligible—raising uncertainty regarding how transactions executed after December 8 would settle in an efficient and orderly manner. Had MMTLP continued trading after December 8, there was the possibility that investors buying MMTLP during that time period may not have realized that:

- The MMTLP shares they purchased were about to be cancelled by Meta Materials,
- Any purchased MMTLP shares might not be received before they were cancelled, and
- They would not be recorded on December 12 as MMTLP holders eligible to receive Next Bridge common stock in the distribution.

FINRA was concerned that an inequitable and unfair result could occur because investors purchasing MMTLP after December 8 would be purchasing an asset that would soon cease to exist, with no entitlement to the replacement security as part of the Next Bridge/MMTLP corporate action distribution. FINRA issued the trading halt to prevent these harms from occurring—consistent with FINRA's authority under the trading halt rule, which allows FINRA to halt trading when necessary to protect investors and the public interest.[22]

---

[20]     FINRA Uniform Practice Advisory (UPC # 35-22) (December 9, 2022), Trading and Quotation Halt for META MATERIALS PFD SER A (MMTLP), available at https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf.

[21]     December 12, 2022, was a Monday; given the standard two-day settlement cycle and the intervening weekend, this date meant that trades needed to be executed by December 8 to settle timely.

[22]     Additional concerns included that any trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outside of DTC and that the MMTLP shares may have been cancelled by the issuer before broker-to-broker settlement occurred. In addition, there was the potential for confusion and disagreement in the settlement process among the parties with

The Honorable Ralph Norman
January 31, 2024
Page 10


Questions Regarding Naked Short Selling or Counterfeit Shares in MMTLP

A "short sale" is the sale of a security by one party (the seller) that does not own the security at the time of the sale or a sale where the seller delivers a borrowed security to the purchaser. Short selling is not illegal. Indeed, the SEC has determined that short selling can provide the market with the important benefits of market liquidity and pricing efficiency. SEC Regulation SHO is the primary rule that governs broker-dealers who engage in short selling activity for their own account or the account of others.

When reporting trades, Regulation SHO requires broker-dealers to identify short sales.[23] Regulation SHO also generally requires a broker-dealer to perform a "locate" prior to engaging in a short sale—*i.e.*, the broker-dealer must have reasonable grounds to believe that the security can be borrowed so that it can be delivered upon settlement and does not fail (a "failure to deliver" or "FTD"). A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arrange to borrow the securities in time to make delivery within the standard settlement period—resulting in a FTD.[24] Generally, Regulation SHO does not permit "naked" short selling except under limited circumstances.[25] While there is no identifier in trade reporting data to specifically identify "naked" short sales, if there is significant "naked" short selling in a security, FINRA would expect to see indicators of this activity in various data sources. In particular, because naked short selling is marked by the inability of the seller to deliver the securities upon settlement, significant naked short selling is often accompanied by a high number of FTDs.[26]

_____

respect to which security should be delivered to the buyer. *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

[23]   *See* November 6, 2023, MMTLP FAQs, Question No. 15.

[24]   *Id.*

[25]   *See generally* Securities and Exchange Commission: Key Points About Regulation SHO (Section IV.1. *Is all "naked" short selling abusive or illegal?*"), available at https://www.sec.gov/investor/pubs/regsho.htm.

[26]   A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction by the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from "naked" short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as: delays in customers delivering their shares to the broker-dealer; the inability to obtain borrowed shares in time for settlement; issues related to the physical transfer of securities; or the failure of the broker-dealer to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC has published FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

The Honorable Ralph Norman
January 31, 2024
Page 11

FINRA has found no evidence that there was significant naked short selling in MMTLP involving FINRA member firms at the end of its trading. Relative to the number of total shares outstanding, there were not a high number of FTDs in MMTLP for the trading days prior to the trading halt. SEC-published FTDs as of December 9 were very low—215,238 shares out of 165,472,241 shares.[27] In addition, while SEC-published FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA estimates that aggregate FINRA member FTDs on that date also would have been very low. A very small number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would have potentially resulted in FTDs due to the fact that FINRA member broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs at member firms together with other factors—such as the availability of shares (stock borrows or margin securities) to cover almost 100% of the open short positions on December 12, the successful distribution of Next Bridge shares according to public statements by the issuer, and the low amount of short interest positions in MMTLP at FINRA members relative to total shares outstanding as of December 12[28]—do not indicate that there was extensive "naked" short selling near the end of trading resulting in "counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by such activity.[29]

---

[27]     The SEC typically publishes data obtained from the National Securities Clearing Corporation's Continuous Net Settlement (CNS) system on the total quantity of FTDs per security as of each reporting settlement date. *See* https://www.sec.gov/data/foiadocsfailsdatahtm. However, the SEC did not publish FTD data for MMTLP for December 12 because transactions in MMTLP executed on the last day of its trading—December 8—were not cleared through CNS.

[28]     FINRA estimates that there was an aggregate short interest position in MMTLP in accounts held at FINRA member broker-dealers as of December 12 of approximately 2.65 million shares out of 165.47 million total shares outstanding, which is not a significant percentage—only 1.6%—of the total shares outstanding. The aggregate short interest position in MMTLP in accounts held at FINRA member broker-dealers had therefore decreased substantially—by nearly 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approximately 6.4 million shares) declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to approximately 2.65 million shares as of December 12.

         Some investors have confused short *interest* data with short sale *volume* information, both of which FINRA publishes on its website. While the two data sets are related in that short sale *volume* activity may ultimately result in a reportable short interest *position*, they are not the same. In fact, a particular short sale will not necessarily result in a short position that is later reflected in FINRA's short interest report. *See* March 16, 2023, MMTLP FAQs, Question No. 8. *See also* Short Interest – What It Is, What It Is Not (January 25, 2023), available at https://www.finra.org/investors/insights/short-interest.

[29]     As stated above, investors' use of information obtained on social media to make investment decisions is an area of concern for FINRA and other regulators. *See supra* note 7.

The Honorable Ralph Norman
January 31, 2024
Page 12

Requests for an Audited Share Count of Next Bridge/MMTLP Shares

FINRA is unable to conduct the requested "certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions" described in your letter.  As we have previously noted, FINRA lacks the authority and data necessary to regulatorily obtain such information.[30]  Pursuant to the Exchange Act, FINRA's regulatory authority is limited to overseeing the conduct of FINRA member firms and their associated persons.  Transfer agents, which are regulated by the SEC and not FINRA, are responsible for maintaining issuer security holder records and have responsibilities concerning the reconciliation and safekeeping of securities.  FINRA also does not have regulatory authority over all the entities, domestic or foreign, that could act as custodians or agents holding securities for others and be reflected as such on the books of the transfer agent.  FINRA understands, based on public statements issued by Next Bridge, that its transfer agent, AST, has distributed all shares related to the Next Bridge/MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareholders' bank, broker, or nominee representatives.[31]

In addition, FINRA does not currently possess the data that presumably would be required to conduct a "certified audited and consolidated count of shares."  Some have assumed that "blue sheet" data could be used to conduct an audit of the Next Bridge/MMTLP share count.  FINRA and SEC examination and investigation teams use blue sheet requests to obtain detailed transaction data from clearing broker-dealers for a specific security for specified dates.  Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific security on specific dates—it does not identify the *position* held in a specific security on a specific date by any person or entity.  Further, blue sheet data does not contain information about whether or how a short position was "covered" with a purchase or borrow of shares, whether a short sale is "naked," whether there was a locate, or if delivery occurred on settlement date.[32]  Nor does blue sheet data capture share exchanges or dividends

---

[30]     *See* November 6, 2023, MMTLP FAQs, Question No. 13.

[31]     *See* Next Bridge Hydrocarbons, Inc. Provides Statement Regarding Its Spin-Off (February 16, 2023).

> The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company (AST).  AST has distributed all shares of our common stock related to the Spin-Off – either directly to any stockholders that held their shares directly registered with AST or to our shareholders' bank, broker or nominee representatives.  For questions relating to the mechanics of the distribution of shares resulting from the Spin-Off or matters relating to subsequent transfer of shares our common stock, you should review the Prospectus referenced below or contact AST shareholder relations…

[32]     For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a short position of 3,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 shares on February 1, 2023, but not whether the

The Honorable Ralph Norman
January 31, 2024
Page 13

by issuers. Because blue sheet data is requested for investigatory purposes, FINRA does not voluntarily disclose this data to third parties except the SEC, other regulators, and law enforcement pursuant to specific, targeted regulatory or law enforcement requests for the data.[33] The other regulatory tools available to FINRA (*e.g.*, Consolidated Audit Trail and FINRA's trade reporting facilities) also do not provide the data that would enable FINRA to perform a "certified audited and consolidated count of shares," as they also do not contain *position* information.

Receipt of Next Bridge Shares in the Next Bridge/MMTLP Corporate Action Distribution

FINRA understands that there continue to be questions regarding whether the right number of Next Bridge shares were distributed to investors. As FINRA has discussed previously,[34] FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not have regulatory authority over issuers or transfer agents. However, based on publicly available information reported by Next Bridge in connection with the Next Bridge/MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[35] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, AST, which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[36] Thus, there does not appear to be a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis.

We understand that some investors are nonetheless concerned that their broker-dealers have not received their Next Bridge shares or that the information provided by their broker regarding the shares reflected in their account is not accurate. We have encouraged investors to reach out to their brokerage firms to understand the status of their shares or to discuss their

---

account was closing out the short position, nor that the account held a long position of 2,000 shares following the purchase.

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short position of 1,000 shares, blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February 1, 2023, but would not show that the account increased its short position to 2,000 shares.

[33]    Blue sheet data contains sensitive trading and customer personal data, and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.

[34]    *See* November 6, 2023, MMTLP FAQs, Question No. 12.

[35]    *Id.*

[36]    *Id.*

The Honorable Ralph Norman
January 31, 2024
Page 14

options.[37]  For example, investors may request a transfer of shares at the transfer agent from the broker-dealer's name to their name; this transfer may take time to achieve and may involve fees.  If an investor makes such a request and their broker has not been willing to transfer their shares pursuant to their instructions, the investor should contact the broker to understand the status of their Next Bridge shares and, if the broker does not provide a satisfactory explanation, the investor may submit an investor complaint to FINRA.[38]

We note that some of the discussion on social media has concerned circumstances where an investor was unable to direct register their Next Bridge shares with the transfer agent because the investor's MMTLP shares had been loaned out by the broker (*e.g.*, where the customer participated in a fully paid lending program, earning a fee for lending the securities).  In such cases, the MMTLP shares would likely have been loaned to a short seller and delivered to the buyer in the short sale transaction, who would have been credited with the Next Bridge shares.  In a securities lending transaction, the lender transfers the legal rights to the security to the borrower.  Thus, investors who held settled long positions in MMTLP on December 12, 2022, were holders entitled to receive shares of Next Bridge as part the Next Bridge/MMTLP corporate action—even if they received borrowed shares in settlement of the transaction (the existence of a borrow by the seller does not impact the ownership rights of the purchaser).[39]  Conversely, the lender of those shares would not be entitled to receive the Next Bridge shares directly from the issuer; however, pursuant to the lending agreement, the lender typically has a claim for the Next Bridge shares against the borrower.[40]  Customers whose MMTLP shares had been on loan as of December 12 should contact their brokerage firm to gain an understanding of the agreements that govern the loan and to discuss their options.

---

[37]     *See* March 16, 2023, MMTLP FAQs, Question No. 10.

[38]     Investors may file a complaint with FINRA at https://www.finra.org/investors/need-help/file-a-complaint.

[39]     *See* November 6, 2023, MMTLP FAQs, Question No. 16.  Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the current holder of the shares.  The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid by the borrower to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan contract is terminated.

[40]     For example, on December 8, Borrower/Short Seller sells short 100 MMTLP shares to Buyer and Lender lends 100 shares of MMTLP to Borrower/Short Seller.  On December 12, upon settlement of the transaction, Buyer is a holder of a settled 100-share long position in MMTLP and therefore is entitled to receive 100 shares of Next Bridge common stock in the distribution from the issuer.  The lending agreement typically would provide that the Borrower/Short Seller must deliver 100 shares of Next Bridge common stock to the Lender upon the termination of the loan.  The Borrower/Short Seller would reflect an obligation for the shares it owes to the Lender until it purchases and delivers the shares owed.  Since there is no secondary trading market for Next Bridge common stock, Borrowers/Short Sellers may be unable to buy shares of Next Bridge common stock to deliver to Lenders.

The Honorable Ralph Norman
January 31, 2024
Page 15

Potential Future Trading in Next Bridge Shares

Next Bridge filed a Form S-1 registration statement with the SEC to register the issuance of its common stock in connection with the Next Bridge/MMTLP corporate action, which became effective on November 18, 2022. According to the prospectus, Next Bridge is an independent public reporting company. The shares are publicly tradeable under federal law and are widely held.[41] However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the necessary steps to support the development of a secondary market (steps that its predecessor undertook with respect to the MMTLP shares). When Next Bridge registered its common stock, it stated that it would not seek to make the common stock DTC-eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC eligibility enables the central clearance and settlement of securities transactions).[42] Unless Next Bridge takes steps that would support trading in its common stock, trading will continue to be difficult, including trades to close out short positions.[43]

Thus, the lack of a public market for Next Bridge's common stock is the result of Next Bridge's decisions and Next Bridge can rectify the challenges investors are facing by taking the appropriate steps to support the development of a secondary market. While FINRA cannot force Next Bridge to take these steps, FINRA has engaged with Next Bridge leadership, including to explain ways in which the company could support investors' ability to trade Next Bridge shares.[44] FINRA stands ready to take steps that are in line with its role in the OTC markets, consistent with its authority and the processes and procedures that apply to all potential quotation and trading activity in OTC equity securities.

Forward-Looking Steps to Improve OTC Trading for Investors

FINRA is committed to continuous improvement in all of its regulatory operations in order to further its mission, including by learning from events such as those that occurred with respect to MMTLP. For example, FINRA is considering the increase in self-directed retail participation in the markets and concerns regarding investors' use of social media sources to

---

[41]     *See also* March 16, 2023, MMTLP FAQs, Question No. 11.

[42]     *See*
        https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc30257
        6_2.

[43]     *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available
        at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

[44]     FINRA Correspondence with Next Bridge Hydrocarbons, available at https://www.finra.org/media-
        center/newsreleases/2023/finra-correspondence-next-bridge-hydrocarbons-april-june-2023. We also
        continue to engage in correspondence with Next Bridge leadership to understand their perspective on
        the nature and extent of short positions in Next Bridge common stock.

The Honorable Ralph Norman
January 31, 2024
Page 16

make investment decisions. In addition, FINRA is considering whether any changes may be appropriate to long-standing communication protocols around corporate action announcements—particularly where the corporate action appears to be the subject of significant retail interest through social media activity.

FINRA also has been asked whether statutory changes may improve investing in OTC equity securities for investors. Specific to this situation, the federal securities laws do not currently require that issuers of a class of equity securities that are publicly offered (or otherwise widely held) take the steps necessary to facilitate the electronic clearance and settlement of transactions through a registered clearing agency, which, in turn, would support investors' ability to trade the securities. As a result, even where an issuer's securities are SEC-registered or the issuer is a public reporting company under SEC rules, as a practical matter, investors may be unable to buy or sell the securities. This outcome can be problematic where the investors initially purchased a security for which there was an active trading market, but due to a corporate action and through no action of their own, such investors subsequently hold a different security for which there is no trading market. A statutory change in this area could remove impediments to investors' ability to transfer their shares and alleviate the concerns that exist today with trading Next Bridge common stock, including closing out short positions.[45]

**Conclusion**

FINRA is committed to fulfilling our statutory mission of protecting investors and promoting market integrity in a manner that facilitates vibrant capital markets. We share your concerns regarding investors who have complained that they cannot trade their Next Bridge common stock in the absence of a trading market.

We are willing to continue to engage with you and other Congressional offices on this matter. If you have any further questions or need any additional information, FINRA officials would be happy to meet with you and your staff again. Please do not hesitate to contact me, or your staff may contact our Senior Vice President of Government Affairs, Greg Dean. Thank you again for your letter, and for the work of your staff on this issue.

Sincerely,

Robert W. Cook
President and Chief Executive Officer

---

[45] Congress and the SEC might consider whether this type of regulatory change could best be accomplished through a new SEC rule or an amendment to the Exchange Act.

The Honorable Ralph Norman
January 31, 2024
Page 17


Cc:

The Honorable Pete Sessions
The Honorable Bill Posey
The Honorable Alex Mooney
The Honorable Bryan Steil
The Honorable Mike Flood
The Honorable Byron Donalds
The Honorable Erin Houchin
The Honorable Barry Loudermilk
The Honorable Scott Fitzgerald
The Honorable William Timmons
The Honorable Warren Davidson
The Honorable Michael V. Lawler
The Honorable John Rose
The Honorable Andy Ogles
The Honorable Marcy Kaptur
The Honorable Jeff Van Drew
The Honorable Raúl M. Grijalva
The Honorable Joe Wilson
The Honorable Delia Ramirez
The Honorable Stephanie Bice
The Honorable Betty McCollum
The Honorable Ron Estes
The Honorable Linda T. Sánchez
The Honorable Mike Ezell
The Honorable Darren Soto
The Honorable John Rutherford
The Honorable Bill Johnson
The Honorable Eli Crane
The Honorable Daniel Webster
The Honorable Troy E. Nehls
The Honorable Jeff Duncan
The Honorable Russell Fry
The Honorable Brian Fitzpatrick
The Honorable Lisa McClain
The Honorable Andy Harris, M.D.
The Honorable Andy Biggs
The Honorable Tim Walberg
The Honorable Diana Harshbarger
The Honorable Virginia Foxx
The Honorable Randy Feenstra
The Honorable Randy Weber
The Honorable Adrian Smith

The Honorable Ralph Norman
January 31, 2024
Page 18

Cc (cont.):

The Honorable Scott Franklin
The Honorable Marc Molinaro
The Honorable John Moolenaar
The Honorable Paul A. Gosar, D.D.S.
The Honorable Doug Lamborn
The Honorable Nancy Mace
The Honorable Barry Moore
The Honorable Victoria Spartz
The Honorable Carlos A. Gimenez
The Honorable Beth Van Duyne
The Honorable Nick Langworthy
The Honorable Earl L. "Buddy" Carter
The Honorable Mike Carey
The Honorable Nicole Malliotakis
The Honorable Lance Gooden
The Honorable Gus M. Bilirakis
The Honorable John Joyce
The Honorable James Comer
The Honorable María Elvira Salazar
The Honorable Cory Mills
The Honorable W. Greg Steube
The Honorable Matthew M.  Rosendale
The Honorable Claudia Tenney
The Honorable Matt Gaetz
The Honorable Jenniffer González-Colón
The Honorable August Pfluger
The Honorable Nick LaLota
The Honorable Rich McCormick, MD, MBA
The Honorable Jen Kiggans
The Honorable Max Miller

# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action and trading halt (March 16, 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in those shares would receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questions regarding the circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and suggested that there was a substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concern that, even though their brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been delivered to their broker-dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the new FAQs below begins with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

### 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers or transfer agents. However, according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate action, Meta Materials distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders who owned MMTLP as of the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfer agent and registrar, American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge / MMTLP corporate action—the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC.[7] While, as discussed below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST's stock records, the information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP corporate action—does not reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of Next Bridge shares distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherwise.[8]

### 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is not clear what is meant by "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determine whether there are "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though the term "counterfeit shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.