Exhibit 45

**From:** (b)(6)
**Sent:** Sat, 23 Dec 2023 18:11:32 +0000
**To:** Burris, Kevin
**Cc:** Bailey, Lily
**Subject:** Congressional mail 12/22 briefing book

Kevin,

I approve (b)(5) the following Congressional correspondence:

1. **Congressional Response Letters (K. Burris, OLIA)**
   a. *Braun-Carper - CASES Act - ES162184 – Response*
   b. *Gonzalez - FINRA decision on MMTLP - ES162228 – Response*
   c. *Warren et al - Lobbying Disclosure - ES162226 – Response*

(b)(5)

Gary

**From:** (b)(6)
**Sent:** Sat, 16 Mar 2024 17:26:36 +0000
**To:** Burris, Kevin
**Cc:** Bailey, Lily
**Subject:** Congressional mail

Kevin,

I approve (b)(5) the first 2 letters:

1. Desaulier – MMTLP
2. Himes - ADF

On the 3rd (b)(5) , let's discuss.

Gary

1. **Congressional Letters for Review (OLIA)**
   a. DeSaulnier - MMTLP - ES162287
   b. DeSaulnier - MMTLP - ES162287 (Response)
   c. Himes - ADF – ES162296
   d. Himes - ADF – ES162296 (Response)

(b)(5)

| | |
|---|---|
| **From:** | (b)(6) |
| **Sent:** | Sat, 3 Feb 2024 14:36:40 +0000 |
| **To:** | Burris, Kevin |
| **Cc:** | Bailey, Lily |
| **Subject:** | Congressional mail |

Kevin,

I approve (b)(5) the following replies:

1. McHenry / Huizenga / Hill / Wagner – X account compromise
2. Norman & 72 members - MMTLP
3. Wasserman / Gosar & 13 members – NAC's

Gary

1. **Congressional Letters for Approval (K. Burris, OLIA)**
    a. *McHenry et al - Social Media Communications re approval of Bitcoin ETFs – ES162292*
    b. *McHenry et al - Social Media Communications re approval of Bitcoin ETFs - ES162292 – Response*
    c. *Norman et al - MMTLP - ES162279*
    d. *Norman et al - MMTLP - ES162279 – Response*
    e. *Westerman et al - NAC - ES162295*
    f. *Westerman et al - NAC - ES162295 – Response*

(b)(5)

**From:**      Chair
**Sent:**      Fri, 21 Apr 2023 15:01:45 -0400
**To:**        Help (OIEA Investor Complaints)
**Subject:**   FW: $MMTLP

-----Original Message-----
From: (b)(6)                    @yahoo.com>
Sent: Thursday, April 20, 2023 11:45 PM
To: Chair <chair@sec.gov>
Subject: $MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi chair Gensler hope all is well. Can you update us on $MMTLP? 65000 people have lost it all and I think we deserve answers.

Sent from my iPhone

**From:**          (b)(6)
**Sent:**          Tue, 12 Sep 2023 00:31:45 +0000
**To:**            Allen, Stephanie Claire; Bailey, Lily
**Subject:**       FW: 9/12 SBC Hearing Prep Materials
**Attachments:**          September 12 SBC Hearing Topics.docx, Senate Banking Sept 12 2023 Hearing
Talking Points.docx, Supplemental TPs from CF Confidential 9-11-23 evening.docx, QFR - HFSC -
Oversight of the SEC - April 18, 2023 (final).pdf


FYI


**From:** Burris, Kevin (b)(6)      )SEC.GOV>
**Sent:** Monday, September 11, 2023 7:12 PM
**To:** (b)(6)      )SEC.GOV>
**Cc:** Fischer, Amanda (b)(6)      )SEC.GOV>; Slavkin Corzo, Heather (b)(6)      )SEC.GOV>;
Schneider, Scott (b)(6)      )SEC.GOV>
**Subject:** 9/12 SBC Hearing Prep Materials


Hi Gary,

Please find the following hearing prep materials attached:

(1)  A list of the probable hearing question topics that Senators will cover (according to their
     staffs);
(2)  A set of talking points on likely hearing topics;
(3)  A supplement to the talking points drafted by CF this evening; and
(4)  Your final answers to the latest HFSC QFRs.

Best,
Kevin

# Questions For the Record
## House Financial Services Committee
### *Oversight of the Securities and Exchange Commission*
#### April 18, 2023

**Questions for the Record submitted by Chairman McHenry:**

1. There are real concerns about the data used in the economic analysis of the fundamentally flawed Order Competition Rule proposal. A number of market participants have included data-driven analyses in their comment letters showing that the purported benefits of auctions would actually result in a net loss to retail investors. In addition, academic studies have questioned the wisdom of auctions and the analysis used to support the proposed order competition rule. For example a study entitled: "On the Potential Cost of Mandating Qualified Auctions for Marketable Retail Orders" (March 2023), by Professors Battalio and Jennings concludes that the SEC used an algorithm that is full of errors in calculating the potential benefits and costs of the Order Competition Proposal: "The Securities and Exchange Commission utilizes an algorithm developed by Boehmer et al. (2021) that is known to have both type I errors (i.e., falsely identify institutional trades as retail) and type II errors (i.e., identify only a subset of actual retail trades) to classify trades that the NYSE's publicly available TAQ database shows were reported to a Trade Reporting Facility (i.e., a TRF) to estimate the potential costs of failed auctions in its proposed Order Competition Rule." This study concludes that the actual costs of the "failed auctions may be on the same order of magnitude as the potential benefits of successful auctions" and that "the annualized cost of adverse movements computed 100 milliseconds after orders are received by wholesaler(s), which is the duration of the shortest proposed auction, ranges from $1.73 billion to $1.88 billion. When we use the length of the longest proposed auction, the annualized cost ranges from $2.17 billion to $2.55 billion." At the very least, this study calls into question the estimated benefits of auctions to retail investors and, at its worst, suggests that the auctions will lead to adverse price movements given the length of auctions.

   Will you agree to pause the Order Competition Rule proposal unless the Commission can prove that costs do not outweigh the benefits for retail investors when using the same analysis as the academics in this study?

   <u>RESPONSE</u>:

   As is customary in our rulemaking, the Commission examined the costs, benefits, and other economic effects of the order competition rule proposal. When considering the rules for possible adopting stage, we benefit from public comment on the proposal. Thus, should the Commission decide to adopt, we will prepare an economic analysis and carefully will consider comments, including those mentioned in your question, relevant to the economic effects of the proposed rule and reasonable alternative approaches.

2. There is a growing amount of data and academic analysis that demonstrates that payment for order flow (PFOF) has (1) helped brokerage firms eliminate costly trading commissions, leading to an increase in retail investors participating in U.S. equities markets, (2) allowed retail investors to receive better prices for their stock trades than if those same trades were executed on public exchanges, and that such price improvement for retail investors is economically significant (by some estimates amounting to billions of dollars), and (3) cannot explain differences in execution quality across retail broker-dealers, including firms that do not collect payment for order flow on equities trades (see, for example: "The 'Actual Retail Price' of Equity Trades," Sept. 2022; OCR Comment Letter from Prof. Chris Schwarz and Philippe Jorion; "The Impact of Zero Commissions on Retail Trading and Execution", Feb. 2020; Retail Order Execution Quality under Zero Commissions, Mar. 2021; "Trading Volume Shares and Market Quality: Pre- and Post-Zero Commissions", Feb. 2023).

   a) Do you believe these studies on retail prices and PFOF are wrong or fundamentally flawed? If yes, why?
   b) Do you have any analysis – as opposed to unsupported statements – that PFOF has resulted in worse prices for a significant number of retail investors?

RESPONSE:

Payment for order flow can raise issues around conflicts of interest. As described in the Commission's settled enforcement action against Robinhood in 2020, payment for order flow can distort routing decisions.[15]
Further, as the staff wrote in the GameStop report, payment for order flow may incentivize broker-dealers to use digital engagement practices, such as gamification, to increase customer trading.[16]

3. The Biotechnology Innovation Organization's (BIO) comment letter for the Order Competition rule proposal highlights how the proposal will dampen and constrain liquidity for smaller issuers, including its members. Specifically, the letter calls into question the SEC's assumption that there will be institutional money that wants to interact with retail that contains smaller issuers: "Institutions do not need to trade small cap stocks every day. But when they do, they do so knowing that wholesalers are there. This is why they route all of their orders to market-makers whose sole focus is ensuring the best execution at the best price for the size of the order across all stocks whenever they must be traded." Further, the letter states that BIO has spoken with institutional money who have stated that they won't be there to provide liquidity: "Money managers and institutions involved in processing biotechnology stock trades on behalf of their retail clients have told BIO that they are not prepared and not equipped to do such proposed auctions. The retail-facing institutions are not inclined to dedicate resources to ensure that all market orders are executed in the best manner possible across all stocks that are traded in a day even if those stocks may not be part of their book of business for that day. Wholesalers already perform this market function."

   a) Can you point to the specific page in the proposal where the Commission

considered the negative effects to capital formation for smaller issuers?

b) What is the likelihood that this consistent execution across stocks (often at or better than the prevailing market across all securities) currently offered by market makers could be eliminated with these proposals?

c) What is the likely effect on prices and execution quality for less liquid securities that are less likely to benefit from competitive auctions?

d) What is the potential resultant effect on cost of capital and capital formation for less liquidity securities that may no longer benefit from consistent retail executions by market makers after the implementation of the anticipated rule proposals? Are you concerned that creating this new auction structure might lead to less liquidity for these names and harm capital formation?

RESPONSE:

The Commission's proposing release for the Order Competition Rule can be found on the SEC's website, www.sec.gov, and is also available at 88 FR 128. The analysis of the economic effects of the proposal, including the effects on capital formation can be found starting on page 203 of the Federal Register version, 88 FR 128, 203. Thus, should the Commission decide to adopt an order competition rule, we will prepare an economic analysis and carefully will consider comments, including those mentioned in your question, relevant to the economic effects of the proposed rule and reasonable alternative approaches.

4. The SEC has issued twice as many rule proposals in your first two years in office as the first two years under Chair Mary Jo White and Chair Jay Clayton. Many of these new rules would affect the same or interconnected financial products and market sectors, while others are likely to have the same or similar negative effects, such as increasing risk or investing costs. Yet the SEC's economic analysis looks at each rule independently and in isolation from the others, which completely ignores the obvious linkages between many of them. Failing to analyze the cumulative and overlapping effects of the many proposals creates heightened risk of unintended consequences for our capital markets that could add additional stress and uncertainty to our economy. Last September, Senators on both sides of the aisle raised this concern with you, and in response you reassured them that the SEC does "consider those cross issues."

a) What is your approach to looking holistically at regulatory requirements and the feasibility of firms operationalizing all these major rules at once?

b) Has the SEC released to the public any of its analysis of the cumulative impacts across multiple rule proposals? If not, why not?

c) Can you commit to conducting a publicly available economic analysis of the cumulative effects of all the rules that the SEC has proposed during your time as Chair before the SEC moves to adopt them?

d) Will the SEC commit to moving forward in a more deliberative and incremental basis to ensure that it does not undermine the deepest, most liquid, and resilient markets?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. The Commission's economic analysis of a proposed regulatory action compares the current state of the world—including the problem that the rule is designed to address— with the expected state of the world with the proposed regulation (or regulatory alternatives) in effect. To the extent that rules that are adopted are relevant for the baseline or the costs and benefits of the rule under consideration, this effect is incorporated in the economic analysis. For more information on the costs and benefits of rules proposed or adopted by the Commission, please see the SEC's website, www.sec.gov.

5. Market data is the lifeblood of the U.S. equity markets, but the dissemination of equity market data is antiquated and filled with conflicts of interest. The Market Data Infrastructure rule survived challenges in the D.C. Circuit and the SEC has been in a position to implement this important reform for several years.

Given your active rulemaking agenda, what is stopping you from approving changes to market data processing with the exchanges?

RESPONSE:

The Market Data Infrastructure Rules contain a detailed implementation schedule. The first phase of the implementation included the filing of amendments to the relevant national market system plans (NMS Plans). The amendments were to reflect the new decentralized consolidation model—*i.e.*, the introduction of competing consolidators for the collection, consolidation, and dissemination of consolidated market data—as well the new fees for consolidated market data. The NMS Plan amendments were filed with the Commission, published for public comment, and disapproved by the Commission in September 2022 because they did not comply with the Market Data Infrastructure Rules. *See* https://www.sec.gov/rules/sro/nms/2022/34-95849.pdf, https://www.sec.gov/rules/sro/nms/2022/34-95850.pdf, and https://www.sec.gov/rules/sro/nms/2022/34-95848.pdf.

6. In 2021, the SEC's Asset Management Advisory Committee, which included representatives of individual investors, pension funds, and institutional investors, unanimously recommended that the SEC "should consider permitting retail investors access to a wider range of private investments." In particular, the SEC recommended that the "SEC should consider whether the [registered investment company] framework is an appropriate method to balance investor protection with access to private investments."

   a) Has the SEC taken any steps to implement these recommendations?

b) Do you agree that the registered investment company framework provides a way to provide additional access to private investments while also protecting investors?

RESPONSE:

The Asset Management Advisory Committee (AMAC) issued a Final Report and Recommendations for Private Funds on September 27, 2021. As you note, the Final Report and Recommendations acknowledges the need to balance wider access with investor protection. The Commission has continued to consider issues relating to private investments and the role of the registered investment company framework.

7. The SEC's existing liquidity risk management rules have only been in effect since 2018. You've indicated that your proposed rule entitled, "Open-End Fund Liquidity Risk Management and Swing Pricing," is in direct response to market stresses encountered during March 2020. However, the SEC's proposal does not include any specific examples of funds that were unable to meet redemption requests or otherwise manage their liquidity during March 2020.

Can you explain what the problem is that you are trying to address and why the SEC's recent rulemaking only five years ago requires such a major overhaul?

RESPONSE:

The proposal is designed to enhance the liquidity risk management of open-end funds. If adopted, it would seek to promote investor protection and greater resiliency for these funds, including during times of stress.

A defining feature of open-end funds is the ability for shareholders to redeem their shares daily, in both normal times and times of stress. Open-end funds, though, have an underlying structural liquidity mismatch. This is because they invest in securities across a range of liquidities, including securities that are costlier or take more time to sell.

In times of stress, when many investors may redeem their shares in a fund at once, a fund might need to sell less-liquid securities quickly to generate cash. When done in volume, this can raise issues for investor protection, our capital markets, and the broader economy. We saw such systemic issues during the onset of the Covid-19 pandemic, when many investors sought to redeem their investments from open-end funds. The resulting liquidity challenges contributed to stress across our financial system.

During the market events of March 2020, fund managers discussed their liquidity concerns with Commission staff and the potential need for emergency relief. In addition, open-end funds experienced large outflows and encountered widening bid-ask spreads when purchasing or selling portfolio investments at that time. This likely contributed to dilution of the value of funds' shares for remaining investors.

8. In June 2022, the SEC reopened the comment period for "Listing Standards for Recovery

of Erroneously Awarded Compensation." When the proposal was reopened, the SEC added complex data for evaluating the proposal and a new economic analysis. However, the SEC only provided a 30-day comment period.

Given your comments about the importance of receiving feedback from stakeholders on proposed rulemakings, can you explain why such a short comment period was provided?

RESPONSE:

The Listing Standards for Recovery of Erroneously Awarded Compensation rule had been proposed and previously re-opened for public comment in October of 2021. The proposal was reopened again in June of 2022. The Administrative Procedure Act (APA) requires that agencies provide interested parties with notice of proposed rulemaking and a reasonable and meaningful opportunity to participate in the rulemaking process through submission of written data, views, or arguments. I believe that the comment periods we have used for our rulemakings are consistent with our obligations under the APA and provide interested parties fair and ample time to comment on proposed rules. Further, when comment periods close, we often continue to get additional comments, through meetings and otherwise, which staff has considered as well.

9.  You repeatedly testified that the SEC's "authorities are just about the public registrants, say 7,000 or 8,000 companies" and that the SEC's climate disclosure proposal does not place "any obligations on nonpublic companies." Despite these comments, the SEC's comment file is full of comments from representatives of private companies who believe they will incur substantial costs if the SEC finalizes the proposal as is. For example, on April 17, 2023, the Agricultural Retailers Association, American Farm Bureau Federation, American Soybean Association, National Cattlemen's Beef Association, National Corn Growers Association, National Pork Producers Council, and the North American Meat Institute sent a letter stating that "public companies that are required to report emissions from agricultural production will inevitably require farmers and ranchers to track and report their emissions information to those companies" and that this "tracking will be extremely expensive, invasive, and burdensome for farmers and ranchers, at the cost of improved production practices that generate actual environmental gains."

   a)  Do you agree that the rule, as proposed, would impose substantial costs on nonpublic companies?

   b)  What analysis has the SEC conducted to assess the impact that the increased reporting requirements and the associated costs of the climate rule will have on the attractiveness of our public markets and companies' decision to go public?

RESPONSE:

The proposal would set climate-related risk disclosure requirements for companies that are public registrants.

As noted, we have received comments on the possible effects on private companies. Staff are reviewing those comments and considering recommendations that would address concerns that the rule may have indirect effects on private companies.

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. This includes a consideration of compliance costs, direct costs, and indirect costs. In addition, the statutes administered by the SEC require the Commission, when engaged in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest, also to consider efficiency, competition, and capital formation. The SEC's analysis of the costs and benefits of the proposal (including consideration of issues raised in this question) are located in the Economic Analysis sections of the proposing release that can be found on the SEC's website, www.sec.gov, and are also available at 87 FR 21334.

**10.** Your proposed climate rule will impact arrangements with private companies and other entities that contract with registrants as they will likely be forced to collect and provide data to support the registrant's climate disclosure obligations. Some private companies and other businesses not directly subject to the SEC's disclosure mandates may be able to shoulder the cost of collecting and providing information, but most will not be able to afford it.

What analysis have you conducted to determine how many private businesses will be forced out of supply chains due to your rule?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. This includes a consideration of compliance costs, direct costs, and indirect costs. The SEC's analysis of the costs and benefits of the proposal are located in the Economic Analysis sections of the proposing release that can be found on the SEC's website, www.sec.gov, and are also available at 87 FR 21334. As noted, we have received comments on the possible effects of the proposed climate rule on private companies. Staff are reviewing those comments and considering recommendations that would address concerns that the rule may have indirect effects on private companies. We also received comments about our analysis of costs in the proposal, which we will address in our analysis of costs in consideration of any possible final rule.

**11.** Retail investors are already overwhelmed by mandated disclosure. In an era of 100-page proxy statements and annual reports, owning just 20 stocks subjects one to thousands of pages of disclosure.

a) Has the SEC made public any analysis regarding the analysis of the expenses and time that individual investors will incur to review the extra information that will arise from the climate proposal? If not, why not?

b) Has the SEC made public any analysis regarding the analysis of the expenses and time that individual investors will incur to review the extra information that will arise from the culmination of all of the rules proposed during your tenure? If not, why not?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. The SEC's analysis of the costs and benefits of this proposal is located in the Economic Analysis section of the proposing release that can be found on the SEC's website, www.sec.gov, and is also available at 87 FR 21334.

12. During your testimony, you noted several times that the SEC "is not a climate regulator." In *West Virginia v. EPA*, the Supreme Court emphasized a "common sense" principle of statutory interpretation known as the "major questions doctrine." In that case, the Court reaffirmed the position that a government agency's rulemaking authority is not unlimited and that the major questions doctrine requires a government agency to point to "clear" congressional authorization for its actions.

Given that Congress did not authorize the SEC to dictate climate policy via a mandatory disclosure regime, can you clearly explain why the proposal does not raise major questions?

RESPONSE:

In all of the agency's rulemaking and other policy endeavors, the Commission is anchored by the laws Congress has passed, the courts' interpretations of those laws, the Commission's economic analysis, and input from the public. As your question identifies, the Supreme Court's decision in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), addressed the major questions doctrine. The proposed rules the SEC currently is considering are consistent with its statutory authorities.

With respect to the proposed climate-related risk disclosure rule, as stated in the proposing release, the Commission has authority to promulgate disclosure requirements that are "necessary or appropriate to protect investors."[1] As the release also explained, climate-related risks can present financial consequences that investors in public companies may consider in making investment and voting decisions.[2] Commission staff are continuing to evaluate all comments on the proposed climate disclosure rule,

---

[1] *See The Enhancement and Standardization of Climate-Related Disclosure for Investors*, 87 FR 21334 at 21335 (Apr. 11, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-04-11/pdf/2022-06342.pdf.
[2] *Id.* at 21335-36.

including comments on the Commission's statutory authority and other issues. The proposed rule—like any other rulemaking proposal—may be revised in response to public comment.

**13.** The climate proposal effectively dictates expectations for how a company's governance on climate should be structured, including whether directors have expertise in climate-related risks, the frequency of board discussions on climate matters, and how boards set climate-related targets. I'm worried the SEC is going down the path of creating boards filled with "specialty directors."

      a) Can you explain why this would be important for all companies at the board level?

      b) If the SEC goes down this path, should it also set expectations for board expertise on pandemics, geopolitical affairs, macroeconomics, or even taxation? What is the SEC's rationale to justify disclosure on climate expertise and dozens of other areas?

RESPONSE:

The proposed climate-related risk disclosure rule would not impose governance requirements on companies or mandate how they structure their boards. The items you refer to are proposed disclosures that could provide investors with insight into how a company's board considers climate-related risks and any relevant qualifications of board members. We have received comments on this proposed disclosure requirement, and staff are considering those comments carefully.

**14.** During your testimony, you claimed that Congress gave the SEC authority to mandate climate disclosures in the Securities Act of 1933 and the Securities Exchange Act of 1934.

      a) The Commission previously determined that "disclosure relating to environmental and other matters of social concern should not be required of all registrants unless appropriate to further a specific congressional mandate or unless, under the particular facts and circumstances, such matters are material." (*See* SEC, Concept Release, Business and Financial Disclosure Required by Regulation S-K, 81 Fed. Reg. 23,921, 23,970, Apr. 22, 2016). Can you explain why the SEC's opinion on this matter has significantly shifted and when Congress granted the SEC new authority to justify that shift?

      b) When promulgating such disclosure rules, do you agree that the SEC should define "investors" as those focused on financial returns, as opposed to those that have other primary objectives or motivating reasons?

RESPONSE:

The proposing release for climate-related risk disclosures details a four-decade history of SEC disclosure rules and guidance related to environmental matters.

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

With respect to climate-related risk, hundreds of companies today already are making climate-related risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

**15.** Congress has repeatedly expressed disapproval of the length and complexity of the disclosure burdens on registrants and has instructed the SEC to simplify, not increase, the disclosure burdens on public companies.

  a) Can you identify the actions that the SEC is taking to shorten and simplify reporting obligations of public companies?
  b) Can you provide an analysis of the aggregate impact of your currently proposed rulemakings on the length of and complexity of public company disclosure obligations?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking including the impact and effect of reporting obligations on companies and investors. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. Commission proposing releases also solicit public input into questions such as whether any different treatment should be afforded companies of different sizes or maturity (*i.e.*, time as a public registrant), among other factors. We also factor in the interests of investors in those companies and how best to protect investors' interests.

**16.** The SEC should provide Congress and the public at large more meaningful notice and disclosure regarding international regulatory negotiations. This will provide for a better understanding of U.S. positions and provide for more meaningful input when domestic rules are developed. Regulators will also benefit from more informed commentary for better rules and more efficient oversight.

Will you commit to posting public summaries of meetings with international organizations, such as the International Organization of Securities Commissions (IOSCO), and text of any agreements made to provide notice and public comment before signing?

RESPONSE:

The SEC advocates consistently for transparent processes at international organizations, including the Financial Stability Board (FSB) and IOSCO. SEC representatives have

regularly advocated for (i) public consultation on reports with policy recommendations; (ii) opportunities for public engagement, including industry, in the form of roundtables or workshops; and (iii) engagement with academics who have conducted research relevant to the work of international standard-setting bodies. Additionally, the FSB and IOSCO publish their annual work plans, press releases on significant policy issues and initiatives, as well as summaries of stakeholder feedback from public consultations.

Further, importantly membership in the FSB and IOSCO does not constrain the SEC's independence or appropriate exercise of its jurisdiction. No decision of either organization is binding on the SEC, nor can the FSB or IOSCO cause the Commission to act in a manner contrary to its legal and policy frameworks.

**17.** Last year, large publicly traded companies faced an unprecedented number of shareholder proposals. This surge in proposals can be attributed to the SEC's decision in November 2021 to eliminate the longstanding requirement that socially oriented proposals must be material to a company's business to be included on proxy ballots, as outlined in Staff Legal Bulletin No. 14L.

   a) How is the SEC monitoring the impact of Staff Legal Bulletin No. 14L and your July 2022 amendments to measure the impact on companies and their investors including the extraordinary amounts of time considering overly prescriptive and in many cases non-germane proposals that now appear in company proxy statements?
   b) Will you please provide the percentage of 14a-8 no-action letter requests granted by SEC staff for each of the last five years?
   c) During your tenure, have there been instances where SEC staff failed to respond to a 14a-8 no-action letter request in a timely manner, resulting in a public company having to include a shareholder proposal on its proxy? If yes, please list those instances.
   d) Why have you limited the usefulness of the "No Action" process in this way and will you modify this approach going forward?
   e) Have you conducted any analysis on how much time it would take individuals to read and make informed voting decisions on the additional proposals that would result?

RESPONSE:

The vast majority of proposals that shareholders vote on are submitted by management. With respect to proposals submitted by shareholders, Staff Legal Bulletin No. 14L clarified the standards staff will apply in responding to no-action requests from companies seeking to exclude the proposals, including those based on the so-called "ordinary business" exclusion in Rule 14a-8(i)(7). During the last two years, there have not been any instances where SEC staff failed to respond to a 14a-8 no-action letter request in a timely manner, resulting in a public company having to include a shareholder proposal in its proxy.

Separately, the Commission made a proposal in July 2022, subject to feedback from the public, intended to clarify the application of certain other bases for excluding shareholders proposals under Rule 14a-8. While amendments have not yet been adopted, the SEC's analysis of the costs and benefits of the July 2022 rule proposal are located in the Economic Analysis sections of the proposing release that can be found on the SEC's website, www.sec.gov, and are also available at 87 FR 45052.

**18.** On March 9, 2022, the SEC proposed expansive new disclosures by public companies regarding cybersecurity matters.

    a) How has the SEC sought to incorporate feedback from other agencies of the administration on its cybersecurity disclosure proposal for issuers, particularly with respect to the implementation of the discreet disclosure regime prescribed by Cyber Incident Reporting for Critical Infrastructure Act at the Department of Homeland Security?

    b) Are you concerned that mandating premature disclosure of cybersecurity incidents may harm investors if the information being disclosed is incomplete or inaccurate and results in mispriced securities or uninformed market speculation?

    c) How will the SEC ensure that premature disclosure of material cybersecurity incidents will not increase the exploitation of vulnerabilities or jeopardize concurrent law enforcement investigations?

RESPONSE:

SEC staff often engages and consults with other federal agencies in connection with the preparation of proposed rules. Agencies also engage with the SEC through the public comment process.

In the proposing release regarding cybersecurity risk management, strategy, governance, and incident disclosure, the Commission requested comment on the timing of the proposed cybersecurity incident disclosures. This request also included whether companies should be allowed to delay reporting based on the Attorney General's written determination that the delay is in the interest of national security.

The Commission adopted final rules on this matter on July 26, 2023. As noted in the adopting release, we consulted with the Department of Justice to establish an interagency communication process to allow for the Attorney General's determination to be communicated to the Commission in a timely manner. During the rulemaking process, we also considered issues raised by commenters with respect to alleged conflicts with regulations and programs of the Department of Defense, the Department of Energy, the Department of Homeland Security, the Federal banking regulatory agencies, state insurance laws, and miscellaneous other Federal agencies or laws.

The Commission also is a member of the Cyber Incident Reporting Council. The Council's creation was mandated by the Cyber Incident Reporting for Critical Infrastructure Act of 2022 to coordinate, de-conflict, and harmonize Federal incident reporting requirements.

**19.** Under your predecessor, the SEC adopted extremely modest reforms to the rules governing shareholder proposals and the role of proxy advisory firms. The 2020 reforms

would have safeguarded the interests of shareholders and investors who care about
accurate and material information.

    a) By reversing these reforms before they went into effect, how could the SEC
       accurately gauge the impact these reforms would have in practice?
    b) Why did your proposed rule focus on the benefits to proxy advisors' profitability
       while ignoring the substantial costs to companies and investors?

RESPONSE:

In July 2020, the Commission adopted final rules establishing new requirements for
proxy advisory firms. That rule provided important benefits for investors and market
participants by improving disclosure of conflicts of interest in proxy advisory firms and
expressly including proxy voting advice within the definition of a proxy solicitation so
that the investor protections of the federal proxy rules extend to such advice.

We did, however, continue to hear from many investors that certain conditions in the
2020 rule might restrain independent proxy voting advice.

Thus, in November 2021, the Commission proposed amendments to the proxy rules
governing proxy voting advice and in July 2022 adopted those rules as proposed. The
final rules repealed the above-mentioned conditions in the 2020 rule.

Under the final rules, proxy voting advice generally remains a "solicitation" subject to the
proxy rules, and proxy advisory firms generally are still subject to the conflicts of interest
disclosure requirements adopted in 2020. The Commission release adopting the final
rules contained an Economic Analysis section in which the Commission discussed the
economic effects of the final rules.

**20.** The COVID-19 crisis accelerated the evolution toward a digital economy. What steps
does the SEC plan to take to revise outdated rules to permit e-delivery of investment
documents?

RESPONSE:

As noted, the COVID-19 crisis accelerated the evolution toward a digital economy and
evolving technology provides opportunities to improve investor experience with regard to
the Commission's disclosure framework.

Last fall, the Commission adopted substantial modifications to fund shareholder reports,
including a modernized, layered disclosure framework that includes instructions to
promote the use of interactive, user-friendly design features. The Commission also has
adopted amendments to require electronic filing of certain other forms previously-filed in
paper. Among other benefits, these changes would make the filings more readily
accessible and searchable on our website. This benefits investors who may reference
these documents, the registrants that file these documents, as well as our agency in both
processing and reviewing these documents. The staff continues to evaluate the ways in
which we can modernize other investment disclosures, where possible, to the benefit of
investors.

**21.** What are the operating costs for the Consolidated Audit Trail on an annual basis to date?

RESPONSE:

CAT LLC has made publicly available its financial statements and budgets on the CAT NMS Plan website, at https://www.catnmsplan.com/audited-financial-statements and https://www.catnmsplan.com/cat-financial-and-operating-budget.

**22.** What is your best estimate for the operating costs for the Consolidated Audit Trail over the next 5 years?

RESPONSE:

The Self-Regulatory Organizations, through CAT LLC, are responsible for budgeting for the estimated operating costs of the Consolidated Audit Trail. For information regarding these budgets, see https://www.catnmsplan.com/cat-financial-and-operating-budget.

**23.** Your proposed "Best Execution" rule has expanded the existing rules under FINRA and the MSRB to asset classes like digital assets. By the SEC's own admission, it has 'limited information' about order handling and best execution practices within digital asset market structure, begging the question of how this rule would practically govern the market for buying and selling digital assets, which functions separately from traditional securities. This feels equivalent to the EPA requiring that all owners of electric cars retrofit their vehicles with eco-friendly carburetors—clearly something not fit for purpose.

How do you plan on enforcing a rule on a market function it admittedly doesn't understand nor can justify in the first place?

RESPONSE:

The proposed Regulation Best Execution, subject to feedback from the public and potential adoption by the Commission, would apply to all securities. If adopted, it would help ensure that brokers have policies and procedures in place to uphold one of their most important obligations: to seek best execution when trading securities, whether equities, fixed income, options, crypto security tokens, or other securities. The Commission has been enforcing the duty of best execution under the antifraud statutes for decades, and FINRA enforces its standards (and the MSRB, its standard).

**Questions for the Record submitted by Rep. Wagner:**

**24.** The SEC's Asset Management Advisory Committee's Report and Recommendations for Private Investments stated that "although SEC rules do not expressly limit the percentage of illiquid assets that a closed-end fund may hold, the SEC staff has taken the position that a closed-end fund that holds more than 15% of its assets in private funds should only be offered to accredited investors."

        a)  What is the basis for this SEC staff position?

       b)  The SEC insists that closed-end funds that hold more than 15% of assets in private funds include a very high minimum investment (often greater than $20,000). If there is already an accredited investor restriction, how does a higher minimum investment protect investors?

RESPONSE:

Dating back to the early 2000s, registered funds seeking to invest all or substantially all of their assets in private funds have limited those registered funds to investments by accredited investors and established higher minimum investments.

The staff's position was that using a registered fund—one that's primarily a vehicle for retail investors—to gain access to private funds frustrated the intent of statutes and rules that otherwise limit direct investments in such private funds to accredited investors.

Beginning in the 2010s, registered funds sought to invest significant amounts, but less than 100 percent, in private funds. The staff's position is that, below a certain threshold level (15 percent in this case), the concerns described above would be sufficiently diminished.

**25.** With almost 3,000 comments in opposition to your proposed rule entitled, "Open-End Fund Liquidity Risk Management and Swing Pricing," there is broad opposition from advocates across the ideological spectrum. Almost every single retirement, investing, consumer-focused, tax reform, and financial reform group that submitted a letter expressed deep concerns about some or all of the proposal — raising concerns that the SEC's swing pricing proposal is both unworkable and extremely harmful for retail investors and retirement savers.

What economic analysis did the SEC do in considering alternative proposals before settling on the version of proposals it made public?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. The SEC's analysis of the costs and benefits of the Open-end fund Liquidity Risk Management and Swing Pricing proposal is located in the Economic Analysis section of the proposing release that can be found on the SEC's website, www.sec.gov, and is also available at 87 FR 77172.
The economic analysis also discussed alternatives to the proposal and requested comment on those alternatives, including their benefits and costs. The staff is reviewing all comments on the proposal, including comments addressing the costs and benefits of the proposal and the alternatives discussed in the proposal.

**26.** I understand that the SEC is creating a specific registration form for Registered Index

Linked Annuities (RILAs), as required by Congress. As you know, insurance companies have long used statutory accounting principles when preparing their financial statements. This widely respected accounting standard is better suited for investors in insurance products because it uses a very conservative valuation of assets to examine the solvency of these companies and to ensure they are able to make good on all potential claims. The SEC has appropriately accepted the use of statutory accounting by insurers when registering other products with the SEC, including variable annuities, variable life products, and in many cases RILAs. When they are unable to use statutory accounting and are instead required to use GAAP, these firms accrue accounting bills in the millions of dollars, adding to the cost and complexity of the product for consumers.

Will you commit to allowing insurers to choose between statutory accounting or GAAP in the final RILA registration form?

RESPONSE:

Commission staff is in the process of making recommendations to the Commission regarding implementing the Congressional directive to create a specific registration form for RILAs. Staff in our Division of Investment Management are leading this project and collaborating with stakeholders across the Commission to formulate recommendations to the Commission for a rule proposal. While I cannot prejudge the outcome on any particular provision of this rulemaking, staff are considering the issues surrounding statutory versus GAAP accounting. I look forward to continuing to engage with the staff on this important rulemaking.

**27.** The SEC, as part of its Congressional mandate, initially introduced its rule on "Prohibitions of Conflicts of Interest in Securitizations" in 2011, which was ultimately never finalized. In January 2023, the SEC re-proposed its rulemaking. However, the reproposed rule introduces broad prohibitions impacting the continuation of routine market activities and would encompass a wide range of market participants and institutions, many who may have limited or no connection to the relevant securitization. As written, the rule establishes a number of extremely broad definitions and provisions, with specific market concerns around the definitions of "sponsor" and "conflicted transaction." There is market consensus that the rule is critically flawed and unworkable for many market participants.

   a) Can the SEC explain why it is creating a broad Volcker-like compliance regime for the entire market, instead of just ensuring that firms do not short a specific set of loans? Will the SEC commit to simplifying the Conflicts of Interest proposed rule, which seems to be using an excessive measure when a targeted approach may suffice?

   b) Will the SEC commit to narrowing the scope of the Conflicts of Interest proposed rule to ensure that routine risk management activities, such as interest rate hedging and other forms of hedging, can continue? Concerns have been raised about the potential implications the rule could create for our markets, especially since the rule's definition of "conflicted transactions" is too broad.

c) How will the SEC strike a balance in its final rule that removes conflicts of interest while ensuring the healthy functioning of our markets, as Congress originally intended? The re-proposed rule, as currently written, exceeds the original mandate of Section 621 of the Dodd Frank Act and conflicts with existing goals of other prudential regulators, and may result in prohibitions of essential market activities.

d) What analysis did the SEC perform on the significant costs associated with the Volcker Rule-like compliance program requirement for all market participants, not just banks, as mandated by the re-proposed rule? The definition of "sponsor" in the rule encompasses a wide range of securitization participants, including non-bank broker-dealers, corporate issuers, servicers, and even investors, who would be subject to Volcker Rule-like requirements not originally designed for them. Is the SEC concerned that the impracticability of this requirement may result in market participants leaving the ABS market and may impede new entrants?

### RESPONSE:

The re-proposed rule, if adopted, would implement the statutory mandate under Section 621 of the Dodd-Frank Act. Consistent with the statute, the re-proposed rule provides exceptions for risk-mitigating hedging activities, bona fide market making, and certain liquidity commitments.

We received many comment letters related to the scope of the proposed rule and the costs associated with compliance. The re-proposed rule responds this public feedback, as well as developments since 2011 in the asset-backed securities markets. For example, the re-proposal clarifies the scope of the prohibited conduct, the exceptions, and the participants subject to the proposal.

The staff also has met with commenters to better understand their concerns. The staff is considering all of the comments received as they develop recommendations to the Commission that would implement the statute and achieve its intended goals to prohibit certain conflicts of interest in securitizations.

The Economic Analysis for the proposing release can be found at 88 FR 9711.

### Questions for the Record submitted by Rep. Byron Donalds

**28.** The last time the Commission made such significant changes to U.S. equity markets was in 2005 with the adoption of Regulation NMS. Prior to those changes, the Commission broadly solicited public feedback, held numerous roundtables, issued white papers and concept releases, and even re-opened comment periods after initial edits to the rule to allow market participants to provide input and insights into any potential changes to equity markets. With the Commission's latest effort to rewrite our equity markets, the process could not be more different. To my knowledge, the SEC did not formally solicit any feedback prior to the release of its proposals either through roundtables or concept releases.

Why did the SEC fail to hold any roundtables, fail to issue any concept releases or white papers and, overall, fail to meaningfully engage with the public prior to the release of these proposals?

RESPONSE:

The Commission engages with the public in many ways. Since issuing these proposals, the Commission has received more than 14,000 comment letters from the public. The staff is in the process of analyzing these comments and carefully will consider all comments received.

**29.** How could providing industry participants and retail investors with materially less opportunity to weigh in—a mere 60-day period to comment on 1,600 pages of regulation – possibly result in a better product than the robust, multi-year process that resulted in Reg NMS?

RESPONSE:

The Administrative Procedure Act (APA) requires that agencies provide interested parties with notice of proposed rulemaking and a reasonable and meaningful opportunity to participate in the rulemaking process through submission of written data, views, or arguments. I believe that the comment periods we have used for our rulemakings are consistent with our obligations under the APA and provide interested parties fair and ample time to comment on proposed rules. In addition, we publish any proposed rule on our website shortly after a vote occurs. This provides additional time for interested parties to formulate a response before the release is published in the Federal Register.

For example, each of the separate 2022 proposed rules to update various aspects of the markets provided the public a total of 107 days to comment, from the Open Commission Meeting (December 14, 2022) to the end of the comment period (March 31, 2023). This is similar in length to the 125 days provided to comment on Regulation NMS, from the Open Commission Meeting (February 26, 2004) to the end of the comment period (June 30, 2004).

As we implement the federal securities laws, we will continue to comply with our obligations under the APA and other applicable requirements.

**30.** I am concerned with the Commission issuing all four of these drastic market structure proposals at once. Numerous market participants have suggested the Commission start with updating "Rule 605," a rule to modernize disclosures regarding order execution quality, and then using that updated 605 information to see what other potential changes could be beneficial to the market.

Why is the Commission not fixing and analyzing the relevant data first, and then evaluating whether additional rules are appropriate?

RESPONSE:

Given the 68 million American households investing,[11] the importance to issuers, the more than $40 trillion size, and rapidly changing technology, it's appropriate that the SEC freshen up its rules to promote efficiency and competition in the equity markets.

Key aspects of our rules for the national market system haven't been updated since 2005. Yet so much has changed. Not only have we seen the electrification of markets, but also a significant share of the markets has moved to wholesalers and other means of trading, otherwise known as the dark markets.

The Commission received a number of comments on these proposals, including comments relating to the sequencing of the proposals. The staff is in the process of analyzing these comments and carefully will consider all comments received in developing their recommendations for any final rules.

31. Aren't you concerned that despite the Commission's acknowledgment that 605 data needs to be updated, and has issued a rule doing just that, the Commission is nevertheless relying on such outdated information to justify the other three proposals?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. The robust data and rigorous analyses in each of the proposals support the respective proposals. Current Rule 605 requires market centers to provide reports containing a significant amount of execution quality data. Though there are ways that current Rule 605 could be improved, the data required under the current Rule remains valid and informative.

32. Chairman Gensler, I'm struck by a 2013 Inspector General report that suggests you have conducted official agency business on your personal email while serving as chairman of the CFTC. I was also struck by a very concerning October 2022 Wall Street Journal article that indicates you have continued this back-channel behavior at the SEC while simultaneously targeting 16 Wall Street firms for the very same behavior. There have been reports that you continue to use multiple SEC email accounts as late as March 8, 2023.

Since you've been chairman of the SEC have you used any unauthorized accounts to conduct any SEC business?

RESPONSE:

It is my practice to conduct SEC business exclusively through official channels. Consistent with the Federal Records Act, any business-related messages inadvertently sent to my personal email account are forwarded to an SEC email.

The SEC prohibits the use of personal email or other non-federal electronic messaging systems (e.g., unauthorized instant, chat, or text messaging services) to conduct SEC business. This prohibition is applicable to all SEC personnel and is reflected in SEC regulations and guidance documents, which are periodically reviewed, updated, and communicated to SEC employees, including all direct reports to the Chair, other staff, and contractor personnel.

**33.** Can you guarantee that SEC staff has never used an unauthorized account to conduct SEC business?

RESPONSE:

SEC employees receive regular training and guidance concerning the SEC's prohibition against the use of personal email accounts or unauthorized electronic messaging systems to conduct SEC business. For example, all employees and contractors are required to complete training on a regular basis on privacy and information security, the proper handling of nonpublic information and recordkeeping requirements. As with any condition of employment that applies to federal employees, a failure to comply with these federal recordkeeping requirements can lead to discipline, up to and including removal from federal service.

**34.** Chair Gensler, in a recent speech, you stated that "a handful of crypto security tokens have registered under the existing regime." What you didn't state is that each of these digital assets that registered at one point have either failed or persist only in a state of uncertainty and considerable disadvantage. None can be fairly stated to have prospered under the registration framework.

Given this fact, do you acknowledge that complying with the SEC registration framework poses challenges to the success and growth of digital asset firms?

RESPONSE:

Compliance with the securities laws doesn't guarantee a project will be successful or that an investment will pay off. Rather, it guarantees the basic bargain in the heart of our capital markets—that investors can decide what risks to take so long as companies issuing securities provide full, fair, and truthful disclosure.

Though there are more than 10,000 tokens in the crypto markets, the vast majority of reported market capitalization comes from 10 of them. As in other entrepreneurial fields, many projects could fail. That's simply part of the entrepreneurial spirit of this great country. Emerging companies that seek to access the securities markets—and through it, the chance to grow and succeed through engaging with U.S. investors in the largest, deepest, most liquid markets in the world—must comply with the securities laws. Compliance provides investors with full, fair, and truthful disclosure—as well as the other time-tested investor protections provided under the securities laws.

There's no reason to treat the crypto securities market differently from the rest of the capital markets just because it uses a different technology. There is nothing about the crypto securities markets that suggests that investors and issuers are less deserving of the protections of our securities laws.

As markets, business models, and technology continue to evolve, we will continue to ensure compliance with the federal securities laws.

**35.** Your most recent Regulatory Flexibility Act rulemaking agenda includes a proposed rule on broker-dealer and investment advisor "digital engagement practices." Broker-dealers and investment advisers have for decades used technology to improve the customer experience and drive down costs. More recent app-based brokerages have accelerated this positive trend by providing highly accessible platforms and the ability to invest and trade at historically low costs. As a result, tens of millions of Americans, many from historically underserved communities, have for the first time begun to participate in U.S. capital markets. In fact, a recent FINRA study titled, "New Investors 2022: Entering the Market in Novel and Traditional Ways", found that 4.2% of the U.S. adult population opened new brokerage accounts in 2022. That compares to 3.6% in 2020. According to the study, "While stories of new account openings no longer flooded the media in 2022, the influx of new investors did not slow." Importantly, the study also states, "Our 2020 study found that New Account Investors at that time were more frequently Black (16 percent) and Hispanic/Latino (15 percent) compared to investors who had been in the market prior to 2020 (7 percent and 13 percent, respectively). That trend continued in 2022: 15 percent of 2022 New Account Investors were Black, and 19 percent were Hispanic/Latino."

I am concerned that additional SEC rulemaking in this area is unnecessary and – alone and in combination with other rules, such as the SEC's radical proposed equity market structure reforms – will reverse the recent beneficial growth in retail investor participation, especially for younger Americans, individuals with smaller accounts, females, and minorities. This would be a tragic outcome, and one completely at odds with this Administration's stated goals to foster economic inclusion, as well as the SEC's own mission – which you are statutorily required to advance. Fortunately, this potential outcome need not become reality. Broker-dealers and investment advisors are already highly regulated. Both the SEC and FINRA already have the necessary tools – including but not limited to SEC Regulation Best Interest, the SEC's general anti-fraud authority, and FINRA's customer communication rules – to address potential abuses by broker-dealers and investment advisors when it comes to how these firms communicate with their customers. Adding more complicated and burdensome SEC rules to address so-called "digital engagement practices" is likely outside the scope of the authorities provided the SEC by Congress, and will only harm retail investors by making it more difficult to invest and forcing many investors to exit the market altogether. This, in turn, will exacerbate existing racial and gender investing and wealth gaps in America. The FINRA study, among other reports, suggests that new technologies and intuitive user

experiences have helped bring tens of millions of retail investors into the U.S. capital markets. At the same time, you have suggested – apparently without any factual support – that retail brokers' digital engagement practices are causing their customers to trade excessively or to make investing or trading decisions that are against their own interests. These inflammatory, unsupported statements are irresponsible coming from a sitting SEC Chairman and have likely already undermined confidence in trust in U.S. capital markets and financial services firms.

Describe what you believe to be an excessive amount of trading for retail investors. Would this standard depend on the characteristics of the particular retail investor, such as their own stated financial goals or interests?

RESPONSE:


We live in an historic, transformational age with regard to predictive data analytics and the use of artificial intelligence.

Today's predictive data analytics models provide an increasing ability to make predictions about each of us as individuals. This growing capability facilitates being able to differentially communicate to each of us—and do so efficiently at scale.

Such analytics and narrowcasting have the potential benefits of greater financial inclusion and enhanced user experience.

This also raises the possibilities that conflicts may arise to the extent that advisers or brokers are optimizing to place their interests ahead of their investors' interests. If a firm's optimization function takes the interest of the firm into consideration as well as the interest of the investor, this can lead to conflicts of interest. What's more, such conflicts could manifest efficiently at scale across brokers' and advisers' interactions with their entire investor bases.

Advisers and brokers have obligations to act in their investors' best interests. When offering advice or recommendations, firms are obligated to eliminate or otherwise address any conflicts of interest and not put their own interests ahead of their investors' interests.

On July 26, 2023, the Commission proposed new rules to address conflicts of interest that may emerge when investment advisers and broker-dealers use predictive data analytics or similar techniques to craft their interactions with investors.

The rules would require, among other things, that firms analyze conflicts of interest that may emerge when using predictive data analytics to interact with investors. Firms would need to identify any such conflicts that result in an investor interaction that places the firm's interests ahead of investors' interests. Firms then would need to eliminate or

neutralize the effects of those conflicts. Building on existing legal standards, this rule would help ensure that firms using predictive data analytics to interact with investors meet their obligations not to place their own interests ahead of their investors' interests.

**36.** Describe in detail whether the SEC has the authority to substitute its own judgment for that of retail investors when it comes to making investment or trading decisions, including but not limited to whether the SEC has the authority to determine what are appropriate and inappropriate trading behaviors for retail investors.

Identify the SEC's statutory authority to make such determinations

RESPONSE:

The SEC's authority is merit-neutral and disclosure-based. We do not take a view about particular companies or investment decisions. The SEC's statutory authority, rather, generally is premised on promulgating rules that are in the public interest and consistent with the protection of investors, as well as its other statutory mandates.

Whenever the SEC is engaged in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, it also must consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

**37.** You have suggested that certain digital engagement practices currently employed (or that could be employed in the future) by retail broker-dealers and investment advisors may amount to investment recommendations or investment advice. To the extent that were true, describe in detail why Regulation Best Interest, The Investment Advisers Act of 1940, the SEC's general anti-fraud authority, FINRA's existing rulebook, and other existing rules and regulations are insufficient to address such practices.

Describe in detail the potential impacts and manner in which the SEC's contemplated rule proposals to address digital engagement practices may make investing less attractive and more expensive for retail investors, including historically underserved communities, and how such proposed rules may push these investors back out of the market.

RESPONSE:

As discussed in response to your previous question (number 35) the Commission proposed rules on July 26, 2023, relating to "Conflicts of Interest Associated with the Use of Predictive Data Analytics by Broker-Dealers and Investment Advisers.".

In those proposed rules and rule amendments, the Commission considered efficiency, competition, and capital formation, in addition to investor protection and the public

interest, as part of its rulemakings. Specifically, the Commission conducted an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. The Commission's economic analysis of a proposed regulatory action, including the recent proposed rules and rule amendments related to conflicts of interest, compares the current state of the world, including the problem that the rule is designed to address, with the expected state of the world with the proposed regulation (or regulatory alternatives) in effect.

**38.** Chair Gensler, in your written testimony before the Committee, you stated, "The length of comment periods has averaged more than 70 days from when we put a proposal on the SEC website." However, under the Administrative Procedure Act and related statutes and Executive Orders, the public comment period begins when a proposed rule is published in the Federal Register. Members of Congress have long recognized this fact – see, e.g., this 2020 press release in which Rep. Maxine Waters emphasizes that a proposed rule's comment period begins "after the proposal was published in the Federal Register." (link) Measured in this way, the average comment period for proposed rules issued during your two years as SEC Chair has been only 45 days. By contrast, President Obama's 2011 Executive Order 13563 directed agencies to provide comment periods for new proposed rules "that should generally be at least 60 days."

Why have you been providing 25% less time for public comment periods than the bare minimum required by President Obama?

RESPONSE:

The Administrative Procedure Act (APA) requires that agencies provide interested parties with notice of proposed rulemaking and a reasonable and meaningful opportunity to participate in the rulemaking process through submission of written data, views, or arguments. I believe that the comment periods we have used for our rulemakings are consistent with our obligations under the APA and provide interested parties fair and ample time to comment on proposed rules. In addition, we publish any proposed rule on our website shortly after a vote occurs. This provides additional time for interested parties to formulate a response before the release is published in the *Federal Register*.

For example, each of the separate 2022 proposed rules to update various aspects of the markets provided the public a total of 107 days to comment, from the Open Commission Meeting (December 14, 2022) to the end of the comment period (March 31, 2023). This is similar in length to the 125 days provided to comment on Regulation NMS, from the Open Commission Meeting (February 26, 2004) to the end of the comment period (June 30, 2004).

Further, when comment periods close, we often continue to get additional comments, through meetings and otherwise, which staff has considered as well.

**39.** According to the Federal Register, "An agency may extend or re-open a comment period when it is not satisfied it has enough high quality comments or when the public comments make a good case for adding more time." (link)

Please identify all proposed rules for which a commenter has asked the SEC to extend the comment period, and among those proposed rules for which the SEC did not extend the comment period, explain how the SEC determined the commenter(s) request did not constitute "a good case for adding more time," and provide all correspondence related to such determinations.

RESPONSE:

The Commission may extend or re-open a comment period for a variety of reasons. To provide a few examples, first, it may allow interested persons an opportunity to comment on additional analyses and data provided by Commission staff. In addition, it may allow interested persons additional time to analyze issues and prepare comments in light of regulatory developments or new legislative requirements relevant to a rulemaking. Further, it may benefit the Commission in its consideration of a final rule by providing the public additional time to consider and comment on the matters addressed in a proposing release. The Commission's rationale for re-opening or extending a comment period is articulated in the relevant rule release. All of the Commission's rulemaking releases are posted on the SEC's website at https://www.sec.gov/rules/rulemaking-index.shtml.

**40.** Chair Gensler, in a speech in June 2022, you said that you had "asked staff to take a holistic, cross-market view of how we could update our rules and drive greater efficiencies in our equity markets, particularly for retail investors" (link). A few months later, on December 14, 2022, the SEC published on its website four proposed rules that would make wholesale, radical changes to how our equity markets work, and you gave the public fewer than 90 days to provide comments (starting when the proposals were published in the Federal Register). This process stands in stark contrast to the SEC's approach the last time it pursued major equity market structure rulemaking in the early 2000s culminating in Regulation NMS. Before and after releasing the proposal, the SEC held public hearings to receive input from market participants; based on the volume and complexity of the feedback received during the comment period, the SEC extended the comment period by 41 days; and the SEC re-proposed the proposed rule because of the extensive changes that it made to the original proposal in light of public input. By ignoring SEC precedent and not soliciting public input at the front-end of the rulemaking process, the SEC failed to consider a great deal of information that is highly relevant to your proposals. This includes several studies published since last December that provide evidence that the two most sweeping proposals – the Order Competition Rule and Regulation Best Execution – will do the opposite of what the SEC claims: increase costs

for everyday retail investors, reduce liquidity in stocks with small market capitalizations and thus raise capital costs for small businesses, and decrease competition for retail investor orders.

Will the SEC conduct a new economic analysis for the four equity market structure proposals that takes into account these studies? And if not, why not?

<u>RESPONSE:</u>

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. The Commission's economic analysis of a proposed regulatory action compares the current state of the world, including existing adopted rules and the problem that the rule is designed to address, with the expected state of the world with the proposed regulation (or regulatory alternatives) in effect. The staff carefully will consider the comment letters, including any comments relating to the economic analysis, in developing their recommendations for any final rules.

**41.** Chair Gensler, in response to your four equity market structure proposals, the SEC received a comment letter from the National Association of Securities Professionals (NASP), which exists to support "increased opportunities for securities professionals of color and fair access to investors who have traditionally been shut out of the markets." That letter states, in part, "our initial concern is that the SEC's proposals could result in a lack of access to the stock market for underserved demographics which could negatively impact the ability of these individuals and communities to build wealth and, in turn, further widen the existing diversity gap in investing."

      a) Did the SEC conduct an economic analysis that evaluates any possible disproportionate impacts of these proposals on low-income and minority investors? If not, why not?

      b) Will the SEC pause its work on the equity market structure proposals until it conducts such an economic analysis and makes it available to the public? If not, why not?

<u>RESPONSE:</u>

In Commission rulemakings, the SEC conducts an economic analysis in each rulemaking proposal or adoption that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. This includes a consideration of compliance costs, direct costs, and indirect costs. The SEC's analyses of the costs and benefits of these proposals are located in the Economic Analysis sections of the proposing releases which can be found on the SEC's website, www.sec.gov, and are also available at 87 FR 80266, 88 FR 128, 88 FR 3786, and 88 FR 5440.

**42.** Would you commit to considering the data received pursuant to the recently-implemented Security-Based Swap Reporting rules on the SEC's Large Position Reporting proposal, in terms of calibrating the threshold for reporting a so-called large position and analyzing the impacts of the proposed rule alongside pending CFTC reporting amendments?

If you do decide to move forward with the new large position reporting for swaps, can you commit to first collecting the data under the proposal, and only after analysis of this data, move forward with any novel public dissemination requirements?

RESPONSE:

Security-based swaps reporting began in November 2021. As was stated in the Rule 10B-1 proposing release, the Commission intends to consider this newly available data in determining thresholds to use in connection with security-based swap positions based on equity securities when adopting any such final rule. The Commission reopened the comment period for the Rule 10B-1 on June 20, 2023. The Commission requested comment on, among other things, a memo prepared by our Division of Economic and Risk Analysis regarding activist investors and potential thresholds that would trigger the 10B-1 reporting requirements. The formal comment period closed on August 21, 2023.

### Questions for the Record submitted by Rep. John Rose

43. In April 2022, the Staff denied a request from Amazon.com Inc. ("Amazon") to exclude a proposal seeking a report on how Amazon's "current retirement plan options align with its climate action goals." The Staff denied Amazon's request because "the Proposal transcended ordinary business matters."[3] This decision contradicted the precedents set in FedEx Corporation (July 7, 2016) and Yum! Brands, Inc. (Feb. 24, 2015). In July 2016, the Staff wrote that a proposal seeking the inclusion of "a fossil-free 401(k) retirement plan" as a plan option was excludable because it "[related] to the terms of FedEx's employee retirement plans."[4] Likewise, in Yum! Brands, the Staff determined that a comparison of senior executives and Yum! Brands employees' compensation was excludable because it "[related] to compensation that may be paid to employees generally."[5]

---

[3] Amazon.com Inc., SEC Staff No-Action Letter, (Apr. 8, 2022) https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2022/aysraphaelamazon040822-14a8.pdf; *See also,* Comcast Corporation, SEC No-Action Letter, (Apr. 13, 2022) https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2022/kantorcomcast041322-14a8.pdf.

[4] FedEx Corporation, SEC Staff No-Action Letter, (Jul. 7, 2016) https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2016/ronaldroman070716-14a8.pdf.

[5] Yum! Brands Inc., SEC Staff No-Action Letter, (Feb. 24, 2015) https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2015/sistersmercy022415-14a8.pdf.

a) Why did the Staff reverse its longtime position that proposals regarding retirement plan options relate to ordinary business matters and are thus excludable?

b) Is this change of position due to the Staff's policy opinions on climate change?

c) How does the Staff's new position align with the economic best interest of the beneficial owners of the 401(k) plans, as required by ERISA?

d) What analysis did the Staff conduct to determine that aligning Amazon's retirement plan options with its climate action goals would be in the best economic interest of the beneficial owners of the 401(k) plans?

e) As part of that analysis, if any, what time frame did the Staff consider in making that determination (e.g., one year, five years, 30 years)?

f) And how did the Staff take into account the heightened uncertainty associated with longer-term time horizons?

g) What are the Staff's criteria and decision-making process for determining whether a proposal relating to management of retirement funds micromanages the company?

RESPONSE:

The staff follows Commission rules—and any Commission guidance regarding the application of those rules—in determining its responses to shareholder proposal no-action requests. The staff carefully reviews the precise language of both the proposal and the accompanying supporting statement.

The staff may find that proposals with some similarities end up with a different result based on a detailed review of these sources. The staff's analysis of whether a proposal seeks to micromanage a company hinges largely on the level of granularity sought in the proposal and whether the proposal inappropriately limits discretion of the board or management.

44. In SLB 14L, the Staff wrote that "to assess whether a proposal probes matters 'too complex' for shareholders," it may "consider the sophistication of investors generally on the matter, the availability of data, and the robustness of public discussion and analysis."[6] Considering that management of employee retirement plans is a complex process conducted by a management level committee with input from independent financial consultants and advisers, how did the Staff determine that shareholders are well-informed on the matter such that their judgment should override that of management and its expert advisors?

RESPONSE:

---

[6] *See* SEC Staff Legal Bulletin No. 14L (Nov. 3, 2021) https://www.sec.gov/corpfin/staff-legal-bulletin-14l-shareholder-proposals.

Consistent with Commission guidance, the staff takes a measured approach to evaluating companies' micromanagement arguments in shareholder proposal no-action requests. A consideration that may arise when evaluating whether a shareholder proposal micromanages a company is whether a proposal probes too deeply into matters of a complex nature upon which shareholders, as a group, such that shareholders, as a group, would not be in a position to make an informed judgment.

The staff's analysis of whether a proposal seeks to micromanage a company hinges largely on the level of granularity sought in the proposal and whether the proposal inappropriately limits discretion of the board or management.

45. Chair Gensler, you have stated numerous times that "the vast majority are securities [and] offers and sales of these thousands of crypto security tokens are covered under the securities laws."[7] Assuming that is correct, and cryptocurrencies are subject to securities regulation, is there a regulated way to custody digital assets under the federal securities laws, and if so, why hasn't any been approved to do so?

RESPONSE:

In 2020, the SEC issued a policy statement and request for comment regarding the custody of crypto asset securities by special purpose broker-dealers.

Additionally, while not prejudging any particular crypto asset, most crypto assets likely are funds or securities covered by the investment adviser custody rule.

The Commission's custody rule for investment advisers, first adopted in 1962, was last updated in 2009. Importantly, though, Congress granted the SEC new authorities in 2010 in response to the financial crisis and Bernie Madoff's frauds. In particular, Congress gave us authority to expand the advisers' custody rule to apply to all assets, not just funds or securities.

In February 2023, The Commission proposed updating the investment advisers' custody rule which would, if adopted, extend the rule's protections to apply not just to investors' funds or securities, but to all of an investors' assets that an adviser may custody.

To be clear, the current custody rule, adopted in 2009, already covers investment advisors' custody of crypto funds and securities. Our proposal, in covering all asset classes, would cover all crypto assets—including those that currently are covered as funds and securities and those that are not funds or securities. Through this expanded custody rule, investors working with advisers would receive the time-tested protections that they deserve for all of their assets, including crypto assets, consistent with what Congress envisioned.

---

[7] Sec.gov, Kennedy and Crypto, (Sept. 8, 2022) https://www.sec.gov/news/speech/gensler-sec-speaks-090822

46. When could we expect the Commission to approve someone for a special purpose broker-dealer license?

RESPONSE:

Before doing business with the public, a broker-dealer generally must become a FINRA member by submitting a new member application to FINRA's Membership Application Program ("MAP"). FINRA's review of a broker-dealer's new member application is an extensive process. It serves as the gatekeeper to the broker-dealer industry and works to protect investors by ensuring that new firms meet FINRA's standards of admission. The MAP process's ultimate goal is to ensure that each applicant is capable of conducting its business in compliance with applicable rules and regulations, and that its business practices are consistent with just and equitable principles of trade, as required by FINRA rules. Prometheum Ember Capital LLC has announced that FINRA granted it approval to operate as a special purpose broker-dealer. I understand that there are other special purpose broker-dealer applications pending with FINRA, but FINRA does not publicly disclose the identity of pending applicants.

**Questions for the Record submitted by Rep. Andy Barr**

47. In your recently proposed rule on Open End Fund Liquidity, you make significant changes to the liquidity management provisions of mutual funds. Maybe the most significant change is classifying all bank loans as "illiquid" which will eliminate bank loan mutual funds. As you know, mutual funds make up 15 percent of the bank loan market.
    a) In the cost benefit analysis, you are required to conduct under the Administrative Procedures Act, will you commit to examining how this would impact the bank loan market and potential impacts for businesses that rely on these loans?
    b) Since this rule was proposed, there have been significant changes in the banking landscape, including tightening credit conditions for U.S. businesses. Will you commit to pausing this rule until we fully understand its impact on today's conditions in light of the recent failures?
    c) Did you examine how classifying all bank loans as "illiquid" would impact the ability of retail investors to access bank loan strategies? How are retail investors supposed to access these strategies going forward?
    d) Will you commit to reopening the comment period to ask additional questions on this and how recent bank failures that happened after the comment period ended might affect investors?

RESPONSE:

The Commission included an economic analysis in its proposing release and sought public comments on the analysis of the effect of eliminating the "less liquid investment" classification category, which includes primarily bank loans. The proposal also discussed

potential results of the amendment, including that advisers may choose a closed-end fund vehicle or other investment structure for bank loan strategies. The staff is reviewing all comments on the proposal, including comments addressing the costs and benefits to mutual funds that hold less liquid investments including bank loans. Staff will consider these comments in developing its recommendations to the Commission for how to proceed.

48. As you likely know, meetings by SEC Commissioners with the public are disclosed in accordance with the topics or proposals being discussed. One can find records of these meetings here: https://www.sec.gov/rules/proposed.shtml. Often it appears that you personally only meet with organizations and groups that are very like-minded with you on concepts of reform. For example, on the highly complex "conflicts of interest" rule, this is the only meeting you have shown to accept or attend:
https://www.sec.gov/comments/s7-01-23/s70123.htm

   a) How would you describe the manner in which you seek counsel from organizations that are impacted by your rules?
   b) Do you see value in meeting and hearing with market participants?
   c) Do you think it is wise to predominately seek counsel and cite in your regulatory proposals only the opinions of groups that support your viewpoint but may have little or no expertise in the markets being materially impacted?
   d) On the conflicts of interest rule, what investors have written to support your proposal?

RESPONSE:

Engagement with interested parties is a critical component of our rulemaking process, and we take the feedback we receive on our proposed rules very seriously. Staff and I have had robust engagement with a broad range of stakeholders representing diverse viewpoints on the Commission's proposed rulemakings. I believe these exchanges improve staff recommendations as well as the decisions and reasoning of the Commission.

As we implement the federal securities laws, we continue to welcome feedback and comments from the public. This helps to ensure that we fulfill our obligations under the Administrative Procedure Act and other applicable requirements. Further, it helps to ensure that our final rules reflect appropriate consideration of public input.

With regard to your question concerning comments related to the Commission's proposed rule on *Prohibition against Conflicts of Interest in Certain Securitizations*, as reflected in the public comment file, the staff and I have participated in meetings with numerous organizations and associations representing a broad range of views. All comment letters related to this proposal are posted to the comment file for this rulemaking, which is available at https://www.sec.gov/comments/s7-01-23/s70123.htm.

49. SAB 121

a) As you mentioned on April 18, all public companies and not just banks have to comply with SAB 121 on-balance sheet treatment of digital assets. Do you agree that prudentially regulated banks have capital liquidity and other prudential requirements that non-bank custodians, or public companies do not have to comply with? If not, why not?

b) Who did the SEC and the Office of Chief Accountant consult with internally and externally on SAB 121?

c) When did those discussions occur?

d) On an ongoing basis, banking organizations must ensure compliance with prudential regulation, including capital and liquidity requirements. In addition, banking organizations are subject to continuous supervision, in many cases including on-site prudential agency supervisory personnel, which examines for compliance with prudential regulatory requirements. Do you agree compliance with prudential regulation addresses the risks identified in SAB 121? If not, why not?

e) Do you believe banks are effectively precluded from participating in the custody of digital assets at scale due to the on-balance sheet treatment of SAB 121? If not, why not?

f) Who does the SEC expect to provide custodian services of digital assets?

g) Are you concerned that investors may turn to offshore solutions?

RESPONSE:

SAB 121 provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding certain crypto assets.

The obligations associated with these arrangements involve unique risks and uncertainties not present in arrangements to safeguard assets that are not crypto assets, including technological, legal, and regulatory risks and uncertainties. These risks can have a significant impact on the entity's operations and financial condition.

The staff believes that the recognition, measurement, and disclosure guidance in this SAB enhances the information received by investors and other users of financial statements about these risks. This helps investors make investment and other capital allocation decisions. Whether or not existing regulatory requirements at a bank or other entity address some or all of the risks identified in SAB 121 depends on the totality of facts and circumstances surrounding any individual situation.

To date, the SEC staff has received several consultations from registrants—including a number from banks—on specific fact patterns. The SEC staff invite dialogue with any parties that are considering applying the guidance in SAB 121. Staff continue their longstanding practice of sharing information with federal banking regulators.

50. Rule 14a-8(i)(7) under the Exchange Act permits a company to exclude a shareholder proposal if it "deals with a matter relating to the company's ordinary business

operations." As explained by the SEC in its 1998 release regarding Rule 14a-8 (the "1998 Release"), this exclusion rests on two central considerations:

(1) "certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight. Examples include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers"; and

(2) "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgement."

The 1998 Release also stated that "proposals relating to such matters but focusing on sufficiently significant social policy issues (e.g., significant discrimination matters) generally would not be considered to be excludable, because the proposals would transcend ordinary business matters and raise policy issues so significant that it would be appropriate for a shareholder vote."

In its recently issued bulletin, SLB 14L, the Staff indicated that it would "realign its approach for determining whether a proposal relates to 'ordinary business' with the standard" established in the 1998 Release. As an example, SLB 14L indicated that "proposals squarely raising human capital management issues with a broad societal impact would not be subject to exclusion solely because the proponent did not demonstrate that the human capital management issue was significant to the company."

Even when considering the new standard laid out in SLB 14L, the Staff granted no-action relief under Rule 14a-8(i)(7) very infrequently this past proxy season and seems to have applied its own subjective and unknown interpretation of what constitutes "a significant social policy issue." Therefore, I am concerned that the Staff's personal beliefs may have unduly influenced its decisions. To permit me to further analyze this matter, please provide the following information:

a) What are the Staff's standards, processes, and rationale for determining whether a proposal relates to a significant social policy issue that transcends ordinary business matters?
   i. Are all proposals relating to diversity, equity, and inclusion initiatives or training deemed to relate to significant social policy issues that transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?
   ii. Are all proposals relating to ideological discrimination deemed to relate to significant social policy issues that transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?
   iii. Are all proposals relating to climate change and greenhouse gas ("GHG") emissions deemed to relate to significant social policy issues that

transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?

iv.   Are all proposals relating to firearms deemed to relate to significant social policy issues that transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?

v.    Are all proposals relating to reproductive rights deemed to relate to significant social policy issues that transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?

vi.   Are all proposals relating to employee compensation and benefits deemed to relate to significant social policy issues that transcend ordinary business matters? If not, how do you determine which are and which are not? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?

vii.  Are there any other matters that the Staff views as presenting significant social policy issues that transcend ordinary business matters? If so, which matters? For all other matters, how do you determine which proposals relate to significant social policy issues? What are the Staff's guidelines for assessing whether to permit the exclusion of such proposals under Rule 14a-8(i)(7)?

RESPONSE:

The staff follows Commission rules—and Commission guidance regarding the application of those rules—in determining its responses to shareholder proposal no-action requests. The staff carefully reviews the precise language of both the proposal and the accompanying supporting statement. The staff may find that proposals with some superficial similarities end up with a different result based on a detailed review of these sources.

The number and outcome of shareholder proposals, no-action requests, and staff responses varies year to year and is driven by many exogenous factors. With that in mind, I note that during this proxy season, there was an increase in both the percentage and the absolute number of no-action response letters in which the staff did not object to companies' views that they may exclude a proposal.

**Questions for the Record submitted by Rep. Zach**

**51.** Do you believe the proposed climate disclosure rule is rooted in the concept of materiality?

a) If not, are there any other disclosure requirements of this magnitude that are similarly untethered to materiality?

b) If you do believe that the proposal is rooted in materiality, why does the proposal set a 1% disclosure threshold for any climate-related impacts to a financial statement line item?

c) How is the 1% threshold consistent with the Supreme Court's definition of materiality?

RESPONSE:

The climate-related risk disclosure proposal is rooted in the concept of materiality. As the release explained, climate-related risks can present financial consequences that investors in public companies may consider in making investment and voting decisions.[8]

With respect to climate-related risk, hundreds of companies today already are making climate-related risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

Like other Commission rules, the proposal employs a variety of disclosure thresholds to elicit decision-useful information. We have received comments asking us to consider adding explicit materiality qualifiers to various proposed disclosure requirements, and staff are considering those comments.

**52.** Why did the SEC decide to move forward with a prescriptive climate disclosure rule applicable to all industries?

a) Why didn't the proposed rule provide sufficient flexibility for companies to provide disclosures that are material and relevant to their particular industry, rather than the one-size-fits-all approach in the proposal?

b) Will this be addressed in the final rule?

RESPONSE:

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

With respect to climate-related risk, hundreds of companies today already are making climate-risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

---

[8] *Id.* at 21335-36.

Further, the rule proposal does provide a number of areas for issuers to flexibly make disclosures. For example, companies could select a specific range of years to define short-, medium-, and long-term horizons to most appropriate to their particular circumstances when disclosing climate-related risks.

In addition, we received comments seeking more flexibility in the form and content of required disclosures and the staff will consider seriously these comments as it prepares recommendations for the Commission regarding the proposed climate disclosure rule.

**53.** The SEC's proposed climate disclosure rule would, in many circumstances, require companies to disclose their Scope 3 greenhouse gas emissions. The disclosure of Scope 3 emissions would be particularly burdensome – and unreliable – for insurers because it would require disclosure of emissions from policyholders and insurers' investments. This leads to double or triple counting as well as inconsistencies from company to company depending on how reliable policyholders, investees, and suppliers can be in reporting their greenhouse gas emissions. How does this square with the SEC's purported goal of creating disclosures that are consistent, reliable, and decision-useful?

RESPONSE:

Many investors, both retail and institutional, have informed us that they use Scope 3 greenhouse gas emissions information to make informed investment decisions. The proposing release discusses the potential burdens associated with collecting Scope 3 emissions data, as well as the limitations of the data to date.

We have received numerous comments on Scope 3 emissions, including comments on the possible effects on private companies. Staff are reviewing those comments and considering recommendations that would address concerns of these commenters.

**54.** In recent years, public companies have faced an increasing number of ESG-related shareholder proposals. At the same time, recent guidance in SEC Staff Legal Bulletin No. 14L (Nov. 2021), as well as the SEC's proposed changes to Rule 14a-8, have made it even more difficult for companies to exclude these proposals from proxy statements. Why is the SEC prioritizing these ESG-related shareholder proposals over value to companies or their shareholders?

RESPONSE:

The Commission first articulated in 1976, and reaffirmed in 1998, that shareholder proposals focusing on sufficiently significant social policy issues generally were not considered to be excludable. The proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote.

Staff Legal Bulletin No. 14L is consistent with that longstanding Commission precedent. In particular, the bulletin clarified the standards the staff will apply in responding to no-action requests, including those based on the so-called "ordinary business" exclusion in Rule 14a-8(i)(7).

Separately, the Commission's July 2022 proposal was intended to clarify the application of certain other bases for excluding shareholders proposals under Rule 14a-8.

**55.** Chair Gensler, in the wake of the FTX collapse late last year we are all looking for ways to crack down on bad actors in this market and try to prevent the next FTX. However, I can't help but keep returning to the fact that FTX.com was a foreign firm based in the Bahamas and not the U.S. And while FTX.com reportedly wouldn't accept U.S. residents as customers, we know from documents that have been made public that many Americans did have accounts with FTX.com and lost money in its collapse. I raise this because I'm hearing increasingly from U.S. crypto exchanges and others in this market that the lack of regulatory clarity and heightened SEC enforcement actions are causing them to seriously consider moving out of the U.S. But we know from FTX that doing so isn't going to stop Americans from creating accounts. In many cases, all that someone needs to do is download a VPN.

So, can you try and give us an explanation of how our ability to protect investors who use off-shore digital asset service providers compares to those who are customers of firms operating here in the U.S.?

RESPONSE:

The U.S. federal securities laws protect U.S. investors. If an entity seeks to raise money from the American public or participate in America's capital markets—as an issuer, exchange, intermediary, investment company, transfer agent, or beyond—that entity also must follow the U.S. securities laws wherever they apply.

This is just as true in the crypto markets. There is nothing about the crypto securities markets that suggests that investors and issuers are less deserving of the protections of our securities laws. Regardless of where an entity is based, if an entity in the crypto securities space seeks to offer, sell, or transact in securities in the U.S. or involving U.S. investors, that entity must comply with Congress's laws and our rules. In the event that entities fail to register where appropriate and to comply with the securities laws, our Division of Enforcement will not hesitate to take action.

**56.** Chair Gensler, we have heard increasingly over the last several months that the lack of clear regulatory rules of the road are causing many crypto industry market participants to consider moving overseas and suspending operations in the United States. While I fully support the SEC's mission to protect investors and hold bad actors accountable, I am concerned that a failure by the U.S. to continue innovating in this space may have long-

term consequences for our global competitiveness and our national security. As I'm sure you're aware, the UK, EU, Japan, Hong Kong, and Australia have all taken significant steps towards developing new market regulations tailored to address the unique characteristics of digital assets.

While I appreciate that you have maintained that current SEC regulations are sufficient for crypto market participants, and that they simply need to comply, can you please explain why that is the case when so many leading foreign jurisdictions have felt the need to update their regulatory regimes?

RESPONSE:

Some jurisdictions, including the U.S., already have existing regulatory frameworks that encompass crypto-assets activities and market participants, while other jurisdictions are in the process of developing or implementing new regulatory frameworks to address gaps in their authorities that did not extend to crypto-assets. Other considerations, not present in the US, such as the EU's goal of ensuring consistent approaches across all member jurisdictions, may also be factors impacting the decisions by other jurisdictions to develop new regulatory frameworks. As I have stated, the crypto securities markets have been operating largely in noncompliance with the federal securities laws. There's no reason to treat the crypto market differently from the rest of the capital markets just because it uses a different technology.

If entities want to transact in America's capital markets and raise money from American investors, they need to follow our time-tested securities laws and investor protections.

**57.** We cannot afford to let noncompliance in the crypto markets undermine these time-tested protections, and possibly spill out to harm other areas in the capital markets as well. Chair Gensler, I would like to draw your attention to a headline in the outlet CoinDesk from March 27, which reads "US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty." While there is an ongoing debate as to the role digital assets will ultimately play in the global financial and payments system, the widespread and rapid adoption of cryptocurrencies by millions around the world causes me to be concerned that a brain drain from the U.S. among those who have expertise in this technology may have serious implications for U.S. national security. For decades, the United States has been able to leverage our leading role in the global financial system and the preeminence of the U.S. dollar to impose financial sanctions against our foreign adversaries. This has no doubt allowed us to avoid sending American servicemen and women into harms way. We now, however, face foreign rivals who are seeking to circumvent the threat of U.S. sanctions. Whether it is Russia seeking to create an alternative to the SWIFT banking network, or China developing and deploying the digital Yuan to countries involved in its Belt and Road projects, the authority of the U.S. is being challenged. Therefore, I am concerned that the SEC's unwillingness to provide clear rules of the road for the regulation of digital assets may have much broader U.S. policy implications.

Could you please tell us whether you have had any conversations with Secretary Yellen, Secretary Blinken, or the President's National Security Advisor, Jake Sullivan, regarding the potential national security implications of crypto market participants exiting the U.S. market?

RESPONSE:

There's no reason to treat the crypto market differently just because different technology is used. We should be technology-neutral. As new technologies come along, though, we need to be sure we're still achieving core public policy goals.
Further, I'd note that financial innovations throughout history don't long thrive outside of public policy frameworks. In finance, that's about protecting investors and consumers, guarding against illicit activity, and ensuring financial stability. These public policy goals can touch upon national security as well.
I believe that innovation can significantly benefit investors and issuers alike. It should not, however, be used to circumvent the important investor and market protections that are at the heart of the SEC's mission—protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation.

As is customary, SEC staff and I regularly engage with interested parties and stake holders, including fellow regulators, to discuss issues of shared interest.

**58.** Chair Gensler, the SEC has acknowledged its proposed Swing Pricing/Hard Close regulation would have a significant negative impact on qualified retirement plan savers. The practical impact of the proposed rule would deny retirement plan savers the benefit of same-day pricing. As you noted during our exchange at the hearing, pricing information is a critical decision-making factor for investors.

Considering the practical impact of your proposed rule, did the SEC solicit feedback from the DOL – the primary regulator for qualified retirement plans – before proposing the rule?

RESPONSE:

SEC staff regularly engages with interested parties and stake holders, including fellow regulators, during the rulemaking process to discuss issues of shared interest.

**59.** Chair Gensler, you have repeatedly emphasized that the SEC's proposed "Enhancement and Standardization of Climate-Related Disclosures for Investors" would only apply to public companies. Yet, as proposed, the rule could scope in otherwise private companies, including insurers who file certain products on Forms S-1 and S-3.

Can you confirm that private insurance companies will not be subject to any final rule as a result of their product filings?

RESPONSE:

The proposal would set climate-related risk disclosure requirements only for companies that are public registrants. As noted, we have received comments on the possible effects on private companies. Staff are reviewing those comments and considering recommendations that would address concerns that the rule may have indirect effects on private companies.

We also received comments regarding the applicability of the proposed rules to entities filing Forms S-1 or S-3 that register the offer and sale of specific products. Staff is considering these comments and possible recommendations to the Commission to address them.

**60.** Chairman Gensler, I understand that the SEC has already begun creating a specific registration form for Registered Index Linked Annuities, or RILAs, as required by Congress and I applaud your efforts on that front. As you know, insurance companies have long used statutory accounting principles when preparing their financial statements. This widely respected accounting standard is better suited for investors in insurance products because it uses a very conservative valuation of assets to examine the solvency of these companies and to ensure they are able to make good on all potential claims. The SEC has appropriately accepted the use of statutory accounting by insurers when registering other products with the SEC, including variable annuities, variable life products, and in many cases RILAs. When they are unable to use statutory accounting and are instead required to use GAAP, these firms accrue accounting bills in the millions of dollars, adding to the cost and complexity of the product for consumers.

Will you commit to allowing insurers to choose between statutory accounting or GAAP in the final RILA registration form?

RESPONSE:

Commission staff are in the process of making recommendations to the Commission regarding implementing this Congressional directive to create a specific registration form for RILAs. Staff in our Division of Investment Management are leading this project and collaborating with stakeholders across the Commission to formulate recommendations for a rule proposal. While I can not prejudge the outcome on any particular provision of this rulemaking, staff are considering the issues surrounding statutory versus GAAP accounting. I look forward to continuing to engage with the staff on this important rulemaking.

**61.** As a member of both the House Agriculture Committee and the House Financial Services Committee, I'm concerned that your proposed custody rule amendments conflict with many of the CFTC rules on custody arrangements for futures commission merchants. As a former chairman of the CFTC, you certainly understand that futures commission merchants have robust customer segregation and custody rules already in place. Many futures commission merchants are dually registered with the SEC as broker-dealers, however, the SEC proposal does not recognize the existing custodial requirements for futures commission merchants. This would create duplicative requirements and confusion.

Will you commit to taking a closer look at the pending SEC custody rule and working with staff to pair back the proposal where there are robust customer protection regimes already in place?

RESPONSE:

The Commission's custody rule for investment advisers, first adopted in 1962, was last updated in 2009. Importantly, though, Congress granted the SEC new authorities in 2010 in response to the financial crisis and Bernie Madoff's frauds. In particular, Congress gave us authority to expand the advisers' custody rule to apply to all assets, not just funds or securities.

In February 2023, The Commission proposed updating the investment advisers' custody rule which would, if adopted, extend the rule's protections to apply not just to investors' funds or securities, but to all of an investors' assets that an adviser may custody. Staff currently are reviewing the comments we received.

As SEC staff consider public comments on the proposal, they will continue to consult with the Commodity Futures Trading Commission ("CFTC"). Both the current investment adviser custody rule and the proposed safeguarding rule acknowledges and relies on the fact that qualified custodians, like CFTC-registered futures commission merchants, are subject to regulatory requirements that afford protections to customers and customer assets. Moreover, the proposed safeguarding rule, like the current custody rule, would continue to recognize certain futures commission merchants as qualified custodians. We also solicited comment on whether proposed requirements would conflict with qualified custodians' respective regulatory regimes.

**62.** Mr. Chairman, your proposal, swing pricing and hard close, briefly acknowledges 'challenges' to the private retirement system – currently overseen by EBSA at the Department of Labor, but there seems to have been no research done into what those challenges would be – neither through conversations with the Department of Labor nor with private industry. Comments from retirement plan sponsors and recordkeepers have since pointed out the significant harm that would be caused to retirement plan savers.

Why wasn't a thorough cost-benefit analysis conducted before the proposal was put forward?

RESPONSE:

The Commission conducted an economic analysis in the Open-End Fund Liquidity Risk Management and Swing Pricing Proposal that examined the costs, benefits, and other economic effects of the proposed rulemaking. The analysis which can be found in the Economic Analysis section of the proposing release, specifically recognizes and discusses the potential effects of swing pricing and the hard close on retirement plans and retirement plan intermediaries.

The SEC staff also has engaged with Department of Labor staff on these matters. We have received additional feedback on these effects through the public comment process, which the staff carefully will consider when making recommendations to the Commission.

**63.** Mr. Chairman, you have proposed mandating a hard close for mutual funds. This isn't a new idea. In fact, it was proposed 20 years ago under different circumstances and quickly abandoned following comments pointing out all of the flaws and negative impacts it would have on retail investors.

What has made you believe that retail investors would not face the same negative impacts and burdens now?

RESPONSE:

Technology since has advanced by a significant degree since 2003, when the Commission first proposed a hard close for mutual funds. This could improve the speed with which intermediaries can process orders relative to 2003 standards.

I recognize, however, that some commenters on the proposal have suggested that a hard close could require earlier cut-off times in certain cases. I appreciate the various concerns that commenters have expressed regarding the potential downstream impacts that the hard close requirement could have on retail investors. Staff are reviewing those comments and considering recommendations that would address the concerns.

**64.** Mr. Chairman, according to the comments submitted for "title," the proposal seems to run counter to the SEC's stated mission to "Protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation."

Can you speak to how enforcing a hard close, thereby placing an early market close time for retirement savers, protects investors or maintains fair markets?

RESPONSE:

Liquidity and dilution management has been a bedrock principle of open-end funds since the passing of the Investment Company Act. Given that fund stockholders can demand daily redemptions, funds have to be able to turn its securities into money on very short notice. Recent events are a reminder there is more work to be done. Lest we forget, the Federal Reserve in 2020 bought corporate bond ETFs, amongst other actions, to alleviate stresses in the markets. Thus, we've issued proposals regarding the liquidity, pricing, and plumbing of these funds.

As to the plumbing, we proposed to shorten the lag between when investors' orders are placed and when the fund receives those orders. Such lag in the data getting to fund companies can create vulnerabilities; shortening that lag can lessen risk.

This aspect of the proposal—along with the proposed swing pricing requirement— was proposed to address disadvantages investors today may face during times of market stress when the value of their mutual fund holdings is reduced by other shareholders' purchase and redemption activity. The proposed use of swing pricing could help reduce fund dilution attributable to transaction costs associated with short-term investors' activity.

**65.** Mr. Chairman, your proposal, swing pricing and hard close, seeks to mandate swing pricing for open-end funds despite the fact that swing pricing is currently available to open-end funds but few if any, funds have chosen to utilize it.

Why does the Commission seek to mandate something that the market so clearly finds no value in utilizing?

RESPONSE:

Some fund managers have indicated that swing pricing might have been a useful tool during the market events of March 2020.

One possible reason U.S. funds have not used swing pricing to date is that the funds lack timely flow information from intermediaries about redemptions. The proposal seeks to address this through the proposed hard close requirement.

**66.** Mr. Chairman, do you believe that 401(k) savers should have access to the current price of the mutual funds they are buying or selling?
      a) In other words, is the price of a security a crucial factor that savers should consider when making investment decisions?

RESPONSE:

Though the anticipated price of mutual fund shares can be important to an investor making investment decisions,

since 1968, mutual funds have been required to use "forward pricing." This means that an order to purchase or redeem fund shares will receive a price based on the current net asset value ("NAV") next computed after receipt of the order. Funds typically calculate NAV only once a day as of 4 p.m. ET.

This forward pricing requirement is designed to prevent dilution and unfair results that can occur when investors know the price they will receive yet that price differs from the fund's actual NAV at the time of the transaction.

**67.** Let's consider a scenario where a constituent wants to sell a bank-focused mutual fund on Thursday, March 9th — the day before SVB imploded. They log in to their 401(k) account, check the price, and submit their sell order at 3 PM on Thursday, March 9th. Today, they would receive the end-of-day Thursday price when they click the "sell" button. However, under the proposed (SP/HC) rules, 401(k) savers would be buying and selling mutual funds at unknown prices. They might receive the price as it appears at the end of the day on Friday, or maybe even on Monday.

How is this consistent with protecting investors?

RESPONSE:

Under current rules, an investor does not know the price they will receive for their mutual fund shares at the time they place a redemption order. For instance, investors do not know if market events will occur between the time an investor submits an order and the fund's pricing time, typically 4 p.m. ET. Another consideration raised by this question's fact pattern is the potential effects of heightened redemption activity at bank-focused mutual funds on investors who remain in the fund.

The proposed rule is designed to protect remaining investors from dilution that might occur due to market stress that prompts many investors to redeem from a given mutual fund at one time. Under the proposal, the investors that choose to remain in the fund would be protected against the costs that these redemptions otherwise could impose.

**68.** Mr. Chairman, I am deeply concerned about the implications of your proposed rule on 401(k) and annuity retirement savers. It not only relegates them to second-class investors by denying them the ability to know the price when buying or selling, but it also exacerbates the inherent east coast bias that exists in many SEC rules and regulations.

   a) Have you considered the impact of a 4 PM hard close on 401(k) savers who are not located in New York, Miami, or Boston?

   b) How will savers in Iowa, California, Alaska, and other parts of the country be affected?

c) Under your proposed rule, the window of time for savers to submit trades and receive same-day pricing will be further limited for those who do not live on the east coast. Was this factor considered in your cost-benefit analysis of the rule?

RESPONSE:

As the proposal recognizes, investors in different time zones currently are subject to different cut off times for submitting orders to receive a given day's price. This would continue to be the case under the proposed hard close requirement. Further, SEC rules currently allow funds discretion to determine their own pricing times and do not require funds to price their shares as of 4 p.m. ET.

The Commission's economic analysis of the proposal recognized that certain costs to investors may result from reducing an investor's ability to receive same-day pricing, including increased market risks resulting from fund intermediaries establishing earlier cut-off times. The Commission also recognized that the impact of the hard close on investors would depend on the value that investors place on the ability to obtain same-day pricing and the extent to which intermediaries could use technology to process orders more quickly. Commenters have expressed views on these topics. Staff are reviewing those comments and considering recommendations for the Commission.

**69.** Chairman Gensler – While I obviously have several concerns about your Commission's proposed rule on Climate Disclosure, there is one area where I feel we may actually be in agreement. In recent years, we've seen explosive growth in big corporations' greenwashing of their businesses to shareholders. On countless occasions, we see examples of businesses making unrealistic, unsubstantiated claims about their efforts to reduce Scope 1 and 2 emissions by "double-dipping" if you will, their efforts to decarbonize alongside others involved in the carbon reduction chain of custody. For example, let's say that CarbonCapture, Inc. a fictional pie-in-the-sky direct air capture company is able to capture a ton of $CO_2$ and finds a way to sequester it in the ground, generating a credit for sequestration of that carbon. CarbonCapture, Inc. subsequently turns around and sells a voluntary offset credit to their air freight customer, AirIowa, who stated they will "be carbon neutral by 2035 to show how green and forward thinking they are" by enabling carbon capture. Meanwhile, AirIowa Is selling to their business, shipping customers a "carbon reduction offset fee" and marketing to those customers by purchasing this carbon offset and shipping goods with AirIowa, they too can make claims on how they are reducing their Scope 3 emissions. In this instance, there are at least two companies making claims of reduced emissions, but there is only 1 actual ton of carbon that has been removed. These actions are deceptive and misleading at best, and wholesale greenwashing at worst.

a) How is the Commission going to address this duplicitous attempt by companies to manipulate the narrative to satisfy claims of decarbonization, while effectively creating multiplier offsets that never actually took place?

b) Further – Will the Commission specifically require that only one party take credit for these types of actions in the future, and how does the Commission seek to regulate the chain of custody for the voluntary reduction of emissions?"

RESPONSE:

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

With respect to climate-related risk, hundreds of companies today already are making climate-related risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

Without pre-judging any final rule, if the Commission adopts final rules requiring climate-related risk disclosures, the staff will review the responsive disclosures as part of its filing review process. Further, regardless of whether the Commission adopts final rules requiring climate disclosures, Commission staff can recommend enforcement actions in cases where there appear to be materially false or misleading disclosures.

**70.** In 2022, John Deere, Verizon, and American Express were permitted by the SEC to exclude proposals relating to publication of internal nondiscrimination training materials, while Disney's request to exclude a proposal to perform a nondiscrimination audit was denied, deemed by SEC to "transcend ordinary business matters," while CVS was similarly denied no-action relief regarding proposals for racial equity audits.

a) What are the staff criteria used to justify inconsistent application of agency decision making to largely similar proposals?

b) When is employee training—antidiscrimination or other training—deemed to cross the threshold of micromanagement?

RESPONSE:

The staff follows Commission rules—and any Commission guidance regarding the application of those rules—in determining its responses to shareholder proposal no-action requests. The staff carefully reviews the precise language of both the proposal and the accompanying supporting statement.

The staff may find that proposals with some similarities end up with a different result based on a detailed review of these sources. The staff's analysis of whether a proposal seeks to micromanage a company hinges largely on the level of granularity sought in the proposal and whether the proposal inappropriately limits discretion of the board or management.

**71.** While Tractor Supply's 2022 request to exclude a report on whether compensation and workforce practices prioritize financial performance over social costs and risks created by inequality and racial and gender disparities was denied—SEC finding "transcendence of ordinary business matters", BlackRock's request to exclude a proposal detailing impacts of ideological harm from its EEO policy might permit discrimination against conservative employees was found NOT to "transcend ordinary business matters." These are both HR issues relating to potential discriminatory treatment of employees.

   a) Explain please how this is consistent treatment?
   b) Is this not the embodiment of disparate impact?

RESPONSE:

The staff follows Commission rules and any Commission guidance concerning the application of those rules in determining its responses to shareholder proposal no-action requests. The staff reviews carefully the precise language of both the proposal and the accompanying supporting statement. The staff may find that proposals with some superficial similarities end up with a different result based on a detailed review of these sources.

**72.** On February 15th, SEC proposed a rule to amend the custody rule of the Investment Advisors Act, which claims to enhance protections of customer assets managed by registered investment advisers. However, because of the way the rule was proposed, it would drastically impact the traditional bank custody model. As you are aware, custody banks are regulated by the Prudential Banking Regulators, including the OCC & Federal Reserve.

What directive does the SEC have to extend their regulatory reach to custody banks?

RESPONSE:

The Commission's custody rule for investment advisers, first adopted in 1962, was last updated in 2009. Importantly, though, Congress granted the SEC new authorities in 2010 in response to the financial crisis and Bernie Madoff's frauds. In particular, Congress gave us authority to expand the advisers' custody rule to apply to all assets, not just funds or securities.

In February 2023, The Commission proposed updating the investment advisers' custody rule which would, if adopted, extend the rule's protections to apply not just to investors' funds or securities, but to all of an investors' assets that an adviser may custody.

The proposal would apply only to SEC-registered investment advisers who have "custody" of client assets, which can expose those assets to the risk of loss, misuse, theft, or misappropriation. When an adviser has custody of client assets, the proposal would require, among other things, that the adviser maintain those assets with a qualified custodian under a written agreement with certain minimum protective provisions. The proposal explicitly acknowledges and relies on the fact that qualified custodians, under both the proposal and the current rule, often are subject to comprehensive regulatory requirements related to the proper safeguarding of customer assets. The Commission staff also consulted with banking regulators, among others, prior to the proposal and will continue to consult with them as the staff reviews the public comment file before making recommendations to the Commission for any adoption.

**73.** Our understanding is that the SEC's proposal, particularly the provisions on cash segregation and the extension of liability for custody banks, could have significant cost implications on the industry, which will filter down and impact end investors. The SEC's economic impact analysis seems to lack robust analysis here.

Wouldn't you agree this is an important piece to thoroughly analyze?

RESPONSE:

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. This includes a consideration of compliance costs, direct costs, and indirect costs. In addition, the statutes administered by the SEC require the Commission, when engaged in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest, also to consider efficiency, competition, and capital formation.

The SEC's analysis of the costs and benefits of the proposed safeguarding rule (including consideration of issues raised in this question) are located in the Economic Analysis sections of the proposing release that can be found on the SEC's website, www.sec.gov, and are also available at 88 FR 14792.
The Commission has sought public comment on that economic analysis, including the potential costs and benefits. The Commission has received a number of comment letters addressing the potential costs of the proposal, all of which the staff carefully will consider in making any recommendation for Commission action.

**74.** Has the SEC considered, for example, in its economic impact analysis, the impact the rules will have on Investment advisers' choice of custodians, competition, and pricing?

RESPONSE:

Yes. The Commission considered efficiency, competition, and capital formation, in addition to investor protection and the public interest in assessing this proposal. The proposing release includes an economic analysis that examines the costs, benefits, and other economic effects of the proposal, that can be found on the SEC's website, www.sec.gov, and are also available at 88 FR 14792

The Commission requested comment on all aspects of its economic analysis of the proposal, including whether the analysis has: (i) identified all benefits and costs, including all effects on efficiency, competition, and capital formation; (ii) given due consideration to each benefit and cost, including each effect on efficiency, competition, and capital formation; and (iii) identified and considered reasonable alternatives to the proposed rule.

Commission staff carefully will consider the comments, including any economic impact concerns raised by market participants, when making any recommendation for Commission action.

**75.** The SEC's proposed amendments to the custody rule would significantly impact and likely alter the operations and activities of banks that act as qualified custodians.

Did the SEC staff reach out and dialogue with FDIC or OCC staffs beforehand to confirm that the proposal is not inconsistent with, and does not conflict with, any federal banking laws and any FDIC and OCC regulations or guidance to which these banks are subject? If so, what was discussed?

RESPONSE:

The Commission staff consulted with banking regulators prior to the proposal. Further, the release sought input on the proposed requirements for qualified custodians, including whether the requirements would conflict with banking regulations or industry practice. The Commission staff will coordinate with banking regulator counterparts as the staff reviews the comment file in making a recommendation to the Commission for any adoption.

**76.** The SEC is in the process of finalizing a rulemaking regarding climate disclosure requirements for publicly-held companies. The proposal included reporting on "scope 3 financed emissions," which would require financial institutions to collect and report on

the emissions activity of their customers, including privately-held small businesses and even state and local municipal governments. Proponents of the rule have noted that "financial institutions are uniquely positioned to pressure a wide range of companies to disclose and manage their emissions".

    a) Do you think it is appropriate for the SEC to use disclosure requirements to shape access to capital for American businesses and families, or even local governmental entities?

    b) Should my ability to secure a loan from my bank be contingent on my ability to prove that I have a small carbon footprint?

RESPONSE:

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

With respect to climate-related risk, hundreds of companies today already are making climate-risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

We have received comments on the possible effects of the proposed climate rule on private companies. Staff are reviewing those comments and considering recommendations that would address concerns that the rule may have indirect effects on private companies. We also received comments about our analysis of costs in the proposal, which we will address in analysis of costs in any consideration of any possible final rule.

**77.** How is it within the SEC's mandate of investor protection to regulate, directly or indirectly through extensive disclosure requirements, the allocation of capital to or away from entities based upon their emissions?

    a) Shouldn't that be left to the Environmental Protection Agency?

RESPONSE:

With respect to the proposed climate-related risk disclosure rule, as stated in the proposing release, the Commission has authority to promulgate disclosure requirements that are "necessary or appropriate to protect investors."[9] As the release also explained, climate-related risks can present financial consequences that investors in public

---

[9] *Id.*

companies may consider in making investment and voting decisions.[10] The Commission is continuing to receive and the staff are continuing to evaluate all comments on the proposed climate disclosure rule, including comments on the Commission's statutory authority and other issues.

**78.** Given the mission and activities of the federal prudential regulators, isn't it more appropriate for them to issue rulemaking and guidance for traditional banking activities such as custodying assets?

> b) Did you engage in any sort of stakeholder discussion with these agencies when drafting Staff Accounting Bulletin (SAB) 121?

### RESPONSE:

SAB 121 provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding certain crypto assets.

The obligations associated with these arrangements involve unique risks and uncertainties not present in arrangements to safeguard assets that are not crypto assets, including technological, legal, and regulatory risks and uncertainties. These risks can have a significant impact on the entity's operations and financial condition.

The staff believes that the recognition, measurement, and disclosure guidance in this SAB enhances the information received by investors and other users of financial statements about these risks. This helps investors make investment and other capital allocation decisions. Whether or not existing regulatory requirements at a bank or other entity address some or all of the risks identified in SAB 121 depends on the totality of facts and circumstances surrounding any individual situation.

To date, the SEC staff has received several consultations from registrants—including a number from banks—on specific fact patterns. The SEC staff invite dialogue with any parties that are considering applying the guidance in SAB 121. Staff continue their longstanding practice of sharing information with federal banking regulators.

**79.** In your opinion, did you adequately consider all the potential knock-off effects when issuing SAB 121? [see attached letter beginning on the bottom of pages 27 through 30.

### RESPONSE:

SAB 121 provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding crypto assets. It is intended to assist registrants

---

[10] *Id.* at 21335-36.

in consistently accounting for and disclosing such risk and uncertainties, so that investors are provided with decision-useful information.

**80.** SAB 121 is very broad in the scope of its definitions. Did you intend for it to apply to tokenized and digitally "native" versions of traditional assets using permissioned blockchains in addition to what is commonly understood as cryptocurrency?

      a) If the answer is yes—these are very different concepts and present vastly different risk profiles.

      b) Is it really appropriate to conflate the two when these tokens operate within the existing banking infrastructure and regulatory framework? The risks of Distributed Ledger Technology is adequately addressed by the prudential regulators.

      c) If the answer is no—would you be willing to issue a clarification? SAB 121 has engendered significant confusion in the marketplace and could stifle innovation.

RESPONSE:

SAB 121 defines the term "crypto asset" as a digital asset that is issued and/or transferred using distributed ledger or blockchain technology using cryptographic techniques. The accounting guidance, however, does not relate to the technical specifications or properties of the crypto asset.

Instead, SAB 121 provides non-binding staff guidance. The guidance relates to the application of existing accounting and disclosure requirements, under U.S. GAAP and SEC rules, for material risks and uncertainties associated with safeguarding crypto assets.

**81.** Chair Gensler, coming from Iowa, I am very familiar with how insurance companies are regulated by state by state and how they must manage capital and risk on a constant basis. Your recently Proposed Rule 192 for Conflicts of Interest, I believe, inadvertently included transactions that traditional insurance companies utilize routinely to manage their insurance risk and capital flows to meet the needs of homebuyers pursuing the dream of homeownership. I am referring to Mortgage Insurance-Linked Notes (MILNs), which utilize the capital markets to transfer risk, transactions in which both the insurer and capital markets investors are aligned in interest: both parties take on certain tranches of risk in exchange for a premium and both benefit if the loan does not default, and similarly both pay a portion of losses if they do. It is not a usually defined "conflict of interest" to partake in these transactions, which are ordinary course transactions for many insurers. Can you clarify to me if these MILN reinsurance transactions will not be impaired by the Conflicts of Interest Rule?

RESPONSE:

The re-proposed rule, if adopted, would implement the statutory mandate under Section 621 of the Dodd-Frank Act. Consistent with the statute, the re-proposed rule provides

exceptions for risk-mitigating hedging activities, bona fide market making, and certain liquidity commitments.

We received many comment letters related to the scope of the proposed rule and the costs associated with compliance. The re-proposed rule responds this public feedback, as well as developments since 2011 in the asset-backed securities markets. For example, the re-proposal clarifies the scope of the prohibited conduct, the exceptions, and the participants subject to the proposal.

The staff also has met with commenters to better understand their concerns. The staff is considering all of the comments received, including those received related to MILNs, as they develop recommendations to the Commission that would implement the statute and achieve its intended goals to prohibit certain conflicts of interest in securitizations.

The Economic Analysis for the proposing release can be found at 88 FR 9711.

**82.** Commissioner Gensler, my state of Iowa, has more than 400 life insurance companies licensed to do business. More than 30 of those are domiciled in the state. The life insurance industry invests $66 billion in Iowa's economy. I have a keen interest in how the SEC's hard close proposal will impact my state. My constituents with variable annuity contracts will be negatively affected by the hard close proposal, and it doesn't seem that the SEC considered this. Variable annuity contracts are a popular life insurance product, with more than 28 million in force in the United States as of 2021. Should the proposal be adopted, the SEC may require insurance companies to break the promises they made to those investors. Insurers would need to amend each of those contracts to reflect the SEC's hard close requirements, which would cut off their investment options.

    a) The harm to consumers seems clear, yet, the SEC has not articulated a tangible benefit. Commissioner Gensler, have you considered the adverse impacts your proposal would have on American investors?

    b) Has the SEC performed a cost/benefit analysis that takes into account access to retirement products for middle-market consumers?

    c) How do you plan to address these problems with your proposal?

RESPONSE:

The hard close aspect of the proposal—along with the proposed swing pricing requirement— was proposed to address disadvantages investors today may face during times of market stress when the value of their mutual fund holdings is reduced by other shareholders' purchase and redemption activity. The proposed use of swing pricing could help reduce fund dilution attributable to transaction costs associated with short-term investors' activity.
Swing pricing also allocates the costs associated with redemption and purchase activity more fairly.

The Commission included an economic analysis in its proposing release and sought public comments on the analysis. The economic analysis discusses the potential costs and benefits of the proposal on funds and their investors. The staff is reviewing all comments on the proposal, including comments addressing the costs and benefits of the proposed hard close requirement, and will consider these comments when developing any recommendations for Commission action.

**83.** 7 Does the SEC believe it is beneficial for investors to have financial institutions involved as advisors in de-SPAC transactions?

    a) Are you concerned that the March 2022 proposed rules regarding SPACs, if adopted, would disincentivize financial institutions with deep market expertise from being involved in de-SPACs due to the proposed definition of'"underwriter""

### RESPONSE:

Underwriter status depends upon a person's activities occurring "in connection with" a "distribution" of any security. The Commission's SPAC proposing release contains a number of requests for comment about the proposed definition of "underwriter" with respect to de-SPAC transactions. The staff will consider comments received in response to those requests when developing any recommendation for Commission action.

**84.** The SEC''s proposal would alter the definition of a "blank check" company under the Private Securities Litigation Reform Act (PSLRA) by preventing a SPAC from using the PSLRA safe harbor for forward-looking statements. However, a compan''s assessment of future earnings is just the type of information that Congress envisioned should be protected when it enacted the PSLRA. Further, the elimination of the safe harbor blatantly contradicts other provisions within the same proposal that require the SPAC to disclose the material reasons its proposed de-SPAC transaction should be considered fair to public shareholders.

On what basis does the SEC believe it has the legal authority to rewrite the PSLRA in contradiction of Congress'' intent or without its direct authority?

### RESPONSE:

The PSLRA safe harbor is not available when a forward-looking statement is made in connection with an offering by a "blank check company." Under the PSLRA, the term "blank check company" and certain other terms "have the meanings given those terms by rule or regulation of the Commission."

To address concerns about the use of forward-looking statements, such as projections, in connection with de-SPAC transactions, the Commission proposed to amend the definition of "blank check company" for purposes of the PSLRA. The Commission did so pursuant to the statutory authority under the PSLRA to define "blank check company" by Commission rule or regulation.

**85.** What specific statutory authority does the SEC have to amend the Private Securities Litigation Reform Act in order to remove the safe harbor for forward looking statements for SPACs (as proposed in the March 2022 rule?

RESPONSE:

As I stated above, the PSLRA safe harbor is not available when a forward-looking statement is made in connection with an offering by a "blank check company." Under the PSLRA, the term "blank check company" and certain other terms "have the meanings given those terms by rule or regulation of the Commission."

To address concerns about the use of forward-looking statements, such as projections, in connection with de-SPAC transactions, the Commission proposed to amend the definition of "blank check company" for purposes of the PSLRA. The Commission did so pursuant to the statutory authority under the PSLRA to define "blank check company" by Commission rule or regulation.

**86.** Since becoming head of the SEC in 2021, you have presided over a rulemaking agenda that is, depending on your viewpoint, either ambitious or too much, too fast. For example, in 2023 the SEC has issued nine rule proposals, which combined add up to over 2,200 pages. These proposals involve a variety of complex issues, including cybersecurity, custody and privacy. Providing a substantive analysis of such a rule's impact involves significant time, effort, and resources. I am concerned that this accelerated pace does not allow industry stakeholders to provide thoughtful, helpful, or meaningful feedback during the allotted comment period.

Given how many rule proposals have been in motion at any given time over the last couple of years do you believe the SEC is able to hear feedback from everyone who wants to provide it?

RESPONSE:

The Administrative Procedure Act (APA) requires that agencies provide interested parties with notice of proposed rulemaking and a reasonable and meaningful opportunity to participate in the rulemaking process through submission of written data, views, or arguments. I believe that the comment periods we have used for our rulemakings are consistent with our obligations under the APA and provide interested parties fair and ample time to comment on proposed rules. In addition, we publish any proposed rule on our website shortly after a vote occurs. This provides additional time for interested parties to formulate a response before the release is published in the *Federal Register*. Further, when comment periods close, we often continue to get additional comments, through meetings and otherwise, which staff has considered as well.

Staff carefully read and analyze each comment letter that is submitted in connection with a proposed rule, and the feedback and information we receive are addressed in any adopting release. Often, interested parties ask to meet with staff to explain their comment

letters or offer additional views. For example, the Commission's proposal on *Cybersecurity Risk Management for Investment Advisers, Registered Investment Companies, and Business Development Companies* and its proposal on *Safeguarding Advisory Client Assets* include a robust comment file reflecting significant public input.

In addition, as reflected in the comment file, the Commissioners and staff have engaged in numerous meetings with interested stakeholders on these proposals. We welcome those meetings and the opportunity for additional feedback. I believe these exchanges improve staff recommendations and the decisions and reasoning of the Commission.

As we implement the federal securities laws, we continue to welcome feedback and comments from the public. This helps to ensure that we fulfill our obligations under the APA and other applicable requirements. Further, it helps to ensure that our final rules reflect appropriate consideration of public input.

**87.** The notice and comment process outlined in the Administrative Procedure Act (APA) is intended to allow stakeholders sufficient time to review and analyze proposals and provide substantive input. Historically, Administrations of both political parties have said that comment periods should be at least 60-days. Commissioner Peirce recently observed that, "For complicated rulemakings or at times when we have many rulemakings outstanding simultaneously, 90-day comment periods are likely more appropriate."

Do you agree with that view?

RESPONSE:

The Administrative Procedure Act (APA) requires that agencies provide interested parties with notice of proposed rulemaking and a reasonable and meaningful opportunity to participate in the rulemaking process through submission of written data, views, or arguments. I believe that the comment periods we have used for our rulemakings are consistent with our obligations under the APA and provide interested parties fair and ample time to comment on proposed rules. In addition, we publish any proposed rule on our website shortly after a vote occurs. This provides additional time for interested parties to formulate a response before the release is published in the *Federal Register*.

For example, each of the separate 2022 proposed rules to update various aspects of the markets provided the public a total of 107 days to comment, from the Open Commission Meeting (December 14, 2022) to the end of the comment period (March 31, 2023). This is similar in length to the 125 days provided to comment on Regulation NMS, from the Open Commission Meeting (February 26, 2004) to the end of the comment period (June 30, 2004).

In addition, since January 2022, we have provided the public an average of 70 days from when a proposal is published on the SEC website. With the closing of a comment period, staff begins its work to account for this important public input but continues to receive additional comments.

**88.** You maintain that the current pace of regulatory proposals is comparable to that of your predecessors. Even if that were true, in the first quarter of 2023, the SEC issued four proposals related to cybersecurity and data privacy alone. Given the complex and overlapping nature of these proposals, I am concerned that stakeholders will not be able to generate effective comments in the time allowed, possibly even facing a choice to not submit comments on one relevant proposal in order to focus their resources on another.

Do you believe it is necessary to issue so many interconnected proposals in the same timeframe?

RESPONSE:

Reflecting on the past two years, I could not be more proud of the accomplishments of the Commission and its staff. Technology, markets, and business models constantly change. Thus, the nature of the SEC's work must evolve as the markets we oversee evolve. The agenda of SEC rulemakings[11] reflects a long tradition of updating our rules to meet new challenges. Further, the agenda includes rulemaking items that we have been directed by Congress to implement. Our ability to fulfill our mission depends on having an up-to-date rulebook—consistent with our mandate from Congress, guided by economic analysis, and shaped by public input.

**89.** Your recent budget request asked for more resources to hire more attorneys for rulemaking and enforcement. If the SEC provided longer comment periods and issued fewer proposals at once (that is, avoiding a deluge of proposals with overlapping comment periods), would those additional resources still be necessary?

RESPONSE:

The SEC's oversight function is vast. Based upon the most recent data, we oversee more than 40,000 registered entities—asset managers, brokers, dealers, exchanges, fund complexes, public companies, and many more.

We provide oversight to the Public Company Accounting Oversight Board (PCAOB), the Financial Industry Regulatory Authority (FINRA), the Municipal Securities Rulemaking Board (MSRB), the Securities Investor Protection Corporation (SIPC), and the Financial Accounting Standards Board (FASB).

In addition, we look after the accounting and auditing functions of the public markets, process thousands of periodic filings and registration statements, and work through

---

[11] The most recently published agenda is available at
https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentP
ub=true&agencyCode=&showStage=active&agencyCd=3235&csrf_token=1F24FFA7E817F47161985C526F147C
3715DBBF04155640F894331C0B444622A784E1683E18CCFA8B6FD989B0205A85BED275

thousands of examinations and enforcement actions each year. We review the disclosures and financial statements of more than 8,700 reporting companies. We engage and interact with the investing public on a daily basis through activities ranging from our investor education programs and risk alerts on SEC.gov to the critical market information we provide through the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system.

The SEC's budget request would increase the agency's staffing level and provide critical resources to keep pace with the rapid expansion of the size and complexity of the securities markets and the entities over which it has jurisdiction. The request also will enable the SEC to address noncompliance in the crypto securities markets. In addition, using these resources, we will continue to bolster our cybersecurity, secure cloud infrastructure, as well as economic and data analytics.

**90.** We're concerned about the lack of any analysis of the costs of the Commission's proposal on the retirement savings system and retirement savers themselves. One of my constituent businesses is a leading provider of recordkeeping and investment services for retirement plans of all types. Every day, they receive hundreds of thousands to millions of investment trade orders from retirement savers in 401k and other types of retirement plans, through transactions like routine contributions, reallocations of accounts, and loan and other withdrawal requests. Over many years they've refined their process to aggregate these trade requests across all plans, resulting in one daily net trade request to each mutual fund. To highlight the benefits to retirement savers, in one typical month our constituents' final trade file requests distilled 167,340,000 individual transaction requests received during the month to approximately 136,500 total trade orders to the NSCC. At a cost of \$0.06 per trade order through the NSCC, this trading process substantially reduces trading costs for retirement plans and retirement savers, especially relative to any alternative system that would facilitate one-on-one trades by individual retirement savers to maintain daily valuation under the Commission's proposal.

How can the Commission propose a rule that would fundamentally upend the defined contribution system without evaluating the resulting costs to retirement savers?

RESPONSE:

The economic analysis of the Open-End Fund Liquidity Risk Management and Swing Pricing proposal discussed the proposal's potential costs to retirement plan record-keepers as well as the potential effects on retirement plan investors. Specifically, the Commission acknowledged that retirement plan recordkeepers and other intermediaries may have to modify or update certain systems and processes to comply with the proposed swing pricing and hard close requirements.

The Commission also requested comment on a number of specific items regarding retirement plans. The staff carefully will consider commenter feedback when making any recommendations for Commission action.

**91.** Target-date funds are the most widely used default investments in use today in defined contribution plans. In fact, the same Iowa-based provider I mentioned earlier noted that, as of the end of March 2023, 43% of the assets invested in all of the investments that the firm recordkeeps for their plan clients were in target date funds.

Target date funds are "fund of funds (FoFs)," investment vehicles that invest in other mutual funds. The proposed hard close requirement is particularly harmful to FoFs, because FoFs are dependent upon the NAVs of the underlying funds in which they invest. A hard close is simply not workable for FoFs, because it would require a FoF to submit its orders for the underlying funds before the FoF is able to determine the dollar amount it needs to invest or raise by purchasing or selling the underlying funds. The Propose Rule acknowledges this problem and even suggests that these types of orders would need to be executed over more than one day or using prices from the prior day. Yet, the Commission undertook no further study of the impact this could have on retirement savers' accounts or their confidence in the retirement system.

Is the Commission intending to undertake further study of the harmful effects and costs the proposed hard close would have on target date funds?

RESPONSE:

The proposing release discussed the potential effects of a hard close on fund of funds' structures. The release also requested comment on this topic.

The staff is reviewing all comments on the proposal, including comments addressing the costs and benefits of a hard close for fund of funds. Staff will consider these comments when making any recommendation for Commission action.

**92.** Cryptocurrencies and the underlying technology that powers them, blockchain, have distinct use cases. For example, while digital assets are one important financial utility of blockchain, there are also many other promising blockchain applications in other sectors, such as healthcare, cybersecurity and agriculture.

How can the SEC adapt its regulatory approach to better differentiate between blockchain technology and cryptocurrencies, given potential impacts on various industries?

RESPONSE:

There's no reason to treat the crypto market differently just because different technology is used. We should be technology neutral. As new technologies come along, though, we need to be sure we're still achieving core public policy goals.

Further, I'd note that financial innovations throughout history don't long thrive outside of public policy frameworks. In finance, that's about protecting investors and consumers, guarding against illicit activity, and ensuring financial stability. These public policy goals can touch upon national security as well.

I believe that innovation can significantly benefit investors and issuers alike. It should not, however, be used to circumvent the important investor and market protections that are at the heart of the SEC's mission—protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation.

The crypto securities markets have been operating largely in noncompliance with the federal securities laws. There is nothing about the crypto securities markets that suggests that investors and issuers are less deserving of the protections of our securities laws.

We cannot afford to let noncompliance in the crypto markets undermine these time-tested protections, and possibly spill out to harm other areas in the capital markets as well.

**93.** In light of the increasing adoption of blockchain technology for non-financial applications, what measures is the SEC considering to ensure that regulatory frameworks remain flexible and relevant?

RESPONSE:

Innovation in our capital markets has been ongoing since antiquity. Such innovation facilitates new and effective ways to invest, trade, and raise capital. As new technologies come along, though, we need to be sure we're still achieving core public policy goals. At the SEC, we will continue to foster that development while helping to ensure compliance with the federal securities laws.

**94.** What are the SE''s plans to address the potential challenges and risks posed by the integration of blockchain technology in traditional financial systems?

RESPONSE:

Regardless of the ledger being used, be it a spreadsheet, a database, or blockchain technology, when investors put their money at risk, it's the economic realities of the investment that matter. Innovation cannot be used to circumvent the important investor and market protections that are at the heart of the SEC's mission—-investor protection, fair, orderly and efficient markets, and promoting capital formation.

The SEC and our staff are in ongoing dialogue with external stakeholders and its registrants concerning a number of matters, including the technologies that they use to perform their business functions and to satisfy their regulatory duties.

**95.** As blockchain technology continues to evolve and mature, how does the SEC plan to collaborate with other regulatory agencies, both domestically and internationally, to develop a consistent and coordinated regulatory approach?

RESPONSE:

The SEC works closely and collaboratively with other regulatory agencies, domestically and internationally, on a wide range of issues related to the crypto markets.

Most agencies have dedicated offices responsible for staying abreast of developments in the crypto space. Our respective staffs communicate frequently about these developments.

SEC participates in broader interagency initiatives, such as the President's Working Group on Financial Markets report regarding stablecoins. The SEC also participates in multiple international bodies that are addressing issues in the crypto markets, such as the International Organization of Securities Commissions and the Financial Stability Board. The SEC will continue to communicate and work closely with other agencies and bodies to ensure the integrity and transparency of our financial markets.

**96.** How can the SEC encourage responsible innovation in blockchain technology, while also ensuring that investor protection and market integrity are not compromised?

RESPONSE:

The SEC and staff seek to oversee a regulatory environment for investors, issuers, and market participants that fosters innovation, investor protection, capital formation, market integrity, and confidence in the markets.

The SEC and staff are in ongoing dialogue with market participants and registrants concerning a number of matters, including the technologies that registrants can use to perform their business functions and to satisfy their regulatory duties.

For example, the SEC established FinHub in October 2018 to lead engagement efforts with the FinTech community. That engagement has included providing guidance and clarity to market participants.

The SEC welcomes, in particular, ideas from market participants and registrants as to how they can utilize new technologies, consistent with regulatory requirements, to carry out these functions and duties in more robust, secure, and cost-effective ways.

**97.** What is the SE''s perspective on the potential use of blockchain technology to enhance transparency, traceability, and security in financial markets, and how might this influence future regulatory policies?

RESPONSE:

Innovation in our capital markets has been ongoing since antiquity. Innovation facilitates new and effective ways to invest, trade, and raise capital. Regardless of the ledger being used, be it a spreadsheet, a database, or blockchain technology, when investors put their money at risk, it's the economic realities of the investment that matter.

Innovation cannot be used, though, to circumvent the important investor and market protections that are at the heart of the SEC's mission—-investor protection, fair, orderly and efficient markets, and promoting capital formation.
As markets, business models, and technology continue to evolve, we will continue to ensure compliance with the federal securities laws.

**98.** Considering the rapid pace of innovation in the blockchain space, how does the SEC plan to keep up with emerging developments and their potential implications for the broader financial ecosystem?

RESPONSE:

Innovation in our capital markets has been ongoing since antiquity. Innovation facilitates new and effective ways to invest, trade, and raise capital. Regardless of the ledger being used, be it a spreadsheet, a database, or blockchain technology, when investors put their money at risk, it's the economic realities of the investment that matter.

Innovation cannot be used, though, to circumvent the important investor and market protections that are at the heart of the SEC's mission—-investor protection, fair, orderly and efficient markets, and promoting capital formation.
As markets, business models, and technology continue to evolve, we will continue to ensure compliance with the federal securities laws.

**99.** Based on what we have learned since its collapse, it seems clear that FTX suffered a critical failure in leadership at best and criminal activity at worst. It also seems possible that FTX may not prove to be an isolated event long-term, as other exchanges are encountering turbulence.

    a) Given what we now know about FTX, what steps is the SEC taking to ensure that bad actors in this space are not posing an unnecessary risk to consumers?

    b) Has the SEC considered applying existing law to regulate all assets as securities?

RESPONSE:

> As Supreme Court Justice Thurgood Marshall put it, when Congress defined a security, they painted with "a broad brush."
>
> Whether a particular instrument is within the definition of security is based on the facts and circumstances. As it relates to investment contracts, the U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.
>
> Given that many crypto tokens are securities, it follows that many crypto intermediaries are transacting in securities and have to register with the SEC in some capacity, with the accompanying federal securities laws protections to investors.
>
> Crypto intermediaries—whether they call themselves centralized or decentralized (e.g., DeFi)—often are an amalgam of services that, in the rest of the securities markets, typically are separated from each other: exchange functions, broker-dealer functions, custodial and clearing functions, and lending functions. This separation of function helps mitigate the conflicts that can arise with the commingling of such services.
>
> There is nothing about the crypto securities markets that suggests that investors and issuers are less deserving of the protections of our securities laws. Under the securities laws, investors in crypto securities, like investors in all securities, should benefit from exchange rulebooks that protect against fraud, manipulation, front-running, wash sales, and other misconduct. Investors also should benefit from the applicable regulations for brokers, dealers, and other intermediaries. Our Division of Enforcement has and will continue to pursue violations of the federal securities laws by crypto market participants.

**100.** How will the SEC address the concerns of regulatory arbitrage, where companies may choose to operate in jurisdictions with more lenient regulations, potentially stifling innovation within the United States?

RESPONSE:

> The U.S. federal securities laws protect U.S. investors. If an entity seeks to raise money from the American public or participate in America's capital markets—as an issuer, exchange, intermediary, investment company, transfer agent, or beyond—that entity also must follow the U.S. securities laws wherever they apply. Our Division of Enforcement stands ready to address any potential noncompliance with our rules and Congress's laws.

**101.** How does the SEC plan to collaborate with other national and international regulatory bodies to create a harmonized approach to blockchain and cryptocurrency regulation that can effectively address the global nature of these technologies?

RESPONSE:

The SEC works closely and collaboratively with other regulatory agencies, domestically and internationally, on a wide range of issues, including related to the crypto markets.

Most agencies have dedicated offices responsible for staying abreast of developments in the crypto space. Our respective staffs communicate frequently about these developments.

SEC participates in broader interagency initiatives, such as the President's Working Group on Financial Markets report regarding stablecoins. The SEC also participates in multiple international bodies that are addressing issues in the crypto markets, such as the International Organization of Securities Commissions and the Financial Stability Board. The SEC will continue to communicate and work closely with other agencies and bodies to ensure the integrity and transparency of our financial markets.

**102.**     As non-fungible tokens (NFTs) gain traction in various industries, how will the SEC approach the regulation of these unique digital assets, particularly when their value and use cases may differ significantly from traditional cryptocurrencies?

RESPONSE:

As Supreme Court Justice Thurgood Marshall put it, when Congress defined a security, they painted with "a broad brush."

Whether a particular instrument is within the definition of security is based on the facts and circumstances. As it relates to investment contracts, the U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

In analyzing whether a crypto asset is an investment contract, the focus of the analysis is not only on the form and terms of the asset itself but also on the circumstances surrounding the crypto asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). No single fact is determinative; rather, the analysis requires examination of all the facts and circumstances.

**103.**     How does the SEC plan to address the potential risks associated with the increasing use of stablecoins, particularly those that may not be fully backed by the assets they claim to represent?

RESPONSE:

As the President's Working Group report on stablecoins notes, "stablecoins, or certain parts of stablecoin arrangements, may be securities, commodities and/or derivatives."

Thus, the use of stablecoins presents a number of public policy challenges with respect to protecting investors.

Stablecoins may facilitate those seeking to sidestep a host of public policy goals connected to our traditional banking and financial system, such as anti-money laundering, tax compliance, sanctions compliance, and other safeguards against illicit activity. The SEC will continue working with other U.S. regulators, including the CFTC, to deploy the full protections of the law regarding these products and arrangements. We will do so where appropriate, acting under our statutory authority.

### Questions for the Record submitted by Rep. Meuser

**104.**      Is Chairman Gensler recused from matters involving former President Donald Trump? If not, why not?
    RESPONSE:

I am committed to complying with the highest ethical standards and maintaining an ethical culture at the SEC to ensure the American public has confidence in the integrity of our enforcement, regulatory, and policymaking initiatives.  It is my understanding that no ethics law, regulation, or policy requires me to recuse from matters based on the involvement of former President Donald Trump.

**105.**      Is Melissa Hodgman recused from matters involving former President Donald Trump? If not, why not?


RESPONSE:

The SEC is committed to complying with the highest ethical standards and maintaining an ethical culture to ensure the American public has confidence in the integrity of our enforcement, regulatory, and policymaking initiatives. All agency employees are bound by federal ethics laws, regulations, and policies concerning conflicts of interest.  The Ethics Office regularly consults with and advises employees on their obligations and applicable ethics restrictions. I understand that Ms. Hodgman has never been assigned to and has never worked on any matters involving former President Donald Trump.

**106.** Is Megan Barbero recused from matters involving former President Donald Trump? If not, why not?


RESPONSE:

The SEC is committed to complying with the highest ethical standards and maintaining an ethical culture to ensure the American public has confidence in the integrity of our enforcement, regulatory, and policymaking initiatives. All agency employees are bound by federal ethics laws, regulations, and policies concerning conflicts of interest. The Ethics Office regularly consults with and advises employees on their obligations and

applicable ethics restrictions. It is my understanding that no ethics law, regulation, or policy requires Ms. Barbero to recuse from matters based on the involvement of former President Donald Trump.

**107.** What is the legal basis for refusing to process a registration statement based on the existence of a so-called I) examination?

RESPONSE:

SectiI5(c) of the Securities Act prohibits the offer and sale of securities while the related registration statement is not effective and is the subject of a SectiI8(e) examination. Therefore, as a matter of policy, the Division will not review or comment on a registration statement while a SectiI8(e) examination is in effect.

**108.** In January, the SEC proposed a rule to prohibit conflicts of interest for securities. I am concerned about how the scope of this rule might accidentally affect the mortgage insurance industry.

   a) Can you assure this committee that your proposed rulemaking will not inadvertently include the mortgage insurance industry in its scope?
   b) Can you assure this committee that your team will protect the mortgage insurance industry from undo regulatory burdens and compliance costs?

RESPONSE:

The re-proposed rule, if adopted, would implement the statutory mandate under Section 621 of the Dodd-Frank Act. Consistent with the statute, the re-proposed rule provides exceptions for risk-mitigating hedging activities, bona fide market making, and certain liquidity commitments.

We received many comment letters related to the scope of the proposed rule and the costs associated with compliance. The re-proposed rule responds this public feedback, as well as developments since 2011 in the asset-backed securities markets. For example, the re-proposal clarifies the scope of the prohibited conduct, the exceptions, and the participants subject to the proposal.

The staff also has met with commenters to better understand their concerns. The staff is considering all of the comments received, including those received related to MILNs, as they develop recommendations to the Commission that would implement the statute and achieve its intended goals to prohibit certain conflicts of interest in securitizations.

The Economic Analysis for the proposing release can be found at 88 FR 9711.

109.    IPOs have been down in recent years. Does this have any connection to overly long review processes at the SEC for forms such as the S-4?

RESPONSE:

Form S-4 registration statements are used to offer and sell securities in connection with business combination transactions, such as mergers. During the last two fiscal years, merger activity more than tripled 2020 levels.

110.    What should a company do that finds itself caught in an unusually lengthy S-4 review?

RESPONSE:

The length of time that a filing review takes depends on many factors including the complexity of the transaction, the quality of the disclosure, and the responsiveness of the company to comments.

111.    What should I be telling constituents who invested in a company currently in an unusually lengthy S-4 review?

RESPONSE:

The length of time that a filing review takes depends on many factors including the complexity of the transaction, the quality of the disclosure, and the responsiveness of the company to comments.

112.    Have you consulted with the Department of Labor to do a study about the costs that the proposed rule on swing pricing would add for retirement investors?

RESPONSE:

The Commission conducted an economic analysis in the Open-End Fund Liquidity Risk Management and Swing Pricing Proposal that examined the costs, benefits, and other economic effects of the proposed rulemaking. The analysis which can be found in the Economic Analysis section of the proposing release, specifically recognizes and discusses the potential effects of swing pricing and the hard close on retirement plans and retirement plan intermediaries.

We have received additional feedback on these effects through the public comment process, which the staff carefully will consider when making recommendations to the Commission.

**Questions for the Record submitted by Rep. Steil**

*Regulation by Enforcement – Digital Assets*

113.    Last September you said publicly that crypto exchanges and other intermediaries which you believe are dealing in digital assets securities need to "come in, talk to us, and register."

Since then, you have repeated calls for crypto exchanges to register with the SEC. However, just over a year ago you said in a speech that "crypto platforms currently list both crypto commodity tokens and crypto security tokens," and that "I've asked staff to consider how best to register and regulate platforms where the trading of securities and non-securities is intertwined."

To date, the only digital asset you have definitively identified as being a non-security is Bitcoin.

If there is no bright line from the SEC defining which digital assets are securities and which are not, and the Commission has not determined whether a registered platform can trade in securities and non-securities, could you please explain how it would be possible for a crypto exchange to register with the SEC as a National Securities Exchange?

RESPONSE:

Given that many crypto tokens are securities, it follows that many crypto intermediaries are transacting in securities and have to register with the SEC in some capacity.

Crypto intermediaries—whether they call themselves centralized or decentralized (e.g., DeFi)—often are an amalgam of services that typically are separated from each other in the rest of the securities markets: exchange functions, broker-dealer functions, custodial and clearing functions, and lending functions.

These crypto asset market participants engaging in securities activities are operating in noncompliance with the federal securities laws and the protections such laws provide. For example, platforms are operating as exchanges, but investors do not have the benefit of exchange rules and regulations that protect against fraud, manipulation, front-running, wash sales, and other misconduct.

Similarly, crypto market intermediaries may be acting as brokers or dealers without providing the important protections to investors that the federal securities laws require.

I have asked staff to work with intermediaries to ensure they register each of their functions—exchange, broker-dealer, custodial functions, and the like. I also have asked staff to consider how investors might trade crypto security tokens versus or alongside crypto non-security tokens.


*Regulation by Enforcement – Accounting Firms*

114.     Your regulation by enforcement approach, which you have generally applied to the digital assets industry, also extends to the accounting industry, where the SEC and

PCAOB are challenging auditors' independent judgements and making it harder and harder for them to do their jobs and retain and attract talent to the profession. Last year, PCAOB enforcement actions rose to their highest level since 2017, and monetary penalties were the largest in the history of the PCAOB. The PCAOB disclosed 29 actions involving the performance of an audit or a firm's system of quality control, up over 60% from 2021.

While some of these actions might be justified, I am concerned that they reflect an unnecessarily aggressive position with regard to audit professionals, when consultation and guidance may be more helpful to achieve the ultimate goal that we all share of protecting investors.

      a) Can you explain how enforcement actions rather than consultation and guidance are helping to protect investors?
      b) And can you commit to a more open process with the accounting industry going forward?

RESPONSE:

The Supreme Court has noted that auditors serve as trusted gatekeepers in our financial disclosure regime and in our capital markets. As such, auditors are held to a high standard of ethics and professional conduct.

It would harm trust in the markets if regulators failed to enforce applicable laws, rules, and standards, particularly when it comes to any alleged misconduct or noncompliance from auditors. By conducting appropriate enforcement activity—consistent with statute, including the Sarbanes-Oxley Act of 2002—the PCAOB is fulfilling its obligations, protecting investors, facilitating capital formation, and enhancing trust in markets.

*Best Execution*

115.  Many stakeholders have expressed concerns that the SEC's Best Execution proposal, unlike the existing FINRA framework, does not afford broker dealers flexibility to exercise their market expertise and judgment in achieving best execution for their customers. I am concerned this may hamper execution quality, particularly when market conditions are challenging and the ability to use expertise and judgement is critical.

RESPONSE:

The Commission recognizes the importance of providing broker-dealer flexibility to exercise its expertise and judgment when executing customer orders. Therefore, as proposed, Regulation Best Execution primarily is a policies and procedures-based rule.

For example, the proposal specifies the policies and procedures that brokers need to adopt with respect to best execution, while retaining their ability to consider a variety of factors in determining the best market for customer orders. These policies and procedures would be required to include specific considerations that a broker would need to address in order to comply with the proposed best execution standard, such as the information used to evaluate markets. These policies and procedures also would have to address specified price and non-price considerations relevant to determining the best markets for customer orders.

In addition, the proposed rule would not require a broker-dealer to include in its policies and procedures a minimum number of markets that it would need to identify as material potential liquidity sources for customer orders. Rather, the Commission recognized that a broker-dealer's identification of such liquidity sources could be influenced by the nature of the broker-dealer's business operation and customer order flow, among other things. Therefore, as proposed, the broker-dealer would follow its policies and procedures in assessing reasonably accessible information and determining material potential liquidity sources.

Moreover, as proposed, the factors that must be included in a broker-dealer's policies and procedures—with respect to complying with the standard and determining the best market for customer orders—are consistent generally with the factors that FINRA and the MSRB have identified as relevant to a broker-dealer's best execution determinations.

**116.** Why did the SEC diverge so substantially from the FINRA standard that has served institutional investors well?

RESPONSE:

Proposed Regulation Best Execution is consistent with the FINRA best execution rule in many respects. In some other respects, the proposed Regulation Best Execution does differ from the FINRA rule.

I believe, if adopted, the rules would help ensure that brokers have policies and procedures in place to uphold one of their most important obligations: to seek best execution when trading securities for investors, whether equities, fixed income, options, crypto security tokens, or other securities.

The proposing release describes, and solicits comment on, the consistencies and differences between the FINRA rule and the proposed rules. Staff will consider comments in consideration of recommendations to the Commission on any possible adopting release.

**117.** What evidence does the SEC have that restricting the expertise and judgment of broker dealers in executing for institutional investors will improve execution quality?

RESPONSE:

In proposing Regulation Best Execution, the Commission recognizes the importance of providing a broker-dealer flexibility to exercise its expertise and judgment when executing customer orders. Therefore, as proposed, Regulation Best Execution primarily is a policies and procedures-based rule.

For example, the proposal specifies the policies and procedures that brokers need to adopt with respect to best execution, while retaining their ability to consider a variety of factors in determining the best market for customer orders. These policies and procedures would be required to include specific considerations that a broker would need to address in order to comply with the proposed best execution standard, such as the information used to evaluate markets. These policies and procedures also would have to address specified price and non-price considerations relevant to determining the best markets for customer orders.

**118.**     How do you reconcile the fact that the SEC has never called into question the FINRA Best Execution standard, and yet the Commission now introduces a radically different standard of its own?

RESPONSE:

I believe a best execution standard is too important, too central to the SEC's mandate to protect investors, not to have on the books as Commission rule text. Proposed Regulation Best Execution would enhance investor protection by providing for additional enforcement capabilities, including the ability to bring remedial actions and impose sanctions for violations of the new rule. This, in turn, would reinforce and bolster the SROs' own enforcement efforts.

Proposed Regulation Best Execution is consistent with the FINRA best execution rule in many respects. In some other respects, the proposed Regulation Best Execution does differ from the FINRA rule.

The proposing release describes, and solicits comment on, the consistencies and differences between the FINRA rule and proposed rules.

*Defining A Dealer*

**119.**     Do you believe that a business is required to register as a dealer if it bought and sold securities in more than a few isolated transactions?

RESPONSE:

Section 3(a)(5) of the Securities Exchange Act of 1934 defines a dealer as someone who is engaged in the business of buying and selling securities for their own account. Section

3(a)(5) further says that "The term 'dealer' does not include a person that buys or sells securities (…) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." Thus, analyzing a person's activities to determine dealer registration status requires analyzing the relevant facts and circumstances.

Activities under the definition may include, among others, actively soliciting customers or counterparties either directly, or through third parties; participating in a distribution of new issues; purchasing securities at a discount to the prevailing market price and selling them into the market for a markup; or purchasing or selling securities as a principal to or from customers, in addition to providing professional activities such as investment advice.

**120.**    Do you believe that making convertible investments, in full compliance with Rule 144, in issuers listed on a national securities exchange like NASDAQ can potentially constitute "dealer" activity requiring registration?

RESPONSE:

As described in my response to your question above, analyzing a person's activities to determine dealer registration status requires analyzing the relevant facts and circumstances.

Recent Commission enforcement actions have alleged—and related court rulings have upheld—violations of Section 15(a) of the Exchange Act for acting as an unregistered dealer. These violations were against persons that engaged in a regular business activity that, among other things, involved (1) purchasing debt or convertible securities from publicly-traded companies or from creditors of those companies; (2) converting these instruments into shares of stock at a discount from market prices; and (3) selling that stock into the market upon conversion via registered broker-dealers or otherwise.

**Questions for the Record submitted by Rep. Fitzgerald**

**121.**    Influence of Better Markets Over SEC: Chairman Gensler – I have grave concerns about the influence that Better Markets is having on the SEC's agenda. By my count, Better Markets has filed comment letters on more than thirty of the rules you have proposed (almost all in support), and according to your public calendar (which is only available through January 2023) you have personally met with Better Markets at least 8 times. While Better Markets purports to "promote the public interest in financial reform, financial and the economy," my former colleague Lee Zeldin recently wrote an article[12] that highlights some of the potential conflicts of interests and lack of transparency at Better Markets. I'm also concerned with your lack of transparency regarding your meetings with Better Markets, as none of the meetings are noted in the comment files of rule proposals. I find it hard to believe that Better Markets did not discuss any pending

---

[12]https://www.realclearpolicy.com/articles/2023/03/03/how_congress_can_stop_the_next_ftx_885118.html#!.

proposal in its many meetings with you given their apparent interest in so many rule proposals.

Please report any discussions you have had with Better markets regarding any pending rule proposals, as why they are not disclosed in the comment files for these proposals.

RESPONSE:

We take engagement with interested parties and feedback on our proposed rules very seriously. Staff and I have had robust engagement with a broad range of stakeholders representing diverse viewpoints on the Commission's proposed rulemakings. I believe these meetings improve staff recommendations and the decisions and reasoning of the Commission.

As we implement the federal securities laws, we continue to welcome feedback and comments from the public. This helps to ensure that we fulfill our obligations under the Administrative Procedure Act and other applicable requirements. Further, it helps to ensure that our final rules reflect appropriate consideration of public input.

**122.**    Fiduciary Duty of Index Funds: Chairman Gens—er - On June 15 last year, the SEC requested information on whether index providers should be treated as investment advisers and held to the same standards as active fund managers. These providers enable everyday investors to have access to affordable, diversified investment opportunities that help them build wealth and save for retirement. Portfolios in these indices are not designed with the specific needs or circumstances of any particular end-user client. In fact, model portfolio providers typically do not know the identity of or any other information about any end-user clients.

     a)  It is generally accepted that a fiduciary relationship arises only if "one person has reposed trust and confidence in another who thereby gains influence and superiority over the other."

     b)  If the SEC were to classify index providers as investments advisors, how would they owe a fiduciary duty to an investor that they do not recommend any particular course of action, have authority to direct or act for its customer, and don't even know their identity?

RESPONSE:

The Advisers Act establishes a federal fiduciary duty for investment advisers. The duty is imposed in recognition of the nature of the relationship between an adviser and its client—a relationship of trust and confidence.

If an index provider, under certain facts and circumstances, acts as an investment adviser as defined by the Advisers Act, then the index provider would owe that same fiduciary duty to its clients.

The Commission's Request for Comment, in part, sought information and comments from index providers, among others, regarding their analyses as to whether they meet the statutory definition of "investment adviser." It also sought whether those parties "view

themselves as having fiduciary obligations to any investors that rely on the information they provide."

Staff will carefully review the submitted comments when making any recommendation for Commission action.

**123.**     Cyber Security Rule: Chairman Gens—er - Last year, the SEC proposed a cybersecurity rule that imposes a 48-hour reporting window after a cyber incident. I am concerned this rule would divert resources from cyber first responders, duplicate efforts that already stretch scarce resources, and assist attackers more than it helps investors. Whatever information is disclosed under the rule is far more likely to be understood and of more use to the expert attackers than it would for a typical investor.

What is the purpose of this disclosure to investors if a cyber attack is manipulated by the attacker to be discovered and disclosed for the attackers' own benefit?

RESPONSE:

The Cyber Security proposing release states that under the proposed disclosure amendments for registered investment advisers and funds, registrants generally would not be required to publicly disclose technical information about incidents that could compromise their cybersecurity going forward. We have received comments on the proposed cybersecurity incident disclosure requirement, and staff are carefully considering those comments.

**124.**     Disclosures on Corporate Debt: Chairman Gensler – In 2020 the SEC finalized a rule instituting new public disclosure requirements for companies that issue over-the-counter equity securities to retail investors. After the rule was finalized, the SEC staff issued a no-action letter in September 2021 saying that the rule and its new disclosure requirements would also apply to fixed income securities—including corporate debt issued by private companies under Rule 144A. Retail investors can't purchase these securities, and these companies that issue corporate debt have remained private for a reason. The state of Wisconsin and my district in particular is home to a lot of light manufacturing companies that are privately held. Under this rule, these companies would be forced to choose between disclosing sensitive, confidential information or being cut off from the secondary market for their debt issuance.

Why should companies that intentionally have chosen not to take on the burden of going public be forced into the same disclosures as a public company when they issue corporate debt?

RESPONSE:

When the Commission adopted amendments to Rule 15c2-11 in 2019, it did not change the scope of the securities covered by the rule, which has included fixed-income securities since its adoption in 1971.

In response to indications from market participants that they wanted additional time to complete the operational and systems changes necessary to comply with the Amended Rule for fixed-income securities, staff issued a no-action letter on November 30, 2022, for certain fixed-income securities. The no-action letter will expire on January 4, 2025.

**125.**     DOJ Criticism of SEC Rules: Chairman Gensler – Among the many rules the SEC has proposed, the Order Competition rule to designate certain stock orders placed by individual investors as "segmented orders" and the Best Execution rule to establish a best execution duty on broker dealers seem to have conflicting goals. According to Biden DOJ antitrust officials, if both the order competition and the best-execution proposals are adopted, brokers' best execution policies and procedures will have to take into account auctions conducted pursuant to the Order Competition Rule and consider the competitive dynamics of those auctions compared to other ways to execute clients' orders.

How does the reduced competition resulting from the combination of these rules further protects investors?

RESPONSE:

Commission staff currently is considering carefully the comments on the proposal for an order competition rule and the proposal for regulation best execution, including the effect on competition.

**126.**     ESG and Antitrust: Chairman Gens—er - Section 1 of the Sherman Act forbids "contracts, combinations and conspiracies" that unreasonably restrain trade. That is, a Section 1 violation requires an agreement among two or more actors. Businesses that enter into collaboration agreements, even if under the banner of good faith ESG reform, nonetheless run the risk of Section 1 scrutiny. While not every ESG initiative among multiple companies will violate the antitrust laws, these practices should be closely examined by the Federal Trade Commission and DOJ Antitrust Division.

As the SEC works through ESG disclosures, how will you ensure these disclosures do not inadvertently allow companies to illegally collude on ESG efforts that have anticompetitive harm?

RESPONSE:

The proposing release for climate-related risk disclosures details a four-decade history of SEC disclosure rules and guidance related to environmental matters.

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

With respect to climate-related risk, hundreds of companies today already are making climate-related risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures. The SEC has no role as to climate risk itself. But we do have an important role in helping to ensure that public companies make full, fair, and truthful disclosure about the material risks they face.

Any potential violation of the antitrust laws would fall under the remit of the Federal Trade Commission or the Department of Justice.

**127.**     Feedback from Foreign Regulators and Financial Stability Oversight Council
(FSOC) on Swing Pricing/Liquidity Rule:
   a) Chairman Gens—er - how much is the mandatory swing pricing/hard
      close/liquidity risk management rule proposal influenced by conversations you
      have had with foreign central banks, the Financial Stability Board, FSOC, US
      Treasury and the Federal Reserve Board?
   b) Please describe the nature of these conversations. Have any of them expressed
      any positive statements to you about the use of mutual funds?
   c) If not, what makes you think they care about the negative impact the rule proposal
      will have on American investors' ability to continue to use mutual funds?

RESPONSE:

As Chair of the Commission, I am a member of FSOC and represent the Commission as a
member of the Financial Stability Board. The Commission engages in conversations with
these bodies and individual members on many shared topics of interest, including the
functioning of open end funds, particularly during times of stress. The Commission,
however, is an independent agency. Policy decisions are made pursuant to a vote of the
five members of the Commission with a focus on our three-part mission of protecting
investors; maintaining fair, orderly, and efficient markets; and facilitating capital
formation.

**128.**     Effect of Liquidity Rule on "Illiquid Investments": Chairman Gens—er - The
SEC's proposed liquidity rule amendments would produce the nonsensical result of
making certain large and highly liquid stock funds breach the rule's "illiquid
investments" limit —even major stocks names like CVS and Netflix could be deemed
illiquid.
Was this rule intended to apply to securities such as those?

RESPONSE:

While the proposal does not specify any particular investment as illiquid, it does note that
trading a large investment position relative to the market's total trading volume may
affect liquidity and price. Commenters have noted that depending on market conditions
and the size of the position, this could include major stock names. The staff is
considering these comments along with comments on other portions of the proposed
rulemaking prior to making recommendations to the Commission.

**129.**     Conflict Between Short Sale Disclosure Rule and Securities Based Swaps
Disclosure Rule: Chairman Gens—er - The SEC's proposal on short sale disclosure
seems to conflict with the Commission's proposal on securities-based swaps disclosure
(Rule 10B-1). The short sale disclosure rule prudently excludes individual position
reporting to avoid negative consequences such as copy-catting and herd behavior. This
disclosure would be done on a monthly basis. In contrast, the securities-based swaps
disclosure rule explicitly requires individual position reporting – and at the low threshold
relative to the market cap of many stocks – and on an aggressive timeline of one day after
the trade is placed.

a) Has the Commission made a determination that the concerns related to front-running, copy-catting, and herd behavior, which are clearly risks associated with the short-sale disclosure, do not exist in the case of securities-based swaps disclosure?

b) If so, how did the Commission come to that conclusion and what type of cost-benefit analysis was performed in drawing that conclusion.

RESPONSE:

The Commission currently is reviewing comments on this and other issues that it received in response to Proposed Rule 10B-1, and carefully will consider such comments prior to any possible rule adoption.

The Commission reopened the comment period for the Rule 10B-1 on June 20, 2023. The Commission requested comment on, among other things, a memo prepared by our Division of Economic and Risk Analysis regarding activist investors and potential thresholds that would trigger the 10B-1 reporting requirements. The formal comment period closed on August 21, 2023.

**Questions for the Record submitted by Rep. Flood**

**130.**    Fed Chair Jerome Powell said in June of 2022 before the Senate Banking Committee, "custody assets are off balance sheet, always have been." Chairman Gensler, on April 18 you stated, you or the Commission "consulted with bank regulators subsequently" issuing Staff Accounting Bulletin 121.

a) Which bank regulators and/or staff have you consulted?

b) What topics were raised?

c) Did the banking regulators provide any recommendations to the OCA? If so, what?

d) Did they identify any conflict between SAB 121 and prudential regulations?

e) Could you provide a written timeline outlining any interagency coordination with prudential regulators on SAB 121?

RESPONSE:

SAB 121 provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding certain crypto assets.

The obligations associated with these arrangements involve unique risks and uncertainties not present in arrangements to safeguard assets that are not crypto assets, including technological, legal, and regulatory risks and uncertainties. These risks can have a significant impact on the entity's operations and financial condition.

The staff believes that the recognition, measurement, and disclosure guidance in this SAB enhances the information received by investors and other users of financial statements

about these risks. This helps investors make investment and other capital allocation decisions. Whether or not existing regulatory requirements at a bank or other entity address some or all of the risks identified in SAB 121 depends on the totality of facts and circumstances surrounding any individual situation.

To date, the SEC staff has received several consultations from registrants—including a number from banks—on specific fact patterns. The SEC staff invite dialogue with any parties that are considering applying the guidance in SAB 121. Staff continue their longstanding practice of sharing information with federal banking regulators.

**131.**    On April 18th, you mentioned the SEC or the Office of Chief Accountant (OCA) consulted with the "Big 4" accounting firms in advance of issuing SAB 121. I ask that you bring some clarity to the content and timeline of those conversations:
   a) When did those conversations happen?
   b) Which companies were involved?
   c) What topics were addressed and what recommendations were provided?

RESPONSE:

SEC staff participated in discussions and consultations preceding the issuance of SAB 121, including participating in meetings with accounting firms, including with the largest firms. Since the issuance of SAB 121, SEC staff have continued to engage with a wide variety of stakeholders, including accounting firms, registrants, and prudential banking regulators.

**132.**    Besides the Big 4, who else externally did the SEC and/or OCA consult with on SAB 121 before it was issued?
   a) Was the Treasury Department consulted?
   b) Did you consult with any public-entities that would be subject to the SAB?

RESPONSE:

The staff participated in discussions and consultations preceding the issuance of SAB 121 as part of its regular public outreach activities, including with respect to public accounting firms, other federal regulators, and other stakeholders.

**133.**    On April 18, you also testified that "putting crypto assets off-balance sheet puts further risk in the system and is a disaster for the system." On an off-balance sheet basis, digital assets can be custodied in segregated wallets that are not subject to insolvency risk.

If a customer's digital assets are therefore segregated from the assets of the custodian (and from other clients of the custodian) *and* protected in the event of the custodian's insolvency, why can't those assets remain off-balance sheet?

RESPONSE:

SAB 121 provides staff guidance on accounting by certain entities that assume obligations to safeguard crypto assets held for platform users. The SAB also discusses related disclosures that may be appropriate—including the recognition of a safeguarding obligation by a registrant in its financial statements.

SAB 121 notes that the unique technological, legal, and regulatory risks and uncertainties that crypto asset safeguarding arrangements may create for a registrant's operations and financial condition. I would note that we've also seen numerous companies within the crypto space blow themselves up, hurting countless investors in their wake. As a result of the bankruptcies of BlockFi, Celsius, FTX, Genesis, Voyager, and other crypto firms, investors often are left lining up in bankruptcy court.

Further, SAB 121 seeks to assist registrants in meeting their disclosure obligations. This would enhance the information available to investors—
as well as other users of financial statements—about such risks when making investment and other capital allocation decisions.

**134.** Has the Office of Chief Accountant (OCA) had conversations regarding the on-balance sheet treatment of banks and the possibility that banks will not be able to offer custody of digital assets due to SAB 121?
   a) If so, what was discussed?
   b) Does the OCA believe banks are effectively precluded from custodying digital assets due to SAB 121?
   c) Who does the SEC and OCA believe will provide custody services of digital assets?

RESPONSE:

SAB 121 is neutral as to whether a registrant should engage in such safeguarding activities. It provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding crypto assets.

Since issuing SAB 121, SEC staff have continued to engage with a wide variety of stakeholders, including accounting firms, registrants, and prudential banking regulators regarding the application of SAB 121 to banks and other registrants.

**135.** SAB 121 captures "crypto-assets," which is broadly defined and encompasses cryptocurrencies and tokenized assets (whether issued natively or digital representations of traditional assets).

Has the SEC considered narrowing the universe of in-scope assets so that tokenized assets are excluded from on-balance sheet treatment?

RESPONSE:

SAB 121 defines the term "crypto asset" as a digital asset that is issued and/or transferred using distributed ledger or blockchain technology using cryptographic techniques. The accounting guidance, however, does not relate to the technical specifications or properties of the crypto asset.

Instead, SAB 121 provides non-binding staff guidance. The guidance relates to the application of existing accounting and disclosure requirements, under U.S. GAAP and SEC rules, for material risks and uncertainties associated with safeguarding crypto assets.

**136.**     Chair Gensler, is the Office of Chief Accountant considering avenues to address the conflict with prudential rules and standards by withdrawing the bulletin or exempting the on-balance sheet requirement of SAB 121?

RESPONSE:

The Office of the Chief Accountant continually evaluates the application of U.S. GAAP and related guidance for potential improvements and opportunities to provide additional guidance. Part of this evaluation includes consulting with prudential regulators and other stakeholders to identify potential conflicts between regulatory frameworks.

As of now, there is no plan to withdraw or alter the content of SAB 121.

**137.**     On March 9 the SEC proposed the "Safeguarding Advisory Client Assets" rule. The rule seeks to apply the same set of consumer protections to a broad range of assets, including digital assets, applying the same high level of safeguards to insulate consumers from "any unlawful activities or financial reserves, including insolvency, of the adviser." Even if banks meet the definition of a Qualified Custodian, SAB 121 would have the practical effect of severely limiting their ability to serve as Qualified Custodian for digital assets even if they meet all requirements and are otherwise approved for such activity by their prudential regulators.
             a) Is the SEC considering a qualified custodian exemption to the on-balance sheet accounting requirement of SAB 121?

RESPONSE:

The Commission and its staff are currently considering commenter feedback on the Safeguarding Advisory Client Assets proposal, including comments on the relation of the proposal and SAB 121.

137.     The way this rule was proposed it would drastically impact the traditional bank custody model. As you are aware custody banks are regulated by the Prudential Banking Regulators, including the OCC & Federal Reserve.

What directive does the SEC have to extend their regulatory reach to custody banks?

RESPONSE:

The Commission's custody rule for investment advisers, first adopted in 1962, was last updated in 2009. Importantly, though, Congress granted the SEC new authorities in 2010 in response to the financial crisis and Bernie Madoff's frauds. In particular, Congress gave us authority to expand the advisers' custody rule to apply to all assets, not just funds or securities.

In February 2023, The Commission proposed updating the investment advisers' custody rule which would, if adopted, extend the rule's protections to apply not just to investors' funds or securities, but to all of an investors' assets that an adviser may custody.

The proposal would apply only to SEC-registered investment advisers who have "custody" of client assets, which can expose those assets to the risk of loss, misuse, theft, or misappropriation. When an adviser has custody of client assets, the proposal would require, among other things, that the adviser maintain those assets with a qualified custodian under a written agreement with certain minimum protective provisions. The proposal explicitly acknowledges and relies on the fact that qualified custodians, under both the proposal and the current rule, are often subject to comprehensive regulatory requirements related to the proper safeguarding of assets. The Commission staff also consulted with banking regulators, among others, prior to the proposal, and will continue to consult with them as staff reviews the public comment file before making a recommendation for any adoption.

138.    Will you commit to keeping a state pathway for qualified custodians in the final version of the Commission's proposed Safeguarding Rule?

RESPONSE:

Both the current custody rule and the proposed safeguarding rule provide that qualifying banks, as defined in the Advisers Act, may serve as qualified custodians. The Commission's safeguarding proposal acknowledges that there are a number of state-chartered trust companies, which in certain circumstances may qualify as banks under the Advisers Act.

To that end, the Commission sought comment on whether such regulatory regimes would satisfy the enhanced protections in in the proposed safeguarding rule. The Commission and staff will continue to consider this subject as we review comments on the proposal.

139.    The SEC's proposal, particularly the provisions on cash segregation and the extension of liability for custody banks, could have significant cost implications on the

industry which will filter down and impact end investors. The SEC's economic impact analysis seems to lack robust analysis here.

Wouldn't you agree this is important piece to thoroughly analyze?

RESPONSE:

The Commission engaged in a thorough analysis of the costs and benefits associated with the proposed safeguarding rule. The Commission has sought public comment on that economic analysis, including the potential costs and benefits. The Commission has received a number of comment letters addressing the potential costs of the proposal, all of which the staff carefully will consider when making any recommendation for Commission action.

140.    Has the SEC considered, for example in its economic impact analysis, the impact the rules will have on Investment advisers choice of custodians, competition, and pricing?

RESPONSE:

The Commission considered efficiency, competition, and capital formation, in addition to investor protection and the public interest in assessing this proposal. The proposing release includes an economic analysis that examines the costs, benefits, and other economic effects of the proposal.

The Commission requested comment on all aspects of its economic analysis of the proposal, including whether the analysis has: (i) identified all benefits and costs, including all effects on efficiency, competition, and capital formation; (ii) given due consideration to each benefit and cost, including each effect on efficiency, competition, and capital formation; and (iii) identified and considered reasonable alternatives to the proposed rule.

Commission staff carefully will consider the comments, including any economic impact concerns raised by market participants, when making any recommendation for Commission action.

**Questions for the Record submitted by Rep. Davidson**

141.    In response to receiving a Wells notice, Coinbase said that they had asked the SEC to identify which digital assets on their platforms they believe may be securities, but the Commission declined to do so. According to their blog, they also repeatedly asked for the SEC's feedback on two different registration models, but there was no feedback.

When a company wants to comply with the law and get a direct answer from the SEC, how can you expect them or others to come in and talk with the Commission staff when the result is a non-answer from the SEC, and later an enforcement action?

RESPONSE:

SEC staff has engaged and will continue to engage with market participants to discuss regulatory issues surrounding the crypto markets.

Whether any particular crypto asset is a security is a facts and circumstances analysis. In general, a crypto asset is analyzed to determine whether it has the characteristics of any product that meets the definition of "security" under the federal securities laws. The term "security" includes an "investment contract," as well as other instruments such as stocks, bonds, and transferable shares.

Given that many crypto tokens are securities, it follows that many crypto intermediaries are transacting in securities and have to register with the SEC in some capacity.

Crypto intermediaries—whether they call themselves centralized or decentralized (e.g., DeFi)—often are an amalgam of services that typically are separated from each other in the rest of the securities markets: exchange functions, broker-dealer functions, custodial and clearing functions, and lending functions.

These crypto asset market participants engaging in securities activities are operating in noncompliance with the federal securities laws and the protections such laws provide. For example, platforms are operating as exchanges, but investors do not have the benefit of exchange rules and regulations that protect against fraud, manipulation, front-running, wash sales, and other misconduct.

Similarly, crypto market intermediaries may be acting as brokers or dealers without providing the important protections to investors that the federal securities laws require.

I have asked staff to work with intermediaries to ensure they register each of their functions—exchange, broker-dealer, custodial functions, and the like. I also have asked staff to consider how investors might trade crypto security tokens versus or alongside crypto non-security tokens.

142.     Last year, the Commission took action against several former Coinbase employees related to insider trading on at least 25 crypto assets, which the Commission said at least nine of which were securities. However, the Commission did not explain why it considers "at least nine" of the crypto assets to be securities nor why the other 16 crypto assets might not be securities. While your statements suggest it is clear what crypto assets the SEC considers securities, even the SEC in this action does not offer clarity on how it makes determinations about which digital assets it deems securities.

        What are the specific attributes or characteristics of the 16 crypto assets that led the SEC to not declare them securities in the insider trading charges against these individuals at that time?

RESPONSE:

As Supreme Court Justice Thurgood Marshall put it, when Congress defined a security, they painted with "a broad brush."

Whether a particular instrument is within the definition of security is based on the facts and circumstances. As it relates to investment contracts, the U.S. Supreme Court's Howey case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

In analyzing whether a crypto asset is an investment contract, the focus of the analysis is not only on the form and terms of the asset itself but also on the circumstances surrounding the crypto asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). No single fact is determinative; rather, the analysis requires examination of all the facts and circumstances.

The complaint in *SEC
v. Wahi* includes the allegations that at least nine of the crypto assets in which the defendants traded based on material nonpublic information were securities.

### Questions for the Record submitted by Rep. Hill

SEC proposal – Safeguarding Advisory Client Assets

143.    Chair Gensler, the SEC recently proposed substantial changes to the investment adviser custody rule, greatly expanding the assets and types of advisory activities that would now be subject to even more heavily prescriptive and onerous requirements, and effectively extend the SEC's authority to regulate entities—such as banks—that are outside the statutory remit of the SEC. The proposed rule also has the potential to make ordinary cash banking and entering into normal derivatives transactions a practical impossibility.

Can you explain why the SEC has decided to upend traditional custodial practices and impose costs and risks on retail investors by foreclosing numerous traditional investments, markets, and the availability of investment advisory services?

RESPONSE:

The Commission's custody rule for investment advisers, first adopted in 1962, was last updated in 2009. Importantly, though, Congress granted the SEC new authorities in 2010 in response to the financial crisis and Bernie Madoff's frauds. In particular, Congress gave us authority to expand the advisers' custody rule to apply to all assets, not just funds or securities.

In February 2023, The Commission proposed updating the investment advisers' custody rule which would, if adopted, extend the rule's protections to apply not just to investors' funds or securities, but to all of an investors' assets that an adviser may custody.

The proposal would apply only to SEC-registered investment advisers who have "custody" of client assets, which can expose those assets to the risk of loss, misuse, theft, or misappropriation.

The current investment adviser custody rule provides important protections against the loss, theft, or misappropriation of client assets by an adviser or its related persons. The Commission's proposed safeguarding rule also draws on the agency's experience with the existing custody rule to advance those same goals and provide enhanced protections in light of changes in the market since the current rule's adoption.

The proposal would continue the basic framework of the current custody rule while extending protections to a broader array of client assets to which investment advisers today have access. The proposed requirements are designed to remain evergreen as methods for safekeeping continue to evolve to reflect changes in technology, investment products, and custodial service best practices. Many custodians' practices comply already with several of the proposed requirements.

144.      Currently, banks are one of the four types of entities that can serve as "qualified custodians" for client assets. While the proposal maintains banks as one of those types of entities, the new proposal adds new requirements on banks. One of these new requirements is that banks are to hold client assets in segregated, bankruptcy remote accounts. The proposal does not distinguish between non-cash assets (such as securities) and cash assets.

Am I correct that this requirement applies to both non-cash and cash assets?

RESPONSE:

As proposed, the safeguarding rule would not distinguish between a client's cash and non-cash assets. It would apply to all of the asset classes that an adviser can access.

145.      Currently bank custodians hold client cash on their balance sheet as a deposit liability, meaning that clients have a contractual claim to the return of their cash. This is a well-established and long-standing practice by bank custodians.

   a) Am I correct that this requirement will now require bank custodians to hold client cash off-balance sheet?

   b) If bank custodians are to now hold client cash off balance sheet, isn't that a fundamental shift in practice with a significant impact to bank custodians' balance sheets?

   c) What economic analysis or impact assessments has the SEC conducted to quantify the adverse impacts if cash is held off balance sheet and banks are no longer able to use that cash for essential acts such as maturity transformation?

d) Has the SEC ever reached out to federal bank regulators about this to ensure that the safeguarding proposal is not inconsistent with any federal banking laws, regulations, or guidance?

e) If bank custodians are still able to hold client cash on balance sheet, can you please explain how custodians are to do so in a manner that satisfies the segregated, bankruptcy remote account requirements in the proposal?

RESPONSE:

The proposal would require banks acting as qualified custodians to hold advisory client cash in an account designed to protect client assets from the bank's creditors in the event of its insolvency or failure. The Commission specifically sought comment on this element of the proposal. We have received many comments on the application of this proposed requirement to client cash. Like all comments the Commission receives, the staff carefully will consider these comments when making any recommendation for Commission action.

The proposal's requirement to hold client assets in an account designed to protect client assets from the bank's creditors, in the event of its insolvency or failure, may affect a custodial bank's balance sheet. The proposal does not specify particular account types.

The economic analysis addresses the benefits and costs of the proposal as applied more broadly to all client assets, including cash.

The proposal specifically sought comment on the potential costs to advisory clients of requiring banks to hold client assets in accounts designed to protect client assets from a bank's insolvency or failure in order to be a qualified custodian.

Before making any recommendation to the Commission, the staff carefully will consider all comments on the proposal, including those comments relating to the treatment of client cash and related economic effects.

The Commission staff consulted with banking regulators prior to the proposal. The release sought input on the proposed requirements for qualified custodians, including whether certain requirements would conflict with banking regulations or industry practice.

The Commission staff will continue to coordinate with our banking regulator counterparts as the staff reviews the comment file in making a recommendation for any adoption.

Investment contract analysis

146.   Chair Gensler, you frequently assert, including in your written testimony for today's hearing, that "the majority of crypto tokens are securities." Specifically, you and the SEC Enforcement Division have argued on numerous occasions that many digital assets are investment contracts. You and the SEC Enforcement Division have gone even further, arguing in court that certain digital assets that are traded on secondary markets are investment contracts, even though such sales do not involve an issuer at all let alone any agreement between an issuer and the buyer that the issuer will take efforts to generate an investment return to that specific buyer.

a) Can you provide any examples of when a court has made such a ruling?
b) How are such sales any different from secondary market sales of designer shoes, gold, art or other commodities?
c) Is it your view that secondary sales of such commodities are investment contracts too?

RESPONSE:

Congress created a definition of security that is intended to be broad, in order to encompass new and different types of investments that are presented to investors and that invoke the protections of the federal securities laws.

One type of security is an investment contract, which relies on the Supreme Court's "Howey" test. Under the Howey test, an "investment contract," which is a security, exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

Whether a particular digital asset at the time of its offer or sale satisfies the Howey test depends on the specific facts and circumstances. All the facts and circumstances are relevant.

The determination whether an asset is a security, however, does not depend on the underlying technology. Courts have ruled in favor of the SEC in a number of enforcement actions that have alleged certain crypto assets are securities under Howey. See, e.g., *Sec. & Exch. Comm'n v. LBRY, Inc.*, 21-cv-260-PB (D.N.H. Nov. 7, 2022); *Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020); *Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020.)

The SEC's Section 21(a) 2017 Report of Investigation on The DAO and subsequent settled enforcement orders set forth the SEC's views on how the federal securities laws apply to particular crypto assets.


SEC proposal – Prohibition Against Conflicts of Interest in Certain Securitizations

**147.**     Will you commit that the SEC's rule will not inadvertently prohibit risk and capital management transactions in the reinsurance and Insurance Linked Notes market?

RESPONSE:

The re-proposed rule, if adopted, would implement the statutory mandate under Section 621 of the Dodd-Frank Act. Consistent with the statute, the re-proposed rule provides exceptions for risk-mitigating hedging activities, bona fide market making, and certain liquidity commitments.

We received many comment letters related to the scope of the proposed rule and the costs associated with compliance. The re-proposed rule responds this public feedback, as well as developments since 2011 in the asset-backed securities markets. For example, the re-proposal clarifies the scope of the prohibited conduct, the exceptions, and the participants subject to the proposal.

The staff also has met with commenters to better understand their concerns. The staff is considering all of the comments received, including those received related to MILNs, as they develop recommendations to the Commission that would implement the statute and achieve its intended goals to prohibit certain conflicts of interest in securitizations.

The Economic Analysis for the proposing release can be found at 88 FR 9711.


Cell sweep and record keeping

**148.**     Do you use your personal phone to text?


**149.**     Do you text SEC staff or other members of the administration with that phone?


**150.**     Are those texts being preserved in compliance with government record preservation requirements?


**151.**     Do you use or have you used off-channel apps like Signal, WhatsApp or other applications to text? Are those messages being preserved in compliance with government record preservation requirements?

RESPONSES:

It is my practice to conduct SEC business exclusively through official channels. Consistent with the Federal Records Act, any business-related messages inadvertently sent to my personal email account are forwarded to an SEC email.

The SEC prohibits the use of personal email or other non-federal electronic messaging systems (e.g., unauthorized instant, chat, or text messaging services) to conduct SEC business. This prohibition is applicable to all SEC personnel and is reflected in SEC regulations and guidance documents, which are periodically reviewed, updated, and

communicated to SEC employees, including all direct reports to the Chair, other staff, and contractor personnel.

SEC employees receive regular training and guidance concerning the SEC's prohibition against the use of personal email accounts or unauthorized electronic messaging systems to conduct SEC business. For example, all employees and contractors are required to complete training on a regular basis on privacy and information security, the proper handling of nonpublic information and recordkeeping requirements. As with any condition of employment that applies to federal employees, a failure to comply with these federal record-keeping requirements can lead to discipline, up to and including removal from federal service.

### Questions for the Record submitted by Rep. Lucas

**152.**     Congress addressed transparency related to securities lending and short positions in separate sections of the Dodd-Frank Act, Section 984(b) and Section 929X respectively.
This is appropriately reflected in the SEC's decision to propose two distinct rulemakings, Proposed Rule 10c-1 for securities lending and Proposed Rule 13f-2 for short positions.

In light of this, and in line with regulations, market practice and common understanding that have long recognized this distinction, it is important for the SEC to ensure its definition of a "stock loan" for the purposes of 10c-1 does not include short positions.

Will you please describe how the SEC intends to clarify the definition of what constitutes a securities lending transaction subject to 10c-1 to avoid unnecessary overlap in reporting obligations that is inconsistent with congressional intent?

RESPONSE:

Short sales are defined by Rule 200(a) of Regulation SHO as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller."

When a person sells short, they borrow securities to deliver to the purchaser. The short seller pays the lender for borrowing the shares. Lenders of securities loans may also lend securities for other reasons, such as to broker-dealers that need to borrow securities to close out fails to deliver as required by Regulation SHO Rule 204.

As proposed, Rule 10-c-1 would require lenders in such transactions to report the terms of the loans they make to short sellers. As proposed, Rule 13f-2 would require institutional money managers that sell short to report their short sales. The staff is in the process of analyzing comments and carefully will consider all comments received in developing their recommendations for any final rules.

**153.**     With regard to the SEC's proposal for enhancing transparency in the securities lending markets (Proposed Rule 10c-1), stakeholders have provided several recommendations intended to mitigate potential unintended and harmful consequences to investors and markets. These recommendations are geared towards ensuring that public

reporting does not disseminate confusing or misleading information to markets or reveal sensitive trading strategies that would create a disincentive for investors to participate.

While I believe the more prudent approach is to require reporting solely for regulatory purposes first to give the agency time to analyze collected data before they develop a public dissemination regime, in the event the SEC intends to proceed with public reporting it is imperative that the agency heed the recommendations of practitioners in the public comment file.

For example, stakeholders have suggested that the SEC require reporting by end of day, on an aggregate basis, rather than on a transaction-by-transaction basis at T+15 minutes. This approach would help restore balance to the proposal. It would avoid the noise caused by fails and corrections that routinely occur intraday in the securities loans markets and protect sensitive trading information, while still providing prevailing transaction terms available to regulators, lenders and borrowers.

Will the SEC's final proposal take into account this important feedback intended to mitigate potential unintended and harmful consequences?

RESPONSE:

The Commission is currently reviewing comments on this and other issues that it received in response to Proposed Rule 10c-1, and carefully will consider such comments in any final rulemaking.

154.    Current regulatory requirements for emissions reporting build in sufficient time for quality control and review, with verified reports not due until long after the end of the fiscal year. However, the SEC reporting requirement wouldn't necessarily provide for that same review time.

        a) How does the Commission justify this approach when agencies with more emissions reporting expertise deliberately chose another path?

        b) Please describe the efforts you have made to date to coordinate with the EPA regarding GHG emissions reporting under the SEC's proposed climate disclosure regulations, including the efforts to ensure consistency between reporting regimes and efforts to avoid duplicative or inconsistent reporting requirements.

        c) Please detail any feedback you have received from EPA regarding the feasibility of the SEC's proposed timelines and level of granularity in reporting.

RESPONSE:

SEC staff engages often with other federal agencies in connection with the preparation of proposed rules. Agencies also engage with the SEC through the public comment process.[13] We have received comments on the timing of when proposed annual greenhouse gas emissions disclosures would be made compared to reporting under non-

---

[13] *See, e.g.,* https://www.sec.gov/comments/s7-10-22/s71022-20132508-302990.pdf.

Commission regulations. Staff are carefully reviewing those comments and considering recommendations that would address the concerns about timing.

155.    Companies cannot always trace the use of their product to its final destination, particular as it relates to hydrocarbon value chains. In addition, issuers will have parties with varying degrees of sophistication within their value chain. If an issuer receives unreliable data when calculating its Scope three emissions, is that not more harmful than helpful to investment decision-making?

RESPONSE:

In the climate disclosure proposing release, the Commission recognized the potential relative challenges in Scope 3 emissions data collection and measurement. In light of this, the Commission proposed requiring disclosure of Scope 3 emissions only if such emissions were material to investors or if the company had made a commitment that included reference to Scope 3 emissions.

Moreover, the proposal would phase in Scope 3 disclosures after Scopes 1 and 2; a new safe harbor would be available for Scope 3 disclosures; and smaller reporting companies would be exempt from Scope 3 disclosures.

The proposing release included a number of requests for comment about the proposed Scope 3 emissions disclosure requirement. For example, we have received comments on the possible effects on private companies. Staff are reviewing and considering recommendations that would address those comments along with other comments with regard to other provisions of the proposal as it formulates any recommendations to the Commission.

156.    Please state whether you agree that midstream pipeline companies that merely transport hydrocarbons but never take title to the hydrocarbons should have to report emissions related to those hydrocarbons under the SEC's proposed concept of Scope 3 emissions.

If you believe that such emissions are within the Scope 3 emissions of these midstream pipeline companies, please state the basis for your view.

RESPONSE:

The Commission's proposed climate disclosure rule contains a proposed definition of Scope 3 emissions. The staff will evaluate any comments received on the proposed definition as it formulates any recommendations to the Commission.

157.    Attributing the frequency or strengthening of severe weather events to climate change is a difficult science. While the Intergovernmental Panel on Climate Change (IPCC) has reported global increases in heat waves and heavy precipitation, even the most recent IPCC reports have not been able to confidently identify increases in tropical

cyclones (including hurricanes), floods, tornadoes, or drought as a result of human-caused climate change.
   a) Therefore, does the Commission expect issuers to distinguish between damage caused by severe weather attributed to natural trends and severe weather attributed to human-caused climate change?
   b) Does the Commission have climate science expertise to provide a level of certainty or verification in this field?

RESPONSE:

The Commission's proposed climate disclosure rule would require disclosure of the impacts from severe weather events and other natural conditions. The Commission provided examples of severe weather events and other natural conditions in the proposed rule to aid in the comparability of the resulting disclosure while assisting issuers in making the disclosures. Staff are reviewing comments with regard to these provisions of the proposal as it formulates any recommendations to the Commission.

158.    Please state all specific sources of law that you claim provide the legal basis for the SEC's authority to promulgate each of the proposed regulations outlined in the Committee's memorandum, including the following:
   a) Provide the case citations for any case law that you believe supports your position that the SEC has the legal authority to promulgate each of these proposed regulations.
   b) Explain why you believe this assertion of authority complies with the Supreme Court's decision in West Virginia v. Environmental Protection Agency, 597 U.S. ___ (2022).
   c) Explain why you do not believe that any of these proposed regulations poses constitutional concerns, including under the First Amendment and Due Process Clause.
   d) State whether you believe the SEC has the authority to require climate change disclosures not otherwise material to a company and provide the legal basis for your view.
   e) Describe your view of the SEC's authority to require certain expertise for board members or disclosures regarding board decision-making and the legal basis for your view.
   f) Provide any non-privileged analyses that the SEC has prepared regarding its legal authority to promulgate these rules.

RESPONSE:

I understand that your staff has advised Commission staff that your questions relate specifically to the Commission's proposed rule on *The Enhancement and Standardization of Climate Related Disclosures for Investors* (climate disclosure rule).[14]

In all of the agency's rulemaking and other policy endeavors, the Commission is anchored by the laws Congress has passed, the courts' interpretations of those laws, the Commission's economic analysis, and input from the public.

The Supreme Court's decision in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), addressed the major questions doctrine. The proposed rules the SEC currently is considering are consistent with its statutory authorities.

With respect to the proposed climate-related risk disclosure rule, as stated in the proposing release, the Commission has authority to promulgate disclosure requirements that are "necessary or appropriate to protect investors."[15] As the release also explained, climate-related risks can present financial consequences that investors in public companies may consider in making investment and voting decisions.[16] The Commission is continuing to receive and the staff are continuing to evaluate all comments on the proposed climate disclosure rule, including comments on the Commission's statutory authority and other issues.

The proposed rule—like any other rulemaking proposal—may be revised in response to public comment.

159.     Describe the cost analysis you have performed for each of the proposed regulations outlined in the Committee's memorandum. Please state whether you believe that the SEC must take cost into consideration when issuing regulations

RESPONSE:

I understand that your staff has advised Commission staff that your questions relate specifically to the Commission's proposed rule on *The Enhancement and Standardization of Climate Related Disclosures for Investors* (climate disclosure rule).[17]

In Commission rulemakings, the SEC conducts an economic analysis that examines the costs, benefits, and other economic effects of that particular rulemaking. In doing so, it follows best practices identified by Congress, the courts, and other regulatory agencies. This includes a consideration of compliance costs, direct costs, and indirect costs. The SEC's analysis of the costs and benefits of the proposed climate disclosure rule are located in the Economic Analysis sections of the proposing release that can be found on the SEC's website, www.sec.gov, and are also available at 87 FR 21334.

---

[14] See, *The Enhancement and Standardization of Climate-Related Disclosure for Investors*, 87 FR 21334 at 21335 (Apr. 11, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-04-11/pdf/2022-06342.pdf.
[15] *Id.*
[16] *Id.* at 21335-36.
[17] See, *The Enhancement and Standardization of Climate-Related Disclosure for Investors*, 87 FR 21334 at 21335 (Apr. 11, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-04-11/pdf/2022-06342.pdf.

**Questions for the Record submitted by Rep. Nickel**

**160.**    Do you believe banks are effectively precluded from participating in the custody of digital assets at scale due to the on-balance sheet treatment of SAB 121?
a) And if so, who would provide this service?
b) Are you concerned that some may turn to offshore solutions?

RESPONSE:

SAB 121 provides non-binding staff guidance on the application of existing accounting and disclosure requirements under U.S. GAAP and SEC rules for material risks and uncertainties associated with safeguarding certain crypto assets.

The obligations associated with these arrangements involve unique risks and uncertainties not present in arrangements to safeguard assets that are not crypto assets, including technological, legal, and regulatory risks and uncertainties. These risks can have a significant impact on the entity's operations and financial condition.

The staff believes that the recognition, measurement, and disclosure guidance in this SAB enhances the information received by investors and other users of financial statements about these risks. This helps investors make investment and other capital allocation decisions. Whether or not existing regulatory requirements at a bank or other entity address some or all of the risks identified in SAB 121 depends on the totality of facts and circumstances surrounding any individual situation.

To date, the SEC staff has received several consultations from registrants—including a number from banks—on specific fact patterns. The SEC staff invite dialogue with any parties that are considering applying the guidance in SAB 121. Staff continue their longstanding practice of sharing information with federal banking regulators.

**161.**    Given the capital, liquidity and other prudential requirements banks are required to comply with on balance sheet treatment of SAB 121, was there any interagency engagement on SAB 121 before or after this was issued in March of 2022?
a) Has the Commission received any feedback, particularly from the federal banking agencies, regarding SAB 121?

RESPONSE:

SEC staff participated in discussions and consultations preceding the issuance of SAB 121, including participating in meetings with accounting firms. Since the issuance of SAB 121, SEC staff have continued to engage with a wide variety of stakeholders, including accounting firms, registrants, and federal prudential banking regulators.

**162.**     Has the Office of Chief Accountant considered the possible consequences of SAB 121 and are you considering amending the bulletin to address this, such as through a qualified custodian exemption to the on-balance sheet requirement of SAB 121?

RESPONSE:

The Office of the Chief Accountant continually evaluates the application of U.S. GAAP and related guidance for potential improvements and opportunities to provide additional guidance. Part of this evaluation includes consulting with prudential regulators and other stakeholders to identify potential conflicts between regulatory frameworks. As of now, there is no plan to withdraw or alter the content of SAB 121.

**163.**     Cryptocurrencies and the underlying technology that powers them, blockchain, have distinct use cases. For example, while digital assets are one important financial utility of blockchain, there are also many other promising blockchain applications in other sectors, such as healthcare, cybersecurity and agriculture.

How can the SEC adapt its regulatory approach to better differentiate between blockchain technology and cryptocurrencies, given potential impacts on various industries?

RESPONSE:

There's no reason to treat the crypto market differently just because different technology is used. We should be technology-neutral. As new technologies come along, though, we need to be sure we're still achieving core public policy goals.

Further, I'd note that financial innovations throughout history don't long thrive outside of public policy frameworks. In finance, that's about protecting investors and consumers, guarding against illicit activity, and ensuring financial stability. These public policy goals can touch upon national security as well.

I believe that innovation can significantly benefit investors and issuers alike. It should not, however, be used to circumvent the important investor and market protections that are at the heart of the SEC's mission—protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation.

The core principles from the securities laws apply to all corners of the securities markets. There is nothing about the crypto securities markets that suggests that investors and issuers are less deserving of the protections of our securities laws. Further, regardless of the ledger being used, be it a spreadsheet, a database, or blockchain technology, when investors put their money at risk, it's the economic realities of the investment that matter.

Innovation in our capital markets has been ongoing since antiquity. Innovation facilitates new and effective ways to invest, trade, and raise capital.

Innovation cannot be used, though, to circumvent the important investor and market protections that are at the heart of the SEC's mis—on--investor protection, fair, orderly and efficient markets, and promoting capital formation.

As markets, business models, and technology continue to evolve, we will continue to ensure compliance with the federal securities laws.

**164.**     As blockchain technology continues to evolve and mature, how does the SEC plan to collaborate with other regulatory agencies, both domestically and internationally, to develop a consistent and coordinated regulatory approach?

RESPONSE:

The SEC works closely and collaboratively with other regulatory agencies, domestically and internationally, on a wide range of issues related to the crypto markets.

Most agencies have dedicated offices responsible for staying abreast of developments in the crypto space. Our respective staffs communicate frequently about these developments.

SEC participates in broader interagency initiatives, such as the President's Working Group on Financial Markets report regarding stablecoins. The SEC also participates in multiple international bodies that are addressing issues in the crypto markets, such as the International Organization of Securities Commissions and the Financial Stability Board. The SEC will continue to communicate and work closely with other agencies and bodies to ensure the integrity and transparency of our financial markets.

**165.**     How will the SEC address the concerns of regulatory arbitrage, where companies may choose to operate in jurisdictions with more lenient regulations, potentially stifling innovation within the United States?

RESPONSE:

The U.S. federal securities laws protect U.S. investors. If an entity seeks to raise money from the American public or participate in America's capital markets—as an issuer, exchange, intermediary, investment company, transfer agent, or beyond—that entity also must follow the U.S. securities laws wherever they apply. Our Division of Enforcement stands ready to address any potential noncompliance with our rules and Congress's laws.

**166.**     Homeownership is the primary vehicle for hardworking families to attain financial stability and build long-term wealth, but families in North Carolina and throughout the country continue to experience barriers due to high interest rates and low housing supply. Access to low down payment mortgage with private mortgage insurance (PMI) is an important tool in helping families achieve the American Dream of homeownership. In 2022 alone, nearly 40,000 North Carolina household purchased a home or refinanced an existing mortgage due to PMI and nearly 60% of purchasers

with PMI were first-time homebuyers. The SEC's recently re-proposed Conflicts of Interest rule may inadvertently prohibit private mortgage insurers from obtaining reinsurance coverage through the capital markets using Mortgage Insurance-Linked Notes (MILNs). These are important tools to manage risk and capital exposures in order to support new homebuyers.

Will you commit to final rule language or a No Action Letter to clarify that the proposed rule is not intended to restrict or prohibit the use of MILNs?

RESPONSE:

We received comment letters related to the proposed rule's application to the private mortgage insurance industry. The staff carefully will consider their concerns, together with the concerns of all the commenters, when making any recommendation for Commission action.

**167.**     I understand that the SEC is creating a specific registration form for Registered Index Linked Annuities (RILAs), as required by Congress. As you know, insurance companies have long used statutory accounting principles when preparing their financial statements. This widely respected accounting standard is better suited for investors in insurance products because it uses a very conservative valuation of assets to examine the solvency of these companies and to ensure they are able to make good on all potential claims. The SEC has appropriately accepted the use of statutory accounting by insurers when registering other products with the SEC, including variable annuities, variable life products, and in many cases RILAs. When they are unable to use statutory accounting and are instead required to use GAAP, these firms accrue accounting bills in the millions of dollars, adding to the cost and complexity of the product for consumers.

Will you commit to allowing insurers to choose between statutory accounting or GAAP in the final RILA registration form?

RESPONSE:

Commission staff is in the process of making recommendations to the Commission regarding implementing the Congressional directive to create a specific registration form for RILAs. Staff in our Division of Investment Management are leading this project and collaborating with stakeholders across the Commission to formulate recommendations to the Commission for a rule proposal. While I cannot prejudge the outcome on any particular provision of this rulemaking, staff are considering the issues surrounding statutory versus GAAP accounting. I look forward to continuing to engage with the staff on this important rulemaking.

**Questions for the Record submitted by Rep. Ritchie Torres**

**168.**    Chair Gensler, in December I led a bipartisan letter to Secretary Yellen with some of my colleagues on this Committee regarding our concerns with the Commission's proposed rule regarding the definition of a securities dealer. We were concerned that the SEC did not thoroughly consider the proposal's impact on the Treasury market or other related asset classes, simply concluding in the cost-benefit analysis that the impact on market efficiency and competition was "uncertain." The Treasury Department responded that "the SEC's staff is considering comments received on this rule proposal in making recommendations for the SEC's consideration." Chair Gensler, as the Commission nears the completion of this rule, I hope you are heeding our concerns. I look forward to reviewing a thorough cost-benefit analysis of the final rule conducted with input from Treasury and the Inter-Agency Working Group on Treasury Market Surveillance (IAWG).

RESPONSE:

The Commission requested comment on all aspects of the proposal, including the proposed rule's economic analysis. The staff is carefully considering the comments received on this proposed rule, including related to the proposal rule's cost-benefit analysis of the potential impact on market efficiency and competition, in making any recommendation for Commission action.

### Questions for the Record submitted by Rep. Nikema Williams

**169.**    As my colleagues here know, I like to use my five minutes in hearings as an opportunity to focus on how we can use or change our system to help close the racial wealth gap. I represent Atlanta, the city with the largest racial wealth gap in the country. That gap impacts Black people's everyday lives—from buying a home, to opening a small business, to having a comfortable retirement.

All too often, investors who have worked hard, saved as much as possible, and worked with a stockbroker to invest their retirement savings find themselves having lost a significant amount of, if not the entirety of, those savings thanks to that broker's wrongdoing. When that investor files a Financial Industry Regulatory Authority – FINRA – arbitration case, I understand that if they're one of the few who take a claim all the way through a hearing and then are one of the 31 percent of all investors who are awarded some amount of damages, that FINRA statistics show that nearly $1 out of every $4 awarded goes unpaid. This problem is not new and has received attention for decades, but it still has not been addressed. I know you were questioned about this topic just a few weeks ago, and that you expressed concern, indicated that this is a priority, and that you would ensure your staff understand the importance of the issue. I want to add some context as to why this issue is so important for my constituents and why action is needed now.

In addition to a racial wealth gap in this country, there is a racial gap in financial literacy. In fact, a FINRA study found that Black and Hispanic Americans scored significantly lower on financial literacy tests than their Asian and white peers. When you have a lower level of financial literacy, you may not know how to make sure the broker you are

trusting with your retirement, your life's savings, isn't going to make risky investments so they can collect higher fees. The SEC's oversight of FINRA is one of its critical roles and the SEC is entitled to step in and add to or amend FINRA's rulebook to compel changes to protect investors. A number of solutions have been suggested, like a national investor recovery pool, or mandatory insurance requirements.

    a)  Chair Gensler, what has the SEC done to investigate the viability of those potential solutions?

    b)  What do you believe is a reasonable timeframe to study, enact, and enforce a practical solution to the problem?

    c)  Can you commit to this timeframe today?

RESPONSE:

SEC and FINRA rules impose significant consequences on broker-dealers and associated persons for having unpaid arbitration awards. For example, under the SEC's net capital rule, if a broker-dealer does not have the ability to pay an arbitration award, it must immediately cease doing business. Also, FINRA can suspend from the brokerage industry any member firm or associated person who fails to pay an arbitration award.

More recently, FINRA established new requirements designed, in part, to strengthen the tools available to FINRA to address unpaid awards. Among other things, FINRA's new requirements create: (1) a rebuttable presumption that an application for new FINRA membership would be denied if the applicant or its associated persons was subject to a pending arbitration claim, and (2) a new requirement for a member firm to consult with FINRA before making certain business changes, including expansions, if the member or its associated persons had specified unpaid arbitration awards or settlements.

In addition, FINRA created a new program designed to identify higher risk firms, so-called "restricted firms," and incentivize them to improve behavior. Once identified, such firms would have done one if not both of the following: "lock up" specified funds or securities, and comply with additional conditions and restrictions to their business operations. Withdrawals of "locked up" funds or securities would be contingent upon a commitment to pay down specified pending arbitration claims or unpaid arbitration awards.

We are committed to continuing to engage in a constructive dialogue—especially including to other ways to improve recovery rates for investors, impose consequences on firms and individuals that do not pay, and improve disclosures to investors regarding bad actors.

**170.**      I would like to shift gears somewhat and turn to the connection between racial equity, human capital management disclosures, and investor protection.

According to a 2021 study from the Federal Reserve Bank of San Francisco, racial and ethnic disparities in the labor market led to an estimated $51 trillion loss in U.S. GDP between 1990 and 2019, with these inequities in earnings, hours worked, and other dimensions of labor market outcomes costing the U.S. GDP $2.6 trillion in 2019 alone. In fact, a significant portion of U.S. GDP growth per capita —40 percent —between 1960 and 2010 is owed to "falling human capital barriers" in the form of increased representation of women and Black men in highly skilled occupations.

What do these GDP data points have to do with investors?

Well, long-term, diversified investors rely on economic growth to support portfolio performance, and GDP growth is a primary driver of returns. So in addition to the enormous human and economic costs of racial inequality, the substantial barriers to GDP growth caused by racial inequalities lower returns across portfolios. Conversely, policies and practices that address persistent racial disparities in income, housing, and wealth can provide a strong foundation for the sustainable economic growth sought by long-term investors.

Racial equity issues also impact the financial performance of individual companies. For example, a McKinsey study of 366 companies found that corporate leadership in the top quartile for racial and ethnic diversity were 35 percent more likely to have financial returns above their national industry median.

Chair Gensler, can you explain the importance of the human capital management disclosure rule that is currently on the SEC's agenda, specifically how it will contribute to broad-based economic growth, and the role it will play in helping investors assess corporate racial and ethnic diversity?

RESPONSE:

Our capital markets depend on a basic bargain. Investors get to decide which risks to take so long as companies offering securities to the public provide full, fair, and truthful disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.

**174.**      The Commission's rulemaking agenda contains an item that is intended to enhance registrant disclosures regarding human capital management. The staff currently is in the process of formulating recommendations for the Commission's consideration**71.**

Will you commit to working with the SEC Commissioners to propose such a disclosure rule that includes workplace composition data on diversity and pay equity policies, audits, and ratios, as recommended by the Human Capital Management Coalition in its rulemaking request?

a) When can we expect to see such a rule proposed?

RESPONSE: The Commission's rulemaking agenda contains an item that is intended to enhance registrant disclosures regarding human capital management. The staff currently is in the process of formulating recommendations for the Commission's consideration.

174. **Questions for the Record submitted by Rep. Vincent Gonzal72.**    Question 1: Regulatory requirements should seek to incentivize as robust disclosure as possible so that investors can assess the information and make informed investment decisions. As you know, the proposed Climate Disclosure Rule creates new requirements for publicly traded firms. Even seeking to collect and estimate emissions data is challenging for the largest and most sophisticated companies —let alone the thousands of smaller public companies that have never collected emissions data before. Reporting concepts, measurement tools, methodologies, and technologies are evolving at a rapid pace. The proposal contemplates reliance on untested third-party standard setters. Disclosure rules shouldn't be so complicated, and so difficult-to-interpret, that companies trying in good faith to comply with the rules end up getting penalized. For all these reasons, we need to look at expanding the safe harbor features of the rule. The proposed Scope 3 safe harbor is a good starting point for any enhanced climate disclosures, but I think you can do more here. A meaningful safe harbor should cover the entire final rule, considering the unique challenges that the SEC itself recognizes companies must overcome to meet the proposed climate-related disclosure obligations.
   a) How are you thinking about safe harbor protections?
   b) How do you plan to encourage and equip smaller firms to meet obligations?

RESPONSE:

The Commission's proposed climate disclosure rule contains a safe harbor for Scope 3 emissions disclosure from certain forms of liability under the Federal securities laws. In addition, as the proposed rule clarified, forward-looking statements that may be elicited by the proposed rule would be covered by the safe harbor in the Private Securities Litigation Reform Act.

The proposing release also contains requests for comment regarding whether specific safe harbors should be included for this and other aspects of the proposed rules. We received many comments that were responsive to these requests, both in favor and opposed to more expansive safe harbors. The staff carefully will consider all comments on this point as it formulates recommendations.

173.    Question 2: Chair Gensler, I understand that investors need and deserve all the material information about companies before they invest, and I strongly support that. But that information also needs to be comparable across companies, in order for investors to make an apples-to-apples comparisons between different companies. My concern with requiring companies to report Scope 3 emissions in the climate disclosure rule is that accurately estimating Scope 3 emissions is, from what I understand next-to-impossible right now, which makes any Scope 3 disclosures inherently unreliable. Companies would be required to rely on data from third parties that they cannot verify, and may use

different data, different definitions, and different methodologies to estimate Scope 3 emissions. All of this undermines the usefulness of these disclosures for investors.

So, my question is: Given the inherent difficulty of estimating Scope 3 emissions, and the lack of comparability across companies, what would the value of requiring companies to disclose Scope 3 emissions from the investor's perspective?

RESPONSE:

In the climate disclosure proposing release, the Commission recognized the potential relative challenges in Scope 3 emissions data collection and measurement. In light of this, the Commission proposed requiring disclosure of Scope 3 emissions only if such emissions were material to investors or if the company had made a commitment that included reference to Scope 3 emissions.

Moreover, the proposal would phase in Scope 3 disclosures after Scopes 1 and 2; a new safe harbor would be available for Scope 3 disclosures; and smaller reporting companies would be exempt from Scope 3 disclosures.

The proposing release included a number of requests for comment about the proposed Scope 3 emissions disclosure requirement. For example, we have received comments on the possible effects on private companies. Staff are reviewing and considering recommendations that would address those comments along with other comments with regard to other provisions of the proposal as it formulates any recommendations to the Commission.

### Questions for the Record submitted by Rep. Cleaver

**174.**     Chairman Gensler: One of the key bi-partisan reforms to the mortgage market in the wake of the global financial crisis has been the development of the credit risk transfer (CRT) market whereby Fannie Mae, Freddie Mac, and other private issuers are able to better manage risk and avoid the excess accumulation of mortgage credit risk on just a handful of leveraged balance sheets, instead sharing these credit risks out to the global capital markets and other balance sheets more suitable to hold them much the way the enterprises are charged with sharing interest rate risk out to the global capital markets via there issuance of Mortgage Backed Securities.  This has proven a vital tool helping to attract additional private capital to support mortgage credit availability, lowering the cost of credit, while also de-risking taxpayers. A wide spectrum of stakeholders and bi-partisan members of Congress have since 2013, consistently expressed support for CRT which has been developed and matured through three subsequent administrations of different political ideologies, helping to create a more diverse market for mortgage credit risk. The SEC's proposed conflict of interest rule, as currently proposed, would appear to treat prudent risk-mitigating CRT transactions which are now commonly used by the GSEs and private mortgage insurers who help fund higher LTV borrowers as conflicted transactions even when these companies bear a portion of the losses in the event of defaults.

a) Can you confirm that is the intent of the proposal?
b) And if this impact was not intentional, can you please assure me that you will clarify in the final rule that it would not serve to prevent the GSEs, private mortgage insurers, and/or other issuers from using the CRT market as a critical risk and capital management tool?

RESPONSE:

The re-proposed rule, if adopted, would implement the statutory mandate under Section 621 of the Dodd-Frank Act. Consistent with the statute, the re-proposed rule provides exceptions for risk-mitigating hedging activities, bona fide market making, and certain liquidity commitments.

We received many comment letters related to the scope of the proposed rule and the costs associated with compliance. The re-proposed rule responds this public feedback, as well as developments since 2011 in the asset-backed securities markets. For example, the re-proposal clarifies the scope of the prohibited conduct, the exceptions, and the participants subject to the proposal.

The Economic Analysis for the proposing release can be found at 88 FR 9711.

We received comment letters related to the proposed rule's application to the GSEs and other market participants that engage in CRT transactions, as well as its application to the private mortgage insurance industry. The staff also has met with commenters to better understand their concerns. The staff is considering all of the comments received as they develop recommendations to the Commission that would implement the statute and achieve its intended goals to prohibit certain conflicts of interest in securitizations.

**From:** (b)(6)
**Sent:** Sat, 15 Apr 2023 23:54:33 +0000
**To:** Allen, Stephanie Claire
**Subject:** FW: Brief Book 4/17 Monday
**Attachments:** HFSC April 18 2023 Hearing Talking Points (updated 203.04.15).docx

FYI

**From:** Nagashunmugam, Minu (b)(6)                    @SEC.GOV>
**Sent:** Saturday, April 15, 2023 3:03 PM
**To:** (b)(6)        @SEC.GOV>
**Cc:** Barbero, Megan <BarberoM@SEC.GOV>; Burris, Kevin <burrisk@SEC.GOV>; Fischer, Amanda <FischerAm@SEC.GOV>; Slavkin Corzo, Heather <SlavkinCorzoH@SEC.GOV>
**Subject:** Re: Brief Book 4/17 Monday

Gary - please see the attached HFSC talking points that have been reviewed by OGC. I will also upload these to the SP

**From:** Nagashunmugam, Minu (b)(6)                    @SEC.GOV>
**Sent:** Friday, April 14, 2023 6:13:14 PM
**To:** (b)(6)        @SEC.GOV>
**Cc:** Barbero, Megan (b)(6)            @SEC.GOV>; Burris, Kevin (b)(6)          @SEC.GOV>; Fischer, Amanda (b)(6)            @SEC.GOV>; Fischer, YJ (b)(6)          @SEC.GOV>; Frayer, Corey (b)(6)          @SEC.GOV>; Havenstein, Philipp (b)(6)          @SEC.GOV>; Huntley, Anna C (b)(6)          @SEC.GOV>; Johnson, Aisha (b)(6)          @SEC.GOV>; Klemmer, Corey (b)(6)          @SEC.GOV>; Krawitz, Jacob D. (b)(6)          @sec.gov>; Morse, Mika (b)(6)          @SEC.GOV>; Ostrom, Samantha J. (b)(6)          @SEC.GOV>; Percival, Heather (b)(6)          @SEC.GOV>; Pokorny, Jenna (b)(6)          @SEC.GOV>; Roper, Barbara (b)(6)          @SEC.GOV>; Schneider, Scott (b)(6)          @SEC.GOV>; Slavkin Corzo, Heather (b)(6)            @SEC.GOV>; Stone, Matthew (b)(6)          @SEC.GOV>; Sutaria, Ajay (b)(6)          @SEC.GOV>; Suthammanont, Victor (b)(6)          @SEC.GOV>; Wachter, Jessica (b)(6)          @SEC.GOV>; Nagashunmugam, Minu (b)(6)          @SEC.GOV>
**Subject:** Brief Book 4/17 Monday

Gary - Here are your Monday brief book materials.

**MONDAY BRIEF BOOK**

(b)(5)

(b)(5)

**Minu Nagashunmugam**
*Special Assistant to the Chief of Staff*
Office of Chair Gary Gensler | U.S. Securities and Exchange Commission
(b)(6)

| From: | Chair |
|---|---|
| Sent: | Wed, 12 Apr 2023 13:18:17 -0400 |
| To: | Help (OIEA Investor Complaints) |
| Subject: | FW: Finra file #20230782957/TD Ameritrade #R2023C6AT3 |
| Attachments: | Td.docs.pdf, TD.Rebuttal.jpg |

**From:** (b)(6)
**Sent:** Wednesday, April 12, 2023 6:48 AM
**To:** (b)(6)         )schwab.com' (b)(6)          )schwab.com>; (b)(6)          )schwab.com'
(b)(6)          )schwab.com>; (b)(6)          )schwab.com' (b)(6)          )schwab.com>;
(b)(6)          )tdameritrade.com' (b)(6)          )tdameritrade.com> (b)(6)          )finra.org'
(b)(6)          )finra.org>; (b)(6)          )finra.org' (b)(6)          )finra.org>;
(b)(6)          )finra.org' (b)(6)          )finra.org>; Chair <chair@sec.gov> (b)(6) )tdameritrade.com'
(b)(6) )tdameritrade.com>; (b)(6)          )tdameritrade.com'
(b)(6)          )tdameritrade.com>
**Subject:** Finra file #20230782957/TD Ameritrade #R2023C6AT3

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Gentlemen,

The purpose of this communication is to resolve an issue I've recently had with TD Ameritrade regarding funds missing from my brokerage account. Coming from Leadership in Retail Banking, I am quite familiar with how valuable your time is. I apologize for my intrusion, it was not my intent to get you involved, however, I have exhausted all other avenues. Being in executive positions such as yourselves where there is distance between you and the everyday business dealings of TD, I think it is important that you gentlemen be made aware of my situation.

I originally opened my account with TD Ameritrade this past November. I had been told that your customer service was among the best, and Robinhood's service had left something to be desired so I opened an account to house the funds that I mainly trade for amusement. After opening my account, I requested that my 289 shares of MMLTP be ACAT over from Robinhood. Part of my complaint had been regarding those shares. TD was quick in resolving that after I had filed my complaint with Finra. Please pass along my gratitude. On April 11th, I finally received correspondence for the first time attempting to explain what had happened to my accounts. I am sorry to say that this correspondence contains many factual errors. I am attaching a copy for your reference. The letter I received states that my accounts had been restricted as of November 29, 2022. However, I had access to my accounts until January 9th of this year. I have not gotten anything from TD stating that they were ceasing out business relationship until now. The fraud department has refused to contact me thus far despite my repeated attempts to contact

them. Only one employee, (b)(6) has been remotely agreeable to the fact that I am missing assets. She deserves recognition for how pleasant she has been to deal with.

On December 29th, I purchased approximately (b)(6) shares of KALA. I would have given an exact figure, however TD Ameritrade will not produce a statement for me to show it. By December 31st, the value of those KALA shares grew to (b)(6) All of the shares had plenty of time to settle by then. I had utilized the feature that gives me instant access to my funds despite the ACH process taking on average 5 business days to soft post and up to an additional week to hard post. Needless to say, and exactly like all of your other clients that utilize this feature, my margin account covered my purchase in it's entirety. With around two full weeks until an ACH hard posts to the receiving party's account, it is very convenient that TD offers this for their clients. I have voiced my concerns regularly offer the past 20 years regarding ACH processing times to no avail. It puzzles me that it isn't instant in this day and age. I initially sold only enough shares to cover TD's margin call when I saw it. I had previously spotted an error on my part with my funding account which I immediately notified TD Ameritrade of. My deposits were going to reject and instead of starting the process over and making TD wait another 2 weeks for the funds to arrive via ACH, I simply sold the security. TD automatically kept (b)(6) which was the amount of my rejected deposits. When TD Ameritrade kept those funds, they completed the transaction for selling me KALA in the first place. It was a faster way for them to get paid and the fact that my debt to TD was considered paid was assured to me by a representative over the phone. I had called TD several times during the first two weeks of January. While your representatives were always very pleasant and always willing to help, they were not very adept at solving my problem. They was no consistency in answers from one representative to the next. When one representative had mentioned "free riding", I took it upon myself to find the definition. That representative had correctly told me that the funds in my account totaling (b)(6) would be held for 90 days. The regulation clearly states that it is admissible to sell the security in order to satisfy the margin call, which I did. I assume that TD has a system in place to automatically retain funds in this scenario, as I had previously mentioned, TD kept the first (b)(6) of the sale. Had that not been the case, I would have gladly fixed my error and initiated another deposit for (b)(6) I was assured that I did not need to take further action by several TD employees. I am not sure what your retention schedule is for recorded calls, but if calls from January are still available then it should be evident that I had no intention to defraud TD Ameritrade. I was 100% compliant with the terms of your client agreement during my tenure as TD's client. Consideration in the amount of (b)(6) was taken by TD upon the sale of the security in question, and it is that fact that constitutes a business deal between TD Ameritrade and myself. This past Friday was the 90th day that my funds were missing. I would very much like to be reinstated as your customer, however, I do understand that it might not be possible at this point. I was given arbitration as an option from one TD representative. I would like to resolve this amicably if possible. I am aware that the representatives that I have spoken to thus far were only doing what was expected of them. I have no ill will toward TD or Charles Schwab and while litigation is not currently an option, I cannot say for certain that it will remain that way. It is my hope that as top executives, you look into this and instruct TD Ameritrade to restore the funds in my account and let me ACAT them to my current brokerage if you cannot change my status back to good standing. As it currently stands, I am owed exactly (b)(6) I wish to be respectful of your time and do not require a direct response from any of you. I do ask that you have a representative contact me to confirm action is

being taken so we can all avoid unnecessary legal action. I am confident that the funds in my account will be restored and hope that I will be able to do business with TD Ameritrade in the future. I thank you all for spending your valuable time looking into this. Feel free to contact me should you require additional information.

Respectfully,

(b)(6)

**From:**       Chair
**Sent:**       Mon, 24 Apr 2023 10:21:17 -0400
**To:**         Help (OIEA Investor Complaints)
**Subject:**    FW: Freedom of information Act. MMTLP, MMAT and TRCH

**From:** (b)(6)
**Sent:** Sunday, April 23, 2023 10:08 AM
**To:** SEC Ombudsman <ombudsman@SEC.GOV>; Chair <chair@sec.gov>; CommissionerPeirce <CommissionerPeirce@SEC.GOV>
**Cc:** Shylkofski, Samantha (b)(6)        @mail.house.gov>; Brown, Cindy
(b)(6)        @mail.house.gov>
**Subject:** Freedom of information Act. MMTLP, MMAT and TRCH

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear SEC,

I am writing to you today to express my deep concern regarding the short sale of stocks of MMAT, MMTLP, and Trch. It has come to my attention that certain market participants have been engaging in short selling of these stocks in a manner that appears to be manipulative and detrimental to the interests of other market participants.

As you are aware, short selling can be a legitimate trading strategy when used appropriately. However, when short selling is done in a manner that is designed to manipulate the market, it can cause significant harm to other investors and the integrity of the markets. I believe that this is what is happening with MMAT, MMTLP, and Trch.

I am also requesting access to any correspondence between Finra and the SEC related to these stocks for the dates of 10/07/2021 through 12/31/2022. I believe that this information will shed light on the actions of certain market participants and help to determine whether any illegal or unethical behavior has taken place. I am making this request under the Freedom of Information Act, 5 U.S.C. § 552. I request a waiver of all fees associated with this request, as disclosure of the requested information is in the public interest and will contribute significantly to public understanding of the SEC's regulatory functions.

I urge you to investigate this matter thoroughly and take appropriate action to protect investors and ensure the integrity of our financial markets. Thank you for your attention to this matter and if needed please forward it to the appropriate parties.

Sincerely,

(b)(6)

**From:**      Chair
**Sent:**      Fri, 21 Apr 2023 15:24:38 -0400
**To:**        Help (OIEA Investor Complaints)
**Subject:**   FW: Interview

**From:** (b)(6)
**Sent:** Friday, April 21, 2023 2:09 PM
**To:** CommissionerPeirce <CommissionerPeirce@SEC.GOV>; Chair <chair@sec.gov>;
CommissionerCrenshaw <CommissionerCrenshaw@SEC.GOV>; CommissionerUyeda
<CommissionerUyeda@SEC.GOV>; CommissionerLizarraga <CommissionerLizarraga@SEC.GOV>
**Cc:** (b)(6)
**Subject:** Interview

> **CAUTION:** This email originated from outside of the organization. Do not click links or open
> attachments unless you recognize the sender and know the content is safe.

Hi All,

In an interview with Charles Payne, Commissioner Peirce suggested that the shareholders of MMTLP file
complaints to the SEC. We have filed thousands of complaints and made probably as many phone calls.
Many of our phone calls result in getting hung up on. In our complaints, you keep referring back to FINRA
who is even less helpful. Chairman Gensler met some of our community members in Washington this
week and we know you are aware of the MMTLP issue. Why won't you help us resolve this mess? There
are 65k+ investors that are waiting for a resolution.

Thank you for your time,
(b)(6)

| | |
|---|---|
| **From:** | Chair |
| **Sent:** | Fri, 24 Mar 2023 11:29:03 -0400 |
| **To:** | Help (OIEA Investor Complaints) |
| **Subject:** | FW: investor relations |

**From:** (b)(6)
**Sent:** Friday, March 24, 2023 11:07 AM
**Subject:** Fwd: investor relations

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# The halt in trading MMTLP by FINRA was unfair to retail investors and disrupted the normal functioning of the market. Trading needs to reopen to allow for buy-to-close positions only trading to clear up the short shares that exist.

Shorts can not exist in a private company. By issuing an U3 Halt on M.M.T.L.P that is moving to a private company, you essentially locked everyone including short positions. We now have a large share imbalance that needs to be reconciled to go into the allocated 165 million shares.

We know short positions DO EXIST and remain OPEN as confirmed by (b)(6) (b)(6) (CEO of OTC Markets) via his tweet on Feb 6 "The ongoing question is how do short position holders resolve their liability for the Next Bridge common stock if it is not easily transferable or tradable publicly?"

So I would like to ask if you are aware of a potential market emerging in the near future where short positions will be able to cover. And at the same time, will I be able to liquidate my long position in this security if I choose to? If not, how will shorts that (b)(6) admitted existing be reconciled? Who is creating and telling each broker what placeholder identifier number to use? Why are these placeholder identifiers being used to group brokerages that have no affiliation with one another?

Again, you can't take short shares into a private company. The failure to enforce existing rules, such as Rule 203(b)(3) of Regulation SHO and FINRA

Rule 4320, has led to an ongoing state of limbo for shareholders, who have not been made whole despite the lengthy filing process and approval of the S1 by the SEC.

We call for a thorough investigation into the events surrounding MMTLP and the failure to enforce existing rules. It is crucial that the rights of retail investors are protected in the stock market and that fair and equitable markets are maintained for all investors.

Please advise ASAP as to when I should expect corporate action or a news release.

**From:**      Chair
**Sent:**      Tue, 10 Oct 2023 17:42:02 +0000
**Cc:**        Gonzalez, Sergio
**Subject:**   FW: Mail Distribution
**Attachments:**   Scan_(b)(6)_20231010_124121.pdf

Here is another one!

## Tia Butler

Program Specialist
Office of the Secretary
**MOBILE** (b)(6)
(b)(6)    @sec.gov

**From:** Adebayo, Olufunke (Contractor) (b)(6)  @SEC.GOV>
**Sent:** Tuesday, October 10, 2023 1:37 PM
**To:** Chair <chair@sec.gov>
**Subject:** Mail Distribution

**MIKE CRAPO**
U.S. SENATOR
IDAHO

CO-CHAIRMAN, SENATE RENEWABLE ENERGY AND
ENERGY EFFICIENCY CAUCUS

JOINT COMMITTEE ON TAXATION

WORKING FOREST CAUCUS

SENATE WESTERN CAUCUS

**United States Senate**

WASHINGTON, DC 20510

COMMITTEES

FINANCE
RANKING MEMBER

BANKING, HOUSING, AND
URBAN AFFAIRS

BUDGET

September 26, 2023

RECEIVED

OCT 1 0 2023

OFFICE OF THE SECRETARY

Gary Gensler
Chairman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington DC 20549-1090

Dear Chairman Gensler:

We write today requesting that the U.S. Securities and Exchange Commission (SEC) examine events surrounding the trading halt of Meta Materials Series A preferred shares (MMTLP) and provide appropriate information to Senate offices engaged on this matter.

As noted by our House counterparts in a letter dated July 28, 2023, MMTLP shares began trading on the over-the-counter (OTC) market in 2021. In 2022, the SEC approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons. On December 9, 2022, FINRA issued a trading halt on the company's stock, preventing shareholders from making further trades. In FINRA's FAQ[1] regarding the MMTLP corporate action and trading halt, it is noted that Next Bridge Shares would be distributed to MMTLP shareholders with settled positions as of December 12, 2022, and FINRA halted trading on December 9 because securities transactions typically must settle within two business days in accordance with SEC rules.

Since December's events, investors across the country have struggled to gain clarity regarding both the spin-off transaction and the halt on trading. Therefore, we echo our House counterparts and request that the SEC review these market events and any corporate filings made with the Commission. It is equally important to our constituents that the SEC further scrutinize these matters to determine if any wrongdoing occurred.

We hope for a timely response to this matter, and ask that the SEC provide detailed information and analysis.

Thank you for your attention to this important matter.

Sincerely,

Mike Crapo
United States Senator

JD Vance
U.S. Senator

[1] FAQ: MMTLP Corporate Action and Trading Halt | FINRA.org. Www.finra.org.
https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt

WASHINGTON, DC
239 Dirksen Senate Office Bldg.
Washington, DC 20510
(202) 224-6142
(202) 228-1375 FAX

IDAHO STATE OFFICE
251 East Front Street
Suite 205
Boise, ID 83702
(208) 334-1776

NORTH IDAHO
610 Hubbard
Suite 209
Coeur d'Alene, ID 83814
(208) 664-5490

EASTERN IDAHO, NORTH
410 Memorial Drive
Suite 204
Idaho Falls, ID 83402
(208) 522-9779

NORTH-CENTRAL
313 D Street
Suite 105
Lewiston, ID 83501
(208) 743-1492

EASTERN IDAHO, SOUTH
275 S. 5th Avenue
Suite 100
Pocatello, ID 83201
(208) 236-6775

SOUTH-CENTRAL
202 Falls Avenue
Suite 2
Twin Falls, ID 83301
(208) 734-2515

**From:**         Chair
**Sent:**         Wed, 4 Dec 2024 15:07:08 +0000
**To:**           Gonzalez, Sergio
**Subject:**      FW: Mail Distribution
**Attachments:**  Scan_(b)(6)_20241203_113247.pdf
**Importance:**   Normal


CCS entry


**From:** Coston-Queen, Tonya (Contractor) (b)(6) @SEC.GOV>
**Sent:** Tuesday, December 3, 2024 11:41 AM
**To:** Chair <chair@sec.gov>
**Subject:** Mail Distribution


Tonya Coston-Queen (*Contractor*)
Administrative Support III Senior, C2 Alaska, LLC
Office of the Secretary (OS)
*U.S. Securities and Exchange Commission (SEC)*
(b)(6)            @sec.gov | Desk: (b)(6)

Congress of the United States
House of Representatives
400 Austin Ave., Suite 302
Waco, TX 76701-2139

OFFICIAL BUSINESS

PRINTED ON RECYCLED PAPER

SEC Mail Processing

DEC 03 2024

Washington, DC

RECEIVED

DEC 3 2024

OFFICE OF THE SECRETARY

Bun Sessing

M.C.

Gary Gensler
Chairman
U.S. Securities and Exchange Commission
100 F St NE
Washington, DC 20549-2000

20549#2000  0000



PETE SESSIONS
17TH DISTRICT, TEXAS

COMMITTEE ON OVERSIGHT
AND ACCOUNTABILITY
*CHAIRMAN*
SUBCOMMITTEE ON GOVERNMENT
OPERATIONS AND THE FEDERAL WORKFORCE

SUBCOMMITTEE ON NATIONAL SECURITY, THE BORDER,
AND FOREIGN AFFAIRS

COMMITTEE ON FINANCIAL SERVICES

SUBCOMMITTEE ON
CAPITAL MARKETS

SUBCOMMITTEE ON OVERSIGHT
AND INVESTIGATIONS

[...] OFFICE BUILDING
WASHINGTON, DC 20515-4317
(202) 225-6105

☐ 400 AUSTIN AVENUE, SUITE 302
WACO, TX 76701-2139
(254) 633-4500

☐ 901 NORMAL PARK DRIVE, SUITE 208
HUNTSVILLE, TX 77320-3770
(936) 755-7770

☐ 300 EAST SHEPHERD AVENUE, SUITE 210
LUFKIN, TX 75902-3252
(936) 219-6450

☐ 3034 RAGUET STREET
NACOGDOCHES, TX 75965-2852
(936) 585-7959

## Congress of the United States
## House of Representatives
### Washington, DC 20515-4317

November 18, 2024

RECEIVED
DEC  3 2024
OFFICE OF THE SECRETARY

Chairman Gary Gensler
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-2000

Dear Chairman Gensler,

I am writing to formally request the aggregate share count for MMTLP in light of its transition to Next Bridge Hydrocarbons. My office has been contacted by numerous constituents who have expressed deep concern and frustration regarding the transparency of this process, particularly following the delisting of MMTLP and conversion into shared of Next Bridge Hydrocarbons in December 2022.

As you know, MMTLP's shares were removed from the DTCC system following this conversion, as outlined in the November 18th prospectus published by META through the SEC. However, despite repeated inquiries into FINRA and others, there has been no clear or definitive figure provided for the total aggregate share count of MMTLP. FINRA has indicated that the share count figures referenced in their FAQ were derived through reverse engineering, rather than from any direct data, leaving investors with significant uncertainty.

**As Chairman of Government Operations for the Committee on Oversight and Accountability, I urge the SEC to provide any available information regarding the aggregate share count for MMTLP shares or to outline how this data can be obtained.**

Given the widespread investor concerns, ensuring transparency and accountability is essential. While Blue Sheet data raises privacy issues, it's crucial to provide relevant information without compromising sensitive details. Your prompt attention to this matter is appreciated.

Sincerely,

Pete Sessions
Member of Congress

Cc: Frank La Salla, CEO and Director of the Depository Trust & Clearing Corporation
Robert Cook, CEO of the Financial Industry Regulatory Authority

PRINTED ON RECYCLED PAPER

**From:** Chair
**Sent:** Thu, 15 Aug 2024 13:48:56 +0000
**To:** Gonzalez, Sergio
**Subject:** FW: Mail Distribution
**Attachments:** Scan_(b)(6)_20240808_113222.pdf
**Importance:** Normal

Sergio,

Can you take a look at this letter? (b)(5)    Please advise.

Thank you,

**Tia Butler**
Program Specialist
Office of the Secretary
**MOBILE** (b)(6)
(b)(6) @sec.gov

**From:** Taylor, Michelle (Contractor) (b)(6) @SEC.GOV>
**Sent:** Thursday, August 8, 2024 12:03 PM
**To:** Chair <chair@sec.gov>
**Subject:** Mail Distribution

Please see the attached.

**Michelle "Toni" Taylor** **(Contractor)**
Administrative Support II, C2 Alaska, LLC
Office of the Secretary (OS)
U.S. Securities and Exchange Commission (SEC)
Email:(b)(6)    @sec.gov(b)(6)


**U.S. Securities and
Exchange Commission**



**FRANK J. MRVAN**
1ST DISTRICT, INDIANA

1607 LONGWORTH
WASHINGTON, DC 20515-0007
(202) 225-2461

7895 BROADWAY, SUITE A
MERRILLVILLE, IN 46410
(219) 795-1844

http://mrvan.house.gov

COMMITTEE ON VETERANS' AFFAIRS
SUBCOMMITTEES:
RANKING MEMBER - OVERSIGHT & INVESTIGATIONS
ECONOMIC OPPORTUNITY

COMMITTEE ON EDUCATION & THE WORKFORCE
SUBCOMMITTEE:
HEALTH, EMPLOYMENT, LABOR & PENSIONS

VICE CHAIRMAN - CONGRESSIONAL STEEL CAUCUS

CONGRESSIONAL LAW ENFORCEMENT CAUCUS

## Congress of the United States
## House of Representatives

July 25, 2024



The Honorable Gary Gensler
United States Securities and Exchange Commission
100 F Street Northeast
Washington, DC 20549-2000

Dear Chair Gensler,

I write on behalf of (b)(6) Indiana's First Congressional District.

(b)(6) has contacted me with concerns regarding a financial market incident involving the Financial Industry Regulatory Authority (FINRA) and Meta Materials (MMTLP). Enclosed, please find a copy of the correspondence I have received from (b)(6). I would appreciate your addressing his concerns.

Thank you in advance for your serious consideration of this matter. Do not hesitate to let me know if you have any questions or need additional information.

Sincerely,

Frank J. Mrvan
Member of Congress

FJM/er

# Email Viewer

| Message | Details | Attachments | Headers |
|---------|---------|-------------|---------|
| Source | Close | | |

HTML

From: "noreply@mail5.housecommunications.gov" <noreply@mail5.housecommunications.gov>
Date: 6/8/2024 2:11:17 PM
To: (b)(6)              @mail.house.gov" (b)(6)              @mail.house.gov>
Cc:
Subject: Web Form on Help With a Federal Agency

I have contacted you before about this issue and would appreciate an
update on progress. I am talking about an illegal U3 halt on MMTLP
stock that was initiated by FINRA. The SEC who oversees FINRA must
have known about this situation. Now, this government entity is
stonewalling requests about information and data that would prove
possible corruption. I know I am only a single constituent of your
district but there are 65,000 shareholders nationwide who are looking
for a resolution to this illegal activity that has occurred. Thank
you.

| Close |
|-------|

of the United States
of Representatives **SEC Mail Processing**
hington, DC 20515

OFFICIAL BUSINESS          AUG 0 8 2024

NTED ON RECYCLED PAPER     **Washington, DC**

Frank J Mwan
M.C.

FOBLAP1 20549

**From:** InvestorHelp@sec.gov
**Sent:** Mon, 6 Nov 2023 13:43:55 +0000
**To:** Help (OIEA Investor Complaints)
**Subject:** FW: MMTLP

-----Original Message-----
From: (b)(6)
Sent: Friday, November 3, 2023 6:37 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless
you recognize the sender and know the content is safe.

Dear Mr Gensler
The Corruption continues in the US Stock Market!!
Attorney General Merrick Garland said in a statement "Sam Bankman- Fried thought that he was above the law.
Today's verdict proves that he was wrong."
 This case was always about lying, cheating and stealing and we have no patient for it according to Attorney General
(b)(6)               !!
FINRA has created the largest securities fraud in US History!! It gives me great hope that the FBI and the Attorney
General's office will investigate and prosecute the criminals at FINRA and the SEC!! Attorney General (b)(6)
(b)(6)      said that they had handcuffs for all the fraudsters!!! FINRA created securities fraud collusion and market
manipulation!! The SEC is just as guilty for doing absolutely nothing to help and protect the MMTLP investors!!
The FBI and the DOJ are coming for you next!!
We won't stop till we get our two days of trading and jail time for everyone involved!!
Regards
(b)(6)

Sent from my iPhone

| | |
|---|---|
| **From:** | Chair |
| **Sent:** | Mon, 6 Nov 2023 13:43:55 +0000 |
| **To:** | Help (OIEA Investor Complaints) |
| **Subject:** | FW: MMTLP |

-----Original Message-----
From: (b)(6)
Sent: Friday, November 3, 2023 6:37 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The Corruption continues in the US Stock Market!!
Attorney General Merrick Garland said in a statement "Sam Bankman- Fried thought that he was above the law. Today's verdict proves that he was wrong."
This case was always about lying, cheating and stealing and we have no patient for it according to Attorney General (b)(6) !
FINRA has created the largest securities fraud in US History!! It gives me great hope that the FBI and the Attorney General's office will investigate and prosecute the criminals at FINRA and the SEC!! Attorney General (b)(6) (b)(6) said that they had handcuffs for all the fraudsters!!! FINRA created securities fraud collusion and market manipulation!! The SEC is just as guilty for doing absolutely nothing to help and protect the MMTLP investors!! The FBI and the DOJ are coming for you next!!
We won't stop till we get our two days of trading and jail time for everyone involved!!
Regards

(b)(6)

Sent from my iPhone

**From:**       Chair
**Sent:**       Tue, 5 Sep 2023 14:54:48 +0000
**To:**         Help (OIEA Investor Complaints)
**Subject:**    FW: MMTLP

-----Original Message-----
From: (b)(6)
Sent: Friday, September 1, 2023 3:34 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The MMTLP investors have had counterfeit shares in our accounts for 37 weeks 2 days with no resolution from the SEC or FINRA!!
Why has both the SEC and FINRA completely ignored the millions and millions of illegal counterfeit shares in our accounts? This is securities fraud and no one seems to care!!
There needs to be honesty and transparency with the briefing before Congress on September 5 2023. The SEC can't cover up this massive securities fraud!! The SEC can't continue to deflect and sweep this MMTLP fiasco under the rug to protect FINRA!!!!
We have waited T266 days for the settlement of our shares or our right to trade!! This is getting ridiculous that we have waited almost 9 months to get answers!! The MMTLP investors are suffering financially and emotionally!! We need the help of the SEC!! The SEC needs to obtain the audited share count from the Broker Dealers!!! We deserve to know the true extent of this massive securities fraud!!!
Please do the right thing for the 65,000 MMTLP investors and let us trade!!
Regards
(b)(6)

Sent from my iPhone

**From:**      Chair
**Sent:**      Fri, 11 Aug 2023 19:55:57 +0000
**To:**        Help (OIEA Investor Complaints)
**Subject:**   FW: MMTLP

-----Original Message-----
From: (b)(6)
Sent: Friday, August 11, 2023 3:47 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The MMTLP investors have had counterfeit shares in our account for over 34 weeks with no resolution from the SEC whatsoever!!
Why has the SEC completely ignored the millions and millions of illegal counterfeit shares in our accounts? This is securities fraud and needs to be addressed by the SEC!!!!
Why didn't the shorts close their positions with the TRCH and Meta Material merger? Why were the TRCH shorts allowed to go into MMAT? Why were the shorts allowed to continue on with our Meta Materials Preferred Shares that were never supposed to trade?
Was that the plan since June 2021 that the market makers would get MMTLP shares trading since June 2021. The securities fraud started at the time of the merger!!
When is the SEC going to deal with this massive securities fraud?
Shorts can't go into a non trading private company!! FINRA should have followed the S1 and made the shorts close their positions!!
This securities fraud can't be swept under the rug!!
Please do the right thing for the 65,000 MMTLP investors who are suffering financially and emotionally!! Let us trade!!
Regards
(b)(6)

Sent from my iPhone

**From:**          Chair
**Sent:**          Fri, 11 Aug 2023 14:58:15 +0000
**To:**            Help (OIEA Investor Complaints)
**Subject:**       FW: MMTLP

-----Original Message-----
From: (b)(6)
Sent: Thursday, August 10, 2023 6:27 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The corruption in the US Stock Market continues!! The MMTLP investors have had counterfeit shares in our accounts for over 34 weeks with no resolution from the SEC or FINRA whatsoever!! Why has the SEC completely ignored the millions and millions of illegal counterfeit shares in our accounts? This is securities fraud and the SEC really doesn't care!! Why has the SEC stonewalled the MMTLP investors at every turn!!
Congress has asked for a full disclosure for the MMTLP fiasco!! The SEC needs to be honest, transparent and give full detailed information on this massive securities!! We need the SEC to get an audited shares count from all the Broker Dealers!  We deserve to know the true extent of this securities fraud!
It is ridiculous that we have waited over 8 months for our settlement of our shares or our right to trade!! The problem is that you can't have a billion or more counterfeit shares in our accounts and ever expect that we can get our Next Bridge Hydrocarbons shares!! We needs the shorts to close their positions!!
Please do the right thing for the 65,000 MMTLP investors and let us trade!!!
Regards
(b)(6)

Sent from my iPhone

**From:**       Chair
**Sent:**       Thu, 20 Apr 2023 15:29:09 -0400
**To:**         Help (OIEA Investor Complaints)
**Subject:**    FW: MMTLP

-----Original Message-----
From: (b)(6)
Sent: Thursday, April 20, 2023 3:13 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The corruption continues at the SEC and FINRA. The MMTLP investors have had counterfeit shares in our accounts for over 18 weeks with no resolution. What are you going to do for the MMTLP shareholders? People have lost their lives to suicide, people have lost homes, farms and vehicles, people have lost their marriages and people have lost their health due to the extreme stress. Have you no compassion for the MMTLP investors? There are probably over a billion counterfeit shares in the MMTLP accounts. I imagine that the numbers are huge otherwise why would FINRA do the U3 halt. The SEC needs to produce the Blue Sheets so that we have an accurate amount. The only problem is that FINRA has had 4 months to "Doctor" the books. But you can't cover up the counterfeit shares in our accounts that you allowed us to buy. The only way out is to give us our 2 days of trading so that all the shorts can close. The SEC and FINRA have forgotten that your job is to protect retail investors not the criminals!! RETAIL INVESTORS MATTER!! The longer this financial crisis goes on the worse it will be for hedge funds, market makers, broker dealers and of course the SEC and FINRA. Please be honest and transparent with the retail investors. The credibility of the US Stock Market is on the backs of the SEC and FINRA. The investors from around the world will no longer invest in your corrupt stock market again if we don't get our 2 days of trading!!
Regards
(b)(6)

Sent from my iPhone

| | |
|---|---|
| **From:** | Chair |
| **Sent:** | Wed, 29 Mar 2023 09:24:33 -0400 |
| **To:** | Help (OIEA Investor Complaints) |
| **Subject:** | FW: MMTLP |

-----Original Message-----
From: (b)(6)                    ?hotmail.com>
Sent: Tuesday, March 28, 2023 5:03 PM
To: Chair <chair@sec.gov>
Subject: MMTLP

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Mr Gensler
The corruption continues at FINRA with no response from the SEC!! We are at 14 weeks 6 days with counterfeit shares in our accounts and no resolution what so ever!!! FINRA has committed securities fraud by allowing all the illegal naked short shares in our accounts!! They  have committed collusion with the shorts, and illegal naked shorts produced by the market makers and hedge funds. The collusion happened when the hedge funds and shorts knew that there would be a halt ahead of December 8 2022. They knew they didn't have to cover and drove the MMTLP shares down 58% with 9,500,000 short shares that day. FINRA called the halt at the expense of retail investors. They saved their friends at the hedge funds and market makers. The shorts were told in the S1 that they must close their positions and that there could be a squeeze. How fortunate for the shorts to have insider information!! They could just do illegal naked shorts all day with no consequences!! Mr Gensler do you call that a fair and free market??? FINRA has the excuse of the 2 days to settle. Well why have we not got our one for one NBH shares after 14 6 days!! There really is a settlement problem now with up to a billion counterfeit shares that were never allowed to cover in MMTLP accounts. The SEC has a huge crisis with this situation. FINRA thinks that they have immunity and no responsibility. They made coding errors with the FTDs. They made coding errors with the back dated deletion of MMTLP on February 16 2023. Why is the SEC not regulating them when they are so incompetent? They stated in the amendment to the FAQ that some of the shorts had covered and the FTDs had been incorrect. They are absolutely lying to everyone. At this point I feel that the SEC should be asking all the broker dealers for the blue sheets. I feel that FINRA would probably forge the blue sheets. In fact I feel that they could be taking bribes and looking the other way in regards to illegal naked shorting. There needs to be a forensic investigation on FINRA. They can't be immune to the total corruption there!! FINRA is not protecting small investor. The fact of the matter is that they are protecting the hedge funds, market makers and broker dealer who they regulate but unfortunately are paid by those same people. A total conflict of interest!! Please correct this horrible financial crisis for the MMTLP shareholders. We deserve our 2 days of trading that FINRA has stolen from us!! Please be honest and do the right thing!!!
Regards
(b)(6)



Sent from my iPhone

**From:** Gensler, Gary
**Sent:** Tue, 26 Dec 2023 17:11:06 +0000
**To:** Burris, Kevin
**Cc:** Slavkin Corzo, Heather; Rao, Sai
**Subject:** FW: Norman et al - MMTLP - ES162279
**Attachments:** Norman MMTLP Letter to FINRA SEC - ES162279.pdf
**Importance:** Normal

Let's discuss.

**From:** Gonzalez, Sergio (b)(6) @SEC.GOV>
**Sent:** Tuesday, December 26, 2023 11:24 AM
**To:** Zhu, Haoxiang (b)(6) @SEC.GOV>; Wetterau, Jane (b)(6) @SEC.GOV>; Allen, Stephanie Claire (b)(6) @SEC.GOV>; Annino, Angelica (b)(6) @SEC.GOV>; Asher, Taylor (b)(6) @SEC.GOV>; Bailey, Lily (b)(6) @SEC.GOV>; Berke, Janna (b)(6) @SEC.GOV>; Burris, Kevin (b)(6) @SEC.GOV>; Butler, Letia A (b)(6) @SEC.GOV>; Carson, Kevin (b)(6) @SEC.GOV>; CHAIRCORRESPONDENCE (b)(6) @SEC.GOV>; Chea, Keo (b)(6) @SEC.GOV>; Cobbs, Robert (b)(6) @SEC.GOV>; Countryman, Vanessa A. (b)(6) @SEC.GOV>; Crenshaw, Caroline (b)(6) @SEC.GOV>; D'Allaird, Laura (b)(6) @SEC.GOV>; Damrau, Emily (b)(6) @SEC.GOV>; DeLesDernier, J. Matthew (b)(6) @SEC.GOV>; Fernandez, David (b)(6) @SEC.GOV>; Fischer, Amanda (b)(6) @SEC.GOV>; Flowers, Pat (b)(6) @sec.gov>; Frayer, Corey (b)(6) @SEC.GOV>; Freeman, Sharon K. (b)(6) @SEC.GOV>; Gabbert, Richard (b)(6) @SEC.GOV>; Gensler, Gary (b)(6) @SEC.GOV>; Gonzalez, Sergio (b)(6) @SEC.GOV>; Goodrich, Jonathan (b)(6) @SEC.GOV>; Haghshenas, Parisa (b)(6) @SEC.GOV>; Havenstein, Philipp (b)(6) @SEC.GOV>; Haywood, Sherry (b)(6) @sec.gov>; Slavkin Corzo, Heather (b)(6) @SEC.GOV>; Helvin, Lisa (b)(6) @SEC.GOV>; Hill, Brandon (b)(6) @SEC.GOV>; Hirsch, David L (b)(6) @SEC.GOV>; Hunter-Ceci, Holly L. (b)(6) @sec.gov>; Johnson, Aisha (b)(6) @SEC.GOV>; Jung, Stephen M. (b)(6) @SEC.GOV>; Klein, Sarit (b)(6) @SEC.GOV>; Klemmer, Corey (b)(6) @SEC.GOV>; Krawitz, Jacob D. (b)(6) @sec.gov>; Lee, Charles Chao (b)(6) @SEC.GOV>; Levine, Steven (ES) (b)(6) @SEC.GOV>; Leviss, David (b)(6) @SEC.GOV>; Lizarraga, Jaime (b)(6) @SEC.GOV>; Lu, Diem-Mi (b)(6) @SEC.GOV>; Marinaro, Jaime (b)(6) @sec.gov>; Martin, Brenda J. (b)(6) @SEC.GOV>; McFadden, Elizabeth (b)(6) @SEC.GOV>; Middlebrooks, William (b)(6) @SEC.GOV>; Morse, Mika (b)(6) @SEC.GOV>; Moseley, Tiffany (b)(6) @SEC.GOV>; Nada, Basmah (b)(6) @SEC.GOV>; Niazi, Shehzad (Shaz) (b)(6) @SEC.GOV>; Ostrom, Samantha J. (b)(6) @SEC.GOV>; O'Sullivan, Claire (b)(6) @SEC.GOV>; Pagon Marchena, Claudia (b)(6) @SEC.GOV>; Peirce, Hester (b)(6) @SEC.GOV>; Percival, Heather (b)(6) @SEC.GOV>; Pokorny, Jenna (b)(6) @SEC.GOV>; Rao, Sai (b)(6) @SEC.GOV>; Roper, Barbara (b)(6) @SEC.GOV>; Schneider, Scott (b)(6) @SEC.GOV>; Sigmund, Cecilia (b)(6) @SEC.GOV>; Simon, Ammon (b)(6) @SEC.GOV>; Sojka, Sandra (b)(6) @SEC.GOV>; Songer, Jennifer H (b)(6) @SEC.GOV>; Steinberg, Kathryn (b)(6) @SEC.GOV>; Stone, Matthew (b)(6) @SEC.GOV>; Sutaria, Ajay (b)(6) @SEC.GOV>; Suthammanont, Victor (b)(6) @SEC.GOV>; Uyeda, Mark T (b)(6) @sec.gov>; Vetter, Benjamin (b)(6) @SEC.GOV>
**Subject:** Norman et al - MMTLP - ES162279

Good Morning,

Assigned: TM
Action: Chair's signature

Thanks,

Sergio E. Gonzalez
Management and Program Analyst
Office of the Secretary
OFFICE (b)(6)
MOBILE
(b)(6)                    @sec.gov



**U.S. Securities and
Exchange Commission**

# Congress of the United States

## Washington, DC 20510

December 22, 2023

The Honorable Gary Gensler
Chair
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549

Mr. Robert W. Cook
President & Chief Executive Officer
Financial Industry Regulatory Authority
1735 K Street NW
Washington, D.C. 20006

Dear Chairman Gensler and Mr. Cook:

We write to request that the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC) review events surrounding Meta Materials Series A preferred shares (MMTLP).

As you know, MMTLP was created during a merger between Meta Materials (MMAT) and Torchlight Energy Resources (TRCH) to provide preferred stock dividends to TRCH shareholders.[1] MMTLP shares began trading on the OTC market in 2021. In the summer of 2022, the SEC received and subsequently approved a Form S-1 and amendments to spin-off a portion of the company, Meta Materials, into a new company, Next Bridge Hydrocarbons (NBH).[2] On December 9, 2022, FINRA issued a U3 halt on trading in the company's stock, preventing shareholders from making further trades.[3] Since the halt, constituent investors have contacted Members of Congress regarding the spin-off transaction and the subsequent halt on trading. Specifically, we have received more than 40,000 letters from concerned investors.[4]

Many of our constituents have concerns regarding the circumstances surrounding the U3 halt and level of short selling in MMTLP. As you know, the securities industry is regulated by a disclosure-based regime, and transparency is paramount to FINRA's and the SEC's goals of protecting investors and ensuring market integrity. We believe it is appropriate that FINRA and

---

[1] *Securities and Exchange Commission, EDGAR*, "Torchlight Announces Payment of a Special Series A Preferred Stock Dividend, a 1:2 Reverse Stock Split and Planned Closing of the Arrangement Agreement with Meta Material, Inc." https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm (last visited Dec. 8, 2023).

[2] Press Release, Meta Materials, "Meta Materials Inc. Board of Directors Approves Planned Completion of the Spin-off of Next Bridge Hydrocarbons Inc.," https://metamaterial.com/meta-materials-inc-board-of-directors-approves-planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/ (last visited Dec. 8, 2023).

[3] Daily Notice, FINRA, "Attn: Trading and Market Making/Legal and Compliance/Operations/Systems UNIFORM PRACTICE ADVISORY (UPC # 35-22) 12/09/2022," https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf, (last visited Dec. 8, 2023).

[4] CONGRESSIONAL RESEARCH SERVICE, Meme Stock MMTLP and FINRA Trading Halt, (Aug. 21, 2023) https://www.crs.gov/Reports/IN12228.

the SEC review these market events and determine what, if any, wrongdoing may have occurred in order to dispel misinformation and properly safeguard investors.

Please provide a response to the following questions and requests no later than January 31, 2024:

1. Provide a timeline of trading of MMTLP on the OTC markets; the actions taken by the SEC, self-regulatory organizations, the issuers, the transfer agent, and any other relevant parties during the time MMTLP was traded; and the transaction that produced Next Bridge Hydrocarbon shares.

2. The Former CEO of Torchlight Energy Resources stated that "MMTLP was never designed to trade."[5] Please provide a detailed explanation, including the relevant statutory authority and procedures, that allowed for MMTLP shares to trade on the OTC market.

3. Provide the relevant statutory authority, jurisdiction, and adherence to established industry standards regarding the U3 trading halt of MMTLP issued on December 9, 2022.

4. Provide the exact date and circumstances surrounding FINRA's determination to implement the U3 halt, including all unredacted communications between FINRA, SEC, governmental agencies, any outside organizations, FINRA members and non-FINRA members, and any other individuals. Also include all information surrounding the SEC or FINRA's knowledge of the share price in any public or non-public exchange before issuance of the U3 halt.

5. Provide the first date and time that FINRA or its agents advised any market participant in any manner that MMTLP would no longer trade on December 9, 2022. Include any relevant documents or communication.

6. Did FINRA issue a Blue Sheet request for MMTLP during the period of October 2021 through December 2022? Why or why not?

7. How many questions, complaints, and/or inquiries have you received regarding MMTLP?

8. Provide the statutory or legal justification used by the SEC and FINRA to ignore public requests and congressional inquiries regarding MMTLP.

9. Provide the delivery of a certified audited and consolidated count of shares that were held by all U.S. and foreign financial institutions, together with their clearing firm counter-brokers including trades not reported in the consolidated audit trail (CAT), related to MMTLP on the date of December 12, 2022. Please include all shares/holdings of long and short positions, as well as IOUs held by each participating broker and market participant as record owner, beneficial owner, or in any other capacity (each reported separately) including but not limited to: all shares registered at AST, all shares held in

---

[5] Brandon Kochkodin, *MMTLP: The Wild Saga of the Meme Stock That's Left Thousands of Shareholders with Noting,* Forbes Middle East, (Apr. 27, 2023) https://www.forbesmiddleeast.com/money/markets/mmtlp-the-wild-saga-of-the-meme-stock-thats-left-thousands-of-shareholders-with-nothing.

U.S. broker dealers, all shares held offshore that were traded and never settled through the appropriate clearing channels, and the ability to provide the location associated with each short position identified above.

10. Have all MMTLP shareholders received their NBH shares?

11. In your view, did MMTLP investors knowingly enter into a risk-taking transaction with full understanding of material information and without misleading guidance from social media or elsewhere? For example, the SEC has charged social media influencers with manipulation schemes in the past.[6]

12. In your view, are there better ways to provide transparency and clarity regarding risk disclosures that could enhance market integrity and reduce market disruptions? For example, retail investors and experts (e.g., OTC Markets Group's vice president) were reportedly confused about MMTLP's final trading date.[7] As such, investors may not have been able to optimize their investment decisions.

13. Do you have evidence to suggest the existence of fraud and manipulation related to MMTLP transactions, such as illegal forms of naked shorts and counterfeit shares, that could distort the market?

14. Have you seen any indications of insider trading and/or pump and dump related to MMTLP transactions?

15. Are your organizations willing to work with NBH to determine a resolution for existing shareholders? For example, some investors have expressed concern that, even though their brokerage account statements include shares of NBH in their account, these shares may not have actually been delivered to their broker-dealers.

16. Identify any regulatory or legislative gaps that should be addressed to ensure the SEC, FINRA, and other regulated entities may better protect investors and strengthen market integrity.

We look forward to your response. Thank you for your attention to this important matter.

Sincerely,

Ralph Norman
Member of Congress

Pete Sessions
Member of Congress

---

[6] Press Release, Securities and Exchange Commission, "SEC Charges Eight Social Media Influencers in $100 Million Stock Manipulation Scheme Promoted on Discord and Twitter," (last visited December 8, 2023).
[7] *Supra*, note 5.

Bill Posey
Member of Congress

Alex Mooney
Member of Congress

Bryan Steil
Member of Congress

Mike Flood
Member of Congress

Bryon Donalds
Member of Congress

Erin Houchin
Member of Congress

Barry Loudermilk
Member of Congress

Scott Fitzgerald
Member of Congress

William Timmons
Member of Congress

Warren Davidson
Member of Congress

Michael V. Lawler
Member of Congress

John Rose
Member of Congress

Andy Ogles
Member of Congress

Marcy Kaptur
Member of Congress

Jeff Van Drew
Member of Congress

Raul M. Grijalva
Member of Congress

Joe Wilson
Member of Congress

Delia Ramirez
Member of Congress

Stephanie Bice
Member of Congress

Betty McCollum
Member of Congress

Ron Estes
Member of Congress

Linda T. Sánchez
Member of Congress

Mike Ezell
Member of Congress

Darren Soto
Member of Congress

John Rutherford
Member of Congress

Bill Johnson
Member of Congress

Eli Crane
Member of Congress

Daniel Webster
Member of Congress

ES162279

Troy E. Nehls
Member of Congress

Jeff Duncan
Member of Congress

Russell Fry
Member of Congress

Brian Fitzpatrick
Member of Congress

Lisa McClain
Member of Congress

Andy Harris, M.D.
Member of Congress

Andy Biggs
Member of Congress

Tim Walberg
Member of Congress

Diana Harshbarger
Member of Congress

Virginia Foxx
Member of Congress

Randy Feenstra
Member of Congress

Randy Weber
Member of Congress

Adrian Smith
Member of Congress

Scott Franklin
Member of Congress

ES162279

Marc Molinaro
Member of Congress

John Moolenar
Member of Congress

Paul A. Gosar, D.D.S.
Member of Congress

Doug Lamborn
Member of Congress

Nancy Mace
Member of Congress

Barry Moore
Member of Congress

Victoria Spartz
Member of Congress

Carlos A. Gimenez
Member of Congress

Beth Van Duyne
Member of Congress

Nick Langworthy
Member of Congress

Earl L. "Buddy" Carter
Member of Congress

Mike Carey
Member of Congress

Nicole Malliotakis
Member of Congress

Lance Gooden
Member of Congress

ES162279

Gus M. Bilirakis
Member of Congress

John Joyce
Member of Congress

James Comer
Member of Congress

Maria Elvira Salazar
Member of Congress

Cory Mills
Member of Congress

W. Gregory Steube
Member of Congress

Matthew M. Rosendale
Member of Congress

Claudia Tenney
Member of Congress

Matt Gaetz
Member of Congress

Jenniffer Gonzalez-Colon
Member of Congress

August Pfluger
Member of Congress

Nick LaLota
Member of Congress

Rich McCormick, MD, MBA
Member of Congress

Jen Kiggans
Member of Congress

Max Miller
Member of Congress

| | |
|---|---|
| **From:** | Chair |
| **Sent:** | Fri, 31 Mar 2023 10:00:37 -0400 |
| **To:** | Help (OIEA Investor Complaints) |
| **Subject:** | FW: Please reply, concerned investor |

**From:** (b)(6)
**Sent:** Friday, March 31, 2023 10:07 AM
**Subject:** Please reply, concerned investor

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

# The halt in trading MMTLP by FINRA was unfair to retail investors and disrupted the normal functioning of the market. Trading needs to reopen to allow for buy-to-close positions only trading to clear up the short shares that exist.

Shorts can not exist in a private company. By issuing an U3 Halt on M.M.T.L.P that is moving to a private company, you essentially locked everyone including short positions. We now have a large share imbalance that needs to be reconciled to go into the allocated 165 million shares.

We know short positions DO EXIST and remain OPEN as confirmed by (b)(6) (b)(6) (CEO of OTC Markets) via his tweet on Feb 6 "The ongoing question is how do short position holders resolve their liability for the Next Bridge common stock if it is not easily transferable or tradable publicly?"

So I would like to ask if you are aware of a potential market emerging in the near future where short positions will be able to cover. And at the same time, will I be able to liquidate my long position in this security if I choose to? If not, how will shorts that (b)(6) admitted existing be reconciled? Who is creating and telling each broker what placeholder identifier number to use? Why are these placeholder identifiers being used to group brokerages that have no affiliation with one another?

Again, you can't take short shares into a private company. The failure to enforce existing rules, such as Rule 203(b)(3) of Regulation SHO and FINRA Rule 4320, has led to an ongoing state of limbo for shareholders, who have

not been made whole despite the lengthy filing process and approval of the S1 by the SEC.

We call for a thorough investigation into the events surrounding MMTLP and the failure to enforce existing rules. It is crucial that the rights of retail investors are protected in the stock market and that fair and equitable markets are maintained for all investors.

Please advise ASAP as to when I should expect corporate action or a news release.

**From:**      Chair
**Sent:**      Thu, 30 Mar 2023 10:55:48 -0400
**To:**        Help (OIEA Investor Complaints)
**Subject:**   FW: Shareholder Question

**From:** (b)(6)
**Sent:** Thursday, March 30, 2023 10:54 AM
**To:** CommissionerPeirce <CommissionerPeirce@SEC.GOV>; Chair <chair@sec.gov>;
CommissionerCrenshaw <CommissionerCrenshaw@SEC.GOV>; CommissionerUyeda
<CommissionerUyeda@SEC.GOV>; CommissionerLizarraga <CommissionerLizarraga@SEC.GOV>
**Subject:** Shareholder Question

**CAUTION:** This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

I am a shareholder in MMTLP which was halted by FINRA in December, which I am sure you
are aware of. Can you please tell me what is happening to resolve this? My money
is frozen!.
Thanks

(b)(6)

11650 Lantern Road Suite C
Fishers, IN 46038
888-359-3040  Fax: 317-401-8008
AssuranceFuneralFunding.com

NOTICE OF CONFIDENTIALITY: This email message and any attachments is of a confidential nature and is protected by
the attorney/client privilege, specific client and agent privileges as well as any other applicable privileges specific or implied. The
contents and attachments are considered non-public information. It is intended to be conveyed only to the designated recipient(s).
If you have received this message in error or are an unintended recipient, please notify the sender by replying to this message and
then deleting it from your system. Use, dissemination, reproduction or other distribution of this message or its attachments is not
authorized and may be unlawful.

| From: | Chair |
|---|---|
| Sent: | Fri, 14 Jul 2023 12:57:42 +0000 |
| To: | Help (OIEA Investor Complaints) |
| Subject: | FW: Urgent Call for Action: FINRA unfair trading halt of MMTLP |

**From:** (b)(6)
**Sent:** Thursday, July 13, 2023 7:59 PM
**To:** enforcements@sec.gov; Chair <chair@sec.gov>; CommissionerPeirce
<CommissionerPeirce@SEC.GOV>; CommissionerCrenshaw <CommissionerCrenshaw@SEC.GOV>;
CommissionerUyeda <CommissionerUyeda@SEC.GOV>; CommissionerLizarraga
<CommissionerLizarraga@SEC.GOV>; TradingAndMarkets <TradingAndMarkets@SEC.GOV>
**Subject:** Re: Urgent Call for Action: FINRA unfair trading halt of MMTLP

**CAUTION:** This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

Dear Chair Gary Gensler,
Dear SEC Commissioners,
Dear SEC Enforcement Department,

I hope this email finds you well. I am writing to follow up on my previous correspondence
regarding the trading halt of the preferred shares of MMTLP. Unfortunately, I have not received
any response or indication of action taken for over six months.

Therefore, I urgently and respectfully request an update on the measures taken by the SEC in
response to this case. I would greatly appreciate information regarding whether an investigation
has been initiated and, if so, the progress made thus far. Additionally, I seek clarification on the
actions, if any, that have been taken against the parties involved in imposing the trading halt on
MMTLP.

Furthermore, I kindly request details on the progress made towards lifting the trading halt on
MMTLP. It is crucial that affected investors have the opportunity to exercise their right to
withdraw from this position. I seek reassurance that steps are being taken to ensure a fair and
transparent process for investors.

I wholeheartedly appreciate your attention to this matter and your unwavering commitment to
protecting investor interests and upholding market integrity. Given the urgency of the situation, I
kindly request a prompt response that provides an update on the actions taken by the SEC to
address the concerns raised.

Thank you for your time and consideration.

Sincerely,

(b)(6)

On Fri, Jun 9, 2023 at 5:34?PM (b)(6)                                    wrote:
Dear Chair Gary Gensler,
Dear SEC Commissioners,
Dear SEC enforcement department,

I hope this email finds you in good health. As an international investor, I am writing to urgently
draw your attention to a matter of utmost importance that deeply concerns me and many others
who invest in the U.S. stock market. Recent events have raised doubts regarding the protection of
investor interests and the enforcement of market principles, thereby posing a significant threat to
the integrity of our capital markets.

The United States has long been regarded as a global financial powerhouse, admired for the
stability and opportunities provided by its capital markets. However, recent occurrences have
shaken this perception and undermined the confidence of both domestic and international
investors in the fairness and transparency of these markets.

As an international investor, the decision to allocate capital to any market depends heavily on the
existence of robust regulatory frameworks, diligent oversight, and an unwavering commitment to
upholding market integrity. Trust in the integrity of capital markets is of paramount importance
as it directly influences the allocation of global investments.

Therefore, I implore you, in your capacity as the Chairman of the U.S. Securities and Exchange
Commission (SEC), and the Enforcement Division, to prioritize the protection of investor
interests and the enforcement of market regulations. By diligently overseeing and enforcing
regulatory measures, you will not only safeguard the rights and interests of domestic investors
but also send a resolute message to international investors that the United States remains
steadfast in upholding the highest standards of market integrity.

I would like to bring to your attention a specific case that exemplifies the urgent need for action.
On December 9th, 2022, the Financial Industry Regulatory Authority (FINRA) abruptly halted
trading of the preferred shares of MMTLP, which were distributed as a dividend to TRCH
shareholders prior to its merger with MMAT. This sudden and unjustified halt prevented retail
investors, including myself, from exercising our right to exit our positions, thereby eroding the
foundations of fair and open markets upon which the U.S. stock market is built.

Despite making multiple attempts to address this matter with the SEC, no action has been taken
for over six months. This prolonged lack of oversight and accountability of FINRA and market
participants further exacerbates the concerns of investors affected by this unlawful trading halt.

Therefore, I respectfully implore you and the SEC Enforcement Division to exercise your
authority to promptly investigate this case and take appropriate action against FINRA. It is
imperative that the trading halt on MMTLP be immediately lifted, enabling investors to exercise
their right to withdraw from this position. The continuation of this unjustified trading halt has

immobilized our funds, rendering us unable to exit our positions and causing significant financial distress.

I wholeheartedly appreciate your prompt attention to this matter and your unwavering commitment to protecting investor interests and upholding market integrity. I trust that you will address these concerns and work diligently to rectify the situation, ensuring a positive resolution that restores confidence and maintains the principles of fairness, transparency, and investor protection.

Thank you for your time and consideration.

Sincerely,

(b)(6)

(b)(6)

Please do not print this email unless it is necessary. Every unprinted email helps the environment.

| | |
|---|---|
| **From:** | Chair |
| **Sent:** | Fri, 9 Jun 2023 17:20:35 +0000 |
| **To:** | Help (OIEA Investor Complaints) |
| **Subject:** | FW: Urgent Call for Action: FINRA unfair trading halt of MMTLP |

**From:** (b)(6)
**Sent:** Friday, June 9, 2023 11:35 AM
**To:** enforcements@sec.gov; Chair <chair@sec.gov>; CommissionerPeirce <CommissionerPeirce@SEC.GOV>; CommissionerCrenshaw <CommissionerCrenshaw@SEC.GOV>; CommissionerUyeda <CommissionerUyeda@SEC.GOV>; CommissionerLizarraga <CommissionerLizarraga@SEC.GOV>; TradingAndMarkets <TradingAndMarkets@SEC.GOV>
**Subject:** Urgent Call for Action: FINRA unfair trading halt of MMTLP

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Chair Gary Gensler,
Dear SEC Commissioners,
Dear SEC enforcement department,

I hope this email finds you in good health. As an international investor, I am writing to urgently draw your attention to a matter of utmost importance that deeply concerns me and many others who invest in the U.S. stock market. Recent events have raised doubts regarding the protection of investor interests and the enforcement of market principles, thereby posing a significant threat to the integrity of our capital markets.

The United States has long been regarded as a global financial powerhouse, admired for the stability and opportunities provided by its capital markets. However, recent occurrences have shaken this perception and undermined the confidence of both domestic and international investors in the fairness and transparency of these markets.

As an international investor, the decision to allocate capital to any market depends heavily on the existence of robust regulatory frameworks, diligent oversight, and an unwavering commitment to upholding market integrity. Trust in the integrity of capital markets is of paramount importance as it directly influences the allocation of global investments.

Therefore, I implore you, in your capacity as the Chairman of the U.S. Securities and Exchange Commission (SEC), and the Enforcement Division, to prioritize the protection of investor interests and the enforcement of market regulations. By diligently overseeing and enforcing regulatory measures, you will not only safeguard the rights and interests of domestic investors but also send a resolute message to international investors that the United States remains steadfast in upholding the highest standards of market integrity.

I would like to bring to your attention a specific case that exemplifies the urgent need for action.

On December 9th, 2022, the Financial Industry Regulatory Authority (FINRA) abruptly halted trading of the preferred shares of MMTLP, which were distributed as a dividend to TRCH shareholders prior to its merger with MMAT. This sudden and unjustified halt prevented retail investors, including myself, from exercising our right to exit our positions, thereby eroding the foundations of fair and open markets upon which the U.S. stock market is built.

Despite making multiple attempts to address this matter with the SEC, no action has been taken for over six months. This prolonged lack of oversight and accountability of FINRA and market participants further exacerbates the concerns of investors affected by this unlawful trading halt.

Therefore, I respectfully implore you and the SEC Enforcement Division to exercise your authority to promptly investigate this case and take appropriate action against FINRA. It is imperative that the trading halt on MMTLP be immediately lifted, enabling investors to exercise their right to withdraw from this position. The continuation of this unjustified trading halt has immobilized our funds, rendering us unable to exit our positions and causing significant financial distress.

I wholeheartedly appreciate your prompt attention to this matter and your unwavering commitment to protecting investor interests and upholding market integrity. I trust that you will address these concerns and work diligently to rectify the situation, ensuring a positive resolution that restores confidence and maintains the principles of fairness, transparency, and investor protection.

Thank you for your time and consideration.

Sincerely,

(b)(6)

**From:** (b)(6)
**Sent:** Sun, 21 Jul 2024 23:50:01 +0000
**To:** Burris, Kevin
**Cc:** Bailey, Lily
**Subject:** Norman letter

Kevin,

I approve the reply to Norman, et al. letter re MMTLP.

Gary

1. **Responses to Congressional Letters (K. Burris)**
   a. *Norman et al - MMTLP Investigation - ES162456*
   b. Norman et al - MMTLP Investigation - ES162456 – Response

(b)(5)

**From:** (b)(6)
**Sent:** Wed, 12 Apr 2023 23:34:23 +0000
**To:** Burris, Kevin
**Subject:** RE: Brief Book 4/13 Thursday

Kevin,

I approve the McHenry letter (b)(5)
(b)(5)

Gary

**From:** Nagashunmugam, Minu (b)(6)  ⊅SEC.GOV>
**Sent:** Wednesday, April 12, 2023 6:00 PM
**To:** (b)(6)  ⊅SEC.GOV>
**Cc:** Barbero, Megan (b)(6)  ⊅SEC.GOV>; Burris, Kevin (b)(6)  ⊅SEC.GOV>; Fischer, Amanda (b)(6)  ⊅SEC.GOV>; Fischer, YJ (b)(6)  ⊅SEC.GOV>; Frayer, Corey (b)(6)  ⊅SEC.GOV>; Havenstein, Philipp (b)(6)  ⊅SEC.GOV>; Huntley, Anna C (b)(6)  ⊅SEC.GOV>; Johnson, Aisha (b)(6)  ⊅SEC.GOV>; Klemmer, Corey (b)(6)  ⊅SEC.GOV>; Krawitz, Jacob D. (b)(6)  ⊅sec.gov>; Morse, Mika (b)(6)  ⊅SEC.GOV>; Ostrom, Samantha J. (b)(6)  ⊅SEC.GOV>; Percival, Heather (b)(6)  ⊅SEC.GOV>; Pokorny, Jenna (b)(6)  ⊅SEC.GOV>; Roper, Barbara (b)(6)  ⊅SEC.GOV>; Schneider, Scott (b)(6)  ⊅SEC.GOV>; Slavkin Corzo, Heather (b)(6)  ⊅SEC.GOV>; Stone, Matthew (b)(6)  ⊅SEC.GOV>; Sutaria, Ajay (b)(6)  ⊅SEC.GOV>; Suthammanont, Victor (b)(6)  ⊅SEC.GOV>; Wachter, Jessica (b)(6)  ⊅SEC.GOV>; Nagashunmugam, Minu (b)(6)  ⊅SEC.GOV>
**Subject:** Brief Book 4/13 Thursday

Gary - Here are your Thursday brief book materials.

**THURSDAY BRIEF BOOK**
(b)(5)

(b)(5)

**Minu Nagashunmugam**
*Special Assistant to the Chief of Staff*
Office of Chair Gary Gensler | U.S. Securities and Exchange Commission

(b)(6)

**From:** (b)(6)
**Sent:**       Sat, 23 Dec 2023 19:40:14 +0000
**To:**         Burris, Kevin
**Cc:**         Bailey, Lily
**Subject:**    RE: Congressional mail 12/22 briefing book

Thx. (b)(5)

(b)(5)

**From:** Burris, Kevin (b)(6) ⊅SEC.GOV>
**Sent:** Saturday, December 23, 2023 2:28 PM
**To:** (b)(6) ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6) ⊅SEC.GOV>
**Subject:** Re: Congressional mail 12/22 briefing book

Thanks, Gary. (b)(5)
(b)(5)

**From:** (b)(6) ⊅SEC.GOV>
**Sent:** Saturday, December 23, 2023 1:11:32 PM
**To:** Burris, Kevin (b)(6) ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6) ⊅SEC.GOV>
**Subject:** Congressional mail 12/22 briefing book

Kevin,

I approve (b)(5) , the following Congressional correspondence:

1. **Congressional Response Letters (K. Burris, OLIA)**
   a. *Braun-Carper - CASES Act - ES162184 – Response*
   b. *Gonzalez - FINRA decision on MMTLP - ES162228 – Response*
   c. *Warren et al - Lobbying Disclosure - ES162226 – Response*

(b)(5)

Gary

**From:**        (b)(6)
**Sent:**        Sun, 17 Mar 2024 18:16:30 +0000
**To:**          Burris, Kevin
**Cc:**          Bailey, Lily
**Subject:**     Re: Congressional mail

I'm glad to find time later today to talk with you.  I've got some suggestions
**From:** Burris, Kevin (b)(6)    ⊅SEC.GOV>
**Sent:** Sunday, March 17, 2024 2:12:54 PM
**To:** (b)(6)    ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊅SEC.GOV>
**Subject:** Re: Congressional mail

I'll check their availability now.
**From:** (b)(6)    ⊅SEC.GOV>
**Sent:** Sunday, March 17, 2024 2:11:55 PM
**To:** Burris, Kevin (b)(6)    ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊅SEC.GOV>
**Subject:** Re: Congressional mail

Let's talk Sunday
**From:** Burris, Kevin (b)(6)    ⊅SEC.GOV>
**Sent:** Saturday, March 16, 2024 1:36:57 PM
**To:** (b)(6)    ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊅SEC.GOV>
**Subject:** Re: Congressional mail

Thanks, Gary. (b)(5)
(b)(5)

Do you want me to try to schedule a meeting on Monday with me, you, Lisa Helvin and Dave
Leviss (b)(5)            ?
**From:** (b)(6)    ⊅SEC.GOV>
**Sent:** Saturday, March 16, 2024 1:26:36 PM
**To:** Burris, Kevin (b)(6)    ⊅SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊅SEC.GOV>
**Subject:** Congressional mail

Kevin,

I approve (b)(5)            the first 2 letters:

    1. Desaulier – MMTLP
    2. Himes - ADF

On the 3rd (b)(5)        let's discuss.

Gary

1. **Congressional Letters for Review (OLIA)**
   a. DeSaulnier - MMTLP - ES162287
   b. DeSaulnier - MMTLP - ES162287 (Response)
   c. Himes - ADF - ES162296
   d. Himes - ADF - ES162296 (Response)

(b)(5)

| | |
|---|---|
| **From:** | (b)(6) |
| **Sent:** | Sun, 10 Mar 2024 14:30:27 +0000 |
| **To:** | Burris, Kevin |
| **Cc:** | Bailey, Lily |
| **Subject:** | RE: Congressional mail |

Kevin,

I approve replies to:

1. Morelle – MMTLP
2. Sherman / Ogles – trading in Oct 2023
3. Wyden – Near Intelligence

Gary

1. **Congressional Letters for Review (OLIA)**
   a. *Morelle - MMTLP - ES162330*
   b. *Morelle - MMTLP - ES162330 (Response)*
   c. *Ogles-Sherman - Trading during war time - ES162327*
   d. *Ogles-Sherman - Trading during war time - ES162327 (Response)*
   e. *Wyden - Near Intelligence - ES162335*
   f. *Wyden - Near Intelligence - ES162335 (Response)*

(b)(5)

**From:** (b)(6)
**Sent:** Sat, 23 Sep 2023 23:37:07 +0000
**To:** Burris, Kevin
**Cc:** Bailey, Lily; Fischer, Amanda
**Subject:** RE: Congressional replies

Kevin,

I approve, with modifications as in SharePoint the following reply letters:

1. **Congressional Letters and Responses (K. Burris, OLIA)**
   a. *Tuberville-Banks - Webull and MooMoo - ES161955 and Tuberville Joint Letter - Prometheum - ES161999 – Response*
   b. *Sessions et al - MMTLP - ES162059 – Response*
   c. *Sessions-Gottheimer - MiFID - ES162151 – Response*
   d. *Sherman - GBTC - ES161967 – Response*
   e. *Tuberville et al - Prometheum - ES162037 – Response*
   f. *Young - PRC - ES162017 – Response*

Gary

**From:** (b)(6)
**Sent:** Thu, 2 Jan 2025 20:04:27 +0000
**To:** Burris, Kevin
**Subject:** RE: Letter

Kevin,

I approve the Sessions reply letter re MMTLP.

Gary

**From:** Burris, Kevin (b)(6) ⦆SEC.GOV>
**Sent:** Thursday, January 2, 2025 2:50 PM
**To:** (b)(6) ⦆SEC.GOV>
**Subject:** Letter

Hi Gary,

The attached congressional response letter will be in your evening book later today.

Best,
Kevin

**From:**          (b)(6)
**Sent:**          Sun, 24 Dec 2023 18:03:34 +0000
**To:**            Burris, Kevin
**Cc:**            Bailey, Lily
**Subject:**       Wagner reply


Kevin,

(b)(5)


Gary

**From:** Burris, Kevin (b)(6)    ⊃SEC.GOV>
**Sent:** Saturday, December 23, 2023 2:28 PM
**To:** (b)(6)    ⊃SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊃SEC.GOV>
**Subject:** Re: Congressional mail 12/22 briefing book

Thanks, Gary. (b)(5)
(b)(5)


**From:** (b)(6)    ⊃SEC.GOV>
**Sent:** Saturday, December 23, 2023 1:11:32 PM
**To:** Burris, Kevin (b)(6)    ⊃SEC.GOV>
**Cc:** Bailey, Lily (b)(6)    ⊃SEC.GOV>
**Subject:** Congressional mail 12/22 briefing book

Kevin,

I approve (b)(5)                          the following Congressional correspondence:


   1. **Congressional Response Letters (K. Burris, OLIA)**
        a. *Braun-Carper - CASES Act - ES162184 – Response*
        b. *Gonzalez - FINRA decision on MMTLP - ES162228 – Response*
        c. *Warren et al - Lobbying Disclosure - ES162226 – Response*

(b)(5)


Gary