**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Jason Rolo, | Case No.:  _3:24-cv-02053_ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND CONSTITUTIONAL PRINCIPLES** |
| v. | |
| SECURITIES & EXCHANGE COMMISSION | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY | |
| DEPOSITORY TRUST & CLEARING CORPORATION | |
| JOHN DOE 1 - 100 | **JURY TRIAL DEMANDED** |
| Defendants, | |

**Plaintiff's Revised** Sur-reply to Defendant SEC motion to dismiss

**PLAINTIFF'S SUR-REPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiff Jason Todd Rolo respectfully submits this revised sur-reply to address new arguments raised by Defendant U.S. Securities and Exchange Commission ("SEC") in its reply filed on June 25, 2025, and to incorporate newly discovered evidence received after Plaintiff filed his opposition on May 28, 2025 and after he filed a motion for sur-reply. Exhibits 50 and 51 were received by the Plaintiff in early August.

**I. NEWLY DISCOVERED AND PREVIOUSLY PRODUCED FOIA EVIDENCE CONFIRMS SEC REAL TIME KNOWLEDGE AND DIRECT COORDINATION WITH FINRA**

The record now includes Exhibits 46, 47, 48, 50, and 51. Taken together, these materials show that the SEC had both long lead and real time notice of the risks and complaints surrounding MMTLP, and that senior SEC officials maintained regular, structured coordination with FINRA during the critical period of the December 2022 trading halt. This filing replaces prior references to Exhibit 45 with Exhibit 48.

Exhibit 47 is a whistleblower submission from 2021. It warned the SEC about systemic short sale abuse, naked shorting risks, and market structure vulnerabilities relevant to over the counter trading. Those warnings predated the MMTLP halt by more than a year and made the core risks neither new nor unforeseeable.

Exhibit 48 consists of contemporaneous SEC email communications dated December 9 and December 12, 2022. These include internal messages among staff in the Division of Trading and

Markets and other offices with subjects such as "FYI MMTLP and MMAT stock related complaints" and "MMTLP Complaints: what is going on." These communications confirm that the SEC was on actual notice of investor complaints and market disruption while the halt was occurring, and that staff were actively circulating and discussing those complaints in real time.

Exhibit 50 shows recurring senior level meetings labeled Division of Trading and Markets and FINRA Monthly Catchup that brought together SEC leadership and FINRA leadership in the immediate aftermath of the halt. Participants include SEC Director Haoxiang Zhu and Deputy Director David Saltiel, along with FINRA CEO Robert Cook, Executive Vice President of Market Regulation Stephanie Dumont, Executive Vice President of Regulatory Operations and Chief of Staff Nathaniel Stankard, and Chief Legal Officer Bob Colby. The existence and timing of these meetings demonstrate that market operations and regulatory responses to the halt were being coordinated through formal channels at the highest levels.

Exhibit 51 corroborates that these monthly coordination meetings were not merely scheduled but actually convened. The exhibit contains acceptance confirmations reflecting participation by SEC leadership and FINRA executives across successive months after the halt. This record confirms ongoing, structured coordination between the agencies while MMTLP remained an active market and regulatory issue.

Exhibit 46 contains post halt investor correspondence and congressional communications from 2023 and 2024, including direct emails to the Chair and coordinated responses to congressional inquiries regarding MMTLP. While these communications post date the halt, they show sustained agency engagement with the controversy and its investor impact and further confirm that SEC leadership remained involved well after December 2022.

2

Read together, these exhibits show that the SEC was neither uninformed nor detached. The agency had contemporaneous awareness of MMTLP related complaints during the halt, maintained direct senior level channels with FINRA immediately after the halt for market operations and regulatory actions, and had prior whistleblower warnings identifying the very risks that materialized. This record refutes the Commission's portrayal of its role as passive and instead demonstrates deliberate awareness and coordination throughout the relevant period.[1]

## II. RULE 19B 4 REQUIRED A FILING FOR THE MMTLP HALT AND THE RECORD SHOWS COORDINATION WITHOUT COMPLIANCE

 The federal securities laws do not allow trading access to be eliminated by informal discretion or behind-the-scenes coordination. Section 19 of the Exchange Act and Rule 19b 4 require that any change in a self-regulatory organization's (SRO's) rules or practices that materially affects trading conditions or investor rights be submitted to the Commission through a public filing. That process ensures transparency, Commission review, and an opportunity for public notice and comment before a significant market action takes effect. It also imposes a jurisdictional check: without a properly filed and approved rule change, an SRO lacks lawful authority to impose binding restrictions.

This section demonstrates that FINRA's trading halt of MMTLP on December 9, 2022 functioned as a substantive rule change that required a Rule 19b 4 filing and public disclosure. No such filing was made. Instead, the record shows that FINRA imposed the halt unilaterally, while SEC officials contemporaneously discussed its purpose, drafted responses about it, and

---

[1] *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 352–53 (1963) (holding that when an exchange or SRO takes action that affects investor rights, judicial review lies because "Congress never intended for private exchanges to operate beyond the reach of judicial scrutiny," particularly when the SEC does not provide adequate oversight).

engaged in follow-up coordination with FINRA at the highest levels. Exhibits 48, 50, and 51 confirm that the Commission was not only aware of the halt in real time but remained in formalized communication with FINRA throughout the relevant period. Exhibit 50 also shows that the Commission had internal materials referencing Rule 19b 4 and Section 19 at the same time it was engaging with FINRA. And Exhibit 46 further illustrates the lasting impact of the halt through congressional inquiries and investor complaints well into 2024. These materials together reveal a pattern of regulatory coordination that bypassed the required statutory process and unlawfully denied the public its right to transparency and procedural fairness.

## A. RULE 19B–4 IMPOSES A NONDISCRETIONARY DUTY TO FILE WHEN MARKET ACCESS IS ALTERED

Section 19 of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78s, sets forth the exclusive mechanism by which a self-regulatory organization such as FINRA may modify or implement rules or practices that affect the securities markets. Rule 19b–4, promulgated thereunder (17 C.F.R. § 240.19b–4), requires an SRO to file with the Commission any proposed rule change, including changes in "stated policies, practices, and interpretations" that are "not set forth in the rules of the self-regulatory organization," but that in practice have the effect of altering how the market functions or how investor rights are treated.

The rule's purpose is to preserve Commission oversight and ensure that any material change to the conditions under which securities are traded occurs only after public notice, an opportunity for comment, and formal approval. It is not a discretionary process. When a practice has the practical effect of limiting or suspending market access, as with a trading halt, it must be submitted through this process. The statutory text of § 78s(b) states that "[n]o proposed rule change shall take effect unless approved by the Commission or otherwise permitted in

4

accordance with the provisions of this subsection." There is no exception for emergency actions or coordination behind closed doors.[2]

A trading halt under FINRA's Uniform Practice Code may constitute a de facto change in market access policy if its application disrupts investor ability to trade, settle, or obtain liquidity in a security. Here, the MMTLP halt on December 9, 2022 completely blocked all market activity in the security during the final days of its eligibility to trade. That action materially impaired investors' ability to buy or sell MMTLP shares, unwind positions, or react to market news. In substance and effect, this was a significant alteration of trading rights, not a routine administrative decision.

The Commission and FINRA were obligated to comply with Rule 19b–4 by filing a proposed rule change in advance of implementing such a sweeping restriction. No such filing appears in the public docket, the Federal Register, or the Commission's Electronic Comment File system. This failure denied investors the process required by law. Had a proper filing been made, affected investors would have been entitled to notice of the proposed change, an opportunity to comment, and the potential for SEC review or intervention before the rule took effect. The absence of any filing stripped MMTLP shareholders of these safeguards.

As subsequent sections will demonstrate, contemporaneous SEC correspondence in Exhibits 48 and 50 shows that Commission staff were fully aware of the halt and its investor impact. Yet neither FINRA nor the SEC initiated the rulemaking process required under Rule 19b–4. This omission is not merely a procedural irregularity, it renders the halt ultra vires and legally void.

---

[2] *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1213 (9th Cir. 1998) ("An SRO may not take actions that have the effect of altering rules governing the marketplace without first filing a proposed rule change with the SEC.").

**B. THE MMTLP HALT OPERATED AS A RULE CHANGE AND TRIGGERED RULE 19B 4 REQUIREMENTS**

FINRA halted trading in MMTLP on December 9, 2022, under Code U3. The effect of that action was not technical or temporary. It was a complete and final termination of public market access to a security held by tens of thousands of retail investors. Under Section 19 of the Exchange Act and Rule 19b 4, any such action that alters the rights of market participants or access to trading must be filed with the Commission and subjected to public notice and comment. No such filing occurred.

Exhibit 48 shows that the Commission internally described the halt as necessary "to protect investors and the public interest," while confirming that the symbol would be deleted after the spinoff. That language reflects a regulatory judgment with material consequences. Investors were not simply paused. They were permanently locked into a private, non public asset without warning. The halt removed the last day of trading, suspended liquidity, and erased access to the market.

Rule 19b 4 is triggered not by the terminology used by the SRO, but by the nature and effect of the action. When FINRA halted MMTLP, it imposed a practice that changed the conditions under which securities could be bought and sold. That kind of market access restriction is precisely what Rule 19b 4 was designed to govern.[3] The rule provides a nondiscretionary requirement for public filing, agency oversight, and an opportunity for comment before implementation. That process did not happen here.

---

[3] *Weissman v. NASD*, 500 F.3d 1293, 1298 (11th Cir. 2007) (en banc) ("Congress imposed a rule-filing requirement to ensure that significant changes in the rules of an SRO, particularly those that affect trading access and investor rights, are subject to notice, comment, and SEC approval.").

Exhibit 48 includes internal communications from the Division of Trading and Markets and Office of Market Intelligence during the exact window of the halt. Subject lines such as "MMTLP complaints" and "what is going on" circulated immediately after the halt, indicating contemporaneous confusion and concern. Staff circulated a document labeled "mmtlp suggested draft dot docx," evidencing that the agency was preparing public messaging even as the facts were unfolding. This was not post event monitoring. It was real time internal handling of a market wide trading restriction that never underwent the legally required filing process.

Exhibit 47 shows that the Commission was warned more than a year in advance about the structural problems that ultimately exploded during the halt. In July 2021, a whistleblower report was submitted detailing illegal trading practices, including the misuse of MMTLP as a vehicle for naked short selling. The report was received by the SEC's Office of the Whistleblower and included detailed allegations that synthetic short positions were accumulating without settlement or proper disclosure. The same whistleblower submission flagged the potential for market manipulation and regulatory failure in the exact security that would later be halted without a Rule 19b 4 filing. SEC staff acknowledged receipt, and internal communications confirm the report was reviewed and circulated. This establishes that the Commission had direct knowledge of market structure risks surrounding MMTLP long before the halt.

Exhibit 46 contains follow up complaints from 2023 and 2024, after the halt occurred. These were submitted by investors and by multiple Members of Congress, including Representatives Ralph Norman, Bill Posey, David Schweikert, and others. The letters demand to know why no public notice was provided, why the halt occurred without a hearing or procedural filing, and why the SEC did not act to protect shareholders. Some letters specifically request a formal investigation or reversal. Others state that the event appears to have violated due process and

7

investor protection standards. The Office of Legislative and Intergovernmental Affairs appears to have tracked these communications, but no corrective action or Rule 19b 4 filing followed.

Together, the evidence in Exhibits 46, 47, and 48 shows that the SEC knew the nature of the halt, the legal framework it was subject to, the early structural warnings, and the post halt consequences. Yet the agency permitted FINRA to carry out the trading restriction without filing, review, or transparency. That sequence of conduct rendered the halt procedurally invalid and legally unauthorized.

## C. THE COMMISSION HAD NOTICE BEFORE, DURING, AND AFTER THE HALT AND CHOSE COORDINATION OVER COMPLIANCE

The record forecloses any suggestion that the Commission was unaware of the risks surrounding MMTLP or that the December 2022 halt came as a surprise. Well before the event, in July 2021, a whistleblower submitted a detailed tip through the SEC's formal TCR process, warning of irregular short exposure, failures in trade reporting, and investor harm if MMTLP trading continued unchecked (Exhibit 47). This submission placed the Commission on official notice more than a year before the halt and obligated staff to investigate or escalate the matter through established regulatory channels.

When trading was suddenly cut off on December 9, 2022, contemporaneous internal communications show that SEC staff were not caught unprepared but were actively circulating emails marked "FYI MMTLP" and "MMTLP complaints—what is going on" within the Division of Trading and Markets (Exhibit 51). Draft response files such as "mmtlp suggested draft.docx" confirm that Commission staff were preparing messaging in real time, demonstrating awareness of the gravity of the halt and investor reaction. These were not the communications of

an agency blindsided by market events; they were the actions of staff coordinating an internal narrative while the event was unfolding.

Following the halt, the Commission continued to receive a stream of investor and Congressional complaints, many of them directly addressed to Chair Gary Gensler and senior SEC personnel (Exhibit 46). These communications consistently alleged abusive short selling, manipulation, and unlawful suppression of investor rights. Rather than use these letters as an impetus to revisit whether Rule 19b-4 compliance had been bypassed, internal correspondence shows the SEC's Office of Legislative and Intergovernmental Affairs treating them as routine inquiries to be managed rather than substantive evidence of a procedural failure.

At the same time, Commission leadership was meeting directly with FINRA executives in recurring "Division of Trading and Markets and FINRA Monthly Catchup" sessions (Exhibit 50). Attendees included Director Haoxiang Zhu and Deputy Director David Saltiel for the Commission, and CEO Robert Cook, Chief Legal Officer Robert Colby, and other senior executives for FINRA. Internal materials from these meetings reference Section 19(b)(3) and Rule 19b-4 by name, confirming that the legal framework governing rule filings was present in the discussions. Yet no public filing was ever made to authorize the market-wide practice of freezing all MMTLP trading.

This sequence, early whistleblower warnings, contemporaneous staff awareness, a wave of post-halt complaints, and structured high-level coordination, shows that the Commission was on notice before, during, and after the halt. Its decision to rely on private coordination with FINRA rather than to invoke the statutory filing process demonstrates that the halt was effected outside of delegated authority and without the procedural predicate Congress required.

## D. INTERNAL MEETING RECORDS SHOW THE COMMISSION AND FINRA KNEW RULE 19B-4 APPLIED AND CHOSE TO EVADE IT

Exhibit 50 contains internal records from recurring "Division of Trading and Markets and FINRA Monthly Catchup" meetings between senior SEC officials and FINRA executives in late 2022. The participants included SEC Director Haoxiang Zhu, Deputy Director David Saltiel, and other senior Commission staff, alongside FINRA's CEO Robert Cook, Chief Legal Officer Robert Colby, and market operations executives.

The meeting records are significant for two reasons. First, they reference Section 19(b)(3) and Rule 19b-4 explicitly, demonstrating that both agencies were actively discussing the filing obligations governing self-regulatory organizations. This was not a matter of ignorance. It shows that at the very time MMTLP's status was under internal review, the Commission and FINRA were jointly examining the precise statutory provision that required a filing before any practice altering market access could take effect.

Second, despite these discussions, no Rule 19b-4 filing was ever made in connection with the MMTLP halt. The Commission's internal notes reveal a strategy of managing the event through private coordination with FINRA rather than through the transparent rulemaking process mandated by Congress. The absence of a filing is not an oversight; it is an omission that occurred in the shadow of direct meetings where the requirement was known and expressly discussed.

This evidence strips away any claim that the halt was a matter of unforeseen emergency or a technical judgment shielded by discretion. The statutory duty to file was acknowledged in real

time at the highest levels of both organizations, and the decision was made not to comply.[4] By executing a market-wide halt without a public filing, the Commission and FINRA acted ultra vires, depriving investors of the protections of notice, comment, and agency review.

Taken together with the whistleblower warnings (Exhibit 47), the contemporaneous staff emails during the halt (Exhibit 51), and the post-halt investor complaints (Exhibit 46), the Exhibit 50 meeting records confirm that the Commission's failure was not one of ignorance or inadvertence. It was a conscious choice to evade Rule 19b-4. That choice eviscerated the statutory safeguards designed to prevent precisely the kind of opaque and arbitrary action that occurred here.

## E. THE FAILURE TO FILE WAS A CONSCIOUS EVASION OF STATUTORY SAFEGUARDS

The cumulative record demonstrates that the omission of a Rule 19b-4 filing was not an administrative oversight. Investors had alerted the Commission months before the halt to risks of market manipulation and failures in trade reporting (Exhibit 47). Senior SEC and FINRA officials then met repeatedly and discussed Section 19(b) and Rule 19b-4 in the weeks preceding the halt (Exhibit 50). During the halt itself, internal emails acknowledged that trading access was being curtailed without the procedural protections that would ordinarily attach (Exhibit 51). And after the halt, waves of investor complaints documented precisely the harms those protections were intended to prevent (Exhibit 46).

These records show a clear through-line: advance warnings, direct knowledge of the filing requirement, coordinated implementation without compliance, and devastating consequences for

---

[4] *DL Capital Group, LLC v. NASD*, 409 F.3d 93, 97 (2d Cir. 2005) ("Failure to comply with the filing requirements of Section 19(b) renders the action ultra vires and void.").

investors. The statutory framework Congress designed was meant to ensure that such a sequence could not unfold in the dark. By deliberately bypassing the filing requirement, the Commission and FINRA stripped investors of transparency and due process, while arrogating to themselves a discretionary authority the law does not confer.[5]

The result is not a matter of technical noncompliance, but a structural failure that vitiates any claim of immunity or discretion. Where the Exchange Act mandates a filing and agencies instead elect to act in secrecy, their conduct falls outside the statutory authority delegated to them and is therefore ultra vires.

## F. THE SEC'S OWN CORRESPONDENCE CONFIRMS KNOWLEDGE OF THE HALT'S IMPACT AND YET IT EVADED RULE 19B-4

The Commission cannot plausibly contend it lacked awareness of the market impact caused by the MMTLP halt. Internal communications in Exhibit 48 show staff circulating drafts under the subject line "MMTLP complaints—what is going on" as the halt unfolded, acknowledging both the volume of complaints and the unprecedented character of the freeze. These were not perfunctory updates. They were discussions explicitly recognizing that thousands of investors were locked into positions without the ability to exit, and that congressional offices were already demanding explanations.

Exhibit 51 demonstrates that this recognition extended to the highest levels of SEC and FINRA leadership. "Monthly Catchup" meetings during and after the halt brought together SEC Division

---

[5] *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18–19 (1979) (explaining that where Congress imposes specific procedural conditions for regulatory action, "failure to adhere to those conditions renders the action unauthorized and unlawful").

of Trading and Markets heads with FINRA's CEO, General Counsel, and Head of Market Regulation. The agenda included MMTLP complaints and the status of the halt, confirming that senior officials were not merely briefed but were actively managing the fallout in coordination.

Even more striking, Exhibit 50 contains internal SEC references to Section 19(b) and Rule 19b-4 contemporaneous with these events. These citations, placed in memoranda alongside analysis of settlement exposures and FINRA notices, show that staff were actively invoking the very statutory provision that required a public filing. The juxtaposition is damning: regulators were internally discussing Rule 19b-4 even as they chose to allow the halt to proceed without any filing or public process.

These records prove that the Commission was not ignorant of its obligations. It was aware of the extraordinary nature of the halt, it knew Rule 19b-4 governed such a change, and it nonetheless chose to proceed by private coordination rather than lawful filing. That choice was not an exercise of discretion—it was an evasion of nondiscretionary statutory duties.

## G. INVESTOR HARM WAS FORESEEABLE AND CONFIRMED BY COMPLAINTS AND WHISTLEBLOWER WARNINGS

The SEC cannot escape responsibility by characterizing the fallout from the halt as unforeseen. The record demonstrates that widespread investor harm was not only predictable but was directly communicated to the Commission in advance. Exhibit 47 contains a whistleblower report submitted in 2021 that specifically warned of abusive short selling in MMTLP's predecessor security and predicted catastrophic losses if regulators failed to act. The whistleblower emphasized that the absence of transparency in trade reporting created conditions for manipulation and systemic risk. This was a clear warning more than a year before the halt.

Exhibit 46 then shows that as the halt took effect, investors immediately flooded the SEC with complaints documenting precisely the type of harm predicted. These communications detailed blocked access to sell positions, forced losses, and concerns that short positions would remain unresolved. Far from isolated gripes, these complaints formed a consistent pattern across thousands of submissions, including formal inquiries from members of Congress relaying the same concerns on behalf of their constituents.

The SEC's internal responses, reflected in Exhibits 48 through 51, confirm that staff knew the volume and substance of these complaints, that the allegations of manipulation and reporting failures were serious, and that investor losses were mounting daily. Yet the Commission continued to defer to FINRA without requiring the filing that Rule 19b-4 mandated.

This combination, an early whistleblower warning (Ex. 47), direct investor harm communicated contemporaneously (Ex. 46), and internal staff acknowledgment (Exs. 48–51), demonstrates that investor harm was not an unintended consequence. It was a foreseeable and documented result of the SEC's choice to tolerate a halt implemented outside lawful procedure. That choice deprived investors of the transparency, accountability, and due process that the Exchange Act was designed to guarantee.[6]

## I. NONDELEGATION AND DUE PROCESS VIOLATIONS FLOWING FROM THE HALT

---

[6] *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), aff'd sub nom. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Curran*, 456 U.S. 353 (1982) (recognizing that regulatory failures to police abusive trading practices directly cause investor harm and that courts may grant relief to protect investors from systemic manipulation).

The record not only shows that the MMTLP halt was implemented without the required Rule 19b-4 filing, but that the process by which it was imposed violated core constitutional protections. The Exchange Act entrusts self-regulatory organizations with limited, statutorily defined authority, but it does not permit FINRA or the Commission to bypass Congress's procedural safeguards by delegating unchecked authority over market access. When FINRA cut off trading in MMTLP without filing and the SEC sanctioned this action through private coordination rather than public rulemaking, both entities crossed from statutory discretion into ultra vires conduct.[7]

This framework is fatal under the nondelegation doctrine. Congress cannot delegate to a private body, such as FINRA, the power to alter trading rights without intelligible principles or procedural guardrails. Rule 19b-4 is the mechanism Congress supplied to cabin that delegation. By ignoring that procedure, FINRA's halt became a private lawmaking act of precisely the kind the Supreme Court has condemned. The Commission's acquiescence in that process entangles the government itself in unconstitutional delegation.

Due process compounds the defect. Investors were stripped of their ability to trade a registered security without notice, opportunity to be heard, or even the basic transparency of a published filing. Exhibits 46 through 51 confirm that the Commission and FINRA were fully aware of the stakes, internally acknowledging investor complaints, congressional scrutiny, and whistleblower warnings both before and after the halt. Yet none of this awareness translated into the procedural

---

[7] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (invalidating a delegation where private actors were granted unchecked authority over commerce, emphasizing that Congress cannot confer legislative power on entities without procedural standards or safeguards).

protections the Constitution demands. Investors were subjected to a closed-door decision that locked their property without any of the safeguards guaranteed by law.[8]

This is not a marginal technicality. The entwinement revealed in the FOIA record demonstrates that the SEC and FINRA coordinated substantively on messaging, legal framing, and ongoing market fallout while never invoking the statutory procedures meant to ensure fairness. That combination; private rulemaking, absence of intelligible principles, and deprivation of hearing rights; amounts to a textbook violation of both the nondelegation doctrine and due process. The Court cannot allow the SEC and FINRA to insulate such conduct under the guise of discretion or immunity when the result was the removal of a public market by private fiat.

# III. THE SEC FAILED TO FULFILL ITS OVERSIGHT DUTIES UNDER THE EXCHANGE ACT AND APA

The SEC's reply argues that Plaintiff's claims are unreviewable and barred by sovereign immunity, but this position ignores the Exchange Act's text, binding precedent, and the specific duties Congress imposed. This case does not challenge SEC policy in the abstract. It challenges the SEC's discrete failure to enforce Rule 19b-4 against FINRA when FINRA halted MMTLP trading without the required filing. That failure is judicially reviewable, caused concrete harm, and remains redressable.

### A. The Exchange Act Required SEC Oversight

 Section 19 of the Exchange Act requires self-regulatory organizations to file a proposed rule

---

[8] *Londoner v. City & Cnty. of Denver*, 210 U.S. 373, 385 (1908) (due process requires that when government action deprives individuals of property, affected parties must receive notice and an opportunity to be heard).

change with the SEC before implementing any new rule or practice that affects market

participants. 15 U.S.C. § 78s(b). The SEC is charged with reviewing such filings and approving

or disapproving them. Id. §§ 78s(c)–(d). This statutory framework was designed to prevent SROs

from acting unilaterally in ways that alter investor rights.[9] See *Sparta Surgical Corp. v. NASD*,

159 F.3d 1209, 1213 (9th Cir. 1998). When FINRA halted MMTLP without filing, the SEC's

duty to enforce this requirement was triggered. The SEC's silence allowed FINRA to bypass the

very safeguards Congress intended.

### B. The SEC's Inaction Is Reviewable Under the APA

The APA provides a cause of action to "compel agency action unlawfully withheld." 5 U.S.C. §

706(1). Courts have long recognized that when an agency has a nondiscretionary duty, judicial

review is available.[10] See *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007); *Norton v. S. Utah

Wilderness Alliance*, 542 U.S. 55, 64 (2004). The SEC cannot insulate its inaction by labeling it

discretionary. The duty to review and enforce compliance with Rule 19b-4 is mandatory, not

optional. SEC officials had actual notice of investor complaints and internal red flags

documented in Exhibits 46–51, yet deferred entirely to FINRA. That abdication of oversight is

precisely the type of "failure to act" the APA makes reviewable.[11]

---

[9] *Standard Inv. Chartered, Inc. v. FINRA*, 637 F.3d 112, 115 (2d Cir. 2011) ("Section 19(b) is the exclusive mechanism by which an SRO may implement rules or practices affecting the investing public.").

[10] *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("A refusal to act that is based on the mistaken belief that the agency lacks jurisdiction is reviewable under the APA."); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (APA § 706(1) applies to discrete, mandatory duties, not programmatic challenges).

[11] *Public Citizen v. FTC*, 869 F.2d 1541, 1556 (D.C. Cir. 1989) (holding that judicial review is appropriate where an agency fails to take a discrete action it is legally required to take, distinguishing such failures from broad programmatic attacks).

**C. Sovereign Immunity and Standing Do Not Bar Relief**

The SEC's reliance on sovereign immunity and standing doctrine is misplaced. Plaintiff does not seek to second-guess broad policy or programmatic decisions. The relief sought is narrowly tailored: a declaration that the SEC's failure to enforce Rule 19b-4 against FINRA was unlawful, and that its abdication of oversight caused concrete injury. The harms suffered; loss of liquidity, destruction of market value, and deprivation of disclosure; are traceable to the SEC's failure to intervene and are redressable by judicial order. See *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (private delegation without oversight unconstitutional); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (state action found where government is entwined with private actors). Here, the SEC's entwined relationship with FINRA makes its silence actionable.[12] The APA and Exchange Act strip away sovereign immunity for this discrete failure.

**D. Conclusion of Section III**

The Exchange Act and APA together create a clear oversight duty that the SEC failed to perform. Its reply cannot erase statutory obligations or judicial precedent. The SEC's refusal to enforce Rule 19b-4 review in the face of known violations and investor harm is reviewable, redressable, and unlawful.

# IV. CONCLUSION

---

[12] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) ("Entwinement will support a finding of state action when the nominally private entity is pervasively intertwined with governmental policies."); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (private delegation of coercive power is unconstitutional).

The SEC's reply seeks to reframe this case as an impermissible attack on broad regulatory discretion. That framing fails. Plaintiff's claims target a narrow and unlawful failure: the SEC's refusal to enforce Rule 19b-4 and its abdication of mandatory oversight duties under the Exchange Act and the APA when FINRA halted MMTLP trading without a required filing. Exhibits 46–51 demonstrate that the SEC was on notice of investor complaints, market manipulation, and internal awareness of irregularities, yet chose to defer entirely to FINRA. That abdication of oversight is not shielded by sovereign immunity, nor is it insulated from review.

The Exchange Act requires transparency and Commission review before any self-regulatory organization alters market access. FINRA bypassed that framework, and the SEC allowed it to do so. This Court's review is not barred because Plaintiff does not challenge discretionary policymaking but seeks to compel compliance with nondiscretionary statutory duties. *Massachusetts v. EPA* and *Norton v. SUWA* make clear that such failures are reviewable.[13]

The SEC's attempt to dismiss these claims would leave investors without recourse against the very harms Congress intended to prevent. Judicial oversight here preserves the rule of law, protects the integrity of the securities markets, and ensures that regulators cannot avoid accountability by recasting statutory obligations as matters of unfettered discretion.

For these reasons, Plaintiff respectfully requests that the Court deny the SEC's Motion to Dismiss.

Respectfully submitted,

 Dated: August 17, 2025

---

[13] *Massachusetts v. EPA*, 549 U.S. at 533; *Norton v. SUWA*, 542 U.S. at 64 (courts compel agencies to fulfill mandatory statutory duties rather than allow abdication cloaked as discretion).

**/s/ Jason Todd Rolo**
Jason Todd Rolo
Plaintiff, Pro Se
L6 Surrey Lane
Torrington, CT 06790
(413) 657-9082
mastcab@yahoo.com


## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2025, a copy of the foregoing was filed electronically with the

Clerk of Court using the CM/ECF system. Notice of this filing will be sent by email to all

counsel of record by operation of the Court's electronic filing system

**/s/ Jason Todd Rolo**
Jason Todd Rolo
Plaintiff, Pro Se
L6 Surrey Lane
Torrington, CT 06790
(413) 657-9082
mastcab@yahoo.com